1   Meghan Pratschler
2   CA Bar No.: 324970
3   Meghan the Attorney, LLP
4   95 3rd St. 2nd Floor
5   San Francisco, CA 94103-3103
6   meghan@meghantheattorney.com
7   (415) 335-9226

8   -and-

9   Casey Scott McKay
10  TN Bar No.: 034028
11  MC Law, PLLC
12  1441 U St. NW, Suite 712
13  Washington, DC, D.C. 20009
14  202.743.1972
15  casey@mclaw.io

16  *Attorneys for Defendant TRRS Magnate, LLC dba Hydra Cup*

17   **IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN**
18   **DISTRICT OF CALIFORNIA**

19   – – – – – – – – – – – – – – – – – – – – – – – – – – – –X

20   **TROVE BRANDS, LLC D/B/A THE**
21   **BLENDERBOTTLE COMPANY**

22                *Plaintiff,*

23                                        **Case No: 2:22-cv-02222-TLN-CKD,**

24                *v.*

25   **TRRS MAGNATE LLC D/B/A HYDRA CUP,**

26                *Defendant.*

1

1   – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

2   **DEFENDANT HYDRA CUP'S OPENING CLAIM CONSTRUCTION BRIEF**

3   COMES NOW, Defendant TRRS Magnate LLC d/b/a Hydra Cup ("Hydra

4   Cup"), by and through counsel, submits its Opening Claim Construction Brief for

5   U.S. Patent No. D510,235 (the "D235 Patent"), U.S. Patent No. D696,551 (the "D551

6   Patent"), and U.S. Patent No. D697,798 (the "D798 Patent") (collectively the

7   "Asserted Patents") in this patent infringement action filed against Hydra Cup by

8   Plaintiff Trove Brands, LLC d/b/a the BlenderBottle Company ("BlenderBottle").

9   The Asserted Patents cover designs for shaker bottles and lids used for mixing,

10  drinking, pouring, storing, and transporting various contents. Notwithstanding that

11  the designs for the bottles and lids being used by Hydra Cup that BlenderBottle

12  accuses of infringing the Asserted Patents have been available to consumers in the

13  United States before BlenderBottle filed its patent applications and that proof of

14  which was provided to BlenderBottle, each of BlenderBottle's Asserted Patents'

15  claims is dictated by function. Hydra Cup respectfully requests limiting the scope of

16  the design patents to non-functional features as well as features not claimed by

17  prior art. As explained more fully below, the court should adopt Hydra Cup's

18  proposed constructions in full.

19                    **TABLE OF CONTENTS**

2

1   TABLE OF AUTHORITIES

2

3   FACTS

4   -   A. Nature and Stage of the Proceedings.

5   -   B. The Asserted Patents and Accused Products.

6       •   *1. The D551 Patent.*

7           -   a. Practicing Products.

8           -   b. Accused Products.

9       •   *2. The D235 Patent.*

10          -   a. Practicing Products.

11          -   b. Accused Products.

12      •   *3. The D798 Patent.*

13          -   a. Practicing Products.

14          -   b. Accused Products.

16  LEGAL STANDARD

17  -   I. DESIGN PATENT CLAIM CONSTRUCTION IS A MULTI-STEP PROCESS.

18      •   A. Intrinsic Evidence.

19          -   1. Claims.

20          -   2. Specification.

21          -   3. Prosecution History.

22      •   B. Extrinsic Evidence.

23  -   II. CLAIM CONSTRUCTION'S ROLE IN DESIGN PATENT INFRINGEMENT

24  SUITS: THE MODIFIED ORDINARY OBSERVER TEST.

25      •   A. Relics of the Point-of-Novelty Test Persist in the Modern

26          Modified Ordinary Observer Test.

27          -   *1. Claim Construction Includes Functionality Screening to*

28              *Identify the Non-Functional Aspects of the Design.*

29              •   a. Functional Screening Aligns with the Fundamental

30                  Goal of Claim Interpretation, Does Not Alter the

31                  Fundamentals of Design Patent Infringement

32                  Analysis, and Aligns With the Principles of Patent

33                  Public Policy.

3

1      -   *2. Claim Construction Includes Analyzing the Designs in the*
2          *Context of Prior Art.*
3      -   *3. Verbal Descriptions are Allowed in Design Patent Claim*
4          *Construction.*
5      -   *4. Claim Construction by Written Description is Proper.*

7      ARGUMENT
8      -   I. THIS COURT SHOULD ADOPT HYDRA CUP'S PROPOSED CONSTRUCTION
9          FOR THE 'D551 PATENT'S CLAIM BECAUSE IT FOLLOWS FEDERAL CIRCUIT
10         PRECEDENT.
11     •   A. Hydra Cup's Proposed Construction of the 'D551 Patent's
12         Claim.
13     •   B. The Scope of the 'D551 Patent's Claim is Limited by the
14         Functional Elements of the Design and the Functional Purpose of
15         the Design as a Whole.
16     -   *1. The Overall Design of the Lid Design Covered by the 'D551*
17         *Patent is Dictated by Function.*
18     -   *2. Each Design Element of the 'D551 Patent is Dictated by*
19         *Function.*
20     •   a. The Lid's Domed-Body Design Covered by the
21         'D551 Patent Represents the Best Design for Optimal
22         Functionality.
23     •   b. The Lid's Circular-Screw-Top-Base Design Covered
24         by the 'D551 Patent Represents the Best Design for
25         Optimal Functionality.
26     •   c. The Lid's Brackets Design Covered by the 'D551
27         Patent Represents the Best Design for Optimal
28         Functionality.
29     •   c. The Lid's Flip-Top-Cap Design Covered by the
30         'D551 Patent Represents the Best Design for Optimal
31         Functionality.
32     •   d. The Lid's Spout and Spout-Guard Designs Covered
33         by the 'D551 Patent Represents the Best Designs for
34         Optimal Functionality.

1       &bull; e. The Lid's Carry-Loop Design Covered by the 'D551
2        Patent Represents the Best Design for Optimal
3        Functionality.
4     - II. THIS COURT SHOULD ADOPT HYDRA CUP'S PROPOSED CLAIM
5      CONSTRUCTION FOR THE 'D235 PATENT BECAUSE IT FOLLOWS FEDERAL
6      CIRCUIT PRECEDENT.
7      &bull; A. Hydra Cup's Proposed Claim Construction for the 'D235 Patent.
8      &bull; B. The Scope of the 'D235 Patent's Claim is Limited by the Overall
9       Functional Purpose of the Design Dictated by its Overall
10      Functionality and Each Individual Functional Design Element
11      Compromising the Overall Design.
12      - *1. The Overall Design of the BlenderBottle D235 Patent is*
13       *Primarily Dictated by Function.*
14      - *2. Each Design Element Comprising the Overall Design*
15       *Covered by the 'D235 Patent is Dictated by Function.*
16       &bull; a. The Bottle-Body Design Covered by the 'D235
17        Patent Represents the Best Design for Optimal
18        Functionality.
19       &bull; b. The Ribbed-Grip-Bottle-Sides Design Covered by
20        the 'D235 Patent Represents the Best Design for
21        Optimal Functionality.
22       &bull; c. The Measurement-Markings-Tool Design Covered
23        by the 'D235 Patent Represents the Best Design for
24        Optimal Functionality.
25       &bull; d. The Bottle-Screw-Top-Head Design Covered by the
26        'D235 Patent Represents the Best Design for Optimal
27        Functionality.
28       &bull; *e. The Bottle-Bottom Design Covered by the 'D235*
29        *Patent Represents the Best Design for Optimal*
30        *Functionality.*
31       &bull; *f. The Bottle-Lid Design Covered by the 'D235 Patent*
32        *Represents the Best Design for Optimal Functionality.*
33    - III. THIS COURT SHOULD ADOPT HYDRA CUP'S PROPOSED CLAIM
34     CONSTRUCTION FOR THE 'D798 PATENT BECAUSE IT FOLLOWS FEDERAL
35     CIRCUIT PRECEDENT.

- • A. Hydra Cup's Proposed Construction of the 'D798 Patent's Claim.
- • B. The Scope of the 'D798 Patent's Claim is Limited by the Functional Elements of the Design and the Functional Purpose of the Design as a Whole.
  - - *1. The Overall Design of the 'D798 Patent is Dictated by Function.*
  - - *2. Each Individual Element in BlenderBottle's D798 Patent is Dictated by Function.*
    - • a. The Container-Bottle-Body Covered by the 'D798 Patent Represents the Best Design for Optimal Functionality.
    - • b. The Container-Measurement-Markings-Tool is Primarily Functional.
- - IV. DOZENS OF UTILITY PATENTS DESCRIBE THE FUNCTIONALITY OF THE DESIGNS CLAIMED BY THE ASSERTED PATENTS.
- - V. THE SCOPE OF THE ASSERTED PATENTS' CLAIMS IS LIMITED BY DESIGN PATENT PRIOR ART.
  - • A. Design Patent Prior Art.
  - • B. The Accused Products Were Designed Based on Similar Designs Disclosed by Other Patents and Therefore the Asserted Patents' Claims Should be Narrowly Construed in the Context of the Prior Art and Infringement Allegations.
    - - *1. The Accused Products Were Designed Based on the D029 and D047 Patents.*
      - • b. The Accused Products Modeled After the 'D047 Patent Do Not Infringe the 'D551 Patent.
      - • b. The Accused Products Modeled After the 'D029 Patent Do Not Infringe BlenderBottle's D798 Patent.
  - • C. The Accused Products are More Substantially Similar to Designs Disclosed by Other Patents that Cited the Asserted Patents as Prior Art.
    - - c. The Accused Products are More Substantially Similar to the 'D107 Patent than to the Asserted Patents.

1              -    d. The Accused Products that are More Substantially

2                        Similar to the 'D348 Patent than to the Asserted Patents

3                        are Not Infringing the Asserted Patents.

5    CONCLUSION

1     **TABLE OF AUTHORITIES**

2   **Opinions**

3   *Alloc, Inc. v. Int'l Trade Com'n*, 342 F.3d 1361 (Fed. Cir. 2003)

4   *Anheuser-Busch v. Crown Cork & Seal Techs.*, 121 Fed. Appx. 388 (Fed. Cir. 2004)

5   *Application of Zahn*, 617 F.2d 261, 263, 204 U.S.P.Q. 988 (C.C.P.A. 1980)

6   *Auto. Body Parts Ass'n v. Ford Glob. Techs., LLC*, 930 F.3d 1314 (Fed. Cir. 2019)

7   *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1563, 7

8   U.S.P.Q.2d (BNA)

9   *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371 (Fed. Cir. 2004)

10  *Best Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566, 40 U.S.P.Q.2d (BNA)

11  *Bonito Boats v. Thunder Craft Boats*, 489 U.S. 141 (1989)

12  *Contessa Food Prods, Inc. v. Conagra*, 282 F.3d 1370 (Fed. Cir. 2002)

13  *Crocs, Inc. v. International Trade Comm'n*, 598 F.3d 1294 (Fed. Cir. 2010)

14  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342 (Fed. Cir. 2005)

15  *David A. Richardson v. Stanley Works, Inc.*, 597 F.3d 1288 (Fed. Cir. 2010)

16  *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008)

17  *Egyptian Goddess, Inc. v. Swisa, Inc.*, Civil Action No. 3:03-CV0594-N (N.D.Tex.

18  Mar. 4, 2005)

19  *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312 (Fed. Cir. 2015)

20  *Goodyear T. R. v. Hercules T. R. Co.*, 162 F.3d 1113, 48 U.S.P.Q.2d 1767 (Fed. Cir.

21  1998)

8

1  *Gorham Company v. White*, 81 U.S. 511 (1871)

2  *Hupp v. Siroflex of America, Inc.*, 122 F.3d 1456 (Fed. Cir. 1997)

3  *In re Harvey*, 12 F.3d 1061 (Fed. Cir. 1993)

4  *In re Mann*, 861 F.2d 1581 (Fed. Cir. 1988)

5  *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350, 1354-55 (Fed. Cir.

6  2006)

7  *Keystone Retaining Wall Systems v. Westrock*, 997 F.2d 1444 (Fed. Cir. 1993)

8  *Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337 (Fed. Cir. 2020)

9  *Lanard Toys Ltd. v. Dolgencorp LLC*, 2019 WL 1304290 (M.D. Fla. Mar. 21, 2019)

10  *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186 (Fed. Cir. 1988)

11  *Litton Systems, Inc. v. Whirlpool Corp*, 728 F.2d 1423 (Fed. Cir. 1984)

12  *Marine Polymer Techs., Inc. v. Hemcon, Inc.*, 672 F.3d 1350 (Fed. Cir. 2012)

13  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996)

14  *McClain v. Ortmayer*, 141 U.S. 419 (1901)

15  *Minka Lighting, Inc. v. Pan Air Elec. Co.*, 93 Fed. Appx. 214 (Fed. Cir. 2004)

16  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014)

17  *OddzOn Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396 (Fed. Cir. 1997)

18  *Personalized Media Communications., L.L.C. v. Int'l Trade Comm'n*, 161 F.3d 696

19  (Fed. Cir. 1998)

20  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005)

21  *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298 (Fed. Cir. 1999)

1   *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306 (Fed. Cir. 2008)

2   *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992)

3   *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011)

4   *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288 (Fed. Cir. 2010)

5   *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510 (9th Cir. 1992)

6   *Seiko Epson Corp. v. Nu-Kote Intern., Inc.*, 190 F.3d 1360, 1368, 52 U.S.P.Q.2d

7   (BNA)

8   *Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d 1316 (Fed. Cir. 2016)

9   *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376 (Fed. Cir. 2011)

10   *W.Y. Industries, Inc. v. Kari-Out Club LLC*, 2011 WL 3841106 (D.N.J. 2011)

11   **Statutes**

12   5 U.S.C. § 302 35 U.S.C. § 171

13   **Regulations**

14   37 C.F.R. § 1.152

15   37 C.F.R. § 1.153 MPEP § 1501

16   MPEP § 1503

17   MPEP § 1504

18

1          **FACTS**

2    **A. Nature and Stage of the Proceedings.**

3          Hydra Cup submits its proposed claim constructions for the claims of the

4    Asserted Patents for this Court's consideration and adoption.

5          BlenderBottle filed its Complaint on 14 December 2023 and an Amended

6    Complaint on 03 March 2023, asserting that Hydra Cup infringes the Asserted

7    Patents as well as similar trade dresses. (Pls. Amend. Compl. (ECF No. 19)). Hydra

8    Cup filed its Answer and Counterclaims on 13 February 2023 and its Amended

9    Answer and Counterclaims on 17 March 2023. (*See* Defs. Amend. Answer (ECF

10   No. 21)).

11         The parties submitted their Fed. R. Civ. P. 26(f) report and discovery plan on

12   25 April 2023. (*See* Joint Rule 26(f) Report (ECF No. 23)). The Court considered the

13   parties' Joint Rule 26(f) Report and issued its Scheduling Order on 10 May 2023,

14   setting the briefing schedule for claim construction to begin on 30 November 2023.

15   (*See* Scheduling Order (ECF No. 29)).

16   **B. The Asserted Patents and Accused Products.**

17   ***1. The D551 Patent.***

18         The USPTO issued the U.S. Patent No. D696,551, titled "Bottle Lid Having

19   Integrated Handle" on 31 December 2013, based on an application filed on 07

1  September 2012. BlenderBottle asserts against Hydra Cup the sole claim of the

2  ’D551 Patent: “the ornamental design for a bottle lid with an integrated handle, as

3  shown and described.” ’D551 Patent. This claim is described by six drawings:



4  *Id.* at figs. 1-6.

5

6

7  **a. Practicing Products.**

8      BlenderBottle contends the following lids, shown below, embody the ’D551

9  Patent: BlenderBottle Classic, BlenderBottle Classic Replacement Lid,

1   BlenderBottle ProStak, and BlenderBottle ProStak Replacement Lid. (*See* Ex. 3,

2   Pls. Answers to Defs. Interrogs., No. 7, at 17.).

3   **BlenderBottle Classic and Classic Replacement Lid**



4   **BlenderBottle ProStak and ProStak Replacement Lid**



5

6

7   **b. Accused Products.**

8       BlenderBottle accused the following Hydra Cup lids of infringing the 'D551

9   Patent:



1  ***2. The D235 Patent.***

2      The USPTO issued U.S. Patent No. D510,235 on 04 October 2005, based on

3  an application filed on 09 September 2003. BlenderBottle asserts against Hydra

4  Cup the sole claim of the 'D235 Patent: "The ornamental design for a bottle, as

5  shown and described." 'D235 Patent. This claim is described by seven drawings:

6

7



1    *Id*. at figs. 1-7.

2    **a. Practicing Products.**

3          BlenderBottle contends its Classic Shaker Bottle and its BlenderBottle

4    ProStak Replacement Lid, shown below, embody the 'D235 Patent. (*See* Ex. 3, Pls.

5    Answers to Defs. Interrogs., No. 7, at 16.).

6    **BlenderBottle Classic and Classic Replacement Lid**



1  **BlenderBottle ProStak and ProStak Replacement Lid**



2  **b. Accused Products.**

3       BlenderBottle accused the following Hydra Cup shaker bottles and lids of

4  infringing the 'D235 Patent:

5



1   ***3. The D798 Patent.***

2         The USPTO issued U.S. Patent No. D697,798, titled "Container," on 21

3   January 2014, based on an application filed on 06 June 2013. BlenderBottle asserts

4   against Hydra Cup the sole claim of the 'D798 Patent: "The ornamental design for a

5   container, as shown and described." 'D798 Patent. This claim is described by eight

6   drawings:



1   *Id*. at figs. 1-8.

2   **a. Practicing Products.**

3        BlenderBottle contends its BlenderBottle ProStak and its BlenderBottle

4   ProStak Replacement Cup shown below embody the 'D798 Patent. (*See* Ex. 3, Pls.

5   Answers to Defs. Interrogs., No. 7, at 16.).

6   **BlenderBottle ProStak and ProStak Replacement Cup**

7



1    **b. Accused Products.**

2    BlenderBottle accused the following Hydra Cup shaker storage container

3    bottles of infringing the 'D798 Patent, which Hydra Cup also accused of infringing

4    the 'D235 Patent:

5    **Hydra Cup's Products Accused of Infringing the 'D798 Patent.**



6

8

1          **LEGAL STANDARD**

2    **I.     DESIGN PATENT CLAIM CONSTRUCTION IS A MULTI-STEP PROCESS.**

3          Claim construction is the first step in evaluating patent infringement.[1]

4    *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996); *Anheuser-Busch*

5    *v. Crown Cork & Seal Techs.*, 121 Fed. Appx. 388, 392 (Fed. Cir. 2004). Design

6    patent claim construction involves an interpretation of the scope of protection as a

7    matter of law. *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371,

8    1376 (Fed. Cir. 2004). Following the Supreme Court's decision in *Markman*, the

9    Federal Circuit held that proper claim construction requires a review of the patent's

10   intrinsic evidence and extrinsic evidence. *See Phillips v. AWH Corp.*, 415 F.3d 1303,

11   1317 (Fed. Cir. 2005) (en banc)).[2] Courts must review this evidence in the context of

12   the following three claim construction principles: (1) claims are given their ordinary

13   meaning to a person skilled in the art at the invention time;[3] (2) interpretations

14   should align with what was actually invented and the inventor's intent;[4] (3) courts

---

1    [1] The second step is to compare the accused device to the patent claim. *See Gorham Company v.*
2    *White*, 81 U.S. 511, 528 (1871); *Crocs, Inc. v. International Trade Commission*, 598 F.3d 1294, 1303-
3    04 (Fed. Cir. 2010); *Egyptian Goddess*, 543 F.3d at 672-76.

4    [2] The ITC follows these same claim construction rules in Section 337 proceedings involving patent
5    infringement. *See Alloc, Inc. v. Int'l Trade Com'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); 19 U.S.C. §
6    1337.

7    [3] *Phillips*, 415 F.3d at 1313-14

8    [4] *Renishaw PLC v. Marposs Societa'per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)

1  strive to maintain claims' validity, adhering closely to the patent's language and

2  specifications.[5]

3      This means courts must give each disputed claim for each Asserted Patent

4  the meaning it would have to a person of ordinary skill in the art at the time of the

5  invention. *See Phillips*, 415 F.3d at 1313. The courts must begin "th[is] decision-

6  making process by reviewing . . . the patent specification and prosecution history."

7  *Id.* at 1313. In construing design patents, courts consider both intrinsic and

8  extrinsic evidence with a particular emphasis on the patent's drawings and detailed

9  specifications. *Markman*, 52 F.3d at 979.

10  **A. Intrinsic Evidence.**

11      Intrinsic evidence includes the claims, the specification, and the prosecution

12  history. *Phillips*, 415 F.3d at 1314-17. Reviewing the disputed claim terms in light

13  of the intrinsic evidence is necessary because a person of ordinary skill in the art

14  ("POSITA") at the time of the invention is deemed to read the claim term in the

15  context of: (1) the particular claim in which the disputed term appears in a way that

16  makes sense in light of the overall claim language; and (2) the entire patent,

17  including the specification. *Id*. at 1313. As design patents typically are claimed as

18  shown in drawings, without any written description, the court's claim construction

19  must be adapted accordingly. *See Goodyear T. R. v. Hercules T. R. Co.*, 162 F.3d

20  1113, 116 (Fed. Cir. 1998) (citing 37 C.F.R. § 1.153(a)); 37 C.F.R. § 1.153(a).

---

1  [5] *See Marine Polymer Techs., Inc. v. Hemcon, Inc.*, 672 F.3d 1350, 1368 (Fed. Cir. 2012).

1  *1. Claims.*

2    Patent claim terms are generally given their ordinary and customary

3  meaning, which is the meaning they would have to a POSITA. *Phillips*, 415 F.3d at

4  1313-14. Although the majority of the material for construing a design patent will

5  come from the drawings of the design patent, other intrinsic evidence may, in some

6  cases, provide relevant evidence for construing a design patent.[6]

7  *2. Specification.*

8    The specification plays a crucial role in interpreting claims and is often

9  decisive when its description of the invention aligns closely with the proposed claim

10  interpretation. *Phillips*, 415 F.3d at 1316. Specifically, the specification helps in

11  claim construction by outlining the preferred or only embodiment of the invention,

12  distinguishing it from prior art, or by defining specific terms. *See id.* at 1313-15.

13  Yet, it's important to balance interpreting claims based on the specification without

14  wrongly limiting the claims to the embodiments described in it or deviating from

---

1  [6] For example, the title of the design can have relevance to construing the claimed design. *See, e.g.*,
2  *Application of Zahn*, 617 F.2d 261, 263, 204 U.S.P.Q. 988 (C.C.P.A. 1980) (title of design patent
3  "Shank of Drill Bit" would be taken together with the description of the figures to construe the
4  claimed design to be limited to only the shank of the drill bit and not the including the cutting
5  portion). *See also* 37 C.F.R. ¶ 1.153(a) ("The title of the design must designate the particular article.
6  No description, other than a reference to the drawing, is ordinarily required." In design patents, the
7  features shown by solid lines are claimed, while the features shown as broken lines are not claimed.
8  37 C.F.R. § 1.152 ("Design Drawings"); *Contessa Food Prods, Inc. v. Conagra*, 282 F.3d 1370, 1378
9  (Fed. Cir. 2002). In a design patent, all of the claimed ornamental features (those shown in solid
10  lines) must be considered, because "[a] patented design is defined by the drawings in the patent, not
11  just by one feature of the claimed design." *Id.* at 1378.).

1 the invention as presented in the specification. *Retractable Techs., Inc. v. Becton,*

2 *Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011).

3       Additionally, the specification's differentiation of the invention from prior art

4 and its listed advantages can guide the court in ensuring that claims reflect these

5 distinct aspects. *Inpro II Licensing, S.A.R.L. v. T-Mobile USA, Inc.*, 450 F.3d 1350,

6 1354-55 (Fed. Cir. 2006).[7]

7 ***3. Prosecution History.***

8       The prosecution history of a design patent may be relevant in construing the

9 scope of the claimed design. *Goodyear Tire*, 162 F.3d at 1116 (prosecution history

10 did not limit claimed design of tire tread to truck tires, but ordinary observer could

11 be limited to truck purchaser as a factual matter and not one of claim construction)

12 (abrogated by *Egyptian Goddess*, 543 F.3d at 672-76.). The prosecution history can

13 provide helpful information in determining proper claim scope, as the patentee may

14 have disclaimed certain claim interpretations during prosecution to overcome prior

15 art, which the courts should take into account when construing the claim terms

16 *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011).

---

1 [7] For instance, if the specification highlights the absence of components in the invention that are
2 present in prior art, claims may be interpreted to exclude those components. *See id.*; *see Phillips*, 415
3 F.3d at 1316-19.

1   **B. Extrinsic Evidence.**

2   Courts may include extrinsic evidence in their considerations, such as expert

3   testimony which provides insights into how those with technical expertise would

4   interpret patent claims. *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298,

5   1308-10 (Fed. Cir. 1999). It's often appropriate and even recommended for courts to

6   use reliable extrinsic evidence. *Markman*, 52 F.3d at 979; *see also Pitney Bowes*, 182

7   F.3d at 1309 (finding ("[e]xtrinsic evidence consists of all evidence external to the

8   patent and prosecution history, including expert and inventor testimony,

9   dictionaries, and learned treatises."). This approach helps ensure that the

10  interpretation of patent claims aligns with the clearly understood and commonly

11  accepted concepts in the relevant technical field. *See Pitney Bowes*, 182 F.3d at

12  1309-10. That said, courts also caution that this type of evidence should primarily

13  serve as background information and aid in understanding the relevant technology.

14  It should not be the sole basis for claim construction decisions. *See W.Y. Industries,*

15  *Inc. v. Kari-Out Club LLC*, 2011 WL 3841106, at *5 (D.N.J. 2011).

16  **II.   CLAIM CONSTRUCTION'S ROLE IN DESIGN PATENT INFRINGEMENT SUITS:**
17  **THE MODIFIED ORDINARY OBSERVER TEST.**

18  Although the Federal Circuit's rulings over the last two decades have shifted

19  the focus in design patent infringement tests to the ordinary observer test, it is a

20  modified ordinary observer test, integrating elements of the previous points-of-

21  novelty test into the ordinary observer test, emphasizing the importance of

24

understanding the differences between the claimed design and prior art. Courts
have also consistently highlighted the need to distinguish between functional and
non-functional elements in design patents, with the aim being to protect only the
ornamental, non-functional aspects. Consequently, design patent claims should be
construed narrowly by employing functional screening and contextual analysis
within the framework of prior art and infringement allegations. This approach is in
line with the overarching principles of patent law, aiming to protect the aesthetic
aspects of a design while ensuring functional elements are not unduly monopolized.

## A. Relics of the Point-of-Novelty Test Persist in the Modern Modified Ordinary Observer Test.

Over a century ago, the Supreme Court established that design patent
infringement occurs when, to an ordinary observer paying typical purchaser
attention, two designs appear substantially similar to the extent that one could be
mistaken for the other to induce the ordinary observer to purchase one supposing it
to be the other. *Gorham*, 81 U.S. at 528. Since then, the ordinary observer test has
evolved. *See, e.g.*, *Egyptian Goddess Inc.*, 543 F.3d at 674 (noting "[s]ubsequent
cases applied that principle, interpreting the ordinary observer test of *Gorham* to
require that the perspective of the ordinary observer be informed by a comparison of
the patented design and the accused design in light of the prior art, so as to enable
the fact-finder to determine whether the accused design had appropriated the
inventiveness of the patented design.").

1    In *Egyptian Goddess*, the Federal Circuit changed design patent claim

2    construction in three ways: first, the Federal Circuit overturned the points-of-

3    novelty test, and, instead, it held the Supreme Court's ordinary observer test as the

4    exclusive criterion for assessing design patent infringement; second, it cautioned

5    against offering detailed descriptions of design patent claims, warning of potential

6    biases towards certain features and the risk of losing focus on the design as a whole;

7    third, and important here, the Federal Circuit offered some directions on the

8    application of prior art in both claim interpretation and the "ordinary observer" test.

9    *See id*. at 672-76 ("We think, however, that *Litton* and the predecessor cases on

10   which it relied are more properly read as applying a version of the ordinary

11   observer test in which the ordinary observer is deemed to view the differences

12   between the patented design and the accused product in the context of the prior

13   art.").

14   Thus, in *Egyptian Goddess*, the Federal Circuit abolished the points-of-

15   novelty test, holding the ordinary observer test, in modified form, should be the only

16   test for design patent infringement. *Id*. at 674-76. And the modified form of the

17   ordinary observer test requires considering whether "an ordinary observer, *familiar*

18   *with the prior art designs*, would be deceived into believing the accused products are

19   the same as the patented design." *See Crocs, Inc. v. International Trade Comm'n*,

20   598 F.3d 1294 (Fed. Cir. 2010) (citing *Egyptian Goddess*, 543 F.3d at 675-76.). This

21   means relics of the points-of-novelty test, namely functional filtering and the prior

1    art consideration, live on in the modified ordinary observer test. *See id*. This means

2    design patent claim construction includes both functional screening and construing

3    the designs in the context of the prior art. *See id*.

4    ***1. Claim Construction Includes Functionality Screening to Identify the Non-***
5    ***Functional Aspects of the Design.***

6           Design patents are intended to protect the ornamental, non-functional

7    aspects of a product, as outlined. 35 U.S.C. § 171; *Auto. Body Parts Ass'n v. Ford*

8    *Glob. Techs., LLC*, 930 F.3d 1314, 1318 (Fed. Cir. 2019). Courts have continually

9    emphasized the necessity of distinguishing non-functional elements in a design

10   patent claim. *See, e.g.*, *OddzOn Prods.*, 122 F.3d at 1405 ("Where a design contains

11   both functional and non-functional elements, the scope of the claim must be

12   construed in order to identify the nonfunctional aspects of the design as shown in

13   the patent."); *see also Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293 (Fed.

14   Cir. 2010) (stating that the district court properly factored out the functional

15   features of the plaintiff's design as part of its claim construction). This distinction is

16   crucial since a design eligible for patent protection must be primarily ornamental

17   and not dictated by functional considerations. *See Ethicon Endo-Surgery, Inc. v.*

18   *Covidien, Inc.*, 796 F.3d 1312, 1328 (Fed. Cir. 2015).

19         The Federal Circuit has clarified that in design patent litigation, claim

20   construction involves identifying and separating the functional aspects of a design.

21   *See Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1342-44 (Fed. Cir. 2020)

1  (finding "the district court followed our claim construction directives to a tee"

2  because "in an effort to clarify the scope of the protected subject matter, the court

3  identified the functional features of the [patented pencil] design"). In construing the

4  claims of design patents, after first considering the drawings in the

5  specification,courts should next consider the "various features of the claimed design

6  as they relate to the accused design and the prior art. *Id*. at 1342.

7      Although the Federal Circuit has not provided a definitive test for

8  determining if a design is dictated by function, it has identified certain factors to

9  assist in that determination: (1) the presence of non-functional elements; (2) the

10  uniqueness of the design; (3) whether the design represents the best design; (4) the

11  impact of alternative designs on the article's utility; (5) touting with a promotional

12  emphasis on utility features; and (6) coverage by utility patents. *See Auto. Body*

13  *Parts Ass'n*, 930 F.3d at 1319; *Sport Dimension, Inc. v. Coleman Co., Inc.*, 820 F.3d

14  1316, 1320-22 (Fed. Cir. 2016).

15      Moreover, the Federal Circuit has highlighted that the potential for alternate

16  design methods and consumer appeal of a design do not inherently make a design

17  functional. *Auto. Body Parts Ass'n*, 930 F.3d at 1314. A design is considered

18  functional if it is essential to the use or purpose of the article. *Seiko Epson Corp. v.*

19  *Nu-Kote Intern., Inc.*, 190 F.3d 1360, 1368, 52 U.S.P.Q.2d (BNA) 1011 (Fed. Cir.

20  1999); *Avia Group Intern., Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1563, 7

1   U.S.P.Q.2d (BNA) 1548 (Fed. Cir. 1988). A design that is essential to the operation

2   or use of an article, therefore, cannot be the subject of a valid design patent. *Best*

3   *Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566, 40 U.S.P.Q.2d (BNA) 1048

4   (Fed. Cir. 1996).

5        While ornamental designs are challenging to describe verbally, claim

6   construction can still aid in guiding the evaluation of a design's scope, particularly

7   in differentiating between ornamental and functional features.[8] *See Egyptian*

8   *Goddess*, 543 F.3d at 679-680 (noting a detailed verbal claim constructions increase

9   "the risk of placing undue emphasis on particular features of the design and the

10  risk that a finder of fact will focus on each individual described feature in the verbal

11  description rather than on the design as a whole."). This approach is crucial in

12  ensuring that design patents adhere to their intended purpose of protecting the

13  aesthetic, non-functional aspects of a product.

14  **a. Functional Screening Aligns with the Fundamental Goal of Claim**
15  **Interpretation, Does Not Alter the Fundamentals of Design Patent**
16  **Infringement Analysis, and Aligns With the Principles of Patent Public**
17  **Policy.**

18       Functional screening in design patent claims is consistent with the core

19  objectives of claim construction, paralleling the principles applied in utility patents.

20  As established in *Markman* and later elaborated on by other cases, the clarity of

---

1   [8] Courts frequently rely on claim constructions, for example, to assist the fact finder ing
2   "distinguishing between those features of the claimed design that are ornamental and those that are
3   purely functional." *Egyptian Goddess*, 543 F.3d at 674-679 (citing *OddzOn Prods., Inc. v. Just Toys,*
4   *Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997)).

1  patent documentation is crucial. 517 U.S. at 373 (quoting *McClain v. Ortmayer*, 141

2  U.S. 419, 424 (1901)). This clarity is particularly vital in design patents, where the

3  distinction between ornamental and functional elements can be blurred. *See id*. at

4  375. Accurate claim construction in design patents, therefore, serves to interpret

5  ambiguous documentation and delineate the boundary between what is protected

6  and what remains in the public domain. *See id*. at 374-77.

7      And functional screening does not alter the basic principles of design patent

8  infringement analysis. Despite criticisms following *Markman* and *Elmer* decisions,[9]

9  the focus remains on protecting only non-functional, ornamental aspects of a design,

10  as previously underscored by the Federal Circuit. *See Keystone Retaining Wall*

11  *Systems v. Westrock*, 997 F.2d 1444, 1450 (Fed. Cir. 1993); *Lee v. Dayton-Hudson*

12  *Corp.*, 838 F.2d 1186, 1188 (Fed. Cir. 1988) ("design patent is limited to

13  ornamentation . . . [d]esign patents do not and cannot include claims to the

14  structural or functional aspects of the article."). The approach of comparing the

15  accused design with the verbalized claim, rather than the actual design, aims not to

16  restrict the scope of design patents but to ensure that similarities due to

17  unprotected functional aspects do not lead to erroneous findings of infringement.

---

1  [9] *See, e.g.*, Perry Saidman, The Crisis in the Law of Designs, 89 J. PAT. & TRADEMARK OFF.
2  SOC'Y 301, 327 (2007).

1 Cases like *Read*,[10] *Lee*,[11] and *OddzOn*[12] illustrate that this method does not

2 introduce a literal infringement test but rather refines the understanding of what is

3 legally protected, upholding the long-standing principle that functional elements

4 are not covered by design patents.

5       Distinguishing between functional and ornamental aspects in design patents

6 aligns with public policy goals that emphasize clear demarcations between different

7 forms of intellectual property. *See Bonito Boats v. Thunder Craft Boats*, 489 U.S.

8 141, 146 (1989) (quoting U.S. Const., Art. I., §8, cl. 8); *see also Sega Enterprises*

9 *Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1526-27 (9th Cir. 1992). This distinction is

10 crucial to maintain a balance between encouraging innovation and preventing

11 overreach that could hinder scientific and artistic progress. By employing claim

12 construction to differentiate between functional and ornamental aspects, the scope

13 of design patent protection is kept within appropriate bounds, avoiding the removal

14 of concepts from the public domain without the rigorous examination required for

15 utility patents. *See In re Mann*, 861 F.2d 1581, 1582 (Fed. Cir. 1988); *Minka*

16 *Lighting, Inc. v. Pan Air Elec. Co.*, 93 Fed. Appx. 214, 216 (Fed. Cir. 2004) (noting

17 "design patent scope is severely limited"). This approach, endorsed by the Federal

18 Circuit, is essential for an innovation-driven economy, ensuring that design patents

19 fulfill their intended purpose without encroaching on functional elements.

1 [10] *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992).

2 [11] *Lee*, 838 F.2d 1186.

3 [12] *OddzOn*, 122 F.3d 1405.

1  ***2. Claim Construction Includes Analyzing the Designs in the Context of***
2  ***Prior Art.***

3      The Asserted Patents' claims should be narrowly construed in the context of

4  prior art and infringement allegations.

5      In *Egyptian Goddess,* the Federal Circuit expressly emphasized that the

6  differences between the claimed design and the prior art remain relevant, but

7  instead of being considered as part of a separate test, the differences will now be

8  incorporated into the ordinary observer test. 543 F.3d at 680. Accordingly, this

9  Court should "point out various features of the claimed design as they relate to . . .

10 the prior art." *Lanard Toys*, 958 F.3d at 1342 (internal quotation and citation

11 omitted).[13] The *Lanard* district court, for example, considered prior art references,

12 both cited by the examiner and identified by the defendant, in its claim construction

13 analysis, and recognized "the overall appearance of [plaintiff's] design [wa]s distinct

14 from th[e] prior art only in the precise proportions of its various elements in relation

15 to each other, the size and ornamentation of [one design element], and the

16 particular size and shape of [another design element]." *Lanard Toys Ltd. v.*

17 *Dolgencorp LLC*, 2019 WL 1304290, at *12 (M.D. Fla. Mar. 21, 2019). And the

18 Federal Circuit in *Lanard* noted, "*as a matter of claim construction*, the district

19 court undoubtedly considered the points of novelty of the patented design over the

20 prior art," and "s[aw] *no error* in the district court's approach to claim construction."

---

1  [13] *See also Egyptian Goddess*, 543 F.3d at 680 ("point out . . . various features of the claimed design
2  as they relate to . . . the prior art").

1   958 F.3d at 1342-1344 (emphases added) (the district court "construed the claim

2   consistent with the drawings and pointed out the ornamental and functional

3   features of the design as well as the various features as they relate to the prior art"

4   *before* it "proceeded to the question of infringement"). Indeed, the scope of a design

5   patent claim must be viewed in the context of the prior art because design patents

6   only protect "new" and "original" designs. *See* 35 U.S.C. § 171 (a).

7   ***3. Verbal Descriptions are Allowed in Design Patent Claim Construction.***

8        There is no law forbidding verbal descriptions of design patent drawings. The

9   Federal Circuit in *Egyptian Goddess*, highlighted the discretion of district courts in

10   determining the detail level in such descriptions and noted the court's decision to

11   provide a detailed verbal description won't be considered an error unless it results

12   in prejudice. *Egyptian Goddess*, 543 F.3d 665, 679-80 (Fed. Cir. 2008) (en banc)

13   (emphasis added). In *Egyptian Goddess*, for instance, the district court's detailed

14   verbal description of the claimed design was found accurate and non-prejudicial. *See*

15   *Egyptian Goddess, Inc. v. Swisa, Inc.*, Civil Action No. 3:03-CV0594-N (N.D.Tex.

16   Mar. 4, 2005). Moreover, the Federal Circuit acknowledged that the effort put into

17   creating a verbal description might not always proportionately contribute to case

18   analysis. *Egyptian Goddess*, 543 F.3d at 679-80.

1    In some instances, preparing a verbal claim construction is even

2 recommended. *See id*. at 680.[14] Addressing issues like the role of design patent

3 drafting conventions, the impact of prosecution history, and differentiating

4 ornamental from functional features can be crucial. *Id*. (finding such crucial areas

5 include "describing the role of particular conventions in design patent drafting . . .

6 assessing and describing the effect of any representations that may have been made

7 in the course of the prosecution history . . . and distinguishing between those

8 features of the claimed design that are ornamental and those that are purely

9 functional.")

10    When a design includes both functional and ornamental elements, the court

11 may need to verbally distinguish these aspects.[15] As seen in *OddzOn* and

12 *Richardson*, courts must delineate non-functional elements within a design,

13 especially when functional elements are present. *OddzOn Products, Inc. v. Just*

14 *Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997) (finding "[w]here a design contains

15 both functional and non-functional elements, the scope of the claim must be

16 construed in order to identify the non-functional aspects of the design as shown in

17 the patent."); *David A. Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1294 (Fed.

18 Cir. 2010). The analysis in *Richardson* underscores that simply relying on drawings

---

1    [14] For example, a court might need to clarify design patent drawing conventions, such as the
2 interpretation of broken lines. *Id*.

3    [15] *See supra* Section III.A.1.

1  without verbal description may not suffice, particularly when identifying functional

2  components of a design. *See Richardson*, 597 F.3d at 1294.[16]

### 3  *4. Claim Construction by Written Description is Proper.*

4      Although a design patent is not required to have any written description,[17],

5  when a description is present, it can modify the scope of the claim in ways

6  somewhat more direct than is possible in a utility patent (short of providing

7  definitions for utility patent claim terms). *Id*. In fact, it is not unusual for a design

8  patent claim to recite "[t]he ornamental design for [article of manufacture], as

9  shown and described" as set forth in the present patents. *Id*.

10     There are several reasons a written description can be advantageous. First, a

11  written description can make clear that certain sets of drawings relate to separate

12  embodiments, effectively allowing for different scopes of the lone claim. *See* MPEP §

13  1504.05 ("The specification should make clear that multiple embodiments are

14  disclosed and should particularize the differences between the embodiments.").

15  Second, within these embodiments, the specification can make clear that certain

---

1  [16] stating "Richardson fails to explain how a court could effectively construe design claims, where
2  necessary, in a way other than by describing the features shown in the drawings. Richardson's
3  proposition that the claim construction should comprise nothing more than the drawings is simply
4  another way of arguing that the court erred by identifying the functional elements of the patented
5  article, and is therefore unavailing. We find no error in the court's claim construction.". *Richardson*,
6  597 F.3d at 1294.

7  [17] *See* 37 C.F.R. § 1.153(a) ("No description, other than a reference to the drawing, is ordinarily
8  required."); *Hupp v. Siroflex of America, Inc.*, 122 F.3d 1456, 1464 (Fed. Cir. 1997) ("A design patent
9  contains no written description; the drawings are the claims to the patented subject matter.");
10  Manual of Patent Examining Procedure (MPEP) § 1503.01.11

1  embodiments are dependent on the disclosure of other embodiments. *See* MPEP §

2  1504.05. Third, a written description can describe the views taken on by the

3  drawings, to avoid confusion as to the relationship between drawings. *See* MPEP §

4  1503.01.11. Examiners may, in fact, require such descriptions, including

5  specification of the angle of a particular view. A written description in a design

6  patent application can also provide material that claims or disclaims portions of the

7  design not shown in the figures, to provide antecedent basis for later amendments

8  during prosecution. *See* MPEP § 1503.01. Accordingly, the construction of written

9  descriptions in design patents is valid.

10        Thus, to summarize: claim construction for design patents must include a

11  comprehensive assessment of functionality, contextual understanding through prior

12  art, and the allowance of verbal and written descriptions of the claims.

13  Functionality screening is imperative to identify and separate the ornamental

14  aspects from the functional ones, adhering to the legislative intent of design

15  patents. This process ensures that the patent protection is limited to non-functional,

16  aesthetic elements, aligning with the principle that functionality should not be

17  monopolized through design patents. Furthermore, the interpretation of design

18  claims must consider the context of prior art to define the scope of novelty and

19  originality. This approach aligns with the Federal Circuit's guidelines, ensuring

20  that the claimed design is distinct from pre-existing designs and that the patent

21  does not overreach into the realm of common or functional designs. Lastly, the

1  inclusion of verbal and written descriptions in claim construction is crucial. These

2  descriptions provide clarity and context to the visual representations, particularly

3  in distinguishing between ornamental and functional aspects of a design. The

4  Federal Circuit acknowledges the importance of detailed verbal descriptions in

5  aiding the understanding of complex design elements and ensuring a

6  comprehensive evaluation of the patent claims.

7

1                                 **ARGUMENT**

2         Considering the principles of claim construction outlined above,[18] Hydra Cup

3 respectfully requests limiting the scope of the Asserted Patents to designs not

4 dictated by function and to designs not previously disclosed by prior art. Hydra Cup

5 therefore submits its proposed claim constructions for the claims of the Asserted

6 Patents and its reasoning justifying such constructions for this Court's

7 consideration and adoption.

8 **I.**    **THIS COURT SHOULD ADOPT HYDRA CUP'S PROPOSED CONSTRUCTION FOR**
9       **THE 'D551 PATENT'S CLAIM BECAUSE IT FOLLOWS FEDERAL CIRCUIT**
10       **PRECEDENT.**

11 **A. Hydra Cup's Proposed Construction of the 'D551 Patent's Claim.**

12   **.**

| D551 Patent's Claim | Hydra Cup's Proposed Construction |
|---|---|
| The ornamental design for a bottle lid with an integrated handle, as shown and described. | The ornamental design for a bottle lid with an integrated handle, as shown and described, with an overall design that is primarily dictated by functioning as a drinking, mixing, pouring, storing, and transporting article, with each individual design element primarily dictated by function as follows: (1) the lid's **Domed-Body** serves as a sturdy base for the other design elements and is designed and shaped primarily for functional reasons related to the optimal drinking, mixing, |

---

1  [18] *See supra* LAW, Sections I-III..

| D551 Patent's Claim | Hydra Cup's Proposed Construction |
|---|---|
|  | pouring, storing, and transporting of solid and liquid consumables; (2) the lid's **Screw-Top-Base** securely seals the lid to the shaker bottle, thereby enabling the lid to integrate with the shaker bottle to provide an overall useful article; (3) the lid's **Brackets** serve a functional role in attaching or securing the Carry-Loop and the Flip-Top-Cap to the lid; (4) the lid's **Flip-Top-Cap** is functionally designed for sealing and opening the Spout in a quick, easily accessible manner; (5) the lid's **Spout** and **Spout-Guard** are primarily designed for functional utility in filtering and allowing precision passage of liquid and promoting hygiene; and (6) the lids **Carry-Loop** is functionally purposed for ease of carrying and flexibility in attaching to external objects.<br><br>And both the overall functional design and each functional element are recognized as being dictated primarily by their functional nature, and, therefore, the Claim disclaims any ornamental design protection over these elements insofar as their design is dictated by function.<br><br>The Claim also acknowledges the existence of a wide array of prior art in the field of bottle lids with substantially similar designs. As such, the scope of protection sought is limited, focusing only on the unique, non-functional, and ornamental aspects of the design that distinctly set it apart from prior art. |

| D551 Patent's Claim | Hydra Cup's Proposed Construction |
|---|---|
|  | |

1

**B. The Scope of the 'D551 Patent's Claim is Limited by the Functional Elements of the Design and the Functional Purpose of the Design as a Whole.**

BlenderBottle's D551 Patent's design for a shaker bottle lid is a prime example of a design dictated by function on multiple levels. Not only is the overall design of the 'D551 Patent dictated by function, but every single design element comprising the lid design—i.e., the lid's Domed-Body, its Spout, its Flip-Top-Cap, its Spout-Guard, its Brackets, and its Carry-Loop—was crafted and optimized to fulfill specific functional needs in the best way possible, meaning the lid design is predominantly dictated by function at all design levels.

### 1. The Overall Design of the Lid Design Covered by the 'D551 Patent is Dictated by Function.

The overall design of the lid design covered by the 'D551 Patent is primarily dictated by function, focused on enhancing the lid design's overall practical uses.[19] At the highest level of functionality, the 'D551 Patent's lid design combines with BlenderBottle's various shaker bottle products to provide a functional utility for drinking, mixing, pouring, storing, and transporting various dry and liquid consumables.[20] Thus, the 'D551 Patent's lid design is not just a standalone feature; it works in tandem with the bottle to enhance its overall functionality and is an integral component that plays a crucial role in BlenderBottle's shaker bottle's functionality as a versatile, portable beverage container. This symbiotic relationship indicates that the lid's design is dictated by the need to complement and augment the bottle's utility.

Furthermore, the overall design of the lid, including its functional elements, is integral to its unique drinking and mixing functions. It ensures that when the

---

[19] BlenderBottle's utility patent for the exact same lid design that the 'D551 Patent covers describes the functional elements of the lid design. US 8,695,830, Detailed Description (filed 2012-09-11) ("This configuration facilitates the storage and handling of a container having lid. . . . Such bottles 107 can be used to store, carry, and/or mix ingredients of a beverage or other food product.").

[20] (*See* Ex. 10, Screenshot of BlenderBottle Touting Many Uses (March 2012) (showing its shaker being used to mix and pour salad dressing, pancacke batter, and eggs and touting the bottle's functional use a "food storage" container)); *see also* US 3,820,692, Abstract (filed 1973-04-16) (explaining a shaker bottle lid serves at least four functions: "The closure member 12 for vessel 10 and as seen in FIGS. 1-3, 5 and 7 has a four-fold function: namely as a removable, seal-tight closure for vessel or tumbler 10, secondly, as a capacity booster therefor; thirdly as an auxiliary feed mouth and dispensing spout for the vessel when the closure member 12 is in seal-tight engagement therewith; and fourthly to retain the blending element 14 in a substantially fixed position in the assembly.") (emphasis added).

1   bottle is shaken, the contents are mixed efficiently, without leakage, which is a key

2   selling point of a shaker bottle. Thus, it is important to highlight the 'D551 Patent's

3   lid design contribution to consuming and pouring functions as well as its role as a

4   functional secondary sealing mechanism. The lid's primary function is to ensure a

5   leak-proof seal. The threaded design along with the secure flip cap ensures that the

6   contents of the bottle remain inside, even when shaken vigorously. This is crucial

7   for a product designed to mix beverages.

8       Along similar lines the 'D551 Patent's lid design was designed to allow for

9   optimal ease of opening and closing. And its size and shape are dictated by the need

10  for a comfortable drinking experience while also being compatible with the internal

11  dimensions of the bottle for effective mixing. The user-friendly design of the lid,

12  with its grooved sides, allows for easy gripping and manipulation. This is

13  particularly important for users who may be handling the bottle with wet or

14  slippery hands. Furthermore, the 'D551 Patent's lid design allows user's to quickly

15  seal and unseal the lid without removing the entire lid, allows users to mix the

16  contents of the bottle without any risk of spillage or leakage, and allows optimal

17  drinking and pouring with minimal spillage. The lid also functions a mobile

18  drinking, mixing, storing, and pouring article, allowing users portability through

19  easy transporting of said article. The lid's comprehensive design, including its

20  robustness and leak-proof nature, makes the bottle suitable for storage and

21  transportation of liquids. And the choice of materials and the construction of the lid

42

1 are focused on durability and safety, ensuring that the lid withstands repeated use,

2 cleaning, and the stress of being used in a dynamic environment. The design

3 ensures that the bottle can be safely stored in various positions, carried in a bag, or

4 transported without the risk of leakage, which is essential for a portable beverage

5 container.

6     While the lid may have minimal ornamental aspects, its form is dictated by

7 the functional demands of a versatile beverage container. There are only so many

8 ways to provide so much functionality in a single article. BlenderBottle's 'D551

9 Patent's lid design prioritizes practically, indicating a function-first approach,

10 aiming to provide a convenient, durable, and effective solution for drinking, mixing,

11 pouring, storing, and transporting various contents, which is further evidenced by

12 each of the 'D551 Patent's design elements being dictated by function.

13 ***2. Each Design Element of the 'D551 Patent is Dictated by Function.***

14     Examining the purpose and utility of each of the 'D551 Patent's elements

15 shows that each element of the overall design is dictated by function. The functional

16 nature of each element in the lid design in the 'D551 Patent is further substantiated

17 and clearly articulated by its description in multiple utility patents predating the

18 'D551 Patent. And both Plaintiff and consumers have continually touted the 'D551

19 Patent's functionality over the years. This design, far from being merely aesthetic,

20 combines features for enhanced utility and effectiveness, including structural

1  integrity, ease of use, and portability. Each element serves a specific, practical

2  purpose, such as mixing, drinking, pouring, storing, locking and sealing—both by

3  lid and by cap—carrying, attaching, and portability. The design's functionality is

4  further supported by a wide array of prior art invalidating any claim of it being

5  purely ornamental.

6  **a. The Lid's Domed-Body Design Covered by the 'D551 Patent Represents**
7  **the Best Design for Optimal Functionality.**

8  The design of the lid's Domed-Body lacks elements that are purely

9  ornamental. Its dome, concave shape and construction are dictated by the need to

10  enhance mixing, ensure structural integrity, and provide ergonomic benefits. There

11  are no aspects of the Domed-Body's design that serve solely decorative purposes.

12  More specifically, the concave, domed shape lid is a deliberate design choice

13  that significantly improves structural integrity,[21] crucial for lids and bottles used in

14  vigorous shaking and mixing. This design not only enhances the lid's durability but

15  also offers several functional advantages, including distributing forces evenly across

16  the lid and reducing the risk of deformation under stress—a key factor for products

17  used in dynamic environments like gyms. The Domed-Body lid design significantly

18  improves the mixing capability, a core function of a shaker bottle. Its dome shape

---

1  [21] BlenderBottle's utility patent, the 830 Patent, for the exact same lid design further describes the
2  functional benefits provided by using certain composite materials over others: "Lid 100 can be
3  manufactured from materials that are sufficiently flexible to allow posts 104 a to deflect slightly
4  when flip top pivot 101 a is inserted, but sufficiently rigid to prevent handle 102 and flip top 101 from
5  being removed from mount 104 without significant force." U.S. Patent No. 8,695,830, Detailed
6  Description.

facilitates dynamic mixing, ensuring a uniform blend of liquids, powders, or

supplements and preventing powder accumulation in the corners of the lid and

bottle, a common issue with flat lids.[22] By promoting thorough mixing and efficient

incorporation of powders into the liquid, the domed shape proves essential for the

bottle's functionality. Without the bulbous Domed-Body on the lid, the bottle would

not be able to properly mix the contents.

Additionally, the domed shape aids in manufacturing by concealing

imperfections and ensuring stability,[23] further optimizing the lid's mixing

capabilities, hygiene, and ergonomics. This comprehensive approach to design

makes the Domed-Body integral to the lid's overall functionality, offering users an

optimal shaker bottle lid experience.

The ergonomic design of the Domed-Body lid enhances the comfort and ease

of use in the mixing system, as this design provides a better grip for opening and

closing the lid, a notable advantage when hands are wet or sweaty during workouts.

And the smooth surface of the Domed-Body on both sides is functional for ease of

cleaning and maintaining hygiene, which is crucial for a beverage container.[24]

---

[22] (*See id.*).

[23] *See, e.g.*, U.S. Patent No. 8,695,830, Detailed Description (filed on 2012-09-11, issued on 2014-04-15) ("In this manner, flip top 101, handle 102, and lid base 103 can be manufactured as separate components and easily assembled, thus simplifying the manufacture of lids 100.").

[24] (*See, e.g.*, Exhibit 5, Third Party Reviews of BlenderBottle Classic and ProStack (discussing the trials and tribulations of trying to maintain hygienic shaker bottles)).

1    Alternative designs, such as a flat lid, a raised lid with edges, or an angled

2  lid, would compromise the utility of the bottle.[25] A flat surface would be more prone

3  to warping and could lead to powder accumulation in the corners, making it harder

4  to mix thoroughly. The domed shape ensures that powders are effectively

5  incorporated into the liquid, thereby enhancing the mixing process. A flat lid could

6  also affect the bottle's stability when placed on surfaces, leading to potential

7  wobbling or instability. Even designs with raised lids in different shapes are not as

8  effective as the domed-body lid design. The more the shape of the design moves

9  towards straight lines rather than curves—e.g., triangular shaped lids—the less

10  effective the lid is at functioning as a mixer.

11    BlenderBottle's own advertising emphasizes the functional benefits of the

12  Domed-Body. As noted by BlenderBottle, "[m]aking smooth, lump-free protein

13  shakes every time [and] mix[ing] every last bit of powder" are essential functions to

14  any shaker bottle that can only be acheived with certain shapes of the bottles and

15  lids.[26] Touting features such as enhanced mixing capabilities, prevention of powder

16  accumulation, and ease of cleaning as key benefits of the 'D551 Patent's Domed-

17  Body lid design shows the design is appreciated and promoted primarily for its

18  functionality.

---

1  [25] *See, e.g.*, U.S. Patent No. 3,820,692, Description, (filed 1973-04-16) (describing how a lid's domed-
2  body design is specifically shaped like a dome to combine with the specifically shaped bottle "to
3  create the desired fluid flow patter therein.").

4  [26] (*See* Ex 9, Screenshot of BlenderBottle Classic Product Page.).

1       What's more, the Domed-Body integrates with the 'D235 Patent's overall

2    design to improve functionality. Its shape complements other features like the

3    Spout and Flip-Top-Cap, contributing to a cohesive design that enhances the

4    design's overall usability and efficiency. It is also important to note the Domed-

5    Body's functional integration with the lid and bottle's overall functional design.

6    While the Domed-Body design contributes to the overall sleek and modern

7    appearance of the lid, any ornamental value in the Domed-Body lid design covered

8    by the 'D551 Patent is merely a side effect of its functional design.

9       The functionality of the lid's Domed-Body is also confirmed by dozens of

10   utility patents, which in some instances predate the 'D551 Patent by many decades,

11   elaborating on the functional aspects of a lid designed with a domed-body,

12   underscoring that the Domed-Body design is primarily valued for its utility, not its

13   aesthetic value, and therefore is primarily dictated by function.

14      In summary, the lid's Domed-Body design covered by the 'D551 Patent is

15   primarily dictated by function, serving multiple functional roles, including

16   enhancing the mixing process, preventing powder accumulation, handling increased

17   volume and pressure, contributing to the bottle's durability, and providing

18   ergonomic benefits.

**b. The Lid's Circular-Screw-Top-Base Design Covered by the 'D551 Patent Represents the Best Design for Optimal Functionality.**

The lid's Circular-Screw-Top-Base design covered by the 'D551 Patent, including its threading and the shape, are also primarily dictated by function, namely the need to provide a secure and adjustable seal. The simplicity of the design, governed by the limited ways to effectively create a threaded lid, further supports its functional nature. (*See* Ex. 12, Jovčevska et al., at 26 (noting a "screw cap would be a good option when pouring powdered substances is needed . . . [and] for a bottle which has needs of a wider neck, a regular screw cap would be applied.")). The Circular-Screw-Top-Base design is a functional choice ensuring a leak-proof seal, durability, ease of use, and adjustable tightness. This design, aligning with industry standards, is essential for securing the lid to the bottle, particularly beneficial for active lifestyles.

The lid's ability to securely attach to the bottle is vital. The Circular-Screw-Top-Base, with its broad shoulder around the lid's Domed-Body, not only facilitates a secure attachment but also aids in ease of drinking. These elements are crucial for the lid and shaker bottle's functionality, impacting the overall user experience. The screw mechanism's primary function is to create a tight seal, preventing leaks, especially important for active users.[27] Its threading ensures a secure fit, outperforming other closure mechanisms like snap-on lids in durability and

---

[27] *See, e.g.*, U.S. Patent No. 3,820,692, Description, (filed 1973-04-16) (describing the importance of the Circular-Screw-Top-Base's "grooved edge to engage the rim of the container member in a seal-tight relationship."

1  reliability. Moreover, the threaded design necessitates deliberate action to open,

2  reducing the risk of accidental opening in dynamic settings like gyms or during

3  travel. This feature adds a layer of reliability to the bottle, catering to the needs of

4  users in various environments. And this intuitive design is user-friendly, allowing

5  for easy opening, closing, and tightness adjustment to suit various needs. Its

6  standardized threading potentially allows interchangeability with other bottles,

7  adding to its practicality.

8         Considering the limited ways to create a domed shape lid that can achieve

9  the same functionality, the Circular-Screw-Top-Base design is primarily dictated by

10  function. Moreover, it is the optimal design for ensuring a secure, leak-proof seal,

11  crucial for a shaker bottle intended for active use. This design not only allows for a

12  tight fit but also provides durability, reflecting its primary function of securely

13  attaching the lid to the bottle to enable the harsh use expected of a mixing

14  apparatus. Its broad, flat lip around the Domed Body further facilitates both mixing

15  and ease of drinking, emphasizing its functionality. Alternative lid top base closure

16  mechanisms, such as snap-on, flip-top, or suction-based lids, do not offer the same

17  level of security and durability as the screw-top design.[28] These alternatives are

18  prone to wear and degradation, leading to a decreased lifespan and increased risk of

---

1  [28] *See, e.g.*, U.S. Patent No. 8,833,586 (filed 2010-04-16) (stating "because the cap snaps over a spout
2  opening and is secured by tension/friction, the flip top closure is not as secure as a screw-type
3  closure. . . . Because flip top closures open and release through upward pressure, manufacturers
4  have not attached handles to the flip tops for fear that carrying the container/bottle by the handle
5  would create upward pressure on the flip top and cause the flip top to open at an unwanted time.
6  Therefore, to date, integrated handles have been attached directly to the containers/bottles
7  themselves and/or to non-flip top closures and portions thereof such as to screw lids.").

1  leaks, significantly impacting the bottle's utility. Not to mention they simply would

2  not work for a shaker bottle and its lifetime of continual shaking and mixing. More

3  importantly, the Circular-Screw-Top-Base is integral to the lid's overall function as

4  a closure for a mixing and drinking apparatus. It works in conjunction with other

5  functional elements to provide a leak-proof, airtight seal allowing users a cohesive

6  and efficient user experience in operating their shaker bottle.

7       Thus, to summarize, the Circular-Screw-Top-Base on the lid covered by the

8  'D551 Patent is fundamentally functional. Its design, dictated by the need for a

9  secure, adjustable, and durable seal, is essential for the bottle's utility, especially in

10  active and dynamic environments. This functionality is underscored by the

11  potential presence of utility patents, the focus of advertising on practical benefits,

12  and the absence of non-functional design elements.

13  **c. The Lid's Brackets Design Covered by the 'D551 Patent Represents the**
14  **Best Design for Optimal Functionality.**

15       The design of the Brackets on the lid design covered by the 'D551 Patent,

16  characterized by a cylindrical rotating middle enclosed within two concave-shaped

17  brackets on each side, is a prime example of form following function and such a

18  design is primarily dictated by said function. This specific design is crucial for the

19  lid's overall functionality, making it superior to alternative bracket designs.

20       The cylinder in the middle of the Brackets serves as a pivot point for both the

21  Carry-Loop and the Flip-Top-Cap. This design allows smooth and effortless rotation,

1  essential for the ease of opening the Flip-Top-Cap and the flexibility of the Carry-

2  Loop. The cylindrical shape is optimal for reducing friction and wear, ensuring,

3  durability, longevity, and reliability. The concave shape of the Brackets on either

4  side provides a secure enclosure for the cylindrical pivot. This shape is crucial for

5  maintaining the structural integrity of lid as a whole, especially to the pivot

6  mechanism, and to enduring frequent openings and closings of the Flip-Top-Cap

7  and regular movement of the Carry-Loop, all while maintaining structural integrity

8  and ensuring that the Carry-Loop and Flip-Top-Cap remain attached to the lid even

9  under continual use or stress.[29] On a related note, the design is ergonomically

10  sound, providing ease of use without unnecessary bulk while providing robust

11  structural integrity. The efficient use of material in this design adds to the overall

12  lightness and portability of the lid and bottle, which is vital for a product designed

13  for active lifestyles. The Brackets are designed to offer a balance between strength

14  and flexibility: They need to be sturdy enough to support the weight of a full bottle

15  and withstand the repeated action of flipping the cap open and closed, yet flexible

16  enough to allow smooth movement—striking such a balance is not a design decision.

17      The D551 Patent's design for Brackets is clearly superior to all alternatives.

18  Without a pivoting mechanism, for example, the Brackets would restrict the

---

1  [29] *See, e.g.*, U.S. Patent No. 8,833,586 (filed 2010-04-16) (discussing the important of a durable,
2  robust, structure to mount the Brackets and Flip-Cap-Top on a similarly designed lid: "Because flip
3  top closures open and release through upward pressure, manufacturers have not attached handles to
4  the flip tops for fear that carrying the container/bottle by the handle would create upward pressure
5  on the flip top and cause the flip top to open at an unwanted time. Therefore, to date, integrated
6  handles have been attached directly to the containers/bottles themselves and/or to non-flip top
7  closures and portions thereof such as to screw lids.").

1  functionality of both the Carry-Loop and Flip-Top-Cap. A rigid or non-pivoting

2  design would make it difficult to open the Flip-Top-Cap or attach the bottle to bags

3  and other items, diminishing the product's usability. And alternative shapes, such

4  as straight or angular Brackets, could compromise the stability and smooth

5  operation of the pivot mechanism. The concave design ensures that the cylindrical

6  middle remains securely in place, providing a seamless and stable rotation.

7       Finally, as with every other functional element of the lid design covered by

8  the 'D551 Patent, the Brackets design is integrated into the overall lid design of the

9  'D551 Patent, complimenting the lid's overall design, increasing functionality and

10  adding to its practicality without compromising on aesthetics. Without the

11  Brackets, neither the Flip-Top-Cap nor the Carry-Loop would be adjustable and,

12  thus, would fail to properly function; thus, the lid's Brackets on the backside of the

13  lid are not only essential for the functioning of the Flip-Top-Cap, but the Brackets

14  also contain an additional latch connected to the lid's Carry-Loop.

15       Simply put, the design of the Brackets on the lid covered by the 'D551 Patent

16  is a clear testament to the principle of functionality dictating form. It is evident that

17  these Brackets are integral to the BlenderBottle's design, significantly contributing

18  to its functionality and user-friendliness. And it is evident that the Brackets design

19  covered by the 'D551 Patent is dictated by function.

**d. The Lid's Flip-Top-Cap Design Covered by the 'D551 Patent Represents the Best Design for Optimal Functionality.**

The 'D551 Patent's Flip-Top-Cap design is designed primarily for functionality, emphasizing practicality over aesthetics. The design plays crucial roles in the overall lid design's usability, including easy access, leak prevention, and durability, which are essential for a product often used in dynamic settings like gyms or during travel.

More specifically, the Flip-Top-Cap design enhances the bottle's functionality by offering quick and effortless access to the contents.[30] As noted by BlenderBottle in promoting the functionality of the Flip-Top-Cap, the Flip-Top-Cap allows users to maximize convenience.[31] Its design, focusing on providing an arm attached to the Brackets' pivoting mechanism and Spout-Guard, is optimized for one-handed use, crucial during activities like workouts. *See id.* Such a functional feature is not merely for convenience but is a fundamental aspect of the lid's functional design, as evidenced by its lack of purely ornamental elements. *Id.*

---

[30] (*See* Ex. 15, Sohnle, S., Braun-Munker, M., Ecker, F. (2016): A comparative study of various screw caps. Is there any correlation between the results of a target group study and instrumental measurement? Ernaehrungs Umschau, Vol. 63 (9), pp. 186-191. DOI: 10.4455/eu.2016.039 (noting the force required to open the lids should be balanced—it must be low enough to allow easy opening by all users, yet sufficient to hold up to the pressures of the bottles use and prevent the lid from accidentally popping open due to minor pressure from the liquid inside.)).

[31] (*See* Ex. 9, Screenshot of BlenderBottle Classic Product Page (advertising "[m]aximize your convenience at the gym with our StayOpen flip cap and adjustable carry loop! Our shaker cups feature an integrated StayOpen flip cap and an adjustable carry loop that lets you hold more when your hands are full, as well as offering a perfect spot to attach your keys.")).

1      And the integration of the Flip-Top-Cap with the lid's other features further

2    underscores its functional importance. It offers an alternative, faster way of

3    accessing the bottle's contents. It works in tandem with the Spout and Spout-Guard

4    to prevent the cap from getting lost, maintaining the bottle's effectiveness and

5    security. The Flip-Top-Cap also enables the Spout-Guard to serve as a protective

6    barrier for the drinking Spout, safeguarding it from external contaminants and

7    preserving hygiene.

8      Alternative designs for the Flip-Top-Cap, such as screw-top lids or non-

9    hinged caps, would compromise these functional benefits. They would not provide

10   the same level of convenience, especially in situations requiring quick access, nor

11   would they offer the same reliability in preventing leaks. And BlenderBottle's

12   advertising reinforces the functional importance of the Flip-Top-Cap's functional

13   design qualities, ease of use, and hygienic advantages, indicating that these

14   elements are primarily valued for their utility and therefore fundamentally

15   functional dictated by function.[32]

16      In summary, the Flip-Top-Cap is designed with practical and functional

17   considerations in mind, ensuring secure sealing, ease of access, hygienic protection,

18   integrated design, and durable material use, rather than merely being an

19   ornamental feature. Therefore, this Flip-Top-Cap design should be recognized for its

---

1   [32] *See, e.g.*, Ex. 9, Screenshot of BlenderBottle Classic Product Page (touting the functional benefits of
2   BlenderBottle's "StapOpen flip cap . . . that lets you hold more when your hands are full.").

1   functional role. *See In re Harvey*, 12 F.3d 1061, 1064 (Fed. Cir. 1993). Accordingly,

2   because the Flip-Top-Cap serves a functional purpose, because the focus is on what

3   these elements contribute to the design's overall ornamentation, and because of the

4   design's many functional elements and its minimal ornamentation, the overall

5   claim scope of the 'D551 Patent's claim is accordingly narrow. *See Sport Dimension*,

6   820 F.3d at 1323 (citing *Ethicon Endo–Surgery*, 796 F.3d at 1333-34 (endorsing a

7   "limited" claim scope for a design with functional elements)).

8   **e. The Lid's Spout and Spout-Guard Designs Covered by the 'D551 Patent**
9   **Represents the Best Designs for Optimal Functionality.**

10       The designs of the Spout and Spout-Guard on the 'D551 Patent's lid design

11   are functionally driven, optimizing the lid's usability for efficient liquid

12   consumption. (*See* Ex. 12, Jovčevska et al., at 25-26 (noting the importance of a

13   narrow spout on sport's bottles, "which ensures fast and easy drinking.")). These

14   designs are essential for the lid's effectiveness, particularly for thicker liquids like

15   shakes or smoothies, and they play a key role in enhancing user experience.

16   Emphasizing functionality, the Spout is ergonomically shaped to reduce contact

17   with external contaminants, crucial for usage in environments like gyms. Moreover,

18   the integration of the Spout and Spout-Guard with the lid is vital for preventing

19   spills and leaks, making it ideal for active use. (*See id*. at 25.).

20       Their design, including shape and size, is meticulously tailored to control

21   liquid flow, maintain hygiene, and ensure leak prevention, with no elements that

1  are extraneous to their function. This is evident in the design's focus on easy

2  sipping, particularly advantageous for consuming thick beverages. The Spout and

3  Spout-Guard's contribution to the lid's overall functionality is a central aspect of the

4  'D551 Patent's design, underscoring their indispensability in a portable shaker

5  bottle. (*See id*. at 25-27.).

6      The circular shape of the Spout-Guard on the Flip-Top-Cap that connects

7  with the Spout to seal the bottle is an optimal design for several reasons and is

8  crucial in the context of a shaker bottle used for mixing supplements. (*See* Ex. 12,

9  Jovčevska et al., at 24-26.). It is designed to be wide enough to allow easy pouring

10  and drinking but narrow enough to prevent chunks of supplement powder or the

11  spherical wire agitator from escaping, ensuring a smooth drinking experience

12  without interruptions or spillage. The Spout Guard's circular design provides a

13  uniform seal around the entire perimeter of the Spout, which is more effective in

14  preventing leaks compared to shapes with straight lines like squares or rectangles.

15  And the Spout-Guard's circular shape has no edges or corners, reducing the risk of

16  wear and tear and ensuring a longer-lasting seal. Alternative shapes like squares or

17  rectangles for the protrusion would not be as effective. Straight lines and angles

18  could create potential weak points where the seal might not be as tight, leading to

19  leaks. Additionally, these shapes might make the cap more difficult to open and

20  close quickly, reducing the bottle's overall efficiency and convenience. The circular

21  design of the Flip-Top-Cap's Spout-Guard facilitates quick and easy access to the

1   bottle's contents while ensuring a secure seal when closed. This functionality is

2   paramount in a shaker bottle, where frequent opening and closing are common, and

3   a tight seal is necessary to prevent spills during shaking.[33]

4        The Spout and Spout-Guard designs also allows for a more controlled flow of

5   liquid, reducing the risk of spills or splashes, which can be common when drinking

6   directly from a wide opening.[34]  This is particularly important for users who might

7   consume their drinks while in motion, such as during a workout or when walking.

8   Considering shaker bottles are primarily used for mixing supplements and

9   powdered drinks, it's clear the Spout is designed to facilitate the drinking of such

10  mixtures by, among other things, ensuring that the contents are easily consumable

11  without the need for additional utensils or pouring into another container.

12       It is also important to note the hygienic functionality of the Spout and Spout-

13  Guard designs, preventing contaminants from entering the bottle when the cap is

14  closed, aimed at promoting user safety.[35] Drinking directly from a Spout is generally

15  much more hygienic than drinking from the rim of a bottle, as the Spout can be

---

[33] (*See* Ex. 12, Jovčevska et al., at 26 ("For fast usage of the bottle, when the sportsman is in a hurry or has a limited amount of time to drink from the bottle, a hands-free solution is a good option, one that would unlock the cap within milliseconds. That could be done by implementing a pop top lid or a sports cap lid. The pop top lid ensures quick access while simultaneously doing other tasks. The sport's cap lid has the same objective as the pop top lid, and the main difference is the opening of the lid. The sport's cap lid has a hinge that has to be swung open.")).

[34] (*See* Ex. 13, Packaging Styles—Bottle Caps, *available at* https://www.liquidpackagingsolution.com/news/packaging-styles—bottle-caps (last visited 03 November 2023) (noting the Flip-Top-Cap is one of the best ways used to quickly seal or unseal access to the bottle)).

[35] (*See* Ex. 4, Screenshot of BlenderBottle ProStak Product Paage (touting its "SpoutGuard™ keeps your drinking spout clean")).

1    more easily protected from external contaminants.[36] Additionally, the Spout and

2    Spout-Guard designs can prevent direct contact with the lid's threading or other

3    parts that might be less clean. *See* Jovčevska et al., at 25 (stating "see-through

4    plastic, which is a very good solution for hygienic purposes and accidental

5    spillage."). The Spout and Spout-Guard's supreme ability to prevent the transfer of

6    germs compared to an open bottle is undeniably an essential function to the general

7    safety of the lid's users. *See id*. It is not for ornamentation, but to enhance user

8    interaction. Such designs are not designed for aesthetic display, but as a practical

9    solution to maintain cleanliness.

10        BlenderBottle's advertising highlighting the "pro-level SpoutGuard,"

11    underscores the functional aspect of the Spout. (*See* Ex. 9, Screenshot of

12    BlenderBottle Classic Product Page (last visited 22 November 2023).). As noted by

13    BlenderBottle, the 'D551 Patent's covered design for a Spout and Spout-Guard

14    "prevent[s] dirty gym fingers from touching the drinking surface." (*Id*.). By

15    promoting its ability to keep germs off the drinking surface and prevent spills, the

16    advertising implicitly acknowledges that the primary value of the Spout lies in its

17    functionality, particularly in terms of hygiene and spill prevention. (*See id*.).

---

1    [36] (*See, e.g.*, Ex. 8, Larson AJ, Haver S, Hattendorf J, Salmon-Mulanovich G, Riveros M, Verastegui
2    H, Mäusezahl D, Hartinger SM. Household-level risk factors for water contamination and
3    antimicrobial resistance in drinking water among households with children under 5 in rural San
4    Marcos, Cajamarca, Peru. One Health. 2023 Jan 3;16:100482. doi: 10.1016/j.onehlt.2023.100482.
5    PMID: 36655146; PMCID: PMC9841353. (finding that "drinking water samples collected from
6    narrow-mouthed containers were less likely to be contaminated than samples collected from the
7    faucet (OR = 0.55, p = 0.030) or wide mouthed containers.")).

1      The Spout's design represents the best functional design for its purpose.

2 Unlike a wide-mouth bottle, which can be likened to drinking from a bucket, the

3 Spout offers a practical and efficient means of consuming liquids, especially thicker

4 beverages like shakes or smoothies. This design addresses the specific requirements

5 of a shaker bottle, ensuring ease of drinking which is essential during physical

6 activities. The ergonomic design of the Spout is not an ornamental choice but a

7 practical solution for comfortable and easy sipping, tailored to the bottle's intended

8 use.

9      Alternative Spout and Spout-Guard designs significantly diminish the utility

10 of the bottle. A broader or differently shaped spout, for example, could lead to

11 difficulties in consuming thicker liquids and increase the risk of spills, especially

12 during movement such as walking or exercising. The current Spout and Spout-

13 Guard designs provide controlled flow and spill prevention, essential for the lid's

14 primary function as a portable drinking container. Any deviation from this design

15 would compromise these crucial functional aspects.

16      The Spout and Spout-Guard's functionality is also integral to the overall

17 design of the lid design covered by the 'D551 Patent. It works in conjunction with

18 the lid's other functional elements to facilitate the drinking and pouring, to ensure

19 the lid and bottle's contents are accessible and consumable directly from the lid as

20 well as ensuring precision placement in distributing the contents of the bottle. This

1    synergy between the Spout, Spout-Guard, and the other functional design elements

2    comprising the 'D551 Patent's lid design further emphasizes its role as a key

3    functional component to the 'D551 Patent's lid design rather than an ornamental

4    feature.

5    **f. The Lid's Carry-Loop Design Covered by the 'D551 Patent Represents the**
6    **Best Design for Optimal Functionality.**

7         The Carry-Loop design covered by the 'D551 Patent is primarily dictated by

8    function, serving practical purposes rather than merely being ornamental.

9         As noted by BlenderBottle, the Carry-Loop serves many important functions,

10   including, among other things, "let[ting] you hold more when your hands are full, as

11   well as offering a perfect spot to attach your keys." (*See* Ex. 9, BlenderBottle Classic

12   Product Page.). Simply put, without the lid's Carry-Loop design, the lid would not

13   function as intended by the user.

14        Perhaps most important, the 'D551 Patent's covered design for a Carry-Loop

15   enhances portability. The Carry-Loop is a key feature for enhancing the portability

16   of the lid and bottle "mixing system." It allows users to easily carry the lid and

17   bottle by hand or attach it to a bag, backpack, keys, or belt loop using a carabiner or

18   similar device.(*See, e.g.*, Ex. 9, Screenshot of BlenderBottle Classic Product Page

19   (promoting the functionality of the Carry-Loop design, advertising an "adjustable

20   carry loop that lets you hold more when your hands are full, as well as offering a

21   perfect spot to attach your keys.")). This is especially useful for people who are on

1   the go, such as athletes, hikers, gym-goers, mountain climbers, travelers, or any

2   other active individuals, providing a convenient way to transport the bottle without

3   needing to hold it constantly. On a similar note is the easy accessibility provided by

4   the Carry-Loop, making the lid and bottle more accessible. When attached to a bag

5   or belt, for example, the bottle is readily available for hydration, without the need to

6   rummage through a bag, which is particularly beneficial during activities such as

7   hiking, biking, or working out.

8        The inside outline of the Carry-Loop design is a prime example of functional

9   design, shaped to maximize efficiency and utility. This design, featuring concave

10  sides like an upside-down U (or upside-down bell) with straight-line sides and a

11  curved bottom is dictated by functional necessity, making it superior to alternative

12  designs. It is ergonomically designed to fit the natural curve of fingers and thumbs

13  and, thus, provides a comfortable, secure grip, reducing the strain on the user's

14  hand, which is especially beneficial when the bottle is full and heavy. And the

15  straight-line sides of the Carr-Loop's interior outline provide structural strength,

16  allowing for an even distribution of weight. This is crucial for a Carry-Loop, as it

17  often bears the full weight of the lid and attached bottle, especially when it's filled.

18  The curved bottom of the Carry-Loop design adds to this strength, preventing

19  deformation under load. The open part of the Carry-Loop offers flexibility in terms

20  of attachment options. Users can easily hook the bottle onto gym bags, backpacks,

21  or even their fingers, making it highly versatile for various carrying scenarios.

1    The Carry-Loop design disclosed by the 'D551 Patent is the best available

2    design for optimal functionality and is superior to all alternative designs. A closed

3    loop design, for instance, would restrict the ease of attaching the bottle to larger

4    hooks or handles. The open design of the 'D551 Patent's Carry-Loop design, on the

5    other hand, offers more versatility without sacrificing strength or functionality.

6    Along the same lines, alternative shapes, such as a fully circular or square loop,

7    might not offer the same ergonomic comfort, efficient weight distribution, or

8    structural integrity. The concave shape is uniquely suited to providing a

9    comfortable grip while maintaining structural integrity. And the design utilizes

10   material efficiently, providing maximum strength and functionality without

11   unnecessary bulk. This makes the bottle lighter and more practical to use,

12   especially important for a product meant to be portable and easy to carry. And the

13   connection to the 'D551 Patent's lid's Brackets is a key aspect of the design. This

14   integration ensures that the Carry-Loop remains firmly attached to the lid and

15   bottle, providing reliability and stability during transportation, and also contributes

16   to the overall structural integrity of the bottle.

17   The Carry-Loop design covered by the 'D551 Patent is the result of careful

18   consideration of function, ergonomics, and practicality. It outperforms alternative

19   designs by providing a comfortable, versatile, and durable solution for carrying the

20   lid bottle, making it evident that its design is dictated by function and is the best

21   available option for its intended purpose.

1    To summarize, the design of the 'D551 Patent for a shaker bottle lid

2  exemplifies functional-driven design at every level. Each component of the lid—the

3  Domed-Body, Spout, Flip-Top-Cap, Spout-Guard, Brackets, and Carry-Loop—is

4  meticulously engineered to meet specific functional requirements optimally. This

5  means that from its overall structure to the smallest detail, the lid's design is

6  primarily influenced by practicality and utility, making function the dominant

7  factor in its design process.

8   **II.   THIS COURT SHOULD ADOPT HYDRA CUP'S PROPOSED CLAIM**
9     **CONSTRUCTION FOR THE 'D235 PATENT BECAUSE IT FOLLOWS FEDERAL**
10     **CIRCUIT PRECEDENT.**

11    The entire design of the 'D235 Patent, as well as each of its individual

12  elements–the Bottle-Lid, the Bottle-Head, the Bottle-Screw-Top-Head, the Bottle-

13  Bottom, the Bottle-Front, the Bottle-Back, the Bottle-Sides, and the Measurement-

14  Markings-Tool–are dictated by function rather than ornamentation. Each of these

15  components plays a critical role in the bottle's functionality, specifically designed to

16  enhance the utility of the product for its intended purposes such as mixing, pouring,

17  storing, and transporting liquids. The functional nature of these design elements is

18  further corroborated by BlenderBottle's own marketing strategies, which

19  prominently highlight the practical benefits and innovative features of the bottle.

20  This promotion is not focused on aesthetic qualities but rather on the efficiency,

21  convenience, and effectiveness that these design elements bring to the user.

1   Additionally, customer feedback and testimonials consistently praise the functional

2   aspects of the bottle, emphasizing its practical utility in everyday use. Furthermore,

3   the functionality of each design element is also recognized in existing prior art

4   utility patents. These patents describe the utility and practical applications of

5   similar design elements, thereby reinforcing the argument that the BlenderBottle's

6   design is fundamentally functional. The D235 Patent's design approach aligns with

7   the product's purpose and is evident in how the product is marketed, received by

8   consumers, and reflected in related utility patents. Therefore, the design should be

9   viewed as dictated by function, positioning it outside the realm of purely

10   ornamental design patent considerations.

11   **A. Hydra Cup's Proposed Claim Construction for the 'D235 Patent.**

12   **.**

| Claim Term | Hydra Cup's Proposed Construction |
|---|---|
| The ornamental design for a bottle as shown and described in the image. | The ornamental design for a bottle, as shown and described, wherein the overall design and each individual design element are claimed as ornamental to the extent they are not dictated by their functional utility and wherein the Claim acknowledges the presence of functional elements primarily dictated by function as follows:<br><br>(1) the **Bottle-Body** is primarily designed for drinking, mixing, pouring, storing, and transporting; (2) the **Bottle** |

| Claim Term | Hydra Cup's Proposed Construction |
|---|---|
|  | **Ribbed-Grip-Sides** on both sides of the Bottle-Body are designed for enhanced grip and handling; (3) the **Volumetric-Measurement-Tool** and its translucent window, located on the back of the Bottle-Body, allow for measuring and viewing the bottle's contents; (4) the **Bottle-Screw-Top-Head** is functionally designed for securely sealing with the Bottle-Lid and facilitating the bottle and lid's overall functions of mixing, pouring, drinking, storing, and transporting; (5) the **Bottle-Bottom** is designed to provide structure, stability and support, as well as to enable the implementation of other functional elements; (6) the **Bottle-Lid** is essential for sealing and securing the bottle contents that enable the overall design to provide optimal drinking, mixing, pouring, storing, and transporting capabilities.<br><br>Both the overall design and each individual design element comprising the overall design, being primarily dictated by their functional nature, are not claimed for their ornamental design, and any protection is disclaimed over these designs dictated by function.<br><br>The Claim further acknowledges a broad array of prior art involving bottle and lid designs with substantial similarities and, therefore, the scope of protection is limited to the unique, non-functional, ornamental aspects that distinguish this design from existing designs in the prior art. |

| Claim Term | Hydra Cup's Proposed Construction |
|---|---|
|  | |

B. The Scope of the 'D235 Patent's Claim is Limited by the Overall
Functional Purpose of the Design Dictated by its Overall Functionality
and Each Individual Functional Design Element Compromising the
Overall Design.

*1. The Overall Design of the BlenderBottle 'D235 Patent is Primarily
Dictated by Function.*

The overall design covered by the 'D235 Patent is undeniably dictated by

function rather than ornamentation. This design, encompassing both the shaker

bottle and lid, is a product of careful consideration of the practical needs of active

users who require a dependable and efficient container for their nutritional drinks.

1       More specifically, the 'D235 Patent's design for a shaker bottle and lid, by its

2   very nature, is a quintessentially functional article. (*See* Ex. 12, Jovčevska et al., at

3   25 (finding the following functional elements most important to consumers of

4   exercise bottles: "better ergonomic features for easy and comfortable hand (finger)

5   placement, better way to decrease the slipping area and increase the friction area in

6   order to obtain better bottle's grip, a lip and cap for quick access and usage."))[37] At

7   its core, it serves as a versatile tool, facilitating a range of activities from mixing to

8   pouring and storage. *See id*. This multifunctionality is not just an add-on; it is the

9   essence of the 'D235 Patent's design. The integrated design elements are all

10  meticulously crafted to enhance its primary function as a mobile mixing and storage

11  apparatus. The D235 Patent lacks any design elements that are solely ornamental.

12  From the ergonomic body to the secure lid, each aspect serves a functional purpose,

13  contributing to the bottle's overall utility as a mobile mixing and storage tool.

14      The D235 Patent's lid and bottle design were optimized for functionality. The

15  design represents the most effective solution for its multifunctional purpose and its

16  integrated elements are engineered to facilitate activities like drinking, mixing,

17  pouring, pouring, storing, and transporting. (*See* Ex. 10, Screenshot of

18  BlenderBottle Touting Many Uses (March 2012)). Each component's design is not

---

[37] *See also* Ex. 19, Toscano, R. A., Herazo, J., Millan, R. R., Palma, H., Martinez, J., Approach methodology for the sustainable design of packaging through computational tools: Case study: Water bottles, Case Studies in Thermal Engineering, Vol. 16, pp. 1-11) (2019), *available at* https://doi.org/10.1016/j.csite.2019.100561; Ex. 20, Lovett, J., Engineering Design of a Disposable Water Bottle for an Australian Market, https://eprints.usq.edu.au/24673/1/Lovett_%202013.pdf and https://www.semanticscholar.org/paper/Engineering-design-of-a-disposable-water-bottle-for-Lovett/ e3a1118339d0621eac044ec678b44359b6158369 (last visited on 15 November 2023) (2013).

1   just an aesthetic choice but is optimized for practical utility, making it the best

2   design for these functions.

3        When considering alternative designs, it becomes clear that the 'D235

4   Patent's design is unrivaled in its functional superiority. (*See, e.g.*, Ex. 5, Screenshot

5   of BlenderBottle Touting Effective Results of Mixing System (04 May 2012) ("I can

6   vigorously shake one of those shakers for 20 minutes and not get results as effective

7   as 10 seconds with the Blenderbottle.")). Other designs may compromise on

8   efficiency, ease of use, or effectiveness in mixing and storing contents. The D235

9   Patent's design, however, with its unique combination of features, stands out as the

10   pinnacle of functional design in its category. And alternative designs would

11   significantly reduce the product's effectiveness. The D235 Patent's unique design,

12   including its ergonomic shape, durable materials,[38] and functional lid, provides an

13   unrivaled level of efficiency and ease of use. Any deviation from this design could

14   compromise the bottle's ability to effectively mix, store, and transport contents,

15   demonstrating the functional necessity of its current design.

16        The design covered by the D235 Patents is a clear example of functionality

17   dictating form. The integration of its functional elements is not a mere coincidence;

18   it is a deliberate design choice that makes the 'D235 Patent more than just a shaker

19   bottle and lid. It's a comprehensive tool designed for users who need a reliable,

20   efficient, and effective solution for their drinking, mixing, pouring, storing, and

---

1   [38] *See, e.g.*, Ex. 5, Screenshot of Customer Reviewing BlenderBottle Durability (July 2011).

1  transporting needs. The interdependence of its functional elements elevates the

2  'D235 Patent beyond a simple design for a shaker bottle and lid to an indispensable

3  tool for its intended use. Each element of the 'D235 Patent's design is crucial in

4  achieving the highest level of functionality. The shape of the bottle, the materials

5  used, the design of the lid—every detail is optimized for practical utility. And such

6  optimization is evident in how seamlessly each element works with the others,

7  creating a harmonious blend of efficiency and convenience.

8  *2. Each Design Element Comprising the Overall Design Covered by the*
9  *'D235 Patent is Dictated by Function.*

10  Each design element covered by the 'D235 Patent's design for a shaker bottle

11  and lid—i.e., the Bottle-Body, the Ribbed-Grip-Bottle-Side, the Bottle-Screw-Top-

12  Head, the Bottle-Head, the Bottle-Bottom, the Bottle-Front, the Bottle-Back, and

13  the Bottle-Lid—is dictated by function rather than ornamentation. Each of these

14  elements, designed with a specific purpose in mind, contributes to the overall

15  functionality of the 'D235 Patent's shaker bottle and lid design, ensuring it

16  effectively meets the practical demands of its users. From the ergonomic Ribbed-

17  Grip-Bottle-Side that enhances handling to the Bottle-Bottom designed for stability,

18  and from the Bottle-Screw-Top-Head facilitating controlled pouring to the Bottle-

19  Lid ensuring a leak-proof closure, every element serves a utilitarian purpose.

20  Together, these individual functional elements combine and integrate with the

21  other functional elements to form a shaker bottle and lid that is primarily

1  functional, with their collective design focusing on efficiency, usability, and

2  practicality as well as drinking, mixing, pouring, storing, and transporting, rather

3  than on mere aesthetic appeal.

4  **a. The Bottle-Body Design Covered by the 'D235 Patent Represents the**
5  **Best Design for Optimal Functionality.**

6  The design of the Bottle-Body covered by the 'D235 Patent, with its specific

7  shape, material choice, size, and integration with other functional elements, is

8  dictated by its utility. Each aspect of the design enhances the bottle's effectiveness

9  for its intended purposes, making it the best design for functionality compared to

10  alternatives. The Bottle-Body's primary role is to facilitate the containment, mixing,

11  pouring, storing, and transporting of liquids or dry items, embodying practicality in

12  its very structure. (*See* Ex. 12, Jovčevska et al., at 24-27.)

13  The design of the Bottle-Body, including the rounded front and back with flat,

14  straight-edge portions on the sides in the shape of a surfboard with ribbed gripping

15  ridges, serves specific functional purposes, includes effective mixing of contents,

16  providing a comfortable and secure grip,[39] and ensuring ease of handling and

17  transport. The material choice, such as high-quality, durable plastic, underscores

18  the bottle's intended use in active settings, prioritizing durability and safety.

---

1  [39] (*See* Ex. 12, Jovčevska et al., at 24 (stating "[t]he shape of the bottle is quite small, which makes it
2  easier to handle and transport . . . [and] [t]he curves of the design have a big impact on the
3  ergonomics, as well. However, that means that this bottle holds a smaller amount of liquid.)).

1    The Bottle-Body lacks purely ornamental design elements. Its ergonomic and

2    mixing-efficient shape, leak-resistant design, and stability-focused base affirm its

3    role as a utility-centric component.[40] And any aesthetic aspects it may have are

4    minimal at best; they do not detract from the designs functional attributes. The size

5    and proportions of the Bottle-Body are optimized for holding the necessary amount

6    of liquid without becoming too heavy or unwieldy, making it manageable and

7    transportable, and fitting into standard bottle holders.[41]

8    The choice of material for the Bottle-Body reinforces this functional

9    narrative.[42] High-quality, durable plastic is selected to withstand frequent use and

10   the physical demands of shaking and impacts—a material choice aligned with the

11   designs intended use in active settings, emphasizing durability and safety over

12   aesthetic appeal. Additionally, the Bottle-Body's base design enhances the bottle's

13   stability, preventing tipping and spilling in various environments, from gyms to

14   outdoor activities. This stability feature is a practical response to the dynamic use-

15   cases of the BlenderBottle.[43]

---

1    [40] "A practical water bottle would have to interact well with the user, be manageable and easy to
2    transport, as well as fit into the standard bottle holders (such as bike or car bottle holders)." (*See* Ex.
3    P, Jovčevska et al., at 27.).

4    [41] (*See* Ex. 12, Jovčevska et al., at 27 (finding that if "a bottle holds too little liquid it wouldn't do its
5    function properly, considering the user would either have to refill the bottle multiple times or to have
6    multiple bottles to save time . . . [and] [i]f a bottle holds too much liquid, its size and proportions
7    would be too big, resulting in a heavier bottle, one that is more difficult to handle.")).

8    [42] *See, e.g.*, U.S. Patent No. 3,820,692, Abstract, (filed 1973-04-16) (stating the "[bottle] is *preferably*
9    *made of an unbreakable material* such as the aforementioned *polyethylene* or similar material to
10   augment sealability with a [lid]").

1       Alternative designs would significantly impair the bottle's utility. A different

2  shape or material, for example, could compromise the bottle's durability, its ease of

3  use during physical activities, or its effectiveness in mixing contents. The current

4  design, with its ergonomic features and robust construction, is thus crucial for

5  maintaining the bottle's functional integrity. For example, not one of the alternative

6  designs BlenderBottle referenced in its Amended Complaint as '[e]xamples of

7  commercially available alternatives' is substantially similar to the design at issue in

8  this case. ( *See* Am. Compl, ¶ 38.). More importantly, each of the alternative design

9  offers inferior functionality. (*See id*.). Most of the alternative designs referenced by

10  BlenderBottle have a lids with a flat body, as opposed to a concave, domed body like

11  the lids at issue in this case. (*See id*.). As discussed above, the lid's Domed-Body

12  design is absolutely essential to optimal mixing capabilities as well as maintaining

13  optimal hygene and health and promoting a longer overall life for the lid and bottle.

14  (*See id*.). The only two alternative designs offering a domed lid body like the design

15  at issue in this case—the Huel Shaker Bottle and the Shakeshpere Tumbler—are

16  both inferior in several other ways. (*See id*.). The Huel Shaker's lid's domed body

17  takes up twice as much room as the lids at issue, leaving significantly less room for

---

[43] (*See* Ex. 16, Demirel, B., Daver, F. (2009): Optimization of poly(ethylene terephthalate) bottles via numerical modeling: A statistical design of experiment approach, *Journal of Applied Polymer*, Vol. 114, lasue 2, pp. 1126-1132 (noting the most commonly used material for exercise bottles is polyethylene terephthalate (PET)); *see also* Ex. 18, Kandikjan, T., Mircheski, I. (2020): Design with Plastics, Published by Faculty of Mechanical Engineering in Skopje (stating that polyethylene terephthalateis considered safe to use in food in the food industry.); *see also* Ex. 12, Jovčevska et al., at 26 (describing PET as "a clear, colourless, yet strong plastic with good mechanical, thermal and chemical properties, as well as dimensional stability . . . [and] resistant to moisture, alcohol, solvents, and impact," meaning, because PET is suitable and safe to use for humans, it is the preferred plastic to use in food and beverage packaging.)).

1    the bottle to hold contents. (*See id*.). And it does not have flip cap, or spout or many

2    other functional elements essential to optimal functionality. (*See id*.). And the

3    bottom fifth of the Shakesphere Tumbler's bottle body significantly tapers to narrow

4    the bottle base to roughly half the size of the rest of the bottle body. (*See id*.). Not

5    only does the Shakesphere Tumbler's narrow bottle base significantly decrease

6    mixing functionality by altering the fluid pressure, but it also means the bottle body

7    is much wider than the narrow bottle base and therefore less sturdy and more likely

8    to fall over. (*See id*.).

9        The Bottle-Body's design represents the most effective solution for its

10   functional requirements—drinking, mixing, pouring, storing, and transporting

11   liquids. This includes its ergonomic shape for ease of handling, material choice for

12   durability, and size to accommodate the necessary volume. Its design, emphasizing

13   utility over aesthetics, is tailored to meet the rigorous demands of its intended use.

14   And the Bottle-Body's design integrates seamlessly with other functional elements

15   covered by the 'D235 Patent like the lid and mixing mechanisms, enhancing its

16   overall practicality. The Bottle-Body's secure fit with the lid exemplifies its practical

17   design, prioritizing leak-resistance—a critical aspect of functionality for a portable

18   container. This feature alone distinguishes it from being merely an ornamental

19   aspect. Its compatibility with mixing mechanisms like a wire whisk ball is tailored

20   to ensure efficient mixing, a critical aspect for a shaker bottle. The functional nature

21   of the Bottle-Body design covered by the 'D235 Patent is further substantiated and

1  clearly articulated by descriptions in multiple utility patents predating the 'D235

2  Patent.

3      In conclusion, the Bottle-Body covered by the 'D235 Patent is a prime

4  example of functionality dictating design. Its material choice, ergonomic shape, and

5  overall design are integral to its effectiveness as a container for active lifestyles,

6  clearly demonstrating that its primary purpose is utility, not ornamentation.

7  Therefore, its design should not be considered within the scope of ornamental

8  design patent protection.

9  **b. The Ribbed-Grip-Bottle-Sides Design Covered by the 'D235 Patent**
10 **Represents the Best Design for Optimal Functionality.**

11     The Ribbed-Grip-Bottle-Sides design covered by the 'D235 Patent,

12 characterized by their unique surfboard shaped grips with five long grippable ridges

13 running from the bottom of the Bottle-Body almost to the Bottle-Lid, are designed

14 for functionality. In fact, this design is almost devoid of non-functional elements,

15 focusing solely on enhancing grip and usability. The ridges' shape, size, and pattern

16 are intentionally created to provide a secure, non-slip grip, crucial during the

17 physical activities for which the bottle is commonly used. The design choice of long,

18 thin ridges on the BlenderBottle Classic Shaker Bottle is not only functional but

19 also superior to other alternatives like dots or diagonal ridges. These ridges provide

20 better grip, ergonomic comfort, consistent traction, effective leverage for shaking,

1   durability, pleasing tactile feedback, and uniform pressure distribution, enhancing

2   the overall usability and efficiency of the bottle.

3          The primary function of the five long ridges is to provide a better grip. This is

4   especially important for a shaker bottle, as it is often used while in motion or at the

5   gym where hands might be sweaty. The long, thin ridges provide a more substantial

6   surface area for the fingers to grip compared to dots or smaller patterns. This

7   increased contact area results in better control, especially when shaking the bottle,

8   as the motion requires a firm, non-slip grip. The ridges prevent the bottle from

9   slipping out of the user's hand, ensuring safety and ease of use. Shaker bottles are

10  designed to mix the contents thoroughly, which often requires vigorous shaking.

11  The ribbed grip ridges provide additional leverage, making it easier to hold the

12  bottle securely during this process. This ensures that the user can shake the bottle

13  effectively without exerting excessive effort or losing grip. The ridges provide

14  excellent leverage for the shaking motion required to mix the bottle's contents.

15  Their length and positioning ensure that the force applied by the hand is effectively

16  transmitted to the bottle, facilitating efficient mixing. Alternatives like dots might

17  not provide the same level of leverage, potentially making the shaking process less

18  efficient.

19         These ridges distribute pressure uniformly across the hand, reducing the

20  likelihood of discomfort or pressure points that could occur with alternative designs

like dots, which might create localized pressure points. When the bottle is gripped

tightly, the ridges help distribute the pressure more evenly across the hand. This

reduces the stress on any single point of the hand, making it more comfortable to

hold the bottle for extended periods, especially when it's full and heavier. The ridges

also add to the structural integrity of the bottle. By reinforcing the sides, they can

help the bottle withstand impacts and drops, which are common in gym and outdoor

environments thus ensuring the bottle's longevity and reliability. Along similar

lines, if the bottle is used for hot liquids, the ridges can aid in dissipating heat,

making it more comfortable to hold without feeling too hot.

Along similar lines, the utility of the Ribbed-Grip-Bottle-Sides is also evident

from the ergonomic design. (*See* Jovčevska et al., at 24-27.) The parallel

arrangement of the ridges aligns well with the natural position of the fingers when

holding the bottle. (*See id*.). And the surfboard shape mimics the curvature of the

human hand, making it easier to grip, thereby reducing the chances of the bottle

slipping out of the user's hand, especially when the bottle is wet or the user's hands

are sweaty. This ergonomic alignment can reduce hand fatigue, making it more

comfortable to hold for extended periods, unlike diagonal ridges or dots that might

create uneven pressure points. The design ensures a comfortable and firm grip,

especially important when shaking the bottle to mix contents or drinking from it

during vigorous activities.[44] The continuous nature of the long ridges offers

---

[44] *See* Ex 12., Jovčevska et al., at 24 (noting a "bottle is panelled with rubber on both sides, so no
matter which side the hand is on, the rubber ensures the bottle won't slip from the user's hands.");

1    consistent traction along the length of the grip. In contrast, dots or shorter patterns

2    might provide inconsistent grip, leading to a higher likelihood of the bottle slipping,

3    especially when hands are sweaty or the bottle is wet. The absence of such grips

4    would significantly alter the bottle's utility, as alternative designs like smooth sides

5    would make the bottle more prone to slipping, thus reducing its practicality in

6    fitness and sports contexts. *See id*.

7         Furthermore, the specific design of the grip strips in the 'D235 Patent—long,

8    narrow, and extending almost the full length of the bottle—increases the surface

9    area for the user's grip, enhancing security during use. *See id*. This design is not

10   just beneficial but represents the optimal choice for a shaker bottle, given its

11   primary function of being shaken vigorously. *See id*. The surfboard shape of the

12   Ribbed-Grip-Bottle-Sides, being wider in the middle and tapering towards the ends,

13   offers a stable base for the bottle. This shape helps in distributing the weight of the

14   liquid evenly, reducing the likelihood of the bottle tipping over. Additionally, the

15   ridges add structural strength to the bottle, making it more durable against dents

16   and deformation. Long, thin ridges are likely to be more durable and resistant to

17   wear over time compared to dots or other patterns. They can withstand the constant

18   pressure and motion of gripping and shaking without significant degradation,

19   maintaining their functionality for a longer period. And the ridges provide

---

1    *See id*. at 27 (finding consumers favor bottles with ergonomic features that enhance grip
2    functionality and that it is essential for the main body of a sportsman's bottle should have an
3    ergonomically designed handling mechanism to ensure a comfortable and firm grip during use, as
4    well as offering better control when pouring or drinking from the bottle).

1 additional leverage. When shaking the bottle, the ridges allow for a firmer grip,

2 enabling more efficient mixing of the contents. This is particularly useful for

3 thoroughly mixing protein powders or supplements that tend to clump. And if the

4 bottle is used for hot beverages, the ridges can also aid in dispersing heat, making

5 the bottle more comfortable to hold.[45]

6      In conclusion, the Ribbed-Grip-Bottle-Sides covered by the 'D235 Patent, are

7 fundamentally functional. Their design is dictated by the need to provide a secure

8 grip, enhancing the bottle's safety and usability, particularly in active and dynamic

9 settings. As such, these design elements should be viewed as dictated by function,

10 and thus outside the scope of ornamental design patent protection.

11 **c. The Measurement-Markings-Tool Design Covered by the 'D235 Patent**
12 **Represents the Best Design for Optimal Functionality.**

13      The D235 Patent's Measurement-Markings-Tool design with a translucent

14 window, is dictated by function, not form. The design of the Measurement-

15 Markings-Tool on the 'D235 Patent's design is primarily driven by functionality.

16 The elongated shape, external placement, use of translucent material, and clear

17 visibility all serve to make the bottle more practical, durable, and user-friendly.

18 This design choice reflects a careful consideration of the needs of the users,

19 prioritizing accuracy, convenience, and longevity. These features are essential for

---

1 [45] BlenderBottle described the problem with bottle's being too hot or cold for users to comfortably
2 grip in its utility patent. U.S. Patent No. 8,833,586 (filed 2010-04-16) (describing how the
3 temperature of the bottle's contents and the condensation caused by the bottle's contents were issues
4 faced in engineering the design).

1   the bottle's practical use in accurately measuring and monitoring the contents,

2   crucial for health and fitness routines.

3        The Measurement-Markings-Tool and translucent window lack ornamental

4   elements, underscoring their functional purpose. And these features as

5   fundamental to the bottle's overall utility. (*See* Ex. 12, Jovčevska et al., at 25

6   (stating "see-through plastic, which is a very good solution for hygienic purposes

7   and accidental spillage.")). The Measurement-Markings-Tool provides precise

8   measurements for mixing supplements or liquids, while the translucent window

9   allows users to visually track the volume inside. *See id*. This design's elongated

10   shape allows for a wider range of measurements to be included on the bottle,

11   providing users with more options for precise measurements. Unlike shorter or

12   more compact designs, the elongated shape ensures that the markings are spread

13   out and easily readable, which is crucial for accurately measuring liquid

14   ingredients. *See id*. This combination is vital in contexts where exact quantities are

15   necessary, such as in dietary and hydration management. *Id*.

16        And placing the volumetric measurements on the exterior of the bottle is the

17   most practical design choice. This external placement ensures that the markings

18   are always visible, regardless of the contents or the level of the liquid inside the

19   bottle. If the markings were inside, they could be obscured by the contents, making

20   it difficult to measure accurately. The external placement and material choice

1   contribute to the durability of the markings. Being on the outside and made of a

2   resilient material, they are less likely to fade or wear off with time and use,

3   ensuring the bottle remains functional for a longer period. On a related note, having

4   the markings on the outside also makes the bottle easier to clean. Internal

5   markings could potentially trap ingredients or be eroded by repeated washing, but

6   external markings avoid these issues, maintaining their visibility and accuracy over

7   time. The use of a translucent material for the bottle is integral to the functionality

8   of the volumetric markings. It allows users to easily see the liquid level against the

9   markings, facilitating accurate measurement. A non-translucent or opaque material

10  would make it challenging to discern the exact liquid level, diminishing the

11  usefulness of the markings. The design of these markings takes into account the

12  ease and efficiency of use for the consumer. The clear, elongated markings on a

13  translucent bottle allow for quick and accurate measurements, improving the user

14  experience, especially in fast-paced environments like gyms or when preparing

15  meals.

16      BlenderBottle's marketing emphasizes these features' functionality,

17  promoting the Measurement-Markings-Tool for its precision and ease in achieving

18  health goals, clearly indicating the tool's practical importance over aesthetic appeal.

19  For example, BlenderBottle explains the functionality and importance of the

20  Measurement-Markings-Tool, stating the Measurement-Markings-Tool allows users

21  to "[g]et precise measurements every time. . . . [and] [o]ur easy-to-read

1  measurement markings allow you to add just the right amount of ingredients for

2  your smoothies, protein shakes, and more. Our shaker cups' measurement markings

3  make it easy to achieve your health goals." (*See* Ex 9, Screenshot of BlenderBottle

4  Classic Product Page.).

5        In summary, the designs for the Measurement-Markings-Tool and

6  translucent window featured in the 'D235 Patent are essential for the bottle's

7  functionality. Their presence in the bottle's design is not for decorative purposes but

8  for practical utility, making these elements fundamental to the bottle's

9  effectiveness. As such, they should be viewed as functional components, crucial to

10  the bottle's use, rather than elements of ornamental design eligible for design

11  patent protection. Such designs offer the most functional design solution. They are

12  not merely aesthetic enhancements but are practical tools that significantly improve

13  the bottle's utility. Without these features, the bottle would lose its effectiveness as

14  a tool for precise measurement and content monitoring, demonstrating their

15  indispensability for the bottle's intended use.

16  **d. The Bottle-Screw-Top-Head Design Covered by the 'D235 Patent**
17  **Represents the Best Design for Optimal Functionality.**

18        The Bottle-Screw-Top-Head's shape, threading, and size are all designed to

19  provide a secure seal with the lid. (*See* Ex. 12, Jovčevska et al., at 24-26.). This is a

20  purpose driven design, essential for the bottle's main functions such as spill-free

1   drinking, efficient mixing, and easy cleaning.[46]. The design lacks aesthetic value,

2   focusing instead on practical utility.

3        The extra-wide design of the mouth offered by the wide opening in the Bottle-

4   Screw-Top-Head is dictated by function. It enables easy filling, pouring, and

5   cleaning, addressing the practical needs of users, especially in situations where

6   quick and efficient access is necessary. And the precise engineering of the Bottle-

7   Screw-Top-Head's dimensions and threading ensures a leak-proof and secure

8   connection with the lid. This aspect of the design is critical for containing liquids,

9   especially during vigorous shaking, which is a common use-case for shaker bottles.

10       Accordingly, the design of the Bottle-Screw-Top-Head covered by the 'D235

11   Patent is primarily dictated by function. It is an integral component of the bottle

12   and lid design covered by the 'D235 Patent.

13   ***e. The Bottle-Bottom Design Covered by the 'D235 Patent Represents the Best***
14   ***Design for Optimal Functionality.***

15       The design of the Bottle-Bottom covered by the 'D235 Patent is

16   predominantly functional. The pill or stadium shape for enhanced stability, the

17   ergonomic grip facilitated by the Bottle-Sides, the functional protrusions for

18   improved surface grip, and the specific design choices of the Ribbed-Grip-Bottle-

19   Sides and Measurement-Markings-Tool all underscore the utilitarian nature of the

20   design. These elements, far from being merely aesthetic, are essential for the

---

1   [46] *See* Ex. 12, Jovčevska et al., at 25 ("The top is removable, for easier pouring, mixing and cleaning.")

1  bottle's primary functions of mixing, pouring, storing, and transporting, and are

2  echoed in BlenderBottle's own marketing. Therefore, it is clear that the design of

3  the 'D235 Patent's Bottle-Bottom is a product of practical necessity and utility, not

4  ornamentation.

5        More specifically, the Bottle-Bottom design detailed in the 'D235 Patent, is

6  driven by functionality. The unique pill or stadium shape of the Bottle-Bottom

7  enhances the bottle's stability and ergonomics. This design is crucial for preventing

8  tipping due to the bottle's tall body and facilitates easy gripping and handling. The

9  flat Bottle-Sides, when paired with this base shape, further contribute to its

10  ergonomic design.

11        Additionally, the protrusions at the bottom of the Bottle-Bottom, as shown in

12  figure 7 of the 'D235 Patent, are not just decorative but serve a practical purpose.

13  They improve the bottle's grip on surfaces, reducing the risk of slippage and spills.[47]

14  Altering these protrusions would negatively impact the bottle's functionality,

15  demonstrating their practical importance.

16        Furthermore, the Bottle-Bottom also influences the positioning of various

17  elements like the company's logo, the Measurement-Markings-Tool, and the grip

18  strips on the Bottle-Sides. The alignment of the gripped Bottle-Sides with the

19  straight sides of the Bottle-Bottom is essential for optimal handling. While the

---

1  [47] (*See, e.g.*, Ex. 9, BlenderBottle Classic Product Page (touting the functional benefits derived from
2  the Bottle-Bottom, stating the BlenderBottle Classic "shaker boasts a rounded base for better
3  mixing.")).

1  logo's placement might seem decorative, it aids in quick bottle orientation for brand

2  recognition and content measurement. The transparent Measurement-Markings-

3  Tool, strategically located for visibility, is designed for accurate measurement of

4  contents, as highlighted in BlenderBottle's advertising.[48]

5      When compared to alternative designs, the 'D235 Patent's Bottle-Bottom

6  design stands out for its combination of stability, durability, ergonomics, and

7  functional aesthetics. Other designs might prioritize one aspect over the others, but

8  the 'D235 Patent's Bottle-Bottom design achieves a balance that enhances the

9  overall user experience. Furthermore, the 'D235 Patent's Bottle-Bottom design is

10  designed to work in harmony with other features of the 'D235 Patent, such as the

11  grip strips on the sides and the wide mouth at the top. This cohesive design ensures

12  overall functionality and user-friendliness, making the bottle more than just a

13  container but a well-thought-out tool for hydration and nutrition. Moreover, the

14  functional nature of the Bottle-Bottom design covered by the 'D235 Patent is further

15  substantiated and clearly articulated by descriptions in multiple utility patents

16  predating the 'D235 Patent.

17      In conclusion, the 'D235 Patent's Bottle-Bottom design is predominantly

18  functional. Its stability-enhancing shape, ergonomic considerations, material

19  composition, and features like the Measurement-Markings-Tool and grip strips all

20  contribute to the bottle's practical usability and efficiency. Therefore, the design

---

1  [48] (*See id.*).

1    should be viewed as functional and integral to the bottle's utility, not merely

2    ornamental.

3    **f. The Bottle-Lid Design Covered by the 'D235 Patent Represents the Best**
4    **Design for Optimal Functionality.**

5          The Bottle-Lid design covered by the 'D235 Patent is fundamentally

6    functional in design, with its features and form dictated by practicality and utility,

7    making it an integral component of the bottle's efficiency and effectiveness in active

8    lifestyle contexts, rather than being a mere ornamental addition.

9          The lid design covered by the 'D235 Patent is substantially similar to the lid

10   design covered by the 'D551 Patent except the lid design in the 'D235 Patent does

11   not include a Carry-Loop.[49] Accordingly, Hydra repeats and incorporates herein by

12   reference each of its arguments in Section I, arguing that the overall design of the

13   lid design covered by the 'D551 Patent is dictated by function.[50]

14         In summary, the 'D235 Patent epitomizes functional design, specifically

15   crafted to serve the needs of users with active lifestyles. This design, encompassing

16   both bottle and lid, prioritizes functionality over aesthetics, focusing on key

17   activities like drinking, mixing, pouring, storing, and transporting. The

18   comprehensive design of the D235 shaker bottle and lid, along with its individual

19   elements are fundamentally driven by utility rather than decorative aspects. Each

--------

1    [49] *See supra* Section I.

2    [50] *See id.*

1  component is thoughtfully designed to maximize practicality and efficiency and

2  collectively underscore a design philosophy where functionality reigns, making the

3  'D235 Patent's design an exceptionally practical tool. This emphasis on function

4  over ornamentality distinguishes the 'D235 Patent, positioning it as a superior

5  choice in its category, which is not only emphasized in BlenderBottle's marketing

6  but also echoed in customer feedback and existing utility patents. This integration

7  of functional elements not only showcases the functional superiority of the design

8  over alternatives but also transforms the bottle and lid covered by the 'D235 Patent

9  from a mere bottle and lid to an essential tool, affirming the 'D235 Patent's design is

10  dictated by function.

11  **III.   THIS COURT SHOULD ADOPT HYDRA CUP'S PROPOSED CLAIM**
12  **CONSTRUCTION FOR THE 'D798 PATENT BECAUSE IT FOLLOWS FEDERAL**
13  **CIRCUIT PRECEDENT.**

14  **A. Hydra Cup's Proposed Construction of the 'D798 Patent's Claim.**

| Claim | Hydra Cup's Proposed Construction |
|---|---|
| The ornamental design for a container, as shown and described. | The ornamental design for a container, as shown and described, wherein the overall design and each individual design element are claimed as ornamental to the extent they are not dictated by their functional utility and wherein the Claim acknowledges the presence of functional elements primarily dictated by function as follows:<br><br>(1) the **Bottle-Body** is primarily designed for drinking, mixing, pouring, storing, and transporting; (2) the **Bottle-Screw-Top-Head** is functionally designed for securely sealing with a lid |

| Claim | Hydra Cup's Proposed Construction |
|---|---|
|  | and facilitating pouring and drinking; (3) the **Bottle-Bottom** is designed to provide structure, stability and support, as well as to enable the implementation of other functional elements; (4) the **Volumetric-Measurement-Tool** and its translucent window, located on one side of the Bottle-Body, allow for measuring and viewing the bottle's contents; and (5) the **Bottle-Sides** on both sides of the Bottle-Body are designed for enhanced grip and handling as well as to enable other functional features.<br><br>Both the overall design and each individual design element comprising the overall design, being primarily dictated by their functional nature, are not claimed for their ornamental design, and any protection is disclaimed over these designs dictated by function.<br><br>The Claim further acknowledges a broad array of prior art involving bottle and lid designs with substantial similarities and, therefore, the scope of protection is limited to the unique, non-functional, ornamental aspects that distinguish this design from existing designs in the prior art. |

| Claim | Hydra Cup's Proposed Construction |
|---|---|
|  | |
|  | |

**B. The Scope of the 'D798 Patent's Claim is Limited by the Functional Elements of the Design and the Functional Purpose of the Design as a Whole.**

***1. The Overall Design of the 'D798 Patent is Dictated by Function.***

The overall design of the 'D798 Patent is fundamentally driven by its functional purpose. Each element of the 'D798 Patent's design for a container is primarily functional, catering to the needs of users requiring a versatile and efficient mixing and storage solution. The container design covered by the 'D798 Patent represents the optimal solution for its intended function. The shape and size of the bottle are tailored to ensure ease of handling, maximum capacity, and efficient storage, while the design of the top of the bottle secures to the bottle's lid to ensure a tight seal, preventing leakage and maintaining the quality of the contents.[51] And the Bottle-Bottom enabling integrated storage compartments are a

---

[51] *See supra* Arguments, Sections I.B, II.B (discussing the functional benefits of combining a bottle with a shaker bottle lid).

1  key functional aspect of the design, offering users the convenience of carrying

2  supplements or snacks without the need for additional containers.

3       In the context of storage container shaker bottles, the design alternatives are

4  significantly limited. There are limited ways to design a cylindrical container bottle

5  while maintaining its ability to function as drinking, mixing, pouring, storing, and

6  transporting container. The design in the 'D798 Patent is not just one among many;

7  it is a design that achieves the highest functionality within the constraints of what

8  is possible for such products. The combination of a container with capabilities for an

9  attached lid and attached storage compartments is a unique solution that addresses

10  specific user needs in a way that other designs fail to match. This means the 'D798

11  Patent's design is the best available, considering the functional requirements of the

12  design. Alternative designs would either compromise on the efficiency of the mixing

13  mechanism, the convenience of the integrated storage, or the overall usability of the

14  bottle. In terms of achieving a design that perfectly balances these functional

15  aspects, the 'D235 Patent stands alone.

16       BlenderBottle describes its D798 Patent's design, embodied in its ProStack

17  storage container shaker bottle, as an "[a]ll-in-one shaker and supplement storage

18  system," that includes four separate attachable parts: a 20oz shaker bottle; a 150cc

19  attachable storage container jar; a 100cc attachable storage container jar; and a pill

20  organizer. (*See, e.g.*, Ex. 4, Screenshot of BlenderBottle's ProStack Shaker Bottle

1   Product Page.). Thus, the primary new feature offered by its D798 Patent is the

2   designs ability to function as a multi-compartment storage container, offering users

3   the ability to attach multiple storage container jars to the bottom of the bottle.[52]

4          Given the inherently functional nature of the product and the limited scope

5   for alternative designs that maintain the same level of functionality, the scope of

6   the 'D798 Patent should be viewed as very narrow. The design is dictated by the

7   need to efficiently combine the functions of drinking, mixing, pouring, storing, and

8   transporting in a single, portable container, leaving little room for variations that

9   do not detract from its practical utility. The D798 Patent's design, therefore, while

10  patented as a design patent, is primarily a reflection of its overall functionality and

11  of its elements dictated by function than an exercise in aesthetic creativity.

12  ***2. Each Individual Element in BlenderBottle's 'D798 Patent is Dictated by***
13  ***Function.***

14         Each design element in BlenderBottle's 'D798 Patent's design for a container

15  bottle is primarily functional.

16  **a. The Container-Bottle-Body Covered by the 'D798 Patent Represents the**
17  **Best Design for Optimal Functionality.**

18         According to BlenderBottle, its container design covered by the 'D798 Patent

19  is a "shaker [container storage bottle] [that] combines a . . . shaker bottle with

20  interlocking storage containers, making it easier than ever to carry nutrition and

---

1   [52] (*See, e.g.*, Ex. Ex. 4, Screenshot of BlenderBottle's ProStack Shaker Bottle Product Page
2   (advertising "House your protein powders, pre-workouts, BCAAs, with two attachable jars.
3   Vitamins? No problem. Use the attachable pill tray housed in the lid of one of the jars.").)

1    supplements on the go."[53] And the Container-Bottle-Body is a "durable, leak-proof

2    shaker bottle." (*See, e.g.*, Ex. 4, Screenshot of BlenderBottle's ProStack Shaker

3    Bottle.). BlenderBottle informs its storage container bottle is "[d]ishwasher safe"

4    and "BPA and phthalate-free." (*Id.*). Along the same lines, the use of multiple types

5    of plastic material on the surface of the Container-Bottle-Body, especially the

6    transition from coarse and opaque to transparent and smooth material for the

7    Container-Measurement-Markings-Tool, serves a practical purpose. It allows users

8    to clearly view the container's contents, especially the volume, which is essential for

9    a container bottle. And the curved surface forming a cylinder shape is a standard

10   design for many bottles due to its ergonomic and manufacturing benefits. This

11   design provides a balanced distribution of weight and is easy to manufacture.

12   **b. The Container-Measurement-Markings-Tool is Primarily Functional.**

13          The design of the Container-Measurement-Markings-Tool covered by the

14   'D798 Patent is fundamentally functional and represents the best available design

15   for its intended purpose. The Container-Measurement-Markings-Tool is a vital

16   functional feature, adhering to standard measurement practices and providing

17   clarity on measurements for consumables. Its design, utilizing a transparent

18   material, is crucial for accurately gauging the contents of the bottle. This

19   transparency ensures users have a clear, unobstructed view of the measurements,

20   which is essential for precise portion control and supplement management.

---

1    [53] (*See, e.g.*, Ex. 4, Screenshot of BlenderBottle's ProStack Shaker Bottle Product Page.).

1      Furthermore, the placement of measurement markings on the outside of the

2    container, as opposed to the inside, is a superior design choice. This positioning

3    avoids contact with the bottle's contents, preventing any potential wear or erosion of

4    the markings over time, thus ensuring long-term visibility and accuracy. And

5    external markings are easier to read, especially when the bottle is filled or in use.

6    And the elongated, translucent window, coupled with the depressions on the

7    container's sides, is not just for measurement clarity but also adds an ergonomic

8    benefit. The design of the depressions, particularly on the right side where the

9    Container-Measurement-Markings-Tool is housed, aids in clarity and ease of

10   measurement. On the left side, the depression provides a functional grip, enhancing

11   the container's usability, especially when hands are wet or full.

12      In conclusion, the 'D798 Patent's design for the Container-Measurement-

13   Markings-Tool is the most effective and practical design when compared to

14   alternative options. It provides clear, accurate, and durable measurement

15   markings, enhances the container's ergonomic use, and prioritizes functionality

16   over decorative aspects, making it the best available design for its intended

17   purpose.

18   **IV.**     **DOZENS OF UTILITY PATENTS DESCRIBE THE FUNCTIONALITY OF THE**
19         **DESIGNS CLAIMED BY THE ASSERTED PATENTS.**

20      Numerous utility patents dating back over forty years further elaborate on

21   the usefulness and functionality of the lid and bottle designs claimed by the

92

1  Asserted Patents, highlighting the functional nature of each Asserted Patent's

2  claimed design and further demonstrating that each of the Asserted Patent's

3  claimed design is entirely dictated by function.

4      The following utility patents all describe the functionality of designs similar

5  to those claimed by the Asserted Patents: U.S. Patent No. 8,695,830 (filed on 2012-

6  09-11, issued on 2014-04-15); U.S. Patent No. 3,820,692 (issued on 1974-06-28); U.S.

7  Patent No. 5,499,736 (issued on 1996-03-19); U.S. Patent No. 2,754,866 (issued on

8  1956-07-17); U.S. Patent No. 7,533,783 (filed 2005-12-20); U.S. Patent No. 8,464,895

9  (filed 2011-06-27); U.S. Patent No. 8,985,370 (filed 2013-12-09 with a priority date

10  of 2012-05-30)

11  **The '830 Describes the Functional Utility Dictating the Flip-Top-Cap,**
12  **Brackets, Carry-Loop, and Spout and Spout-Guard Designs.**

13      BlenderBottle filed a utility patent for the exact same lid design covered by

14  the 'D551 Patent, the day before BlenderBottle filed its D551 Patent, describing the

15  'D551 Patent's utility and demonstrating how the design is primarily dictated by

16  function. *See* '830 Patent.

17          .

93

| 'D551 Patent | '830 Patent |
|---|---|
|  |  |
|  |  |

1    BlenderBottle's '830 Patent provides a detailed description of both the overall

2    functionality of the 'D551 Patent's lid design as well a detailed description for each

3    individual functional element comprising the 'D551 Patent's lid design. For

4    example, BlenderBottle of the lid design covered by the 551 Patent as follows: "In

5    this manner, flip top 101 and handle 102 are securely attached to the lid while

6    enabling flip top 101 and handle 102 : to remain independently pivotable. For

7    example, while flip top 101 remains inserted into spout 105, handle 102 can be

8    freely pivoted around the axis of mount 104. Similarly, flip top 101 can be pivoted

9    around the axis of mount 104 without pivoting handle 102." *See* '830 Patent, 9-10,

10   Claims 3-4.

1    The '830 Patent also describes the functionality of the Brackets design,

2    "allowing" the Flip-Top-Cap and Carry-Loop to "independently pivot." *Id*. at 9-10,

3    Claims 3-4.

4    "Flip top 101 includes a flip top pivot 101a having a protrusion 1014 on
5    each side. As shown in FIGS. 1, 2, 4 and §, flip top pivot 10la may
6    comprise an at least substantially solid or continuous body and
7    protrusions 1015 may extend outwardly from each side or end of the
8    body. Handle 102 includes a loop 102a and a handle pivot 1024 on each
9    side. Flip top 101 and handle 102 are mounted within mount 104 such
10   that flip top 101 and handle 102 can each independently pivot.
11   Although the Figures illustrate a handle having a round loop, loops of
12   other shapes could also be used. Further, handle 102 can also be
13   formed in a shape other than a loop as long as the handle includes
14   handle pivots 1024 on both sides (e.g., a hook, a clip, etc.)."

15   *Id*. at 9-10, Claims 3-4.

16   "A container lid for sealing an opening to a container may include a handle

17   and a flip top that are each independently pivotable along the same axis. The

18   handle can be secured to the container lid between a mount on the lid and the flip

19   top. The handle supports the weight of the container and, because the handle is

20   independently rotatable relative to the flip top, the handle will not inadvertently

21   open the flip top." *Id*. at 1, Abstract.

22   **The '692 Patent Describes the Functional Utility Dictating the lid's Domed-**
23   **Body, Flip-Top-Cap, Brackets, the Carry-Loop Design, and the Spout and**
24   **Spout-Guard Design.**

25   The '692 Patent discloses a lid design substantially similar to the lid design

26   covered by the 'D551 Patent and describes its functional utility. *See* '692 Patent.

95

1          .



2    Id., figs. 1-3. The '692 Patent describes the multifunctional nature of the domed-

3    body shaker bottle lid design. *See id*. It serves four primary purposes: as a

4    removable, seal-tight closure for the container; as a means to increase the

5    container's capacity; as an auxiliary opening for adding ingredients and a spout for

6    dispensing; and finally, to keep the blending element in a stable position within the

7    assembly. *Id*. at 1:64-2:7. The 692 Patent also elaborates on the functional aspects

8    of a domed-body lid design, describing how the dome-body lid design formed by the

9    inwardly curving side wall leading to the top wall is primarily functional, as the

10   dome shape, in conjunction with the container's unique design, creates a fluid flow

11   pattern that moves the liquid from the sides towards the center, enhancing

12   agitation and mixing efficiency. *See id*. Additionally, the 692 Patent details the

13   design of the vessel's bottom wall, which includes a centrally located, internally

14   projecting hemispherical portion. *Id*. This design element works in contrast to the

15   flow pattern created by the top, directing fluids from the center of the vessel

1 towards the side walls. When the container is shaken, this design creates a

2 comprehensive fluid flow pattern, as illustrated in FIG. 5, ensuring thorough mixing

3 by exposing the fluid to various eddy flow patterns across different areas of the

4 blending element. *Id*.

5     In describing this hinged cap, the 692 Patent described the functionality of

6 the cap: "The seal for the spout or neck 20 as shown in FIG 1. cooperates with the

7 flared peripheral spout 13 and is comprised of a conventional cap-like member 15

8 suitably removably attached to closure top wall 19, as by hinge pivots 23." *Id*. at

9 2:31-36.

10 **The '736 Patent Describes the Functional Utility Dictating the Flip-Top-**
11 **Cap, Brackets, Carry-Loop, Spout, and Spout-Guard Designs.**

12     The '736 Patent discloses a design substantially similar to the Flip-Top-Cap

13 design on the lid covered by the 'D551 Patent and describes its functional utility.

14 *See* '736 Patent.





1

2    *Id.*, figs 2, 4-5.

3         More specifically, the '736 Patent describes the functional utility of the flip-

4    top-cap design as follows: a "new and improved cap member 10 includes means for

5    forming a releasable cover seal for the pouring orifice 54. As depicted in the

6    drawings the pouring orifice is defined by a raised projecting latch lip 52 extending

7    upwardly within the central recess 38. Latch lip 52 includes a latch shoulder 66

8    defined along the inwardly-facing side thereof. The free end 48 on strap 22 is

9    provided with cooperating snaplock orifice sealing structures 72 and 74 extending

10   from an underside surface 70 of strap 22." *Id.* at 5:48-57, figs. 1, 4-5.

**The '866 Describes the Functional Utility Dictating the Flip-Top-Cap, Bottle-Body, Bottle-Lid, Spout, and Spout-Guard Designs.**

The '866 Patent also discloses Flip-Top-Cap, Bottle-Body, Bottle-Lid, Carry-Loop, Spout and Spout-Guard designs just like that of the designs covered in the 'D551 Patent and describes the functionality of such a design. *See* '866 Patent.



*See id*. at fig. 3. The '866 Patent explains that "in normal use of the container 10 it is found desirable to merely pivot the cap 22 about the hinge 16, thus exposing the aperture in the cover 12 for easy removal of the container's contents." *Id*. at 2:52-59. The 866 Patent further describes the benefits and functionality provided by having multiple sized access ports for a lid, made possible by a flip-top-cap design, noting "[b]y such an arrangement filling of the container is facilitated by removing the large cover from its sealed engagement with the container, [w]hile pouring is greatly facilitated by removal of the smaller cap from the aperture in said cover." *Id*.

**The '370 Patent Describes the Functional Utility Dictating the Brackets and Carry-Loop.**

1    The '370 Patent describes a functional hinged cap similar to the 'D551

2  Patent's Flip-Top Cap as follows: "A handle 32 may be attached to the inner lid 18

3  and/or the outer lid 16 to provide a convenient method of carrying the bottle 10 or

4  attaching the bottle 10 to a backpack, gym bag or the like. In one embodiment, the

5  handle 32 is attached about the outer ends of the hinge 26, thus permitting the

6  handle 32 to be a hinged handle. The handle 32 and outer lid 16 share the hinge 26

7  so that only one hinge pin need be provided for both elements." *See* '370 Patent,

8  11:5-6.



9

11  **The '895 Patent Describes the Functional Utility Dictating the Carry-Loop**
12  **Design.**

1      The '895 Patent discloses a Carry-Loop design similar to the Carry-Loop

2    design claimed by the Asserted Patents and describes how the Carry-Loop design is

3    dictated by function. *See* '895 Patent.




4

5    More specifically, the '895 Patent describes such functionality as follows:

6       As may best be viewed in FIG, 3A, the upper portion 162 further
7       includes first and second hinge pin mounts 184A and 184B,
8       respectively, that are configured to mount a finger loop to allow a user
9       to easily carry the assembly 10. The finger loop 172 includes a hinge
10      pin sleeve 174, in which a hinge pin 180 is positioned, and a loop
11      portion 178. The hinge pin 180 is coupled to the hinge pin mounts
12      184A and 184B such that the finger loop 172 is removably or fixedly
13      secured to the lid 150. The finger loop 172 may be operative to rotate
14      about the hinge pin 180 between a downward extending position
15      shown in FIG. 1 to an upward extending position shown in FIG. 2. In
16      other embodiments, the finger loop 172 may be operative to rotate over

1    a larger or smaller range of angles (e.g., 90 degrees, 270 degrees, or the
2    like). In operation, a user may carry the assembly 10 by inserting a
3    finger or other object (e.g., a belt, a strap, or the like) into the loop
4    portion 178 of the finger loop 172.

5    *See id.* at 10, 2, Detailed Description of the Invention.

**6    The '783 Patent Describes the Functional Utility Dictating the Carry-Loop,**
**7    and Spout and Spout-Guard Designs.**

8    The '783 Patent discloses a Carry-Loop design similar to the Carry-Loop

9    design claimed by the Asserted Patents and describes how the Carry-Loop design is

10    dictated by function. *See* '783 Patent.



11    More specifically, the '783 Patent describes such functionality as follows:

12    When present, handle 140 may, but is not required to, define a closed
13    perimeter, or boundary, 142 through which a lanyard, karabineer, belt,
14    strap, user's finger, or other structure may extend to hold and/or retain
15    the drink bottle in a selected position. It is within the scope of the
16    present disclosure that this closed boundary is perhaps best seen in
17    FIG. 25. The closed boundary may be defined entirely by the handle or
18    that it may be defined by the handle and the base of the cap assembly.

1   Regardless, the closed boundary refers to a closed perimeter around an
2   opening through which an object may be inserted, such as to position
3   or coupled to the drink container. Additionally or alternatively, when
4   the drink bottle includes a tether than interconnects the cap assembly
5   and the fluid container, the tether may also define (when the cap
6   assembly is properly mounted on the fluid container) a (or another)
7   closed boundary through which a strap or other securing or positioning
8   structure may extend.

9   *See id.*, Claim 16.

10   **V.    THE SCOPE OF THE ASSERTED PATENTS' CLAIMS IS LIMITED BY DESIGN**
11   **PATENT PRIOR ART.**

12   In the case at hand, the designs for the shaker bottles and lids claimed by the

13   Asserted Patents are not new or original. In construing the claims of the Asserted

14   Patents, the Court should consider the numerous prior art references cited by the

15   examiner on the face of the Asserted Patents, as well as the additional references

16   identified by Hydra Cup below.

17   **A. Design Patent Prior Art Narrowing the Scope of the Asserted Patents.**

18   The following are examples of prior art references that are substantially

19   similar to the designs for lids, shaker bottles, and container claimed by the Asserted

20   Patents  along with the prior art referenced in the Assert Patents, necessitate an

21   extremely narrow construction.

22





1

**B. The Accused Products Were Designed Based on Similar Designs Disclosed by Other Patents and Therefore the Asserted Patents' Claims Should be Narrowly Construed in the Context of the Prior Art and Infringement Allegations.**

*1. The Accused Products Were Designed Based on the D029 and D047 Patents.*

The Accused Products were designed and modeled after the shaker bottle designs in the 'D047 Patent the 'D029 Patent. *See* U.S. Patent No. D666,047 (filed 2011-04-14); U.S. Patent No. D766,029 (filed 2015-07-15). The D047 Patent references BlenderBottle's D551 Patent as prior art; and the 'D029 Patent references BlenderBottle's D798 Patent as prior art. Thus, the USPTO has already determined that the designs are different enough to warrant granting separate and distinct patents and Hydra Cup's products therefore cannot infringe.

**D029 Patent, D047 Patent, and Hydra Cup's Accused Products.**



1

**D047 Patent Bottle and Lid Design Next to Hydra Cup's Accused Products**



3

**D047 Patent Bottle and Lid Design Next to Hydra Cup's Accused Products**



1

**a. The Accused Products Modeled After the 'D047 Patent Do Not Infringe the 'D551 Patent.**

The majority of the Accused Products are modeled after the 'D047 Patent. (*See* Ex. 6, Hydra Cup's 'D047 Patent License Agreement with Zhigang.). BlenderBottle's 'D551 and 'D798 Patents cite the 'D047 and 'D235 Patents as prior art. *See* 'D551 Patent, References Cited; 'D798 Patent, References Cited. Hydra Cup's Accused Products accused of infringing the 'D551 and 'D235 Patents were modeled after the bottle and lid design disclosed by the 'D047 Patent, not the 'D551 and 'D235 Patents. (*See id*.). And the 'D551 Patent was granted by the USPTO with the 'D047 and D235 Patents cited as prior art. *See id*. This means the USPTO Examining Agent recognized significant differences between the 'D047 Patent and BlenderBottle's 'D235 and 'D551 Patents. Therefore, because Hydra Cup's Accused Products are designed after the design covered by the 'D047 Patent, not the Asserted Patents, and because the USPTO has already determined that the 'D047 Patent sufficiently differs from the Asserted Patents, it follows that the Accused Products modeled after the 'D047 Patent would inherently also differ from the Asserted Patents. The fact that the 'D551 Patent was granted in light of the 'D047 Patent being cited as prior art demonstrates that the USPTO recognized a unique

107

1  and non-obvious design in the 'D047 Patent. The substantial similarity between the

2  Accused products and the 'D047 Patent they were designed after suggests that any

3  resemblance to the 'D551 Patent is coincidental or superficial and does not

4  constitute infringement.

5      The Accused Products resembling the design covered by the 'D047 Patent are

6  leveraging a legally distinct design space. The scope of the Asserted Patents are

7  extremely narrow. Given the USPTO's distinction between the design covered by

8  the 'D047 Patent and the designs covered by the 'D551 Patent and the narrow

9  constraints on the reach of the 'D551 Patent, BlenderBottle must face a significant

10  challenge in proving direct infringement by the Accused Products designed after the

11  'D047 Patent. The USPTO's approval of the 'D551 Patent, considering the 'D047

12  Patent cited as prior art, serves as a strong indication of the distinctiveness of the

13  'D047 design. Consequently, products modeled after the 'D047 Patent, such as

14  Hydra Cup's Accused Products, should not be considered infringing on the 'D551

15  Patent; therefore, the 'D551 Patent's claim should be construed accordingly narrow.

16  **b. The Accused Products Modeled After the 'D029 Patent Do Not Infringe**
17  **BlenderBottle's 'D798 Patent.**

18      Similarly, Hydra Cup's Accused Products are also designed based on the

19  design in U.S. Patent No. D766,029 (filed 2015-07-22). The D029 Patent cites the

20  D047 and D235 Patents as prior art. *See* D029 Patent, References Cited.

1    Comparing the 'D029 Patent and the 'D798 Patent reveals significant

2    differences in their ornamental aspects. The 'D029 design, distinct in its aesthetic

3    elements, does not infringe upon the ornamental aspects of the 'D798 Patent.

4    Therefore, products modeled after the D029 design, including the Accused Products,

5    should not be considered infringing. And the Asserted Patents should be construed

6    narrowly to reflect such limitations on the scope of their claims.

7  **C. The Accused Products are More Substantially Similar to Designs**
8  **Disclosed by Other Patents that Cited the Asserted Patents as Prior Art.**

9    The Accused Products are more closely aligned with the designs of other

10   recently granted patents that cited the Asserted Patents as prior art. This means

11   the USPTO specifically determined that such new designs are sufficiently distinct

12   from those in the Asserted Patents.

13  **a. The Accused Products are More Substantially Similar to the 'D107**
14  **Patent than to the Asserted Patents.**

15   The Accused Products are more similar to the 'D107 Patent. *See* U.S. Patent

16   No. D1,003,107 (filed 2023-02-24).

17        

109

1

2

3   The 'D107 Patent cites BlenderBottle's 'D235 and 'D551 Patents as prior art. *See id*.

4   at References Cited. Thus, because Hydra Cup's Accused Products are more similar

5   in overall design to the 'D107 Patent and because the D107 was deemed to not

6   infringe upon BlenderBottle's D235 or 'D551 Patents, Hydra Cup's Accused

7   Products that are substantially similar to its 'D107 Product are therefore also not

8   accusing BlenderBottle's 'D235 or 'D551 Patents. Thus, the claims of the 'D235 and

9   'D551 should be narrowly construed to reflect such a narrow scope of protection.

10      Hydra Cup's Accused Products closely resemble the design in Hydra Cup's

11   D107 Patent, not the designs in BlenderBottle's D235 and D551 Patents. This

12   resemblance is crucial because it suggests that any similarities between the

13   Accused Products and BlenderBottle's patents are coincidental or insufficient to

14   constitute infringement. Significantly, the 'D107 Patent was granted after citing

15   BlenderBottle's D235 and D551 Patents as prior art. The USPTO's approval of the

16   'D107 Patent, in light of these citations, indicates that the examining agent found

17   Hydra Cup's design in the 'D107 Patent to be substantially different from the

18   designs in BlenderBottle's 'D235 and 'D551 Patents. This differentiation by the

19   USPTO is a strong indicator of the uniqueness and non-infringing nature of the

20   'D107 Patent's design. The decision by the USPTO to grant Hydra Cup's 'D107

21   Patent, despite the consideration of BlenderBottle's patents as prior art, implies

1  that the designs covered by Hydra Cup's patent do not infringe upon the designs of

2  BlenderBottle's patents. If the USPTO had found substantial similarities that

3  would constitute infringement, it would not have granted Hydra Cup's patent.

4       Patent law operates on the principle that each patent is unique and non-

5  obvious over existing prior art. The granting of Hydra Cup's D107 Patent, with

6  BlenderBottle's patents as cited prior art, underlines this principle, suggesting that

7  the designs are legally distinct. Considering the USPTO's recognition of the

8  distinctiveness of Hydra Cup's 'D107 Patent, BlenderBottle faces a considerable

9  challenge in proving that Hydra Cup's Accused Products, which are similar to the

10  D107 design, infringe upon their 'D235 or 'D551 Patents. The close resemblance of

11  Hydra Cup's Accused Products to its 'D107 Patent, rather than BlenderBottle's

12  patents, will be a key factor in the infringement analysis. This resemblance

13  indicates that the Accused Products are operating within the design scope legally

14  established and protected by Hydra Cup's 'D107 Patent.

15       The approval of the 'D107 Patent in the context of BlenderBottle's 'D235 and

16  'D551 Patents being cited as prior art, strongly suggests that Hydra Cup's Accused

17  Products that are more substantially similar to the 'D107 Patent compared to the

18  Asserted Patents represents a distinct, non-infringing design. Consequently, the

19  claims of the 'D235 and 'D551 Patent should be narrowly construed to acknowledge

1    the Accused Products are more substantially similar to other patents that reference

2    the Asserted Patents as prior art.

3    **b. The Accused Products that are More Substantially Similar to the 'D348**
4    **Patent than to the Asserted Patents are Not Infringing the Asserted**
5    **Patents.**

6        The lid designs on the Accused Products are more similar to the lid designs

7    disclosed by the 'D348 Patent than to BlenderBottle's Asserted Patents. *See* U.S.

8    Patent No. D992,348 (filed 2023-02-03). The 'D348 Patent cites BlenderBottle's

9    'D235 and 'D551 Patents as prior art as well as the 'D029 Patent. *See id*. at

10    References Cited. Thus, because the Accused Products are more similar in overall

11    design to the 'D348 Patent and because the 'D348 was deemed to not infringe upon

12    BlenderBottle's 'D235 or 'D551 Patents, the Accused Products that are substantially

13    similar to the 'D348 Patent are therefore also not infringing BlenderBottle's 'D235

14    or 'D551 Patents. Thus, the closer alignment of the Accused Products' lid design

15    with the lid design covered by D348 Patent, rather than the lid designs covered by

16    BlenderBottle's 'D235 and 'D551 Patents, further narrows the scope of the lid

17    design covered by the 'D235 and 'D551 Patents' claim.

18                         **CONCLUSION**

19        The design elements of the Asserted Patents are primarily dictated by

20    function and were available to consumers well before BlenderBottle filed its patent

21    applications. Examining the overall functional nature of each Asserted Patent as

1    well as the functional nature of each design element, shows how each functional

2    element combines and integrates with the other functional elements to form designs

3    for shaker bottles and lids that are fundamentally utilitarian in nature.

4    BlenderBottle's attempt to broadly claim infringement overlooks the functional

5    design considerations and prior art that underpin the basic design of its products,

6    using design patents to unjustly thwart competition. Accordingly, Hydra Cup's

7    proposed constructions aim to limit the scope of these patents to non-functional

8    features and those not claimed by prior art, in alignment with the principles of

9    patent public policy and the fundamental goal of claim interpretation in design

10   patents. For the reasons discussed above, Defendant Hydra Cup request that the

11   Court adopt its proposed constructions of the disputed claims of the Asserted

12   Patents.

13   **Dated**: 30 November 2023

14                                              By: /s/Meghan Pratschler/
15                                              Meghan Pratschler
16                                              CA Bar No.: 324970
17                                              Meghan the Attorney, LLP
18                                              95 3rd St 2nd Floor
19                                              San Francisco, CA 94103-3103
20                                              meghan@meghantheattorney.com
21                                              (415) 335-9226

22                                              -and-

23                                              By: /s/Casey Scott McKay/
24                                              Casey Scott McKay
25                                              TN Bar No.: 034028
26                                              MC Law, PLLC

1441 U St. NW, Suite 712
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

*Attorneys for Defendant TRRS Magnate, LLC dba Hydra Cup*

# CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by email on 30 November 2023 on the following parties:

KNOBBE MARTENS OLSON & BEAR
Paul A. Stewart (SBN 153,467)
paul.stewart@knobbe.com
Ali S. Razai (SBN 246,922)
ali.razai@knobbe.com
Jacob R. Rosenbaum (SBN 313,190)
jacob.rosenbaum@knobbe.com
Christian D. Boettcher (SBN 342,950)
christian.boettcher@knobbe.com

KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

By: /s/Meghan Pratschler/
Meghan Pratschler
CA Bar No.: 324970
Meghan the Attorney, LLP
95 3rd St 2nd Floor
San Francisco, CA 94103-3103
meghan@meghantheattorney.com
(415) 335-9226

-and-

By: /s/Casey Scott McKay/
Casey Scott McKay
TN Bar No.: 034028
MC Law, PLLC
1441 U St. NW, Suite 712
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

1          *Attorneys for Defendant TRRS Magnate, LLC dba Hydra Cup*

2

3

4

1      **EXHIBITS**

2

3      Exhibit 1, Declaration of Casey Scott McKay

4      Exhibit 3, BlenderBottle's Objections and Responses To Hydra Cups Interrogatories

5      Exhibit 4, Screenshot BlenderBottle ProtStak Container Bottle Product Page

6      Exhibit 5, Third Party Reviews of BlenderBottle Classic and ProStack

7      Exhibit 6, Hydra Cup's D047 Patent License Agreement with Zhigang

8      Exhibit 7, Screenshot of BlenderBottle Touting Effective Results of Mixing System
9      (04 May 2012), *available at*
10     https://web.archive.org/web/20130504060128/http://blenderbottleshaker.blogspot.co
11     m/

12     Exhibit 8, Larson AJ, Haver S, Hattendorf J, Salmon-Mulanovich G, Riveros M,
13     Verastegui H, Mäusezahl D, Hartinger SM. Household-level risk factors for water
14     contamination and antimicrobial resistance in drinking water among households
15     with children under 5 in rural San Marcos, Cajamarca, Peru. One Health. 2023 Jan
16     3;16:100482. doi: 10.1016/j.onehlt.2023.100482. PMID: 36655146; PMCID:
17     PMC9841353

18     Exhibit 9, Screenshot of BlenderBottle Classic Product Page (last visited 22
19     November 2023), *available at* https://www.blenderbottle.com/products/classic

20     Exhibit 10, Screenshot of BlenderBottle Touting Many Uses (March 2012)

21     Exhibit 13, Packaging Styles---Bottle Caps, *available at*
22     https://www.liquidpackagingsolution.com/news/packaging-styles---bottle-caps (last
23     visited 03 November 2023).

24     Exhibit 14, Plastic bottles market---Growth, trends, Covid-19 impact, and forecasts
25     (2021—2026), *available at*
26     https://www.mordorintelligencecom/industry-reports/plastic-bottles-market (last
27     visited on 28 October 2023)

28     Exhibit 15, Simone Sohnle, Myriam Braun-Münker, Felix Ecker, Fulda, A
29     comparative study of various screw caps, Science & Research, (2016), *available at*
30     https://www.ernaehrungs-umschau.de/fileadmin/Ernaehrungs-Umschau/pdfs/
31     pdf_2016/09_16/EU09_2016_WuF_Braun-Muenker_en.pdf.

1  Exhibit 16,  Demirel, B., Daver, F. (2009): Optimization of poly(ethylene
2  terephthalate) bottles via numerical modeling: A statistical design of experiment
3  approach, _Journal of Applied Polymer_, Vol. 114, lasue 2

4  Exhibit 17, Ana Jovčevska, Leo Kralevski, Ile Mirčesk, Design and Improvement of
5  a Reusable Bottle for Sports Drinks Using Virtual Testing and Validation, Mech.
6  Eng. Sci. J. 40 (1) 23–31 (2022), *available at*
7  https://doi.org/10.55302/MESJ22401647023j

8  Exhibit 18, Kandikjan, T., Mircheski, I. (2020): Design with Plastics, Published by
9  Faculty of Mechanical Engineering in Skopje

10  Exhibit 19, Toscano, R. A., Herazo, J., Millan, R. R., Palma, H., Martinez, J.,
11  Approach methodology for the sustainable design of packaging through
12  computational tools: Case study: Water bottles, Case Studies in Thermal
13  Engineering, Vol. 16, pp. 1-11) (2019), *available at*
14  https://doi.org/10.1016/j.csite.2019.100561.

15  Exhibit 20, Lovett, J., Engineering Design of a Disposable Water Bottle for an
16  Australian Market, *available at* https://eprints.usq.edu.au/24673/1/Lovett_
17  %202013.pdf and https://www.semanticscholar.org/paper/Engineering-design-of-a-
18  disposable-water-bottle-for-Lovett/e3a1118339d0621eac044ec678b44359b6158369
19  (last visited on 15 November 2023) (2013)