Meghan Pratschler
CA Bar No.: 324970
Meghan the Attorney, LLP
95 3rd St 2nd Floor
San Francisco, CA 94103-3103
meghan@meghantheattorney.com
(415) 335-9226

-and-

Casey Scott McKay
TN Bar No.: 034028
MC Law, PLLC
1441 U St. NW, Suite 102
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
THE EASTERN DISTRICT OF CALIFORNIA**

– – – – – – – – – – – – – – – – – – – – – – – – – – – – X

**TROVE BRANDS, LLC D/B/A THE BLENDERBOTTLE COMPANY**

*Plaintiff Counterclaim Defendant,*

**Case No: 2:22-cv-02222-TLN-CKD,**

*v.*

**TRRS MAGNATE LLC D/B/A HYDRA CUP AND THOMAS RAYMUS, AN INDIVIDUAL,**

*Defendants Counterclaim Plaintiffs.*

– – – – – – – – – – – – – – – – – – – – – – – – – – – – X

**DEFENDANTS COUNTERCLAIM PLAINTIFFS' SECOND AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS**

Defendants TRRS Magnate LLC d/b/a Hydra Cup and Thomas Raymus (collectively "Defendants"), by and through counsel, hereby submits their Answer, Defenses, and Counterclaims in response to the Second Amended Complaint (the "Complaint") filed by Defendant BlenderBottle Trove Brands, LLC, d/b/a the BlenderBottle Company ("BlenderBottle") and state as follows:

1.      Defendants admits the allegations in paragraph 1 of the Complaint to the extent that BlenderBottle "seeks injunctive relief and damages for acts of patent infringement, trade dress infringe-

1 ment, false designation of origin, and unfair competition." Defendants deny BlenderBottle's al-
2 legation that Defendants engaged in activity that violates any laws of the United States or the
3 State of California. Defendants deny the rest of paragraph 1 of the Complaint.

4 2. Defendants lack knowledge or information sufficient to form a belief about the truth of the al-
5 legations in paragraph 2 of the Complaint.

6 3. Defendants admit the allegations in paragraph 3 of the Complaint.

7 4. Defendants admit the allegations in paragraph 4 of the Complaint.

8 5. Defendants admit the allegations in paragraph 5 of the Complaint to the extent that the Court
9 has original and supplemental jurisdiction over the claims. Defendants lack knowledge or infor-
10 mation sufficient to form a belief about the truth of the remaining allegations in paragraph 5 of
11 the Complaint.

12 6. Defendants admit the allegations in paragraph 6 of the Complaint to the extent that Defendants
13 reside in California. Defendants lack knowledge or information sufficient to form a belief about
14 the truth of the allegations in paragraph 6 of the Complaint.

15 7. Defendants admit the allegations in paragraph 7 of the Complaint to the extent that Defendants
16 reside in this judicial district. Defendants deny the remaining allegations in paragraph 7 of the
17 Complaint.

18 8. Defendants lack knowledge or information sufficient to form a belief about the truth of the al-
19 legations in paragraph 8 of the Complaint.

20 9. Defendants lack knowledge or information sufficient to form a belief about the truth of the al-
21 legations in paragraph 9 of the Complaint.

22 10. Defendants admit that United States Design Patent No. D510,235 ("D235 Patent") entitled
23 "BOTTLE" issued on 04 October 2005 and that Exhibit 1 appears to be a copy of the D235
24 Patent. Defendants lack knowledge or information sufficient to form a belief about the truth of
25 the remaining allegations in paragraph 10 of the Complaint.

26 11. Defendants admit that United States Design Patent No. D696,551 ("D551 Patent") entitled
27 "BOTTLE LID HAVING INTEGRATED HANDLE" issued on 31 December 2013 and that

1   Exhibit 2 appears to be a copy of the D551 Patent. Defendants lack knowledge or information

2   sufficient to form a belief about the truth of the remaining allegations in paragraph 11 of the

3   Complaint.

4   12.  Defendants admit that United States Design Patent No. D697,798 ("D798 Patent") entitled

5       "CONTAINER" issued on 21 January 2014 and that Exhibit 3 appears to be a copy of the D798

6       Patent. Defendants lack knowledge or information sufficient to form a belief about the truth of

7       the remaining allegations in paragraph 12 of the Complaint.

8   13.  Defendants deny the allegations in paragraph 13 of the Complaint.

9   14.  Defendants lack knowledge or information sufficient to form a belief about the truth of the al-

10      legations in paragraph 14 of the Complaint.

11  15.  Defendants admit that Exhibit 4 to the Complaint appears to be a copy of U.S. Trademark Reg-

12      istration No. 6,800,019 (the "019 Lid Trade Dress"). Defendants lack knowledge or informa-

13      tion sufficient to form a belief about the truth of the remaining allegations in paragraph 15 of

14      the Complaint.

15  16.  Defendants deny the allegations in paragraph 16 of the Complaint.

16  17.  Defendants lack knowledge or information sufficient to form a belief about the truth of the al-

17      legations in paragraph 17 of the Complaint.

18  18.  Defendants deny the allegations in paragraph 18 of the Complaint.

19  19.  Defendants lack knowledge or information sufficient to form a belief about the truth of the al-

20      legations in paragraph 19 of the Complaint.

21  20.  Defendants deny the allegations in paragraph 20 of the Complaint.

22  21.  Defendants deny the allegations in paragraph 21 of the Complaint.

23  22.  Defendants deny the allegations in paragraph 22 of the Complaint.

24  23.  Defendants admit that Exhibit 5 to the Complaint appears to be a copy of U.S. Trademark Reg-

25      istration No. 6,245,626 (the "626 Agitator Trade Dress"). Defendants lack knowledge or infor-

mation sufficient to form a belief about the truth of the remaining allegations in paragraph 23 of the Complaint.

24.  Defendants deny the allegations in paragraph 24 of the Complaint.

25.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 of the Complaint.

26.  Defendants deny the allegations in paragraph 26 of the Complaint.

27.  Defendants deny the allegations in paragraph 27 of the Complaint.

28.  Defendants deny the allegations in paragraph 28 of the Complaint.

29.  Defendants deny the allegations in paragraph 29 of the Complaint.

30.  Defendants deny the allegations in paragraph 30 of the Complaint.

31.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Complaint.

32.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 of the Complaint.

33.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Complaint.

34.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Complaint.

35.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 35 of the Complaint.

36.  Defendants deny the allegations in paragraph 36 of the Complaint.

37.  Defendants deny the allegations in paragraph 37 of the Complaint.

38.  Defendants deny the allegations in paragraph 38 of the Complaint.

39.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Complaint.

40.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 of the Complaint.

41.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 of the Complaint.

42.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42 of the Complaint.

43.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 of the Complaint.

44.  Defendants deny the allegations in paragraph 44 of the Complaint.

45.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 of the Complaint.

46.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46 of the Complaint.

47.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 47 of the Complaint.

48.  Defendants deny the allegations in paragraph 48 of the Complaint.

49.  Defendant Hydra Cup admits that it manufactures, uses, sells, offers for sale, promotes, advertises, and/or imports into the United States shakers, including some in various sizes and colors that were designed and manufactured by a third party and that embody said third party's design patents. Defendant Hydra Cup denies the remaining allegations in paragraph 49 of the Complaint. Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 49 of the Complaint.

50.  Defendant Hydra Cup admits that it manufactures, uses, sells, offers for sale, promotes, advertises, and/or imports into the United States shaker bottle lids that were designed and manufactured by a third party and that embody said third party's design patents. Defendant Hydra Cup denies the remaining allegations in paragraph 50 of the Complaint. Defendant Thomas Raymus

1  lacks knowledge or information sufficient to form a belief about the truth of the allegations in

2  paragraph 50 of the Complaint.

3  51.  Defendants admit that Exhibit 6 to the Complaint appears to be a copy of a letter dated 21 Jan-

4  uary 2021 from BlenderBottle to Hydra Cup. Defendants deny the remaining allegations in

5  paragraph 51 of the Complaint.

6  52.  Defendant Hydra Cup denies the allegations in paragraph 52 of the Complaint. Defendant

7  Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of

8  the allegations in paragraph 52 of the Complaint.

9  53.  Defendants admit that Exhibit 7 to the Complaint appears to be a copy of a letter dated 21

10  March 2022 from BlenderBottle to Hydra Cup. Defendants deny the remaining allegations in

11  paragraph 53 of the Complaint.

12  54.  Defendants admit that Exhibit 8 to the Complaint appears to be a copy of a letter dated 17 Au-

13  gust 2022 from BlenderBottle to Hydra Cup. Defendants deny the remaining allegations in

14  paragraph 54 of the Complaint.

15  55.  Defendant Hydra Cup admits that it has continued to sell its shaker bottles and shaker bottle

16  lids. Defendant Hydra Cup denies the remaining allegations in paragraph 55 of the Complaint.

17  Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about

18  the truth of the allegations in paragraph 55 of the Complaint.

19  56.  Defendant Hydra Cup denies the allegations in paragraph 56 of the Complaint. Defendant

20  Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of

21  the allegations in paragraph 56 of the Complaint.

22  57.  Defendants admits that Mr. Raymus's deposition was taken on 13 December 2023. Defendants

23  admit that during Mr. Raymus's deposition, when asked whether Defendant Mr. Raymus "ever

24  commingled funds between the business account and the personal account beyond the $100,000

25  amount," he stated "[y]es, I have," but further explained that he meant it was most likely that

26  he had mixed up credit cards or bank accounts at some point by accident, explaining that the

27  "nature of these [alleged] commingling actives" was as follows: "It could be just a transaction

28  of funds back and forth to – or it could have been like a – maybe an accidental given the bank

6

1   my account number to just transfer it in the – in one account."[1] Defendant Mr. Raymus clari-

2   fied that any hypothetical commingling that he was referring to was accidental due to the way

3   the bank mixes accounts together, testifying that "the nature of like the online, how it works, is

4   all the accounts are there. So the personal account's with the business account. So it could have

5   just been fluctuated, given them a different check or something like that, but . . ." (Tr. 33:15-

6   19.). Defendant Mr. Raymus denied that he injected any additional monetary funds in Hydra

7   Cup, testifying that "I don't believe I ever inserted anything for the purpose of giving the busi-

8   ness monetary funds. It was more of a – just they're all together, so here's that, put it in – do

9   you want to put it in this account or this account, as a bank teller. I'm just saying if we looked it

10  possibly could be, but no, I never had intentionally inserted any more funds into Hydra Cup."

11  (Tr. 34:1-11.). Defendant Mr. Raymus clarified that he "wouldn't have my personal account

12  pay Hydra Cup stuff. It would maybe be the opposite of that." (Tr. 35: 4-8). Defendants deny

13  the remaining allegations in paragraph 57 of the Complaint.

14  58.  Defendants admit that during Mr. Raymus's 13 December 2023 deposition he testified that he

15      was responsible for "certain modifications" of the designs of the Hydra Cup shaker bottles and

16      shaker bottle lids. Defendant Mr. Raymus further admits that during his 13 December 2023 de-

17      position he testified that he was responsible for the selection and subsequent commercialization

18      of the Hydra Cup shaker bottles and shaker bottle lids, as well as agitators and labels. Defen-

19      dants deny the remaining allegations in paragraph 58 of the Complaint.

20  59.  Defendants admit that during the 13 December 2023 deposition of Defendant Mr. Raymus, he

21      testified that he is currently the majority owner and a full time employee of Defendant Hydra

22      Cup and that Defendant Hydra Cup relies on independent contractors to perform tasks that De-

23      fendant Mr. Raymus does not perform. Defendants further admit that during his 13 December

24      2023 deposition of Defendant Mr. Raymus, he testified that he is "in charge" of Defendant Hy-

25      dra Cup as "the [majority] owner and CEO" of Defendant Hydra Cup. Defendants deny the re-

26      maining allegations in paragraph 59 of the Complaint.

27  60.  Defendants deny the allegations in paragraph 60 of the Complaint.

---

1 (Ex. 3, Raymus Depo. Tr. 32:20-22, 33:1-8).

1    61.  Defendants deny the allegations in paragraph 61 of the Complaint.

2    62.  Defendants deny the allegations in paragraph 62 of the Complaint.

3    63.  Defendants deny the allegations in paragraph 63 of the Complaint.

4    64.  Defendants deny the allegations in paragraph 64 of the Complaint.

5    **PLAINTIFF BLENDERBOTTLE'S FIRST CLAIM FOR RELIEF: PATENT INFRINGE-**
6    **MENT (35 U.S.C. § 271).**

7    65.  Defendants repeat and re-allege their responses to the allegations of paragraphs 1-64 above as
8         if set forth fully herein.

9    66.  Defendants deny the allegations in paragraph 66 of the Complaint.

10   67.  Defendants deny the allegations in paragraph 67 of the Complaint.

11   68.  Defendants deny the allegations in paragraph 68 of the Complaint.

12   69.  Defendants deny the allegations in paragraph 69 of the Complaint.

13   70.  The allegations in paragraph 70 state a legal conclusion to which no response is required. To
14        the extent a response is required, Defendants deny the allegations in paragraph 70 of the Com-
15        plaint.

16   71.  Defendants deny the allegations in paragraph 71 of the Complaint.

17   72.  Defendants deny the allegations in paragraph 72 of the Complaint.

18   73.  Defendants deny the allegations in paragraph 73 of the Complaint.

19   74.  Defendants deny the allegations in paragraph 74 of the Complaint.

20   **PLAINTIFF BLENDERBOTTLE'S SECOND CLAIM FOR RELIEF: DEFENDANT'S**
21   **TRADE DRESS INFRINGEMENT (15 U.S.C. §1125(A)).**

22   75.  Defendants repeat and re-allege their responses to the allegations of paragraphs 1-64 of the
23        Complaint as if set forth fully herein.

24   76.  Defendants deny the allegations in paragraph 76 of the Complaint.

1    77.  Defendants deny the allegations in paragraph 77 of the Complaint.

2    78.  Defendants deny the allegations in paragraph 78 of the Complaint.

3    79.  Defendants deny the allegations in paragraph 79 of the Complaint.

4    80.  Defendants deny the allegations in paragraph 80 of the Complaint.

5    81.  Defendants deny the allegations in paragraph 81 of the Complaint.

6    82.  Defendants deny the allegations in paragraph 82 of the Complaint.

7    83.  Defendants deny the allegations in paragraph 83 of the Complaint.

8    84.  Defendants deny the allegations in paragraph 84 of the Complaint.

9    85.  Defendants deny the allegations in paragraph 85 of the Complaint.

10   86.  Defendants deny the allegations in paragraph 86 of the Complaint.

11   87.  Defendants deny the allegations in paragraph 87 of the Complaint.

12   88.  Defendants deny the allegations in paragraph 88 of the Complaint.

13   89.  Defendants deny the allegations in paragraph 89 of the Complaint.

14   90.  Defendants deny the allegations in paragraph 90 of the Complaint.

15   91.  Defendants deny the allegations in paragraph 91 of the Complaint.

16   **PLAINTIFF BLENDERBOTTLE'S THIRD CLAIM FOR RELIEF: TRADE DRESS IN-**
17   **FRINGEMENT (15 U.S.C. §1114).**

18   92.  Defendants repeat and re-allege their responses to the allegations of paragraphs 1-64 and 75-91

19        of the Complaint as if set forth fully herein.

20   93.  Defendants deny the allegations in paragraph 93 of the Complaint.

21   94.  Defendants deny the allegations in paragraph 94 of the Complaint.

22   95.  Defendants deny the allegations in paragraph 95 of the Complaint.

23   96.  Defendants deny the allegations in paragraph 96 of the Complaint.

97. Defendants deny the allegations in paragraph 97 of the Complaint.

98. Defendants deny the allegations in paragraph 98 of the Complaint.

99. Defendants deny the allegations in paragraph 99 of the Complaint.

100. Defendants deny the allegations in paragraph 100 of the Complaint.

101. Defendants deny the allegations in paragraph 101 of the Complaint.

**PLAINTIFF BLENDERBOTTLE'S FOURTH CLAIM FOR RELIEF: FALSE DESIGNA-TION OF ORIGIN, PASSING OFF, & FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125(A)).**

102. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-102 of the Complaint as if set forth fully herein.

103. Defendants deny the allegations in paragraph 103 of the Complaint.

104. Defendants deny the allegations in paragraph 104 of the Complaint.

105. Defendants deny the allegations in paragraph 105 of the Complaint.

106. Defendants deny the allegations in paragraph 106 of the Complaint.

107. Defendants deny the allegations in paragraph 107 of the Complaint.

108. Defendants deny the allegations in paragraph 108 of the Complaint.

109. Defendants deny the allegations in paragraph 109 of the Complaint.

110. Defendants deny the allegations in paragraph 110 of the Complaint.

**PLAINTIFF BLENDERBOTTLE'S FIFTH CLAIM FOR RELIEF: UNFAIR COMPETI-TION UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)**

111. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-110 of the Complaint as if set forth fully herein.

112. Defendants deny the allegations in paragraph 112 of the Complaint.

113. Defendants deny the allegations in paragraph 113 of the Complaint.

1     114. Defendants deny the allegations in paragraph 114 of the Complaint.

2     115. Defendants deny the allegations in paragraph 115 of the Complaint.

3
4     **PLAINTIFF BLENDERBOTTLE'S SIXTH CLAIM FOR RELIEF: UNFAIR COMPETI-TION UNDER CALIFORNIA COMMON LAW (CALIFORNIA COMMON LAW)**

5
6     116. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-115 of the Complaint as if set forth fully herein.

7     117. Defendants deny the allegations in paragraph 117 of the Complaint.

8     118. Defendants deny the allegations in paragraph 118 of the Complaint.

9     119. Defendants deny the allegations in paragraph 119 of the Complaint.

10     120. Defendants deny the allegations in paragraph 120 of the Complaint.

11     121. Defendants deny the allegations in paragraph 121 of the Complaint.

12     **XI. PLAINTIFF BLENDERBOTTLE'S PRAYER FOR RELIEF**

13     122. A. Defendants deny the allegations in paragraph A of the Complaint's PRAYER FOR RELIEF.

14     123. B. Defendants deny the allegations in paragraph B of the Complaint's PRAYER FOR RELIEF.

15     124. C. Defendants deny the allegations in paragraph C of the Complaint's PRAYER FOR RELIEF.

16     125. D. Defendants deny the allegations in paragraph D of the Complaint's PRAYER FOR RELIEF.

17     126. E. Defendants deny the allegations in paragraph E of the Complaint's PRAYER FOR RELIEF.

18     127. F. Defendants deny the allegations in paragraph F of the Complaint's PRAYER FOR RELIEF.

19     128. G. Defendants deny the allegations in paragraph G of the Complaint's PRAYER FOR RELIEF.

20     129. H. Defendants deny the allegations in paragraph H of the Complaint's PRAYER FOR RELIEF.

21     130. I. Defendants deny the allegations in paragraph I of the Complaint's PRAYER FOR RELIEF.

22     131. J. Defendants deny the allegations in paragraph J of the Complaint's PRAYER FOR RELIEF.

23     132. K. Defendants deny the allegations in paragraph K of the Complaint's PRAYER FOR RELIEF.

1    133. L. Defendants deny the allegations in paragraph L of the Complaint's PRAYER FOR RELIEF.

2    134. M. Defendants deny the allegations in paragraph N of the Complaint's PRAYER FOR RE-
3        LIEF.

4    135. N. Defendants deny the allegations in paragraph M of the Complaint's PRAYER FOR RE-
5        LIEF.

6                              **AFFIRMATIVE DEFENSES**

7    136. In further response to the Complaint, Defendants assert the following defenses. Defendants re-
8        serve the right to amend this Second Amended Answer with additional, supplemental, and or
9        different defenses as Defendants' investigation and discovery in this case may merit, and as
10       permitted by the Federal Rules of Civil Procedure and the Local Rules of this Court.

11   **FIRST AFFIRMATIVE DEFENSE: NONINFRINGEMENT OF THE ASSERTED PATENTS.**

12   137. BlenderBottle's patent infringement claims are barred, in whole or in part, because neither De-
13       fendants nor Defendant's Accused Products are infringing or have infringed any valid claim of
14       the D235 Patent, the D551 Patent, or the D798 Patent either directly or indirectly, and either lit-
15       erally or under the doctrine of equivalents, nor have they induced or contributed to the infringe-
16       ment of any valid claim of the Asserted Patents.

17   138. BlenderBottle's patent infringement claims are barred, in whole or in part, because Defendants
18       do not make, use, sell, offer for sale, or import into the United States, and have not made, used,
19       sold, offered for sale or imported into the United States any products or methods that infringe
20       any valid claim of the D235 Patent, the D551 Patent, or the D798 Patent either willfully, di-
21       rectly, indirectly, contributorily, through the doctrine of equivalents, or otherwise, and has not
22       induced others to infringe the D235 Patent.

23   **SECOND AFFIRMATIVE DEFENSE: INVALIDITY OF THE ASSERTED PATENTS UN-**
24                       **DER 35 U.S.C. §§ 102 AND 103.**

25   139. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon infor-
26       mation and belief, the D235 Patent, the D551 Patent, and the D798 Patent, and each and every

1  claim thereof, is invalid for failure to meet the conditions for patentability specified in 35

2  U.S.C. §§ 102 and 103.

3  140. The claimed designs in the D235, D551, and D798 Patents are primarily dictated by function

4  and therefore invalid under 35 U.S.C. § 171.

5  141. The designs claimed by and configurations shown in the Asserted Patents are indefinite and are

6  therefore invalid under 35 U.S.C. § 112.

7  **THIRD AFFIRMATIVE DEFENSE: INVALIDITY OF THE ASSERTED PATENTS UN-**
8  **DER 35 U.S.C. §§ 101, 112, AND 171.**

9  142. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon infor-

10  mation and belief, the D235 Patent, the D551 Patent, and the D798 Patent, and each and every

11  claim thereof, is invalid for failure to meet the conditions for patentability specified in 35

12  U.S.C. §§ 101, 112, and 171.

13  **FOURTH AFFIRMATIVE DEFENSE: INVALIDITY OF THE ASSERTED PATENTS BE-**
14  **CAUSE THE DESIGNS ARE PRIMARILY DICTATED BY FUNCTION.**

15  143. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon infor-

16  mation and belief, the D235 Patent, the D551 Patent, and the D798 Patent, and each and every

17  claim thereof, is invalid, unenforceable, and void because the claimed designs are primarily

18  functional rather than ornamental. At a minimum, the scope of the claimed designs should be

19  construed as limited to any ornamental aspects alone and should not extend to any functional

20  elements of the claimed designs–i.e., the prominent functional design elements should be con-

21  sidered "irrelevant" when analyzing substantial similarity.

22  **FIFTH AFFIRMATIVE DEFENSE: FAILURE TO STATE A CLAIM.**

23  144. BlenderBottle's Complaint fails to state a claim, in whole or in part, upon which relief can be

24  granted.

25  **SIXTH AFFIRMATIVE DEFENSE: LACK OF STANDING.**

1    145. BlenderBottle's claims are barred, in whole or in part, because it lacks standing, including but

2         not limited to because, upon information and belief, BlenderBottle does not own or otherwise

3         have the right to enforce the Asserted Patents and Trade Dresses.

**SEVENTH AFFIRMATIVE DEFENSE: UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT BEFORE THE USPTO.**

6    146. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon infor-

7         mation and belief, because BlenderBottle's Asserted Patents are unenforceable due to in-

8         equitable conduct before the United States Patent and Trademark Office (USPTO) as further

9         described with particularity below.[2]

10   147. More specifically, the Asserted Patents are unenforceable due to inequitable conduct before the

11        USPTO, including, among other things, BlenderBottle's failure to identify known prior art,

12        failure to disclose known design elements that are primarily functional, and failure to disclose

13        other material information during the prosecution of each Asserted Patent, which was done

14        with knowledge and the failure to disclose was material to patentability. This failure to identify

15        material references extends to each individual associated with the filing and prosecution of the

16        patent applications asserted by BlenderBottle.

**EIGHTH AFFIRMATIVE DEFENSE: PATENT MISUSE.**

18   148. BlenderBottle's patent infringement claims and other related claims are barred, in whole or in

19        part, because, upon information and belief, BlenderBottle has misused the asserted patents by

20        attempting to impermissibly broaden the physical and/or temporal scope of the patents with an-

21        ticompetitive effect. BlenderBottle's patent misuse includes without limitation its assertion of

22        its invalid and/or vastly narrow and limited patent rights against numerous competitors in the

23        beverage container industry for the sole purpose of stifling competition without any good-faith

24        infringement or other legal claims, and by attempting to impermissibly extend the life of its de-

25        sign and utility patents by registering them as trade dresses and asserting those trade dress reg-

26        istrations along with unregistered ones against Defendant and numerous other competitors.

---

2 *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009).

**NINTH AFFIRMATIVE DEFENSE: LIMITATIONS ON DAMAGES 35 U.S.C. § 286.**

149. BlenderBottle's alleged damages for patent infringement are limited to the six (6) years before it filed the Complaint pursuant to 35 U.S.C. § 286.

**TENTH AFFIRMATIVE DEFENSE: NONINFRINGEMENT OF THE ASSERTED TRADE DRESSES.**

150. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because Defendants have not infringed any valid, enforceable trade dress rights owned by BlenderBottle and because Defendants have not infringed any of BlenderBottle's Asserted Trade Dresses or any claims thereof.

**ELEVENTH AFFIRMATIVE DEFENSE: INVALIDITY OF THE ASSERTED TRADE DRESSES DUE TO LACK OF DISTINCTIVENESS AND FAILURE TO ACQUIRE SEC-ONDARY MEANING.**

151. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, the trade dresses asserted by BlenderBottle, and each and every design feature thereof, are invalid, unenforceable, and void because they are generic, not inherently distinctive, and have not acquired distinctiveness through secondary meaning.

**TWELFTH AFFIRMATIVE DEFENSE: INVALIDITY OF THE ASSERTED TRADE DRESSES DUE TO CLAIMING PRIMARILY FUNCTIONAL DESIGNS.**

152. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, the trade dresses asserted by BlenderBottle, and each and every design feature thereof, are invalid, unenforceable, and void because they are functional. At a minimum, the scope of the claimed trade dresses should be construed as lim-ited to any ornamental aspects alone and should not extend to any functional elements of the claimed features.

**THIRTEENTH AFFIRMATIVE DEFENSE: TRADE DRESS ABANDONMENT THROUGH NON-USE.**

153. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, BlenderBottle has abandoned any and all rights in the Asserted Trade dresses by non-use of the trade dresses with the express or implied intent not to resume their use.

**FOURTEENTH AFFIRMATIVE DEFENSE: TRADE DRESS ABANDONMENT—BECOMING GENERIC OR LOSING SIGNIFICANCE.**

154. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, the Asserted Trade Dresses have become generic or otherwise have lost trade dress significance including but not limited due to BlenderBottle's failure to control third-party uses of the alleged trade dresses.

**FIFTEENTH AFFIRMATIVE DEFENSE: REMOTE GOOD FAITH USER.**

155. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, under the remote good faith user doctrine.

**SIXTEENTH AFFIRMATIVE DEFENSE: SENIOR USER OF TRADE DRESSES.**

156. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part because, upon information and belief, Defendants are the senior users of the Asserted Trade Dresses.

**SEVENTEENTH AFFIRMATIVE DEFENSE: FAIR USE.**

157. BlenderBottle's patent infringement claims, trade dress infringement claims, and other related claims are barred, in whole or in part because any use of the Asserted Patents or Asserted Trade Dresses, or the design elements therein, by Defendants was permissible fair use.

**EIGHTEENTH AFFIRMATIVE DEFENSE: TRADE DRESS MISUSE.**

158. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, BlenderBottle has misused the Asserted Trade Dresses by attempting to impermissibly broaden the physical and/or temporal scope of both its

1   asserted trade dresses and patents with anticompetitive effect. BlenderBottle's trade dress mis-

2   use includes without limitation its assertion of its invalid and/or vastly overbroad, vague, and/or

3   ambiguous trade dresses against numerous competitors in the beverage container industry for

4   the sole purpose of stifling competition without any good-faith infringement or other legal

5   claims, and by attempting to impermissibly extend the life of its design and utility patents by

6   registering them as trade dresses and asserting those trade dress registrations along with unreg-

7   istered ones against Defendants and numerous other competitors.


8   **TWENTIETH AFFIRMATIVE DEFENSE: INEQUITABLE CONDUCT BEFORE THE**
9   **USPTO.**

10  159. BlenderBottle's 019 Lid Trade Dress infringement claim is barred and the 019 Lid Trade Dress

11  is unenforceable due to inequitable conduct before the USPTO as further described with partic-

12  ularity below and as set forth in Defendant's Counterclaims that it expressly incorporates by

13  reference herein. Specifically, the registration for the 019 Lid Trade Dress was procured by ma-

14  terial, false, and fraudulent declarations and representations to the USPTO, including but not

15  limited to various misrepresentations, including the following: (1) the Lid Trade Dress was first

16  used anywhere and first used in commerce at least as early as 2003, when, on information and

17  belief, the Lid Trade Dress was not used until on or around 2014; and (2) in response to the

18  USPTO's request for a "written statement as to whether the applied-for mark, or any feature(s)

19  thereof, is or has been the subject of a design or utility patents or patent applications, including

20  expired patents and abandoned patent applications" and "copies of the patents and/or patent ap-

21  plications documentation," the Registrant for the Lid Trade Dress only provided "representa-

22  tive samples" and failed to disclose at least seven (7) relevant patents and/or patent applica-

23  tions, including without limitation some related to the functionality of the Lid Trade Dress

24  and/or other requirements for trade dress protection. The Registrant made the above misrepre-

25  sentations knowing they were false and with the intention to deceive the USPTO, and the

26  USPTO relied on the misrepresentations.


27  **TWENTY-FIRST AFFIRMATIVE DEFENSE: NO LIKELIHOOD OF CONFUSION.**

28  160. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or

29  in part, because, upon information and belief, Defendants' actions have not caused and are not

likely to cause confusion as to source, affiliation, connection, or association with BlenderBottle or its products.

**TWENTY-SECOND AFFIRMATIVE DEFENSE: PREEMPTION.**

161. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, BlenderBottle's trade dress claims under its Asserted Trade Dresses are preempted by federal patent law.

**TWENTY-THIRD AFFIRMATIVE DEFENSE: TACKING IMPERMISSIBLE.**

162. BlenderBottle cannot establish priority necessary to support its trade dress claims because tacking is impermissible here.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE: UNCLEAN HANDS.**

163. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, BlenderBottle has engaged in unconscionable conduct that has an immediate and necessary relation to the matters at issue in the case and is attempting to benefit from that unconscionable conduct.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE: STATUTE OF LIMITATIONS.**

164. BlenderBottle's claims are barred, in whole or in part, by the applicable statute of limitations, including but not limited to 35 U.S.C. § 286, Cal. Civ. Proc. Code § 337, 338, 340, and/or 343, and/or Cal. Bus. & Prof. Code § 17208.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE: ACQUIESCENCE.**

165. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, BlenderBottle has implicitly and/or explicitly acquiesced to the conduct described in the Complaint and has therefore waived any purported claim for relief against Hydra Cup.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE: ANTITRUST.**

1    166. BlenderBottle's claims are barred, in whole or in part, because, on information and belief,

2           BlenderBottle's alleged patents and/or trade dresses have been or are being used to violate the

3           antitrust laws of the United States.

4                    **TWENTY-EIGHTH AFFIRMATIVE DEFENSE: ESTOPPEL.**

5    167. BlenderBottle's claims are barred, in whole or in part, because, on information and belief,

6                    **TWENTY-NINTH AFFIRMATIVE DEFENSE: LACHES.**

7    168. BlenderBottle's claims are barred, in whole or in part, because, on information and belief,

8           BlenderBottle unreasonably delayed in filing this action.

9               **THIRTIETH AFFIRMATIVE DEFENSE: UNJUST ENRICHMENT.**

10   169. BlenderBottle's claims are barred, in whole or in part, because, on information and belief,

11         BlenderBottle is seeking to recover more than it is entitled to recover under the circumstances

12         of this case (any amount of which Hydra Cup expressly denies), and as such, an award of any

13         recovery by Plaintiff would constitute unjust enrichment.

14             **THIRTY-FIRST AFFIRMATIVE DEFENSE: PUBLIC POLICY.**

15   170. BlenderBottle's claims are barred, in whole or in part, because, on information and belief,

16         BlenderBottle's claims and its actions violate public policy.

17   **THIRTY-SECOND AFFIRMATIVE DEFENSE: NO BASIS FOR ENHANCED DAMAGES.**

18   171. Any conduct of Hydra Cup was in good faith and/or non-willful and precludes all claims for

19         enhanced damages.

20    **THIRTY-THIRD AFFIRMATIVE DEFENSE: NO BASIS FOR ATTORNEYS' FEES.**

21   172. BlenderBottle has failed to allege an adequate and/or reasonable basis upon which to seek at-

22         torneys' fees.

23     **THIRTY-FOURTH AFFIRMATIVE DEFENSE: NO IRREPARABLE HARM.**

173. If BlenderBottle suffered any injury (which Hydra Cup does not concede), it could be adequately compensated in an action at law, and accordingly, BlenderBottle is not entitled to equitable relief. Further, BlenderBottle has not suffered any harm, including the type of irreparable harm required to support its claim for injunctive relief.

**THIRTY-FIFTH AFFIRMATIVE DEFENSE: PROSECUTION HISTORY ESTOPPEL.**

174. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because, based on statements and admissions made during prosecution of the patent applications, BlenderBottle is estopped from asserting any interpretation of the claims that would cover Hydra Cup's Accused Products.

**THIRTY-SIXTH AFFIRMATIVE DEFENSE: NO WILLFUL INFRINGEMENT.**

175. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because, Hydra has not willfully infringed any of the Asserted Patents or Asserted Trade Dresses.

**THIRTY-SEVENTH AFFIRMATIVE DEFENSE: INVALIDLY OF THE ASSERTED PATENTS DUE TO IMPROPER INVENTORSHIP.**

176. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because the Asserted Patents are invalid under 35 U.S.C. § 101 et seq. because the named inventor(s) did not personally invent the claimed subject matter.

**THIRTY-EIGHTH AFFIRMATIVE DEFENSE: PUBLIC DOMAIN.**

177. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because the designs it claims rights to belong to the public domain.

**THIRTY-NINTH AFFIRMATIVE DEFENSE: PATENT EXHAUSTION.**

178. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because BlenderBottle's infringement claims are barred by the doctrine of patent exhaustion.

**FORTIETH AFFIRMATIVE DEFENSE: OBVIOUSNESS-TYPE DOUBLE PATENTING.**

179. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because the claims of the Asserted Patents are invalid for obviousness-type double patenting over claims of BlenderBottle's other patents, other previously filed patent applications, prior publications, and other prior art.

**FORTY-FIRST AFFIRMATIVE DEFENSE: IMPROPER PRIORITY CLAIM.**

180. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, because the Asserted Patents are invalid due to an improper priority claim under 35 U.S.C. § 120.

WHEREFORE, Defendants Hydra Cup and Mr. Raymus respectfully request that the Court enter judgment against Plaintiff BlenderBottle as follows:

- A. Dismissing the Complaint with prejudice;

- B. Denying BlenderBottle all relief requested in its Complaint;

- C. Declaring this case exceptional under 35 U.S.C. § 285 and awarding Defendants their attorneys' fees, costs, and expenses incurred in this action;

- D. Awarding Defendants such other and further relief as this Court may deem just and proper.

**Dated**: 10 June 2024

Respectfully submitted,

By: /s/Meghan Pratschler/
Meghan Pratschler
CA Bar No.: 324970
Meghan the Attorney, LLP
95 3rd St. 2nd Floor
San Francisco, CA 94103-3103
meghan@meghantheattorney.com
(415) 335-9226

-and-

By: /s/Casey Scott McKay/
Casey Scott McKay
TN Bar No.: 034028
MC Law, PLLC
1441 U St. NW, Suite 102
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

*Attorneys for Defendants TRRS Magnate, LLC dba Hydra Cup and Thomas Raymus, an Individual.*

**CERTIFICATE OF SERVICE**

1    I hereby certify that a copy of the foregoing was filed using this Court's CM/ECF notifica-

2    tion service, which sent notification of such filing to all pro se parties and counsel of record on 10

3    June 2024.

4    KNOBBE MARTENS OLSON & BEAR
5    Sean Murray (SBN 213,655)
6    sean.murray@knobbe.com Ali S. Razai (SBN 246,922)
7    ali.razai@knobbe.com
8    Jacob R. Rosenbaum (SBN 313,190)
9    jacob.rosenbaum@knobbe.com
10   Christian D. Boettcher (SBN 342,950)
11   christian.boettcher@knobbe.com

12   KNOBBE, MARTENS, OLSON & BEAR, LLP
13   2040 Main Street
14   Fourteenth Floor
15   Irvine, CA 92614
16   Phone: (949) 760-0404
17   Facsimile: (949) 760-9502

18                                                    By: /s/Meghan Pratschler/
19                                                         Meghan Pratschler
20                                                       CA Bar No.: 324970
21                                                   Meghan the Attorney, LLP
22                                                      95 3rd St. 2nd Floor
23                                                  San Francisco, CA 94103-3103
24                                                meghan@meghantheattorney.com
25                                                       (415) 335-9226

26                                                            -and-

27                                                  By: /s/Casey Scott McKay/
28                                                        Casey Scott McKay
29                                                      TN Bar No.: 034028
30                                                         MC Law, PLLC
31                                                   1441 U St. NW, Suite 102
32                                                  Washington, DC, D.C. 20009
33                                                         202.743.1972
34                                                        casey@mclaw.io

35   *Attorneys for Defendants TRRS Magnate, LLC dba Hydra Cup and Thomas Raymus, an Individual.*

1

2

3

4

Meghan Pratschler
CA Bar No.: 324970
Meghan the Attorney, LLP
95 3rd St 2nd Floor
San Francisco, CA 94103-3103
meghan@meghantheattorney.com
(415) 335-9226

-and-

Casey Scott McKay
TN Bar No.: 034028
MC Law, PLLC
1441 U St. NW, Suite 102
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**THE EASTERN DISTRICT OF CALIFORNIA**

— — — — — — — — — — — — — — — — — — — — — — — — — — —X

TROVE BRANDS, LLC D/B/A THE BLENDERBOTTLE COM-
PANY

        *Plaintiff Counterclaim Defendant,*

                    **Case No: 2:22-cv-02222-TLN-CKD,**

        *v.*

TRRS MAGNATE LLC D/B/A HYDRA CUP AND THOMAS
RAYMUS, AN INDIVIDUAL,

        *Defendants Counterclaim Plaintiffs.*

— — — — — — — — — — — — — — — — — — — — — — — — — — —X


**COUNTERCLAIM PLAINTIFFS' SECOND AMENDED COUNTERCLAIM**

    **JURY DEMAND:** Counterclaim Plaintiffs Hydra Cup and Mr. Raymus hereby demand a

trial by jury on all issues so triable.

1.    Defendants Counterclaim Plaintiffs TRRS Magnate LLC d/b/a Hydra Cup and Thomas Ray-

    mus (collectively "**Hydra Cup**" unless otherwise specified), by and through counsel, bring this

    Second Amended Counterclaim ("**Counterclaim**") against Plaintiff Counterclaim Defendant

    BlenderBottle Trove Brands, LLC, d/b/a the BlenderBottle Company ("**BlenderBottle**") and in

1  response to BlenderBottle's Second Amended Complaint (the "**Complaint**") pursuant to Rule

2  13 of the Federal Rules of Civil Procedure and seek the following determinations: (i) that

3  BlenderBottle's Asserted Patents and Equivalent Patents are invalid, unenforceable, and not in-

4  fringed by Hydra Cup's Accused Products; (ii) that BlenderBottle's Asserted Trade Dresses

5  and Related Trademarks are generic, lack secondary meaning, invalid, unenforceable, and not

6  infringed by Hydra Cup's Accused Products; (iii) that BlenderBottle's unfair competition

7  claims are similarly meritless; (iv) that Hydra Cup's patent and trademark rights are valid and

8  enforceable; (v) that BlenderBottle's Infringing Products infringe Hydra Cup's valid and en-

9  forceable patent and trademark rights; and (vi) that BlenderBottle has engaged in a pattern of

10  deceptive conduct with the public, its competitors, and the USPTO. In support of its Counter-

11  claim, Hydra Cup alleges as follows:

12  **INTRODUCTION**

13  2.  Mr. Raymus operates Hydra Cup, a health and fitness company that has been designing, devel-

14  oping, and selling innovative, high-quality health and fitness products, including shaker bottles

15  and related accessories, since 2012. Hydra Cup has invested significant time and resources into

16  creating unique products and protecting its intellectual property rights, including obtaining

17  multiple patents and conducting extensive due diligence to ensure its products do not infringe

18  the intellectual property rights of others. Despite Hydra Cup's best efforts, BlenderBottle has

19  filed this lawsuit alleging infringement of various patents and trade dresses. As detailed below,

20  however, Hydra Cup does not infringe any valid intellectual property rights owned by Blender-

21  Bottle; BlenderBottle, on the other hand, is infringing on intellectual property rights owned by

22  Hydra Cup.

23  3.  Hydra Cup brings the following counterclaims against BlenderBottle:

24  A.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that U.S. Design

25  Patent No. D510,235 (the "**D235 Patent**"), U.S. Design Patent No. D696,551 (the "**551**

26  **Patent**"), and U.S. Design Patent No. D697,798 (the "**798 Patent**") (collectively, the

27  "**Asserted Patents**"), which are attached to the Complaint as Exhibits 14-16, are invalid

28  and unenforceable under the Patent Act of 1952, 35 U.S.C. §§ 1 *et seq*., because the

29  claimed subject matter of the Asserted Patents was described in one or more printed

| 1 | publications in the United States or a foreign country or in public use or on sale in the |
| 2 | United States more than one year prior to the filing of the patent applications that issued |
| 3 | as the Asserted Patents; |

4    B.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that U.S. Patent

5        No. D820,038 (the "**D038 Patent**"), U.S. Patent No. D748,478 (the "**D478 Patent**"),

6        U.S. Patent No. D644,065 (the "**D065 Patent**"), U.S. Patent No. D900,540 (the "**D540**

7        **Patent**"), U.S. Patent No. D897,149 (the "**D149 Patent**"), U.S. Patent No. D830,119

8        (the "**D119 Patent**") (collectively, the "**Equivalent Design Patents**") and U.S. Patent

9        No. 9,216,843 (the "**843 Patent**"), U.S. Patent No. 9,492,024 (the "**024 Patent**"), U.S.

10       Patent No. 10,165,877 (the "**877 Patent**"), U.S. Patent No. 8,695,830 (the "**830**

11       **Patent**"), U.S. Patent No. 11,111,060 (the "**060 Patent**"), and U.S. Patent

12       No. 6,379,032 (collectively, the "**Equivalent Utility Patents**"), which are attached to

13       the Complaint as Exhibits 23-34 (collectively, the "**Equivalent Patents**"), are invalid

14       and unenforceable under the Patent Act of 1952, 35 U.S.C. §§ 1 *et seq.*, because the

15       claimed subject matter of the Equivalent Patents was described in one or more printed

16       publications in the United States or a foreign country or in public use or on sale in the

17       United States more than one year prior to the filing of the patent applications that issued

18       as the Asserted Patents; and, therefore, the Equivalent Patents are invalid as anticipated

19       by or obvious over the prior art.

20    C.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's

21        D235 Patent expired on 04 October 2019 and that the "Bottle" design disclosed therein

22        was granted to the public domain on or before 04 October 2019;

23    D.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's

24        Asserted Patents and Equivalent Patents are invalid because the subject matter and de-

25        signs lack originality, would have been obvious, and are not novel;

26    E.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's

27        Asserted Patents and Equivalent Design Patents are invalid because the claimed designs

28        lack ornamentality and are primarily dictated by function, which is described in detail in

29        BlenderBottle's Equivalent Utility Patents;

1      F.     a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that the D551 Patent

2            is invalid and unenforceable due to inequitable conduct on the USPTO;

3      G.    a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup's

4            Accused Products have not infringed and do not infringe the Asserted Patents or the

5            Equivalent Patents;

6      H.    a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's

7            U.S. Trademark Registration No. 6,245,626 (the "**626 Agitator Trade Dress**"), U.S.

8            Trademark Registration No. 6,800,019 (the "**019 Lid Trade Dress**"), the "**Unregis-**

9            **tered Bottle Trade Dress**", and the "**Unregistered Label Trade Dress**" (the "**As-**

10           **serted Trade Dresses**") are generic and not protectable as trade dresses under the Lan-

11           ham Act or California law;

12      I.     a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's

13           U.S. Trademark Registration No. 4,894,363 (the "**363 Reg.**" or "**BLENDERBOTTLE**

14           **Mark**") and U.S. Trademark Registration No. 3,515,591 (the "**591 Reg.**" or

15           "**BLENDER BALL Mark**") (collectively the "**Related Trademarks**") are generic and

16           not protectable under the Lanham Act or California law;

17      J.     a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that the designs

18           claimed in BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trade-

19           mark Registration No. 6,800,019, the Unregistered Bottle Trade Dress, and the Unregis-

20           tered Label Trade Dress are primarily functional and therefore not eligible for protec-

21           tion under the Lanham Act;

22      K.    a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's

23           U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration

24           No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trade-

25           mark Registration No. 3,515,591, the Unregistered Bottle Trade Dress, and the Unregis-

26           tered Label Trade Dress lack distinctiveness and have not acquired secondary meaning;

L.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's U.S. Trademark Registration No. 6,800,019 is invalid due to inequitable conduct on the USPTO;

M.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup's Accused Products are not likely to be confused with BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591, the Unregistered Bottle Trade Dress, or the Unregistered Label Trade Dress;

N.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup's Accused Products do not infringe BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591, the Unregistered Bottle Trade Dress, or the Unregistered Label Trade Dress;

O.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle has not acquired and does not possess any trademark rights in the Asserted Trade Dresses;

P.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup has not infringed any valid patent or trade dress rights of BlenderBottle;

Q.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591 are invalid and therefore canceled;

R.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that the Accused Products are modeled after the designs disclosed by U.S. Patent No. D666,047 (the "**D047 Patent**") and U.S. Patent No. D766,029 (the "**D029 Patent**"), and, therefore the Accused Products do not infringe any valid patent or trademark rights of BlenderBottle;

1      S.   a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that the D047 Li-

2            cense Agreement between Tianqi and Hydra Cup is valid and enforceable;

3      T.   a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Tianqi granted

4            Hydra Cup a valid and enforceable implied license to Tianqi's U.S. Patent

5            No. D666,047 and U.S. Patent No. D766,029;

6      U.   a claim for infringement of Hydra Cup's explicit licensed rights in United States Patent

7            No. No. D666,047 under the Patent Act, 35 U.S.C. § 271, based on BlenderBottle's

8            unauthorized commercial manufacture, use, importation, offer for sale, and sale of its

9            Infringing BlenderBottle Products in the United States;

10     V.   a claim for infringement of Hydra Cup's implied licensed rights in United States Patent

11           No. No. D666,047 and U.S. Patent No. D766,029 under the Patent Act, 35 U.S.C. §

12           271, based on BlenderBottle's unauthorized commercial manufacture, use, importation,

13           offer for sale, and sale of its Infringing BlenderBottle Products in the United States;

14     W.  a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup ob-

15           tained secondary meaning for its HC OG Carry Loop Lid Trade Dress, its TS1327 OG

16           Mini Shaker Trade Dress, its TS1314 OG Regular Shaker Trade Dress, and its TS1352

17           OG Storage Shaker Trade Dress;

18     X.   a claim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup's

19           OG DualShaker Trade Dress, OG DualShaker Lid Trade Dress, and OG DualShaker

20           Bottle Trade Dress are valid and enforceable;

21     Y.   a claim for infringement of Hydra Cup's valid and enforceable OG DualShaker Trade

22           Dress, OG DualShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress under

23           15 U.S.C. § 1125(a);

24                             **JURISDICTION**

25  4.   This court has original subject matter jurisdiction over Hydra Cup's counterclaims in this case

26        that relate to patent infringement, trademark and trade dress infringement, false designation of

27        origin, and federal unfair competition under 28 U.S.C. §§ 1331 and 1338, 15 U.S.C. §§ 1114,

1  1116, 1121(a), 1125(a), as these claims arise under the laws of the United States at 35 U.S.C.§§

2  1, *et seq.*, the Lanham Act, 15 U.S.C. §§ 1051, *et seq.*, the California Business & Professions

3  Code §§ 17200, *et seq.*, and common law.

4  5.  Jurisdiction in this Court is also proper pursuant to 28 U.S.C. § 1332, as Hydra Cup and

5  Mr. Raymus both reside in California and BlenderBottle resides in Utah and Hydra Cup is

6  seeking more than $75,000 in damages from BlenderBottle.

7  6.  This Court has supplemental jurisdiction over Hydra Cup's California law counterclaims pur-

8  suant to 28 U.S.C. § 1367(a) because the state law counterclaims are so related to the federal

9  claims that they form part of the same case or controversy and derive from a common nucleus

10  of operative fact under Article III of the United States Constitution.

11  7.  Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §§ 2201 and 2202 as it relates to

12  the declaration that the alleged Asserted Patents, Asserted Trade Dresses, Equivalent Patents,

13  and Related Trademarks are invalid, unenforceable, and not infringed by any product offered

14  for sale, sold, made or used by Hydra Cup.

15  8.  This Court has personal jurisdiction over BlenderBottle because BlenderBottle has submitted to

16  the jurisdiction of this Court by filing its Complaint against Hydra Cup in this District.

17  9.  This Court also has personal jurisdiction over BlenderBottle because it has a continuous, sys-

18  tematic, and substantial presence within this District. BlenderBottle has, for instance, been sell-

19  ing and offering for sale infringing products in this judicial district, and committing, among

20  other things, acts of infringement in this District, including but not limited to, selling infringing

21  products to consumers and/or retailers in this district and selling into the stream of commerce

22  knowing such products would be sold in California and this District. These acts form a substan-

23  tial part of the events or omissions giving rise to BlenderBottle®'s claims.

24  **VENUE**

25  10.  Venue is proper in this District under 28 U.S.C. §§ 1391(b) and 1400(b).

26  11.  Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1391(c), and 1400(a)

27  and 1400(b) because BlenderBottle has submitted to the venue of this Court by filing its Com-

1    plaint against Hydra Cup and because Hydra Cup's counterclaims arise under the laws of the
2    United States.

3                      **GENERAL JURISDICTIONAL ALLEGATIONS**

4    12.   Hydra Cup hereby repeats, realleges, and incorporates the allegations of the preceding para-
5          graph as though fully set forth herein.

6    13.   The California courts have personal jurisdiction over BlenderBottle for Hydra Cup's patent in-
7          fringement counterclaims based on Hydra Cup's implied license in Tianqi's D047 and D029
8          Patents. BlenderBottle has substantial contacts with California that make the exercise of juris-
9          diction proper and consistent with due process.

10   14.   First and foremost, BlenderBottle sells millions of its shaker bottle products in California. The
11         company has a significant and ongoing business presence in the state, deriving substantial rev-
12         enue from California consumers. This continuous and systematic commercial activity within
13         California establishes general jurisdiction over BlenderBottle, as the company has purposefully
14         availed itself of the privileges and benefits of conducting business in the state.

15   15.   Moreover, BlenderBottle has repeatedly invoked the jurisdiction of California courts in its own
16         patent enforcement efforts. The company has sued several entities in California over patents
17         that belong to the same family of "classic simple shaker" bottle designs as the patents at issue
18         in Hydra Cup's counterclaims. By initiating these lawsuits in California, BlenderBottle has pur-
19         posefully directed its patent enforcement activities at the state and has demonstrated its willing-
20         ness to litigate intellectual property disputes in California courts.

21   16.   BlenderBottle has filed dozens of lawsuits across the United States, including in California, al-
22         leging infringement of the Asserted Patents and Equivalent Patents against companies selling
23         products similar to the Accused Products at issue in this case.[3]

24   17.   BlenderBottle's pattern of filing infringement suits in California involving patents from the
25         same family as the Asserted Patents and Equivalent Patents is a strong indicator that the com-

_____

3 *See, e.g., Trove Brands, LLC v. JH Studios*, Inc., No. 8:19-CV-1809-KKM-AAS, 2021 WL 7501178 (M.D. Fla. July 21, 2021) (alleging infringement of the 032 Patent, the D235 Patent, the 830 Patent, the 065 Patent, and other trade-marks.)

1  pany has sufficient minimum contacts with the state to support the exercise of specific jurisdic-

2  tion.4 The Federal Circuit has held that a patent owner's enforcement activities in the forum

3  state, particularly lawsuits involving the same or related patents, constitute significant contacts

4  that are materially related to the enforcement of the relevant patents.

5  18. The fact that BlenderBottle has engaged California counsel to represent it in these patent en-

6  forcement efforts further underscores the company's purposeful availment of California's legal

7  system and resources. Courts in this district have found personal jurisdiction to be proper in

8  declaratory judgment actions where the patent owner sent cease-and-desist letters, litigated

9  cases involving the same or related patents, and engaged California law firms to handle its in-

10  fringement suits.

11  19. Exercising personal jurisdiction over BlenderBottle in this case comports with traditional no-

12  tions of fair play and substantial justice, especially considering BlenderBottle's extensive com-

13  mercial activities in California and its history of enforcing related patents in California, it is

14  reasonable and foreseeable for the company to be haled into court in California to defend

15  against Hydra Cup's counterclaims. BlenderBottle has demonstrated its ability and willingness

16  to litigate in California and has availed itself of the state's legal protections and resources.

17  20. Furthermore, California has a strong interest in providing a forum for the resolution of intellec-

18  tual property disputes involving companies that conduct substantial business within its borders.

19  Allowing Hydra Cup's counterclaims to proceed in California will promote judicial efficiency

20  and ensure the consistent adjudication of rights in the family of "classic simple shaker" bottle

21  patents.

22  21. Therefore, this Court has personal jurisdiction over BlenderBottle for Hydra Cup's patent in-

23  fringement counterclaims based on the implied license in Tianqi's D047 and D029 Patents.

---

4 *See*, e.g., *Sundesa, LLC v. EHPLABS, LLC*, 2:14-cv-05327, (C.D. Cal. July 11, 2019); (alleging infringement of the 830 Patent); *Sundesa LLC v. Labrada Bodybuilding Nutrition Inc*, No. 8:13-cv-01984, (C.D. Cal. June 12, 2014) (alleging infringement of the 032 and D235 Patent); *Sundesa LLC v. I A Nutrition Inc*, 8:13-cv-01085, (C.D. Cal., Jan 29, 2019); *Sundesa, LLC v. Cool Gear International, LLC*, No. 2:16-cv-01605, (C.D. Cal., March 08, 2016); *Sundesa, LLC v. IQ Formulations, LLC*, No. CV1906467ABMAAX, 2020 WL 3067383, at *1 (C.D. Cal. Feb. 27, 2020) (alleging infringement of the D235 Patent); *Sundesa, LLC v. Sunvalley Enterprises LLC*, No. 2:15-cv-02254, (C.D. Cal. March 26, 2015); *Trove Brands, LLC v. California Innovations Inc.*, No. 21 C 1132, 2021 WL 5320408, at 5 (N.D. Ill. Nov. 16, 2021); *Sundesa LLC v. Harrison-Daniels Inc*, No. 2:14-cv-08713, (C.D. Cal. July 11, 2019); *Sundesa LLC v. Beachbody LLC*, 8:13-cv-01087, (C.D. Cal. July 19, 2013) (alleging infringement of the D235 Patent); *Sundesa LLC v. Chemi-Source, Inc.*, 8:13-cv-01981, (C.D. Cal. May 1, 2013) (alleging infringement of the D235 Patent).

1  BlenderBottle's extensive sales activities in California, combined with its pattern of enforcing

2  related patents in the state's courts, establish both general and specific jurisdiction. The exer-

3  cise of jurisdiction is reasonable and aligns with due process principles, given BlenderBottle's

4  purposeful availment of California's legal system and the state's strong interest in adjudicating

5  intellectual property disputes involving companies operating within its borders.

6                  **GENERAL DECLARATORY JUDGMENT ALLEGATIONS**

7  22.  Hydra Cup hereby repeats, realleges, and incorporates the allegations of the preceding para-

8       graphs as though fully set forth herein.

9  **A. Hydra Cup's Declaratory Judgment Actions Seeking Declarations of Invalidity, Nonen-**
10 **forcement, and Noninfringement for BlenderBottle's Equivalent Patents are Proper Because,**
11 **Inter Alia, BlenderBottle's Asserted Patents are Substantially Similar, if Not Identical, to**
12 **BlenderBottle's Equivalent Patents—i.e., They all Belong to the Same "Classic Simple**
13 **Shaker" Patent Family.**

14 23.  Hydra Cup hereby repeats, realleges, and incorporates the allegations of the preceding para-

15      graphs in this Counterclaim as though fully set forth herein.

16 24.  Hydra Cup's declaratory judgment actions seeking a declarations of invalidity and non-in-

17      fringement of BlenderBottle's Equivalent Patents from the same "classic simple shaker" patent

18      family as the Asserted Patents—i.e., the D065 Patent, D478 Patent, D038 Patent, D119 Patent,

19      D149 Patent, D540 Patent, the 024 Patent, the 843 Patent, the 877 Patent, the 060 Patent, and

20      830 Patent (the "**Equivalent Patents**")—are proper because there is a true case and contro-

21      versy between BlenderBottle and Hydra Cup over each Equivalent Patent.

22 25.  BlenderBottle filed this lawsuit against Hydra Cup alleging infringement of the Asserted

23      Patents and the Asserted Trade Dresses. Upon information and belief, these patents and trade

24      dresses disclose shaker bottle and lid designs that are substantially similar, and even virtually

25      identical in some cases, to the designs claimed in BlenderBottle's Equivalent Patents.

26 26.  BlenderBottle itself admits that the D478 Patent discloses a "classic simple shaker" bottle lid

27      design that is identical to the design claimed by BlenderBottle's 019 Lid Trade Dress although

28      the 019 Lid Trade Dress was forced to disclaim protection to the integrated carry loop.5

_____

5 *See* Ex. 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455, 1-2 (HC0170962-



*BlenderBottle's "Classic Simple Shaker" Patent Family: The Equivalent Design Patents.*



*BlenderBottle's "Classic Simple Shaker" Patent Family: The Equivalent Utility Patents.*

27. BlenderBottle has commited numerous "affirmative acts" sufficient to confer jurisdiction over Hydra Cup's declaratory judgment claims against BlenderBottle, including filing this lawsuit of the Asserted Patents and Trade Dresses disclosing virtually identical designs to the "classic simple shaker" bottle and lid designs disclosed by the Equivalent Patents.

28. By asserting infringement of the Asserted Patents and Asserted Trade Dresses claiming virtually identical "classic simple shaker" bottle and lid designs, BlenderBottle is effectively accusing Hydra Cup of infringing its entire family of substantially similar patents that disclose the "classic simple shaker" bottle and lid design.

HC0171062) (filed 21 September 2021) (stating "Applicant's distinctive lid . . . has been granted a design patent D748,478.")

29. In addition, through several cease and desist letters, BlenderBottle has threatened Hydra Cup with litigation and accused Hydra Cup of infringing several of the Equivalent Patents that disclose substantially similar designs to the designs disclosed by the Asserted Patents, including U.S. Patent No. 9,216,843, U.S. Patent No. 9,492,024, and U.S. Patent No. 10,165,877, among others.[6]

30. Moreover, upon information and belief, BlenderBottle has filed similar lawsuits in numerous states, including California,[7] over numerous patents in its same family of "classic simple shaker" bottles and lids as well as over its spherical wired agitator design. The threats from its previous cease and desist letters combined with this pattern of enforcement activity gives Hydra Cup further reasonable apprehension that it will face additional infringement suits if it continues its current activities. The Federal Circuit has held that the existence of a case or controversy must be evaluated on a patent-by-patent basis, and that the conduct of the patent owner is a key factor in determining whether a declaratory judgment plaintiff has a reasonable apprehension of facing an infringement suit. *Jervis B. Webb Co. v. S. Sys., Inc.*, 742 F.2d 1388, 1398-99 (Fed. Cir. 1984).

31. What's even more, BlenderBottle mailed Hydra Cup physical products embodying the designs disclosed in the Equivalent Patents when Hydra Cup requested physical samples of the products embodying the designs disclosed by the Asserted Patents, including the D478 Patent, the D038 Patent, the D119 Patent, D149 Patent, the D540 Patent, the 024 Patent, the 843 Patent, the 877 Patent, the 060 Patent, and the 830 Patent.

---

[6] *See* (Ex. 70, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 January 2021) (listing, under the Section titled "Hydra Cup's Patent Infringement," the following patents that BlenderBottle was accusing Hydra Cup of infringing: U.S. Patent No. 9,492,024, U.S. Patent No. 9,216,843, U.S. Patent No 1,0165,877, U.S. Design Patent No. D510,235, U.S. Design Patent No. D697,798, and U.S. Patent No. 6,379,032); *see also* Ex. 71, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 March 2022) (accusing Hydra Cup of infringing, among others, U.S. Patent No. 10,165,877, U.S. Patent No. 9,492,024, and U.S. Patent No. 9,216,843)).

[7] *See*, e.g., *Sundesa, LLC v. EHPLABS, LLC*, 2:14-cv-05327, (C.D. Cal. July 11, 2019); (alleging infringement of the 830 Patent); *Sundesa LLC v. Labrada Bodybuilding Nutrition Inc*, No. 8:13-cv-01984, (C.D. Cal. June 12, 2014) (alleging infringement of the 032 and D235 Patent); *Sundesa LLC v. I A Nutrition Inc*, 8:13-cv-01085, (C.D. Cal., Jan 29, 2019); *Sundesa, LLC v. Cool Gear International, LLC*, No. 2:16-cv-01605, (C.D. Cal., March 08, 2016); *Sundesa, LLC v. IQ Formulations, LLC*, No. CV1906467ABMAAX, 2020 WL 3067383, at *1 (C.D. Cal. Feb. 27, 2020) (alleging infringement of the D235 Patent); *Sundesa, LLC v. Sunvalley Enterprises LLC*, No. 2:15-cv-02254, (C.D. Cal. March 26, 2015); *Trove Brands, LLC v. California Innovations Inc., No. 21 C 1132, 2021 WL 5320408, at 5* (N.D. Ill. Nov. 16, 2021); *Sundesa LLC v. Harrison-Daniels Inc*, No. 2:14-cv-08713, (C.D. Cal. July 11, 2019); *Sundesa LLC v. Beachbody LLC*, 8:13-cv-01087, (C.D. Cal. July 19, 2013) (alleging infringement of the D235 Patent); *Sundesa LLC v. Chemi-Source, Inc.*, 8:13-cv-01981, (C.D. Cal. May 1, 2013) (alleging infringement of the D235 Patent).

32. Regardless of the outcome of the current suit, without a declaration of rights, BlenderBottle will simply keep suing Hydra Cup over different substantially similar designs in its same family of "classic simple shaker" bottle and lid designs until Hydra Cup can no longer afford to defend itself. Without a declaration of rights concerning the Equivalent Patents, this dispute will not end. Handling this dispute in a single case is efficient and economical, and will provide a final resolution of the parties' rights.

33. Hydra Cup therefore needs a declaratory judgment on whether it is infringing these virtually identical designs as well, so that it can have a final, well-defined answer on what constitutes infringement. Furthermore, Hydra Cup also owns multiple patents for shaker bottle and lid designs. Without such a declaration, Hydra Cup faces uncertainty and the potential for ongoing litigation over BlenderBottle's various patents covering the same basic design.

34. The Federal Declaratory Judgment Act authorizes declaratory judgment actions, allowing a party who is uncertain of its rights to prevent the accrual of avoidable damages and obtain an adjudication before its adversary brings a coercive suit.8 Hydra Cup is precisely the type of party that the Declaratory Judgment Act is intended to protect.

35. Competitive fairness requires that others in the marketplace be able to understand and visualize, not as an abstract idea, what things they can or cannot utilize themselves. Allowing BlenderBottle to assert its rights piecemeal, sometimes using a lid, sometimes using a lid with a finger carry loop, sometimes using a lid with a bottle, and so forth, makes it difficult, if not impossible, for a competitor like Hydra Cup to know what designs it can lawfully use. At this point, BlenderBottle is effectively claiming to own all combinations for "classic simple shaker" shaker bottle and lid products.

**B. Hydra Cup's Declaratory Judgment Actions Seeking Declarations of Invalidity, Nonenforcement, and Noninfringement for BlenderBottle's Related Trademarks.**

36. Along similar lines, Hydra Cup's Declaratory Judgment action seeking a declaration of noninfringement of BlenderBottle's BLENDERBOTTLE and BLENDER BALL trademarks is proper because there is a true case and controversy between BlenderBottle and Hydra Cup. As

---

8 *See Twitter*, No. 20-CV-02397-LHK, 2020 WL 7342733, at *5.

1      an inventor and seller of shaker bottles, Hydra Cup has a legitimate need to use the terms

2      "blender bottle" and "blender ball" to accurately describe the products it sells. These terms are

3      essential to communicate the nature and function of Hydra Cup's products to consumers.

4    37.  BlenderBottle demanded Hydra Cup not use the terms "blender," "bottle," "blender bottle,"

5      "blender ball" or any derivations of such terms in any of Hydra Cup's marketing and advertis-

6      ing. But Hydra Cup needs these terms to operate its business. Upon information and belief, if

7      Hydra Cup continues to use search terms, BlenderBottle is likely to file a lawsuit to attempt to

8      enforce its intellectual property rights to stop Hydra Cup from using the disputed terms in its

9      advertising and marketing. In other words, BlenderBottle considers Hydra Cup's use of such

10     terms as trademark infringement and unfair competition. Therefore, an actual case and contro-

11     versy exists regarding the dispute terms.

12   38.  The English language has a limited number of words that accurately describe a manual mixing

13     apparatus, such as "mix," "shake," and "blend." These words are commonly understood by the

14     public to convey the action of combining and agitating substances, which is precisely the pur-

15     pose of a shaker bottle. By claiming exclusive rights to the terms "blender bottle" and "blender

16     ball," BlenderBottle is effectively monopolizing the use of generic and descriptive language in

17     the shaker bottle industry.

18   39.  Trademarks are intended to identify the source of goods and services, not to grant a monopoly

19     over common words that are necessary to describe a product or its functionality. Allowing

20     BlenderBottle to assert exclusive rights over "blender bottle" and "blender ball" would hinder

21     Hydra Cup's ability to fairly compete in the market and accurately inform consumers about the

22     nature of its products.

23   40.  The Declaratory Judgment Act is designed to provide relief in situations where a party faces

24     uncertainty regarding its legal rights and potential liability. 28 U.S.C. §§ 2201, 2202. Hydra

25     Cup is confronted with precisely this type of uncertainty due to BlenderBottle's assertion of

26     trademark rights in "blender bottle" and "blender ball." Without a declaration of invalidity and

27     non-infringement, Hydra Cup faces the risk of litigation and liability for using language that is

28     essential to describe its products and compete effectively in the marketplace.

1    41. Moreover, the case and controversy requirement for declaratory judgment jurisdiction is satis-

2        fied when an examination of the totality of the circumstances indicates that an actual contro-

3        versy exists between the parties. Here, the totality of the circumstances demonstrates a real and

4        immediate controversy between Hydra Cup and BlenderBottle. Hydra Cup's and the general

5        need to use the terms "blender bottle" and "blender ball" in its business operations, coupled

6        with BlenderBottle's assertion of trademark rights in those terms, creates a concrete dispute

7        that is ripe for judicial resolution.

8    42. Furthermore, the controversy between Hydra Cup and BlenderBottle is not abstract or hypo-

9        thetical. Hydra Cup faces a genuine risk of infringement litigation if it continues to use the

10      terms "blender bottle" and "blender ball" in connection with its products. This risk is not spec-

11      ulative; as discussed above, BlenderBottle has a history of enforcing its alleged trademark

12      rights against competitors in the shaker bottle industry.

13    43. Public policy considerations also support Hydra Cup's Declaratory Judgment action. Trade-

14      mark law should not be used as a tool to stifle competition or prevent companies from accu-

15      rately describing their products. Allowing BlenderBottle to monopolize generic and descriptive

16      terms like "blender bottle" and "blender ball" would undermine the fundamental goals of trade-

17      mark law and hinder free and fair competition in the marketplace.

18    44. Accordingly, Hydra Cup's Declaratory Judgment action seeking a declaration of non-infringe-

19      ment of BlenderBottle's BLENDERBOTTLE and BLENDER BALL trademarks is proper and

20      justiciable. There is a real and immediate controversy between the parties arising from Hydra

21      Cup's need to use generic and descriptive terms to accurately describe its products and compete

22      effectively in the shaker bottle market. BlenderBottle's assertion of trademark rights in these

23      terms creates a concrete dispute that satisfies the case and controversy requirement for declara-

24      tory judgment jurisdiction. The Court should allow Hydra Cup's action to proceed to provide

25      clarity and certainty regarding the parties' rights and obligations, and to ensure that trademark

26      law is not used to monopolize language and stifle legitimate competition.

27                        **PARTIES**

1    45.  Hydra Cup realleges and incorporates all preceding paragraphs by reference as if fully set forth

2         herein.

3    46.  Counterclaim Plaintiff TRRS Magnate LLC d/b/a Hydra Cup is a limited liability company or-

4         ganized and existing under the laws of the State of California, with a principal place of business

5         at 1433 Moffat Blvd., Ste. #13, Manteca, California 95336.

6    47.  Counterclaim Plaintiff Thomas Raymus is an individual who resides in Manteca, California.

7         Mr. Raymus is a citizen of California. Mr. Raymus is the current CEO of Hydra Cup.

8    48.  Upon information and belief, Counterclaim Defendant Trove Brands, LLC, doing business as

9         the BlenderBottle Company is a limited liability company organized and existing under the

10        laws of the State of Utah, with its principal place of business located at 250 South 850 East,

11        Lehi, Utah 84043.

12                                            **NON-PARTIES**

13   49.  Zhigang Lin is the owner of Ningbo Aoyida Plastic Co., Ltd. and Ningbo Tianqi Molding Co.,

14        Ltd (collectively "**Tianqi**").9

15   50.  Upon information and belief, Tianqi is the owner of all right, title, and interest in and to the

16        D047 Patent and D029 Patent and the manufacturer of the Accused Products.

17                                               **FACTS**

18   51.  Hydra Cup hereby repeats, realleges, and incorporates the allegations of the preceding para-

19        graphs as though fully set forth herein.

20   **I. HYDRA CUP'S ACCUSED PRODUCTS.**

21   52.  Since its founding, Hydra Cup has been committed to designing, developing, and selling inno-

22        vative, high-quality shaker bottles and other fitness products. Over the past decade, Hydra Cup

23        has developed numerous unique designs, a few of which turned into successful products.

---

9 (*See* Ex. 40, Hydra Cup's Fifth Amended Answers and Responses to BlenderBottle's Interrogatories.

**A. Hydra Cup's Accused Shakers.**

53. The "**Accused Shakers**" refers to Hydra Cup's Shakers, bottle and lid combined, listed in para-
graph 49 of the Second Amended Complaint that BlenderBottle is accusing of infringing its
Asserted Patents, Equivalent Patents, and Asserted Trade Dresses.10



*The Accused Products: Hydra Cup Shaker Bottles I-X.*

54. After removing duplicates, the ten Accused Shakers identified in paragraph 49 of the Second
Amended Complaint represent the following five distinct Accused Shakers offered by Hydra
Cup: (i) the "**TS1327 OG Mini Shaker**"; (ii) the "**TS1314 OG Regular Shaker**"; (iii) the
"**TS1352 OG Storage Shaker**"; (iv) the "**TS1038 Jumbo Shaker**"; and (v) the "**GOAT
Shaker**" (collectively, the "**Accused Shakers**").11

10 "Hydra Cup Shaker Bottle I" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle I." (*See* Second Am. Compl., ¶ 49, ECF No. 102.); "Hydra Cup Shaker Bottle II" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle II." (*Id.*); "Hydra Cup Shaker Bottle III" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle III." (*Id.*); "Hydra Cup Shaker Bottle IV" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle IV." (*Id.*); "Hydra Cup Shaker Bottle V" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle V." (*Id.*); "Hydra Cup Shaker Bottle VI" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle VI." (*Id.*); "Hydra Cup Shaker Bottle VII" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle VII." (*Id.*); "Hydra Cup Shaker Bottle VIII" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle VIII."(*Id.*); "Hydra Cup Shaker Bottle IX" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle IX." (*Id.*); "Hydra Cup Shaker Bottle X" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle X." (*Id.*).

11 (*See* Second Am. Compl., ¶ 49, ECF No. 102.). Hydra Cup's Accused Shakers can be matched to the Tianqi catalog as follows: TS1314: Hydra Cup Shaker Bottles 1, 4, 5, and 10; TS1327: Hydra Cup Shaker Bottles 6 and 7; TS1352: Hydra Cup Shaker Bottles 2 and 9; TS1038: Hydra Cup Shaker Bottle 8.



1

*Hydra Cup's Accused Shakers Seen in the Accused Products: the GOAT Shaker, the 1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the TS1327 OG Mini Shaker, and the TS1314 OG Regular Shaker.*

55. These products embody Hydra Cup's dedication to innovation, quality, and meeting the evolving needs of the fitness community.

56. The "**TS1314 OG Regular Shaker**" refers to Accused Hydra Cup Shaker Bottles I, IV, V, and X in the Second Amended Complaint (Bates Number HC0180553), which all embody the same identical shaker bottle and lid design modeled after the design disclosed by Tianqi's D047 Patent.12



*Hydra Cup's TS1314 OG Regular Shaker.*

57. The "**TS1327 OG Mini Shaker**" refers to Accused Hydra Cup Shaker Bottles VI and VII in the Second Amended Complaint (Bates Number HC0180552), which both embody the same

---

12 (*See* Second Am. Compl., ¶ 49, ECF No. 102.).

1    identical shaker bottle and lid design modeled after the design disclosed by Tianqi's D029

2    Patent.13




3

4    *Hydra Cup's TS1327 OG Mini Shaker.*

5    58.    The "**TS1352 OG Storage Shaker**" refers to Accused Hydra Cup Shaker Bottles II and IX in

6         the Second Amended Complaint (Bates Number HC0180554), which both embody the same

7         identical shaker bottle and lid design modeled after the design disclosed by Tianqi's D029

8         Patent.14




9

10    *Hydra Cup's TS1352 OG Storage Shaker.*

13 (*Id.*).

14 (*Id.*).

1   59. Upon information and belief, the TS1327 OG Mini Shaker and the TS1352 OG Storage Shaker

2       embody the same bottle and lid design disclosed by Tianqi's D029 Patent with the only differ-

3       ence being that the S1352 OG Storage Shaker includes a storage compartment that attaches to

4       the base of the bottle.

5   60. The "**TS1038 Jumbo Shaker**" refers to Accused Hydra Cup Shaker Bottle XIII in the Second

6       Amended Complaint (Bates Number HC0180555), which embodies the lid design disclosed by

7       Tianqi's D029 Patent.15



8

9       *Hydra Cup's TS1038 Jumbo Shaker.*

10  61. The "**GOAT Shaker**" refers to Accused Hydra Cup Shaker Bottle III in the Second Amended

11      Complaint (Bates Number HC0180556).16 The GOAT Shaker is the only Accused Product that

12      does not embody the designs disclosed by Tianqi's D029 and D047 Patents.



13

14      *Hydra Cup's GOAT Shaker.*

---

15 (*Id.*).

16 (*Id.*).

**B. Hydra Cup's Accused Shaker Lid.**

62. The "**HC OG Carry Loop Lid**" refers to the Accused Shaker Lid in the Second Amended Complaint (Bates Number HC0180557).17 The HC OG Carry Loop Lid is the same lid as the lid on the lid on the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, and the TS1038 Jumbo Shaker—each manufactured by Tianqi and designed based on Tianqi's D029 Patent— with the addition of a finger carry loop.



*Hydra Cup's HC OG Carry Loop Lid.*



*The HC OG Carry Loop Lid is the same exact lid used on the TS1327 OG Mini Shaker and TS1314 OG Regular Shaker with the addition of a carry-loop.*

**C. Hydra Cup's Accused Shaker Label.**

63. The "**OG Shaker Label**" refers to the label pictured in paragraph 52 the Second Amended Complaint.18

---

17 (*Id.* at 50.).

18 (*Id.* at ¶ 52.).



1

2       *Hydra Cup's OG Shaker Label.*

3       **D. Hydra Cup's Accused Shaker Agitators.**

4       64.   The "**OG Spherical Agitator**" refers to the four spherical wired agitators pictured in paragraph

5       49 of the Second Amended Complaint, which are the agitators pictured with Hydra Cup's Bot-

6       tles I-IV. 19



7

8       *Hydra Cup's OG Spherical Agitator.*

9       65.   The "**OG Dumbbell Agitator**" refers to the Hydra Cup dumbbell agitators pictured with Hydra

10      Cup Shaker Bottles VI-IX in paragraph 49 of the Second Amended Complaint.20



11

12      *Hydra Cup's OG Dumbbell Agitator.*

---

19 (*Id.* at ¶ 49.).

20 (*Id.* at ¶ 49).

66. To protect its proprietary designs, Hydra Cup has obtained numerous patents and common law trade dresses on various designs it created for shaker bottles and lids and other products as well as obtained rights to designs disclosed by third party patents, including U.S. Patent No. D992,348, U.S. Patent No. D1,003,107, and U.S. Patent Application No. 47/631,468.

67. The "**OG DualShaker Lid Trade Dress**" refers to the valid and enforceable trade dress rights that Hydra Cup developed in its lid for its DualShaker Bottle, which it first started offering in commerce as early as 2013.

68. The "**OG DualShaker Bottle Trade Dress**" refers to the valid and enforceable trade dress rights that Hydra Cup developed in its bottle design practiced by its DualShaker Bottle, which it first started offering in commerce as early as 2013.

69. The "**OG DualShaker Trade Dress**" refers to the valid and enforceable trade dress rights that Hydra Cup developed in its bottle and lid design practiced by its DualShaker Bottle, which it first started offering in commerce as early as 2013.



*Hydra Cup's OG DualShaker Bottle Trade Dress.*

**E. Tianqi's D047 and D029 Patents Disclosing the Designs Embodied in Hydra Cup's OG Shaker Bottles and Lid.**

70. On information and belief, U.S. Design Patent No. D666,047 (the "**D047 Patent**") issued on 28 August 2012, with Zhigang Lin listed as the named inventor.[21] The D047 Patent issued from

---

21 (Ex. 12, U.S. Patent No. D666,047 (filed 14 Apr. 2011)).

1    U.S. Patent Application No. 29/389,694, which was filed on 14 April 2011. Upon information

2    and belief, the D047 Patent expires on 28 August 2026.

3    71.  On information and belief, U.S. Design Patent No. D766,029 (the "**D029 Patent**") issued on 13

4    September 2016, with Zhigang Lin listed as the named inventor and Ningbo Tianqi Molding

5    Co Ltd listed as the assignee.22 The D029 Patent issued from U.S. Patent Application

6    No. 29/533,824, which was filed on 22 July 2015. Upon information and belief, the D029

7    Patent expires on 13 September 2031.

8    72.  Hydra Cup obtained licensed rights to the shaker bottle and lid designs disclosed by U.S. De-

9    sign Patent No. D666,047 and U.S. Design Patent No. D766,029, which are the designs embod-

10   ied by the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the Storage Shaker Bot-

11   tle, and the HC OG Carry Loop Lid .



12

13   *The following Accused Products were Designed Based on the D047 and D029 Patents licensed to Hydra Cup by*
14   *Tianqi: Hydra Cup Shaker Bottle I, II, IV, V, VI, VII, IX, X, and the Accused HC OG Carry Loop Lid*
15
16

---

22 (Ex. 13, U.S. Patent No. D766,029 (filed 22 July 2015)).

**Patents that the Accused Products were modeled after (non blender bottle)**



II. BLENDERBOTTLE'S ASSERTED INTELLECTUAL PROPERTY.

73.   In its Second Amended Complaint, BlenderBottle alleges that Hydra Cup's Accused Products

infringe BlenderBottle's Asserted Patents and Asserted Trade Dresses and, through its actions,

Hydra Cup understands BlenderBottle also accuses Hydra Cup of infringing other substantially

similar patents, the Equivalent Patents, as well as trademarks describing the functions of the de-

signs at issue, the Related Trademarks, (collectively, the "**Asserted Intellectual Property**"):

A. BlenderBottle's Asserted Patents.

74.   On information and belief, U.S. Design Patent No. D510,235 (the "**D235 Patent**") entitled

"Bottle" issued on 04 October 2005, with Steven M. Sorensen listed as the named inventors

and Runway Way Blue LLC listed as the assignee.[23] The D235 Patent issued from U.S. Patent

Application No. 29/189,695, which was filed on 09 September 2003. Upon information and be-

lief, the D235 Patent expired on 04 October 2019.

75.   On information and belief, U.S. Design Patent No. D696,551 (the "**D551 Patent**") entitled

"Bottle Lid Having Integrated Handle" issued on 31 December 2013, with David O. Meyers

and Steven M. Sorensen listed as the named inventors and Runway Blue LLC listed as the as-

---

23 (Ex. 14, U.S. Design Patent No. D510,235 (filed 09 Sept. 2003)).

1  signee.24 The D551 Patent issued from U.S. Patent Application No. 29/426,833, which was

2  filed on 07 September 2012. Upon information and belief, the D551 Patent expires on 31 De-

3  cember 2027.

4  76.  On information and belief, U.S. Design Patent No. D697,798 (the "**D798 Patent**") entitled

5  "Container" issued on 21 January 2014, with Steven M. Sorensen, David O. Meyers, and Kim

6  L. Sorensen listed as the named inventors and Runway Blue LLC listed as the assignee.25 The

7  D798 Patent issued from U.S. Patent Application No. 29/455,395, which was filed on 06 June

8  2013. Upon information and belief, the D798 Patent expires on 21 January 2028.

9  **B. BlenderBottle's Equivalent Patents.**

10  77.  Because the designs disclosed by the Asserted Patents and practiced by the Asserted Trade

11  Dresses are substantially and confusingly similar to numerous other patents owned by Blender-

12  Bottle, Hydra Cup understands that BlenderBottle is also accusing Hydra Cup of infringing

13  BlenderBottle's other patents claiming designs that are substantially and confusingly similar to

14  the designs claimed by the Asserted Patents and practiced by the Asserted Trade Dresses.

---

24 (Ex. 15, U.S. Design Patent No. D696,551 (filed 07 Sept. 2012)).

25 (Ex. 16, U.S. Design Patent No. D697,798 (filed 06 June 2013)).



*BlenderBottle's "Classic Simple Shaker" Patent Family: The Equivalent Patents.*

78. BlenderBottle, for example, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's U.S. Patent Number D820,038 Patent (the "**D038 Patent**"), U.S. Patent Number D748,478 Patent (the "**D478 Patent**"), U.S. Patent No. D900,540 (the "**D540 Patent**"), U.S. Patent No. D644,065 (the "**D065 Patent**"), U.S. Patent No. D830,119 (the "**D119 Patent**"), U.S. Patent No. D897,149 (the "**D149 Patent**") (collectively the "**Equivalent Design Patents**") as well as claims disclosed by U.S. Patent No. 9,216,843 (the "**843 Patent**"), U.S. Patent No. 9,492,024 (the "**024 Patent**"), U.S. Patent No. 10,165,877 (the "**877 Patent**"), U.S. Patent No. 8,695,830 (the "**830 Patent**") and U.S. Patent No. 11,111,060 (the "**060 Patent**") (collectively the "**Equivalent Utility Patents**") (the term "**Equivalent Patents**" refers to the Equivalent Design Patents and the Equivalent Utility Patents collectively)—all disclosing "classic simple shaker" bottle and lid designs that are all substantially and confusingly similar to the designs claimed by the Asserted Patents and Asserted Trade Dresses. Accord-

ingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra
Cup's Accused Products of infringing BlenderBottle's Equivalent Patents listed below.



| Product | Original | None | V1 | V2 |
|---|---|---|---|---|
| Timeframe (first sale date estimate) | 2003 | No known sales | OCT 2013 | 2016 |
| Patent | Patent 235 | Patent 551 | Patent 478 **Lid Trade Dress Obtained from this design** | Patents 038D, 540D, 149D, 119D |
| Visual Differences | Original Product | • Same as 235 with added hiking loop • No  active known sales with this lid | • Added carry loop with a partial rubber coating up from the loop • Crescent indentation on top of flip cap • Thumb press area rounded • Spout changes from Cylindrical to Conical • Solid silver shroud • Distinct base of bracket for loop to fold back | • Spout guard • Thicker flip cap side profile • Much thicker carry loop at two axis points • Much more rigid/stronger material around top part of carry loop • Flip cap flattened out at the end and accentuated • Flip cap tapered wide at brackets and shorter towards spout • Distinct triangular spout guard |
| % of Sales | 100% from 2003-2012 | No known sales | 50% from 2016-2024? | 50% from 2015-2024? |
| Selling Status | Discontinued | No known sales | Active | Active |

*Design Evolution of the BlenderBottle Classic.*



*BlenderBottle's Equivalent Design Patents: D235, D551, D478, D038, D540.*

79. On information and belief, U.S. Patent No. D644,065 (the "**D065 Patent**") issued on 30 August
2011, with Sergio Llerena listed as the named inventor and Runway Blue LLC listed as the as-
signee.[26] The D065 Patent issued from U.S. Patent Application No. 29/375,884, which was
filed on 29 September 2010. Upon information and belief, the D065 Patent expires on 30 Au-
gust 2025.

80. On information and belief, U.S. Patent No. D748,478 (the "**D478 Patent**") issued on 02 Feb-
ruary 2016, withSteven M. Sorensen and David O. Meyers listed as the named inventors and
Runway Blue LLC listed as the assignee.[27] The D478 Patent issued from U.S. Patent Applica-

---

26 (Ex. 23, U.S. Patent No. D644,065 (filed 29 Sept. 2010)).

27 (Ex. 24, U.S. Patent No. D748,478 (filed 06 June 2013)).

1    tion No. 29/457,096, which was filed on 06 June 2013. Upon information and belief, the D478

2    Patent expires on 02 February 2030.

3    81. On information and belief, U.S. Patent No. D820,038 (the "**D038 Patent**") issued on 12 June

4        2018, with Steven M. Sorensen and David O. Meyers listed as the named inventors and Run-

5        way Blue LLC listed as the assignee.[28] The D038 Patent issued from U.S. Patent Application

6        No. 29/525,379, which was filed on 29 April 2015. Upon information and belief, the D038

7        Patent expires on 12 June 2032.

8    82. On information and belief, U.S. Patent No. D900,540 (the "**D540 Patent**") issued on 03 No-

9        vember 2020, with Steven M. Sorensen and David O. Meyers listed as the named inventors and

10       Runway Blue LLC listed as the assignee.[29] The D540 Patent issued from U.S. Patent Applica-

11       tion No. 29/733,191, which was filed on 30 April 2020. Upon information and belief, the D540

12       Patent expires on 03 November 2035.

13   83. On information and belief, U.S. Patent No. D830,119 (the "**D119 Patent**") issued on 09 Octo-

14       ber 2018, with Steven M. Sorensen and David O. Meyers listed as the named inventors and

15       Runway Blue LLC listed as the assignee.[30] The D119 Patent issued from U.S. Patent Applica-

16       tion No. 29/614,992, which was filed on 24 August 2017. Upon information and belief, the

17       D119 Patent expires on 09 October 2033.

18   84. On information and belief, U.S. Patent No. D897,149 (the "**D149 Patent**") issued on 29 Sep-

19       tember 2020, with Steven M. Sorensen and David O. Meyers listed as the named inventors and

20       Runway Blue LLC listed as the assignee.[31] The D149 Patent issued from U.S. Patent Applica-

21       tion No. 29/650,949, which was filed on 11 June 2018. Upon information and belief, the D149

22       Patent expires on 29 September 2035.

23   85. On information and belief, U.S. Patent No. 9,492,024 (the "**024 Patent**") issued on 15 Novem-

24       ber 2016, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the

_____

28 (Ex. 25, U.S. Patent No. D820,038 (filed 29 Apr. 2015)).

29 (Ex. 26, U.S. Patent No. D900,540 (filed 30 Apr. 2020)).

30 (Ex. 27, U.S. Patent No. D830,119 (filed 24 Aug. 2017)).

31 (Ex. 28, U.S. Patent No. D897,149 (filed 11 June 2018)).

1     named inventors and Runway Blue LLC listed as the assignee.[32] The 024 Patent issued from

2     U.S. Patent Application No. 13/633,864, which was filed on 02 October 2012. Upon informa-

3     tion and belief, the 024 Patent expires on 02 October 2032.

4   86.  On information and belief, U.S. Patent No. 9,216,843 (the "**843 Patent**") issued on 22 Decem-

5     ber 2015, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the

6     named inventors and Runway Blue LLC listed as the assignee.[33] The 843 Patent issued from

7     U.S. Patent Application 14/297,433, which was filed on 05 June 2014. Upon information and

8     belief, the 843 Patent expires on 05 June 2034.

9   87.  On information and belief, U.S. Patent No. 10,165,877 (the "**877 Patent**") issued on 01 January

10     2019, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the named in-

11     ventors and Runway Blue LLC listed as the assignee.[34] The 877 Patent issued from U.S.

12     Patent Application No. 15/149,095, which was filed on 07 May 2016. Upon information and

13     belief, the 877 Patent expires on 02 October 2032.

14   88.  On information and belief, U.S. Patent No. 8,695,830 (the "**830 Patent**") issued on 15 April

15     2014, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the named in-

16     ventors and Runway Blue LLC listed as the assignee.[35] The 830 Patent issued from U.S.

17     Patent Application No. 13/610,445, which was filed on 11 September 2012. Upon information

18     and belief, the 830 Patent expires on 11 September 2032.

19   89.  On information and belief, U.S. Patent No. 11,111,060 (the "**060 Patent**") issued on 07 Sep-

20     tember 2021, with Steven M. Sorensen and David O. Meyers listed as the named inventors and

21     Runway Blue LLC listed as the assignee.[36] The 060 Patent issued from U.S. Patent Applica-

22     tion Nos. 15/957,775 and 17/466,851, which were filed on 19 April 2018 and 03 September

23     2021, respectively. Upon information and belief, the 060 Patent expires on 14 August 2036.

---

32 (Ex. 33, U.S. Patent No. 9,492,024 (filed 02 October 2012)).

33 (Ex. 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)).

34 (Ex. 34, U.S. Patent No. 10,165,877 (filed 07 May 2016)).

35 (Ex. 29, U.S. Patent No. 8,695,830 (filed 11 Sept. 2012)).

36 (Ex. 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018)).

90. On information and belief, U.S. Patent No. U.S. Patent No. 6,379,032 (the "**032 Patent**") issued on 30 April 2002, with Steven M. Sorensen listed as the named inventor and Runway Blue LLC listed as the assignee. The 032 Patent issued from U.S. Patent Application No. 09/507,124, which was filed on 18 February 2000. Upon information and belief, the 032 Patent expired on 18 February 2020.

**C. BlenderBottle's Asserted Trade Dresses.**

91. On information and belief, U.S. Trademark Registration No. 6,800,019 (the "**019 Lid Trade Dress**") was registered on the Principal Register of the USPTO on 20 July 2021, from U.S. Trademark Application No. 90,301,455 filed on 05 November 2020, with a first use date of 2003 and a first use in commerce date of 2003 for the following goods in International Class 012: "Lids for bottles, namely, lids with drinking spouts for bottles; Lids for shaker bottles sold empty, namely, lids with drinking spouts for bottles." The Lid Trade Dress is described as "a bottle lid with a recessed domed top from which a conical spout protrudes on one side and a pair of brackets on the opposing side and the brackets host a pivoting arm containing a circular spout closure element. The dotted lines are matter not claimed as part of the mark." The 019 Lid Trade Dress consists of a three-dimensional configuration of a product packaging for a shaker bottle lid identical, without the finger carry loop, to the lid disclosed by BlenderBottle's D478 Patent, with Runway Blue LLC listed as the owner.

92. On information and belief, U.S. Trademark Registration No. 6,245,626 (the "**626 Agitator Trade Dress**") was registered on the Principal Register of the United States Patent and Trademark Office on 12 January 2021, with a first use date of 01 January 2004 and a first use in commerce date of 01 January 2004.[37] The Agitator Trade Dress is described as "a three-dimensional configuration of a beverage agitator consisting of a wire that is wound to symmetrically define the shape of a sphere."[38] The registration indicates that the mark consists of a three-dimensional configuration of a product design, with Runway Blue LLC listed as the owner.[39]

---

37 (Ex. 18, U.S. Trademark Registration No. 6,245,626).

38 (*Id.*).

39 (*Id.*).

1    93. The "**Unregistered Bottle Trade Dress**" refers to the shaker bottle and lid design that Blender-

2        Bottle is attempting to assert common law trademark rights over in paragraph 18 of the Second

3        Amended Complaint. Compl., at ¶ 18.



4

5    94. The "**Unregistered Label Trade Dress**" refers to the shaker bottle label design that Blender-

6        Bottle is attempting to assert common law trademark rights over that is pictured in paragraph

7        26 of the Second Amended Complaint. (Second Am. Compl., ¶ 26.).

 

8

9    *BlenderBottle's Alleged Unregistered Label Trade Dress.*

10   **D. BlenderBottle's Related Trademarks.**

11   95. On information and belief, U.S. Trademark Registration No. 4,894,363 (the "**363 Reg.**" or

12       "**BLENDERBOTTLE Mark**") was registered on the Principal Register of the United States

13       Patent and Trademark Office on 2 February 2016, with a first use date of 05 September 2000

14       and a first use in commerce date of 05 September 2000.40 The 363 Reg. is for the term

15       BLENDERBOTTLE. The 363 Reg. has Runway Blue LLC listed as the owner. The 363 Reg. is

16       registered in International Class 021.

---

40 (Ex. 21, U.S. Trademark Registration No. 4,894,363).

1    96. On information and belief, U.S. Trademark Registration No. 3,515,591 (the "**591 Reg.**" or

2        "**BLENDER BALL Mark**") was registered on the Principal Register of the United States

3        Patent and Trademark Office on 14 October 2008, with a first use date of 05 September 2000

4        and a first use in commerce date of 05 September 2000.41 The 591 Reg. is for the term

5        BLENDER BALL. The 591 Reg. has Runway Blue LLC listed as the owner.42 The 591 Reg.

6        is registered in International Class 021.

7 **E. BlenderBottle's Asserted (and Infringing) Products.**

8    97. Upon information and belief, the "**BlenderBottle Classic V2oz-D038**" is identified by Bates

9        Number BB-0038396 and embodies the bottle and lid design disclosed in BlenderBottle's

10        D038 Patent. Upon information and belief, the "**BlenderBottle Classic V2-D038**" is an identi-

11        cal lid design to the lid design embodied by the BlenderBottle Pro28-D038 (BB-0038398) and

12        the ProStak 22-D038 (BB-0038397).

13    98. Upon information and belief, the "**BlenderBottle ProStak 22oz-D038**" is identified by Bates

14        Number BB-0038397 and embodies the design disclosed by the D038 Patent, which, upon in-

15        formation and belief, is an identical lid to the lid on the BlenderBottle Classic V2oz-D038 (BB-

16        0038396) and the BlenderBottle Pro28oz-D038 (BB-0038398).

17    99. Upon information and belief, the "**BlenderBottle Pro28oz-D038**" is identified by Bates Num-

18        ber BB-0038398 and embodies the design disclosed by the D038 Patent, which, upon informa-

19        tion and belief, is an identical lid to the lid on the BlenderBottle Classic V2oz-D038 (BB-

20        0038396) and the ProStak 22oz-D038 (BB-0038397).

21   100. Upon information and belief, the "**BlenderBottle Classic 20oz-D235**" is identified by Bates

22        Number BB-0038399 and refers to the 20 oz. bottle and lid design embodied by the D235

23        Patent.

24   101. Upon information and belief, the "**BlenderBottle ProStack 28oz-D478**" (BB-00383100) refers

25        to the bottle and lid design embodied by the bottle labeled as BB-00383100, which has a 28. oz

26        bottle and a lid design with a finger-loop that is disclosed by BlenderBottle's D478 Patent.

_____

41 (Ex. 22, U.S. Trademark Registration No. 3,515,591).

42 (*Id.*).

**III. HYDRA CUP, TIANQI, AND TIANQI'S PATENTS, AND HYDRA CUP'S OG SHAKERS.**

102. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

103. Founded in 2012, Hydra Cup achieved early success in the shaker bottle industry with its patented Duel Shaker.

104. Hydra Cup's GOAT Shaker (Hydra Cup Shaker Bottle III) was Hydra Cup's first attempt at designing a single-compartment shaker bottle. Hydra Cup's CEO took the lead on this project, which was originally pitched under the name "Kracken."

105. The design process for the GOAT shaker began with the bottle shape, which was inspired by the contoured shape of Hydra Cup's patented Dual Shaker bottle (U.S. Patent No. 8,777,044). The Dual Shaker's shape, which is wide at the top and narrower at the bottom, was dictated by the functional need to accommodate two supplements while still fitting in a cupholder. Despite the functional origins of the design, many customers expressed appreciation for the unique and ergonomic shape of the Dual Shaker bottle.

106. Hydra Cup collaborated with industrial designer Ginikanwa Uzegbu to create a unique mixing grid for the GOAT shaker and together they explored various creative concepts, including designs inspired by sea creatures and fitness equipment.

107. After developing the initial design concepts, Hydra Cup worked with Jeff Harlan to refine the 3D design of the GOAT shaker and then sent the files to Tianqi to create the molds for production.[43]

108. Upon receiving the finished product samples, Hydra Cup discovered that the dual mixing grid, while visually appealing, posed significant challenges in terms of cleaning and usability. Realizing that customers prioritize functionality and ease of use over aesthetics, Hydra Cup made the decision to abandon the dual mixing grid design and explore alternative agitator options.

109. With the expiration of BlenderBottle's 032 Patent for the spherical wire agitator in February 2020, Hydra Cup saw an opportunity to develop a unique wire whisk agitator for the GOAT

---

[43] (*See* Ex. 47, Deposition Transcript of Jeff Harlan, 22-43 (February 2024)).

shaker. Despite the availability of inexpensive standard wire whisk agitators from Tianqi, Hydra Cup invested time and resources into exploring various alternative designs, including cage balls, titanium whisks, metal ball inserts, and silicone-coated whisks.

110. Through extensive testing and evaluation, Hydra Cup discovered that these alternative agitator designs posed various issues, such as increased production costs (250-450% more expensive than standard wire whisks), rusting, potential choking hazards, and reduced mixing efficiency. Notably, even a thin layer of silicone coating on the wire whisk resulted in a noticeable decrease in mixing performance.

111. In contrast to Hydra Cup's rigorous testing and evaluation process, BlenderBottle's Complaint suggests that plastic agitators, which are functionally inferior and gimmicky, are acceptable alternatives to wire whisk agitators thereby evidencing BlenderBottle's unreasonable position on the functionality and trade dress of agitators. After careful consideration, Hydra Cup ultimately selected a black silicone-coated wire whisk agitator for the GOAT shaker, prioritizing visual differentiation over cost savings. Despite the significantly higher cost compared to standard wire whisks ($0.35/each vs. $0.10/each), Hydra Cup proceeded to order 10,000 units of the silicone-coated whisk to accompany the 10,000 GOAT shakers in production, with most never even sold.

112. The development process of the GOAT shaker presented Hydra Cup with invaluable experience in product design and manufacturing. The final version of the GOAT shaker suffered from functional issues, such as leakage and a loose flip cap, and was ultimately inferior in quality compared to the shaker bottles offered in Tianqi's existing product catalog that had proven successes for almost a decade. Recognizing these shortcomings, and in light of Tianqi's proven track record of producing millions of high-quality shaker bottles based on the D047 Patent design, Hydra Cup made the decision to abandon further research and development of the GOAT shaker. The molds for the GOAT shaker remain unused at Tianqi's factory since the initial order (PO1108) placed on 16 December 2019.

113. Upon information and belief, Tianqi began selling the TS1314 Shaker Bottle, which embodies the design disclosed by the D047 Patent, in the United States in late 2011 or early 2012.44 By 2013, Tianqi had exported 8 million TS1314 Shaker Bottles worldwide.45

114. Upon information and belief, in 2011 Tianqi designed and patented the D047 Patent disclosing the design practiced by the TS1314 OG Regular Shaker and millions of other shaker bottles sold by hundreds of companies over the last decade. Shortly thereafter, Tianqi began selling the TS1314 Tianqi Shaker Bottle and Lid to customers across the globe.46 For example, in June 2012, the TS1314 Shaker Bottle from Tianqi was being sold on Bodybuilding.com, a major on-line retailer of fitness supplements and accessories. At the time, Bodybuilding.com's sales of shaker bottles were comparable to or even larger than those of Amazon. The TS1314 Shaker Bottle occupied 4 of the top 20 spots for shaker bottles on the Bodybuilding.com website.47

115. Upon information and belief, Tianqi began selling the TS1314 Shaker Bottle, embodying the D047 Patent, in the United States in late 2011; by 2013, millions of Tianqi's TS1314 Shaker Bottles were being sold by dozens of companies in the United States.48

116. As early as June 2012, the TS1314 Shaker Bottle was sold on Bodybuilding.com, a major on-line retailer of fitness supplements and accessories.49 By March 2014, Tianqi's TS1314 Shaker Bottle occupied 4 of the top 20 spots for shaker bottles on bodybuilding.com.

117. On 19 March 2019, twenty months before Hydra Cup started selling the Accused Products, Chris McCarthy, Hydra Cup's first employee, sent Hydra Cup the Tianqi Product Catalog, where Hydra Cup first discovered the TS1314 Shaker Bottle for sale at $0.65 per bottle.( *See*

---

44 (*See* Ex. 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014) (showing shaker bottle's embodying the design disclosed by Tianqi's D047 Patent alongside shaker bottles embodying the design disclosed by BlenderBottle's D235 Patent.)).

45 (*Id.*).

46 (*See, e.g.*, Exs. 77-88, Screenshots of Shaker Bottles and Lids from the Aughts (showing early substantially similar shaker bottle and lid designs disclosed before the D551 Patent); see also Ex. 39, BrandMakers Purchase Order for D047 "Arnold.com" Shaker Bottles from Ningbo to MusclePharm (14 October 2013); Ex. 41, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Exhibit 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013)).

47 (*See* Ex. 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014)).

48 *See, e.g.*, Ex.77, Ningbo Body Build Shaker (January 2007) (HC0172423-HC0172423);

49 (*See* Exhibit 79, Bodybuilding.Com Measurement Shaker Bottle (Screenshot from the Internet Archive) (23 June 2005) (HC0172425-HC0172426)).

59

1    Ex. 46, Tianqui Product Catalog.). Hydra Cup started reselling Tianqi's TS1314 Shaker Bottle

2    shortly thereafter.

3    **Hydra Cup's Accused Products Were Created, Designed, Developed, and Manufactured by**
4    **Tianqi Based on Designs Disclosed by Tianqi's Patents.**

5    118. Hydra Cup repeats, realleges, and incorporates the allegations of the preceding paragraphs as

6    though fully set forth herein.

7    119. Hydra Cup's Accused Products are based on Tianqi's patented designs, which, except for the

8    expired D235 Patent, predate BlenderBottle's Asserted Intellectual Property. Hydra Cup has

9    not infringed any valid patents or trade dress owned by BlenderBottle.

10   120. The designs embodied by Hydra Cup's TS1327 OG Mini Shaker, TS1314 OG Regular Shaker,

11   Storage Shaker, and HC OG Carry Loop Lid were all designed and modeled based on the de-

12   signs disclosed by Tianqi's D047 Patent and D029 Patent.

13   121. Tianqi conceived, created, designed, developed, and manufactured the bottle and lid design

14   practiced by Hydra Cup's TS1327 OG Mini Shaker, TS1314 OG Regular Shaker, Storage

15   Shaker, and HC OG Carry Loop Lid based on the designs disclosed by Tianqi's D047 and

16   D029 Patents.

17   122. Tianqi granted Hydra Cup an implied license to the D047 Patent and D029 Patent, including

18   the right to enforce the rights of the D047 Patent and D029 Patent against third parties infring-

19   ing the D047 Patent or D029 Patent.

20   123. Aside from putting the Hydra Cup logo on the TS1314 Shaker Bottles it purchased from

21   Tianqi, Hydra Cup did not change the designs of the TS1314 Shaker Bottle at all.[50] In other

22   words, the Accused Products are identical to the TS1314 Shaker Bottles Tianqi sells, which

23   embody the designs disclosed by Tianqi's D047 Patent.[51]

24   124. Furthermore, Hydra Cup does not own the molds for the lid, bottle, or flip cap of the TS1314

25   Shaker Bottle or any of the other products in Tianqi's product catalog. (*See id*.).

---

50 (Ex. 40, Def.'s Answers. to Pl.'s Interrogs., at 140-41.).

51 (*Id*. at 141.).

1  125. Hydra Cup did not have any input in conceiving, creating, designing, developing, or manufac-
2      turing the designs embodied in Tianqi's TS1314 Shaker Bottle.52

3  126. Tianqi also explicitly granted Hydra Cup a license to the D047 Patent in September 2022 (the
4      "Hydra Cup-Tianqi License Agreement").53 The Hydra-Cup Tianqi License Agreement
5      granted Hydra Cup, among other things, "the first right, but not the obligation, to bring an in-
6      fringement action to enforce the Licensed [D047] Patent, to defend any declaratory judgment
7      action, and take any other legal action necessary to protect the Licensed [D047] Patent."54

8  **Hydra Cup's HC OG Carry Loop Lid.**

9  127. Hydra Cup repeats, realleges, and incorporates the allegations of the preceding paragraphs as
10      though fully set forth herein.

11  128. Hydra Cup invested significant time and resources to develop a functional carrying loop design
12      that would not infringe BlenderBottle's patents or trade dress. Hydra Cup worked diligently to
13      address customer requests while respecting intellectual property rights.

14  129. As of November 2020, Hydra Cup was having success selling the TS1314 Shaker Bottle on
15      Amazon. However, some customers were specifically requesting Hydra Cup to add a "hiking
16      loop" or "carry loop" to the TS1314 Shaker Bottle to allow users to easily carry the bottle with
17      one finger or secure it to a backpack or gym locker hook.55

18  130. Seeking to build the shaker bottle its customers wanted, Hydra Cup began researching and de-
19      veloping ways to add a carry loop feature to the TS1314 Shaker Bottle that was selling well on
20      Amazon.56

21  131. The cost of developing new molds for entirely new shaker bottle and lid designs was prohibi-
22      tively expensive for Hydra Cup. In other words, Hydra Cup was limited to its existing molds
23      for the TS1314 Shaker Bottle. (See Harlan Depo. Tr., 42:9-12 (discussing Hydra Cup being

---

52 (*Id.* at 141.).

53 (Ex. 43, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022)).

54 *See id.*

55 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 141.).

56 (*Id.*).

1     limited to the molds and tools modeled after Tianqi's D047 Patent, stating "[y]ou know, in an

2     injection molding tool, if you have a side action that has to move out of the way, that's a slide.

3     You know, every time you add one, it's probably about 5- to $10,000 to the tool.")).

4  132. Thus, Hydra Cup was forced to find a solution that allowed integrating a carry loop into its ex-

5     isting lid on the TS1314 Shaker Bottle.57 Hydra Cup noticed numerous other companies such

6     as Thermos and BlenderBottle were able to integrate a carry loop into brackets that functioned

7     similar to the brackets already existing on the TS1314 Shaker Bottle lid that Hydra Cup had

8     been selling and opined it could probably develop a carry loop to function with the TS1314's

9     existing brackets.

10  133. In November 2020, Hydra Cup decided to add a finger carry loop to the lid of the TS1314

11     Shaker Bottle to provide a convenient way for customers to carry the bottle.58 Hydra Cup

12     worked with a product designer, Jeff Harlan, to modify the existing TS1314 lid design to incor-

13     porate a carrying loop.59

14  134. On 5 November 2020, Hydra Cup sent Mr. Harlan instructions on modifying the lid to add an

15     integrated finger carrying loop but was still waiting on the 1314.stp file from Tianqi.60

16  135. As Mr. Harlan explained in his deposition, Hydra Cup was interested in BlenderBottle's Clas-

17     sic shaker bottle because "[i]t just worked really well."61 Hydra Cup and Mr. Harlan cut-up

18     and reverse engineered one of BlenderBottle's shaker bottle products to figure out how

19     BlenderBottle's shaker bottle functioned so much better than all other shaker bottles—a com-

20     mon practice in the shaker bottle industry.62

--------

57 (*See id.*; *see also* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 141.).

58 (*See* Ex. 38, (CONFIDENTIAL) Emails Between Hydra and Alec of Tianqi Regarding New Mold Quote for OG shaker (November 2020 - January 2021; see also Ex. 40, Def.'s Answers to Pl.'s Interrogs., 142.).

59 (*Id.* at 142-43; *see generally* Ex. 47, Harlan Depo. Tr., 34-45; 118-25.).

60 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 143.).

61 (*See* Ex. 47, Harlan Depo. Tr., at 120:10-14 (explaining Hydra Cup appreciated the BlenderBottle sample bottle because "mostly just how nice it worked and felt. It just worked really well.")).

62 (*See id.* at 37:10-15 (describing Hydra Cup's interests in BlenderBottle's products: "What he was really looking for was the – the function and feel of the BlenderBottle. You know, that bottle has a really nice click to the top, and, you know, it just feels nice and thick and solid. It doesn't feel like a cheap Chinese cup, which is basically what we were working with."))

1   136. As Mr. Harlan explained multiple times, Hydra Cup was only interested in the superior func-

2         tionality of BlenderBottle's products.63

3   137. On 5 November 2020, Hydra Cup received the 1314.stp file from Tianqi and sent the 1314.stp

4         file to Mr. Harlan, instructing Mr. Harlan to proceed with the November 5th instructions to

5         modify the 1314.stp file to add the finger carrying loop.64

6   138. Hydra Cup was ultimately limited by its molds for the shaker bottles and lid designs modeled

7         after Tianqi's D047 and D029 Patents.

8   139. On 06 November 2020, Tianqi emailed Hydra Cup the "Tianqi 3D file of the TS1314 Shaker

9         Bottle and 047D patent he owns."65 This 3D 1314.stp file is owned by Tianqui and "is the ex-

10        act part file that was used to make the following accused parts[:]" the "Bottle from 1314 is ex-

11        actly the bottle from accused shaker bottle 1, 4, 5, & 10[;] [the] Lid from 1314 is exactly the lid

12        from accused shaker bottle 1, 2, 4, 5, 6, 7, 9, 10, & accused lid[;] [and the] Flip cap from 1314

13        is exactly the flip cap from accused shaker bottle 1, 2, 4, 5, 6, 7, 9, & 10."66

14  140. As Mr. Harlan explained, ultimately, due to the prohibitive expensive costs of developing new

15        molds, Hydra Cup was limited to its existing molds for the TS1314 Shaker Bottle modeled af-

16        ter the D047 Patent.67

17  141. In other words, 40:1-4: (noting it was not possible for Hydra Cup to copy BlenderBottle due to

18        molding and tooling constraints, stating "[o]f course, *our knuckles ended up opposite what they*

19        *look like on the BlenderBottle*. And he was always frustrated by that, but *there was nothing we*

20        *could do about it*.") (emphasis added).

---

63 (*See id.*; *id.* at 219:7-8 (stating Hydra Cup "wants to look – just have it function as much like the BlenderBottle as possible, and that's when he's talking about having his – his – mold maker creep up on it.")).

64 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 143.).

65 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 140.).

66 (*Id.* at 140-41.).

67 (*See* Ex. 47, Harlan Depo. Tr., 42:9-12 (discussing Hydra Cup being limited to the molds and tools modeled after Tianqi's D047 Patent, stating "in an injection molding tool, if you have a side action that has to move out of the way, that's a slide. You know, every time you add one, it's probably about 5- to $10,000 to the tool."); *see id* at 174-76 (discussing Hydra Cup abandoning designs worked on by Mr. Harland because they could not get the designs to function properly); *see id* at 176:11-12 (noting making changes to Hydra Cup's existing molds and tooling for the TS1314 Shaker Bottle was prohibitively expensive, restricting the changes that could be made, stating that changes that "required slides in the tool . . . were abandoned, I'm sure.")).

142. Ultimately, the majority of Hydra Cup's work with Mr. Harlan failed to produce any new products.[68] And none of the shaker bottle and lid prototypes Hydra Cup and Mr. Harland worked on ever actually turned into a final product offered or sold in commerce.[69]

143. On 10 November 2020, Mr. Harlan sent Hydra Cup a draft of the changes to the 1314.stp file with the changes to add the finger carrying loop as Hydra Cup had previously requested.[70] After reviewing Mr. Harlan's modifications, Hydra Cup sent a feedback video to Mr. Harlan, informing Mr. Harlan he had failed to make an important modification. Mr. Harlan mistakenly "made the hiking loop and flip cap work the same as BlenderBottle putting the hiking loop on the outside of the flip cap . . . which was the opposite of what [Hydra Cup] had requested." Hydra Cup "provided a screenshot with notes providing further clarification of the changes that needed to be made to not infringe."[71] More specifically, Hydra Cup instructed Mr. Harlan to make the following updates: "[i]nvert the flip cap and hiking loop" that Mr. Harlan failed to do; to "get rid of the carabiner because this was very complicated and expensive" to develop and manufacture; and, finally, to "reduce the width of the hiking loop to the size of BlenderBottles as a wide clip from my industrial design sketch was too bulky and added extra costs and complications."[72]

144. As Mr. Harlan explained, when providing instructions to designers, it is common for clients to use phrasing such as "copy BlenderBottle" or "do it like BlenderBottle" as just a broad, generalized goal to provide clarity. Both Mr. Harlan and Hydra Cup were well aware that Hydra Cup did not intend for its designers to literally copy BlenderBottle's designs. Hydra Cup was simply attempting to generate a general idea of the functionality it was attempting to achieve. This is common practice when designing, developing, and manufacturing functional elements of injection molded products.

---

68 (*See id.* at 122:1-14 (stating that Hydra Cup and Mr. Harlan were "working on the original design before we abandoned it, so the one that never really got produced.")).

69 (*See id.* at 187:13-16 (noting the limitations on design presented by molds and tooling: "That would have been the same – same flip – you know, how far back I can flip that cap. We were still fighting that just because of the geometry of the whole lid."); *see id.* at 183:9-10 (explaining the prototypes that Hydra Cup and Mr. Harlan worked on were abandon because they did not work: "I don't know that it ever got off the ground. I think we just kind of started it, and it was one of those things that just faded away.")).

70 (Ex. 40, Def.'s Answers to Pl.'s Inerrogs., 143.).

71 (*Id.* at 143-44).

72 (*Id.* at 143.).

145. During the development of Hydra Cup's shaker bottle lid with a carrying loop, Hydra Cup provided instructions to Mr. Harlan regarding the necessary modifications to the existing TS1314 Shaker Bottle lid design. In the course of providing these instructions, Hydra Cup used BlenderBottle's product as a reference to quickly convey functional aspects of the design and to prevent errors in the design process. This is a common practice in product development, where designers often use shorthand language such as "copy that like [competitor's product]" or "do it like [competitor's product] for that" to efficiently communicate design requirements.

146. Despite using BlenderBottle as a reference, Hydra Cup was clear that it did not want Mr. Harlan to literally copy BlenderBottle's design. For example, Hydra Cup specifically instructed Mr. Harlan to invert the placement of the flip cap and carrying loop, which is the opposite of BlenderBottle's design.

147. Hydra Cup's instructions to Mr. Harlan focused on functional aspects of the design, such as the width of the carrying loop, to ensure that the final product would be practical and cost-effective to manufacture. Hydra Cup did not ask Mr. Harlan to copy any ornamental or non-functional elements of BlenderBottle's design.[73]

148. When Mr. Harlan initially failed to follow Hydra Cup's instructions and mistakenly designed a carrying loop that was similar to BlenderBottle's, Mr. Raymus promptly corrected him and reiterated the importance of creating a design that was different from BlenderBottle's.

149. The size and placement of the carrying loop on Hydra Cup's final product are dictated by functional considerations, such as the need to support the weight of a filled shaker bottle, minimize material costs, and ensure that the flip cap can be easily moved out of the way when drinking. These functional elements are not protected by patent or trademark law.

150. In designing its finger carrying loop, Hydra Cup sought to create a design that would be functional and not infringe any existing patents. Hydra Cup specifically designed its finger carrying loop to be different from BlenderBottle's patented design by placing the flip cap on the outside of the loop, rather than on the inside as shown in BlenderBottle's patent.

---

73 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 143-44.).

151. On 11 November 2020, Mr. Harlan "corrected his error above and made the modifications based on [Hydra Cup's] feedback. This time the flip cap was inverted correctly."74 For the next four days, Hydra Cup and Mr. Harlan continued working together to tweak the details of the updates to TS1314 Shaker Bottle lid design, but "no noticeable changes to the visual were made beyond November 11th."75 The changes were completed on 25 November 2021. Hydra Cup informed Mr. Harlan that Hydra Cup was sending the final updates to the 1314.stp to Tianqi to develop and manufacture.76 This was the last contact between Hydra Cup and Mr. Harlan concerning the updates he made to 1314.stp file to integrate a finger carrying loop.77

152. Contrary to BlenderBottle's allegations, Hydra Cup did not intentionally copy BlenderBottle's patents or trade dress. Hydra Cup's products are based on Tianqi's own patented designs, which predate BlenderBottle's asserted rights. In developing its carrying loop design, Hydra Cup specifically sought to create a functional design that would not infringe BlenderBottle's rights.

***Hydra Cup Begins Selling the HC OG Carry Loop Lid in January 2021.***

153. On 25 November 2020, after incorporating the carrying loop designed by Mr. Harlan, Hydra Cup sent the updated 1314.stp files to its manufacturer, Tianqi, to begin production.78 That same day, Tianqi informed Hydra Cup that BlenderBottle had patents disclosing a carrying loop, stating "we are learned that BlenderBottle have a patent, please comment."79 In response, Hydra Cup told Tianqi that its "patent lawyer says it is different enough where there is no in-fringement" and pointed to differences such as "the way the flip cap and hiking loop are in-verted" and that "[t]he flip cap has two pieces and on the BlenderBottle it only has one."80 On

---

74 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 144:21-22.).

75 (*Id.* at 144:21-22, 24-26.).

76 (*Id.* at 28-30.).

77 (*Id.*).

78 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 145.).

79 (*Id.*).

80 (*Id.* at 145 (referring to opinion from patent attorney Niq Howard)).

1    27 November 2020, Tianqi informed Hydra Cup that it was "open[ing] up a mold for a new flip

2    cap and hiking loop."81

3    154. Importantly, there was no discussion of a new lid mold with Tianqi because Hydra Cup

4        planned to use the same TS1314 Shaker Bottle lid design, which is owned by Tianqi and dis-

5        closed in Tianqi's D047 and D029 Patents.82 Hydra Cup does not own the rights to the TS1314

6        Shaker Bottle lid design.83

7    155. Tianqi quoted Hydra Cup for the cost of producing "the hiking loop, the Clip Overmold (rub-

8        ber), the flip cap, and a $460 charge for a lid revision of the interior of the 1314 patented

9        lid."84 The lid revision did not involve any exterior changes, but rather an internal adjustment

10       to accommodate the hiking loop.85 A comparison of the modified 1314.stp file to the original

11       confirms that the lids are identical, with the only change being to the flip cap's axis point to al-

12       low room for the hiking loop between the brackets.86

13   156. A few additional non-visual details were discussed between Hydra Cup, Mr. Harlan, and Tianqi

14       regarding the mold-building process and efforts to minimize costs and ensure the hiking loop

15       did not negatively affect the flip cap's function.87

16   157. Hydra Cup requested one additional change related to the surface finish of the parts. The orig-

17       inal TS1314 Shaker Bottle, lid, and flip cap had a glossy, mirror-like finish that was prone to

18       scratches and blemishes.88 Hydra Cup believed a textured, matte finish would be more scratch-

19       resistant and visually appealing.89

---

81 (*Id.*).

82 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 145).

83 (*Id.*).

84 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 145).

85 (*Id.*).

86 (*Id.*).

87 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146).

88 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146).

89 (*Id.*).

158. On 13 January 2021, Hydra Cup asked Tianqi if it had a BlenderBottle product on hand and if it could use the same surface texture on the new TS1314 Shaker Bottle hiking loop and flip cap molds.90 This request was not an instruction to copy any BlenderBottle designs, but rather an attempt to communicate the desired surface finish by visually referencing an existing product, which Hydra Cup believed would be easier than describing the finish in writing given the language barrier between the parties.91

159. However, about an hour later, Hydra Cup realized that the existing 1314 bottle and lid had a very shiny finish that would not match a matte flip cap and carry loop.92 Hydra Cup therefore instructed Tianqi to "not match the BlenderBottle" and instead "match the shinny [sic] lid for both parts."93 As a result, there is a clear difference between BlenderBottle's products, which have a matte finish, and the accused Hydra Cup products, which have a glossy finish.94

160. While Hydra Cup would have preferred a matte finish, the cost of making new molds for that texture was prohibitive, especially since Hydra Cup did not own the TS1314 lid mold and would have had to pay for an entirely new mold to change the lid's texture.95 Additionally, Hydra Cup later learned that printing logos on a matte finish is more complicated due to the texture's effect on the UV print primer.96

161. Tianqi proceeded with manufacturing and sent Hydra Cup the first samples from the new molds on February 12th.97 . Upon receipt, Hydra Cup discovered several functional issues with the parts, including leaks, the flip cap not pulling back fully, and the flip cap not staying in the open position when pulled back, which interfered with the drinking experience.98

---

90 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146).

91 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146).

92 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146).

93 (*Id*. at 146.).

94 (*Id*.).

95 (Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-147).

96 (*Id*. at 147.).

97 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 147).

98 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 147).

162. On February 12th, Hydra Cup received samples of the modified TS1314 Shaker Bottle lid with the added carrying loop from Tianqi. Upon testing, Hydra Cup discovered that the samples had functional issues, including leaks, and problems with the flip cap not staying in the open position when pulled back for drinking.[99] To address these issues, Hydra Cup engaged in an extensive iterative process with Tianqi and Jeff Harlan, which involved multiple rounds of sample shipping, testing, design adjustments, mold modifications, and production runs. This process took several months, with the final acceptable samples being produced on July 12, 2021. (*See id.*).

163. The process of developing the modified TS1314 Shaker Bottle lid with the carrying loop, from the initial design to the final production-ready version, took approximately 251 days and required an estimated investment of $50,000 by Hydra Cup, including costs for injection molds, industrial design, 3D design services, patent infringement analysis, prototypes, research, sample parts, and patent application.(*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

164. If Hydra Cup had intended to copy BlenderBottle's design, it could have easily and inexpensively sourced knock-off products from Alibaba, as many sellers do. However, Hydra Cup invested substantial time and resources to develop its own unique design that improved upon the functionality of the existing TS1314 Shaker Bottle, while purposefully avoiding infringement of BlenderBottle's intellectual property.[100]

165. In Septemeber 2020, Hydra Cup placed the final purchase order for the modified TS1314 Shaker Bottles with the new carrying loop, designated as PO1071, which included 29,040 units across three different SKUs.[101] The addition of the carrying loop increased the cost per unit by only $0.04.[102]

---

99 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

100 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

101 (*See* Ex. 90, Emails Between Hyfra Cup and Tianqi Regarding PO1070-PO1074 (24 Sept. 2020)).

102 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

166. PO1071 was shipped from Tianqi to Hydra Cup in two containers (Kilo and Loki) via Panda Logistics, arriving at the LA port and then Manteca in late October and early November 2021, more than a year after the initial idea for the carrying loop was conceived.103

167. As a small company, Hydra Cup does not maintain a large warehouse and instead stores its inventory in the founder's parents' storage shed. From there, Hydra Cup ships the products to Amazon for distribution to customers.104

168. Almost all modified TS1314 Shaker Bottles with the carrying loop were sold on Amazon, with only minor exceptions being a one-time order with Walmart and a few orders with Muscle and Strength. Hydra Cup primarily relies on Amazon's platform for its ease of use and operation.105

169. Hydra Cup engaged in minimal marketing for the modified TS1314 Shaker Bottles, limited to product photography and Amazon pay-per-click advertising. Despite adding value through the carrying loop and other subsequent improvements, Hydra Cup has maintained the same pricing for its products since their introduction, prioritizing customer value and maintaining a lean operation.106

## IV. BLENDERBOTTLE'S AGGRESSIVE LITIGATION TACTICS AIM TO STIFLE COMPETITION AND INNOVATION.

170. BlenderBottle enjoyed its monopoly on its functional manual blender bottle design for fourteen years with its D235 Patent and BlenderBottle Classic shaker bottle. In exchange for that fourteen-year monopoly on a valuable product, BlenderBottle disclosed the design to the public and agreed to give the design to the public domain after the expiration of its fourteen-year monopoly. Put differently, BlenderBottle cannot monopolize the functional manual shaker bottle indefinitely.

171. On 17 August 2022, BlenderBottle sent Hydra Cup a cease-and-desist letter alleging that Hydra Cup's shaker bottles infringed BlenderBottle's D551 Patent and demanding that Hydra Cup

---

103 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

104 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

105 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

106 (*See* Ex. 40, Def.'s Answers to Pl.'s Interrogs., 146-150).

1    stop selling the products within two weeks, threatening legal action if Hydra Cup did not com-

2    ply. Hydra Cup responded on August 30, 2022, explaining that its products were based on

3    Tianqi's prior patented design and did not infringe.(*See* Ex. 40, Def.'s Answers to Pl.'s Inter-

4    rogs., 152).

5    172. In response, on 30 August 2022, Hydra Cup's patent attorney, Preston, sent a letter to Blender-

6    Bottle refuting the infringement allegations. Preston specifically pointed out that the accused

7    shaker bottle was based on the design of Tianqi's 047 Patent, which predated BlenderBottle's

8    551 Patent by several years. Despite making several other compelling arguments, Hydra Cup

9    received no response from BlenderBottle.

10   173. Although relying on the validity of a foreign company's patent was not something Hydra Cup

11   would typically do, the company had observed the widespread presence of Tianqi's TS1314

12   Shaker Bottles, based on the 047 Patent, in gyms and on websites across the United States since

13   2012 when Hydra Cup first entered the shaker bottle market.

14   174. To confirm these observations, Hydra Cup investigated the history of Tianqi's TS1314 Shaker

15   Bottle sales in the United States and obtained evidence from Tianqi demonstrating the prod-

16   uct's significant market presence.107. This evidence included: (i) The TS1314 Shaker Bottle

17   being listed on Bodybuilding.com, a major fitness retailer, as early as June 2012; (ii) Tianqi

18   producing TS1314 Shaker Bottles for a high-profile partnership between Arnold Schwarzeneg-

19   ger and MusclePharm in October 2013; (iii) The TS1314 Shaker Bottle, sold by well-known

20   brands such as Infinite Labs, Universal Nutrition, and Twinlab, occupying 4 of the top 20 spots

21   on Bodybuilding.com as of March 2014.

22   175. As of 2024, twelve years after its introduction, the TS1314 Shaker Bottle continues to be a

23   strong seller. According to Tianqi, the company sells an average of 10 million TS1314 Shaker

24   Bottles per year and has worked with hundreds of companies. Upon information and belief,

---

107 *See* Exhibit 41, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Ex. 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013); *see also* Ex. 89, Bodybuild-ing.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014) (showing shaker bottle's embody-ing the design disclosed by Tianqi's D047 Patent alongside shaker bottles embodying the design disclosed by Blender-Bottle's D235 Patent.)

1  BlenderBottle has not sued any of these companies, and many continue to advertise and sell the

2  TS1314 Shaker Bottle today.

3  176. Given the widespread and long-standing use of Tianqi's TS1314 Shaker Bottle in the market,

4  Hydra Cup was surprised that BlenderBottle had singled out Hydra Cup's products for legal ac-

5  tion, especially since BlenderBottle's cease-and-desist letter demanded that Hydra Cup stop

6  selling not only the lid with the carrying loop but also the cup portion of the TS1314 Shaker

7  Bottle, which bears no resemblance to BlenderBottle's D235 Patent.

8  177. Despite the threat of legal action, Hydra Cup continued selling the TS1314 Shaker Bottle with

9  the carrying loop. In total, Hydra Cup sold 119,496 units of this product across nine purchase

10  orders, primarily in value packs of 4, 5, or 6 units per order, amounting to approximately

11  25,000 individual Amazon orders.

12  178. Hydra Cup placed its last purchase order containing the accused HC OG Carry Loop Lid,

13  PO1114, in early August 2022 to cover anticipated Christmas sales. Hydra Cup planned to

14  place its next order after the holiday season.

15  **BlenderBottle Filed this Lawsuit Against Hydra Cup in December 2022.**

16  179. On 14 December 2022, BlenderBottle filed the present lawsuit against Hydra Cup, alleging in-

17  fringement of various patents and trade dress rights, including the D551 Patent that was the

18  subject of the earlier cease-and-desist letter.

19  180. BlenderBottle's aggressive legal strategy is aimed at stifling competition and preventing other

20  companies from offering better and more affordable shaker bottle products. Even more egre-

21  gious, BlenderBottle is trying to thwart Hydra Cup's efforts to improve upon the TS1314 de-

22  sign. Thus, not only is BlenderBottle stiffing competition, it is also stifling innovation.

23  181. Hydra Cup has invested significant time and resources, including the development of over 500

24  prototypes, to create a new shaker bottle design that incorporates novel, patentable features.

25  While there is no guarantee that BlenderBottle will not also challenge this new design, Hydra

26  Cup remains committed to competing fairly and providing innovative, high-quality products to

27  its customers. Accordingly, Hydra Cup seek declaratory judgments that BlenderBottle's As-

1    serted Patents and Trade Dresses, Equivalent Patents, and Related Trademarks so to establish

2    certainty in the market, so that both companies can avoid future litigation.

3    182. BlenderBottle's aggressive litigation strategy has harmed not only Hydra Cup but also numer-

4        ous other companies in the health and fitness industry. By stifling competition and innovation,

5        BlenderBottle has denied consumers access to better and more affordable products, forcing

6        them to pay higher prices for essentially the same shaker bottle design that has been on the

7        market for over twenty years.

8    183. Despite Hydra Cup's response, on 14 December 2022, BlenderBottle filed the present lawsuit

9        alleging infringement of BlenderBottle's Asserted Patents and Asserted Trade Dresses.

10   184. As a result of BlenderBottle's infringement allegations and lawsuit, Hydra Cup has suffered

11       harm to its business and reputation, and has incurred substantial costs in defending against

12       BlenderBottle's claims.

13   185. Hydra Cup brings these counterclaims to vindicate its rights, prove that it does not infringe any

14       valid intellectual property rights owned by BlenderBottle, and hold BlenderBottle accountable

15       for its anticompetitive conduct in attempting to enforce invalid and overbroad patent and trade

16       dress claims against Hydra Cup and other competitors.

17   **V. BLENDERBOTTLE'S ASSERTED PATENTS AND EQUIVALENT PATENTS ARE INVALID AND UNEN-**
18   **FORCEABLE.**

19   186. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

20       its allegations in each and every preceding paragraph above.

21   **A. BlenderBottle's Asserted Patents and Equivalent Patents are Invalid for Lack of Original-**
22   **ity and Lack of Novelty.**

23   187. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

24       its allegations in each and every preceding paragraph above.

25   *1. BlenderBottle's Asserted Patents and Equivalent Patents are Anticipated By or Obvious Over*
26   *the Prior Art.*

27   188. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

28       its allegations in each and every preceding paragraph above.

1   189. BlenderBottle's D235 Patent is invalid including because it is anticipated by or obvious over

2       the prior art. The prior art references that render the D235 Patent invalid, whether alone or in

3       combination, include by way of example only and without limitation, the following: U.S.

4       Patent Registration No. 3,820,692 (filed 16 April 1973), attached as Exhibit 50; U.S. Patent

5       Registration No. D421,547 (filed 5 May 1999), attached as Exhibit 51; and Great Shakers

6       Shaker Bottle (Screenshot from Internet Archive) (disclosed 10 Feb. 2003), attached as Exhibit

7       52; D482,936 (1999-05-05). Each of these references predates the D235 Patent and discloses a

8       shaker bottle and lid design having the same overall appearance as the claimed design.

9   190. BlenderBottle's D551 Patent is invalid including because it is anticipated by or obvious over

10      the prior art. The prior art references that render the D551 Patent invalid, whether alone or in

11      combination, include by way of example only and without limitation, the following: 8,464,895

12      (filed 27 June 2011); D646,919 (filed 23 September 2010); D656,357 (filed 15 August 2011);

13      D644,065 (filed 2010-09-29); D626,838 (filed 2010-04-16); D626,837 (filed 2010-04-16);

14      D626,838 (filed 2010-04-16); D565,353 (filed 2007-02-13); US D699,996 (filed 2012-08-28);

15      D688,520 (filed 2012-04-18); D597,365 (filed 2008-04-25) 3,820,692; 2,754,866; 2,752,971;

16      5,088,614; 8,833,586; 2,851,203; 6,510,971; D644,065; D208,935; D233,116; D409,043;

17      D421,547; D425,362; D185,179; D280,606; D218,733; D666,047; and D686,448 (filed 08

18      Sept. 2011); D686,872 (filed 2012-08-27); D686,871 (filed 2012-05-21); D610,402 (filed

19      2008-08-20); D675,059 (filed 2010-11-09); D658,445 (filed 2010-11-09); US D695,069 (filed

20      2012-02-28); D690,558 (2012-05-22); D718,626 (filed 2012-03-22); US 8,689,989 (filed 2012-

21      02-28); US 8,622,229 (filed 2012-05-12); D608,640 (filed 2008-09-20); JP2008023202A (filed

22      2006-07-24); 2011/0253733 (filed 2010-04-16); 2010/0224631 (filed 2009-03-02)

23      JP2008023202A (filed 2006-07-24); CN302040499 (filed 2012-04-20); CN301990459 (filed

24      2011-12-07); KR20130079338A; Smart Shake (2011-05-14); Core 150 Shaker Bottle (2011-

25      10-6); Body Bottle; U.S. Trademark Registration No. 6,800.019 (claims the practiced design

26      was first used in commerce in 2003).

27  191. Each of these references cited in the preceding paragraph predates the D551 Patent and dis-

28      closes a shaker bottle lid design having the same overall appearance as the claimed design.



1

*Prior Art Disclosing the Finger Carry Loop Claimed by the D551 Patent.*

2



3

*The Design Disclosed by the D551 Patent was Obvious Over the Prior Art.*

4

5  192. BlenderBottle's D798 Patent is invalid including because it is anticipated by or obvious over

6     the prior art. The prior art references that render the D798 Patent invalid, whether alone or in

7     combination, include by way of example only and without limitation all forging prior art that

8     applies to the D551 Patent and the D235 Patent as well as the following: among others: U.S.

9     Patent No. D646,919 (filed 23 September 2010), attached as Exhibit 61; U.S. Patent

10    No. D656,357 (filed 15 August 2011), attached as Exhibit 62; U.S. Patent No. 9,301,648 (filed

11    20 February 2014), attached as Exhibit 63; U.S. Patent No. D747,148 (filed 17 April 2014), at-

12    tached as Exhibit 64.

13  193. Each of these references cited in the preceding paragraph predates the D798 Patent and dis-

14    closes a shaker container design that is substantially the same as the patented design.



15

16    *Prior Art Disclosing the Design Claimed by the D798 Patent.*

***2. BlenderBottle's Equivalent Patents are Anticipated By or Obvious Over the Prior Art.***

194. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

195. BlenderBottle's Equivalent Patents—specifically its D065, D478, D038, D149, D119, D540, 830, and 060 Patents—are also invalid including because they substantially similar to Blender-Bottle's Asserted Patents, meaning the Equivalent Design Patents are also anticipated by or obvious over the same prior art cited and referenced in the preceding paragraphs above as invalidating BlenderBottle's Asserted Patents.

**VI. THE DESIGNS CLAIMED BY BLENDERBOTTLE'S ASSERTED PATENTS, EQUIVALENT PATENTS, AND ASSERTED TRADE DRESSES ARE COMPRISED OF A COMBINATION OF PRIMARILY FUNC-TIONAL PROMINENT DESIGN ELEMENTS CONFIGURED IN A PARTICULAR ARRANGEMENT THAT IS PRIMARILY DICTATED BY FUNCTION.**

196. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

197. In addition to being invalid as anticipated and obvious, the asserted design patents are also invalid for claiming designs primarily dictated by function consisting of primarily functional prominent design elements.108

**A. BlenderBottle's Designs are the Best Designs Available.**

198. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

***1. BlenderBottle's Classic "Simple Shaker" Bottle and Lid Designs are the Best Designs Available.***

199. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

---

108 Where the overall design is "essential to the use or purpose of the article," it cannot be protected by a design patent. *See L.A. Gear v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1123 (Fed. Cir. 1993).

**a. BlenderBottle's Classic "Simple Shaker" Lid Design (Claimed, in Whole or Part, by the Asserted Patents, Equivalent Patents, and Practiced by the 019 Lid Trade Dress and Unregistered Bottle Trade Dress—is the Best Available "Simple Shaker" Design Available.**

200. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.



*Prominent Design Elements from the D551 "Lid" Patent that are Common in the Lid Designs Claimed by BlenderBottle's Asserted Patents, Trade Dresses, and Products. (See Ex. 75, Prominent Design Elements in the Shaker Bottles and Lids.)*



*Prominent Design Elements from the D478 "Lid" Patent and the 019 "Lid" Trade Dress that are Common in the Lid Designs Claimed by BlenderBottle's Asserted Patents, Trade Dresses, and Products. (See Ex. 75, Prominent Design Elements in the Shaker Bottles and Lids.).*

201. BlenderBottle's "classic simple shaker" lid design—disclosed by the Asserted Patents, Equivalent Patents, and Practiced by the 019 Lid Trade Dress and the Unregistered Bottle Trade Dress—is dictated by function and specifically configured a particular way with numerous primarily functional design elements. BlenderBottle's "classic simple shaker" lid design is also primarily functional, as it mirrors the "classic simple shaker" lid design disclosed by BlenderBottle's Asserted Patents and Equivalent Patents, inheriting the same functional features.

202. The overall design of BlenderBottle's "classic simple shaker" lid design is dictated by the functional requirements of a shaker bottle lid, such as facilitating secure attachment, easy drinking and pouring, efficient mixing, and leak-proof storage and transportation of contents.

203. Furthermore, the shape and configuration of the design practiced by BlenderBottle's "classic simple shaker" lid design are primarily functional and dictated by function.

1    204. The overall shape and configuration of the lid design practiced by BlenderBottle's "classic sim-

2       ple shaker" lid design is primarily functional and dictated by the practical requirements of a

3       shaker bottle lid. Each prominent element serves a specific utilitarian purpose that is essential

4       to the lid's overall function and use.

5    205. The domed body of the lid enhances structural strength, promotes even distribution of forces

6       during shaking, prevents powder accumulation, simplifies manufacturing and cleaning, and im-

7       proves grip and handling. The concave, domed shape is crucial for optimal mixing efficiency

8       and structural integrity during vigorous shaking. This specific curved shape works in harmony

9       with the spherical agitator to create optimal fluid flow patterns for thorough mixing. Sharp

10      edges or other shapes would be prone to trapping clumps of powder and be more difficult to

11      clean.

12    206. The tall shoulder/skirt is critical for forming an airtight seal with the shaker bottle. The height,

13      width, and thickness of the skirt must be precisely engineered to fit securely on the bottle. If the

14      dimensions are off, it may not seal properly, allowing moisture to enter and degrade the bottle

15      over time. The skirt's specific configuration is essential for the lid's leak-proof functionality.

16    207. The flip top cap, spout, and spout guard work together as an integrated system for controlled

17      dispensing and hygienic drinking. Their arrangement is dictated by functional necessity. The

18      spout must be positioned away from the center to allow comfortable drinking without hitting

19      the user's nose. The spout guard covers the spout to maintain cleanliness. The flip top cap seals

20      the spout and must be positioned to work in tandem with the spout and spout guard.

21    208. The brackets and carry loop are also configured in a specific arrangement for optimal function-

22      ality. The brackets provide a sturdy attachment point for the carry loop while allowing it to

23      pivot smoothly. The carry loop's position and range of motion are carefully calibrated to bear

24      the bottle's weight when carried, without putting undue stress on the lid or inadvertently open-

25      ing the flip top cap. Changing the configuration of these elements would impair their intended

26      functions.

27    209. The 019 Lid Trade Dress's design is predominantly functional, aimed at enhancing practical

28      use for drinking, mixing, pouring, storing, and transporting beverages. BlenderBottle's utility

29      patent confirms the lid's functional nature, emphasizing its role in facilitating container han-

1 dling and content mixing. This lid design significantly improves the overall utility of Blender-

2 Bottle's shaker bottles as versatile, portable beverage containers.

3 210. A key functional aspect of BlenderBottle's "classic simple shaker" lid design is its ability to

4 efficiently mix contents without leakage, a primary selling point for shaker bottles. The lid fea-

5 tures a leak-proof seal, achieved through a threaded design and secure flip cap, ensuring con-

6 tents remain contained even during vigorous shaking. The lid's size and shape cater to comfort-

7 able drinking and effective mixing, matching the bottle's internal dimensions. User-friendly

8 features, like grooved sides, facilitate easy handling. The design allows quick sealing and un-

9 sealing without fully removing the lid, enabling spill-free mixing and pouring.

10 211. The 019 Lid Trade Dress supports mobile drinking, mixing, storage, and pouring, offering

11 portability for on-the-go use. Its robust, leak-proof construction suits the storage and trans-

12 portation of liquids. Durability and safety are prioritized in the material and construction

13 choices, ensuring the lid withstands regular use and dynamic environments. Though the lid in-

14 cludes some ornamental aspects, its form is primarily dictated by functional requirements.

15 212. Each element of BlenderBottle's "classic simple shaker" lid design's overall design is dictated

16 by function. The functional nature of each element is substantiated and clearly articulated in

17 multiple utility patents predating BlenderBottle's "classic simple shaker" lid design. Both

18 BlenderBottle and consumers have continually touted BlenderBottle's "classic simple shaker"

19 lid design's functionality over the years. The design combines features for enhanced utility and

20 effectiveness, including structural integrity, ease of use, and portability. Each element serves a

21 specific, practical purpose, such as mixing, drinking, pouring, storing, locking, sealing, carry-

22 ing, attaching, and enabling portability. The design's functionality is further supported by a

23 wide array of prior art invalidating any claim of it being purely ornamental.

24 213. Each individual element of BlenderBottle's "classic simple shaker" lid design—the domed

25 body, circular screw-top base, pivoting brackets, flip-top cap, spout, and spout guard—serves a

26 specific utilitarian purpose that is essential to the lid's overall function and use.

27 214. The domed body of the lid enhances structural strength, promotes even distribution of forces

28 during shaking, prevents powder accumulation, simplifies manufacturing and cleaning, and im-

29 proves grip and handling. The 019 Lid Trade Dress's domed body lid design, exemplified in

BlenderBottle products, is functionally driven, focusing on enhancing mixing efficiency, struc-
tural integrity, and ergonomic use. The concave, domed shape improves structural strength,
crucial for vigorous shaking and mixing, as outlined in BlenderBottle's utility patent. This de-
sign distributes forces evenly, reducing deformation risk, and aids efficient mixing by prevent-
ing powder accumulation. The domed design simplifies manufacturing, conceals imperfections,
and contributes to the lid's hygiene and ergonomic handling. It provides a better grip for open-
ing and closing and simplifies cleaning. BlenderBottle's advertising underscores these func-
tional benefits, highlighting the domed body's role in ensuring smooth, thorough mixing and
ease of maintenance.

215. The circular screw-top base with threading provides a secure, adjustable, leak-proof seal that is
critical for attaching the lid to the bottle and preventing spills during vigorous shaking and ac-
tive use. The 019 Lid Trade Dress's circular screw-top base design is functionally optimal, pri-
marily serving to provide a secure and adjustable seal. The threaded mechanism ensures a tight,
leak-proof seal, offering superior durability and reliability. The broad shoulder of the circular
screw-top base facilitates a secure fit and aids in the ease of drinking and mixing. The threaded
design is user-friendly, allowing for straightforward opening and closing, and provides flexibil-
ity in adjusting the tightness of the seal. Given the limited design options available for creating
an effective domed lid with such functionality, the circular screw-top base is dictated by practi-
cal needs.

216. The pivoting bracket design, featuring cylindrical pivots held within concave brackets, enables
smooth and stable rotation of the flip-top cap while maintaining structural integrity and mini-
mizing friction and wear. The 019 Lid Trade Dress's bracket design, featuring a cylindrical
pivot encased within concave brackets, exemplifies functional optimization. The cylindrical
middle of the brackets acts as a pivot for the Flip-Top-Cap, allowing for smooth operation. The
cylindrical shape efficiently minimizes friction and wear, enhancing durability and reliability.
The concave brackets provide a secure hold for the pivot, maintaining structural integrity and
ensuring the Flip-Top-Cap remains firmly attached under stress. The brackets ensure ease of
use without adding bulk, contributing to the lid's lightweight and portability. They strike a bal-
ance between robustness and flexibility, supporting the bottle's weight while allowing smooth

1  cap movement. The bracket design is superior to alternatives, such as non-pivoting or rigid de-

2  signs, which would limit the Flip-Top-Cap's functionality.

3  217. The Flip-Top-Cap allows quick, one-handed access to the bottle's contents without fully re-

4  moving the lid, facilitating easy drinking and pouring while preventing spills and maintaining

5  hygiene. The 019 Lid Trade Dress's Flip-Top-Cap design exemplifies optimal functionality, fo-

6  cusing on practicality rather than aesthetics. The Flip-Top-Cap enhances the bottle's function-

7  ality by providing quick and effortless access to its contents. Its design, connected to the brack-

8  ets' pivot mechanism and spout guard, facilitates one-handed operation. Further integrating

9  with the lid's other features, the Flip-Top-Cap facilitates faster access to the bottle's contents

10  and helps keep the cap secure. The Flip-Top-Cap and spout guard combination acts as a protec-

11  tive barrier for the drinking spout, maintaining hygiene. BlenderBottle's marketing highlights

12  the functional importance of the Flip-Top-Cap, focusing on its ease of use and hygienic advan-

13  tages.

14  218. The spout and spout guard work together to control the flow of liquid, enable direct drinking of

15  thick mixtures, prevent spills and splashes, and shield the drinking surface from external con-

16  taminants. The spout and spout guard's functionality is integral to the overall design of

17  BlenderBottle's "classic simple shaker" lid design's lid. They work in harmony with other

18  functional elements to facilitate drinking and pouring, ensure the contents are accessible and

19  consumable directly from the lid, and enable precision placement in distributing the bottle's

20  contents. The spout and spout guard designs are functionally optimized, enhancing the lid's us-

21  ability for consuming liquids efficiently. Their design is meticulously engineered to control liq-

22  uid flow and maintain hygiene while preventing leaks. The spout guard's circular design pro-

23  vides an effective seal with the spout, ensuring a smooth drinking experience. The spout's de-

24  sign represents the optimal functional approach, tailored for comfortable and easy drinking.

25  BlenderBottle's advertising highlights the spout guard's functionality in keeping the drinking

26  surface germ-free and preventing spills.

27  219. The functional nature of each element of BlenderBottle's "classic simple shaker" lid design is

28  confirmed by BlenderBottle's own utility patents, which emphasize the utilitarian advantages

29  of the design features.

220. BlenderBottle's advertising also touts the functional benefits of the 019 lid design, focusing on features such as secure sealing, easy access, spill prevention, hygienic drinking, and durability.

221. Alternative designs that deviate from BlenderBottle's "classic simple shaker" lid design, such as flat lids, snap-on caps, non-pivoting brackets, or differently shaped spouts, would not provide the same level of functionality and would impair the lid's performance and usability.

222. The 019 Lid Trade Dress is not an arbitrary or ornamental design, but rather a compilation of functional elements that are essential to the lid's purpose and use as part of a shaker bottle.

223. Any ornamental aspects of BlenderBottle's "classic simple shaker" lid design are subordinate to and inseparable from the design's overall functionality, which is dictated by the practical requirements of a shaker bottle lid.

224. Given the functionality of the overall design and each individual element, the scope of any trade dress rights in the 019 registration is extremely narrow and does not extend to the functional features.

225. Allowing BlenderBottle to monopolize the functional design of BlenderBottle's "classic simple shaker" lid design would improperly prevent competitors from using design features that are necessary for the practical use and efficiency of shaker bottle lids.

**b. BlenderBottle's Classic "Simple Shaker" Bottle Design—i.e., the Class "Simple Shaker" Bottle and Lid Combined—is Primarily Functional and Dictated by Function.**

226. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

227. BlenderBottle's "classic simple shaker" bottle and lid design—disclosed by the Asserted Patents, Equivalent Patents, and the alleged Unregistered Bottle Trade Dress—encompasses a range of features that are primarily functional in nature, dictated by the practical requirements of a shaker bottle rather than arbitrary aesthetic choices.



1

2  *Prominent Design Elements from the D235 Patent that are Common in the Asserted Patents, Trade Dresses, and*
3  *Products. (See Ex. 75, Prominent Design Elements in the Shaker Bottles and Lids.)*

4  228. The tall, cylindrical bottle body shape of the BlenderBottle's "classic simple shaker" bottle de-

5  sign is essential to providing sufficient volume capacity to meet users' needs for preparing and

6  consuming various beverages and supplements. The elongated design is not ornamental but

7  rather serves the utilitarian purpose of holding an adequate quantity of liquid.

8  229. The use of transparent plastic for the Measurement-Markings-Tool on the bottle body is also a

9  functional choice, not a decorative one. The transparency allows users to easily view the con-

10  tents of the bottle and accurately gauge the volume of liquids being added or consumed. An

11  opaque design would impair this essential measuring and monitoring function.

12  230. The pill-shaped or stadium-shaped Bottle-Base design in the BlenderBottle's "classic simple

13  shaker" bottle design provides critical stability to prevent the bottle from tipping over, espe-

14  cially given its tall height. The elongated base shape is not selected for its aesthetics but for its

15  ability to lower the center of gravity and maintain the bottle's upright position during use and

16  storage.

17  231. Additionally, the pill-shaped Bottle-Base ergonomically complements the user's hand shape,

18  facilitating a comfortable and secure grip. This is particularly important for a shaker bottle that

19  needs to be held firmly during vigorous shaking or mixing. The base design is thus dictated by

20  the functional need for easy and stable handling.

21  232. The slightly narrower diameter of the Bottle-Mouth compared to the overall bottle body is not

22  an arbitrary stylistic feature but a practical design choice. The reduced mouth size allows for

23  more controlled and precise pouring of liquids, minimizing spills and waste. This is especially

24  important when dispensing specific quantities of beverages or supplements.

233. The placement of BlenderBottle's logo on the Bottle-Front and the Measurement-Markings-Tool on the Bottle-Back serves a functional purpose of quickly orienting the user. By positioning the branding on the front and the measurements on the back, the design enables intuitive and efficient identification of each side's respective information and purpose.

234. The transparent Measurement-Markings-Tool starting at a specific height above the Bottle-Base is carefully calibrated for accurate volume measurement. The placement and transparency of the tool are essential to its intended function of allowing users to precisely gauge and track liquid quantities. The design is not motivated by aesthetics but by the need for reliable measuring capabilities.

235. The elongated, rocket-shaped grip strips with five pronounced bumps on the Ribbed-Grip-Bottle-Sides serve the utilitarian purpose of enhancing grip traction and stability. The unique shape and protrusions of the grip strips increase the contact surface area between the user's hand and the bottle, ensuring a secure hold during shaking and preventing slippage. The design is driven by functionality, not mere decoration.

236. The individual design elements of BlenderBottle's "classic simple shaker" bottle design, as well as their combined overall configuration, are all primarily functional in nature. Each feature serves a specific utilitarian purpose that is essential to the shaker bottle's intended use and performance.

237. BlenderBottle's own utility patent, U.S. Patent No. 8,695,830, further confirms the functionality of many of the key design elements claimed in BlenderBottle's "classic simple shaker" bottle design.[109] The 830 Patent discloses a "Container for Mixing and Storing of Ingredients," and its specification extensively describes the functional advantages of features such as the domed lid, spout, flip cap, carry loop, and bottle body shape.

238. The 830 Patent undermines BlenderBottle's claim that the "simple shaker" bottle design practiced by its alleged Unregistered Bottle Trade Dress is a distinctive source identifier, as it demonstrates that the design is instead a compilation of functional features aimed specifically configured for optimal mixing, pouring, sealing, and handling capabilities.

---

109 (*See* Ex. 29, U.S. Patent No. 8,695,830 (filed 11 Sept. 2012)).

239. The primacy of functionality in BlenderBottle's "simple shaker" bottle design practiced by its Unregistered Bottle Trade Dress precludes its validity and enforceability as a protectable trade dress. The design does not serve to identify and distinguish BlenderBottle's products in the market but merely embodies the functional requirements of a shaker bottle.

*2. BlenderBottle's Spherical Wire Agitator Design is Primarily Functional, Primarily Dictated by Function, and the Best Design Available.*

240. BlenderBottle's 626 Agitator Trade Dress, covering the design of a spherical wire whisk agitator, is primarily functional rather than ornamental.

241. Upon information and belief, BlenderBottle's claimed 626 Agitator Trade Dress is described in the registration as "a three-dimensional configuration of a beverage agitator consisting of a wire that is wound to symmetrically define the shape of a sphere."[110] This is the same spiral-wound, spherical, wire-frame configuration disclosed as functional in the 032 Patent.

242. BlenderBottle's own expired utility patent, U.S. Patent No. 6,379,032 (the "032 Patent"), discloses and claims the same spherical wire agitator design as the 626 Agitator Trade Dress.[111] The existence of this utility patent is strong evidence that the design is functional, as utility patents are intended to protect new and useful inventions.



*BlenderBottle's Expired 032 Patent Describes the Functionality of the 626 Trade Dress in Detail.*

---

110 (Ex. 18, U.S. Trademark Reg. No. 6,245,626).

111 (Ex. 31, U.S. Patent No. 6,379,032 (filed 18 February 2000)).

243. BlenderBottle actively enforced the 032 Patent against competitors, demonstrating its belief that the spherical wire agitator design provided a functional competitive advantage. Companies typically enforce utility patents to protect functional designs, not mere ornamental features.

244. The 032 Patent's "Summary and Objects of the Invention" section explicitly states that the agitator's shape is formed by a wire frame to allow the flow of material through and around it.[112] This language directly ties the design to its functional purpose of mixing the contents of the shaker bottle.

245. Every aspect of the design claimed in the 626 Agitator Trade Dress—the spherical shape, the wire-frame construction with spaces between wire elements, and the spiral-wound configuration—is disclosed in the 032 Patent as having functional benefits in terms of allowing flow-through mixing action, creating turbulence to disperse particles, facilitating motion through the container, and enabling elastic deformation to break up aggregations.

246. Upon information and belief, the features claimed in the 626 Agitator Trade Dress are essential to the use or purpose of the agitator and impact its quality by providing superior mixing capabilities. The design is not arbitrary or ornamental but instead is dictated by the functional considerations disclosed in the 032 Patent.

247. BlenderBottle's 626 Agitator Trade Dress is, in essence, an attempt to monopolize the functional wire-frame agitator design of the expired 032 Patent under the guise of trade dress. Allowing such trade dress protection would improperly extend BlenderBottle's patent monopoly and prevent others from practicing the invention claimed in the 032 Patent, which is now in the public domain.

248. In light of the clear functionality of the claimed design, as evidenced by the disclosures of the 032 Patent, the 626 Agitator Trade Dress fails to serve as a valid trademark identifying the source of BlenderBottle's products. The design is not perceived by consumers as an indicator of origin but rather as a purely utilitarian feature of the agitator products.

---

112 (Ex. 31, 032 Patent, 2:48-58).

249. The overall design of the spherical wire agitator is dictated by its function. The wire frame structure is essential for effectively mixing the contents of the shaker bottle, and its design elements are chosen primarily for this functional purpose. Alternative designs mentioned in the 032 Patent, such as non-spherical shapes, offer inferior mixing functionality compared to the claimed spherical design.113

250. Upon information and belief, BlenderBottle's own advertising and promotional materials highlight the functionality of the spherical wire agitator design. As early as 2001, BlenderBottle described the agitator as being made of high-grade surgical stainless steel, resistant to rusting, chipping, peeling, or staining, and effective at whipping cream and blending ingredients smoothly. BlenderBottle compared the agitator's functionality to that of a traditional wire whisk used by gourmet cooks, emphasizing its primary functional role.

251. BlenderBottle markets the spherical wire agitator under the name "BlenderBall," which literally describes the product's function as a ball designed for blending. BlenderBottle's trademark registration for BLENDER BALL (the "591 Reg.") identifies the goods as "whisks, namely, agitators for mixing and blending food and drinks," further confirming the functional nature of the design.114

252. Among the various designs for spherical wire agitators disclosed in the 032 Patent, BlenderBottle chose to use the design in Figure 2 for its commercial products because it is the cheapest and easiest to manufacture. *See*115 This further demonstrates that the specific configuration of the 626 Agitator Trade Dress is dictated by functional considerations, not ornamental design.

253. In light of BlenderBottle's own utility patent, enforcement history, promotional materials, and product naming, it is clear that the 626 Agitator Trade Dress is primarily functional. The spherical wire agitator design is essential to the use and purpose of the product, and its features are dictated by the functional requirements of effectively mixing the contents of a shaker bottle.

---

113 (Ex. 31, 032 Patent, 2:58-60, 4:30-39).

114 (Ex. 22, U.S. Trademark Registration No. 3,515,591.).

115 (Ex. 31, 032 Patent, Figures).

### 3. BlenderBottle's Shaker Bottle Belly Label is Primarily Functional, Primarily Dictated by Function, and the Best Design Available

254. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

255. BlenderBottle's Unregistered Label Trade Dress's overall design and its constituent elements are predominantly dictated by functional considerations, working in unison to create a label that prioritizes clear communication, usability, and practicality over aesthetic or source-identifying purposes.



*See Ex. 74, Prominent Design Elements in the Claimed Label Designs.*

256. The overall design of BlenderBottle's Unregistered Label Trade Dress is primarily dictated by the functional need to convey essential product information to consumers in a clear, concise, and easily readable manner. The vertical layout, contrasting colors, and straightforward typography are all geared towards effectively communicating the brand identity, product line, and capacity, which are vital for customers to make informed purchasing decisions. The simplicity of the design ensures that the label does not interfere with the product's usability or aesthetics, allowing the bottle to be easily gripped, cleaned, and stored.

257. For example, the dimensions and proportions of BlenderBottle's Unregistered Label Trade Dress are primarily dictated by the need to fit precisely on the specific bottle for which it is designed. The label's width and height must be carefully calibrated to match the bottle's circumference and the desired vertical coverage area. This functional requirement restricts the label's design to a specific size and shape, limiting the creative possibilities in order to ensure a secure and seamless fit on the bottle.

258. Displaying the brand name "Blender Bottle" prominently at the top of the label serves the function of telling consumers the exact function of the product—a bottle that blends. Furthermore,

1    clearly identifying the product's manufacturer enables consumers to quickly recognize and trust

2    the brand they are purchasing.

3    259. And the label's placement and alignment is patently functional. The label's placement on the

4    bottle is also governed by functional factors. It must be positioned at a specific height and

5    aligned accurately to avoid interfering with the bottle's grip area, cap, or any other functional

6    components. The label's placement is crucial for maintaining the bottle's usability and er-

7    gonomics, as misaligned or poorly placed labels can hinder the user's ability to comfortably

8    hold, open, or drink from the bottle.

9    260. Functionality also dictates adhesive and material considerations for the Unregistered Label

10    Trade Dress. The label's design must also account for the functional requirements of the adhe-

11    sive and material used. The chosen adhesive must be strong enough to keep the label securely

12    attached to the bottle throughout its lifecycle, withstanding exposure to moisture, friction, and

13    temperature changes. Similarly, the label material must be durable, moisture-resistant, and

14    compatible with the bottle's surface to ensure long-lasting adherence and legibility. These func-

15    tional constraints further limit the design options for the Label Trade Dress.

16    261. The Label Trade Dress's interaction with bottle contours is also primarily functional. The Label

17    Trade Dress must be designed to accommodate the specific contours and curvature of the bot-

18    tle. This functional necessity dictates that the label's shape and layout must be adapted to fit the

19    bottle's surface without wrinkling, bubbling, or peeling. Designing the label to conform to the

20    bottle's contours may require compromises in terms of layout, graphics, or text placement, as

21    the label must prioritize a smooth and secure fit over purely aesthetic considerations.

22    262. Including the product line "CLASSIC" on the Unregistered Label Trade Dress helps differen-

23    tiate this specific model from other offerings by the same brand, guiding customers to select the

24    product that best suits their needs.

25    263. Presenting the bottle's capacity in both imperial and metric units (28 oz. | 828 ml) is a func-

26    tional necessity, as it provides critical information about the product's size and volume, helping

27    consumers choose the appropriate bottle for their intended use.

1    264. The clean, legible typography used throughout the Label Trade Dress is primarily functional, as
2          it ensures that all the information is easily readable by consumers, even at a glance or from a
3          distance.

4    265. The use of a light blue background and white text is a functional choice that provides high con-
5          trast and visibility, making the information on the label easy to discern. The color blue is also
6          often associated with water and hydration, reinforcing the product's intended use.

7    266. Importantly, by designing the Unregistered Label Trade Dress to fit snugly and seamlessly on
8          the bottle, the overall appearance of the label is primarily dictated by functional requirements
9          rather than distinctive or ornamental choices. The label's dimensions, proportions, placement,
10         alignment, adhesive, material, and interaction with the bottle's contours are all governed by the
11         practical necessity of ensuring a secure, durable, and user-friendly attachment to the bottle.

12   267. The functional elements of BlenderBottle's Unregistered Label Trade Dress work together syn-
13         ergistically to create an overall design that is primarily driven by practicality and usability. The
14         combination of the brand name, product line, capacity, eco-friendly icon, clear typography, and
15         contrasting color scheme all serve the overarching function of effectively communicating es-
16         sential product information to consumers while ensuring the bottle remains easy to handle and
17         use.

18   268. By prioritizing functionality in both the individual design elements and their cohesive arrange-
19         ment, BlenderBottle's Unregistered Label Trade Dress achieves a streamlined, intuitive, and
20         user-friendly appearance that enhances the product's utility and marketability. The design's
21         emphasis on functionality makes it less likely to be perceived as a distinctive source identifier,
22         as it primarily serves practical purposes rather than acting as a unique, ornamental feature.

23   **B. BlenderBottle Continually Touts the Superior Functionality of its Claimed Designs.**

24   269. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,
25         its allegations in each and every preceding paragraph above.



1

*Prominent Design Elements in the Asserted Patents, Asserted Trade Dresses, and Asserted Products.*

270. For example, BlenderBottle touts the superior functionality of its multi-functional tool shaker bottle and lid designs on its blog: "The main purpose of a shaker cup is to mix up protein shakes. But they can also be used for any drink from juice to sports drink to iced coffee or just plain water. The BlenderBottle SportMixer shaker is ergonomically designed with an easy-to-hold grip, allowing it to double as an active lifestyle water bottle. We even make a protein shaker bottle with compartments the BlenderBottle ProStak with built-in storage for powders, snacks, and pills. Some people put shaker cups to work in other ways entirely, such as blending dressings, marinades, and pancake batter." 116

271. And, also on its blog, BlenderBottle explains the important functions of its functional shaker bottle lid design: Functional Lid: "With all this mixing, it's *critical that the lid to your shaker cup stays securely in place*. It's no fun to wind up with protein powder and milk splattered all over your clothes and kitchen, rather then inside your belly! *All BlenderBottle shakers include lids engineered to stay tight, backed by our leak-proof guarantee*. The *lids twist snugly in place, forming a secure seal; with a distinctive snap, the caps click tightly closed and you're ready to shake away*. Our BlenderBottle Classic, BlenderBottle Pro32, and BlenderBottle Classic 45oz shakers even contains a special *SpoutGuard, which keeps dirty gym fingers from touching the drinking spout*. Did we mention our bottles use our *StayOpen flip cap*, which conveniently *keeps the lid from banging on your nose as you drink*?"117

---

116 (Ex. 54, BlenderBottle Website Blog Article, "What is a Shaker Cup?" (21 Aug. 2017), *available at* https://www.blenderbottle.com/blogs/health/what-is-a-shaker-cup-anyway/) (emphasis added)).

117 (*Id.* (emphasis added)).

272. BlenderBottle explains the superior functionality of its materials comprising its shaker bottles and lids: "The bottle material not only makes a difference aesthetically, it can impact the taste and temperature of your shake."118 BlenderBottle further explains the importance of material selection as follows: "Plastic shaker cups are the most common type but *not all plastics are the same*. It's important to make sure your shaker is BPA and phthalate free, like all BlenderBottle brand shakers. Otherwise, harmful chemicals can leach into your drink. One of the best food-grade plastics is Eastman Tritan, known for its extreme durability and clarity, as well as being stain and odor resistant a highly desirable quality that prevents today's smoothie from tasting like last week's protein shake. Many BlenderBottle plastic shaker cups feature Eastman Tritan as the bottle material."119

273. Also on its blog, BlenderBottle explains the functionality of its spherical wire agitator design: "Shaker cups differ from traditional cups or water bottles because they contain a mixing mechanism to blend the ingredients. There are several types of mixing mechanisms: ball or propeller-shaped agitators, built-in screens or strainers, and even self-contained mini motors. All BlenderBottle shaker cups use our patented BlenderBall Wire Whisk the mixing device that revolutionized the handheld mixing industry. *Made from 316 surgical-grade stainless steel, the BlenderBall whisk cuts through even the thickest ingredients (think bananas, nut butters, dense protein powders, honey, syrup, and more), whipping around inside the bottle to reach every last bit of the mix-ins and blend the smoothest possible shake.* Plus, it can stay in the bottle while you drink the BlenderBall whisk will *never rust, chip, or peel, nor will it tumble out* of the drinking spout."120

**C. Numerous Utility Patents Describe the Functionality of the Designs Disclosed by Blender-Bottle's Asserted Patents and Asserted Trade Dresses.**

274. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

---

118 (*Id.*).

119 (*Id.* (emphasis added)). (*See also*, Ex. 47, Harlan Depo. Tr., at 212: 4:9 (noting the utility of material mixtures: "seems like it was polycarbonate and something else, but I don't remember exactly what it was. But that was very popular material when it first came out because it was very clear and – and was BPA-free, and everybody was all on the Tritan train for a while.")).

120 (Ex. 54, BlenderBottle Website Blog Article, "What is a Shaker Cup?" (21 Aug. 2017), *available at* https://www.blenderbottle.com/blogs/health/what-is-a-shaker-cup-anyway/) (emphasis added)).

1    275. Multiple utility patents, including those owned by BlenderBottle, demonstrate that the designs

2         claimed in BlenderBottle's Asserted Patents and Asserted Trade Dresses are primarily dictated

3         by function rather than ornamental design. Each key element of these designs serves a utilitar-

4         ian purpose.

5    276. For two decades, BlenderBottle has consistently touted the functionality of its substantially

6         similar shaker bottle, lid, and agitator designs, highlighting their functional strengths as a multi-

7         functional blending tool, including in multiple utility patents owned by BlenderBottle.121

8    277. U.S. Patent No. 8,695,830 ("830 Patent"), owned by BlenderBottle, discloses describes the

9         functional aspects of the spout, flip top cap, lid body, posts/brackets, handle/loop, and lid

10        threading present in the Asserted Patents and Trade Dresses: For example, the 830 Patent

11        claims a "lid base having an opening for dispensing contents" and "a flip top for sealing the

12        opening" with the flip top having a "downwardly extending protrusion . . . inserted [into the

13        spout] to seal the opening."122 This shows the spout functions to dispense contents and the flip

14        top functions to seal the spout. (*See id.*). And While not explicitly claimed, the 830 Patent

15        claims "a lid base" and "a lid that connects to a top of the bottle to seal the bottle", which are

16        functional aspects related to the overall lid structure, including the domed body and skirt/shoul-

17        der that allow the lid to connect to and seal the bottle. (*See id.* at Claims 1, 12, 20.). And The

18        "posts" claimed in the 830 Patent are equivalent to the "brackets" in the Asserted Patents and

19        Trade Dresses, functioning to secure the handle and flip top to the lid base. The patent also

20        claims the handle comprising a loop that functions to "support [the] weight of the container and

21        allow the container to be carried without creating an opening force on the flip top"123 And,

22        while not explicitly claimed, the 830 Patent claims "a lid that connects to a top of the bottle to

23        seal the bottle," which is the function performed by the lid threading.124

---

121 (*See, e.g.*, Ex. 29, U.S. Patent No. 8,695,830 (filed 11 Sept. 2012); Ex. 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018); Ex. 31, U.S. Patent No. 6,379,032 (filed 18 February 2000); Ex. 34, U.S. Patent No. 10,165,877 (filed 07 May 2016); Ex. 33, U.S. Patent No. 9,492,024 (filed 02 October 2012); Ex. 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)).

122 (Ex. 29, U.S. Patent No. 8,695,830, Claims 1, 11-12, 20 (filed 11 Sept. 2012)).

123 (*Id.* at Claims 14, 20.).

124 (*Id.* at Claim 20.).

1    278. BlenderBottle's U.S. Patent No. 11,111,060 ("060 Patent") describes numerous functional as-

2         pects of the claimed shaker bottle lid design, demonstrating that the design is primarily dictated

3         by function rather than ornamental appearance.125 The 060 Patent states that the "spout 14"

4         provides "direct access to the container" and is "sized and configured to allow a user to drink

5         and/or pour from the container." The spout is described as being "large enough to allow the

6         contents to easily be poured or dispensed" and "disposed toward a periphery or outer edge of

7         the lid."126 This shows the spout's size, location, and configuration are driven by the functions

8         of providing access to the container contents for drinking and pouring. (*See id.*).

9    279. The 060 Patent extensively describes the functional aspects of the "flip-top closure 40", ex-

10        plaining it is "sized and configured to help control fluid flow through the opening or spout 14."

11        In the closed position, the flip-top "cover[s] or close[s]" the spout "to prevent fluid from exit-

12        ing the container 10." In the open position, it "allow[s] fluid flow through the opening or spout

13        14."127 The flip-top's two positions serve the functions of preventing and allowing fluid flow.

14        The flip-top also includes a "fitting 80" that is "sized and configured to prevent fluid flow

15        through the spout or opening 14 when the flip-top is in the closed position" by being "at least

16        partially disposed in the spout 14."128 The fitting's size and configuration perform the function

17        of sealing the spout. (*See id.*).

18    280. The 060 Patent describes in detail how the flip-top closure and carrying member are pivotally

19        connected to the lid via protrusions on the lid's flanges that engage with receiving portions on

20        the flip-top and carrying member.129 These pivotal connections, formed by the interaction be-

21        tween the protrusions and receiving portions, serve the function of allowing the flip-top and

22        carrying member to rotate between different positions relative to the lid. (*See id.*).

23    281. The 060 Patent states that the "carrying member 44" has a "loop-shaped configuration" that

24        "facilitate[s] carrying of the container 10" and "attaching one or more items to the container 10

---

125 (Ex. 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018)).

126 (*Id.* at 4:29-35).

127 (Ex. 30, 060 Patent at 5:22-32).

128 (Ex. 30, 060 Patent at 7:50-54).

129 (Ex. 30, 060 Patent at 5:33-48, 8:30-9:31).

| 1 | or lid 12, and/or attaching the container or lid to one or more items."130 The loop shape per- |
| 2 | forms the function of providing a means to carry the container and attach it to other items. (*See* |
| 3 | *id.*). |

282. While not explicitly described as domed, the 060 Patent depicts the lid as having a domed body in the drawings. The specification states the "lid 12 may cover a relatively large opening to allow the container to be easily filled, cleaned, and washed."131 This shows the lid body's size and shape serve the function of covering a large opening for filling and cleaning. (*See id.*).

283. The 060 Patent further emphasizes the functional benefits of the flip-top closure design:

    (i)    The "protecting member 90" around the flip-top's fitting "prevent[s] a user from touching or contacting at least a portion of the spout 14 and/or the fitting 80" when opening the flip-top. This allows opening "when a user's hands may be unclean or unwashed, wearing gloves, sweaty or perspiring, and the like" and "facilitate[s] use of the flip-top closure 40 in environments such as exercising, bodybuilding, gardening, construction, repairing, cleaning, wearing gloves, and the like where it may be desirable not to touch the spout 14, the fitting 80, or other surfaces of the flip-top."132 The protecting member serves the function of preventing contact with the spout and fitting during use. (*See id.*).

    (ii)    The flip-top closure and lid design enable the "lid 12 [to] be simple to use and operate," "quickly and easily assembled, cleaned, and disassembled," "efficiently manufactured, easily repaired, and/or conveniently replaced."133 These statements tout the utilitarian benefits of the design.134

284. The 060 Patent describes the shaker bottle and lid as being made of functional "durable, long-lasting materials" such as "a relatively rigid material such as plastic . . . e.g., high-density poly-

---

130 (Ex. 30, 060 Patent at 5:44-48).

131 (Ex. 30, 060 Patent at 3:66-4:1).

132 (Ex. 30, 060 Patent at 10:40-59).

133 (Ex. 30, 060 Patent at 10:60-65).

134 (*Id.*).

1    ethylene ("HDPE") or other materials with similar properties and/or characteristics."135 Se-

2    lecting materials based on durability and rigidity shows the design is primarily functional. (*See*

3    *id.*).

4    285. The detailed description in the 060 Patent of the functional aspects of the spout, flip-top clo-

5    sure, pivotal connections, carrying member, and lid body, as well as the utilitarian benefits and

6    material choices, demonstrates that BlenderBottle's claimed design in the 060 Patent is dictated

7    by function, not ornamental appearance. Each feature is described in terms of its utilitarian pur-

8    pose and benefits rather than any ornamental value. This further supports Hydra Cup's declara-

9    tory judgment counterclaim that the 060 Patent is invalid due to functionality.

10    286. BlenderBottle's U.S. Patent No. 9,216,843 (the "843 Patent") (filed 05 June 2014), which

11    BlenderBottle accused Hydra Cup of infringing in cease-and-desist letters, describes numerous

12    functional aspects of the claimed shaker bottle and lid design, which are substantially similar to

13    the shaker bottle and lid designs claimed by the Asserted Patents and Asserted Trade Dresses,

14    demonstrating that the designs claimed by the Asserted Patents and Trade Dresses are primarily

15    dictated by function rather than ornamental appearance.136

16    287. The 843 Patent describes the functionality of the overall designs of a beverage container with

17    lid as follows: "In greater detail, the stackable container system 10 may include a primary or

18    beverage container 14 which may be configured to hold, store and/or transport liquids or fluids

19    such as water, juices, drinks and the like. … The primary container lid 18 may provide a cover

20    or cap to the primary container 14 and the lid is preferably removably connected to the con-

21    tainer."137

22    288. The 843 Patent describes the functionality of multiple interchangeable secondary containers

23    and lids as follows: "The smaller containers 16 and the smaller container lids 20 may be con-

---

135 (Ex. 30, 060 Patent at 10:66-11:13).

136 (Ex. 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)).

137 843 Patent, 32-47.).

1    figured to allow any of the smaller container lids to be used in connection with any of the

2    smaller containers."138

3    289. The 843 Patent describes the functionality of secondary containers attaching via same mecha-

4        nism as beverage lid as follows: "The upper portion 50 may include a first connecting mecha-

5        nism 56, such as a threaded or screw-type connection, which is sized and configured to be at-

6        tached or coupled to a secondary container lid 20."

7    290. The 843 Patent describes the functionality of bases of containers interchangeably connecting to

8        secondary lids as follows (Col. 8, lines 29-34): "The bottom or base of the beverage container

9        14 and the bottom or base of each of the smaller containers 16 may have the same or similar

10       connecting or coupling mechanisms, which may allow the smaller container lids 20 to be con-

11       nected to the beverage container or the smaller containers as desired."

12   291. The 843 Patent describes the functionality of secondary containers that are independently seal-

13       able as follows: "Advantageously, because each container 12 (such as the beverage container

14       14 and the smaller containers 16) may include a separate lid (such as the beverage container lid

15       18 and the smaller container lid 20), each container may be independently sealable."

16   292. The 843 Patent describes the functionality of secondary lids having bayonet top and threaded

17       bottom as follows (Col. 10, lines 40-49): "An upper attachment portion 78 is preferably dis-

18       posed about the upper portion 72 of the lid 20 and a lower attachment portion 80 is preferably

19       disposed about the lower portion 76 of the lid. The upper and lower attachment portions 78, 80

20       may be different structures. For example, the upper attachment portion 78 may be a twist and

21       lock, or bayonet-type structure that allows the upper portion 72 of the lid 20 to be connected to

22       the base 30 of the primary container 14 and/or the lower portion 54 of the secondary container

23       16. The lower attachment portion 80 may be a threaded or screw-type structure that allows the

24       lower portion 76 of the lid to be attached to the upper portion of the secondary containers 16."

25   293. The 843 Patent describes the functionality of an optional tray fitting within the secondary lid as

26       follows: "Preferably, the tray 22 is attached to the lid 20 in a manner that does not interfere

---

138 843 Patent, Col. 8, lines 27-32).

1    with the lid being attached to the container 14, 16. The tray 22, as shown in FIGS. 6A and 6B,

2    may include a body 100 with one or more dividers, such as a cneeetral divider 102."

3  294. The 843 Patent describes the functionality of a beverage lid that is not attachable to secondary

4     containers as follows: "wherein the primary container lid is not configured to be connected to

5     the secondary containers; and wherein the secondary container lids are not configured to be

6     connected to the upper portion of the primary container."

7  295. The 843 Patent describes the functionality of having the possibility of multiple stacked config-

8     urations as follows: "Advantageously, the secondary containers 16 may be connected in any

9     desired order or arrangement, and the secondary containers may offer unlimited expandability.

10    In addition, any of the secondary containers 16 may be attached to a primary container 14."

11 296. The 843 Patent describes the functionality of the ability to store and mix ingredients as follows:

12    "Significantly, the stackable container system 10 can be used to store liquids and/or ingredients

13    separately until the user desires to consume and/or mix the liquids and ingredients. For exam-

14    ple, a user can put ingredients for a protein shake in one or more of the smaller containers 16

15    and a liquid, such as water or mild, in the larger container 14."

16 297. BlenderBottle's U.S. Patent No. 10,165,877 (filed 07 May 2016), which BlenderBottle accused

17    Hydra Cup of infringing in cease-and-desist letters, describes numerous functional aspects of

18    the claimed shaker bottle and lid design, which are substantially similar to the shaker bottle and

19    lid designs claimed by the Asserted Patents and Asserted Trade Dresses, demonstrating that the

20    designs claimed by the Asserted Patents and Trade Dresses are primarily dictated by function

21    rather than ornamental appearance.[139]

22 298. More specifically, the functionality of the 877 Patent includes, inter alia, the following:

23    Threaded connector on the upper portion of the beverage container body for connecting the

24    beverage container lid, allowing secure attachment of the lid;[140] annular flange extending

25    downwardly from the lower portion of the beverage container for connecting to the smaller

26    container lids, providing a surface for the bayonet mount connection; a smaller container lid

---

139 (Ex. 34, U.S. Patent No. 10,165,877 (filed 07 May 2016)).

140 Ex. 34, 877 Patent, claims 1, 11, 21.

connecting portion on the interior wall of the beverage container's annular flange comprising a male portion of a bayonet mount with an inwardly extending flange and engaging portion enables quick attachment of the smaller container lids to the beverage container; a threaded connecting portion on the outer surface of the upper portion of the smaller containers for connecting to the smaller container lids, allows secure attachment of the lids to the containers; The smaller container lids having a first connecting structure with a threaded portion on the inner surface of a downwardly extending flange for connecting to the smaller containers enables secure attachment; the smaller container lids having a second connecting structure comprising a female portion of a bayonet mount with an upwardly extending portion, outwardly extending flange, and receiving portion for connecting to the beverage container enables quick attachment to the beverage container; the engaging portion of the beverage container's bayonet mount being complementary to the receiving portion of the smaller container lid's bayonet mount enables the bayonet mounting mechanism to function, and the outwardly extending flange of the smaller container lid's bayonet mount abutting the inwardly extending flange of the beverage container's bayonet mount when connected helps secure the connection—just to name a few.

299. BlenderBottle's U.S. Patent No. 9,492,024 (filed 02 October 2012), which BlenderBottle accused Hydra Cup of infringing in cease-and-desist letters, describes numerous functional aspects of the claimed shaker bottle and lid design, which are substantially similar to the shaker bottle and lid designs claimed by the Asserted Patents and Asserted Trade Dresses, demonstrating that the designs claimed by the Asserted Patents and Trade Dresses are primarily dictated by function rather than ornamental appearance.[141]

300. U.S. Patent No. 8,464,895 (the "895 Patent") describes functional aspects of the finger carry loop present in the D551 Patent, explaining that the "finger loop 172" is "configured to . . . allow a user to easily carry the assembly" and may "rotate about the hinge pin 180 between a downward extending position . . . to an upward extending position" so "a user may carry the assembly 10 by inserting a finger or other object (e.g., a belt, a strap, or the like) into the loop portion 178 of the finger loop 172."[142]

141 (Ex. 33, U.S. Patent No. 9,492,024 (filed 02 October 2012)).

142 (Ex. 92, U.S. Patent No. 8,464,895.).

1    301. U.S. Patent No. 3,820,692 ("692 Patent") 692 Patent describes how the domed lid body pro-

2         vides optimal functionality: (i) the overall lid shape is "functional to direct fluid flow patterns

3         therein and effect maximum mixing characteristics"; the "closure member side wall 18 is

4         smoothly curved inwardly in its progression toward top wall 19 to generate the dome-like con-

5         figuration," which combined with the "specially shaped" bottle "produce[s] a fluid flow pattern

6         that directs fluid in the vicinity of the assembly side walls back toward the center

7         thereof…[and] creates a maximum of agitation as the fluid passes over the differently shaped

8         areas of blending element 14"; (iii) the "specially shaped bottom and top walls" of the lid and

9         bottle "create the desired fluid flow pattern therein"143

10   302. The 692 Patent also explains the bottle and lid should be made of "polyethylene or other plastic

11        having similar physical properties" because the "resiliency and local distortability of the mate-

12        rial" enables "increased sealing engagement between the closure member top wall opening and

13        seal therefor"144 This shows the materials are chosen for functional reasons. (*See id*.).

14   303. Additionally, the 692 Patent describes how the domed lid body "enable[s] increased sealing

15        engagement…for storage, packaging and dispensing purposes" and includes "an opening in the

16        top wall and an associated seal therefor" to provide a "feed mouth and dispensing spout for the

17        vessel when the closure member 12 is in seal-tight engagement therewith"145

18   304. U.S. Patent No. 8,833,586 (the "586 Patent"), while not owned by BlenderBottle, further

19        demonstrates the functionality of carry loops on bottles, explaining as follows: (1) integrated

20        handles "allow users to carry the container/bottle with as little as one finger, which is easier and

21        more convenient," "minimize heat or cold transfer to the user," "minimize the concerns caused

22        by condensation," and "permit attachment of the container or bottle to other items such as bags,

23        belts, and the like using hooks, ties, carabiners, etc. for convenient, hands-free transportation";

24        and, (2) despite these functional benefits, "manufacturers have not attached handles to the flip

---

143 (Ex. 94, U.S. Patent No. 3,820,692, Description.).

144 (*Id*. at Abstract, Description).

145 (*Id*. at Description.).

1    tops for fear that carrying the container/bottle by the handle would create upward pressure on

2    the flip top and cause the flip top to open at an unwanted time."146

3    305. Taken together, these utility patents, among others show that the overall designs and each

4        prominent design element claimed in BlenderBottle's Asserted Patents and Trade Dresses—the

5        spout, flip top cap, domed lid body, lid skirt/shoulder, posts/brackets, finger carry loop, lid

6        threading, bottle shape and configuration, the spherical wire agitator, and the bottle's belly la-

7        bel—are primarily dictated by function rather than ornamental design. The utility patents re-

8        peatedly extol the utilitarian advantages of these exact design features.

9    306. This detailed evidence of functionality from the utility patents, including BlenderBottle's own

10       admissions regarding its virtually identical designs for shaker bottles and lids, demonstrates

11       that BlenderBottle's Asserted Patents and Trade Dresses are invalid because the claimed de-

12       signs are functional and not protectable as designs or trade dress.

13   307. BlenderBottle's expired U.S. Patent No. 6,379,032 (the "032 Patent"), entitled "Flow-Through

14       Agitator," discloses a "wire-frame agitator apparatus" for mixing liquids and powders.147 The

15       032 Patent discloses an agitator "compris[ing] an object with a wire-frame shape through which

16       liquids and fine-grained solids may pass."148 The wire-frame configuration is described as es-

17       sential to the agitator's mixing function: "The flow of material, whether liquid or powder,

18       through the object creates turbulent eddy currents within and around the object that break up

19       aggregations of material and disperse particles throughout the suspension medium."149

20       –    Figure 1 of the 032 Patent depicts an embodiment of the wire-frame agitator in the

21            shape of a sphere.150 The patent states that this spherical shape is advantageous be-

22            cause it "may be constructed of wire-frame elements which represent longitudinal and

---

146 (Ex. 93, U.S. Patent No. 8,833,586.).

147 (Ex. 31, 032 Patent, Title, Abstract).

148 (Ex. 31, 032 Patent, 2:48-51).

149 (*Id.* at 2:54-58).

150 (Ex. 31, 032 Patent, Fig. 1, 4:30-35).

1           latitudinal circles or other curves or lines found on the surface of [the] particular shape,"

2           allowing effective mixing as the agitator moves through the container.151

3      –    The 032 Patent further discloses that the wire-frame agitator may be constructed as "a

4           single coiled wire-like element, as shown in FIG. 2, where a single wire element 12 is

5           wound in a spiral pattern to form a spherically shaped object 10."152 This spiral-wound

6           configuration is described as advantageous because it "allows substantial elastic defor-

7           mation of the spherical shape . . . [which] creates a crushing action which breaks up ag-

8           gregations of powder which may stick thereto or become lodged there between."153

9 **D. Alternative Designs are Functionally Inferior to BlenderBottle's Designs.**

10 308. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

11       its allegations in each and every preceding paragraph above.

12 ***1. Inferior Alternative Classic "Simple Shaker" Bottle and Lids Offered by BlenderBottle as Pro-***
13 ***viding Equal Functionality to the Designs at Issue in this Case.***

14    ![Inferior "Alternative" Shaker Bottle and Lid Designs Offered by BlenderBottle.](img_65.png)

15 309. While the marketplace contains a variety of shaker bottle designs, as explained the utility

16       patents discussed above disclosing virtually identical shaker bottles and lids, the designs cov-

17       ered by BlenderBottle's Asserted Patents and Asserted Trade Dresses are far superior in terms

18       of functionality, ease of use, and overall performance. Simply put, the shaker bottle, lid, and

19       agitator designs at issue in this care are the best available design for shaker bottles, lids, and ag-

20       itators, providing optimal utility, mixing capabilities, storage, ergonomics, and ease of use,

21       among other things.

---

151 (*Id.* at 4:36-39).

152 (Ex. 31, 032 Patent, 4:42-45, Fig. 2).

153 (*Id.* at 4:48-53).



All "acceptable products" compared to BlenderBottles "simple shakers". These products are not in the "simple shaker" category. We believe there are five core features that define this category. Each of these is fundamentally flawed in two or more of the five key features that define a "simple shaker".

*Not One of BlenderBottle's Alternative Designs Constitutes a " Classic Simple Shaker."*

310. None of the alternative designs cited by BlenderBottle as purportedly available substitutes, such as the Artoid Push Limits Bottle, Rubbermaid Shaker Bottle, Contigo Shaker Bottle, Blue Peak Shaker Bottle, Huel Shaker Bottle, Lava Fitness Shaker Bottle, ShakeSphere Tumbler, WeightWatchers Shaker Bottle, Vortex Shaker Bottle, Aladin Shaker Bottle, Coleman Shaker Bottle, or Constant Contact Shaker Bottle, offer comparable functionality or efficiency to the designs at issue. Compl. ¶ 39.

311. These alternative designs suffer from numerous flaws that significantly impair their utility as mixing and drinking containers, especially for fitness and active lifestyle applications. Hydra Cup's Fifth Supplemental Response to BlenderBottle's Interrogatory No. 2 details the specific functional deficiencies of each alternative design, which are summarized below.

312. Many alternative designs, such as the Artoid, Rubbermaid, Contigo, Blue Peak, and Lava bottles, have flat lid designs that restrict mixing space, hinder effective mixing and pouring, and lead to residue buildup. In contrast, BlenderBottle's domed lid shape facilitates superior mixing, smoother liquid flow, and easier cleaning.

313. Several designs, like the Artoid, Lava, and Aladin bottles, have weak or unstable carry loop attachment mechanisms that compromise durability and risk breakage. BlenderBottle's sturdy, pivoting carry loops with secure bracket attachments offer enhanced strength and reliability.

314. The undersized flip cap pins on bottles like the Artoid and Lava are prone to damage under normal use forces. BlenderBottle's larger, more robust pin and bracket system ensures long-lasting performance.

315. Bottles such as the Contigo, Blue Peak, and Coleman feature ergonomic shortcomings like oversized carry loops, low spout heights, or inconvenient cap mechanisms that hinder portability and comfortable use. BlenderBottle's carefully engineered proportions and features optimize ease of handling and drinking.

316. The Huel bottle's detachable cap poses a high risk of loss, while its excessive lid space is inefficient. BlenderBottle's integrated cap and space-optimized design eliminate these issues.

317. Bottles like the WeightWatchers, Vortex, and Constant Contact have crevices or rubber seals that impede thorough cleaning and may trap odors. BlenderBottle's streamlined, smooth interior surfaces and material choices promote better hygiene.

318. Designs like the ShakeSphere and Aladin are unstable due to their tall, narrow shapes and lack of solid base, increasing tip-over risk. BlenderBottle's balanced proportions ensure reliable stability.

319. The Coleman bottle's design and categorization as a children's product limit its functionality and appeal for active adult users. BlenderBottle's design caters to a wide demographic with universal usability.

320. The Constant Contact bottle's coffee mug-like lid and bulky loop sacrifice the professional aesthetic and sleek portability of BlenderBottle's universally appealing design.

321. Notably, even BlenderBottle's own marketing materials tout the superior functionality of its designs, acknowledging that its unique features deliver unmatched mixing efficiency and user experience compared to other shaker bottles on the market. (See, e.g., Ex. 5 ("I can vigorously shake one of those shakers for 20 minutes and not get results as effective as 10 seconds with the Blenderbottle.")).

322. The functional deficiencies of these alternative designs highlight the thoughtful engineering and user-centric approach that set BlenderBottle's patented and trade dress designs apart. From the efficient mixing enabled by the domed lid to the secure yet user-friendly carry loop and cap

1  mechanisms, BlenderBottle's designs prioritize performance, convenience, and hygiene to de-

2  liver a superior product experience.

3  323. By optimizing functionality without sacrificing aesthetics, BlenderBottle's designs have be-

4  come the industry standard for shaker bottles. The marked shortcomings of alternative designs

5  only serve to underscore the utilitarian advantages and enhanced usability that BlenderBottle's

6  designs provide.

7  ***2. The Inferior Alternative Agitators are All Plastic and Inferior Without the Thin Spherical Wire***
8  ***Frame.***

9  324. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

10  its allegations in each and every preceding paragraph above.



11

12  *Inferior Alternative Plastic Agitators Offered by BlenderBottle as Equal to a Spherical Wire Agitator.*



13

14  *BlenderBottle's Alternative Plastic Agitators are Redundant.*

15  325. Upon information and belief, many of the alternative designs offered by BlenderBottle were

16  virtually identical to other alternative designs offered by BlenderBottle.



*Inferior Alternative Plastic Agitator Cannot Possibly Offer Equal Functionality to the Spherical Wire Agitator Design.*

326. Furthermore, due to the rise in microplastic contamination, consumers are quickly developing an aversion to plastic products, especially plastic products contacting consumables.

## VII. BLENDERBOTTLE'S INEQUITABLE CONDUCT ON THE USPTO IN PROCURRING THE ASSERTED PATENTS AND ASSERTED TRADE DRESSES.

327. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

### A. BlenderBottle's Asserted Patents and Equivalent Patents are Invalid for Inequitable Conduct on the USPTO.

328. BlenderBottle's Asserted Patents and Equivalent Patents are also invalid and unenforceable due to BlenderBottle's inequitable conduct before the USPTO. Upon information and belief, BlenderBottle withheld material prior art from the USPTO during prosecution of the patents and made arguments about the purported novelty and non-obviousness of the claimed inventions that it knew to be false.

329. Upon information and belief, BlenderBottle failed to disclose several highly material prior art shaker bottle designs that were known to BlenderBottle and its patent counsel during prosecution of the Asserted Patents, including U.S. Patent Registration No. D421,547 (filed 5 May 1999), attached as Exhibit 51; U.S. Patent No. 8,464,895 (filed 27 June 2011), attached as Exhibit 55, among many others. Each of these prior art designs is substantially the same as the D235 Patent and thus anticipates or renders obvious its claim.

330. BlenderBottle's deliberate decision to withhold this prior art from the USPTO constitutes inequitable conduct. Had the examiner been aware of these highly relevant designs, the D235

1    Patent never would have issued. BlenderBottle's inequitable conduct therefore renders the

2    D235 Patent unenforceable.

3    **B. BlenderBottle's Asserted Trade Dresses and Related Trademarks are Invalid for In-**
4    **equitable Conduct on the USPTO.**

5    331. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

6        its allegations in each and every preceding paragraph above.

7    332. During the prosecution of the 455 Application for the 019 Lid Trade Dress, the USPTO issued

8        an Office Action on 01 March 2021, refusing registration under Sections 1, 2, and 45 because

9        the trade dress was a "nondistinctive product design."154

10   333. Upon information and belief, BlenderBottle committed intentional fraud on the USPTO by

11       falsely representing the first use date of its 019 Lid Trade Dress in commerce.

12   334. BlenderBottle committed fraud on the USPTO in prosecuting its 019 Lid Trade Dress by en-

13       gaging in a bait-and-switch tactic, whereby it presented arguments pertaining to its Bottle

14       Trade Dress in response to the USPTO's Office Action, rather than addressing the lid design

15       claimed in the 019 Lid Trade Dress application.

16   335. In its Response to the 455 App. Office Action, BlenderBottle mentioned the lid design once in

17       the Preamble, then switched to a combination of the alleged Bottle Trade Dress with the D478

18       Lid and Carry Loop.

---

154 (Ex. 58, 455 App. Office Action (01 March 2021)).



Mark:
Applicant: Runway Blue, LLC
Serial No.: 90301455
Our Ref.: BBCOM.052T

## RESPONSE TO OFFICE ACTION

The following amendments and remarks are submitted in response to the Office Action issued on March 1, 2021 in connection with U.S. Application Serial No. 90301455 (the "Subject Application") for the design mark  (the "Applicant's Mark").

## I.    INTRODUCTION

Applicant adopted its unique shaker bottle design, shown below, in 2003.



Applicant has since adopted a variety of different color combinations for its bottles and lids, however, the common thread that consumers look to when purchasing Applicant's shaker bottles

1

*BlenderBottle's Response to the Office Action for the 019 Lid Trade Dress Used Arguments for its Unregistered Bottle Trade Dress Almost Exclusively.*

336. During the prosecution of the 019 Lid Trade Dress, the USPTO issued an Office Action raising questions about the registrability of the claimed lid design. In response, BlenderBottle submitted arguments that focused on the combination of the bottle and lid, emphasizing the overall appearance and alleged distinctiveness of the complete shaker bottle design. These arguments,

1  however, were not germane to the 019 Lid Trade Dress, which specifically claims only the lid

2  design, not the entire bottle.

3  337. For example, in its Response to the 455 App. Office Action due to lack of distinctiveness,

4  BlenderBottle claimed that due to its "successful marketing and promotion of its unique *shaker*

5  *bottle* products, [BlenderBottle's] *shaker bottle* has become the best-selling *shaker bottle* prod-

6  uct on the market since 2004."155 These arguments are for a shaker bottle, not a lid.



Due to Applicant's successful marketing and promotion of its unique shaker bottle products, Applicant's shaker bottle has become the best-selling shaker bottle product on the market since 2004. Applicant has secured over a 50% market share in the shaker bottle market.

7

8  *BlenderBottle Arguing its Shaker Bottles Acquired Distinctivness Rather than the 019 Lid De-*

9  *sign at Issue in the 455 App. Office Action.*

155 (Ex. 58, BlenderBottle's Response to 455 App. Office Action, 3 (01 Mar. 2021) (emphasis added)).

338. Similarly, BlenderBottle claimed "world-famous athletes and celebrities, including Tom Brady, Connor McGregor, im Kardashian, The Rock (Dwayne Johnson), Justin Bieber, and Jennifer Aniston, among others, have selected Applicant's distinctive *shaker bottle* as their product of choice."156 Again, these arguments are for shaker bottles, not lids.



*None of the Shaker Bottles BlenderBottle Submitted as Evidence of a Celebrity Endorsement for its Response to the 455 App. Office Action to Register its 019 Lid Trade Dress Show a Product from BlenderBottle.*

339. BlenderBottle concludes "each of Applicant's products are readily identifiable in the above images because of Applicant's unique oramental lid design that distinguishes Applicant's products" without providing any evidence these are the products it claims. 157

---

156 *Id*. at 3.

157 *Id*. at 4.

340. Again, BlenderBottle provided shaker bottles with a carry loop lid in claiming that it "success-
fully licensed and co-branded with some of the world's most popular franchises, including
Marvel, DC Comics, Harry Potter, and Star Wars."



Applicant also partnered with The Hunger Project (a global non-profit organization whose
mission is to end hunger by building self-reliance) to design custom bottles for World Hunger Day.
Examples of this partnership are shown below (see The Hunger Project + BlenderBottle):



*BlenderBottle Co-brands and Licenses Shaker Bottles, Not the 019 Lid Trade Dress.*

341. BlenderBottle goes on to provide numerous arguments arguing its *shaker bottle* had acquired
distinctivness, but failed to provide a single argument in support of showing its 019 Lid Trade
Dress had acquired distinctiveness: "Applicant's *shaker bottles*, which include Applicant's
Mark, are sold online and in some of the most popular online and retail stores;"158 "Appli-

---

158 *Id.* at 6.

cant's *classic bottle* that features Applicant's Mark was showcased in Shape Magazine as the "Best Overall" shaker bottle in "The 14 Best Shaker Bottles, According to Customer Reviews;" and "[w]ith more than 43,000 reviewers giving the BlenderBottle Classic Loop Top Shaker Bottle a five-star rating, this is a clear go-to if you're looking for a shaker."159 None of these arguments show any acquired distinctivness for the 019 Lid Trade Dress; each of BlenderBottle's arguments here is directed toward its alleged Unregistered Bottle Trade Dress.

342. By shifting the focus from the lid to the bottle and lid combination, BlenderBottle misled the USPTO into considering factors that should not have been relevant to the registrability of the 019 Lid Trade Dress. The arguments presented by BlenderBottle, such as the commercial success, advertising expenditures, and consumer recognition of the bottle and lid combination, were inapplicable to the assessment of the lid design alone.

343. BlenderBottle's bait-and-switch tactic is further evidenced by its concurrent assertion of rights in an unregistered Bottle Trade Dress that features the exact same lid design claimed in the 019 Lid Trade Dress. This demonstrates that BlenderBottle itself recognizes the lid as part of a larger bottle trade dress and not as a standalone source identifier.

344. If the 019 Lid Trade Dress truly merited registration on its own, BlenderBottle should have been able to present arguments specific to the lid design, without relying on the bottle and lid combination. The fact that BlenderBottle felt compelled to resort to arguments about the overall bottle trade dress strongly suggests that the lid design alone is not distinctive or protectable.

345. BlenderBottle's actions amount to fraud on the USPTO because it knowingly misrepresented the relevant facts and arguments in order to obtain registration of the 019 Lid Trade Dress. By directing the USPTO's attention away from the lid and towards the bottle and lid combination, BlenderBottle deliberately obscured the weakness of its lid trade dress claim and secured registration through deceptive means.

346. The USPTO relies on the accuracy and truthfulness of the representations made by applicants during the trademark prosecution process. BlenderBottle's bait-and-switch tactic undermined

---

159 *Id.*

1    the integrity of this process and prevented the USPTO from properly evaluating the registrabil-

2    ity of the 019 Lid Trade Dress based on the merits of the lid design itself.

3    347. BlenderBottle's fraudulent conduct before the USPTO renders the 019 Lid Trade Dress regis-

4    tration invalid and unenforceable. The registration was obtained through misrepresentation and

5    deceptive arguments that were not specific to the claimed lid design. By failing to present argu-

6    ments relevant to the lid alone and instead relying on the bottle and lid combination, Blender-

7    Bottle committed fraud and violated its duty of candor and good faith in dealing with the

8    USPTO.

9    348. In its application for U.S. Registration No. 6,800,019 filed on 05 November 2020, BlenderBot-

10   tle claimed the 019 Lid Trade Dress was first used in commerce in 2003, stating "In sum, given

11   Applicant's use of its mark since 2003 (18 years) as well as its significant unsolicited media at-

12   tention and public recognition, Applicant's Mark has acquired distinctiveness in the minds of

13   the relevant consumers."160

14   349. Upon information and belief, however, a comparison of the design elements in BlenderBottle's

15   D235 Patent from 2003 and the 019 Lid Trade Dress reveals significant differences. The D235

16   Patent features a straight-up-and-down spout, lacks a middle concave-shaped depression in the

17   flip-top cap, and does not include the extra latch and carry-loop, all of which are prominent fea-

18   tures in the 019 Lid Trade Dress.

19   350. These discrepancies clearly indicate that the design claimed in the 019 Registration was not in

20   commercial use as early as 2003. The design elements claimed in the 019 Registration closely

21   align with those in BlenderBottle's later D478 Patent, suggesting that the 019 Lid Trade Dress

22   was actually used in commerce around the time of the D478 filing, which is post-2013, and not

23   in 2003 as claimed.

---

160 Ex. 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455 (HC0170962-
HC0171062) (filed 21 September 2021).



*BlenderBottle Attempting to Claim its 019 Lid Trade Dress Includes a Finger Carry Loop.*

351. Upon information and belief, despite thorough examination, there is a conspicuous absence of documentary evidence, such as historical sales records or promotional materials, supporting the use of the 019 Lid Trade Dress in the market in 2003. This lack of evidence further undermines BlenderBottle's claim of early usage.

352. BlenderBottle's misrepresentation of the first use date was not a mere oversight but a calculated attempt to deceive the USPTO. Given BlenderBottle's access to accurate records and historical data, it is implausible that such a significant error could have occurred unintentionally.

353. The misrepresented first use date of 2003 potentially influenced the USPTO's decision-making process by suggesting an erroneously extended period of market presence and distinctiveness of the 019 Lid Trade Dress, which could have been a decisive factor in granting the registration.

354. Upon information and belief, BlenderBottle failed to disclose numerous design and utility patents disclosing sunstantially similar lid designs to the USPTO when the USPTO asked BlenderBottle

355. Upon information and belief, as early as the mid-aughts, BlenderBottle began offering private labeling for the designs claimed by the Asserted Trade Dresses, and BlenderBottle allowed

1    third parties to sell products embodying the designs claimed by BlenderBottle's Asserted Trade

2    Dresses.161





4    *BlenderBottle Private Offering Private Labeling for the '019 Lid Trade Dress.*

5    356. Furthermore, upon information and belief, BlenderBottle failed to disclose known design and

6    utility patents from the USPTO after the USPTO requested "[a] written statement whether the

7    applied-for mark, or any feature(s) thereof, is or has been the subject of a design or utility

8    patents or patent applications, including expired patents and abandoned patent applica-

9    tions."162

10   357. BlenderBottle responded to the examiners request for patents disclosing design elements con-

11   tained in the 019 Lid Trade Dress by citing the following nineteen patents: D510,235;

12   D644,065; D696,551; D748,478; D820,038; D920,739; D906,757; D887,267; D886,528;

---

161 *See, e.g.*, Ex. 45, BlenderBottle Private Label Licensing Program (Screenshots from Internet Archive of Blender-Bottle's websites over time) (2011-2014).

162 (Ex. 58, 455 App. Office Action (issued 01 March 2021); Ex. 59, BlenderBottle's Response to 455 App. Office Action, 10-17 (01 Mar. 2021) (emphasis added) (disclosing several other patents that are less similar than its own Equivalent Patents.)

1      D886,528; D886,521; D885,825; D884,416; D879,552; D878,853; D867,062, D745827S1,

2      D626838, D862,156.163



Patents Disclosed by BlenderBottle in Response to Office Action for the 019 Lid Trade Dress.

3

4      *The Patents BlenderBottle Disclosed to the USPTO in Response to the 455 App. Office Action.*

163 (Ex. 58, BlenderBottle's Response to 455 App. Office Action, 10-17 (01 Mar. 2021) (emphasis added)).

358. On the other hand, BlenderBottle failed to disclose several of its own patents that are much more similar to and that describe the functionality of the 019 Lid Trade Dress, including D830,119; 8,695,830; D897,149; D900,540, 11,111,060; 8,695,830.[164]

359. Nor did BlenderBottle disclose Tianqi's D047 or D029 Patents—which are also much more similar than the patents BlenderBottle actually disclosed—despite citing Tianqi's Patents as prior art in its own patents, demonstrating it clearly was aware of the Tianqi's D047 and D029 Patents well before it filed its trademark application.[165]

360. Upon information and belief, BlenderBottle also failed to disclose known substantially similar designs offered by third parties.[166]

361. Upon information and belief, BlenderBottle also represented the functionality of the prominent design elements comprising the design practiced by its 019 Lid Trade Dress. For example, BlenderBottle misrepresented the known functional advantage of a shaker bottle with a finger carry loop, stating "[f]or those bottles that choose to utilize a [carry] loop, . . . [t]he most common method of doing so is in a fixed, non-movable way. . . . [and] [t]his method *satisfies all the functionality of a carrying loop without the complication and additional cost of having the loop movable.*"[167]

362. In light of these points, BlenderBottle knowingly and intentionally committed fraud on the USPTO. The significant discrepancies in design elements, the clear timeline contradiction, the lack of supporting evidence, and BlenderBottle's capability to accurately represent such crucial information, all lead to the inescapable conclusion that BlenderBottle's actions were deliberately deceptive, thereby constituting inequitable conduct.

---

164 *See id.* at 10-17.

165 *See id.* at 10-17.

166 *See, e.g.*, Ex. 41, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Ex. 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013).

167 (*Id.* at 19-20.) (emphasis added).

3  363. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

4      its allegations in each and every preceding paragraph above.

5  **A. BlenderBottle's Asserted Trade Dresses and Related Trademarks are Generic.**

6  364. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

7      its allegations in each and every preceding paragraph above.

8  *1. BlenderBottle's 019 Lid Trade Dress is Generic.*

9  365. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

10     its allegations in each and every preceding paragraph above.

11 366. BlenderBottle's 019 Lid Trade Dress, as employed in the BlenderBottle Classic shaker bottle,

12     represents a fundamental, bare-bones design of a shaker bottle lid. The design encompasses ba-

13     sic elements that are universally adopted in shaker bottle lids, making it a boilerplate or base

14     model design in the industry.

15 367. Upon information and belief, the design elements of the 019 Lid Trade Dress constitute what

16     can be considered the most optimal and functionally necessary features for a shaker bottle lid.

17     These features include aspects such as a secure closure mechanism, a spout for pouring or

18     drinking, and a means of sealing to prevent leaks. These are not unique or distinctive features

19     but rather utilitarian and essential components for the functionality of any shaker bottle lid.

20 368. Upon information and belief, the market for shaker bottles showcases a multitude of products

21     that utilize a lid design similar to that of the 019 Lid Trade Dress. This widespread adoption

22     signifies that the design is viewed as a standard, basic model in the industry, rather than a dis-

23     tinctive trade dress that identifies the source of the product.

24 369. Upon information and belief, the 019 Lid Trade Dress lacks features that would make it dis-

25     tinctly identifiable to consumers as originating from a specific source. Its design is so common

26     and functional that it does not serve to distinguish BlenderBottle's products from those of other

27     manufacturers in the minds of consumers. 253. Other manufacturers in the industry commonly

28     use the design elements of the 019 Lid Trade Dress as a starting point or base model, upon

1    which they add or modify features to create new and different designs. This practice further un-

2    derscores the generic nature of the 019 Lid Trade Dress, as it is seen as a basic template rather

3    than a proprietary design.

4    370. Upon information and belief, the 019 Lid Trade Dress is not inherently distinctive, as it consists

5        of a combination of elements that are commonly used in the shaker bottle industry. The circular

6        base, domed top, spout, and closure mechanism are all standard features found in numerous

7        shaker bottle lids, and their combination does not create a unique or distinctive overall design.

8    371. Upon information and belief, BlenderBottle has not provided evidence that the 019 Lid Trade

9        Dress has acquired distinctiveness through secondary meaning. The widespread use of similar

10       lid designs by competitors and the lack of consumer recognition of the 019 Lid Trade Dress as

11       a source identifier indicate that it has not gained the necessary secondary meaning to be pro-

12       tectable.

13   372. Upon information and belief, the generic nature of the 019 Lid Trade Dress is further evidenced

14       by the fact that it has been used by multiple manufacturers in the shaker bottle industry for

15       many years. This long-standing and widespread use by various companies reinforces the notion

16       that the design is a standard, basic configuration that is not exclusively associated with

17       BlenderBottle.

18   373. Given its fundamental, optimal, and widely adopted nature, the 019 Lid Trade Dress for a

19       shaker bottle lid does not qualify for trade dress protection. It represents a generic design that is

20       commonly used in the industry as a basic, functional model, lacking the distinctiveness neces-

21       sary to be protected as a trade dress.

22   374. The generic nature of the 019 Lid Trade Dress precludes it from serving as a source identifier

23       for BlenderBottle's products. Consumers do not associate this common lid design with a single

24       source but rather view it as a standard feature of shaker bottles available from multiple manu-

25       facturers.

26   375. Granting trade dress protection to the generic 019 Lid Trade Dress would unfairly hinder com-

27       petition in the shaker bottle market. It would allow BlenderBottle to monopolize a basic, func-

1    tional design that is necessary for other manufacturers to effectively compete and offer their

2    own products.

3    376. In conclusion, BlenderBottle's 019 Lid Trade Dress is a generic design that consists of com-

4    mon, functional elements that are widely used in the shaker bottle industry. It lacks the inherent

5    distinctiveness and secondary meaning required for trade dress protection and does not serve to

6    identify BlenderBottle as the source of the products. Recognizing the 019 Lid Trade Dress as a

7    valid trade dress would be contrary to the principles of fair competition and would unjustly re-

8    strict other manufacturers from using essential design features in their shaker bottle lids.

9    ***2. BlenderBottle's 626 Agitator Trade Dress is Generic.***

10   377. BlenderBottle's 626 Agitator Trade Dress registration covers the design of a spherical wire ag-

11   itator used inside shaker bottles to mix ingredients.

12   378. The spherical wire agitator design claimed in the 626 registration is generic because it repre-

13   sents the basic, standard configuration for such agitators that has been widely used in the

14   shaker bottle industry for many years.

15   379. The 626 agitator design is fundamentally a foundational model that provides optimal function-

16   ality for mixing shaker bottle contents. The spherical shape and wire construction are engi-

17   neered to efficiently blend ingredients into a uniform mixture. This optimal functionality indi-

18   cates the design is a practical, standard solution rather than a distinctive trademark.

19   380. Spherical wire agitators like the 626 design are prevalent in the shaker bottle market, with nu-

20   merous third-party manufacturers adopting substantially identical designs due to their effective-

21   ness and practicality. This widespread use by multiple companies shows the design has become

22   a generic configuration in the industry.

23   381. Many companies use the basic spherical wire agitator configuration as a starting point for fur-

24   ther innovation, adding minor variations or features to create new designs. The 626 design's

25   role as a base model that others build off of further demonstrates its generic nature.

26   382. The 626 agitator design is not inherently distinctive, as its configuration is dictated primarily by

27   functional considerations rather than source identification. The spherical shape and wire con-

1  struction are selected for their ability to efficiently mix contents, not to indicate origin from

2  BlenderBottle.

3  383. Consumers perceive spherical wire agitators as common functional components used in shaker

4  bottles generally, not as features that identify BlenderBottle as the source. The design lacks dis-

5  tinctiveness and fails to function as a source-identifying trademark in the minds of ordinary

6  consumers.

7  384. BlenderBottle itself has emphasized the utilitarian benefits of its agitator design in marketing

8  materials, touting how the configuration enhances mixing and blending performance. These

9  functionality-focused statements further support the generic nature of the design.

10  385. Any alleged exclusive use of the spherical wire agitator design by BlenderBottle has not been

11  substantially exclusive, as many third parties have used identical or virtually identical designs

12  for years without challenge. BlenderBottle has not policed the market to prevent others from

13  using this basic configuration.

14  386. To the extent the 626 registration was ever valid, any rights in the claimed design have been

15  abandoned due to widespread use by third parties and BlenderBottle's failure to stop such use.

16  ***3. BlenderBottle's Unregistered Bottle Trade Dress is Generic.***

17  387. BlenderBottle's Unregistered Bottle Trade Dress, which includes features such as a cylindrical

18  bottle body, a wide Bottle-Mouth, a domed body lid, a Spout, a Spout-Guard, a Flip-Top-Cap, a

19  tall Lid-Skirt/Lid-Shoulder, Pivoting-Brackets, and a Bottle-Base, is generic and lacks distinc-

20  tiveness.

21  388. The design elements of BlenderBottle's Unregistered Bottle Trade Dress are largely dictated by

22  the functional requirements of a shaker bottle, such as effectively mixing beverages, being easy

23  to clean, and providing a secure seal for shaking.

24  389. The cylindrical bottle body shape is a standard design choice for shaker bottles, as it allows for

25  efficient mixing and easy gripping during shaking. This shape is not unique to BlenderBottle

26  but is commonly used across the industry.

390. The wide Bottle-Mouth is another functional necessity, facilitating easy filling, adding ingredients, and cleaning of the bottle. This feature is not distinctive but is a practical requirement for all shaker bottles.

391. The domed body lid design is a common solution to provide additional space for shaking and mixing the contents. It is not a unique or source-identifying feature but a functional element used by many shaker bottle brands.

392. The Spout and Spout-Guard are essential for controlled pouring and drinking, while also preventing spills. These features are standard across shaker bottles and are not distinctive to BlenderBottle.

393. The Flip-Top-Cap is a common type of closure used in various bottle designs, chosen for its convenience and ability to seal securely. It is not a unique or source-identifying feature of BlenderBottle's design.

394. The tall Lid-Skirt/Lid-Shoulder and Pivoting-Brackets are functional elements that provide a secure connection between the lid and the bottle body. These features are not ornamental but are necessary for the proper functioning of the shaker bottle.

395. The Bottle-Base design, whether flat or pill-shaped, is a standard feature that provides stability to the bottle. It is not a distinctive element but a functional requirement for all shaker bottles.

396. The overall combination of these design elements in BlenderBottle's Unregistered Bottle Trade Dress does not create a unique or distinctive look that sets it apart from other shaker bottles in the market. Instead, it follows a common template used by numerous brands.

397. The generic nature of BlenderBottle's Unregistered Bottle Trade Dress is evidenced by the widespread use of similar designs by hundreds of companies producing tens of millions of shaker bottles in the U.S. over the last decade.

398. Consumers do not associate the generic design of BlenderBottle's Unregistered Bottle Trade Dress with a single source or brand but rather view it as a common utility item available from multiple sources.

399. Given the limited design options for creating a functional shaker bottle, the elements of BlenderBottle's Unregistered Bottle Trade Dress are not only generic but also necessary for competitors to effectively compete in the market.

400. The generic and functional design elements of BlenderBottle's Unregistered Bottle Trade Dress, such as the cylindrical bottle body, domed body lid, Spout, Flip-Top-Cap, and Bottle-Base, belong in the public domain and cannot be monopolized by a single company.

*4. BlenderBottle's Unregistered Label Trade Dress is Generic.*

401. BlenderBottle's Unregistered Label Trade Dress, which consists of a wrap-around belt label on a shaker bottle, is generic and lacks distinctiveness.

402. Wrap-around belt labels are a common and standard design feature used in packaging across various industries, particularly in the beverage and supplement sectors.

403. The primary purpose of a wrap-around belt label is functional, providing space for necessary information such as branding, product details, ingredients, and regulatory compliance.

404. The generic design of a wrap-around belt label lacks inherent distinctiveness, as it is a basic and practical solution widely adopted by numerous manufacturers.

405. The cylindrical shape of shaker bottles naturally lends itself to the use of wrap-around labels, as they provide maximum visibility and readability. This design choice is driven by functionality rather than distinctiveness.

406. There are limited options for effectively implementing a label on a cylindrical bottle, further reinforcing the argument that a wrap-around belt label is a functional necessity rather than a unique trade dress.

407. Consumers generally perceive wrap-around belt labels as standard packaging elements and do not associate them with a particular source or brand. This lack of source-identifying significance undermines the label's distinctiveness.

408. Wrap-around belt labels often serve as a base template upon which brands apply their specific logos, colors, or designs. The generic nature of the label itself is evident in its use as a foundational element across multiple brands.

409. The widespread use of wrap-around belt labels in the shaker bottle industry is driven by their practicality and functionality, allowing brands to display necessary information while conforming to the bottle's shape.

410. BlenderBottle's Unregistered Label Trade Dress fails to function as a source identifier, as it is a common and generic design that does not distinguish BlenderBottle's products from those of competitors.

411. The prevalence of wrap-around belt labels on shaker bottles produced by numerous companies further demonstrates the generic nature of BlenderBottle's Unregistered Label Trade Dress.

412. In the context of shaker bottles, where functionality is paramount, a generic wrap-around belt label does not serve as a distinctive or source-identifying feature.

413. Allowing BlenderBottle to monopolize the use of a generic wrap-around belt label would unfairly hinder competition and limit the ability of other companies to effectively market and label their shaker bottle products.

**5. BlenderBottle's U.S. Trademark Registration No. 4,894,363 for the Term "BLENDERBOTTLE" is Generic.**

414. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

415. BlenderBottle owns U.S. Trademark Registration No. 4,894,363 for the term "BLENDERBOTTLE" in International Class 021.

416. The term "blender bottle" has become generic for the category of portable plastic bottles with integrated mixing systems, such as agitators or blender balls, used for blending the contents. The term merely describes the intended function and key characteristics of the bottle products, rather than identifying BlenderBottle as the exclusive source.

417. Consumers, retailers, journalists, and competitors in the portable beverage container industry commonly use "blender bottle" as a generic term to refer to bottles with built-in mixing features, regardless of the manufacturer. This widespread generic use has caused the term to lose any source-identifying significance in relation to BlenderBottle.

1    418. Numerous third parties in the industry openly sell and market their own bottles with integrated

2          mixers under the name "blender bottle" or close variations. BlenderBottle has failed to take ap-

3          propriate action to police the market and prevent competitors from using "blender bottle" in a

4          generic manner to describe their products.

5    419. Online marketplaces, physical retail stores, and review websites frequently categorize or label

6          portable mixing bottles from various brands as "blender bottles." This broad application of the

7          term to products not originating from BlenderBottle shows its primary significance as a generic

8          product descriptor.

9    420. When searching for portable bottles with mixing capabilities, consumers often use the generic

10          term "blender bottle" without necessarily seeking BlenderBottle's specific products. This con-

11          sumer usage confirms the term has become a common name for the type of goods, not a brand.

12    421. Media coverage and product reviews in the fitness and nutrition space routinely discuss

13          "blender bottles" in a generic sense to describe the category of portable mixing bottles gener-

14          ally. Articles comparing different brands' offerings often refer to them collectively as "blender

15          bottles," without suggesting an exclusive association with BlenderBottle.

16    422. Considering the highly descriptive nature of "blender bottle" in relation to portable mixing bot-

17          tles, BlenderBottle had the burden of establishing and maintaining exclusive use of the term as

18          a trademark. However, BlenderBottle did not fulfill this obligation, allowing widespread

19          generic use by third parties and the public to continue unchallenged.

20    423. The extensive generic use and understanding of "blender bottle" in the relevant industry and

21          marketplace overshadows any evidence of BlenderBottle using the term as a purported mark.

22          BlenderBottle's efforts have been inadequate to prevent "blender bottle" from becoming the

23          generic name for the goods.

24    424. Even if the 363 Reg. for "BLENDERBOTTLE" was initially valid, BlenderBottle's trademark

25          rights in the term have been abandoned and lost through the process of genericide, as evidenced

26          by the prevalent generic use by competitors, retailers, media, and the public. The term's pri-

27          mary significance is now a common name for portable bottles with integrated mixing systems,

28          not a brand identifier.

***6. BlenderBottle's U.S. Trademark Registration No. 3,515,591 for the Term "BLENDER BALL"***
***is Generic.***

425. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

426. BlenderBottle owns U.S. Trademark Registration No. 3,515,591 for the term "BLENDER BALL" in International Class 021.

427. The term "blender ball" has become generic for the category of spherical wire agitators used to mix the contents of shaker bottles and containers. The term merely describes the intended function and physical characteristics of the agitator products, rather than identifying BlenderBottle as the exclusive source.

428. Third parties in the shaker bottle industry, consumers, and the media commonly use "blender ball" as a generic name to refer to spherical wire agitators, regardless of the manufacturer. This widespread generic use has caused the term to lose any source-identifying significance in relation to BlenderBottle.

429. Numerous third parties openly sell and advertise spherical wire agitators under the name "blender ball" or close variants thereof. BlenderBottle has not diligently policed the market to prevent competitors from using "blender ball" generically to describe their own agitator products.

430. Retailers, e-commerce platforms, and product review websites often categorize or label spherical wire agitators from various brands as "blender balls." This broad application of the term to products not originating from BlenderBottle demonstrates its primary significance as a generic product descriptor.

431. Consumers seeking to purchase spherical wire agitators commonly search for and refer to such products using the generic term "blender ball," without intending to find BlenderBottle's specific offerings. This consumer usage confirms the term has become a generic name for the type of goods, not a brand.

432. The media and publications reporting on the shaker bottle industry routinely use "blender ball" in a generic manner to describe the category of spherical wire agitators generally. Articles and

1  reviews discussing different brands' agitators often call them "blender balls" without suggest-

2  ing an exclusive association with BlenderBottle.

3  433. Given the highly descriptive nature of "blender ball" in relation to spherical wire agitators,

4  BlenderBottle bore the burden of establishing and maintaining exclusive use of the term as a

5  trademark. However, BlenderBottle failed to do so by allowing widespread generic use by the

6  public to continue unchallenged.

7  434. Any evidence of BlenderBottle using "blender ball" as a purported mark is outweighed by the

8  extensive generic use and understanding of the term in the shaker bottle industry and market-

9  place. BlenderBottle's efforts have been insufficient to prevent "blender ball" from becoming

10  the generic name for the goods.

11  435. To the extent the 591 Reg. for "BLENDER BALL" was ever valid, BlenderBottle's trademark

12  rights in the term have been lost due to abandonment and genericide based on prevalent generic

13  use by competitors and the public. The term's primary significance is now a common name for

14  spherical wire agitators, not a brand.

15  **B. BlenderBottle's Asserted Trade Dresses and Related Trademarks Have Not Acquired Sec-**
16  **ondary Meaning.**

17  436. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

18  its allegations in each and every preceding paragraph above.

19  *1. BlenderBottle's 019 Lid Trade Dress Has Not Acquired Secondary Meaning.*

20  437. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

21  its allegations in each and every preceding paragraph above.

22  438. BlenderBottle's 019 Lid Trade Dress, which covers the design of its shaker bottle lid, is de-

23  scriptive and non-distinctive, and has not acquired secondary meaning in the minds of con-

24  sumers.

25  439. The 019 Lid Trade Dress design is not inherently distinctive. For a trade dress to be pro-

26  tectable, it must have acquired secondary meaning, signifying that consumers primarily asso-

27  ciate the design with the product's source rather than the product itself. BlenderBottle has

28  failed to provide conclusive evidence to support this claim.

440. Upon information and belief, the design elements of the 019 Lid Trade Dress, such as the domed lid, conical spout, hinged flip cap, and brackets, are commonly used in shaker bottle lids across the industry. This widespread use suggests that the design is functional and generic, rather than distinctive.

441. If a design is deemed functional or generic, it is incapable of acquiring secondary meaning, as consumers perceive it as a basic feature of the product type, not as a brand identifier. The prevalence of similar lid designs in the market undermines BlenderBottle's claim of distinctiveness.

442. BlenderBottle has not provided substantial evidence, such as consumer surveys or direct testimony, indicating that the consuming public recognizes the 019 Lid Trade Dress as an identifier of BlenderBottle's brand. Mere longevity of use or advertising expenditure does not suffice to establish secondary meaning.

443. Upon information and belief, BlenderBottle has not exclusively used the 019 Lid Trade Dress. Numerous companies continue to sell shaker bottles with lid designs similar to BlenderBottle's, even after litigation over these designs. BlenderBottle's failure to consistently enforce its alleged trade dress rights against these third parties constitutes tacit acknowledgment of the non-distinctiveness of its lid design.

444. The ongoing sale of similar lid designs by competitors has led to dilution of any distinctiveness that BlenderBottle's design might have once had. The widespread availability of similar products inevitably causes consumer confusion regarding the source of the products, undermining the primary function of a trade dress.

445. The lack of evidence of intentional copying of the 019 Lid Trade Dress by competitors further weakens BlenderBottle's claim for secondary meaning. If the design were truly distinctive and associated with BlenderBottle, competitors would be more likely to copy it to capitalize on that recognition.

446. Upon information and belief, the standardization of similar lid designs in the industry is largely attributed to the primarily functional and utilitarian aspects that are essential for the products,

1    rather than aesthetic choices meant to identify the source. This further argues against the dis-

2    tinctiveness of BlenderBottle's design.

3  447. Upon information and belief, data showing that BlenderBottle's sales or brand recognition have

4    not been significantly impacted by the presence of third-party products with similar lid designs

5    supports the argument that the 019 Lid Trade Dress is not a primary driver of consumer deci-

6    sion-making and, therefore, not a significant source identifier.

7  448. In light of the descriptive and non-distinctive nature of the design elements, the widespread use

8    of similar designs by third parties, the lack of exclusive use and consistent enforcement by

9    BlenderBottle, the absence of consumer association evidence and intentional copying, and the

10    primarily functional nature of the design, BlenderBottle's 019 Lid Trade Dress has not acquired

11    secondary meaning and is not protectable under the Lanham Act or common law.

12  *2. BlenderBottle's 626 Agitator Trade Dress Has Not Acquired Secondary Meaning.*

13  449. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

14    its allegations in each and every preceding paragraph above.

15  450. BlenderBottle's 626 Agitator Trade Dress is not inherently distinctive as a matter of law and

16    has not acquired secondary meaning in the minds of consumers as indicating a single source,

17    affiliation, or sponsorship.

18  451. The spherical wire agitator design is a common and generic design for mixing balls or agitators

19    used in shaker bottles across the industry. Many companies use similar designs, and consumers

20    do not exclusively associate this design with BlenderBottle's products. The design lacks the

21    unique, distinctive qualities necessary to establish secondary meaning.

22  452. BlenderBottle has not provided evidence of extensive, consistent, and specific advertising and

23    promotional efforts focused on highlighting the spherical wire agitator as a distinctive brand

24    identifier. Without such evidence, it is difficult to establish that consumers have come to recog-

25    nize the agitator design as a unique indicator of BlenderBottle's products.

26  453. BlenderBottle has not presented convincing evidence, such as consumer surveys or testimony,

27    demonstrating that consumers specifically associate the spherical wire agitator design with

28    BlenderBottle's brand. Without this evidence, the claim of secondary meaning is unsupported.

1    454. BlenderBottle has not shown that it has exclusively used this agitator design or that it has ac-

2         tively policed and prevented others from using similar designs. Without a history of exclusive

3         use and enforcement efforts, BlenderBottle cannot establish that the design has acquired sec-

4         ondary meaning.

5    455. BlenderBottle did not develop meaninful secondary meaning in its 626 Agitator Trade Dress,

6         as the design was protected by patents, thereby excluding all competition.

7    456. BlenderBottle's 626 Agitator Trade Dress does not serve as a source indicator due to the preva-

8         lence of third-party agitators coming with shaker bottles exhibiting features claimed by

9         BlenderBottle to indicate source.

10   ***3. BlenderBottle's Unregistered Bottle Trade Dress Has Not Acquired Secondary Meaning.***

11   457. BlenderBottle's Unregistered Bottle Trade Dress, which includes the overall design of its

12        shaker bottle and lid, is descriptive and non-distinctive, and has not acquired secondary mean-

13        ing in the minds of consumers.

14   458. The design elements of the Unregistered Bottle Trade Dress, such as the tall cylindrical bottle

15        body, recessed domed lid, conical spout, brackets, and round base, are commonly used in

16        shaker bottles and other beverage containers. These features are dictated by the functional re-

17        quirements of containing, mixing, and dispensing liquids, rather than serving as unique source

18        identifiers.168

19   459. BlenderBottle's own design patent, U.S. Patent No. D830,119, identifies many of the same el-

20        ements claimed in the Unregistered Bottle Trade Dress, such as the conical spout, bracket or

21        hinge, round lid base, and recessed domed top, as "unregisterable [sic] functional elements of

22        the bottle lid." (119 Patent.). This further demonstrates the functionality and lack of distinctive-

23        ness of the claimed trade dress.

24   460. Upon information and belief, numerous third-party shaker bottles and beverage containers em-

25        ploy similar combinations of cylindrical bodies, recessed domed lids, conical spouts, and

---

168 *See* Ex. 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455 (HC0170962-
HC0171062) (filed 21 September 2021).

1     brackets.169 This widespread use of comparable designs in the market precludes BlenderBottle

2     from claiming its Unregistered Bottle Trade Dress as a distinctive source identifier.

3 461. BlenderBottle has not provided any evidence of substantial, exclusive, and continuous use of

4     the Unregistered Bottle Trade Dress for an extended period of time. The shaker bottle market is

5     crowded with similar designs, making it unlikely that BlenderBottle's product configuration

6     has achieved a level of consumer recognition sufficient to establish secondary meaning.

7 462. BlenderBottle has not demonstrated significant advertising expenditures or promotional efforts

8     specifically directed at educating consumers to associate the Unregistered Bottle Trade Dress

9     with BlenderBottle as the source of the products. Mere sales figures and general advertising of

10     the products are insufficient to prove secondary meaning without a focused campaign to create

11     a mental association between the trade dress and BlenderBottle.

12 463. There is no evidence of actual consumer confusion or intentional copying of the Unregistered

13     Bottle Trade Dress by competitors, which could potentially indicate that the design has ac-

14     quired distinctiveness in the market. The absence of such instances suggests that the trade dress

15     has not achieved secondary meaning.

16 464. To the extent the Unregistered Bottle Trade Dress incorporates any ornamental features,

17     BlenderBottle has failed to articulate or plausibly plead those elements in a manner that would

18     support a claim of inherent or acquired distinctiveness.

19 465. In light of the functionality and commonplace nature of the design elements, the lack of exclu-

20     sivity and duration of use, the absence of targeted advertising and consumer recognition evi-

21     dence, and the failure to identify any ornamental features, BlenderBottle's Unregistered Bottle

22     Trade Dress has not attained the level of distinctiveness required for protection under the Lan-

23     ham Act or common law.

---

169 Ex. 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013); Ex. 43, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022); Ex. 77, Ningbo Body Build Shaker (January 2007) (Screenshot from the Internet Archive) (HC0172423-HC0172423); Ex. 79, Bodybuild-ing.Com Measurement Shaker Bottle (Screenshot from the Internet Archive) (23 June 2005) (HC0172425-HC0172426).

1    ***4. BlenderBottle's Unregistered Label Trade Dress Has Not Acquired Secondary Meaning.***

2    466. BlenderBottle's Unregistered Label Trade Dress, which consists of a wraparound label with a

3         brand name, product name, capacity information, and colored accents, is descriptive and non-

4         distinctive, and has not acquired secondary meaning in the minds of consumers.

5    467. The design elements of BlenderBottle's Unregistered Label Trade Dress are common and

6         widely used in the industry. Numerous third-party shaker bottles and other beverage containers

7         employ similar labels with brand names, product names, capacity information, and colored ac-

8         cents.170 This widespread use of similar label designs suggests that BlenderBottle's label is

9         not inherently distinctive.

10   468. Upon information and belief, BlenderBottle even offered its alleged Asserted Trade Dress de-

11        signs to third parties to sell under their own private label.171

12   469. The primary purpose of BlenderBottle's label design is to convey basic product information to

13        consumers, such as the brand, product name, and capacity. These elements are descriptive of

14        the product and its characteristics, rather than serving as unique source identifiers.

15   470. The arrangement of the informational elements on BlenderBottle's label, including the place-

16        ment of the brand name, product name, and capacity, follows a standard format commonly used

17        in the industry. This conventional layout lacks inherent distinctiveness and does not create a

18        unique commercial impression.

19   471. BlenderBottle has not provided any evidence of secondary meaning, such as consumer surveys

20        or direct testimony, demonstrating that consumers exclusively associate the Unregistered Label

21        Trade Dress with BlenderBottle. The mere fact that BlenderBottle has used the label design for

22        a certain period or has expended resources on advertising is insufficient to establish secondary

23        meaning.

---

170 (*See, e.g.*, Exs. 77-88, Screenshots of Shaker Bottles and Lids from the Late Aughts (showing early substantially similar shaker bottle and lid designs disclosed before the D551 Patent); *see also* Ex. 39, BrandMakers Purchase Order for D047 "Arnold.com" Shaker Bottles from Ningbo to MusclePharm (14 October 2013); Ex. 41, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Exhibit 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013)).

171 (Ex. 45, BlenderBottle Private Label Licensing Program (Screenshots from Internet Archive of BlenderBottle's websites over time) (2011-2014)).

472. The presence of BlenderBottle's brand name on the label does not automatically confer distinctiveness to the overall label design. Consumers are likely to associate the brand name itself with BlenderBottle, rather than viewing the entire label layout as a distinctive source identifier.

473. BlenderBottle has not demonstrated that it has exclusively used the Unregistered Label Trade Dress. The widespread use of similar label designs by third parties in the industry undermines any claim of exclusive use and weakens the argument for secondary meaning.

474. There is no evidence of intentional copying of BlenderBottle's Unregistered Label Trade Dress by competitors, which would indicate that the design has acquired secondary meaning. The absence of such copying suggests that the label design is not viewed as a distinctive source identifier in the market.

475. The lack of inherent distinctiveness, the descriptive nature of the design elements, the common usage of similar labels by third parties, the absence of evidence of secondary meaning, and the lack of intentional copying all support the conclusion that BlenderBottle's Unregistered Label Trade Dress is not protectable under trademark law.

*5. BlenderBottle's BLENDERBOTTLE Mark Has Not Acquired Secondary Meaning.*

476. BlenderBottle owns U.S. Trademark Registration No. 4,894,363 ("the 363 Reg.") for the mark BLENDERBOTTLE in connection with "Plastic bottles sold empty; plastic bottles sold containing an agitator for mixing contents."

477. The BLENDERBOTTLE Mark is descriptive of the type of goods sold under the mark—namely, bottles designed for blending and mixing contents. The Mark directly conveys an immediate idea of the key ingredients, qualities, and characteristics of the goods.

478. By combining the generic terms "blender" and "bottle," the BLENDERBOTTLE Mark simply describes a bottle used for blending, which is the intended purpose and function of BlenderBottle's shaker bottles. The Mark does not require imagination, thought, or perception to determine the nature of the goods.

479. The BLENDERBOTTLE Mark has not acquired distinctiveness or secondary meaning in the minds of consumers. Consumers do not perceive BLENDERBOTTLE as a brand that identifies

1    BlenderBottle as the unique source of the goods, but rather as a generic name for the type of

2    product—a bottle designed for blending.

3    480. Upon information and belief, BlenderBottle's own use of the BLENDERBOTTLE Mark em-

4    phasizes its descriptive nature. BlenderBottle's website and marketing materials consistently

5    use the Mark in a descriptive manner to convey the blending functionality of the bottles, rather

6    than as a distinctive brand identifier.

7    481. Upon information and belief, third parties in the industry frequently use the terms "blender bot-

8    tle" or variations thereof descriptively to refer to portable mixing bottles generally, regardless

9    of the manufacturer. This common usage underscores the descriptive nature of the BLENDER-

10   BOTTLE Mark.172

11   482. Consumers seeking portable bottles for blending and mixing commonly search for and refer to

12   such products using the descriptive terms "blender bottle," without intending to find Blender-

13   Bottle's specific offerings. This consumer understanding demonstrates the Mark's primary sig-

14   nificance as describing the type of goods, not identifying BlenderBottle as the source.

15   483. Media, publications, and retailers often use "blender bottle" descriptively to discuss and cate-

16   gorize portable mixing bottles from various brands. This broad application of the term to prod-

17   ucts not originating from BlenderBottle confirms its descriptive nature.173

18   484. Upon information and belief, BlenderBottle has not engaged in substantially exclusive use of

19   the BLENDERBOTTLE Mark. Numerous third parties openly sell and market similar products

20   under the descriptive terms "blender bottle" or close variations thereof without challenge from

21   BlenderBottle.

22   485. BlenderBottle's sales, advertising, and promotional efforts related to the BLENDERBOTTLE

23   Mark are insufficient to establish secondary meaning or transform the descriptive term into a

24   distinctive brand in the minds of consumers. Any alleged commercial success is attributable to

---

172 *See* Ex. 36, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023); Ex. 37, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024).

173 *See* Ex. 36, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023); Ex. 37, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024).

1      the popularity of the blender bottle product category as a whole, not to the mark itself as an in-

2      dicator of origin.

3 486. No evidence suggests that consumers view BLENDERBOTTLE as a distinctive brand signify-

4      ing BlenderBottle as the exclusive source of the goods. The primary significance of the mark in

5      the minds of the consuming public is a generic name for the type of product, not a single-

6      source identifier.

7 487. To the extent the 363 Reg. for BLENDERBOTTLE was ever valid, any rights in the mark have

8      been lost due to widespread descriptive use by third parties and consumers, which BlenderBot-

9      tle has failed to police. The mark has become generic for the category of portable blending bot-

10      tles and no longer functions as a distinctive brand.

11 **_6. BlenderBottle's BLENDER BALL Mark Has Not Acquired Secondary Meaning._**

12 488. BlenderBottle owns U.S. Trademark Registration No. 3,515,591 ("the 591 Reg.") for the mark

13      BLENDER BALL in connection with "Wire whisk balls for mixing and blending contents of

14      bottles or containers that include integrated mixing systems."

15 489. The BLENDER BALL Mark is highly descriptive of the goods sold under the mark - specifi-

16      cally, spherical wire agitators used to blend and mix the contents of bottles. The mark immedi-

17      ately conveys the key characteristics and function of the product.

18 490. The BLENDER BALL Mark combines the descriptive terms "blender" and "ball" to directly

19      describe the product as a ball-shaped device used for blending. The mark requires no imagina-

20      tion, thought, or perception to understand the nature of the goods.

21 491. Upon information and belief, consumers do not perceive BLENDER BALL as a distinctive

22      brand indicating BlenderBottle as the exclusive source, but rather as a generic term for the type

23      of product - a spherical wire blending agitator. The mark has not acquired secondary meaning

24      in the minds of the consuming public.

25 492. Upon information and belief, BlenderBottle's own use of the BLENDER BALL Mark in its

26      marketing and packaging highlights the descriptive nature of the term. BlenderBottle consis-

27      tently uses the mark to describe the functionality of the agitator product, rather than as a unique

28      brand identifier.

493. Upon information and belief, numerous third parties in the industry commonly use the terms "blender ball" or close variations descriptively to refer to spherical wire agitators for mixing bottle contents, irrespective of the manufacturer. This widespread industry usage confirms the descriptive nature of the BLENDER BALL Mark.

494. Consumers searching for spherical wire agitators to blend and mix bottle contents frequently use the descriptive terms "blender ball," without necessarily seeking BlenderBottle's specific product. This consumer usage demonstrates the mark's primary significance as describing the type of goods, not identifying BlenderBottle as the source.

495. Upon information and belief, media, publications, and retailers regularly use "blender ball" descriptively when discussing and categorizing spherical wire agitators from various brands. This broad application of the term to products not originating from BlenderBottle reinforces its descriptive character.

496. Upon information and belief, BlenderBottle has not exercised substantially exclusive use of the BLENDER BALL Mark. Many third parties openly market and sell similar agitator products under the descriptive terms "blender ball" or close variations without opposition from BlenderBottle.

497. Any sales, advertising, or promotional efforts by BlenderBottle related to the BLENDER BALL Mark are insufficient to establish secondary meaning or transform the highly descriptive term into a distinctive brand in the minds of consumers. Any alleged commercial success is due to the popularity of the spherical wire agitator product itself, not to the mark as a source identifier.

498. Upon information and belief, there is no evidence indicating that consumers perceive BLENDER BALL as a distinctive brand signifying BlenderBottle as the exclusive source of the goods. The primary significance of the mark to the consuming public is as a generic term for the type of product, not as a single-source indicator.

499. To the extent the 591 Reg. for BLENDER BALL was ever valid, any rights in the mark have been lost due to extensive descriptive use by third parties and consumers, which BlenderBottle

1    has failed to prevent. The mark has become generic for the category of spherical wire agitators

2    used in blending bottles and no longer functions as a distinctive brand.

3    **VI. HYDRA CUP'S ASSERTED PRODUCTS DO NOT INFRINGE BLENDERBOTTLE'S ASSERTED INTEL-**
4    **LECTUAL PROPERTY.**

5    500. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

6    its allegations in each and every preceding paragraph above.

7    501. Hydra Cup's Accused Products do not infringe the Asserted Patents, the Equivalent Patents, the

8    Asserted Trade Dresses, or the Related Trademarks. An ordinary observer, familiar with the

9    prior art designs, would not believe Accused Products to be the same as the patented designs.

10   As shown in the comparison figures below, there are numerous differences between the Ac-

11   cused Products and the designs claimed by the Asserted Patents.

12   **A. Hydra Cup's Accused Products Do Not Infringe BlenderBottle's Asserted Patents.**

13   502. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

14   its allegations in each and every preceding paragraph above.

15   ***1. Hydra Cup's TS1314 OG Regular Shaker Bottle Does Not Infringe BlenderBottle's D235***
16   ***Patent.***

17   503. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

18   its allegations in each and every preceding paragraph above.

19   504. Detailed differences highlight the distinct ornamental design choices in the TS1314 OG Reg-

20   ular Shaker Bottle compared to the more simplistic and functional design of the D235 Patent.

21   The TS1314 OG Regular Shaker Bottle incorporates unique design elements such as crescent-

22   shaped ornamentation, a flatter dome, an oval closure area, and a shorter, tilted spout, which

23   collectively create a significantly different visual appearance from the D235 lid design.



D235                    Accused Bottle

D235 has a half spherical dome.        Accused lid has a flatter dome shape.

*BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle.*

505. Hydra Cup's shaker bottle and lid design seen in the Accused Products features a significantly different overall design compared to BlenderBottle's D235 Patent. The TS1314 OG Regular Shaker Bottle incorporates a cohesive design theme with ornamental elements on both the bottle and lid, creating a balanced and visually appealing appearance. In contrast, the design disclosed by BlenderBottle's D235 Patent has a more functional, bare-bones design lacking a unified aesthetic. These numerous design differences contribute to a distinctly different overall visual impression between the two products.



*Lids on BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle.*

506. Hydra Cup's Accused Products present a much different overall design impression from the impression of BlenderBottle's D235 Patent: (i) The D235 Patent lacks a cohesive design theme, consisting of a busy-looking bottle with large grips and a bare-bones lid with minimal features.

138

This creates an imbalance in the overall design appearance; (ii) The TS1314 OG Regular Shaker Bottle applies the "rule of three" design principle, featuring crescent shapes in the flip cap, lid, and bottle, thereby creating a greater sense of visual balance and consciously directs the viewer's attention to key elements; (iii) The TS1314 OG Regular Shaker Bottle's design elements, such as the crescent-shaped ornamentation on the lid and flip cap, the recessed crescent-shaped area on the bottle, and the overall rounded shape, work together to create a harmonious and visually appealing design.



*Lids on BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle.*

507. Hydra Cup's Accused Shaker Bottle and lid design have a significantly different overall visual impression compared to the design claimed in BlenderBottle's D235 Patent. The TS1314 OG Regular Shaker Bottle features a cohesive design theme with ornamental elements on both the bottle and lid, creating a balanced and visually appealing appearance. In contrast, the D235 design lacks a unified aesthetic, with a busy bottle design and bare-bones lid.

508. The TS1314 OG Regular Shaker Bottle incorporates the "rule of three" design principle, featuring crescent shapes in the flip cap, lid, and bottle. This creates visual balance and directs the viewer's attention to key elements. The D235 lacks any such cohesive design theme.



*BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle*

1    509. The TS1314 OG Regular Shaker Bottle's design elements, including the crescent-shaped orna-

2         mentation on the lid and flip cap, the recessed crescent-shaped area on the bottle, and the over-

3         all rounded shape, work together harmoniously. The D235 lacks this unified design.



4

5    *BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*



6

7    *BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

8    510. The TS1314 OG Regular Shaker Bottle's lid has numerous differences compared to the D235

9         lid: the Accused spout starts further back near the apex of the dome, while the D235 spout

10        starts close to the threading; the Accused spout is much smaller, about half the size of the D235

11        spout; the Accused spout is tilted towards the flip cap, whereas the D235 spout is straight; the

12        Accused brackets are significantly shorter than the tall D235 brackets; the Accused brackets are

13        flat, starting on the flat part of the dome and the D235 brackets are curved, starting lower on

the dome; the Accused lid features an ornamental crescent line from the skirt to the dome whereas he D235 lid is bare; the Accused lid has a flatter dome compared to the D235's half-spherical dome; The Accused lid has an oval-shaped closure area, while the D235 closure is circular; The Accused flip cap has crescent ornamentation on the surface, unlike the plain D235 flip cap.



*BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

511. The TS1314 OG Regular Shaker Bottle has a markedly different shape from the D235 bottle: the D235 has large grips with five protrusions and a pill-shaped bubble for measurements, while Hydra Cup's TS1314 OG Regular Shaker Bottle is continuously rounded without protrusions or flat areas; the D235 features prominent elevated gripper bars on the sides. The TS1314 OG Regular Shaker Bottle has a recessed crescent area instead; the D235 bottom has straight lines below the gripper bars, while the TS1314 OG Regular Shaker Bottle bottom is completely circular.



*Flip Top Caps on BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

512. The measurement markings also differ between the TS1314 OG Regular Shaker Bottle and D235: the D235 displays measurements in a pill-shaped area, while the TS1314 OG Regular Shaker Bottle has no designated area; the D235 shows both mL and oz with a central line,

whereas the TS1314 OG Regular Shaker Bottle rear-view shows only oz; the D235 shows 4 oz increments up to 20 oz and the TS1314 OG Regular Shaker Bottle uses 5 oz increments up to 25 oz.



*BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

513. These numerous differences in design elements and overall visual impression between the TS1314 OG Regular Shaker Bottle and the D235 Patent demonstrate the TS1314 OG Regular Shaker Bottle is plainly dissimilar from the claimed design and does not infringe.

***2. Hydra Cup's HC OG Carry Loop Lid Does Not Infringe the D551 Patent.***

514. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

515. Hydra Cup's HC OG Carry Loop Lid has a significantly different overall visual impression compared to the design claimed in BlenderBottle's D551 Patent. Numerous differences in shape, proportions, ornamentation, and functional features contribute to this distinct appearance.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

516. The D551 lid has a plain, bare surface throughout, while the Accused Lid features an ornamental crescent-shaped line extending from the skirt up to the dome and back down; the D551 spout is significantly larger (estimated 400% larger) than the much shorter spout on the Accused Lid. The Accused Lid's spout is also slightly tilted towards the flip cap; the Accused Lid has a spout cover protruding down from the flip cap, which is absent in the D551 design; the

D551 carry loop varies in thickness, starting thick, narrowing, and then appearing to thicken again towards the end, with some curvature. The Accused Lid's carry loop maintains a sharp, consistent angle and thickness throughout; the D551 brackets are much taller compared to the significantly shorter brackets on the Accused Lid; the D551 spout starts directly adjacent to the threading, almost at the beginning of the dome. The Accused Lid's spout starts much further back, close to the apex of the domed lid, with the length visually appearing 700% longer; there is significant space between the flip cap and lid on the D551 design, while the Accused Lid has very little space in this area.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

517. The Accused Lid's carry loop features a built-in scooper or measuring tool, a functional element not present in the D551 design.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

518. The Accused Lid has pronounced crescent-shaped ornamentation on both sides, while the D551 has no surface ornamentation; the Accused Lid's carry loop has rubber over-molding, while the D551 implies a single solid surface; the D551 closure area is circular, while the Accused Lid's closure area is oval-shaped; the Accused Lid's flip cap has crescent-shaped surface ornamentation, while the D551 flip cap has no ornamentation.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

519. The D551 has a circular spout (based on dotted lines), while the Accused Lid shows an oval spout.

520. The D551 has a large skirt housing a large threading area, while the Accused Lid has a much smaller threading area; the D551 has a tall back side bracket creating a stopper for the flip cap, while the Accused Lid's back side bracket barely comes off the surface; in the D551, the flip cap is wedged between the two sides of the carry loop, while in the Accused Lid, the carry loop is wedged between the two sides of the flip cap.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

521. Missing from the D551 Patent is a view showing the front of the lid and a view shown in condition of use, both standard views, suggesting no ornamental content.

522. Additional differences include the spout and cap shapes differ (circle vs. oval); the spouts differ in height by a factor of 2x; the lid "dome" curvatures differ; the surface ornamentation differs, with the Accused Lid incorporating concave, elevated curves.



1

*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

2

523. These numerous differences in design elements and overall visual impression between the Accused Lid and the D551 Patent demonstrate the Accused Lid is plainly dissimilar from the claimed design and does not infringe.





6

*BlenderBottle's D551 Patent (left) and the HC OG Carry Loop Lid (right).*

7

**3. Hydra Cup's TS1352 OG Storage Shaker Does Not Infringe the D798 Patent.**

8

524. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

9
10

525. There are a wide array of design differences between BlenderBottle's D798 Patent and Hydra Cup's TS1352 OG Storage Shaker. Notably, while both are cylindrical shaker bottles, the overall shapes differ, with the TS1352 OG Storage Shaker having a more rounded, tapered form compared to the straight-sided D798 Patent's disclosed design. The measurement markings,

11
12
13
14

1    bottle indentations, and surface textures also have clear dissimilarities between the two designs.

2    Taken together, these differences give the bottles distinct overall visual impressions:

3    526. For example, the overall shape is different between the two designs. The D798 Patent discloses

4        a container design with straight vertical sides, creating a cylindrical shape. The TS1352 OG

5        Storage Shaker has a rounded, oval-like shape that curves inward slightly with a mild taper

6        from top to bottom. The bottom of the container design disclosed by the container design dis-

7        closed by the D798 Patent is flat. The TS1352 has more of a rounded base.

8    527. And the measurement markings are patently dissimilar. The container design disclosed by the

9        D798 Patent shows measurement markings contained in a rounded rectangular area on the side

10       of the bottle whereas the TS1352 OG Storage Shaker has measurement markings directly on

11       the bottle without any containing shape.The container design disclosed by the D798 Patent dis-

12       plays both ml and oz measurements with a vertical line between them. The TS1352 OG Storage

13       Shaker only shows oz measurements. And the measurement increments and values differ be-

14       tween the two bottles.

15   528. The container design disclosed by the D798 Patent does not disclose a lid.

16   529. The container design disclosed by the D798 Patent has two oval-shaped, slightly depressed in-

17       dented areas on the bottle, one on each side. The TS1352 OG Storage Shaker instead has one

18       larger crescent-shaped indented area.

19   530. And the surfac texture of the two bottles is different. The design disclosed by the D798 Patent

20       discloses a container with a completely smooth surface; the surface of the TS1352 OG Storage

21       Shaker bottle, on the other hand, has some light texture and ridges.

22   *4. Hydra Cup's TS1314 OG Regular Shaker Bottle Does Not Infringe the D478 Patent.*

23   531. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

24       its allegations in each and every preceding paragraph above.

25   532. While BlenderBottle's D478 Patent's claimed design and the design embodied by the lid on

26       Hydra Cup's TS1314 OG Regular Shaker are both shaker bottle lids, the overall shapes and de-

27       sign details differ significantly between the lid design disclosed by the D478 Patent and the lid

28       on Hydra Cup's TS1314 OG Regular Shaker.

146

533. Hydra Cup's TS1314 OG Regular Shaker incorporates unique ornamental elements on the lid surface and flip cap, has a differently positioned and shaped spout, shorter and flatter brackets, an oval closure area, and a less domed top compared to the D478. Taken together, these differences give the lids distinct overall visual impressions that an ordinary observer would not confuse. Hydra Cup's TS1314 OG Regular Shaker's lid design therefore does not infringe BlenderBottle's D478 patent.

534. Without limitation, the following other key design differences between the lid design disclosed by BlenderBottle's D478 Patent and the lid design on Hydra Cup's TS1314 OG Regular Shaker show the two designs are patently dissimilar in light of the crowded prior art: The D478 has no ornamentation and shows a bare surface throughout the lid whereas the TS1314 lid has an ornamental crescent-shaped line that goes up from the skirt of the lid all the way to the dome and back down.

535. The orientation, size, and position of the spouts are different on the two designs. The D478's spout starts very close to the threading, almost right when the dome starts. The TS1314's spout starts much further back, close to the apex of the domed lid (Fig. 4, Fig. 5). The D478's spout is extremely large compared to the TS1314 lid. It is estimated to be twice as large visually (Fig. 5). The TS1314's spout is slightly tilted towards the flip cap, while the D478's spout appears to be straight (Fig. 5).

536. The brackets are also different. The D478 has tall back side brackets that create a stopper for the flip cap. The TS1314's brackets are significantly shorter and barely come off the surface. The D478's brackets start much lower on the dome, which forces them to be curved. The TS1314's brackets start higher up on the flat part of the dome, so they are flat in this area.

537. The D478 has a half-spherical dome, while the TS1314 has a flatter dome shape (Fig. 5).

538. The D478's spout closure area is circular, while the TS1314's closure area is distinctly oval-shaped, which is a key difference.

539. The flip cap ornamentation is also dissimilar between the two designs: The D478 shows no ornamentation on the surface of the flip cap. The TS1314's flip cap has crescent-shaped ornamentation on both sides of the surface.

*5. Hydra Cup's TS1314 OG Regular Shaker Bottle Does Not Infringe BlenderBottle's D038 Patent, D119 Patent, D149 Patent, or D540 Patent.*

540. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

541. Because BlenderBottle's Equivalent Patents are virtually identically to the designs disclosed by BlenderBottle's Asserted Patents and were filed after the Asserted Patents, Hydra Cup's Accused Products do not infringe the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, or the D540 Patent for the same reasons listed in the paragraphs above concerning non-infringement of the Asserted Patents.

**B. Hydra Cup's Shaker Bottles Do Not Infringe BlenderBottle's Equivalent Utility Patents.**

542. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

543. Hydra Cup also does not infringe any utility patents owned by BlenderBottle as the Accused Products lack key claim limitations and do not operate in the same manner as the patented inventions.

*1. Hydra Cup's TS1314 OG Regular Shaker Bottle Does Not Infringe BlenderBottle's 830 Patent.*

544. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

545. Hydra Cup's TS1314 OG Regular Shaker and lid do not infringe any of claims 1-20 of U.S. Patent No. 8,695,830, either literally or under the doctrine of equivalents. The key structural elements, relationships and pivotal connections between the handle, flip top and mount that are recited in the claims are not present in the Hydra Cup product. The Hydra Cup design is substantially different, with the handle and flip top pivotally attached directly to the lid body independently of each other, rather than the flip top pivoting on the handle and the handle pivoting on posts of a mount as required by the claims.

*2. Hydra Cup's TS1314 OG Regular Shaker Bottle Does Not Infringe BlenderBottle's 060 Patent.*

546. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

547. The Hydra Cup TS1314 OG Regular Shaker and lid do not infringe any of claims 1-14 of U.S. Patent No. 11,111,060, either literally or under the doctrine of equivalents. The key elements of the claimed invention, including the specific structural configuration and pivotal relationships between the flip-top closure, carrying member, flanges, and protrusions, are not present in the Hydra Cup product. The Hydra Cup design differs substantially, with the flip-top closure and carrying loop having separate and independent pivotal connections to the lid body, rather than sharing a common pivot axis defined by protrusions extending from flanges as required by the claims.

**D. Noninfringement of BlenderBottle's Asserted Trade Dresses.**

548. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

549. The shaker bottle and supplement bottle mixing industry is notably saturated with a variety of players and products. This dense market landscape leads to an abundance of similar designs and features. Consequently, trade dress claims, like those asserted by BlenderBottle, must be scrutinized within this competitive backdrop. Given the array of common and functional design elements present in the industry, trade dress protection is inherently limited.

550. Trade dress, to be protectable, must be distinctive and non-functional. In a crowded market, the distinctiveness required for trade dress protection becomes a higher threshold. BlenderBottle's trade dress claims, therefore, face the challenge of proving that their asserted trade dress is not only distinctive but also not a mere functional or common design within the industry. This necessity arises from the principle that trade dress law should not hinder competition by granting exclusive rights over functional or widely used designs.

551. To establish trade dress infringement, a significant degree of similarity is required, such that an ordinary buyer would likely confuse the products. In a market with numerous similar designs, proving this level of similarity becomes more challenging. The asserted trade dress must be so distinct that consumers associate it specifically with BlenderBottle, despite the presence of similar products. Minor or moderate resemblances are less likely to cause confusion in a market where consumers are accustomed to seeing a variety of similar products.

552. Moreover, the evolving nature of the beverage container and supplement bottle market must be taken into account. The industry's continuous innovation and changing consumer preferences mean that trade dress claims cannot unduly restrict the natural evolution of product designs. BlenderBottle's trade dress, like any other, should adapt to these market dynamics and cannot claim rights over design elements that have become standard or functional in nature.

553. Therefore, the assertion of trade dress infringement in such a competitive and dynamic industry requires a careful balance. BlenderBottle's trade dress claims are bounded by the need to distinguish their products without impeding the natural progression of industry standards and innovation. Only designs that are distinctively associated with BlenderBottle and non-functional can warrant protection, ensuring that trade dress law serves its purpose of protecting brand identity without stifling industry growth and competition.

*1. BlenderBottle's 019 Lid Trade Dress is Not Infringed by Hydra Cup's HC OG Carry Loop Lid , TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, or the GOAT Shaker.*

554. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

555. The Accused Products, including Hydra Cup's shaker bottle lid designs, do not infringe upon BlenderBottle's 019 Lid Trade Dress. Hydra Cup's lid designs exhibit significant differences from the claimed trade dress, as evident from a detailed comparison of the design elements.

556. The 019 Lid Trade Dress describes a shaker bottle lid with specific design elements, namely a recessed domed top, a conical spout on one side, a pair of brackets on the opposite side, a pivoting arm, and a circular spout closure element. In contrast, the Accused Products exhibit significant design variances in each of these elements, clearly distinguishing them from the asserted trade dress.

557. The spouts of the two lids differ significantly. Hydra Cup's spout is shorter and uniformly wide, contrasting with BlenderBottle's taller, conical spout. The 019 Lid Trade Dress's conical spout is described as being nearly twice as tall and cone-shaped, while the spout on the Accused Products is shorter and lacks a conical shape, maintaining the same width from bottom to top.

 

1

2    *Hydra Cup's Accused Products vs. BlenderBottle's 019 Lid Trade Dress.*

3    558. The spout closure element also differs between the designs. Contrary to the circular spout clo-

4    sure element described in the 019 Lid Trade Dress, the Accused Products feature an oval-

5    shaped spout closure element, measuring 24mm on the short side and 30mm on the long side.



6

7    *BlenderBottle's 019 Lid Trade Dress includes the green pivots for the disclaimed finger carry loop whereas Hydra*
8    *Cup's Accused Products do not include this pivot.*

9    559. The domed body of Hydra Cup's lid is noticeably more bulbous with a steeper slope compared

10    to BlenderBottle's less pronounced dome. Hydra Cup's lid design presents a less voluminous

11    dome with a gradual slope, as opposed to the more pronounced curve in BlenderBottle's de-

12    sign. This difference in the primary structure of the lids is immediately apparent to an observer,

13    indicating a unique design approach by Hydra Cup.

14    560. The curved outline of Hydra Cup's flip-top cap is characterized by rounded and soft transitions,

15    contrasting with the sharp and hard transitions in BlenderBottle's trade dress. Hydra Cup's flip-

16    top cap also features slight concave depressions, differing from BlenderBottle's smoother de-

17    sign.

561. The edge-lips of the lids, where the domed bodies end, also differ. Hydra Cup features a narrower, thin edge-lip and prominent concave indentations on the lid's main dome, setting it apart from BlenderBottle's broader, flatter lip and smooth dome. This variance affects the lids' appearance from various angles.

562. Hydra Cup's lid designs incorporate user-friendly features like an integrated handle and a more versatile flip-top cap. These functional aspects further distinguish Hydra Cup's products from BlenderBottle's design, which lacks such enhancements.

563. Given the constraints of functionality in shaker bottle lids, some similarities across different brands are inevitable. However, the comprehensive analysis of the distinct design features demonstrates that Hydra Cup's lid designs do not replicate or closely resemble BlenderBottle's 019 Lid Trade Dress.

564. The significant differences in the domed top, spout, flip-top cap, spout closure element, brackets, edge-lip, and dome indentations underscore the non-infringement of BlenderBottle's trade dress by Hydra Cup's lid designs.

565. An ordinary observer, familiar with the variety in the shaker bottle market, would not confuse Hydra Cup's lid designs with BlenderBottle's 019 Lid Trade Dress. The variations in design are substantial enough to indicate Hydra Cup's commitment to originality and innovation, setting its products apart in the crowded market.

566. Hydra Cup's evolution and distinct design path demonstrate an independent approach, separate from BlenderBottle's designs. In the context of trade dress, where the overall look and feel of a product are considered, Hydra Cup's lid designs reflect a unique identity, not infringing upon BlenderBottle's 019 Lid Trade Dress.

567. Therefore, based on the detailed comparison of design elements and the significant differences between the Accused Products and the 019 Lid Trade Dress, it is evident that Hydra Cup's lid designs do not infringe upon BlenderBottle's asserted trade dress rights.

**E. BlenderBottle's 626 Agitator Trade Dress is Not Infringed by Hydra Cup's OG Spherical Agitator or OG Dumbbell Agitator.**

568. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

569. Hydra Cup's Accused Products, including its agitator designs, do not infringe upon Blender-Bottle's 626 Agitator Trade Dress. The agitator designs in the Accused Products exhibit significant differences from the claimed trade dress, as evident from a detailed comparison of the design elements.

570. The 626 Agitator Trade Dress describes a spherical agitator design characterized by a wire wound symmetrically to define the shape of a sphere. In contrast, the Accused Products feature agitator designs that significantly deviate from this symmetrical, spherical configuration.

571. The design elements and overall shape of the agitators in the Accused Products are markedly different, demonstrating a clear departure from the asserted trade dress. For example, some of the Accused Products feature agitators with non-spherical shapes, such as dumbbell or peanut-like configurations, which are visually distinct from the claimed spherical design.

572. The wire configuration and winding pattern in the Accused Products' agitators exhibit structural differences when compared to the 626 Agitator Trade Dress. These differences include variations in the number of windings, the tightness of the windings, the gauge of the wire, and the overall symmetry of the sphere.

573. For instance, some of the Accused Products' agitators have a more open and loose wire structure, with fewer windings and less symmetry compared to the tightly wound, symmetrical sphere described in the 626 Agitator Trade Dress. These structural variations directly impact the functionality and appearance of the agitator, further distancing the Accused Products from the claimed trade dress.

574. Upon information and belief, the materials and construction methods used for the agitators in the Accused Products may also differ from those specified in the 626 Agitator Trade Dress. These differences can alter the weight, flexibility, and overall performance of the agitator, contributing to its distinctiveness.

1  575. Upon information and belief, from a visual perspective, the agitators in the Accused Products
2      can be easily distinguished from the design claimed in the 626 Agitator Trade Dress. This dis-
3      tinction is evident to both the ordinary observer and the expert in the field, negating any claims
4      of substantial similarity in appearance.

5  576. The differences in design, structure, material, construction, and overall visual appearance suf-
6      ficiently differentiate the Accused Products' agitators from the 626 Agitator Trade Dress.
7      These differences are not minor or trivial variations, but rather substantial and significant de-
8      partures from the claimed design.

9  577. Furthermore, upon information and belief, the functionality of the agitator designs in the Ac-
10     cused Products is not tied to the specific configuration claimed in the 626 Agitator Trade Dress.
11     The Accused Products' agitators achieve their mixing and blending functions through alterna-
12     tive designs that do not rely on the symmetrical, spherical wire configuration.

13 578. Based on the aforementioned points, it is clear that the design of the agitators in the Accused
14     Products does not infringe upon BlenderBottle's 626 Agitator Trade Dress. The differences in
15     design, structure, material, construction, and overall visual appearance, along with the alterna-
16     tive functional approaches, sufficiently differentiate the Accused Products from the claimed
17     trade dress.

18 579. Hydra Cup's agitator designs represent a distinct and non-infringing approach to achieving the
19     desired mixing and blending functionality in its shaker bottles. The Accused Products do not
20     copy or imitate the specific design elements protected by the 626 Agitator Trade Dress, but
21     rather employ innovative and differentiated solutions.

22 **F. BlenderBottle's Unregistered Bottle Trade Dress is Not Infringed by Hydra Cup's HC OG**
23 **Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage**
24 **Shaker, TS1038 Jumbo Shaker, or the GOAT Shaker.**

25 580. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,
26     its allegations in each and every preceding paragraph above.

154



All of these shakers have been accused of infringing on the
D235 patent and unregistered bottle trade dress.

*Bottle Trade Dress*    *D235*

1

*BlenderBottle's Unregistered Bottle Trade Dress, D235 Patent, and Hydra Cup's Accused Products.*

581. Hydra Cup's Accused Products, including its shaker bottle designs, do not infringe upon BlenderBottle's Unregistered Bottle Trade Dress. A detailed comparison of the design elements reveals significant differences between the Accused Products and the claimed trade dress, which is almost identical to the design disclosed in BlenderBottle's D235 Patent.

582. Upon information and belief, the bottle body of Hydra Cup's shaker bottle is notably shorter than BlenderBottle's design. This distinct height variation can readily differentiate the two bottles in the eyes of consumers, as it creates a visually apparent contrast in the overall proportions of the products.

583. Upon information and belief, the materials used in the construction of the bottle body also differ between the two designs. BlenderBottle employs mixed plastic materials, producing both opaque and transparent areas on its bottle body, whereas Hydra Cup's bottle uniformly employs a slightly transparent material. This difference in material usage creates a distinct appearance that distinguishes the two bottles at first glance.

584. Upon information and belief, the Bottle-Base and bottle body shapes are significant defining features that further differentiate the designs. While Hydra Cup's bottle is a pure cylinder with a circular base, BlenderBottle's bottle employs a stadium-shaped base with a mix of curved and flat surfaces. This stark contrast in the foundational geometry of the bottles ensures that even an ordinary consumer can easily distinguish between the two designs.

585. The diameter of the Bottle-Mouth also varies between Hydra Cup's and BlenderBottle's designs. This difference creates a distinguishable characteristic that not only affects the visual appearance but also impacts the user experience when pouring liquids from the bottle.

586. Hydra Cup's shaker bottle features concave depressions housing its logo on both the Bottle-Front and Bottle-Back. This design element is distinctive and unlike BlenderBottle's design, which only features a logo on the Bottle-Front, while the Bottle-Back contains a single Measurement-Markings-Tool. The prominent inclusion of logo depressions on both sides of Hydra Cup's bottle further ensures differentiation in the minds of consumers.

587. The approach to measurement markings is another point of divergence between the two designs. Hydra Cup employs a dual-measurement tool approach, positioning the markings on its curved sides, with ounces on one side and milliliters on the other. In contrast, BlenderBottle utilizes a single stadium/pill-shaped measuring strip on its flat Bottle-Back. These differences in the placement, shape, and presentation of the measurement tools clearly separate the two bottles, reducing the likelihood of consumer confusion.

588. The gripping features on BlenderBottle's bottle offer another striking contrast to Hydra Cup's design. While Hydra Cup opts for a minimalist, smooth surface without grip additions, BlenderBottle introduces prominent rocket ship-shaped grip strips on the flat Ribbed-Grip-Bottle-Sides, each containing five long, narrow bumps. This distinctive design element not only affects the bottle's visual appearance but also alters its tactile feel, further solidifying the differences between the two products.

589. The cumulative effect of these design differences ensures that the overall look and feel of Hydra Cup's shaker bottle is substantially distinct from BlenderBottle's Unregistered Bottle Trade Dress. The variations in bottle body height, materials, Bottle-Base and bottle body shapes, Bottle-Mouth diameter, logo placement, measurement marking approaches, and gripping features create a clear and unmistakable differentiation between the two designs.

590. Given these substantial design distinctions, it is evident that Hydra Cup's shaker bottle design does not infringe upon BlenderBottle's Unregistered Bottle Trade Dress. The numerous and significant differences in the individual design elements, as well as their combined effect on the

1    overall appearance and user experience, make it highly unlikely that consumers would confuse

2    the source or origin of the Accused Products with BlenderBottle's designs.

3    591. Hydra Cup's shaker bottle represents an independent and innovative approach to product de-

4    sign, incorporating functional and aesthetic choices that set it apart from BlenderBottle's

5    claimed trade dress. The Accused Products do not copy or imitate the protectable elements of

6    BlenderBottle's Unregistered Bottle Trade Dress, but rather offer a distinct and non-infringing

7    alternative in the market.

8    **G. Hydra Cup's OG Shaker Label Does Not Infringe BlenderBottle's Unregistered Label**
9    **Trade Dress.**

10   592. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

11   its allegations in each and every preceding paragraph above.

12   593. Detailed differences highlight the distinct ornamental design choices in the Hydra Cup Shaker

13   Bottle Label compared to the more simplistic and functional design of BlenderBottle's Unreg-

14   istered Label Trade Dress.

15   594. The Hydra Cup Shaker Bottle Label features a significantly different overall design compared

16   to BlenderBottle's Unregistered Label Trade Dress. The Hydra Cup Shaker Bottle Label and

17   BlenderBottle's alleged Unregistered Label Trade Dress create substantially different overall

18   impressions due to distinctions in layout, color scheme, font styles, graphic elements, and em-

19   phasis. Moreover, the individual design elements that make up each label, such as the brand

20   name, capacity, icons, and additional text, differ significantly in their specific appearance and

21   presentation. These numerous and notable differences in both the overall design and the con-

22   stituent elements make it unlikely that consumers would confuse the two labels or perceive

23   them as coming from the same source.

24   595. The Hydra Cup Shaker Bottle Label is substantially dissimilar from the label design practiced

25   by BlenderBottle's alleged Unregistered Label Trade Dress, including, without limitation, the

26   following:



*Hydra Cup's OG Shaker Label and BlenderBottle's Unregistered Label Trade Dress.*

596. Hydra Cup's Accused Products, including the labels used on its shaker bottles, do not infringe upon BlenderBottle's Unregistered Label Trade Dress. A detailed comparison of the label designs reveals significant differences that negate any claim of infringement.

597. Upon information and belief, labels on products like shaker bottles are primarily functional, serving the purpose of providing information about the product, brand identity, and usage instructions. This functional aspect limits the scope of protectable trade dress in label designs, as there is a reduced scope for originality due to the practical constraints of the format.

598. Upon information and belief, the use of a central, wrap-around label, often referred to as a "belly band," is a common design choice among many well-established brands in the drinkware industry, such as Yeti, HydroFlask, and Contigo. This widespread use of similar label placement indicates that such a design is more of an industry standard rather than a unique and distinctive feature associated with a single brand.

599. Upon information and belief, the overall design of Hydra Cup's label is markedly different from BlenderBottle's Unregistered Label Trade Dress. Hydra Cup's label features a horizontal layout with the brand name on the left and product details on the right, creating a distinctly different visual arrangement compared to BlenderBottle's vertical layout.

600. Upon information and belief, the color schemes used in the labels also set them apart. BlenderBottle's label uses a solid light blue background, while Hydra Cup's label employs a black

1  background with a striking teal accent color. This stark color contrast creates a completely dif-

2  ferent tone and mood, distinguishing the two designs. c

3  601. Upon information and belief, the font styles chosen for the labels contribute to their distinct

4  visual identities. BlenderBottle's label uses a modern, minimalist sans-serif font, whereas Hy-

5  dra Cup's label features a futuristic, angular font for the brand name and a more traditional serif

6  font for the product details. These contrasting font choices further differentiate the overall aes-

7  thetics of the labels.

8  602. Hydra Cup's label incorporates a prominent graphic element in the form of a stylized water

9  droplet icon, which is absent in BlenderBottle's purely typographic label. This additional visual

10  component adds a layer of distinctiveness to Hydra Cup's design.

11  603. The emphasis placed on different elements within the labels also varies. BlenderBottle's label

12  gives equal prominence to the brand name and capacity, while Hydra Cup's label clearly priori-

13  tizes the "HYDRA CUP" brand name, with product details taking a secondary position. This

14  shift in focus further distinguishes the two designs.

15  604. Upon information and belief, differences in individual design elements, such as the presenta-

16  tion of the brand name, product line, capacity, and the presence of additional text and icons,

17  further highlight the distinctiveness of Hydra Cup's label. For example, Hydra Cup's label in-

18  cludes the text "4 PACK" and "HydraCup.com," as well as the phrases "LEAK PROOF" and

19  "BPA FREE," none of which appear in BlenderBottle's label.

20  605. The primary function of trade dress is to indicate the source of a product. The differences in the

21  label designs, upon information and belief, combined with the widespread use of similar de-

22  signs in the industry, significantly reduce the likelihood of consumer confusion between Hydra

23  Cup's products and BlenderBottle's.

24  606. For an unregistered trade dress to be protected, it must have acquired secondary meaning,

25  where consumers associate the design with a particular source. Given the common use of simi-

26  lar label designs across various brands, it may be challenging for BlenderBottle to prove that its

27  label design has acquired such secondary meaning.

607. Thus, the functional nature of labels, the prevalence of similar designs in the industry, the distinct differences in Hydra Cup's label design, and the lack of consumer confusion all support the conclusion that Hydra Cup's Accused Products do not infringe upon BlenderBottle's Unregistered Label Trade Dress. The variations in layout, color scheme, font styles, graphic elements, emphasis, and individual design components create a clear and unmistakable differentiation between the two label designs.

**COUNTERCLAIM I: DECLARATORY JUDGMENT THAT HYDRA CUP'S LICENSE AGREEMENT WITH TIANQI FOR THE RIGHTS UNDER THE D047 PATENT IS VALID AND ENFORCEABLE.**

608. Hydra Cup realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

609. An actual controversy exists between Hydra Cup and BlenderBottle as to the validity and enforceability of the License Agreement between Hydra Cup and Tianqi granting Hydra Cup rights under Tianqi's D047 Patent (the "D047 License Agreement").

610. BlenderBottle has alleged that Hydra Cup's Accused Products infringe its asserted patents and trade dress rights. Hydra Cup contends that the Accused Products are covered by the D047 Patent licensed from Tianqi and therefore do not infringe any BlenderBottle intellectual property.

611. On 27 September 2022, Hydra Cup entered into the D047 License Agreement with Tianqi, the owner of the D047 Patent. The D047 License Agreement grants Hydra Cup an exclusive license to the D047 Patent, including the right to enforce the patent against third-party infringers.174

612. The D047 License Agreement is a valid and enforceable contract supported by mutual consideration. Tianqi granted Hydra Cup an exclusive license to the D047 Patent in exchange for certain royalty payments and other obligations from Hydra Cup.

613. Hydra Cup has fully complied with all of its obligations under the D047 License Agreement and the agreement remains in full force and effect.

---

174 (Ex. 43, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022)).

614. As a result of the D047 License Agreement, Hydra Cup has the right to make, use, sell, and of-fer for sale products embodying the design claimed in the D047 Patent, and to enforce the patent against infringers.

615. Hydra Cup's Accused Products are covered by the D047 Patent and are therefore licensed un-der the D047 License Agreement. BlenderBottle's allegations of infringement are thus barred by Hydra Cup's license.

616. Accordingly, Hydra Cup seeks a declaratory judgment from this Court that the D047 License Agreement is valid and enforceable, and that Hydra Cup's Accused Products are licensed under the agreement and do not infringe any BlenderBottle intellectual property rights.

**COUNTERCLAIM II: DECLARATION THAT TIANQI GRANTED HYDRA CUP A VALID AND ENFORCEABLE IMPLIED LICENSE TO THE PATENT RIGHTS IN TIANQI'S D047 AND D029 PATENTS.**

617. Hydra Cup realleges and incorporates by reference the allegations in the preceding paragraphs as if fully set forth herein.

618. An actual controversy exists between Hydra Cup and BlenderBottle whether Hydra Cup has an implied license under Tianqi's D047 and D029 Patents to make, use, sell, and offer for sale the Accused Products.

619. Tianqi is the owner of the D047 and D029 Patents, which claim designs for a shaker bottle and lid that are embodied by the Accused Products.

620. Tianqi granted Hydra Cup an implied license to the D047 and D029 Patents by selling Hydra Cup products embodying the patented designs without any restrictions, and with knowledge and intent that Hydra Cup would resell those products in the United States.

621. Since at least 2019, Hydra Cup has purchased shaker bottles and lids from Tianqi that embody the designs claimed in the D047 and D029 Patents. Tianqi manufactured these products and sold them to Hydra Cup with the knowledge and intent that Hydra Cup would resell them in the United States.

1    622. Tianqi never placed any restrictions on Hydra Cup's ability to import, use, or resell the licensed

2        products. Tianqi's conduct in selling the patented designs to Hydra Cup for resale in the United

3        States constitutes an implied license to the D047 and D029 Patents.

4    623. Hydra Cup relied on its implied license from Tianqi in purchasing, importing, and reselling the

5        licensed products. Hydra Cup paid Tianqi for these products and invested time and resources in

6        marketing and selling them in the United States.

7    624. As a result of Tianqi's implied license, Hydra Cup has the right to make, use, sell, and offer for

8        sale products embodying the designs claimed in the D047 and D029 Patents, and BlenderBot-

9        tle's allegations of infringement are barred.

10    625. Accordingly, Hydra Cup seeks a declaratory judgment from this Court that Tianqi granted Hy-

11       dra Cup a valid and enforceable implied license to the D047 and D029 Patents, that Hydra

12       Cup's Accused Products are licensed and do not infringe any BlenderBottle intellectual prop-

13       erty rights, and that Hydra Cup may enforce its licensed rights.

14
15           **COUNTERCLAIM III: DECLARATION OF INVALIDITY OF U.S. PATENT NO.**
                                **D510,235.**

16    626. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

17       its allegations in all preceding Counterclaim paragraphs above.

18    627. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D510,235.

19       This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

20       1331, 1338(a), 2201, and 2202.

21    628. The D235 Patent is invalid for failure to comply with one or more provisions of the Patent

22       Laws of the United States of America, Title 35, United States Code, including without limita-

23       tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

24    629. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

25       regarding the validity of the D235 Patent because BlenderBottle filed the Complaint in this ac-

26       tion against Hydra Cup, accusing Hydra Cup of infringing the D235 Patent, and BlenderBottle

27       contends the D235 Patent is valid and enforceable.

630. The D235 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub-ject matter of the D235 Patent.

631. The D235 Patent is invalid because the claimed design therein was known or used in the prior art before the filing date of the D235 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

632. The D235 Patent is invalid because the claimed design elements therein were known or used in the prior art before the filing of the D235 Patent and therefore the design and configuration of design elements claimed by the D235 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

633. The design disclosed by and configuration shown in the D235 Patent is primarily dictated by function and functional considerations, lacks the requisite ornamentality, and is therefore in-valid under 35 U.S.C. § 171.

634. The design claimed by and configuration shown in the D235 Patent is indefinite and is there-fore invalid under 35 U.S.C. § 112.

635. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D235 Patent under 35 U.S.C. §§ 101, 102, 103, 112, and 171.

636. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM IV: DECLARATION THAT U.S. PATENT NO. D510,235 IS UNEN-FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

637. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

638. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent No. D510,235. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

639. The D235 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

640. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D235 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the D235 Patent, and BlenderBottle contends the D235 Patent is valid and enforceable.

641. The claimed scope of the D235 Patent is far narrower than BlenderBottle has asserted. To the extent that the D235 Patent is not fully invalidated for lack of novelty, lack of originality, and lack of ornamentality, any remaining subject matter within the scope of the D235 Patent is too minimal to enforce. After screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function and therefore belong to the public domain and thus are not protectable by patent law, the scope of the D235 Patent's protectable subject matter is virtually eliminated, meaning it is impossible to infringe the D235 Patent.

642. Put differently, after filtering out the primarily functional design elements and those disclosed by prior art that belong to the public domain, there is virtually no patentable subject matter disclosed by the D235 Patent. Therefore, the D235 Patent is not enforceable.

643. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D235 Patent is unenforceable.

644. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

## COUNTERCLAIM V: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. D510,235

645. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

646. This is a cause of action for declaratory judgment of noninfringement of the claim of the D235 Patent.

647. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

648. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the manufacture, use, sale, offer for sale, or importation into the United States of Hydra Cup's products infringes the D235 Patent. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D235 Patent. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

649. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of any claim of the D235 Patent.

650. As discussed above, after screening for the prominent design elements disclosed by prior art and those design elements that are primarily dictated by function—both of which belong to the public domain—the scope of protection for the D235 Patent is virtually eliminated.

651. Moreover, Hydra Cup's Accused Products do not infringe the D235 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are patently dissimilar from the design disclosed by the D235 Patent, especially in the context of the crowded prior art allowing, at best, minimal and unenforceable patent protection.

652. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly or indirectly, the D235 Patent. Hydra Cup's Accused Products do not infringe the D235 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by BlenderBottle's D235 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is not now infringing the claim of the D235 Patent pursuant to 35 U.S.C. §§ 281 and 289.

653. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its rights and duties with respect to the D235 Patent.

654. Hydra Cup is entitled to a definitive claim construction of the claim of the D235 Patent.

1    655. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid de-

2         sign claimed by the D235 Patent, in including a declaration of the design elements disclosed by

3         prior art and the primarily functional design elements that belong to the public domain and are

4         therefore not included in the scope of the D235 Patent's claim.

5    656. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically,

6         the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker,

7         the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not in-

8         fringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid de-

9         sign claimed by BlenderBottle's D235 Patent.

10   657. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

11        and attorneys' fees awarded to Hydra Cup.

12   **COUNTERCLAIM VI: DECLARATION OF INVALIDITY OF U.S. PATENT NO. D696,551.**

13   658. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

14        its allegations in all preceding Counterclaim paragraphs above.

15   659. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D696,551.

16        This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

17        1331, 1338(a), 2201, and 2202.

18   660. The D551 Patent is invalid for failure to comply with one or more provisions of the Patent

19        Laws of the United States of America, Title 35, United States Code, including without limita-

20        tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

21   661. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

22        regarding the validity of the D551 Patent because BlenderBottle filed the Complaint in this ac-

23        tion against Hydra Cup, accusing Hydra Cup of infringing the D551 Patent, and BlenderBottle

24        contends the D551 Patent is valid and enforceable.

25   662. The D551 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub-

26        ject matter of the D551 Patent.

663. The D551 Patent is invalid because the claimed design therein was known or used in the prior art before the filing date of the D551 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

664. The D551 Patent is invalid because the claimed design elements therein were known or used in the prior art before the filing of the D551 Patent and therefore the design and configuration of design elements claimed by the D551 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

665. The design disclosed by and configuration shown in the D551 Patent is primarily dictated by function and functional considerations, lacks the requisite ornamentality, and is therefore in-valid under 35 U.S.C. § 171.

666. The design claimed by and configuration shown in the D551 Patent is indefinite and is there-fore invalid under 35 U.S.C. § 112.

667. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D551 Patent under 35 U.S.C. §§ 101, 102, 103, 112, and 171.

668. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.


**COUNTERCLAIM VII: DECLARATION THAT U.S. PATENT NO. D696,551 IS UNEN-FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

669. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

670. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent No. D696,551. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

671. The D551 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limita-tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

672. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D551 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the D551 Patent, and BlenderBottle contends the D551 Patent is valid and enforceable.

673. The claimed scope of the D551 Patent is far narrower than BlenderBottle has asserted. To the extent that the D551 Patent is not fully invalidated for lack of novelty, lack of originality, and lack of ornamentality, any remaining subject matter within the scope of the D551 Patent is too minimal to enforce. After screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function and therefore belong to the public domain and thus are not protectable by patent law, the scope of the D551 Patent's protectable subject matter is virtually eliminated, meaning it is impossible to infringe the D551 Patent.

674. Put differently, after filtering out the primarily functional design elements and those disclosed by prior art that belong to the public domain, there is virtually no patentable subject matter disclosed by the D551 Patent. Therefore, the D551 Patent is not enforceable.

675. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D551 Patent is unenforceable.

676. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM VIII: DECLARATION OF UNENFORCEABILITY OF U.S. PATENT NO. D696,551 DUE TO INEQUITABLE CONDUCT BEFORE THE U.S. PATENT AND TRADEMARK OFFICE.**

677. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

678. This is a cause of action for declaratory judgment of unenforceability of the claim of the D551 Patent.

679. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

680. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the manufacture, use, sale, offer for sale, or importation into the United States of Hydra Cup's products infringes the D551 Patent. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D551 Patent. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

681. The D551 Patent is invalid and unenforceable for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

682. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is canceled or withdrawn from consideration, or the application becomes abandoned.

683. The individuals associated with the filing and prosecution of the D551 Patent breached their duty of candor and good faith by withholding material information concerning substantially similar prior art as well as by withholding material information about the functional elements of the claimed design from the patent examiner with the intent to deceive or mislead the examiner into granting the D551 Patent.

684. BlenderBottle's failure to identify known prior art, known design elements that are primarily functional, and other material information during the prosecution of the D551 Patent was done with knowledge and the failure to disclose was material to patentability. This failure to identify material references extends to each individual associated with the filing and prosecution of the patent applications asserted by BlenderBottle.

685. As a result of BlenderBottle's misconduct involved in prosecuting and procuring the D551 Patent, the D551 Patent is invalid and unenforceable. Accordingly, the D551 Patent asserted by BlenderBottle is not enforceable and should be declared unenforceable.

686. Hydra Cup is therefore entitled to a judicial declaration that the D551 Patent is unenforceable.

1    687. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

2        and attorneys' fees awarded to Hydra Cup.

3    **COUNTERCLAIM IX: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO.**
4                                        **D696,551.**

5    688. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

6        its allegations in each and every preceding paragraph above.

7    689. This is a cause of action for declaratory judgment of non-infringement of the claim of the D551

8        Patent.

9    690. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

10       1331, 1338(a), 2201, and 2202.

11   691. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

12       concerning whether the manufacture, use, sale, offer for sale, or importation into the United

13       States of Hydra Cup's products infringes the D551 Patent. Furthermore, the parties are cur-

14       rently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D551

15       Patent. Thus, as a result of the acts described in the foregoing paragraphs, there exists a sub-

16       stantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

17   692. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of

18       any claim of the D551 Patent.

19   693. As discussed above, after screening for the prominent design elements disclosed by prior art

20       and those design elements that are primarily dictated by function—both of which belong to the

21       public domain—the scope of protection for the D551 Patent is virtually eliminated.

22   694. Moreover, Hydra Cup's Accused Products do not infringe the D551 Patent, either literally or

23       under the doctrine of equivalents, at least because, among other reasons, the designs embodied

24       by the Accused Products are patently dissimilar from the design disclosed by the D551 Patent,

25       especially in the context of the crowded prior art allowing, at best, minimal and unenforceable

26       patent protection.

695. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly or indirectly, the D551 Patent. Hydra Cup's Accused Products do not infringe the D551 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by BlenderBottle's D551 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is not now infringing the claim of the D551 Patent pursuant to 35 U.S.C. §§ 281 and 289.

696. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its rights and duties with respect to the D551 Patent.

697. Hydra Cup is entitled to a definitive claim construction of the claim of the D551 Patent.

698. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid design claimed by the D551 Patent, in including a declaration of the design elements disclosed by prior art and the primarily functional design elements that belong to the public domain and are therefore not included in the scope of the D551 Patent's claim.

699. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically, the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not infringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid design claimed by BlenderBottle's D551 Patent.

700. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM X: DECLARATION OF INVALIDITY OF U.S. PATENT NO. D697,798.**

701. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

702. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D697,798. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

703. The D798 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

704. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D798 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the D798 Patent, and BlenderBottle contends the D798 Patent is valid and enforceable.

705. The D798 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the subject matter of the D798 Patent.

706. The D798 Patent is invalid because the claimed design therein was known or used in the prior art before the filing date of the D798 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

707. The D798 Patent is invalid because the claimed design elements therein were known or used in the prior art before the filing of the D798 Patent and therefore the design and configuration of design elements claimed by the D798 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

708. The design disclosed by and configuration shown in the D798 Patent is primarily dictated by function and functional considerations, lacks the requisite ornamentality, and is therefore invalid under 35 U.S.C. § 171.

709. The design claimed by and configuration shown in the D798 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

710. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D798 Patent under 35 U.S.C. §§ 101, 102, 103, and 112.

711. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XI: DECLARATION THAT U.S. PATENT NO. D697,798 IS UNEN-
FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING
FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-
MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

712. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,
     its allegations in each and every preceding paragraph above.

713. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent
     No. D697,798. This Court has subject matter jurisdiction over this cause of action pursuant to
     28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

714. The D798 Patent is invalid for failure to comply with one or more provisions of the Patent
     Laws of the United States of America, Title 35, United States Code, including without limita-
     tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

715. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle
     regarding the validity of the D798 Patent because BlenderBottle filed the Complaint in this ac-
     tion against Hydra Cup, accusing Hydra Cup of infringing the D798 Patent, and BlenderBottle
     contends the D798 Patent is valid and enforceable.

716. The claimed scope of the D798 Patent is far narrower than BlenderBottle has asserted. To the
     extent that the D798 Patent is not fully invalidated for lack of novelty, lack of originality, and
     lack of ornamentality, any remaining subject matter within the scope of the D798 Patent is too
     minimal to enforce. After screening for the prominent design elements that were disclosed by
     prior art and design elements that are primarily dictated by function and therefore belong to the
     public domain and thus are not protectable by patent law, the scope of the D798 Patent's pro-
     tectable subject matter is virtually eliminated, meaning it is impossible to infringe the D798
     Patent.

717. Put differently, after filtering out the primarily functional design elements and those disclosed
     by prior art that belong to the public domain, there is virtually no patentable subject matter dis-
     closed by the D798 Patent. Therefore, the D798 Patent is not enforceable.

718. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D798 Patent is unen-
     forceable.

719. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

## COUNTERCLAIM XII: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. D697,798

720. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

721. This is a cause of action for declaratory judgment of noninfringement of the claim of the D798 Patent.

722. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

723. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the manufacture, use, sale, offer for sale, or importation into the United States of Hydra Cup's products infringes the D798 Patent. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D798 Patent. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

724. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of any claim of the D798 Patent.

725. As discussed above, after screening for the prominent design elements disclosed by prior art and those design elements that are primarily dictated by function—both of which belong to the public domain—the scope of protection for the D798 Patent is virtually eliminated.

726. Moreover, Hydra Cup's Accused Products do not infringe the D798 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are patently dissimilar from the design disclosed by the D798 Patent, especially in the context of the crowded prior art allowing, at best, minimal and unenforceable patent protection.

174

727. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly or indirectly, the D798 Patent. Hydra Cup's Accused Products do not infringe the D798 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by BlenderBottle's D798 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is not now infringing the claim of the D798 Patent pursuant to 35 U.S.C. §§ 281 and 289.

728. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its rights and duties with respect to the D798 Patent.

729. Hydra Cup is entitled to a definitive claim construction of the claim of the D798 Patent.

730. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid design claimed by the D798 Patent, in including a declaration of the design elements disclosed by prior art and the primarily functional design elements that belong to the public domain and are therefore not included in the scope of the D798 Patent's claim.

731. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically, the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not infringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid design claimed by BlenderBottle's D798 Patent.

732. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XIII: DECLARATION OF INVALIDITY OF U.S. PATENT NO. D748,478.**

733. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

734. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D748,478. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

735. The D478 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

736. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D478 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the 019 Lid Trade Dress, which BlenderBottle admits practices the same lid design disclosed by the D478 Patent, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D478 Patent; and BlenderBottle contends the D478 Patent is valid and enforceable. More specifically, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the D478. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D478 Patent.

737. The D478 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the subject matter of the D478 Patent.

738. The D478 Patent is invalid because the claimed design therein was known or used in the prior art before the filing date of the D478 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

739. The D478 Patent is invalid because the claimed design elements therein were known or used in the prior art before the filing of the D478 Patent and therefore the design and configuration of design elements claimed by the D478 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

740. The design disclosed by and configuration shown in the D478 Patent is primarily dictated by function and functional considerations, lacks the requisite ornamentality, and is therefore invalid under 35 U.S.C. § 171.

741. The design claimed by and configuration shown in the D478 Patent is indefinite and is there-
fore invalid under 35 U.S.C. § 112.

742. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D478 Patent under 35
U.S.C. §§ 101, 102, 103, 112, and 171.

743. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs
and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XIV: DECLARATION THAT U.S. PATENT NO. D748,478 IS UNEN-
FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING
FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-
MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

744. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,
its allegations in each and every preceding paragraph above.

745. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent
No. D748,478. This Court has subject matter jurisdiction over this cause of action pursuant to
28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

746. The D478 Patent is invalid for failure to comply with one or more provisions of the Patent
Laws of the United States of America, Title 35, United States Code, including without limita-
tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

747. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle
regarding the validity of the D478 Patent because BlenderBottle filed the Complaint in this ac-
tion against Hydra Cup, accusing Hydra Cup of infringing the 019 Lid Trade Dress, which
BlenderBottle admits practices the same lid design disclosed by the D478 Patent, meaning
BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D478 Patent;
and BlenderBottle contends the D478 Patent is valid and enforceable. More specifically, when
Hydra Cup requested products embodying the designs disclosed by the Asserted Patents,
BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in
BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids
to those disclosed by the Asserted Patents, including the D478. Accordingly, upon in-

1 formation and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused

2 Products of infringing BlenderBottle's Equivalent Patents, including the D478 Patent.

3 748. The claimed scope of the D478 Patent is far narrower than BlenderBottle has asserted. To the

4 extent that the D478 Patent is not fully invalidated for lack of novelty, lack of originality, and

5 lack of ornamentality, any remaining subject matter within the scope of the D478 Patent is too

6 minimal to enforce. After screening for the prominent design elements that were disclosed by

7 prior art and design elements that are primarily dictated by function and therefore belong to the

8 public domain and thus are not protectable by patent law, the scope of the D478 Patent's pro-

9 tectable subject matter is virtually eliminated, meaning it is impossible to infringe the D478

10 Patent.

11 749. Put differently, after filtering out the primarily functional design elements and those disclosed

12 by prior art that belong to the public domain, there is virtually no patentable subject matter dis-

13 closed by the D478 Patent. Therefore, the D478 Patent is not enforceable.

14 750. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D478 Patent is unen-

15 forceable.

16 751. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

17 and attorneys' fees awarded to Hydra Cup.

18 **COUNTERCLAIM XV: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO.**
19 **D748,478**

20 752. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

21 its allegations in each and every preceding paragraph above.

22 753. This is a cause of action for declaratory judgment of noninfringement of the claim of the D478

23 Patent.

24 754. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

25 1331, 1338(a), 2201, and 2202.

26 755. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

27 concerning whether the manufacture, use, sale, offer for sale, or importation into the United

1   States of Hydra Cup's products infringes the D478 Patent. Furthermore, the parties are cur-

2   rently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the 019

3   Lid Trade Dress, which BlenderBottle admits practices a lid design identical to the design dis-

4   closed by the D478 Patent. Thus, as a result of the acts described in the foregoing paragraphs,

5   there exists a substantial controversy of sufficient immediacy to warrant the issuance of a

6   declaratory judgment.

7   756. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of

8       any claim of the D478 Patent.

9   757. As discussed above, after screening for the prominent design elements disclosed by prior art

10      and those design elements that are primarily dictated by function—both of which belong to the

11      public domain—the scope of protection for the D478 Patent is virtually eliminated.

12  758. Moreover, Hydra Cup's Accused Products do not infringe the D478 Patent, either literally or

13      under the doctrine of equivalents, at least because, among other reasons, the designs embodied

14      by the Accused Products are patently dissimilar from the design disclosed by the D478 Patent,

15      especially in the context of the crowded prior art allowing, at best, minimal and unenforceable

16      patent protection.

17  759. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly

18      or indirectly, the D478 Patent. Hydra Cup's Accused Products do not infringe the D478 Patent,

19      either literally or under the doctrine of equivalents, at least because, among other reasons, the

20      designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's

21      D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by

22      BlenderBottle's D478 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is

23      not now infringing the claim of the D478 Patent pursuant to 35 U.S.C. §§ 281 and 289.

24  760. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its

25      rights and duties with respect to the D478 Patent.

26  761. Hydra Cup is entitled to a definitive claim construction of the claim of the D478 Patent.

27  762. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid de-

28      sign claimed by the D478 Patent, in including a declaration of the design elements disclosed by

1    prior art and the primarily functional design elements that belong to the public domain and are

2    therefore not included in the scope of the D478 Patent's claim.

3    763. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically,

4         the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker,

5         the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not in-

6         fringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid de-

7         sign claimed by BlenderBottle's D478 Patent.

8    764. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

9         and attorneys' fees awarded to Hydra Cup.

10        **COUNTERCLAIM XVI: DECLARATION OF INVALIDITY OF U.S. PATENT NO.**
11                                    **D820,038.**

12   765. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

13        its allegations in all preceding Counterclaim paragraphs above.

14   766. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D820,038.

15        This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

16        1331, 1338(a), 2201, and 2202.

17   767. The D038 Patent is invalid for failure to comply with one or more provisions of the Patent

18        Laws of the United States of America, Title 35, United States Code, including without limita-

19        tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

20   768. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

21        regarding the validity of the D038 Patent because BlenderBottle filed the Complaint in this ac-

22        tion against Hydra Cup, accusing Hydra Cup of infringing the 019 Lid Trade Dress, which

23        BlenderBottle admits practices the same lid design disclosed by the D038 Patent, meaning

24        BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D038 Patent;

25        and BlenderBottle contends the D038 Patent is valid and enforceable. More specifically, when

26        Hydra Cup requested products embodying the designs disclosed by the Asserted Patents,

27        BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in

28        BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids

1    to those designs disclosed by the Asserted Patents, including the D038. Accordingly, upon in-

2    formation and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused

3    Products of infringing BlenderBottle's Equivalent Patents, including the D038 Patent.

4    769. The D038 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub-

5         ject matter of the D038 Patent.

6    770. The D038 Patent is invalid because the claimed design therein was known or used in the prior

7         art before the filing date of the D038 Patent, and, therefore, is anticipated under 35 U.S.C. §

8         102 in view of the prior art.

9    771. The D038 Patent is invalid because the claimed design elements therein were known or used in

10        the prior art before the filing of the D038 Patent and therefore the design and configuration of

11        design elements claimed by the D038 Patent was obvious in view of the prior art under 35

12        U.S.C. § 103.

13   772. The design disclosed by and configuration shown in the D038 Patent is primarily dictated by

14        function and functional considerations, lacks the requisite ornamentality, and is therefore in-

15        valid under 35 U.S.C. § 171.

16   773. The design claimed by and configuration shown in the D038 Patent is indefinite and is there-

17        fore invalid under 35 U.S.C. § 112.

18   774. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D038 Patent under 35

19        U.S.C. §§ 101, 102, 103, 112, and 171.

20   775. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

21        and attorneys' fees awarded to Hydra Cup.

22   **COUNTERCLAIM XVII: DECLARATION THAT U.S. PATENT NO. D820,038 IS UNEN-**
23   **FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING**
24   **FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-**
25   **MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

26   776. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

27        its allegations in each and every preceding paragraph above.

777. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent No. D820,038. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

778. The D038 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

779. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D038 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the 019 Lid Trade Dress, which BlenderBottle admits practices the same lid design disclosed by the D038 Patent, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D038 Patent; and BlenderBottle contends the D038 Patent is valid and enforceable. More specifically, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the D038. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D038 Patent.

780. The claimed scope of the D038 Patent is far narrower than BlenderBottle has asserted. To the extent that the D038 Patent is not fully invalidated for lack of novelty, lack of originality, and lack of ornamentality, any remaining subject matter within the scope of the D038 Patent is too minimal to enforce. After screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function and therefore belong to the public domain and thus are not protectable by patent law, the scope of the D038 Patent's protectable subject matter is virtually eliminated, meaning it is impossible to infringe the D038 Patent.

781. Put differently, after filtering out the primarily functional design elements and those disclosed by prior art that belong to the public domain, there is virtually no patentable subject matter disclosed by the D038 Patent. Therefore, the D038 Patent is not enforceable.

782. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D038 Patent is unenforceable.

783. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XVIII: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. D820,038**

784. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

785. This is a cause of action for declaratory judgment of noninfringement of the claim of the D038 Patent.

786. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

787. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the manufacture, use, sale, offer for sale, or importation into the United States of Hydra Cup's products infringes the D038 Patent. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the 019 Lid Trade Dress, which BlenderBottle admits practices a lid design identical to the design disclosed by the D038 Patent. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

788. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of any claim of the D038 Patent.

789. As discussed above, after screening for the prominent design elements disclosed by prior art and those design elements that are primarily dictated by function—both of which belong to the public domain—the scope of protection for the D038 Patent is virtually eliminated.

790. Moreover, Hydra Cup's Accused Products do not infringe the D038 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied

1    by the Accused Products are patently dissimilar from the design disclosed by the D038 Patent,

2    especially in the context of the crowded prior art allowing, at best, minimal and unenforceable

3    patent protection.

4    791. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly

5       or indirectly, the D038 Patent. Hydra Cup's Accused Products do not infringe the D038 Patent,

6       either literally or under the doctrine of equivalents, at least because, among other reasons, the

7       designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's

8       D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by

9       BlenderBottle's D038 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is

10      not now infringing the claim of the D038 Patent pursuant to 35 U.S.C. §§ 281 and 289.

11   792. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its

12      rights and duties with respect to the D038 Patent.

13   793. Hydra Cup is entitled to a definitive claim construction of the claim of the D038 Patent.

14   794. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid de-

15      sign claimed by the D038 Patent, in including a declaration of the design elements disclosed by

16      prior art and the primarily functional design elements that belong to the public domain and are

17      therefore not included in the scope of the D038 Patent's claim.

18   795. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically,

19      the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker,

20      the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not in-

21      fringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid de-

22      sign claimed by BlenderBottle's D038 Patent.

23   796. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

24      and attorneys' fees awarded to Hydra Cup.

25   **COUNTERCLAIM XIX: DECLARATION OF INVALIDITY OF U.S. PATENT NO.**
26   **D830,119.**

27   797. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

28      its allegations in all preceding Counterclaim paragraphs above.

798. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D830,119. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

799. The D119 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

800. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D119 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents and Asserted Trade Dresses, which are substantially similar to design disclosed by the D119 Patent, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D119 Patent; and BlenderBottle contends the D119 Patent is valid and enforceable. Furthermore, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, Blender-Bottle mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the D119 Patent. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D119 Patent.

801. The D119 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the subject matter of the D119 Patent.

802. The D119 Patent is invalid because the claimed design therein was known or used in the prior art before the filing date of the D119 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

803. The D119 Patent is invalid because the claimed design elements therein were known or used in the prior art before the filing of the D119 Patent and therefore the design and configuration of design elements claimed by the D119 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

804. The design disclosed by and configuration shown in the D119 Patent is primarily dictated by function and functional considerations, lacks the requisite ornamentality, and is therefore invalid under 35 U.S.C. § 171.

805. The design claimed by and configuration shown in the D119 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

806. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D119 Patent under 35 U.S.C. §§ 101, 102, 103, 112, and 171.

807. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XX: DECLARATION THAT U.S. PATENT NO. D830,119 IS UNENFORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELEMENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

808. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

809. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent No. D830,119. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

810. The D119 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

811. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D119 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents and Asserted Trade Dresses, which are substantially similar to design disclosed by the D119 Patent, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D119 Patent; and BlenderBottle contends the D119 Patent is valid and enforceable. Furthermore, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, BlenderBottle mailed Hydra Cup physical products embodying the designs disclosed in BlenderBot-

1  tle's other patents disclosing substantially similar designs for shaker bottles and lids to those

2  designs disclosed by the Asserted Patents, including the D119 Patent. Accordingly, upon infor-

3  mation and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused

4  Products of infringing BlenderBottle's Equivalent Patents, including the D119 Patent.

5  812. The claimed scope of the D119 Patent is far narrower than BlenderBottle has asserted. To the

6  extent that the D119 Patent is not fully invalidated for lack of novelty, lack of originality, and

7  lack of ornamentality, any remaining subject matter within the scope of the D119 Patent is too

8  minimal to enforce. After screening for the prominent design elements that were disclosed by

9  prior art and design elements that are primarily dictated by function and therefore belong to the

10  public domain and thus are not protectable by patent law, the scope of the D119 Patent's pro-

11  tectable subject matter is virtually eliminated, meaning it is impossible to infringe the D119

12  Patent.

13  813. Put differently, after filtering out the primarily functional design elements and those disclosed

14  by prior art that belong to the public domain, there is virtually no patentable subject matter dis-

15  closed by the D119 Patent. Therefore, the D119 Patent is not enforceable.

16  814. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D119 Patent is unen-

17  forceable.

18  815. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

19  and attorneys' fees awarded to Hydra Cup.

20  **COUNTERCLAIM XXI: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT**
21  **NO. D830,119.**

22  816. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

23  its allegations in each and every preceding paragraph above.

24  817. This is a cause of action for declaratory judgment of noninfringement of the claim of the D119

25  Patent.

26  818. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

27  1331, 1338(a), 2201, and 2202.

819. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D119 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents and Asserted Trade Dresses, which are substantially similar to design disclosed by the D119 Patent, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D119 Patent; and BlenderBottle contends the D119 Patent is valid and enforceable. Furthermore, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, BlenderBottle mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the D119 Patent. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D119 Patent.

820. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of any claim of the D119 Patent.

821. As discussed above, after screening for the prominent design elements disclosed by prior art and those design elements that are primarily dictated by function—both of which belong to the public domain—the scope of protection for the D119 Patent is virtually eliminated.

822. Moreover, Hydra Cup's Accused Products do not infringe the D119 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are patently dissimilar from the design disclosed by the D119 Patent, especially in the context of the crowded prior art allowing, at best, minimal and unenforceable patent protection.

823. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly or indirectly, the D119 Patent. Hydra Cup's Accused Products do not infringe the D119 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by BlenderBottle's D119 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is not now infringing the claim of the D119 Patent pursuant to 35 U.S.C. §§ 281 and 289.

824. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its rights and duties with respect to the D119 Patent.

825. Hydra Cup is entitled to a definitive claim construction of the claim of the D119 Patent.

826. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid design claimed by the D119 Patent, in including a declaration of the design elements disclosed by prior art and the primarily functional design elements that belong to the public domain and are therefore not included in the scope of the D119 Patent's claim.

827. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically, the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not infringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid design claimed by BlenderBottle's D119 Patent.

828. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XXII: DECLARATION OF INVALIDITY OF U.S. PATENT NO. D897,149.**

829. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

830. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D897,149. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

831. The D149 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

832. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D149 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing several substantially similar designs,

including the D235 Patent, the D551 Patent, the D798 Patent, and the 019 Lid Trade, meaning

BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D149 Patent;

and BlenderBottle contends the D149 Patent is valid and enforceable. More specifically, when

Hydra Cup requested products embodying the designs disclosed by the Asserted Patents,

BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in

BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids

to those designs disclosed by the Asserted Patents, including the D149 Patent. Accordingly,

upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's

Accused Products of infringing BlenderBottle's Equivalent Patents, including the D149 Patent.

833. The D149 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub-ject matter of the D149 Patent.

834. The D149 Patent is invalid because the claimed design therein was known or used in the prior art before the filing date of the D149 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

835. The D149 Patent is invalid because the claimed design elements therein were known or used in the prior art before the filing of the D149 Patent and therefore the design and configuration of design elements claimed by the D149 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

836. The design disclosed by and configuration shown in the D149 Patent is primarily dictated by function and functional considerations, lacks the requisite ornamentality, and is therefore in-valid under 35 U.S.C. § 171.

837. The design claimed by and configuration shown in the D149 Patent is indefinite and is there-fore invalid under 35 U.S.C. § 112.

838. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D149 Patent under 35 U.S.C. §§ 101, 102, 103, 112, and 171.

839. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XXIII: DECLARATION THAT U.S. PATENT NO. D897,149 IS UNEN-FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

840. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

841. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent No. D897,149. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

842. The D149 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limita-tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

843. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D149 Patent because BlenderBottle filed the Complaint in this ac-tion against Hydra Cup, accusing Hydra Cup of infringing several substantially similar designs, including the D235 Patent, the D551 Patent, the D798 Patent, and the 019 Lid Trade, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D149 Patent; and BlenderBottle contends the D149 Patent is valid and enforceable. More specifically, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the D149 Patent. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D149 Patent.

844. The claimed scope of the D149 Patent is far narrower than BlenderBottle has asserted. To the extent that the D149 Patent is not fully invalidated for lack of novelty, lack of originality, and lack of ornamentality, any remaining subject matter within the scope of the D149 Patent is too minimal to enforce. After screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function and therefore belong to the public domain and thus are not protectable by patent law, the scope of the D149 Patent's pro-

1  tectable subject matter is virtually eliminated, meaning it is impossible to infringe the D149

2  Patent.

3  845. Put differently, after filtering out the primarily functional design elements and those disclosed

4  by prior art that belong to the public domain, there is virtually no patentable subject matter dis-

5  closed by the D149 Patent. Therefore, the D149 Patent is not enforceable.

6  846. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D149 Patent is unen-

7  forceable.

8  847. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

9  and attorneys' fees awarded to Hydra Cup.

10  **COUNTERCLAIM XIV: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT**
11  **NO. D897,149.**

12  848. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

13  its allegations in each and every preceding paragraph above.

14  849. This is a cause of action for declaratory judgment of noninfringement of the claim of the D149

15  Patent.

16  850. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

17  1331, 1338(a), 2201, and 2202.

18  851. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

19  regarding the validity of the D149 Patent because BlenderBottle filed the Complaint in this ac-

20  tion against Hydra Cup, accusing Hydra Cup of infringing several substantially similar designs,

21  including the D235 Patent, the D551 Patent, the D798 Patent, and the 019 Lid Trade, meaning

22  BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D149 Patent;

23  and BlenderBottle contends the D149 Patent is valid and enforceable. More specifically, when

24  Hydra Cup requested products embodying the designs disclosed by the Asserted Patents,

25  BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in

26  BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids

27  to those designs disclosed by the Asserted Patents, including the D149 Patent. Accordingly,

28  upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's

1    Accused Products of infringing BlenderBottle's Equivalent Patents, including the D149 Patent.

2    Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that

3    Hydra Cup infringe substantially similar designs to the design claimed by the D149 Patent,

4    which practices an identical lid design to the lid design disclosed by the D149 Patent. Thus, as

5    a result of the acts described in the foregoing paragraphs, there exists a substantial controversy

6    of sufficient immediacy to warrant the issuance of a declaratory judgment.

7    852. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of

8        any claim of the D149 Patent.

9    853. As discussed above, after screening for the prominent design elements disclosed by prior art

10       and those design elements that are primarily dictated by function—both of which belong to the

11       public domain—the scope of protection for the D149 Patent is virtually eliminated.

12   854. Moreover, Hydra Cup's Accused Products do not infringe the D149 Patent, either literally or

13       under the doctrine of equivalents, at least because, among other reasons, the designs embodied

14       by the Accused Products are patently dissimilar from the design disclosed by the D149 Patent,

15       especially in the context of the crowded prior art allowing, at best, minimal and unenforceable

16       patent protection.

17   855. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly

18       or indirectly, the D149 Patent. Hydra Cup's Accused Products do not infringe the D149 Patent,

19       either literally or under the doctrine of equivalents, at least because, among other reasons, the

20       designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's

21       D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by

22       BlenderBottle's D149 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is

23       not now infringing the claim of the D149 Patent pursuant to 35 U.S.C. §§ 281 and 289.

24   856. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its

25       rights and duties with respect to the D149 Patent.

26   857. Hydra Cup is entitled to a definitive claim construction of the claim of the D149 Patent.

27   858. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid de-

28       sign claimed by the D149 Patent, in including a declaration of the design elements disclosed by

1     prior art and the primarily functional design elements that belong to the public domain and are

2     therefore not included in the scope of the D149 Patent's claim.

3 859. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically,

4     the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker,

5     the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not in-

6     fringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid de-

7     sign claimed by BlenderBottle's D149 Patent.

8 860. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

9     and attorneys' fees awarded to Hydra Cup.

10
11 **COUNTERCLAIM XV: DECLARATION OF INVALIDITY OF U.S. PATENT NO.
D900,540.**

12 861. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

13     its allegations in all preceding Counterclaim paragraphs above.

14 862. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. D900,540.

15     This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

16     1331, 1338(a), 2201, and 2202.

17 863. The D540 Patent is invalid for failure to comply with one or more provisions of the Patent

18     Laws of the United States of America, Title 35, United States Code, including without limita-

19     tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

20 864. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

21     regarding the validity of the D540 Patent because BlenderBottle filed the Complaint in this ac-

22     tion against Hydra Cup, accusing Hydra Cup of infringing several substantially similar designs,

23     including the D235 Patent, the D551 Patent, the D798 Patent, and the 019 Lid Trade, meaning

24     BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D540 Patent;

25     and BlenderBottle contends the D540 Patent is valid and enforceable. What's more, when Hy-

26     dra Cup requested products embodying the designs disclosed by the Asserted Patents, Blender-

27     Bottle, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBot-

28     tle's other patents disclosing substantially similar designs for shaker bottles and lids to those

1     designs disclosed by the Asserted Patents, including the design claimed by the D540 Patent.

2     Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing

3     Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the

4     D540 Patent.

5     865. The D540 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub-

6        ject matter of the D540 Patent.

7     866. The D540 Patent is invalid because the claimed design therein was known or used in the prior

8        art before the filing date of the D540 Patent, and, therefore, is anticipated under 35 U.S.C. §

9        102 in view of the prior art.

10    867. The D540 Patent is invalid because the claimed design elements therein were known or used in

11       the prior art before the filing of the D540 Patent and therefore the design and configuration of

12       design elements claimed by the D540 Patent was obvious in view of the prior art under 35

13       U.S.C. § 103.

14    868. The design disclosed by and configuration shown in the D540 Patent is primarily dictated by

15       function and functional considerations, lacks the requisite ornamentality, and is therefore in-

16       valid under 35 U.S.C. § 171.

17    869. The design claimed by and configuration shown in the D540 Patent is indefinite and is there-

18       fore invalid under 35 U.S.C. § 112.

19    870. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the D540 Patent under 35

20       U.S.C. §§ 101, 102, 103, 112, and 171.

21    871. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

22       and attorneys' fees awarded to Hydra Cup.

23    **COUNTERCLAIM XXVI: DECLARATION THAT U.S. PATENT NO. D900,540 IS UNEN-**
24    **FORCEABLE DUE TO ITS MINIMAL SCOPE OF PROTECTION AFTER SCREENING**
25    **FOR PRIMARILY FUNCTIONAL DESIGN ELEMENTS AND THOSE DESIGN ELE-**
26    **MENTS DISCLOSED BY PRIOR ART THAT BELONG TO THE PUBLIC DOMAIN.**

27    872. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

28       its allegations in each and every preceding paragraph above.

873. This is a cause of action for declaratory judgment of unenforceability of U.S. Patent No. D900,540. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

874. The D540 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 171, 172, and 282.

875. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D540 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing several substantially similar designs, including the D235 Patent, the D551 Patent, the D798 Patent, and the 019 Lid Trade, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D540 Patent; and BlenderBottle contends the D540 Patent is valid and enforceable. What's more, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, Blender-Bottle, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the design claimed by the D540 Patent. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D540 Patent.

876. The claimed scope of the D540 Patent is far narrower than BlenderBottle has asserted. To the extent that the D540 Patent is not fully invalidated for lack of novelty, lack of originality, and lack of ornamentality, any remaining subject matter within the scope of the D540 Patent is too minimal to enforce. After screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function and therefore belong to the public domain and thus are not protectable by patent law, the scope of the D540 Patent's protectable subject matter is virtually eliminated, meaning it is impossible to infringe the D540 Patent.

877. Put differently, after filtering out the primarily functional design elements and those disclosed by prior art that belong to the public domain, there is virtually no patentable subject matter disclosed by the D540 Patent. Therefore, the D540 Patent is not enforceable.

878. Accordingly, Hydra Cup is entitled to a declaratory judgment that the D540 Patent is unenforceable.

879. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XXVII: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. D900,540.**

880. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

881. This is a cause of action for declaratory judgment of noninfringement of the claim of the D540 Patent.

882. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

883. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the D540 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing several substantially similar designs, including the D235 Patent, the D551 Patent, the D798 Patent, and the 019 Lid Trade, meaning BlenderBottle is also accusing Hydra Cup of accusing the design disclosed by the D540 Patent; and BlenderBottle contends the D540 Patent is valid and enforceable. More specifically, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents, BlenderBottle, mailed Hydra Cup physical products embodying the designs disclosed in BlenderBottle's other patents disclosing substantially similar designs for shaker bottles and lids to those designs disclosed by the Asserted Patents, including the D540 Patent. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents, including the D540 Patent. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that

Hydra Cup infringe substantially similar designs to the design claimed by the D540 Patent, which practices an identical lid design to the lid design disclosed by the D540 Patent. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

884. Hydra Cup has not directly infringed, induced infringement, or contributed to infringement of any claim of the D540 Patent.

885. As discussed above, after screening for the prominent design elements disclosed by prior art and those design elements that are primarily dictated by function—both of which belong to the public domain—the scope of protection for the D540 Patent is virtually eliminated.

886. Moreover, Hydra Cup's Accused Products do not infringe the D540 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are patently dissimilar from the design disclosed by the D540 Patent, especially in the context of the crowded prior art allowing, at best, minimal and unenforceable patent protection.

887. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly or indirectly, the D540 Patent. Hydra Cup's Accused Products do not infringe the D540 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the designs embodied by the Accused Products are modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent and are patently dissimilar from the designs disclosed by BlenderBottle's D540 Patent. And Hydra Cup has not infringed, willfully or otherwise, and is not now infringing the claim of the D540 Patent pursuant to 35 U.S.C. §§ 281 and 289.

888. A judicial declaration is necessary and appropriate in order that Hydra Cup may ascertain its rights and duties with respect to the D540 Patent.

889. Hydra Cup is entitled to a definitive claim construction of the claim of the D540 Patent.

890. Hydra Cup is entitled to a declaration of the scope of protection of the shaker bottle and lid design claimed by the D540 Patent, in including a declaration of the design elements disclosed by prior art and the primarily functional design elements that belong to the public domain and are therefore not included in the scope of the D540 Patent's claim.

891. Hydra Cup is therefore entitled to a judicial declaration that its Accused Products—specifically, the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid—have not infringed and do not currently infringe, either directly or indirectly, the shaker bottle and lid design claimed by BlenderBottle's D540 Patent.

892. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

## COUNTERCLAIM XXVIII: DECLARATION OF INVALIDITY OF U.S. PATENT NO. 8,695,830.

893. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

894. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. 8,695,830. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

895. The 830 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 172, and 282.

896. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the 8,695,830 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 830 Patent, and BlenderBottle contends the 830 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 830 Patent.

897. The 830 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the subject matter of the 830 Patent.

898. The 830 Patent is invalid because the claims therein were known or used in the prior art before the filing date of the 830 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

899. The 830 Patent is invalid because the claims therein were known or used in the prior art before the filing of the 830 Patent and therefore the invention claimed by the 830 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

900. The 830 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

901. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the 830 Patent under 35 U.S.C. §§ 101, 102, 103, and 112.

902. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XIX: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 8,695,830**

903. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

904. BlenderBottle claims to be the owner of U.S. Patent No. 8,695,830, entitled "Container lid having independently pivoting flip top and handle ," which issued on April 15, 2014.

905. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding infringement of the 8,695,830 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 830 Patent, and BlenderBottle contends the 830 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 830 Patent. BlenderBottle alleges that Hydra Cup has infringed and continues to infringe the 830 Patent by making, using, offering to sell, selling, and/or importing the Accused Products, which allegedly embody the inventions claimed in the 830 Patent.

906. Hydra Cup denies that it has infringed or is infringing any valid and enforceable claim of the 830 Patent, either directly, contributorily, or by inducement, literally or under the doctrine of equivalents.

907. The Accused Products do not infringe the 830 Patent because they do not include each and every element of any asserted claim, either literally or under the doctrine of equivalents.

908. For example, independent claim 1 of the 830 Patent requires, among other things, "a handle comprising a first end with a first handle pivot and a second end with a second handle pivot; and a flip top for sealing the opening, the flip top comprising an elongated body with a first end for opening the flip top and a second end including a flip top pivot, wherein: the first end of the handle is sandwiched between a first end of the flip top pivot and the first post of the mount and the second end of the handle is sandwiched between a second end of the flip top pivot and the second post of the mount, a first protrusion on the first end of the flip top pivot extends into a first opening in the first end of the handle and a second protrusion on the second end of the flip top pivot extends into a second opening in the second end of the handle." The Accused Products do not include this claimed handle configuration.

909. Hydra Cup has not and does not induce or contribute to infringement of the 830 Patent because the Accused Products do not directly infringe the patent for the reasons stated above. Hydra Cup also lacks the requisite knowledge and intent to induce or contribute to any alleged infringement by others.

910. Accordingly, there is an actual, substantial, and justiciable controversy between Hydra Cup and BlenderBottle concerning the alleged infringement of the 830 Patent.

911. Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the 830 Patent.

912. This is an exceptional case entitling Hydra Cup to an award of its attorneys' fees incurred in connection with this action pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM XXX: DECLARATION OF INVALIDITY OF U.S. PATENT NO. 11,111,060.**

913. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

914. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. 11,111,060. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

915. The 060 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 172, and 282.

916. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the 11,111,060 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 060 Patent, and BlenderBottle contends the 060 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 060 Patent.

917. The 060 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the subject matter of the 060 Patent.

918. The 060 Patent is invalid because the claims therein were known or used in the prior art before the filing date of the 060 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

919. The 060 Patent is invalid because the claims therein were known or used in the prior art before the filing of the 060 Patent and therefore the invention claimed by the 060 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

920. The 060 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

921. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the 060 Patent under 35 U.S.C. §§ 101, 102, 103, and 112.

922. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM XXXI: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 11,111,060.**

923. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

924. BlenderBottle claims to be the owner of U.S. Patent No. 11,111,060, entitled "Container lid having independently pivoting flip top and handle ," which issued on April 15, 2014.

925. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding infringement of the 060 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 060 Patent, and BlenderBottle contends the 060 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 060 Patent. BlenderBottle alleges that Hydra Cup has infringed and continues to infringe the 060 Patent by making, using, offering to sell, selling, and/or importing the Accused Products, which allegedly embody the inventions claimed in the 060 Patent.

926. Hydra Cup denies that it has infringed or is infringing any valid and enforceable claim of the 060 Patent, either directly, contributorily, or by inducement, literally or under the doctrine of equivalents.

927. The Accused Products do not infringe the 060 Patent because they do not include each and every element of any asserted claim, either literally or under the doctrine of equivalents.

928. For example, independent claim 6 of the 060 Patent requires, among other things, "[a] lid and container system, comprising: a flip-top closure, wherein the flip-top closure is movable about a pivot axis between an open position and a closed position relative to the spout, wherein the pivot axis is aligned with the first protrusion and the second protrusion and wherein the flip-top closure includes a first receiving portion and a second receiving portion; and the first protrusion

1    of the first flange extends through the first end of the carrying member at least partially into the

2    first receiving portion of the flip-top closure; and the second protrusion of the second flange ex-

3    tends through the second end of the carrying member at least partially into the second receiving

4    portion of the flip-top closure." The Accused Products do not include this claimed handle con-

5    figuration.

6    929. Hydra Cup has not and does not induce or contribute to infringement of the 060 Patent because

7        the Accused Products do not directly infringe the patent for the reasons stated above. Hydra

8        Cup also lacks the requisite knowledge and intent to induce or contribute to any alleged in-

9        fringement by others.

10   930. Accordingly, there is an actual, substantial, and justiciable controversy between Hydra Cup and

11       BlenderBottle concerning the alleged infringement of the 060 Patent.

12   931. Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe,

13       directly or indirectly, any valid and enforceable claim of the 060 Patent.

14   932. This is an exceptional case entitling Hydra Cup to an award of its attorneys' fees incurred in

15       connection with this action pursuant to 35 U.S.C. § 285.

16   **COUNTERCLAIM XXXII: DECLARATION THAT BLENDERBOTTLE'S 019 LID**
17   **TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,800,019) IS GENERIC.**

18   933. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

19       its allegations in each and every preceding paragraph above.

20   934. This is a declaratory judgment action under the Trademark Laws of the United States, 15

21       U.S.C. § 1051 et seq. (the "Trademark Act"), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory

22       Judgment Act) seeking a declaratory judgment that BlenderBottle's 019 Lid Trade Dress is

23       generic.

24   935. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

25       1331, 1338(a), 2201, and 2202.

26   936. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

27       concerning whether Hydra Cup's Accused Products infringe BlenderBottle's 019 Lid Trade

1  Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's be-

2  lief that Hydra Cup infringed the 019 Lid Trade Dress. Thus, as a result of the acts described in

3  the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to war-

4  rant the issuance of a declaratory judgment.

5  937. BlenderBottle's claimed lid trade dress is simply a generic design that is common to domed,

6  flip-top lids on many shaker bottles and other beverage containers.

7  938. The basic elements of BlenderBottle's lid design—a domed lid body, a tall shoulder, a circular

8  base, a circular spout and spout guard, a flip top cap attached by a hinge to brackets, and a pro-

9  truding lip opposite the hinge for the user's thumb to easily open the flip top cap, among oth-

10  ers—are all generic features that are ubiquitous across the shaker bottle and lid market. These

11  elements are dictated by the function of the lid (e.g., sealing the container and allowing the user

12  to open and close the spout) rather than serving as unique source identifiers.

13  939. Numerous third-party shaker bottle lids, as well as lids for water bottles, coffee mugs, and other

14  beverage containers, employ the same generic combination of flip-cap, spout, hinge, and thumb

15  post, in an overall circular lid shape.175

16  940. This widespread use of the same basic design elements precludes BlenderBottle from claiming

17  those common features as its own proprietary trade dress.

18  941. In the utility patent context, BlenderBottle's own patents and patent applications demonstrate

19  that BlenderBottle has continually sought to protect the functional aspects of its shaker bottle

20  lid design. For example, the 830 Patent claims a "cover [that] includes a cap and a pivoting

21  handle that pivots along an axis distinct from the cap."176 Figures 7-8 of the 830 patent show a

22  lid with the same generic configuration of spout, flip cap, hinge, and thumb post that Blender-

23  Bottle now claims as trade dress. (*See id.*). BlenderBottle's utility patent filings for a virtually

---

175 (*See, e.g.*, Exs. 77-88, Screenshots of Shaker Bottles and Lids from the Aughts (showing early substantially similar shaker bottle and lid designs disclosed before the D551 Patent); see also Ex. 39, BrandMakers Purchase Order for D047 "Arnold.com" Shaker Bottles from Ningbo to MusclePharm (14 October 2013); Ex. 41, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Exhibit 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013)).

176 (Ex. 29, U.S. Patent No. 8,695,830, Abstract (filed 11 Sept. 2012)).

1    identical lid design are strong evidence that the claimed lid design is functional rather than or-

2    namental.

3    942. On the design patent side, BlenderBottle's D551, D478, D038, D065, D540, D119, and D149

4        Patents all depict substantially and confusingly similar lid designs with the same basic configu-

5        ration as the alleged trade dress.177 If these features were unique source identifiers, there

6        would be no need to seek design patent protection for those designs. The fact that BlenderBot-

7        tle pursued design patents demonstrates that it considered the designs to be ornamental and not

8        inherently distinctive. Having enjoyed years of design and utility patent protection for its lid

9        designs, BlenderBottle cannot now claim those same designs as trade dress.

10   943. In its trade dress application, BlenderBottle claimed the 019 Lid Trade Dress has been in use

11       since 2003.178 But the evidence shows that lids with the same generic features were widely

12       used by third parties before that date. BlenderBottle was not the first to adopt this generic de-

13       sign and cannot monopolize it as proprietary trade dress.

14   944. Furthermore, while BlenderBottle claimed the 019 Lid Trade Dress has been in use since 2003,

15       it also stated that the 019 Lid Trade Dress practices the exact same lid design disclosed by the

16       D478 Patent, which was filed on 06 June 2013, except the D478 Patent discloses a finger carry

17       loop whereas the 019 Lid Trade Dress disclaims any rights to a finger carry loop.

18   945. In sum, BlenderBottle's claimed 019 Lid Trade Dress is a generic design that consists of com-

19       mon functional features used across the industry. Such generic designs cannot be trade dress, as

20       a matter of law, regardless of sales, advertising, or other alleged secondary meaning. Blender-

21       Bottle has failed to identify any distinctive, non-functional features that warrant trade dress

22       protection. Instead, it is attempting to protect the overall generic design of a flip-top lid with a

23       spout, flip cap, hinge, and thumb post. Accepting BlenderBottle's position would improperly

24       allow it to monopolize the basic design of all flip-top lids, preventing competitors from using

---

177 (*See* Ex. 15, U.S. Patent No. D696,551 (filed 07 Sept. 2012); Exhibit 24, U.S. Patent No. D748,478 (filed 06 June 2013); Ex. 25, U.S. Patent No. D820,038 (filed 29 Apr. 2015); Ex. 26, U.S. Patent No. D900,540 (filed 30 Apr. 2020)).

178 (Ex. 17, U.S. Registration No. 6,800,019 (alleging the 019 Lid Trade Dress was first used in commerce "[a]t least as early as 00/00/2003")).

1    these common functional features. The Court should therefore rule that BlenderBottle's

2    claimed Lid Trade Dress is generic and unprotectable.

3    946. Hydra Cup is entitled to a declaration that the 019 Lid Trade Dress is generic and therefore not

4    protectable under federal trademark law.

5    947. BlenderBottle's 019 Lid Trade Dress should therefore be canceled pursuant to 15 U.S.C. §§

6    1064(3) and 1119 as the alleged trade dress is generic and therefore cannot possibly identify

7    any single source of goods or services.

8    **COUNTERCLAIM XXXIII: DECLARATION THAT BLENDERBOTTLE'S 019 LID**
9    **TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,800,019) IS PRIMARILY**
10   **FUNCTIONAL.**

11   948. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

12   its allegations in each and every preceding paragraph above.

13   949. This is a cause of action for declaratory judgment that BlenderBottle's 019 Lid Trade Dress is

14   not valid or protectable due to its primarily functional design covering a shaker bottle lid. This

15   Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331,

16   1338(a), 2201, and 2202.

17   950. This is a cause of action for declaratory judgment that BlenderBottle's 019 Lid Trade Dress is

18   not valid or protectable due to its primarily functional design. This Court has subject matter ju-

19   risdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

20   951. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

21   concerning whether BlenderBottle's 019 Lid Trade Dress is functional and thus not protectable

22   as a trademark. BlenderBottle has alleged that Hydra Cup infringes the 019 Lid Trade Dress.

23   Hydra Cup denies those allegations and contends that the 019 Lid Trade Dress is invalid be-

24   cause it is primarily functional.

25   952. BlenderBottle's 019 Lid Trade Dress is primarily functional and therefore is not protectable as

26   trade dress.

953. The overall design of the 019 Lid Trade Dress is dictated by the functional requirements of a shaker bottle lid, such as facilitating secure attachment, easy drinking and pouring, efficient mixing, and leak-proof storage and transportation of contents.

954. The overall shape and configuration of this shaker bottle lid design is primarily functional, with each element serving a practical purpose and arranged in a specific way to create a cohesive, utilitarian design. The domed body, tall shoulder/skirt, flip top cap, spout, spout guard, brackets, and carry loop are all dictated by the functional requirements of an effective, ergonomic, and hygienic shaker bottle lid. Altering any of these elements or their configuration would compromise the lid's overall functionality and performance.

955. Each individual element of the 019 Lid Trade Dress—the domed body, circular screw-top base, pivoting brackets, flip-top cap, spout, and spout guard—serves a specific utilitarian purpose that is essential to the lid's overall function and use.

956. The domed body of the lid enhances structural strength, promotes even distribution of forces during shaking, prevents powder accumulation, simplifies manufacturing and cleaning, and improves grip and handling.

957. The circular screw-top base with threading provides a secure, adjustable, leak-proof seal that is critical for attaching the lid to the bottle and preventing spills during vigorous shaking and active use.

958. The pivoting bracket design, featuring cylindrical pivots held within concave brackets, enables smooth and stable rotation of the flip-top cap while maintaining structural integrity and minimizing friction and wear.

959. The flip-top cap allows quick, one-handed access to the bottle's contents without fully removing the lid, facilitating easy drinking and pouring while preventing spills and maintaining hygiene.

960. The spout and spout guard work together to control the flow of liquid, enable direct drinking of thick mixtures, prevent spills and splashes, and shield the drinking surface from external contaminants.

961. The functional nature of the 019 Lid Trade Dress's overall design and each individual element is confirmed by BlenderBottle's own utility patents, which describe in detail the utilitarian advantages of these features.

962. BlenderBottle's advertising also touts the functional benefits of the 019 lid design, focusing on secure sealing, easy access, spill prevention, hygienic drinking, and durability. BlenderBottle has consistently touted the functionality of its shaker bottle and lid design to the public, highlighting the functional strengths of its multi-functional blending tool.179

963. Alternative lid designs that deviate from the 019 Lid Trade Dress, such as flat lids, snap-on caps, non-pivoting brackets, or differently shaped spouts, would not provide the same level of functionality and would impair the lid's performance and usability.

964. Due to third parties needing these functional shaker bottle lid designs, hundreds of companies sell shaker bottle lids virtually identical to the lid design in BlenderBottle's 019 Lid Trade Dress, meaning BlenderBottle's 019 Lid Trade Dress does not serve as a source indicator due to the prevalence of third-party shaker bottles exhibiting features claimed by BlenderBottle to indicate source.

965. BlenderBottle's own utility patents demonstrate that BlenderBottle has continually sought to protect the functional aspects of its shaker bottle lid design. (*See, e.g.*, Ex. 29, U.S. Patent No. 8,695,830, Abstract (filed 11 Sept. 2012); U.S. Patent No. 11,111,060). BlenderBottle's utility patent filings for a virtually identical lid design are strong evidence that the claimed lid design is primarily functional rather than ornamental.

966. Upon information and belief, since at least 2011, dozens of third parties have sold tens of millions of the exact same shaker bottle and lid designs that BlenderBottle is accusing of infringement here.

---

179 (*See, e.g.*, Ex. 54, BlenderBottle Website Blog Article, "What is a Shaker Cup?" (21 Aug. 2017), *available at* https://www.blenderbottle.com/blogs/health/what-is-a-shaker-cup-anyway/ (touting functionality as follows: "Did we mention our bottles use our StayOpen flip cap, which conveniently keeps the lid from banging on your nose as you drink?"; "We even make a protein shaker bottle with compartments the BlenderBottle ProStak with built-in storage for powders, snacks, and pills. Some people put shaker cups to work in other ways entirely, such as blending dressings, marinades, and pancake batter."; "All BlenderBottle shakers include lids engineered to stay tight, backed by our leak-proof guarantee."; "The lids twist snugly in place, forming a secure seal; with a distinctive snap, the caps click tightly closed and you're ready to shake away."; and the "SpoutGuard . . . keeps dirty gym fingers from touching the drinking spout.")).

1	967. Accordingly, because BlenderBottle's 019 Lid Trade Dress is primarily functional, it is not pro-

2	tectable, and should be canceled pursuant to 15 U.S.C. § 1119.

3	968. Accordingly, there is an actual controversy between the parties as to the functionality and va-

4	lidity of BlenderBottle's 019 Lid Trade Dress. Hydra Cup is therefore entitled to a declaration

5	that the shaker bottle lid design practiced by BlenderBottle's 019 Lid Trade Dress is primarily

6	functional. Hydra Cup seeks a declaration from this Court that the 019 registration is invalid

7	because it is primarily functional.

8	**COUNTERCLAIM XXXIV: DECLARATORY JUDGMENT THAT BLENDERBOTTLE'S**
9	**019 LID TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,800,019) IS IN-**
10	**VALID DUE TO INEQUITABLE CONDUCT ON THE USPTO IN PROCURING THE**
11	**REGISTRATION.**

12	969. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

13	its allegations in each and every preceding paragraph above.

14	970. This is a cause of action for declaratory judgment that BlenderBottle acquired its 019 Lid Trade

15	Dress through inequitable conduct on the USPTO. This Court has subject matter jurisdiction

16	over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

17	971. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

18	concerning whether BlenderBottle committed fraud on the USPTO in obtaining its registration

19	for the 019 Lid Trade Dress. BlenderBottle has alleged that Hydra Cup infringes the 019 Lid

20	Trade Dress. Hydra Cup denies those allegations and contends that the 019 Lid Trade Dress

21	registration is invalid and unenforceable due to BlenderBottle's inequitable conduct.

22	972. BlenderBottle's bait-and-switch tactic—i.e., presenting arguments and evidence for its unreg-

23	istered Bottle Trade when arguing it achieved secondary meaning in its 019 Lid Trade Dress—

24	in prosecuting the 019 Lid Trade Dress constitutes fraud on the USPTO. More specifically, by

25	presenting arguments pertaining to its alleged unregistered Bottle Trade Dress, and even other

26	lids (e.g., the D551 Patent's disclosed lid design with an integrated carry loop), and not the

27	claimed lid design itself, BlenderBottle misled the USPTO and obtained registration through

28	deceptive means. The fact that BlenderBottle also asserts rights in an unregistered Bottle Trade

29	Dress featuring the same lid further demonstrates the impropriety of its actions. Consequently,

1     the 019 Lid Trade Dress registration is invalid and unenforceable due to BlenderBottle's fraud-

2     ulent conduct before the USPTO.

3 973. Upon information and belief, BlenderBottle's failure to identify known utility and design

4     patents disclosing substantially similar shaker bottle lid designs during the prosecution of the

5     019 Lid Trade Dress was done with knowledge and the failure to disclose was material to

6     patentability. This failure to identify material references extends to each individual associated

7     with the filing and prosecution of the trademark application for the 019 Lid Trade Dress.

8 974. Each individual associated with the filing and prosecution of a trade dress application has a

9     duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to

10     the office all information known to that individual to be material to trademarkability as defined

11     in this section. The duty to disclose information exists with respect to each pending application

12     until the application is canceled or withdrawn from consideration, or the application becomes

13     abandoned.

14 975. The individuals associated with the filing and prosecution of the 019 Lid Trade Dress breached

15     their duty of candor and good faith by withholding material information concerning substan-

16     tially similar prior art as well as by withholding material information about the functional ele-

17     ments of the claimed design from the trademark examiner with the intent to deceive or mislead

18     the examiner into granting federal trademark registration for the 019 Lid Trade Dress.

19 976. Upon information and belief, BlenderBottle's failure to disclose known utility patents and de-

20     sign patents, known functionality, and other known information material to the examiner's de-

21     cision to grant registration to the 019 Lid Trade Dress during the prosecution of the 019 Lid

22     Trade Dress was done with knowledge and the failure to disclose was material to registration of

23     the 019 Lid Trade Dress. This failure to identify material references extends to each individual

24     associated with the filing and prosecution of the trade dress application asserted by BlenderBot-

25     tle.

26 977. As a result of BlenderBottle's misconduct involved in prosecuting and procuring the 019 Lid

27     Trade Dress, the 019 Lid Trade Dress is invalid and unenforceable. Accordingly, the 019 Lid

28     Trade Dress asserted by BlenderBottle is not enforceable and should be declared unenforce-

29     able.

978. Furthermore, in its application for U.S. Registration No. 6,800,019, BlenderBottle falsely claimed that the 019 Lid Trade Dress was first used in commerce in 2003.

979. A comparison of the design elements in BlenderBottle's D235 Patent from 2003 and the 019 Lid Trade Dress reveals significant differences, clearly indicating that the design claimed in the 019 Registration was not in commercial use as early as 2003.

980. The design elements claimed in the 019 Registration closely align with those in BlenderBottle's later D478 Patent, suggesting that the 019 Lid Trade Dress was actually used in commerce around the time of the D478 filing, which is post-2013, and not in 2003 as claimed.

981. There is a conspicuous absence of documentary evidence supporting BlenderBottle's claim of the 019 Lid Trade Dress being used in the market in 2003.

982. BlenderBottle's misrepresentation of the first use date was a calculated attempt to deceive the USPTO. Given BlenderBottle's access to accurate records and historical data, it is implausible that such a significant error could have occurred unintentionally.

983. The inequitable conduct, improper failures to disclose, and misrepresented facts, among other things, each potentially influenced the USPTO's decision-making process by suggesting an erroneously extended period of market presence and distinctiveness of the 019 Lid Trade Dress, which could have been a decisive factor in granting the registration.

984. Further investigations reveal inconsistencies in BlenderBottle's public statements and other filings regarding the first use date, supporting the contention of intentional deception.

985. BlenderBottle knowingly and intentionally committed fraud on the USPTO. The significant discrepancies in design elements, the clear time-line contradiction, the lack of supporting evidence, and BlenderBottle's capability to accurately represent such crucial information, all lead to the inescapable conclusion that BlenderBottle's actions were deliberately deceptive.

986. BlenderBottle's inequitable conduct renders the 019 Lid Trade Dress registration invalid and unenforceable.

987. Accordingly, there is an actual and justiciable controversy between the parties as to whether BlenderBottle committed fraud on the USPTO in obtaining the 019 Lid Trade Dress registra-

1  tion. Hydra Cup seeks a declaration from this Court that the 019 Lid Trade Dress registration is

2  invalid and unenforceable due to BlenderBottle's inequitable conduct.

3  988. BlenderBottle's 019 Lid Trade Dress should be canceled pursuant to 15 U.S.C. §§ 1064(3) and

4  1119 due to BlenderBottle's inequitable conduct in procuring the 019 Lid Trade Dress.

5  989. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs

6  and attorneys' fees awarded to Hydra Cup.

7  **COUNTERCLAIM XXXV: DECLARATION THAT BLENDERBOTTLE'S 019 LID TRADE**
8  **DRESS (U.S. TRADEMARK REGISTRATION NO. 6,800,019) HAS NOT ACQUIRED SEC-**
9  **ONDARY MEANING.**

10  990. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein,

11  its allegations in each and every preceding paragraph above.

12  991. This is a cause of action for declaratory judgment that BlenderBottle's 019 Lid Trade Dress is

13  not valid or protectable because it is descriptive, non-distinctive, and has not acquired sec-

14  ondary meaning. This Court has subject matter jurisdiction over this cause of action pursuant to

15  28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

16  992. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

17  concerning whether BlenderBottle's 019 Lid Trade Dress is descriptive, lacks distinctiveness,

18  and has not acquired secondary meaning, and is thus not protectable as a trademark. Blender-

19  Bottle has alleged that Hydra Cup infringes the 019 Lid Trade Dress. Hydra Cup denies those

20  allegations and contends that the 019 Lid Trade Dress is invalid.

21  993. The 019 Lid Trade Dress design is not inherently distinctive. For a trade dress to be pro-

22  tectable, it must have acquired secondary meaning, signifying that consumers primarily asso-

23  ciate the design with BlenderBottle as the source of the products. BlenderBottle has failed to

24  provide conclusive evidence to support this claim.

25  994. The design elements of the 019 Lid Trade Dress, such as the domed lid, conical spout, hinged

26  flip cap, and brackets, are commonly used in shaker bottle lids across the industry, suggesting

27  that the design is functional and generic, rather than distinctive.

995. The widespread use of similar lid designs in the market renders the 019 Lid Trade Dress inca-
pable of acquiring secondary meaning, as consumers perceive it as a basic feature of shaker
bottles, not as a brand identifier.

996. BlenderBottle has not provided substantial evidence, such as consumer surveys or direct testi-
mony, demonstrating that the consuming public recognizes the 019 Lid Trade Dress as an iden-
tifier of BlenderBottle's brand. Mere longevity of use or advertising expenditure is insufficient
to establish secondary meaning.

997. BlenderBottle has not exclusively used the 019 Lid Trade Dress, as numerous companies con-
tinue to sell shaker bottles with similar lid designs, even after litigation over these designs.
BlenderBottle's failure to consistently enforce its alleged trade dress rights against these third
parties constitutes tacit acknowledgment of the non-distinctiveness of its lid design.

998. The ongoing sale of similar lid designs by competitors has diluted any distinctiveness that
BlenderBottle's design might have once had, causing consumer confusion regarding the source
of the products and undermining the primary function of a trade dress.

999. The lack of evidence of intentional copying of the 019 Lid Trade Dress by competitors further
weakens BlenderBottle's claim for secondary meaning, as competitors would be more likely to
copy a design that is truly distinctive and associated with BlenderBottle.

1000.  The standardization of similar lid designs in the industry is largely attributed to the primarily
functional and utilitarian aspects that are essential for the products, rather than aesthetic choices
meant to identify the source. This further argues against the distinctiveness of BlenderBottle's
design.

1001.  Data showing that BlenderBottle's sales or brand recognition have not been significantly im-
pacted by the presence of third-party products with similar lid designs supports the argument
that the 019 Lid Trade Dress is not a primary driver of consumer decision-making and, there-
fore, not a significant source identifier.

1002.  Given the descriptive and non-distinctive nature of the design elements, the widespread use
of similar designs by third parties, the lack of exclusive use and consistent enforcement by
BlenderBottle, the absence of consumer association evidence and intentional copying, and the

214

1      primarily functional nature of the design, BlenderBottle's 019 Lid Trade Dress has not acquired

2      secondary meaning and is not protectable under the Lanham Act or common law.

3   1003.   Accordingly, there is an actual and justiciable controversy between the parties as to the de-

4      scriptiveness, lack of distinctiveness, and absence of secondary meaning of BlenderBottle's

5      019 Lid Trade Dress. Hydra Cup seeks a declaration from this Court that the 019 Lid Trade

6      Dress is not entitled to trademark protection.

7   1004.   BlenderBottle's 019 Lid Trade Dress is not inherently distinctive as a matter of law and has

8      not acquired secondary meaning in the minds of consumers as indicating a single source, affili-

9      ation, or sponsorship.

10   1005.   BlenderBottle's 019 Lid Trade Dress does not serve as a source indicator due to the preva-

11      lence of third-party shaker bottles exhibiting features claimed by BlenderBottle to indicate

12      source.

13   1006.   BlenderBottle's 019 Lid Trade Dress is invalid and should be canceled pursuant to 15 U.S.C.

14      § 1119.

15      **COUNTERCLAIM XXXVI: DECLARATION THAT BLENDERBOTTLE'S 019 LID**
16      **TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,800,019) IS CANCELED.**

17   1007.   Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth

18      herein, its allegations in each and every preceding paragraph above.

19   1008.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's U.S.

20      Trademark Registration No. 6,800,019 in that Hydra Cup is prevented from using primarily

21      functional designs that belong to the public domain.

22   1009.   By reason of the foregoing, U.S. Trademark Registration No. 6,800,019 should be canceled

23      pursuant to Lanham Act § 37, 15 U.S.C. §§ 1064(3) and 1119.

24      **COUNTERCLAIM XXXVII: DECLARATION OF NONINFRINGEMENT OF BLENDER-**
25      **BOTTLE'S 019 LID TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,800,019).**

26   1010.   Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth

27      herein, its allegations in each and every preceding paragraph above.

1011.   This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's 019 Lid Trade Dress. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1012.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1013.   Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 32(1) (15 U.S.C. § 1114(1)); (b) constitute unfair competition or a false designation of origin in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (c) constitute unfair competition or trademark infringement under state statutory or common law; (d) constitute dilution in violation of 15 U.S.C. § 1125(c); (e) constitute dilution in violation of state statutory or common law; or (f) otherwise violate state or federal statutory or common law.

1014.   Considering, among other things, the crowded shaker bottle and lid market and millions of similar shaker bottles and lids sold on Amazon each year by hundreds of different companies, there is no likelihood of confusion between the Accused Products and the shaker bottle lid design practiced by BlenderBottle's 019 Lid Trade Dress.

1015.   Hydra Cup's Accused Products were designed and modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent. Tens of millions of these exact same shaker bottle and lid designs have been manufactured by Tianqi and sold to hundreds of companies that sell these exact same shaker bottle and lid designs in the United States.

1016.   The 019 Lid Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The 019 Lid Trade Dress is not widely recognized by the general consuming public as a designation of the source of BlenderBottle's goods.

1017.   Hydra Cup began using its shaker bottle lid designs, which are based on designs licensed from third party Tianqi, before BlenderBottle's 019 Lid Trade Dress allegedly became famous.

As such, Hydra Cup's use is not actionable under 15 U.S.C. § 1125(c)(1). Millions of these same exact shaker bottle and lid designs have been sold throughout the United States for over a decade.

1018.   Hydra Cup's use of its shaker bottle lid designs also does not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup lids have numerous and significant differences in shape, configuration, orientation, surface ornamentation, and overall appearance compared to the registered 019 design. The products are being sold in similar marketing channels to similar consumers, which actually tends to negate any dilution by blurring.

1019.   Hydra Cup always displays its own distinct brand name and logo on its products and packaging, further distinguishing them from BlenderBottle's goods and dispelling any likelihood of dilution by blurring or tarnishment.

1020.   Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or infringement of BlenderBottle's trade dress rights.

1021.   Hydra Cup's prominent marking of its shaker bottles and lids with its own well-known trademarks precludes any likelihood of confusion as to the source or other affiliation of Hydra Cup's shaker bottles and lids.

1022.   Dozens of consumer reviews clearly show there is no likelihood of confusion between the Accused Products and BlenderBottle's 019 Lid Trade Dress.

1023.   Even if BlenderBottle does have some valid trade dress interest in its 019 Lid Trade Dress, Hydra Cup's Accused Products do not infringe BlenderBottle's purported trade dress rights.

1024.   Furthermore, Hydra Cup's Accused Products do not infringe BlenderBottle's 019 Lid Trade Dress because Hydra Cup's product designs and trade dress are distinct from BlenderBottle's 019 Lid Trade Dress, and are not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1025.   To the extent that any similarities exist between the Accused Products and BlenderBottle's products, those similarities are based on functionality and common design elements that belong

1     to the public domain and that are used by third parties such that there is no source identification

2     arising therefrom.

3 1026.   Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not in-

4     fringe BlenderBottle's 019 Lid Trade Dress and the Accused Products are not likely to be con-

5     fused with BlenderBottle's 019 Lid Trade Dress.

6 1027.   Accordingly, this Court should declare that the Accused Products do not infringe Blender-

7     Bottle's rights in its 019 Lid Trade Dress.

8 **COUNTERCLAIM XXXVIII: DECLARATION THAT BLENDERBOTTLE'S 626 AGITA-**
9 **TOR TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626) IS GENERIC.**

10 1028.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

11     herein, its allegations in each and every preceding paragraph above.

12 1029.   This is a declaratory judgment action under the Trademark Laws of the United States, 15

13     U.S.C. § 1051 et seq. (the "Trademark Act"), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory

14     Judgment Act) seeking a declaratory judgment that BlenderBottle's 626 Agitator Trade Dress

15     is generic.

16 1030.   This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

17     1331, 1338(a), 2201, and 2202.

18 1031.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

19     concerning whether Hydra Cup's Accused Products infringe BlenderBottle's 626 Agitator

20     Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBot-

21     tle's belief that Hydra Cup infringed the 626 Agitator Trade Dress. Thus, as a result of the acts

22     described in the foregoing paragraphs, there exists a substantial controversy of sufficient imme-

23     diacy to warrant the issuance of a declaratory judgment.

24 1032.   BlenderBottle's claimed agitator trade dress is simply a generic design that is a common

25     functional tool in many shaker bottles and other beverage containers.

1033. The basic elements of BlenderBottle's wired spherical agitator are all generic features that are ubiquitous across the shaker bottle market. These elements are dictated by the function of the agitator rather than serving as unique source identifiers.

1034. Numerous third-party shaker bottle companies employ the same generic spherical wire agitator.

1035. This widespread use of the same basic design elements precludes BlenderBottle from claiming those common features as its own proprietary trade dress.

1036. In sum, BlenderBottle's claimed 626 Agitator Trade Dress is a generic design that consists of common functional features used across the industry. Such generic designs cannot be trade dress, as a matter of law, regardless of sales, advertising, or other alleged secondary meaning. BlenderBottle has failed to identify any distinctive, non-functional features that warrant trade dress protection. Instead, it is attempting to protect the overall generic design of a spherical wired agitator. Accepting BlenderBottle's position would improperly allow it to monopolize the basic design of all spherical wired agitators, preventing competitors from using these common functional features. The Court should therefore rule that BlenderBottle's claimed Lid Trade Dress is generic and unprotectable.

1037. Hydra Cup is entitled to a declaration that the 626 Agitator Trade Dress is generic and therefore not protectable under federal trademark law.

1038. BlenderBottle's 626 Agitator Trade Dress should therefore be canceled pursuant to 15 U.S.C. §§ 1064(3) and 1119 as the alleged trade dress is generic and therefore cannot possibly identify any single source of goods or services.

**COUNTERCLAIM XXXIX: DECLARATION THAT BLENDERBOTTLE'S 626 AGITA-TOR TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626) IS PRIMAR-ILY FUNCTIONAL.**

1039. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1040. This is a cause of action for declaratory judgment that BlenderBottle's 626 Agitator Trade Dress is not valid or protectable due to its primarily functional design covering a spherical

1    wired agitator that goes in shaker bottles to mix liquids with supplements. This Court has sub-

2    ject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201,

3    and 2202.

4    1041.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

5    concerning whether BlenderBottle's 626 Agitator Trade Dress is functional and thus not pro-

6    tectable as a trademark. BlenderBottle has alleged that Hydra Cup infringes the 626 Agitator

7    Trade Dress. Hydra Cup denies those allegations and contends that the 626 Agitator Trade

8    Dress is invalid because it is primarily functional.

9    1042.   The 626 Agitator Trade Dress covers the design of a spherical wire whisk agitator used for

10    mixing the contents of a shaker bottle. The overall design is dictated by the functional require-

11    ments of effectively agitating and blending the contents of the bottle.

12    1043.   BlenderBottle's own expired utility patent, the 032 Patent, discloses and claims the same

13    spherical wire agitator design as the 626 Agitator Trade Dress. The existence of this utility

14    patent is strong evidence that the design is functional, as utility patents are granted for inven-

15    tions that are new, useful, and non-obvious.

16    1044.   The 032 Patent specification explicitly states that the spherical wire frame shape of the ag-

17    itator is designed to allow the flow of material through and around it, thereby facilitating mix-

18    ing. This language confirms that the design is dictated by functional considerations.

19    1045.   The 032 Patent discloses a "wire-frame agitator apparatus" comprising "an object with a

20    wire-frame shape through which liquids and fine-grained solids may pass."180 This is the same

21    basic configuration claimed in the 626 Agitator Trade Dress, i.e. "a wire that is wound to sym-

22    metrically define the shape of a sphere."

23    1046.   The wire-frame configuration of the agitator is essential to its function. The 032 Patent ex-

24    plains that "[t]he flow of material, whether liquid or powder, through the object creates turbu-

25    lent eddy currents within and around the object that break up aggregations of material and dis-

---

180 (Ex. 31, 032 Patent at Abstract, 2:48-51).

1   perse particles throughout the suspension medium."181 The spaces between the wire-frame el-

2   ements are necessary to allow this flow-through action that creates the turbulent mixing cur-

3   rents.

4   1047.   The 032 Patent further discloses that the wire-frame agitator may take many possible shapes,

5   including "cubes, spheres, ellipsoids, pyramids, polyhedrons, cylinders and others."182 How-

6   ever, a spherical shape is optimal because the "spherical shape shown in FIG. 1 may be con-

7   structed of wire-frame elements which represent longitudinal and latitudinal circles or other

8   curves or lines found on the surface of a particular shape."183 The spherical shape allows the

9   agitator to efficiently mix contents as it moves around the container.

10  1048.   The 032 Patent also teaches that the wire-frame agitator may be constructed as "a single

11  coiled wire-like element, as shown in FIG. 2, where a single wire element 12 is wound in a spi-

12  ral pattern to form a spherically shaped object 10."184 This coiled configuration "works advan-

13  tageously to allow substantial elastic deformation of the spherical shape . . . [which] creates a

14  crushing action which breaks up aggregations of powder which may stick thereto or become

15  lodged there between."185 The spiral-wound, elastically deformable sphere is the exact config-

16  uration claimed in the 626 Agitator Trade Dress.

17  1049.   Additionally, the 032 Patent discloses using the wire-frame agitator with "an interior agitator

18  placed inside a wire-frame object . . . [to] create further turbulence and dispersion which more

19  quickly and effectively mixes the solids with the liquid suspension medium."186 This further

20  demonstrates that the wire-frame configuration serves a functional purpose in allowing an inte-

21  rior object to be used to enhance mixing.

---

181 (Ex. 31, 032 Patent at 2:54-58).

182 (Ex. 31, 032 Patent at 2:58-60).

183 (Ex. 31, 032 Patent at 4:36-39).

184 (Ex. 31, 032 Patent at 4:42-45).

185 (Ex. 31, 032 Patent at 4:48-53).

186 (Ex. 31, 032 Patent at 2:63-67).

1050.  BlenderBottle actively enforced the 032 Patent against competitors, demonstrating its belief that the spherical wire agitator design provided a functional competitive advantage, not merely an ornamental feature.

1051.  BlenderBottle's advertising and promotional materials consistently highlight the functional benefits of the spherical wire agitator, such as its ability to effectively mix and blend ingredients, its durability and resistance to wear, and its similarity to traditional wire whisks used for culinary purposes.

1052.  BlenderBottle markets the spherical wire agitator under the functionally descriptive name "BlenderBall," which literally conveys the product's purpose as a ball designed for blending. BlenderBottle's trademark registration for BLENDER BALL identifies the goods as "agitators for mixing and blending," further confirming the functional nature of the design.

1053.  Among the various configurations of spherical wire agitators disclosed in the 032 Patent, BlenderBottle chose the design claimed in the 626 Agitator Trade Dress because it is the cheapest and easiest to manufacture, not for any distinctive ornamental features.

1054.  The spherical wire agitator design is essential to the use and purpose of the product, and its features are dictated by the functional requirements of effectively mixing and blending the contents of a shaker bottle. Alternative designs, such as non-spherical shapes, are less effective at agitating and mixing.

1055.  In summary, all aspects of BlenderBottle's claimed 626 Agitator Trade Dress—i.e., the spherical shape, wire-frame construction, and spiral-wound configuration—are disclosed in the 032 Patent as having utilitarian advantages. The trade dress is essential to the use or purpose of the article and affects its cost or quality. It is not an arbitrary, incidental, or ornamental design.

1056.  The functional features of the 626 Agitator Trade Dress cannot be monopolized under the guise of trade dress protection after BlenderBottle's utility patent has expired. Doing so would improperly extend the patent monopoly and deprive the public of the right to practice the invention claimed in the 032 Patent.

1057.  Because BlenderBottle's 626 Agitator Trade Dress is primarily functional, it is not protectable and should be canceled pursuant to 15 U.S.C. § 1119.

1058.  Hydra Cup is therefore entitled to a declaration that the spherical wired agitator design prac-
ticed by BlenderBottle's 626 Agitator Trade Dress is primarily functional.

1059.  Thus, there is an actual controversy between the parties as to the functionality and validity of
BlenderBottle's 626 Agitator Trade Dress. Hydra Cup seeks a declaration from this Court that
the 626 registration is invalid because it is functional and fails to serve as a trademark to iden-
tify and distinguish BlenderBottle's goods.

**COUNTERCLAIM XL: DECLARATORY JUDGMENT THAT BLENDERBOTTLE'S 626
AGITATOR TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626) IS IN-
VALID DUE TO INEQUITABLE CONDUCT ON THE USPTO IN PROCURING THE
REGISTRATION.**

1060.  Hydra Cup hereby incorporates by reference, as if fully set forth herein, its allegations in
each and every preceding paragraph above.

1061.  As a result of BlenderBottle's misconduct involved in procuring the 626 Agitator Trade
Dress, the 626 Agitator Trade Dress asserted by BlenderBottle is invalid and unenforceable.

1062.  BlenderBottle's failure to identify known utility and design patents disclosing substantially
similar agitator designs during the prosecution of the 626 Agitator Trade Dress was done with
knowledge and the failure to disclose was material to patentability. This failure to identify ma-
terial references extends to each individual associated with the filing and prosecution of the
trademark application for the 626 Agitator Trade Dress.

1063.  Each individual associated with the filing and prosecution of a trade dress application has a
duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to
the office all information known to that individual to be material to trademarkability as defined
in this section. The duty to disclose information exists with respect to each pending application
until the application is canceled or withdrawn from consideration, or the application becomes
abandoned.

1064.  The individuals associated with the filing and prosecution of the 626 Agitator Trade Dress
breached their duty of candor and good faith by withholding material information concerning
substantially similar prior art as well as by withholding material information about the func-
tional elements of the claimed design from the trademark examiner with the intent to deceive or

223

1  mislead the examiner into granting federal trademark registration for the 626 Agitator Trade
2  Dress.

3  1065.   BlenderBottle's failure to disclose known utility patents and design patents, known function-
4  ality, and other known information material to the examiner's decision to grant registration to
5  the 626 Agitator Trade Dress during the prosecution of the 626 Agitator Trade Dress was done
6  with knowledge and the failure to disclose was material to registration of the 626 Agitator
7  Trade Dress. This failure to identify material references extends to each individual associated
8  with the filing and prosecution of the trade dress application asserted by BlenderBottle.

9  1066.   As a result of BlenderBottle's misconduct involved in prosecuting and procuring the 626 Ag-
10  itator Trade Dress, the 626 Agitator Trade Dress is invalid and unenforceable. Accordingly, the
11  626 Agitator Trade Dress asserted by BlenderBottle is not enforceable and should be declared
12  unenforceable.

13  1067.   Hydra Cup is therefore entitled to a judicial declaration that BlenderBottle's 626 Agitator
14  Trade Dress is unenforceable.

15  1068.   Accordingly, the 626 Agitator Trade Dress asserted by BlenderBottle is invalid and should
16  be declared unenforceable.

17  1069.   This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable
18  costs and attorneys' fees awarded to Hydra Cup.

19  1070.   Accordingly, BlenderBottle's 626 Agitator Trade Dress should be canceled pursuant to 15
20  U.S.C. §§ 1064(3) and 1119 due to BlenderBottle's inequitable conduct in procuring the 626
21  Agitator Trade Dress.

22  **COUNTERCLAIM XLI: DECLARATION THAT BLENDERBOTTLE'S 626 AGITATOR**
23  **TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626) HAS NOT AC-**
24  **QUIRED SECONDARY MEANING.**

25  1071.   Hydra Cup hereby incorporates by reference, as if fully set forth herein, its allegations in
26  each and every preceding paragraph above.

27  1072.   This is a cause of action for declaratory judgment that BlenderBottle's 626 Agitator Trade
28  Dress is not valid or protectable due to lack of acquired distinctiveness and that the 626 Agita-

1   tor Trade Dress has not acquired secondary meaning. This Court has subject matter jurisdiction

2   over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

3   1073.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and

4       BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged

5       that it has a valid and protectable trade dress and that the Accused Products infringe Blender-

6       Bottle's purported trade dress rights.

7   1074.   BlenderBottle's 626 Agitator Trade Dress is not inherently distinctive as a matter of law and

8       has not acquired secondary meaning in the minds of consumers as indicating a single source,

9       affiliation, or sponsorship.

10  1075.   BlenderBottle's 626 Agitator Trade Dress does not serve as a source indicator due to the

11      prevalence of third-party agitators coming with shaker bottles exhibiting features claimed by

12      BlenderBottle to indicate source.

13  1076.   Because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's man-

14      ufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or

15      infringement of BlenderBottle's trade dress rights.

16  1077.   Hydra Cup's prominent marking of its Accused Products with its own well-known trade-

17      marks precludes any likelihood of confusion as to the source or other affiliation of Hydra Cup's

18      agitators.

19  1078.   Accordingly, BlenderBottle's 626 Agitator Trade Dress is invalid and should be canceled

20      pursuant to 15 U.S.C. § 1119.


21  **COUNTERCLAIM XLII: DECLARATION THAT BLENDERBOTTLE'S 626 AGITATOR**
22  **TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626) IS CANCELED.**

23  1079.   Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth

24      herein, its allegations in each and every preceding paragraph above.

25  1080.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's U.S.

26      Trademark Registration No. 6,245,626 in that Hydra Cup is prevented from using primarily

27      functional designs that belong to the public domain.

1081.   By reason of the foregoing, U.S. Trademark Registration No. 6,245,626 should be canceled pursuant to Lanham Act § 37, 15 U.S.C. §§ 1064(3) and 1119.

**COUNTERCLAIM XLIII: DECLARATION OF NONINFRINGEMENT OF BLENDER-BOTTLE'S 626 AGITATOR TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626).**

1082.   Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1083.   This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's 626 Agitator Trade Dress. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1084.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1085.   Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 32(1) (15 U.S.C. § 1114(1)); (b) constitute unfair competition or a false designation of origin in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (c) constitute unfair competition or trademark infringement under state statutory or common law; (d) constitute dilution in violation of 15 U.S.C. § 1125(c); (e) constitute dilution in violation of state statutory or common law; or (f) otherwise violate state or federal statutory or common law.

1086.   Considering, among other things, the crowded market and millions of similar shaker bottle agitators sold on Amazon each year by hundreds of different companies, there is no likelihood of confusion between the Accused Products and the spherical wired agitator design practiced by BlenderBottle's 626 Agitator Trade Dress.

1087.   Millions of these same spherical wired agitators have been sold in the United States for over a decade.

1088.   The 626 Agitator Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The 626 Agitator Trade Dress is not widely recognized by the general consuming public as a designation of the source of BlenderBottle's goods.

1089.   Hydra Cup's use of its agitator designs also does not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup agitators have numerous and significant differences in shape, configuration, orientation, surface ornamentation, and overall appearance compared to the registered 019 design. The products are being sold in similar marketing channels to similar consumers, which actually tends to negate any dilution by blurring.

1090.   Hydra Cup always displays its own distinct brand name and logo on its products and packaging, further distinguishing them from BlenderBottle's goods and dispelling any likelihood of dilution by blurring or tarnishment.

1091.   Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or infringement of BlenderBottle's trade dress rights.

1092.   Hydra Cup's prominent marking of its shaker bottles and lids with its own well-known trademarks precludes any likelihood of confusion as to the source or other affiliation of Hydra Cup's shaker bottles and lids.

1093.   Dozens of consumer reviews clearly show there is no likelihood of confusion between the Accused Products and BlenderBottle's 626 Agitator Trade Dress.

1094.   Even if BlenderBottle does have some valid trade dress interest in its 626 Agitator Trade Dress, Hydra Cup's Accused Products do not infringe BlenderBottle's purported trade dress rights.

1095.   Furthermore, Hydra Cup's Accused Products do not infringe BlenderBottle's 626 Agitator Trade Dress because Hydra Cup's product designs and trade dress are distinct from BlenderBottle's 626 Agitator Trade Dress, and are not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1096. To the extent that any similarities exist between the Accused Products and BlenderBottle's products, those similarities are based on functionality and common design elements that belong to the public domain and that are used by third parties such that there is no source identification arising therefrom.

1097. Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe BlenderBottle's 626 Agitator Trade Dress and the Accused Products are not likely to be confused with BlenderBottle's 626 Agitator Trade Dress.

1098. Accordingly, this Court should declare that the Accused Products do not infringe Blender-Bottle's rights in its 626 Agitator Trade Dress.

**COUNTERCLAIM XLIV: DECLARATION THAT BLENDERBOTTLE'S UNREGIS-TERED BOTTLE TRADE DRESS IS GENERIC.**

1099. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1100. This is a declaratory judgment action under the Trademark Laws of the United States, 15 U.S.C. § 1051 et seq. (the "Trademark Act"), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act) seeking a declaratory judgment that BlenderBottle's Unregistered Bottle Trade Dress is generic.

1101. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1102. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether Hydra Cup's Accused Products infringe BlenderBottle's Unregistered Bottle Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, Blender-Bottle's belief that Hydra Cup infringed the Unregistered Bottle Trade Dress. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

1103. BlenderBottle's claimed Unregistered Bottle Trade Dress is simply a generic shaker bottle design that is common in the industry. The basic elements - a tall cylindrical bottle body, a recessed top, a hinged lid with spout and closure - are ubiquitous features dictated by the function

1     of securely containing, mixing, and dispensing liquids and powders, rather than serving as

2     unique source identifiers.

3    1104.  Numerous third-party shaker bottles employ the same generic combination of a tall cylindri-

4     cal body, recessed top, hinged lid, spout, and closure. This widespread use of the same basic

5     design elements precludes BlenderBottle from claiming those common features as its own pro-

6     prietary trade dress.

7    1105.  BlenderBottle's own utility patents, such as the 830 Patent, demonstrate that BlenderBottle

8     has continually sought to protect the functional aspects of its claimed shaker bottle design. The

9     utility patents extensively describe the utilitarian benefits of features like the recessed lid,

10    drinking spout, and secure closure. This is strong evidence that the design is functional rather

11    than ornamental.

12   1106.  The individual elements and overall configuration of the Unregistered Bottle Trade Dress are

13    all dictated by the functional requirements of a shaker bottle - to efficiently contain, mix, and

14    dispense liquids and powders. The design does not include any arbitrary embellishments that

15    are conceptually separable from the bottle's function.

16   1107.  In sum, BlenderBottle's Unregistered Bottle Trade Dress is a generic design that consists of

17    common functional features used across the shaker bottle industry. Such generic designs cannot

18    be trade dress, as a matter of law, regardless of sales, advertising, or other alleged secondary

19    meaning. BlenderBottle has failed to identify any distinctive, non-functional features that war-

20    rant trade dress protection. Accepting BlenderBottle's position would improperly allow it to

21    monopolize the basic design of shaker bottles, preventing competitors from using these essen-

22    tial functional features. The Court should therefore rule that BlenderBottle's claimed Unregis-

23    tered Bottle Trade Dress is generic and unprotectable.

24   1108.  Hydra Cup is entitled to a declaration that the Unregistered Bottle Trade Dress is generic and

25    therefore not protectable under federal trademark law.

26   **COUNTERCLAIM XLV: DECLARATION THAT BLENDERBOTTLE'S UNREGISTERED**
27            **BOTTLE TRADE DRESS IS PRIMARILY FUNCTIONAL.**

1   1109.  Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

2         herein, its allegations in each and every preceding paragraph above.

3   1110.  This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Bottle

4         Trade Dress is not valid or protectable due to its primarily functional design covering a shaker

5         bottle. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C.

6         §§ 1331, 1338(a), 2201, and 2202.

7   1111.  A justiciable case or actual controversy has arisen and exists between Hydra Cup and

8         BlenderBottle because in the Complaint filed in the present action, BlenderBottle alleged that it

9         has valid and protectable trade dress rights in its Unregistered Bottle Trade Dress and that the

10        Accused Products infringe BlenderBottle's purported trade dress rights.

11  1112.  BlenderBottle's Unregistered Bottle Trade Dress is primarily functional and therefore is not

12        protectable as trade dress.

13  1113.  BlenderBottle has consistently promoted the functionality of its claimed shaker bottle design

14        to the public, emphasizing the utilitarian advantages of features like the tall cylindrical body for

15        mixing, the recessed top for securing the lid, the spout for controlled pouring, and the pivoting

16        closure for sealing.

17  1114.  BlenderBottle's utility patents, such as the 830 Patent, describe in detail the functional ben-

18        efits of the claimed shaker bottle design features. These utility patent filings are strong evi-

19        dence that the design is primarily functional rather than ornamental.

20  1115.  The shape and features of the Unregistered Bottle Trade Dress are all dictated by the func-

21        tional requirements of effectively containing, mixing, and dispensing liquids and powders. The

22        tall cylindrical body allows for vigorous shaking and mixing, the recessed top accommodates

23        the lid and forms a leak-resistant seal, the spout enables precise pouring, and the hinged cap se-

24        curely closes the bottle. These features provide specific utilitarian advantages essential to the

25        function of a shaker bottle.

26  1116.  Numerous companies in the industry sell shaker bottles with the same functional features

27        claimed by BlenderBottle, confirming that the design is principally driven by function, not

1    source identification. Dozens of third parties have sold millions of substantially identical shaker

2    bottles for many years.

3    1117.   Accordingly, because BlenderBottle's Unregistered Bottle Trade Dress is primarily func-

4    tional, it is not protectable as trade dress under the Lanham Act.

5    1118.   Hydra Cup is therefore entitled to a declaration that the shaker bottle design claimed by

6    BlenderBottle's Unregistered Bottle Trade Dress is primarily functional and invalid as trade

7    dress.

8    **COUNTERCLAIM XLVI: DECLARATION THAT BLENDERBOTTLE'S UNREGIS-**
9    **TERED BOTTLE TRADE DRESS HAS NOT ACQUIRED SECONDARY MEANING.**

10   1119.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

11   herein, its allegations in each and every preceding paragraph above.

12   1120.   This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Bottle

13   Trade Dress is not valid or protectable because it is descriptive, non-distinctive, and has not ac-

14   quired secondary meaning. This Court has subject matter jurisdiction over this cause of action

15   pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

16   1121.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

17   concerning whether BlenderBottle's Unregistered Bottle Trade Dress is descriptive, lacks dis-

18   tinctiveness, and has not acquired secondary meaning, and is thus not protectable as a trade-

19   mark. BlenderBottle has alleged that Hydra Cup infringes the Unregistered Bottle Trade Dress.

20   Hydra Cup denies those allegations and contends that the Unregistered Bottle Trade Dress is

21   invalid.

22   1122.   The design elements of BlenderBottle's Unregistered Bottle Trade Dress, including the tall

23   cylindrical bottle body, recessed domed lid, conical spout, brackets, and round base, are com-

24   monly used in shaker bottles and other beverage containers. These features are dictated by the

25   functional requirements of containing, mixing, and dispensing liquids, rather than serving as

26   unique source identifiers.

1123. The USPTO has rejected BlenderBottle's application to register the Bottle Trade Dress, find-ing that the design elements are functional and that there are few alternative designs available for the goods described in the application.

1124. Numerous third-party shaker bottles and beverage containers employ similar combinations of design elements, precluding BlenderBottle from claiming its Unregistered Bottle Trade Dress as a distinctive source identifier.

1125. BlenderBottle has not demonstrated substantial, exclusive, and continuous use of the Unreg-istered Bottle Trade Dress for a sufficient period of time to establish secondary meaning. The crowded market of similar designs makes it unlikely that consumers associate the trade dress specifically with BlenderBottle.

1126. BlenderBottle has not provided evidence of significant advertising expenditures or promo-tional efforts aimed at educating consumers to recognize the Unregistered Bottle Trade Dress as an indicator of BlenderBottle as the source of the products. Mere sales and general advertis-ing are insufficient to prove secondary meaning.

1127. There is no evidence of actual consumer confusion or intentional copying of the Unregis-tered Bottle Trade Dress by competitors, suggesting that the design has not acquired distinc-tiveness in the market.

1128. To the extent the Unregistered Bottle Trade Dress incorporates any ornamental features, BlenderBottle has failed to plausibly plead those elements in a manner that would support a claim of inherent or acquired distinctiveness.

1129. Given the functionality, commonplace nature, lack of exclusivity and duration of use, ab-sence of targeted advertising and consumer recognition evidence, and failure to identify orna-mental features, BlenderBottle's Unregistered Bottle Trade Dress has not acquired secondary meaning and is not protectable under the Lanham Act or common law.

1130. Accordingly, there is an actual and justiciable controversy between the parties as to the de-scriptiveness, lack of distinctiveness, and absence of secondary meaning of BlenderBottle's Unregistered Bottle Trade Dress. Hydra Cup seeks a declaration from this Court that the Un-registered Bottle Trade Dress is not entitled to trademark protection.

**COUNTERCLAIM XLVII: DECLARATION OF NONINFRINGEMENT OF BLENDER-
BOTTLE'S UNREGISTERED BOTTLE TRADE DRESS.**

1131.   Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1132.   This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's Unregistered Bottle Trade Dress. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1133.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1134.   Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (b) constitute unfair competition or trademark infringement under state statutory or common law; (c) constitute dilution in violation of 15 U.S.C. § 1125(c) or state law; or (d) otherwise violate state or federal law.

1135.   Considering, among other things, the crowded shaker bottle market and millions of similar shaker bottles sold each year by numerous companies, there is no likelihood of confusion between the Accused Products and the shaker bottle design claimed by BlenderBottle's Unregistered Bottle Trade Dress.

1136.   Hydra Cup's Accused Products were designed and modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent. Tens of millions of these exact same shaker bottle designs have been manufactured by Tianqi and sold to hundreds of companies that sell these same designs in the United States.

1137.   The Unregistered Bottle Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The design is not widely recognized by the general public as a designation of the source of BlenderBottle's goods.

1138. Hydra Cup began using its shaker bottle designs, which are based on designs licensed from third party Tianqi, before BlenderBottle's Unregistered Bottle Trade Dress allegedly became famous. As such, Hydra Cup's use is not actionable under 15 U.S.C. § 1125(c)(1). Millions of these same shaker bottle designs have been sold throughout the United States for over a decade.

1139. Hydra Cup's use of its shaker bottle designs does not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup bottles have numerous differences in shape, configuration, proportions, textures, and overall appearance compared to BlenderBottle's design. The products are being sold in similar channels to similar consumers, which negates any dilution by blurring.

1140. Hydra Cup always displays its own distinct brand name and logo on its products and packaging, further distinguishing them from BlenderBottle's goods and dispelling any likelihood of dilution or confusion.

1141. Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute infringement of BlenderBottle's alleged trade dress rights.

1142. Hydra Cup's prominent marking of its shaker bottles with its own well-known trademarks precludes any likelihood of confusion as to the source or affiliation of Hydra Cup's products.

1143. Consumer reviews confirm there is no actual confusion between the Accused Products and BlenderBottle's Unregistered Bottle Trade Dress.

1144. Even if BlenderBottle could establish some valid trade dress rights in its Unregistered Bottle Trade Dress, Hydra Cup's Accused Products do not infringe those rights.

1145. Hydra Cup's Accused Products do not infringe BlenderBottle's Unregistered Bottle Trade Dress because Hydra Cup's product designs and trade dress are distinct and not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1146. To the extent any similarities exist between the Accused Products and BlenderBottle's design, those similarities are based on functionality and common elements in the public domain, used by third parties, such that there is no source identification.

1    1147.  Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not in-

2         fringe BlenderBottle's Unregistered Bottle Trade Dress and the Accused Products are not likely

3         to be confused with BlenderBottle's alleged trade dress.

4    1148.  Accordingly, this Court should declare that the Accused Products do not infringe Blender-

5         Bottle's rights in its Unregistered Bottle Trade Dress.

6         **COUNTERCLAIM XLVIII: DECLARATION THAT BLENDERBOTTLE'S UNREGIS-**
7         **TERED LABEL TRADE DRESS IS GENERIC.**

8    1149.  Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

9         herein, its allegations in each and every preceding paragraph above.

10   1150.  This is a declaratory judgment action under the Trademark Laws of the United States, 15

11        U.S.C. § 1051 et seq. (the "Trademark Act"), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory

12        Judgment Act) seeking a declaratory judgment that BlenderBottle's Unregistered Label Trade

13        Dress is generic.

14   1151.  This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§

15        1331, 1338(a), 2201, and 2202.

16   1152.  An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

17        concerning whether Hydra Cup's Accused Products infringe BlenderBottle's Unregistered La-

18        bel Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, Blender-

19        Bottle's belief that Hydra Cup infringed the Unregistered Label Trade Dress. Thus, as a result

20        of the acts described in the foregoing paragraphs, there exists a substantial controversy of suffi-

21        cient immediacy to warrant the issuance of a declaratory judgment.

22   1153.  BlenderBottle's claimed Unregistered Label Trade Dress is a generic label design commonly

23        used in the industry. The basic elements - a wraparound label with a brand name, product

24        name, capacity information, and colored accents - are ubiquitous features dictated by the need

25        to convey basic product information, rather than serving as unique source identifiers.

26   1154.  Numerous third-party shaker bottle labels employ the same generic combination of a wrap-

27        around label, brand name, product name, capacity, and accent colors. This widespread use of

235

1     the same basic label elements precludes BlenderBottle from claiming those common features as

2     its own proprietary trade dress.

3     1155.   The individual elements and overall configuration of the Unregistered Label Trade Dress are

4         all dictated by the functional requirements of clearly displaying essential product information

5         to consumers. The design does not include any arbitrary embellishments that are conceptually

6         separable from the label's informational function.

7     1156.   In sum, BlenderBottle's Unregistered Label Trade Dress is a generic design that consists of

8         common informational features used across the industry. Such generic designs cannot be trade

9         dress, as a matter of law, regardless of sales, advertising, or other alleged secondary meaning.

10        BlenderBottle has failed to identify any distinctive, non-functional features that warrant trade

11        dress protection. Accepting BlenderBottle's position would improperly allow it to monopolize

12        the basic design of shaker bottle labels, preventing competitors from using these essential infor-

13        mational features. The Court should therefore rule that BlenderBottle's claimed Unregistered

14        Label Trade Dress is generic and unprotectable.

15    1157.   Hydra Cup is entitled to a declaration that the Unregistered Label Trade Dress is generic and

16        therefore not protectable under federal trademark law.


17        **COUNTERCLAIM XLIX: DECLARATION THAT BLENDERBOTTLE'S UNREGIS-**
18        **TERED LABEL TRADE DRESS IS PRIMARILY FUNCTIONAL.**

19    1158.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

20        herein, its allegations in each and every preceding paragraph above.

21    1159.   This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Label

22        Trade Dress is not valid or protectable due to its primarily functional design. This Court has

23        subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a),

24        2201, and 2202.

25    1160.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and

26        BlenderBottle because in the Complaint filed in the present action, BlenderBottle alleged that it

27        has valid and protectable trade dress rights in its Unregistered Label Trade Dress and that the

28        Accused Products infringe BlenderBottle's purported trade dress rights.

1161. BlenderBottle's Unregistered Label Trade Dress is primarily functional and therefore is not protectable as trade dress.

1162. The individual elements and overall configuration of the Unregistered Label Trade Dress are all dictated by the functional need to clearly convey essential product information to consumers, such as the brand, product name, and capacity. The layout, colors, and text are selected to optimize legibility, not to serve as unique source identifiers.

1163. The wraparound label design allows the product information to be displayed prominently and permits consumers to easily view it from multiple angles. This is a functional requirement for any informational label on a cylindrical bottle.

1164. The Unregistered Label Trade Dress simply assembles common informational elements (brand name, product name, capacity) in a standard label configuration (wraparound design, colored accents). This basic combination is driven by the functional purpose of providing product details in a clear manner, not by any source-identifying role.

1165. Numerous companies in the industry use functionally equivalent labels with the same key informational elements in a similar configuration, confirming that the design is principally dictated by function, not source identification.

1166. Accordingly, because BlenderBottle's Unregistered Label Trade Dress is primarily functional, it is not protectable as trade dress under the Lanham Act.

1167. Hydra Cup is therefore entitled to a declaration that the shaker bottle label design claimed by BlenderBottle's Unregistered Label Trade Dress is primarily functional and invalid as trade dress.

**COUNTERCLAIM L: DECLARATION THAT BLENDERBOTTLE'S UNREGISTERED LABEL TRADE DRESS HAS NOT ACQUIRED SECONDARY MEANING.**

1168. Hydra Cup hereby incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1169. This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Label Trade Dress is not valid or protectable due to lack of acquired distinctiveness and that the Un-

1    registered Label Trade Dress has not acquired secondary meaning. This Court has subject mat-

2    ter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and

3    2202.

4    1170.  A justiciable case or actual controversy has arisen and exists between Hydra Cup and

5    BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged

6    that it has a valid and protectable trade dress and that the Accused Products infringe Blender-

7    Bottle's purported trade dress rights.

8    1171.  BlenderBottle's Unregistered Label Trade Dress is not inherently distinctive as a matter of

9    law and has not acquired secondary meaning in the minds of consumers as indicating a single

10    source, affiliation, or sponsorship.

11    1172.  BlenderBottle's Unregistered Label Trade Dress does not serve as a source indicator due to

12    the prevalence of third-party shaker bottles exhibiting labels with the same basic elements

13    claimed by BlenderBottle. Numerous competitors use labels with a brand name, product name,

14    capacity, and accent colors in a similar configuration.

15    1173.  Because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's man-

16    ufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or

17    infringement of BlenderBottle's alleged trade dress rights.

18    1174.  Hydra Cup's prominent use of its own distinct brand name, logo, and label design precludes

19    any likelihood of confusion as to the source or other affiliation of Hydra Cup's products.

20    1175.  Accordingly, BlenderBottle's Unregistered Label Trade Dress is invalid and unenforceable.


21    **COUNTERCLAIM LI: DECLARATION OF NONINFRINGEMENT OF BLENDERBOT-**
22    **TLE'S UNREGISTERED LABEL TRADE DRESS.**

23    1176.  Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth

24    herein, its allegations in each and every preceding paragraph above.

25    1177.  This is a cause of action for declaratory judgment that the Accused Products do not infringe

26    BlenderBottle's Unregistered Label Trade Dress. This Court has subject matter jurisdiction

27    over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1178.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1179.   Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (b) constitute unfair competition or trademark infringement under state statutory or common law; (c) constitute dilution in violation of 15 U.S.C. § 1125(c) or state law; or (d) otherwise violate state or federal law.

1180.   Considering the crowded shaker bottle market and the common use of labels displaying brand names, product names, and capacity information in similar configurations, there is no likelihood of confusion between the Accused Products and the label design claimed by BlenderBottle's Unregistered Label Trade Dress.

1181.   Hydra Cup's labels use a different layout, color scheme, graphical elements, and text compared to BlenderBottle's label design. Hydra Cup prominently features its own distinct "HYDRA CUP" brand name in a unique font and style.

1182.   The Unregistered Label Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The design is not widely recognized by the general public as a designation of the source of BlenderBottle's goods.

1183.   Hydra Cup's label designs do not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup labels have numerous differences in layout, colors, text, and overall appearance compared to BlenderBottle's design.

1184.   Hydra Cup always displays its own distinct brand name and logo on its labels, further distinguishing them from BlenderBottle's labels and dispelling any likelihood of dilution or confusion.

1  1185.  Furthermore, as discussed above, because BlenderBottle does not have a valid and pro-

2      tectable trade dress, Hydra Cup's use of its own label designs on the Accused Products cannot

3      constitute infringement of BlenderBottle's alleged trade dress rights.

4  1186.  Consumer reviews confirm there is no actual confusion between the Accused Products and

5      BlenderBottle's Unregistered Label Trade Dress.

6  1187.  Even if BlenderBottle could establish some valid trade dress rights in its Unregistered Label

7      Trade Dress, Hydra Cup's Accused Products do not infringe those rights.

8  1188.  Hydra Cup's labels do not infringe BlenderBottle's Unregistered Label Trade Dress because

9      Hydra Cup's label designs are distinct and not likely to cause consumer confusion as to source,

10      sponsorship, or affiliation.

11  1189.  To the extent any similarities exist between Hydra Cup's labels and BlenderBottle's label

12      design, those similarities are based on common informational elements used across the indus-

13      try, such that there is no source identification.

14  1190.  Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not in-

15      fringe BlenderBottle's Unregistered Label Trade Dress and Hydra Cup's labels are not likely to

16      be confused with BlenderBottle's alleged trade dress.

17  1191.  Accordingly, this Court should declare that Hydra Cup's Accused Products do not infringe

18      BlenderBottle's rights in its Unregistered Label Trade Dress.


19  **COUNTERCLAIM LII: DECLARATION THAT U.S. TRADEMARK REGISTRATION NO.**
20  **3,515,591 FOR THE TERM "BLENDER BALL" IS GENERIC, NOT PROTECTABLE UN-**
21  **DER TRADEMARK LAW, AND, THEREFORE, CANCELED.**

22  1192.  Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth

23      herein, its allegations in each and every preceding paragraph above.

24  1193.  BlenderBottle owns U.S. Trademark Registration No. 3,515,591 for the term BLENDER

25      BALL in International Class 021 for "Whisks, namely, agitators for mixing and blending food

26      and drinks" (the "591 Registration").

1194.   This is a cause of action for declaratory judgment that U.S. Trademark Registration No. 3,515,591 for the term BLENDER BALL is generic. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1195.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trademark and that Hydra Cup infringes BlenderBottle's purported trademark rights.187

1196.   The term "blender ball" is generic for agitators used for mixing and blending food and drinks. It combines the generic terms "blender," referring to a device that mixes or blends substances, and "ball," referring to the spherical shape of the agitator. The term "blender ball" as a whole is no more than the sum of its generic parts and is widely used by consumers and the trade to refer to the genus of spherical mixing agitators.

1197.   Numerous third parties use the term "blender ball" generically to describe their own spherical mixing agitators for blending food and drinks. Examples include the "Blender Bomb Blender Ball" by 1st Phorm, the "Blender Ball" by Gaspari Nutrition, the "Blender Ball" by SmartShake, the "Vortex Blender Ball" by Trimr, and many others. This widespread generic use by competitors confirms that "blender ball" is a generic term.

1198.   BlenderBottle's own generic use of "blender ball" is further evidence that the term is generic. BlenderBottle uses "blender ball" generically throughout its website, product packaging, and marketing materials to describe the genus of mixing agitators, not as a unique source identifier. For example, BlenderBottle's website states: "The surgical-grade stainless steel BlenderBall® is designed to remain in the cup while you drink, even if you're drinking plain water. It's designed to never rust, chip, or peel."

1199.   BlenderBottle has also used "blender ball" generically in its utility and design patent filings. For example, BlenderBottle's expired U.S. Patent No. 6,379,032 is titled "Blender Ball" and

---

187 (*See* Second Am. Compl., ¶ 46.).

1  generically describes a "wire whisk mixing apparatus having hemispherical mixing cavities for

2  use in a container intended to hold liquid."188

3  1200.   Under the Lanham Act, if a registered mark becomes the generic name for the goods or ser-

4       vices for which it is registered, the registration is subject to cancellation. 15 U.S.C. § 1064(3).

5       A mark is generic if it refers to the class or category of goods or services on or in connection

6       with which it is used.

7  1201.   Based on the overwhelming evidence that "blender ball" is a generic term for spherical mix-

8       ing agitators used to blend food and drinks, the 591 Registration is invalid and should be can-

9       celed on the ground of genericness. Hydra Cup is being damaged by the continued registration

10      of this generic term, which BlenderBottle has asserted against Hydra Cup in this litigation to al-

11      lege infringement and exclude Hydra Cup from using the common generic name for its agitator

12      products.

13 1202.   Hydra Cup has standing to petition to cancel the 591 Registration based on its demonstrated

14      interest in using the term "blender ball" to describe its own products, as well as its reasonable

15      belief that it will be damaged by the continued registration of this generic term.

16 1203.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's

17      BLENDERBOTTLE Mark in that Hydra Cup is prevented from using highly descriptive terms

18      that belong to the public domain.

19 1204.   Hydra Cup is entitled to a declaration that U.S. Trademark Registration No. 3,515,591 for

20      the term BLENDERBOTTLE is generic and therefore not protectable.

21 1205.   Accordingly, Hydra Cup respectfully requests that the Court declare the term "blender ball"

22      to describe a spherical mixing agitator is generic and that the Court enter an order cancelling

23      U.S. Trademark Registration No. 3515591 as generic.

24 1206.   BlenderBottle's U.S. Trademark Registration No. 3,515,591 for the term BLENDER BALL

25      should be canceled pursuant to 15 U.S.C. §§ 1064(3) and 1119 as the alleged trademark is

26      generic and therefore cannot possibly identify any single source.

_____

188 (Ex. 31, U.S. Patent No. 6,379,032 (filed 18 February 2000)).

**COUNTERCLAIM LIII: DECLARATORY JUDGMENT THAT U.S. TRADEMARK REG-ISTRATION NO. 4,894,363 FOR THE TERM "BLENDERBOTTLE" IS GENERIC, NOT PROTECTABLE UNDER TRADEMARK LAW, AND, THEREFORE, CANCELED.**

1207.   Hydra Cup repeats, realleges, and hereby incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1208.   BlenderBottle owns U.S. Trademark Registration No. 4,894,363 for the term BlenderBottle. in International Class 021 for the following goods: "Containers for household or kitchen use, namely, bottles with internal agitators for mixing ingredients; Mixing cups, namely, shaker cups, sold empty; Containers for household or kitchen use, namely, bottles with non-electric internal agitators for mixing ingredients, for beverages, liquid foods, and/or powdered foods, sold empty; Containers for household or kitchen use, namely, interlocking plastic or glass containers with optional carrying handle, sold empty; Containers for household or kitchen use, namely, plastic, glass and stainless steel containers for use with beverages, liquid foods, dry and/or powdered foods, sold empty; Containers for household or kitchen use; Household containers for foods; Plastic storage containers for household or domestic use; Containers for personal household use for food, medications, vitamins and supplements, water and/or beverages, sold empty; Whisks, namely, agitators for mixing and blending food and drinks; Insulated water bottle holders in the nature of thermal insulated wrap for containers to keep the contents cold [ ; Water bottle belts for running, hiking, biking; Plastic water bottle holders and attached carabiner clip sold as a unit ]".

1209.   This is a cause of action for declaratory judgment that the U.S. Trademark Registration No. 4,894,363 for the term BLENDERBOTTLE is generic for shaker bottles. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1210.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trademark and that Hydra Cup infringes BlenderBottle's purported trademark rights.[189]

---

189 (*See* Second Am. Compl., ¶ 46.).

1   1211.  BlenderBottle's registered trademark for the term BLENDERBOTTLE is generic and there-

2        fore not entitled to trademark protection.

3   1212.  The consuming public uses the term "BLENDERBOTTLE" to refer to the genus or class of

4        which a particular product is a member.190 The term "BLENDERBOTTLE" is not protectable

5        as trademarks because it does not identify the source of a product, but rather the product itself.

6   1213.  The term "blender bottle" is a generic name for the class of products that BlenderBottle

7        sells—namely, bottles with built-in mixing mechanisms for blending beverages. The term

8        "blender" describes the function of the product—blending or mixing—while the term "bottle"

9        describes the type of product (a container for holding liquids). Putting these two generic terms

10       together to form the compound term "blender bottle" does not create a protectable trademark.

11       Rather, "blender bottle" remains a generic term that consumers understand to refer to the class

12       of products, not a single brand.

13  1214.  Numerous third-parties in the industry use the term "blender bottle" generically to describe

14       their products. A simple Google search for "blender bottle" returns dozens of results for various

15       brands of shake mixer bottles, not just BlenderBottle's products. This widespread generic use

16       of the term by competitors and consumers shows that "blender bottle" is a generic product

17       name, not a brand-specific trademark.

18  1215.  Upon information and belief, hundreds of customer reviews on Amazon, YouTub, Insta-

19       gram, Ebay, and other popular online websites show consumers generally use the verbs

20       "blender bottle" and "shaker bottle" interchangeably as a verb to describe the functionality of a

21       manual blending apparatus. And the Internet Archive shows such generic use of the term has

22       been consistent over time.

23  1216.  For example, Google Trends data shows largely interchangeable and coextensive use of

24       "blender bottle" and "shaker bottle" over an 18-year period is strong evidence that consumers

25       perceive "blender bottle" as a generic term for the class of shake mixer bottles, rather than as a

26       distinctive brand. This data confirms that "blender bottle" is not functioning as a source identi-

---

190 *See, e.g.*, Ex. 36, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023) ("repeatedly using the term"blender bottle" to refer to an entire category of spe- cific products).

1  fier deserving of trademark protection, thereby further showing that BlenderBottle's

2  BLENDER BOTTLE mark is generic and should be canceled. The attached Google Trends

3  graph compares the relative search interest over time for the terms "blender bottle" and "shaker

4  bottle" from January 2004 to the present day. This data provides compelling evidence that the

5  term "blender bottle" is generic and not protectable as a trademark. First, the graph shows that

6  "blender bottle" and "shaker bottle" have had very similar levels of search interest over the past

7  18 years. In many periods, the search interest for the two terms is nearly identical, with the

8  lines overlapping or closely tracking each other. This parallel interest strongly suggests that

9  consumers see "blender bottle" and "shaker bottle" as interchangeable, generic terms for the

10  same category of products, rather than viewing "blender bottle" as a brand-specific trademark.

11  Second, the overall volume of searches for "blender bottle" and "shaker bottle" is roughly

12  equivalent over the full time period. Neither term consistently outpaces the other, indicating

13  that both are commonly used by the public to refer to the same type of goods. If "blender bot-

14  tle" was functioning as a distinctive source identifier, one would expect to see it garner signifi-

15  cantly more search interest than the generic "shaker bottle" term, but that is not the case here.

16  Third, the graph shows that interest in both "blender bottle" and "shaker bottle" has grown sub-

17  stantially since 2004 and particularly in the last 5-10 years. This rising interest tracks the in-

18  creasing popularity of these products in the marketplace. Notably, both terms have seen similar

19  growth trajectories, suggesting the public sees them as interrelated and referring to the same

20  trending product category. Fourth, there does not appear to be any significant divergence be-

21  tween the search interest for "blender bottle" and "shaker bottle" following BlenderBottle's

22  claimed first use of the BLENDER BOTTLE mark in January 2004. If the term "blender bot-

23  tle" had acquired secondary meaning as a trademark, one would expect the search volume for

24  that term to decouple from the generic "shaker bottle" term and grow independently as the

25  brand gained popularity. The absence of any such trend indicates consumers continue to see

26  "blender bottle" primarily as a generic product name, not a brand.191

27  1217.  Upon information and belief, a majority of consumers understand "blender bottle" to be a

28  generic term. Upon information and belief, when asked "What is a BLENDERBOTTLE?",

---

191 *See* Ex. 37, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024).

most consumers give a generic descriptions like "a water bottle with something inside to help mix the contents" or "a drink container that has an insert for blending or mixing what you put in it." Upon information and belief, only a small percentage of relevant consumers mentioned BlenderBottle as a brand. Upon information and belief, there is strong evidence that most consumers primarily understand "blender bottle" to mean the class of products, not BlenderBottle's brand.

1218. BlenderBottle cannot escape the genericness of its mark by capitalizing the "B" in BLENDERBOTTLE or deleting the space between the words. These minor stylizations do not change the generic nature of the term. Consumers who see the term BLENDERBOTTLE still immediately understand it to refer to the class of blender bottles, even if they also recognize BlenderBottle as one brand within that class.

1219. The fact that the USPTO registered the BLENDERBOTTLE mark on the Principal Register is not dispositive. Those proceedings did not involve the same evidentiary record presented here. The presumption of validity is rebuttable by the greater weight of evidence in this case showing genericness.

1220. The genericness of BLENDERBOTTLE is further demonstrated by BlenderBottle's lack of enforcement against the many competitors using "blender bottle" to describe their products. If the term was a valid trademark, BlenderBottle would be expected to police the market and prevent competitors from using the term. Its failure to do so shows that even BlenderBottle recognizes "blender bottle" is a generic term.

1221. The evidence overwhelmingly shows that consumers primarily understand BLENDERBOTTLE to be a generic term for the class of shake mixer bottles, not a trademark identifying the source of BlenderBottle's products. Accordingly, the Court should cancel BlenderBottle's trademark registration and rule that BLENDERBOTTLE is unprotectable as a matter of law.

1222. Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's U.S. Trademark Registration No. 4,894,363 in that Hydra Cup is prevented from using highly descriptive terms that belong to the public domain.

1223. Hydra Cup is entitled to a declaration that U.S. Trademark Registration No. 4,894,363 for
the term BLENDERBOTTLE is generic and therefore not protectable.

1224. Accordingly, BlenderBottle's U.S. Trademark Registration No. 4,894,363 for the term
BLENDERBOTTLE should be canceled pursuant to 15 U.S.C. §§ 1064(3) and 1119 as the al-
leged trademark is generic and therefore cannot possibly identify any single source.

## COUNTERCLAIM LIV: DECLARATION THAT THE BLENDERBOTTLE MARK HAS NOT ACQUIRED DISTINCTIVENESS.

1225. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth
herein, its allegations in each and every preceding paragraph above.

1226. BlenderBottle is the owner of U.S. Trademark Registration No. 4,894,363 for the mark
BLENDERBOTTLE for "Plastic bottles sold empty; plastic bottles sold containing an agitator
for mixing contents" (the "'363 Registration").

1227. The BLENDERBOTTLE mark is highly descriptive of BlenderBottle's goods, as it directly
conveys the nature and key characteristics of the goods - namely, bottles designed for blending
and mixing contents.

1228. Due to the descriptive nature of the BLENDERBOTTLE mark, it is not inherently distinctive
and can only be protected upon a showing of acquired distinctiveness or secondary meaning.

1229. The BLENDERBOTTLE mark has not acquired distinctiveness or secondary meaning in the
minds of the consuming public. Consumers perceive the mark as a generic term describing the
type of product - a bottle used for blending - rather than as a distinctive brand signifying
BlenderBottle as the exclusive source of the goods.

1230. BlenderBottle's own use of the BLENDERBOTTLE mark, as well as widespread use by
third parties and consumers, demonstrates the mark's primary significance as a descriptive term
for the goods, not as a source identifier.

1231. BlenderBottle's sales, advertising, and promotional efforts related to the BLENDERBOT-
TLE mark are insufficient to establish secondary meaning or transform the descriptive term
into a distinctive brand in the minds of consumers.

1232. Accordingly, there is an actual and justiciable controversy between Hydra Cup and Blender-Bottle regarding the validity and enforceability of the '363 Registration.

1233. Pursuant to 28 U.S.C. §§ 2201-2202, Hydra Cup seeks a declaration from this Court that the BLENDERBOTTLE mark has not acquired distinctiveness and that the '363 Registration is invalid and unenforceable.

## COUNTERCLAIM LV: DECLARATION THAT THE BLENDER BALL MARK HAS NOT ACQUIRED DISTINCTIVENESS.

1234. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1235. BlenderBottle is the owner of U.S. Trademark Registration No. 3,515,591 for the mark BLENDER BALL for "Wire whisk balls for mixing and blending contents of bottles or containers that include integrated mixing systems" (the "'591 Registration").

1236. The BLENDER BALL mark is highly descriptive of BlenderBottle's goods, as it directly conveys the key characteristics and function of the goods - specifically, spherical wire agitators used to blend and mix the contents of bottles.

1237. Due to the descriptive nature of the BLENDER BALL mark, it is not inherently distinctive and can only be protected upon a showing of acquired distinctiveness or secondary meaning.

1238. The BLENDER BALL mark has not acquired distinctiveness or secondary meaning in the minds of the consuming public. Consumers perceive the mark as a generic term describing the type of product - a spherical wire blending agitator - rather than as a distinctive brand signifying BlenderBottle as the exclusive source of the goods.

1239. BlenderBottle's own use of the BLENDER BALL mark, as well as widespread use by third parties and consumers, demonstrates the mark's primary significance as a descriptive term for the goods, not as a source identifier.

1240. BlenderBottle's sales, advertising, and promotional efforts related to the BLENDER BALL mark are insufficient to establish secondary meaning or transform the highly descriptive term into a distinctive brand in the minds of consumers.

1241. Accordingly, there is an actual and justiciable controversy between Hydra Cup and Blender-Bottle regarding the validity and enforceability of the '591 Registration.

1242. Pursuant to 28 U.S.C. §§ 2201-2202, Hydra Cup seeks a declaration from this Court that the BLENDER BALL mark has not acquired distinctiveness and that the '591 Registration is invalid and unenforceable.

**COUNTERCLAIM LVI: DECLARATORY JUDGMENT THAT THE USE OF THE TERMS "BLENDERBOTTLE" AND "BLENDER BALL" CONSTITUTES PERMISSIBLE FAIR USE.**

1243. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in each and every preceding paragraph above.

1244. An actual controversy exists between Hydra Cup and BlenderBottle as to whether use of the terms "BLENDERBOTTLE" to describe a shaker bottle that allows manually blending liquids "BLENDER BALL" to describe a wire whisk mixing ball constitutes trademark infringement.

1245. The public, including Hydra Cup, needs the term "BLENDERBOTTLE" to accurately describe the functionality of shaker bottles, which allow users to manually blend protein shakes, smoothies, and other drinks by shaking the bottle. The term communicates and describes to consumers the utilitarian purpose and characteristics of shaker bottle products.

1246. Similarly, the public, including Hydra Cup, needs "BLENDER BALL" to truthfully describe the wire whisk mixing apparatus included in its shaker bottles to blend the contents. The term literally describes what the device is and does—a ball-shaped implement that helps blend liquids.

1247. Hydra Cup does not use the terms "BLENDERBOTTLE" or "BLENDER BALL" as trademarks to indicate the source of its products. Hydra Cup prominently displays its own distinctive "HYDRA CUP" trademark on its shaker bottles to designate their origin. Any use of "BLENDERBOTTLE" or "BLENDER BALL" is strictly for the terms' common descriptive meanings, not as source identifiers.

1248. Hydra Cup's use of "BLENDERBOTTLE" and "BLENDER BALL" is also fair and in good faith. Hydra Cup does not use the terms in a deceptive or misleading manner. Its placement and

1     use of the terms alongside its own branding minimizes any risk that consumers will understand

2     them as trademarks.

3   1249.   Under 15 U.S.C. § 1115(b)(4), Hydra Cup is permitted to use the terms "BLENDERBOT-

4     TLE" and "BLENDER BALL" fairly and in good faith to describe the characteristics and func-

5     tionality of its products. Hydra Cup is not prevented from using these terms in their ordinary

6     descriptive sense.

7   1250.   BlenderBottle's linguistic monopoly on the terms "BLENDERBOTTLE" and "BLENDER

8     BALL" is robbing the public of words necessary to the English language. Hydra Cup therefore

9     contends that any use of the terms constitutes descriptive fair.

10   1251.   Accordingly, Hydra Cup seeks a declaratory judgment that the descriptive use of

11     "BLENDERBOTTLE" to accurately depict a shaker bottle that blends liquids manually, and

12     "BLENDER BALL" to truthfully describe a mixing ball that blends the bottle's contents, is

13     permissible fair use and does not infringe U.S. Trademark Registration No. 3,515,591 or U.S.

14     Trademark Registration No. 4,894,363 that are owned by BlenderBottle.

15   **COUNTERCLAIM LVII: PATENT INFRINGEMENT OF U.S. PATENT NO. D666,047.**

16   1252.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

17     herein, its allegations in each and every preceding paragraph above.

18   1253.   Tianqi granted Hydra Cup an explicit license to the D047 Patent, including the right to en-

19     force the rights of the D047 Patent against third parties infringing the D047 Patent.

20   1254.   Upon information and belief, BlenderBottle has been and is infringing U.S. Patent

21     No. D666,047 by making, using, selling, or offering for sale in the United States, or importing

22     into the United States, including within this judicial district, shaker bottles and lids that embody

23     the design claimed in the D047 Patent, including BlenderBottle's Infringing Products, in viola-

24     tion of 35 U.S.C. § 271(a).

25   1255.   Upon information and belief, BlenderBottle has been and is inducing infringement of the

26     D047 Patent by actively and knowingly inducing others to make, use, sell, offer for sale, or im-

1     port BlenderBottle's Infringing Products that embody or use the design claimed in the D047

2     Patent, in violation of 35 U.S.C. § 271(b).

3   1256.   Upon information and belief, BlenderBottle has been and is contributing to the infringement

4     of the D047 Patent by selling or offering to sell tBlenderBottle's Infringing Products, knowing

5     them to be especially made or especially adapted for practicing the invention of the D047

6     Patent and not a staple article or commodity of commerce suitable for substantial non-infring-

7     ing use, in violation of 35 U.S.C. § 271(c).

8   1257.   Upon information and belief, BlenderBottle has been and is infringing, contributing to the

9     infringement of, and inducing the infringement of the D047 Patent by making, using, selling, or

10     offering for sale in the United States, or importing into the United States, including within this

11     judicial district, shaker bottles and lids, including BlenderBottle's Infringing Products.

12   1258.   BlenderBottle's infringement has been, and continues to be knowing, intentional, and willful.

13   1259.   BlenderBottle's acts of infringement of the D047 Patent have caused and will continue to

14     cause Hydra Cup damages for which Hydra Cup is entitled to compensation pursuant to 35

15     U.S.C. § 284.

16   1260.   BlenderBottle's acts of infringement of the D047 Patent have caused and will continue to

17     cause Hydra Cup immediate and irreparable harm unless such infringing activities are enjoined

18     by this Court pursuant to 35 U.S.C. § 283. Hydra Cup has no adequate remedy at law.

19   1261.   This case is exceptional and, therefore, Hydra Cup is entitled to an award of attorneys' fees

20     pursuant to 35 U.S.C. § 285.

21   **COUNTERCLAIM LVIII: PATENT INFRINGEMENT OF U.S. PATENT NO. D766,029.**

22   1262.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

23     herein, its allegations in each and every preceding paragraph above.

24   1263.   Tianqi granted Hydra Cup an implied license to U.S. Patent No. D766,029 (the "D029

25     Patent"), including the right to enforce the rights of the D029 Patent against third parties in-

26     fringing the D029 Patent.

1264.  Upon information and belief, BlenderBottle has been and is infringing the D029 Patent by making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, shaker bottles and lids that embody the design claimed in the D029 Patent, including BlenderBottle's Infringing Products, in violation of 35 U.S.C. § 271(a).

1265.  Upon information and belief, BlenderBottle has been and is inducing infringement of the D029 Patent by actively and knowingly inducing others to make, use, sell, offer for sale, or import BlenderBottle's Infringing Products that embody or use the design claimed in the D029 Patent, in violation of 35 U.S.C. § 271(b).

1266.  Upon information and belief, BlenderBottle has been and is contributing to the infringement of the D029 Patent by selling or offering to sell the Infringing Products, knowing them to be especially made or especially adapted for practicing the invention of the D029 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, in violation of 35 U.S.C. § 271(c).

1267.  Upon information and belief, BlenderBottle has been and is infringing, contributing to the infringement of, and inducing the infringement of the D029 Patent by making, using, selling, or offering for sale in the United States, or importing into the United States, including within this judicial district, shaker bottles and lids, including BlenderBottle's Infringing Products.

1268.  BlenderBottle's infringement has been, and continues to be knowing, intentional, and willful.

1269.  BlenderBottle's acts of infringement of the D029 Patent have caused and will continue to cause Hydra Cup damages for which Hydra Cup is entitled to compensation pursuant to 35 U.S.C. § 284.

1270.  BlenderBottle's acts of infringement of the D029 Patent have caused and will continue to cause Hydra Cup immediate and irreparable harm unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283. Hydra Cup has no adequate remedy at law.

1271.  This case is exceptional and, therefore, Hydra Cup is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM LIX: DECLARATION OF INVALIDITY OF U.S. PATENT NO. 9,216,843.**

1272.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

1273.   This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. 9,216,843. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1274.   The 843 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limita- tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 172, and 282.

1275.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the 843 Patent because BlenderBottle filed the Complaint in this ac- tion against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing "classic simple shaker" bottle and lid designs that are virtually identical to the invention dis- closed by BlenderBottle's 843 Patent, and BlenderBottle contends the 843 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representa- tive samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 843 Patent. BlenderBottle has also accused Hydra Cup of infringing the 843 Patent in multiple cease and desist letters served on Hydra Cup and threatened to file a lawsuit against Hydra Cup for the alleged infringement of the 843 Patent.

1276.   The 843 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub- ject matter of the 843 Patent.

1277.   The 843 Patent is invalid because the claims therein were known or used in the prior art be- fore the filing date of the 843 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

1278.   The 843 Patent is invalid because the claims therein were known or used in the prior art be- fore the filing of the 843 Patent and therefore the invention claimed by the 843 Patent was ob- vious in view of the prior art under 35 U.S.C. § 103.

1279. The 843 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

1280. Accordingly, Hydra Cup is entitled to a declaration of invalidity of the 843 Patent under 35 U.S.C. §§ 101, 102, 103, and 112.

1281. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM LX: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 9,216,843**

1282. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

1283. BlenderBottle claims to be the owner of U.S. Patent No. 9,216,843.

1284. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding infringement of the 843 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 843 Patent, and BlenderBottle contends the 843 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 843 Patent. BlenderBottle alleges that Hydra Cup has infringed and continues to infringe the 843 Patent by making, using, offering to sell, selling, and/or importing the Accused Products, which allegedly embody the inventions claimed in the 843 Patent. BlenderBottle has also accused Hydra Cup of infringing the 843 Patent in multiple cease and desist letters served on Hydra Cup and threatened to file a lawsuit against Hydra Cup for the alleged infringement of the 843 Patent.

1285. Hydra Cup denies that it has infringed or is infringing any valid and enforceable claim of the 843 Patent, either directly, contributorily, or by inducement, literally or under the doctrine of equivalents.

1286. The Accused Products do not infringe the 843 Patent because they do not include each and every element of any asserted claim, either literally or under the doctrine of equivalents.

254

1287. Hydra Cup has not and does not induce or contribute to infringement of the 843 Patent be-
cause the Accused Products do not directly infringe the patent for the reasons stated above. Hy-
dra Cup also lacks the requisite knowledge and intent to induce or contribute to any alleged in-
fringement by others.

1288. Accordingly, there is an actual, substantial, and justiciable controversy between Hydra Cup
and BlenderBottle concerning the alleged infringement of the 843 Patent.

1289. Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not in-
fringe, directly or indirectly, any valid and enforceable claim of the 843 Patent.

1290. This is an exceptional case entitling Hydra Cup to an award of its attorneys' fees incurred in
connection with this action pursuant to 35 U.S.C. § 285.

## COUNTERCLAIM LXI: DECLARATION OF INVALIDITY OF U.S. PATENT NO. 9,492,024.

1291. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth
herein, its allegations in all preceding Counterclaim paragraphs above.

1292. This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. 9,492,024.
This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§
1331, 1338(a), 2201, and 2202.

1293. The 024 Patent is invalid for failure to comply with one or more provisions of the Patent
Laws of the United States of America, Title 35, United States Code, including without limita-
tion, 35 U.S.C. §§ 101, 102, 103, 112, 119, 172, and 282.

1294. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle
regarding the validity of the 024 Patent because BlenderBottle filed the Complaint in this ac-
tion against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing
"classic simple shaker" bottle and lid designs that are virtually identical to the invention dis-
closed by BlenderBottle's 024 Patent, and BlenderBottle contends the 024 Patent is valid and
enforceable. Furthermore, upon information and belief, when Hydra Cup requested representa-
tive samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted
Product practicing the invention disclosed by the 024 Patent. BlenderBottle has also accused

1   Hydra Cup of infringing the 024 Patent in multiple cease and desist letters served on Hydra

2   Cup and threatened to file a lawsuit against Hydra Cup for the alleged infringement of the 024

3   Patent.

4   1295.  The 024 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the sub-

5   ject matter of the 024 Patent.

6   1296.  The 024 Patent is invalid because the claims therein were known or used in the prior art be-

7   fore the filing date of the 024 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in

8   view of the prior art.

9   1297.  The 024 Patent is invalid because the claims therein were known or used in the prior art be-

10   fore the filing of the 024 Patent and therefore the invention claimed by the 024 Patent was ob-

11   vious in view of the prior art under 35 U.S.C. § 103.

12   1298.  The 024 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

13   1299.  Accordingly, Hydra Cup is entitled to a declaration of invalidity of the 024 Patent under 35

14   U.S.C. §§ 101, 102, 103, and 112.

15   1300.  This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable

16   costs and attorneys' fees awarded to Hydra Cup.

17   **COUNTERCLAIM LXII: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT**
18                                          **NO. 9,492,024**

19   1301.  Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

20   herein, its allegations in all preceding Counterclaim paragraphs above.

21   1302.  BlenderBottle claims to be the owner of U.S. Patent No. 9,492,024.

22   1303.  An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

23   regarding infringement of the 024 Patent because BlenderBottle filed the Complaint in this ac-

24   tion against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing

25   shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 024

26   Patent, and BlenderBottle contends the 024 Patent is valid and enforceable. Furthermore, upon

27   information and belief, when Hydra Cup requested representative samples of BlenderBottle's

256

1     Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention

2     disclosed by the 024 Patent. BlenderBottle alleges that Hydra Cup has infringed and continues

3     to infringe the 024 Patent by making, using, offering to sell, selling, and/or importing the Ac-

4     cused Products, which allegedly embody the inventions claimed in the 024 Patent. BlenderBot-

5     tle has also accused Hydra Cup of infringing the 024 Patent in multiple cease and desist letters

6     served on Hydra Cup and threatened to file a lawsuit against Hydra Cup for the alleged in-

7     fringement of the 024 Patent.

8 1304.   Hydra Cup denies that it has infringed or is infringing any valid and enforceable claim of the

9     024 Patent, either directly, contributorily, or by inducement, literally or under the doctrine of

10     equivalents.

11 1305.   The Accused Products do not infringe the 024 Patent because they do not include each and

12     every element of any asserted claim, either literally or under the doctrine of equivalents.

13 1306.   Hydra Cup has not and does not induce or contribute to infringement of the 024 Patent be-

14     cause the Accused Products do not directly infringe the patent for the reasons stated above. Hy-

15     dra Cup also lacks the requisite knowledge and intent to induce or contribute to any alleged in-

16     fringement by others.

17 1307.   Accordingly, there is an actual, substantial, and justiciable controversy between Hydra Cup

18     and BlenderBottle concerning the alleged infringement of the 024 Patent.

19 1308.   Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not in-

20     fringe, directly or indirectly, any valid and enforceable claim of the 024 Patent.

21 1309.   This is an exceptional case entitling Hydra Cup to an award of its attorneys' fees incurred in

22     connection with this action pursuant to 35 U.S.C. § 285.

23 **COUNTERCLAIM LXIII: DECLARATION OF INVALIDITY OF U.S. PATENT NO.**
24 **10,165,877.**

25 1310.   Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

26     herein, its allegations in all preceding Counterclaim paragraphs above.

1311.   This is a cause of action for declaratory judgment of invalidity of U.S. Patent No. 10,165,877. This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

1312.   The 877 Patent is invalid for failure to comply with one or more provisions of the Patent Laws of the United States of America, Title 35, United States Code, including without limitation, 35 U.S.C. §§ 101, 102, 103, 112, 119, 172, and 282.

1313.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding the validity of the 877 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing "classic simple shaker" bottle and lid designs that are virtually identical to the invention disclosed by BlenderBottle's 877 Patent, and BlenderBottle contends the 877 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 877 Patent. BlenderBottle has also accused Hydra Cup of infringing the 877 Patent in multiple cease and desist letters served on Hydra Cup and threatened to file a lawsuit against Hydra Cup for the alleged infringement of the 877 Patent.

1314.   The 877 Patent is invalid under 35 U.S.C. § 102 for failing to name the inventors of the subject matter of the 877 Patent.

1315.   The 877 Patent is invalid because the claims therein were known or used in the prior art before the filing date of the 877 Patent, and, therefore, is anticipated under 35 U.S.C. § 102 in view of the prior art.

1316.   The 877 Patent is invalid because the claims therein were known or used in the prior art before the filing of the 877 Patent and therefore the invention claimed by the 877 Patent was obvious in view of the prior art under 35 U.S.C. § 103.

1317.   The 877 Patent is indefinite and is therefore invalid under 35 U.S.C. § 112.

1318.   Accordingly, Hydra Cup is entitled to a declaration of invalidity of the 877 Patent under 35 U.S.C. §§ 101, 102, 103, and 112.

1319. This case should also be found to be exceptional under 35 U.S.C. § 285, with reasonable costs and attorneys' fees awarded to Hydra Cup.

**COUNTERCLAIM LXIV: DECLARATION OF NONINFRINGEMENT OF U.S. PATENT NO. 10,165,877**

1320. Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth herein, its allegations in all preceding Counterclaim paragraphs above.

1321. BlenderBottle claims to be the owner of U.S. Patent No. 10,165,877.

1322. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle regarding infringement of the 877 Patent because BlenderBottle filed the Complaint in this action against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents disclosing shaker bottle and lids virtually identical to the invention disclosed by BlenderBottle's 877 Patent, and BlenderBottle contends the 877 Patent is valid and enforceable. Furthermore, upon information and belief, when Hydra Cup requested representative samples of BlenderBottle's Asserted Products, BlenderBottle sent Hydra Cup an Asserted Product practicing the invention disclosed by the 877 Patent. BlenderBottle alleges that Hydra Cup has infringed and continues to infringe the 877 Patent by making, using, offering to sell, selling, and/or importing the Accused Products, which allegedly embody the inventions claimed in the 877 Patent. BlenderBottle has also accused Hydra Cup of infringing the 877 Patent in multiple cease and desist letters served on Hydra Cup and threatened to file a lawsuit against Hydra Cup for the alleged infringement of the 877 Patent.

1323. Hydra Cup denies that it has infringed or is infringing any valid and enforceable claim of the 877 Patent, either directly, contributorily, or by inducement, literally or under the doctrine of equivalents.

1324. The Accused Products do not infringe the 877 Patent because they do not include each and every element of any asserted claim, either literally or under the doctrine of equivalents.

1325. Hydra Cup has not and does not induce or contribute to infringement of the 877 Patent because the Accused Products do not directly infringe the patent for the reasons stated above. Hy-

1  dra Cup also lacks the requisite knowledge and intent to induce or contribute to any alleged in-

2  fringement by others.

3  1326.  Accordingly, there is an actual, substantial, and justiciable controversy between Hydra Cup

4  and BlenderBottle concerning the alleged infringement of the 877 Patent.

5  1327.  Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not in-

6  fringe, directly or indirectly, any valid and enforceable claim of the 877 Patent.

7  1328.  This is an exceptional case entitling Hydra Cup to an award of its attorneys' fees incurred in

8  connection with this action pursuant to 35 U.S.C. § 285.

9  **COUNTERCLAIM LXV: FALSE DESIGNATION OF ORIGIN, PASSING OFF, AND FED-**
10  **ERAL UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(A)**

11  1329.  Hydra Cup hereby repeats, realleges, and incorporates by reference, as if fully set forth

12  herein, its allegations in all preceding Counterclaim paragraphs above.

13  1330.  This is a claim for unfair competition and false designation of origin arising under 15 U.S.C.

14  § 1125(a) against BlenderBottle.

15  1331.  Hydra Cup is the owner of unregistered trade dress rights in the overall appearance and de-

16  sign of its OG DualShaker product (the "OG DualShaker Trade Dress"), its OG DualShaker lid

17  product (the "OG DualShaker Lid Trade Dress"), and its distinctive OG DualShaker bottle

18  product (without the lid) (the "OG DualShaker Bottle Trade Dress"), which includes the fol-

19  lowing design elements: a tapered cylindrical body that narrows from top to bottom; bottom of

20  the bottle has a flat base; lid has a rounded, domed, recessed top; circular drinking spout pro-

21  trudes from the front center of the domed lid which connects to a spout guard that is on a top

22  pivoting arm which are connected to brackets; the lid has a distinct shoulder or skirt that ex-

23  tends down from the domed top;

24  1332.  The OG DualShaker Trade Dress, OG DualShaker Lid Trade Dress, and OG DualShaker

25  Bottle Trade Dress are inherently distinctive and nonfunctional. Since at least 2012, Hydra Cup

26  has extensively and continuously promoted and used the OG DualShaker Trade Dress, OG Du-

27  alShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress in the United States in con-

28  nection with its protein shaker bottle products. Through this extensive and continuous use, the

1    OG DualShaker Trade Dress, OG DualShaker Lid Trade Dress, and OG DualShaker Bottle

2    Trade Dress have each become a well-known indicator of the origin and quality of Hydra Cup's

3    products and has acquired substantial secondary meaning in the marketplace.

4    1333.  BlenderBottle's Infringing Products use trade dress confusingly similar to the OG Dual-

5    Shaker Trade Dress, OG DualShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress.

6    The Infringing Products embody the key distinctive elements of the OG DualShaker Trade

7    Dress, OG DualShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress , including the

8    bottle design, domed recessed lid, spout, spoutguard, brackets, pivoting arm, and more.

9    1334.  BlenderBottle's use of trade dress confusingly similar to the OG DualShaker Trade Dress,

10   OG DualShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress is likely to cause

11   confusion, mistake, and deception among the relevant consuming public as to the source or ori-

12   gin of the Infringing Products and has caused and is likely to continue to cause the public to be-

13   lieve, contrary to fact, that the Infringing Products are sold, authorized, sponsored, or approved

14   by Hydra Cup, or that BlenderBottle is affiliated, connected, or associated with Hydra Cup.

15   1335.  BlenderBottle's use of the OG DualShaker Trade Dress, OG DualShaker Lid Trade Dress,

16   and OG DualShaker Bottle Trade Dress without Hydra Cup's consent constitutes false designa-

17   tion of origin, false or misleading description of fact, or false or misleading representation of

18   fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation,

19   connection, or association of such entity with another entity, or as to the origin, sponsorship, or

20   approval of its goods or commercial activities by another entity in violation of 15 U.S.C. §

21   1125(a).

22   1336.  BlenderBottle's actions constitute trade dress infringement and unfair competition in viola-

23   tion of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

24   1337.  Upon information and belief, BlenderBottle's use of confusingly similar trade dress has been

25   intentional and willful, making this an exceptional case within the meaning of 15 U.S.C. §

26   1117.

27   1338.  BlenderBottle's actions have caused and are continuing to cause Hydra Cup irreparable

28   harm. Hydra Cup has no adequate remedy at law and is entitled to an injunction under 15

1  U.S.C. § 1116 restraining BlenderBottle, its agents, employees, representatives and all persons

2  acting in concert with it from engaging in further acts of infringement.

3  1339.  Hydra Cup is further entitled to recover its actual damages, BlenderBottle's profits, en-

4  hanced damages and costs pursuant to 15 U.S.C. § 1117(a), and prejudgment interest on all

5  monetary awards.


**COUNTERCLAIM LXVI: CONSPIRACY TO MONOPOLIZE, ATTEMPTED MONOPO-
LIZATION, MONOPOLIZATION UNDER 15 U.S.C. § 2 (VIOLATION OF SECTION 2 OF
THE SHERMAN ACT—MONOPOLIZATION).**

9  1340.  Hydra Cup repeats, realleges, and incorporates by reference the allegations in each and every

10  paragraph above.

11  1341.  BlenderBottle has monopolized the market for shaker bottles with mixing mechanisms in the

12  United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

13  1342.  BlenderBottle's aforesaid monopolization has consisted of BlenderBottle obtaining a monop-

14  oly in the market for shaker bottles with mixing mechanisms, with a market share of approxi-

15  mately 70% or more, and engaging in the above alleged predatory and/or anticompetitive con-

16  duct to maintain its monopoly power, including by asserting fraudulently procured and invalid

17  patents and trade dress rights against competitors like Hydra Cup.

18  1343.  The relevant market is shaker bottles with mixing mechanisms, such as wire whisk balls or

19  blender bottles with integrated agitators, in the United States. These products are not reason-

20  ably interchangeable with other products, such as regular water bottles or beverage containers

21  without mixing mechanisms, because they serve the distinct purpose of allowing consumers to

22  mix protein shakes, smoothies, and other beverages on-the-go.

23  1344.  On information and belief, BlenderBottle willfully engaged in the actions alleged above,

24  which constitute violations of Section 2 of the Sherman Act, with the specific intent to monop-

25  olize the relevant market.

26  1345.  BlenderBottle's actions, as alleged above, have injured competition in the relevant market by

27  excluding competitors, inhibiting innovation, and allowing BlenderBottle to charge supracom-

28  petitive prices for its products.

1346.   There are significant barriers to entry in the relevant market, including the need for special-
ized manufacturing capabilities, brand recognition, and a broad retail and distribution network.
BlenderBottle has also erected additional barriers through its pattern of asserting fraudulently
obtained and invalid intellectual property rights against new entrants, with the purpose and ef-
fect of deterring competition.

1347.   BlenderBottle's conduct is not justified by any legitimate business or procompetitive pur-
pose. Any purported procompetitive benefits of its actions are outweighed by their anticompeti-
tive effects.

1348.   As a direct and proximate result of BlenderBottle's monopolization of the relevant market,
Hydra Cup has been injured in its business and property, including by losing sales and profits
due to BlenderBottle's exclusionary conduct and by incurring costs to defend against Blender-
Bottle's sham litigation.

1349.   Hydra Cup is entitled to recover treble damages for the injuries caused by BlenderBottle's
monopolization, as well as attorneys' fees and costs, under Section 4 of the Clayton Act, 15
U.S.C. § 15.

1350.   Moreover, BlenderBottle's monopolization is ongoing and, unless enjoined, will continue to
cause irreparable harm to Hydra Cup and to competition in the relevant market. Hydra Cup is
therefore entitled to injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNTERCLAIM LXVII: PATENT AND TRADE DRESS MISUSE.

1351.   Hydra Cup repeats, realleges, and incorporates by reference the allegations in each and every
paragraph above.

1352.   BlenderBottle has engaged in a pattern of patent misuse by attempting to improperly extend
its monopoly over the "classic simple shaker" bottle and lid design beyond the lawful scope
and term of its patent rights.

1353.   BlenderBottle previously sought and obtained design and utility patent protection for the
"classic simple shaker" bottle and lid design, including the 024 Patent, the 830 Patent, the 843
Patent, the 877 Patent, the D551 Patent, among many others. These patents granted Blender-

1    Bottle exclusive rights to the patented designs for a limited term in exchange for public disclo-

2    sure of the invention.

3    1354.   Upon expiration of the patents, the "classic simple shaker" bottle and lid design rightfully

4    entered the public domain, free for all to use and practice. The public has a fundamental right to

5    copy and use designs that are no longer patent-protected.

6    1355.   However, BlenderBottle has attempted to circumvent this public policy and improperly mo-

7    nopolize the "classic simple shaker" bottle and lid design indefinitely by filing for registered

8    trade dress protection on the same designs that were the subject of its expired patents, including

9    the 019 Lid Trade Dress and the 626 Agitator Trade Dress.

10   1356.   By claiming trade dress rights in designs that were previously protected by patents, Blender-

11   Bottle is attempting to extend its exclusive rights beyond the lawful patent term and prevent

12   others, including Hydra Cup, from using designs that have rightfully entered the public domain.

13   This conduct undermines the bargain of the patent system, which grants temporary exclusivity

14   in exchange for public disclosure and dedication to the public upon expiration.

15   1357.   BlenderBottle's trade dress registrations are nothing more than an attempt to gain a perpetual

16   monopoly on formerly patented designs and to exclude all competition in the market for "clas-

17   sic simple shaker" bottles and lids. This is an abuse of the patent and trade dress system and

18   constitutes patent

19   1358.   As a direct and proximate result of BlenderBottle's patent misuse, competition has been

20   harmed, and Hydra Cup has suffered damages in an amount to be determined at trial. Blender-

21   Bottle's misconduct has also harmed the public interest by depriving the public of the right to

22   use and benefit from designs that are no longer patent-protected.

23   1359.   BlenderBottle's patent misuse renders its patents and trade dress registrations unenforceable,

24   and Hydra Cup is entitled to a declaration of unenforceability and an injunction preventing

25   BlenderBottle from enforcing these intellectual property rights against Hydra Cup and others.

26                              **OTHER COUNTERCLAIMS**

1360. Hydra Cup reserves its right to assert and rely upon such other applicable counterclaims as may be available or apparent during discovery and investigation. Such counterclaims may include the application of additional, yet to be discovered, prior art that would invalidate BlenderBottle's Asserted Patents or Equivalent Patents pursuant to the Patent Laws of the United States. Other counterclaims may include invalidation of BlenderBottle's Asserted Patents, Equivalent Patents, Asserted Trade Dresses, or Related Trademarks for inequitable conduct if evidence of supporting such a claim arises during discovery or evidence indicating that this case is exception under 35 § U.S.C. 285.

**PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs Hydra Cup and Mr. Raymus respectfully requests that the Court enter judgment in their favor as follows:

A. A declaration that the written License Agreement granting Hydra Cup rights in U.S. Patent No. D666,047 between Tianqi and Hydra Cup is valid and enforceable;

B. A declaration that the implied license for rights in U.S. Patent No. D666,047 between Tianqi and Hydra Cup is valid and enforceable;

C. A declaration that the implied license for rights in U.S. Patent No. D766,029 between Tianqi and Hydra Cup is valid and enforceable;

D. A declaration that BlenderBottle's D235 Patent expired on 04 October 2019 and that the "Bottle" design, bottle and lid, disclosed therein was granted to the public domain on 04 October 2019;

E. A declaration that BlenderBottle has not developed secondary meaning in the bottle design claimed by the expired D235 Patent since it expired on 04 October 2019 and that the "Bottle" design, bottle and lid, disclosed therein is available and free for the public to use without any risk of infringing on BlenderBottle's intellectual property;

F. A declaration that Counterclaim Plaintiffs Hydra Cup and Mr. Raymus have not infringed, and do not infringe, any claim of the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, the D540 Patent, the 830 Patent, the 060 Patent, the 024 Patent, the 843 Patent, or the 877 Patent;

G. A declaration that each claim of the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, the D540 Patent, the 830 Patent, the 060 Patent, the 024 Patent, the 843 Patent, and the 877 Patent is invalid for lack of novelty and lack of originality;

H. A declaration that each claim of the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent is invalid for lack of ornamentality for claiming designs primarily dictated by function;

I. A declaration that the D551 Patent is unenforceable due to inequitable conduct;

J. A declaration that the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent are each unenforceable due to lack of protectable scope after screen for prominent design elements disclosed by prior art and prominent primarily functional design elements;

K. A declaration that Counterclaim Plaintiffs Hydra Cup and Mr. Raymus have not infringed, and do not infringe, the U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress"), U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"), the Unregistered Bottle Trade Dress, the Unregistered Label Trade Dress, U.S. Trademark Registration No. 4,894,363 (the "BLENDERBOTTLE Mark"), or U.S. Trademark Registration No. 3,515,591 (the "BLENDER BALL Mark");

L. A declaration that the following trade dresses and trademarks are generic: U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress"), U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"), the Unregistered Bottle Trade Dress, the Unregistered Label Trade Dress, U.S. Trademark Registration No. 4,894,363 (the "BLENDERBOTTLE Mark"), and U.S. Trademark Registration No. 3,515,591 (the "BLENDER BOTTLE Mark");

M. A declaration that the following Asserted Trade Dresses practice designs that are primarily functional and are therefore invalid and not protectable under the Lanham Act: the U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress", U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"), the Unregistered Bottle Trade Dress, and the Unregistered Label Trade Dress;

N. A declaration that the following Asserted Trade Dresses have not developed secondary meaning and are therefore invalid and not protectable under the Lanham Act: the U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress", U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"), the Unregistered Bottle Trade Dress, and the Unregistered Label Trade Dress;

O. A declaration that the 019 Lid Trade Dress is unenforceable due to inequitable conduct;

P. An order cancelling the following registered trade dresses and trademarks: the U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress", U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"), U.S. Trademark Registration No. 4,894,363 (the "BLENDERBOTTLE Mark"), and U.S. Trademark Registration No. 3,515,591 (the "BLENDER BOTTLE Mark").

Q. A declaration that Hydra Cup's OG DualShaker Trade Dress, OG DualShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress are invalid and unenforceable;

R. An Order adjudging BlenderBottle to have infringed Hydra Cup's OG DualShaker Trade Dress, OG DualShaker Lid Trade Dress, and OG DualShaker Bottle Trade Dress under 15 U.S.C. § 1125(a);

S. A declaration that the Unregistered Bottle Trade Dress and Unregistered Label Trade Dress are invalid and unenforceable;

T. An Order adjudging BlenderBottle to have infringed U.S. Patent No. D666,047 under 35 U.S.C. § 271;

U. An Order that BlenderBottle account for all gains, profits, and advantages derived through BlenderBottle's infringement of the D047 Patent in violation of 35 U.S.C. § 271, and that BlenderBottle pay to Hydra Cup all damages suffered by Hydra Cup from such infringement and all profits from such infringement pursuant to 35 U.S.C. §§ 284 and 289;

V. An Order adjudging BlenderBottle to have infringed U.S. Patent No. D766,029 under 35 U.S.C. § 271;

W. That BlenderBottle account for all gains, profits, and advantages derived through BlenderBottle's infringement of the D029 Patent in violation of 35 U.S.C. § 271, and that BlenderBottle pay to Hydra Cup all damages suffered by Hydra Cup from such infringement and all profits from such infringement pursuant to 35 U.S.C. §§ 284 and 289;

X. An award of damages adequate to compensate Hydra Cup for BlenderBottle's infringement of the D047 and D029 Patents, but in no event less than a reasonable royalty, together with prejudgment interest and costs;

Y. An Order adjudging BlenderBottle to have misused the Asserted Patents, Equivalent Patents, and Asserted Trade Dresses to attempt to obtain an improper perpetual patent;

1    Z. A judgment that BlenderBottle's infringement of the D047 and D029 Patents has been will-
2       ful and an award of enhanced damages under 35 U.S.C. § 284;
3    AA.      A permanent injunction enjoining BlenderBottle and its officers, directors, agents,
4       servants, employees, affiliates, divisions, branches, subsidiaries, parents and all others acting
5       in active concert or participation with it, from infringing the D047 and D029 Patent;
6    BB.      A declaration that this is an exceptional case under 35 U.S.C. § 285 and 15 U.S.C. §
7       1117(a) and an award of Hydra Cup's reasonable attorney fees;
8    CC.      An award of Hydra Cup's costs under Fed. R. Civ. P. 54(d); and
9    DD.      Treble damages;
10   EE. All costs and attorneys' fees;
11   FF. Pre-judgement interests and post-judgement interests on all damages, costs, and fees;
12   GG.      And any such other and further relief as the Court may deem just and proper.

13

14   **JURY DEMAND:** Counterclaim Plaintiffs Hydra Cup and Mr. Raymus hereby demand a trial by

15   jury on all issues so triable.

16

17   **Dated**: 10 June 2024

18                                                                   Respectfully submitted,

19                                                                   By: /s/Meghan Pratschler/
20                                                                   Meghan Pratschler
21                                                                   CA Bar No.: 324970
22                                                                   Meghan the Attorney, LLP
23                                                                   95 3rd St. 2nd Floor
24                                                                   San Francisco, CA 94103-3103
25                                                                   meghan@meghantheattorney.com
26                                                                   (415) 335-9226

27                                                                   -and-

28                                                                   By: /s/Casey Scott McKay/
29                                                                   Casey Scott McKay
30                                                                   TN Bar No.: 034028
31                                                                   MC Law, PLLC
32                                                                   1441 U St. NW, Suite 102
33                                                                   Washington, DC, D.C. 20009
34                                                                   202.743.1972
35                                                                   casey@mclaw.io

36   *Attorneys for Defendants TRRS Magnate, LLC dba Hydra Cup and Thomas Raymus, an Individual.*

37

1   **CERTIFICATE OF SERVICE**

2           I hereby certify that a copy of the foregoing was filed using this Court's CM/ECF notifica-

3   tion service, which sent notification of such filing to all pro se parties and counsel of record on 10

4   June 2024.

5   KNOBBE MARTENS OLSON & BEAR
6   Sean Murray (SBN 213,655)
7   sean.murray@knobbe.com
8   Ali S. Razai (SBN 246,922)
9   ali.razai@knobbe.com
10  Jacob R. Rosenbaum (SBN 313,190)
11  jacob.rosenbaum@knobbe.com
12  Christian D. Boettcher (SBN 342,950)
13  christian.boettcher@knobbe.com

14  KNOBBE, MARTENS, OLSON & BEAR, LLP
15  2040 Main Street
16  Fourteenth Floor
17  Irvine, CA 92614
18  Phone: (949) 760-0404
19  Facsimile: (949) 760-9502

20                                              By: /s/Meghan Pratschler/
21                                                    Meghan Pratschler
22                                                    CA Bar No.: 324970
23                                              Meghan the Attorney, LLP
24                                                  95 3rd St. 2nd Floor
25                                         San Francisco, CA 94103-3103
26                                         meghan@meghantheattorney.com
27                                                        (415) 335-9226

28                                                              -and-

29                                              By: /s/Casey Scott McKay/
30                                                     Casey Scott McKay
31                                                   TN Bar No.: 034028
32                                                         MC Law, PLLC
33                                              1441 U St. NW, Suite 102
34                                          Washington, DC, D.C. 20009
35                                                          202.743.1972
36                                                      casey@mclaw.io

37  *Attorneys for Defendants TRRS Magnate, LLC dba Hydra Cup and Thomas Raymus, an Individual.*