1   Meghan Pratschler
2   CA Bar No.: 324970
3   Meghan the Attorney, LLP
4   95 3rd St 2nd Floor
5   San Francisco, CA 94103-3103
6   meghan@meghantheattorney.com
7   (415) 335-9226

8   -and-

9   Casey Scott McKay
10   TN Bar No.: 034028
11   MC Law, PLLC
12   1441 U St. NW, Suite 102
13   Washington, DC, D.C. 20009
14   202.743.1972
15   casey@mclaw.io

16   *Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**THE EASTERN DISTRICT OF CALIFORNIA**

– – – – – – – – – – – – – – – – – – – – – – – – – – X

**TROVE BRANDS, LLC D/B/A THE BLENDERBOTTLE COMPANY**

       *Plaintiff,*

                                       **Case No: 2:22-cv-02222-TLN-CKD,**

       *v.*

**TRRS MAGNATE LLC D/B/A HYDRA CUP AND THOMAS RAYMUS, AN INDIVIDUAL,**

         *Defendants.*

– – – – – – – – – – – – – – – – – – – – – – – – – – X

**DEFENDANTS' THIRD AMENDED ANSWER, DEFENSES, AND COUNTERCLAIMS**

**JURY DEMAND:** Defendants hereby demand a trial by jury on all issues so triable.

Defendants TRRS Magnate LLC d/b/a Hydra Cup and Thomas Raymus (collectively "Defendants" or "Hydra Cup" unless otherwise specified), by and through counsel, hereby submits their Third Amended Answer, Defenses, and Counterclaims in response to the

Second Amended Complaint (the "Complaint") filed by Defendant BlenderBottle Trove Brands, LLC, d/b/a the BlenderBottle Company ("BlenderBottle") and state as follows:

1.  Defendants admit the allegations in paragraph 1 of the Complaint to the extent that BlenderBottle "seeks injunctive relief and damages for acts of patent infringement, trade dress infringement, false designation of origin, and unfair competition." Defendants deny BlenderBottle's allegation that Defendants engaged in activity that violates any laws of the United States or the State of California. Defendants deny the rest of paragraph 1 of the Complaint.

2.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 2 of the Complaint.

3.  Defendants admit the allegations in paragraph 3 of the Complaint.

4.  Defendants admit the allegations in paragraph 4 of the Complaint.

5.  Defendants admit the allegations in paragraph 5 of the Complaint to the extent that the Court has original and supplemental jurisdiction over the claims. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 5 of the Complaint.

6.  Defendants admit the allegations in paragraph 6 of the Complaint to the extent that Defendants reside in California. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 6 of the Complaint.

7.  Defendants admit the allegations in paragraph 7 of the Complaint to the extent that Defendants reside in this judicial district. Defendants deny the remaining allegations in paragraph 7 of the Complaint.

8.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 8 of the Complaint.

9.  Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 9 of the Complaint.

10. Defendants admit that United States Design Patent No. D510,235 ("D235 Patent") entitled "BOTTLE" issued on 04 October 2005 and that Exhibit 1 appears to be a copy of the D235 Patent. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 10 of the Complaint.

11. Defendants admit that United States Design Patent No. D696,551 ("D551 Patent") entitled "BOTTLE LID HAVING INTEGRATED HANDLE" issued on 31 December 2013 and that Exhibit 2 appears to be a copy of the D551 Patent. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 11 of the Complaint.

12. Defendants admit that United States Design Patent No. D697,798 ("D798 Patent") entitled "CONTAINER" issued on 21 January 2014 and that Exhibit 3 appears to be a copy of the D798 Patent. Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 12 of the Complaint.

13. Defendants deny the allegations in paragraph 13 of the Complaint.

14. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 14 of the Complaint.

15. Defendants admit that Exhibit 4 to the Complaint appears to be a copy of U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress"). Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 15 of the Complaint.

16. Defendants deny the allegations in paragraph 16 of the Complaint.

17. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 17 of the Complaint.

18. Defendants deny the allegations in paragraph 18 of the Complaint.

19. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 19 of the Complaint.

20. Defendants deny the allegations in paragraph 20 of the Complaint.

21. Defendants deny the allegations in paragraph 21 of the Complaint.

22. Defendants deny the allegations in paragraph 22 of the Complaint.

23. Defendants admit that Exhibit 5 to the Complaint appears to be a copy of U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"). Defendants lack knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 23 of the Complaint.

24. Defendants deny the allegations in paragraph 24 of the Complaint.

25. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 25 of the Complaint.

26. Defendants deny the allegations in paragraph 26 of the Complaint.

27. Defendants deny the allegations in paragraph 27 of the Complaint.

28. Defendants deny the allegations in paragraph 28 of the Complaint.

29. Defendants deny the allegations in paragraph 29 of the Complaint.

30. Defendants deny the allegations in paragraph 30 of the Complaint.

31. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 31 of the Complaint.

32. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 32 of the Complaint.

33. Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 33 of the Complaint.

34.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 34 of the Complaint.

35.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 35 of the Complaint.

36.   Defendants deny the allegations in paragraph 36 of the Complaint.

37.   Defendants deny the allegations in paragraph 37 of the Complaint.

38.   Defendants deny the allegations in paragraph 38 of the Complaint.

39.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 39 of the Complaint.

40.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 40 of the Complaint.

41.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 41 of the Complaint.

42.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 42 of the Complaint.

43.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 43 of the Complaint.

44.   Defendants deny the allegations in paragraph 44 of the Complaint.

45.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 45 of the Complaint.

46.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 46 of the Complaint.

47.   Defendants lack knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 47 of the Complaint.

48.   Defendants deny the allegations in paragraph 48 of the Complaint.

49.   Defendant Hydra Cup admits that it manufactures, uses, sells, offers for sale, promotes, advertises, and/or imports into the United States shakers, including some in various sizes and colors that were designed and manufactured by a third party and that embody said third party's design patents. Defendant Hydra Cup denies the remaining allegations in paragraph 49 of the Complaint. Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 49 of the Complaint.

50.   Defendant Hydra Cup admits that it manufactures, uses, sells, offers for sale, promotes, advertises, and/or imports into the United States shaker bottle lids that were designed and manufactured by a third party and that embody said third party's design patents. Defendant Hydra Cup denies the remaining allegations in paragraph 50 of the Complaint. Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 50 of the Complaint.

51.   Defendants admit that Exhibit 6 to the Complaint appears to be a copy of a letter dated 21 January 2021 from BlenderBottle to Hydra Cup. Defendants deny the remaining allegations in paragraph 51 of the Complaint.

52.   Defendant Hydra Cup denies the allegations in paragraph 52 of the Complaint. Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 52 of the Complaint.

53.   Defendants admit that Exhibit 7 to the Complaint appears to be a copy of a letter dated 21 March 2022 from BlenderBottle to Hydra Cup. Defendants deny the remaining allegations in paragraph 53 of the Complaint.

54.  Defendants admit that Exhibit 8 to the Complaint appears to be a copy of a letter dated 17 August 2022 from BlenderBottle to Hydra Cup. Defendants deny the remaining allegations in paragraph 54 of the Complaint.

55.  Defendant Hydra Cup admits that it has continued to sell its shaker bottles and shaker bottle lids. Defendant Hydra Cup denies the remaining allegations in paragraph 55 of the Complaint. Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 55 of the Complaint.

56.  Defendant Hydra Cup denies the allegations in paragraph 56 of the Complaint. Defendant Thomas Raymus lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 56 of the Complaint.

57.  Defendants admits that Mr. Raymus's deposition was taken on 13 December 2023. Defendants admit that during Mr. Raymus's deposition, when asked whether Defendant Mr. Raymus "ever commingled funds between the business account and the personal account beyond the $100,000 amount," he stated "[y]es, I have," but further explained that he meant it was most likely that he had mixed up credit cards or bank accounts at some point by accident, explaining that the "nature of these [alleged] commingling actives" was as follows: "It could be just a transaction of funds back and forth to – or it could have been like a – maybe an accidental given the bank my account number to just transfer it in the – in one account."[1] Defendant Mr. Raymus clarified that any hypothetical commingling that he was referring to was accidental due to the way the bank mixes accounts together, testifying that "the nature of like the online, how it works, is all the accounts are there. So the personal account's with the business account. So it could have just been fluctuated, given them a different check or something like that, but . . ." (Tr. 33:15-19.). Defendant Mr. Raymus denied that he injected any additional monetary funds in Hydra Cup, testifying that "I don't believe I ever inserted anything for the purpose of giving the business monetary funds. It was more of a – just they're all together, so here's that, put it in – do you want to put it in this account or this account, as a bank teller. I'm just saying if we looked it possibly could be, but no, I never had intentionally inserted any more funds into Hydra

---

[1] (Ex. 3, Raymus Depo. Tr. 32:20-22, 33:1-8).

1   Cup." (Tr. 34:1-11.). Defendant Mr. Raymus clarified that he "wouldn't have my personal account

2   pay Hydra Cup stuff. It would maybe be the opposite of that." (Tr. 35: 4-8). Defendants deny the

3   remaining allegations in paragraph 57 of the Complaint.

4   58.   Defendants admit that during Mr. Raymus's 13 December 2023 deposition he testified that he was

5   responsible for "certain modifications" of the designs of the Hydra Cup shaker bottles and shaker

6   bottle lids. Defendant Mr. Raymus further admits that during his 13 December 2023 deposition he

7   testified that he was responsible for the selection and subsequent commercialization of the Hydra Cup

8   shaker bottles and shaker bottle lids, as well as agitators and labels. Defendants deny the remaining

9   allegations in paragraph 58 of the Complaint.

10   59.   Defendants admit that during the 13 December 2023 deposition of Defendant Mr. Raymus, he

11   testified that he is currently the majority owner and a full time employee of Defendant Hydra Cup and

12   that Defendant Hydra Cup relies on independent contractors to perform tasks that Defendant

13   Mr. Raymus does not perform. Defendants further admit that during his 13 December 2023 deposition

14   of Defendant Mr. Raymus, he testified that he is "in charge" of Defendant Hydra Cup as "the

15   [majority] owner and CEO" of Defendant Hydra Cup. Defendants deny the remaining allegations in

16   paragraph 59 of the Complaint.

17   60.   Defendants deny the allegations in paragraph 60 of the Complaint.

18   61.   Defendants deny the allegations in paragraph 61 of the Complaint.

19   62.   Defendants deny the allegations in paragraph 62 of the Complaint.

20   63.   Defendants deny the allegations in paragraph 63 of the Complaint.

21   64.   Defendants deny the allegations in paragraph 64 of the Complaint.

22   **PLAINTIFF BLENDERBOTTLE'S FIRST CLAIM FOR RELIEF: PATENT**
23   **INFRINGEMENT (35 U.S.C. § 271).**

65. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-64 above as if set forth fully herein.

66. Defendants deny the allegations in paragraph 66 of the Complaint.

67. Defendants deny the allegations in paragraph 67 of the Complaint.

68. Defendants deny the allegations in paragraph 68 of the Complaint.

69. Defendants deny the allegations in paragraph 69 of the Complaint.

70. The allegations in paragraph 70 state a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in paragraph 70 of the Complaint.

71. Defendants deny the allegations in paragraph 71 of the Complaint.

72. Defendants deny the allegations in paragraph 72 of the Complaint.

73. Defendants deny the allegations in paragraph 73 of the Complaint.

74. Defendants deny the allegations in paragraph 74 of the Complaint.

**PLAINTIFF BLENDERBOTTLE'S SECOND CLAIM FOR RELIEF: DEFENDANT'S TRADE DRESS INFRINGEMENT (15 U.S.C. §1125(A)).**

75. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-64 of the Complaint as if set forth fully herein.

76. Defendants deny the allegations in paragraph 76 of the Complaint.

77. Defendants deny the allegations in paragraph 77 of the Complaint.

78. Defendants deny the allegations in paragraph 78 of the Complaint.

79. Defendants deny the allegations in paragraph 79 of the Complaint.

80. Defendants deny the allegations in paragraph 80 of the Complaint.

81. Defendants deny the allegations in paragraph 81 of the Complaint.

1   82.  Defendants deny the allegations in paragraph 82 of the Complaint.

2   83.  Defendants deny the allegations in paragraph 83 of the Complaint.

3   84.  Defendants deny the allegations in paragraph 84 of the Complaint.

4   85.  Defendants deny the allegations in paragraph 85 of the Complaint.

5   86.  Defendants deny the allegations in paragraph 86 of the Complaint.

6   87.  Defendants deny the allegations in paragraph 87 of the Complaint.

7   88.  Defendants deny the allegations in paragraph 88 of the Complaint.

8   89.  Defendants deny the allegations in paragraph 89 of the Complaint.

9   90.  Defendants deny the allegations in paragraph 90 of the Complaint.

10  91.  Defendants deny the allegations in paragraph 91 of the Complaint.

**PLAINTIFF BLENDERBOTTLE'S THIRD CLAIM FOR RELIEF: TRADE DRESS INFRINGEMENT (15 U.S.C. §1114).**

13  92.  Defendants repeat and re-allege their responses to the allegations of paragraphs 1-64 and 75-91 of the
14       Complaint as if set forth fully herein.

15  93.  Defendants deny the allegations in paragraph 93 of the Complaint.

16  94.  Defendants deny the allegations in paragraph 94 of the Complaint.

17  95.  Defendants deny the allegations in paragraph 95 of the Complaint.

18  96.  Defendants deny the allegations in paragraph 96 of the Complaint.

19  97.  Defendants deny the allegations in paragraph 97 of the Complaint.

20  98.  Defendants deny the allegations in paragraph 98 of the Complaint.

21  99.  Defendants deny the allegations in paragraph 99 of the Complaint.

1   100. Defendants deny the allegations in paragraph 100 of the Complaint.

2   101. Defendants deny the allegations in paragraph 101 of the Complaint.

3   **PLAINTIFF BLENDERBOTTLE'S FOURTH CLAIM FOR RELIEF: FALSE DESIGNATION OF**
4   **ORIGIN, PASSING OFF, & FEDERAL UNFAIR COMPETITION (15 U.S.C. § 1125(A)).**

5   102. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-102 of the

6      Complaint as if set forth fully herein.

7   103. Defendants deny the allegations in paragraph 103 of the Complaint.

8   104. Defendants deny the allegations in paragraph 104 of the Complaint.

9   105. Defendants deny the allegations in paragraph 105 of the Complaint.

10   106. Defendants deny the allegations in paragraph 106 of the Complaint.

11   107. Defendants deny the allegations in paragraph 107 of the Complaint.

12   108. Defendants deny the allegations in paragraph 108 of the Complaint.

13   109. Defendants deny the allegations in paragraph 109 of the Complaint.

14   110. Defendants deny the allegations in paragraph 110 of the Complaint.

15   **PLAINTIFF BLENDERBOTTLE'S FIFTH CLAIM FOR RELIEF: UNFAIR COMPETITION**
16   **UNDER CALIFORNIA BUSINESS & PROFESSIONS CODE (CAL. BUS. & PROF. CODE §§**
17   **17200, *ET SEQ.*)**

18   111. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-110 of the

19      Complaint as if set forth fully herein.

20   112. Defendants deny the allegations in paragraph 112 of the Complaint.

21   113. Defendants deny the allegations in paragraph 113 of the Complaint.

22   114. Defendants deny the allegations in paragraph 114 of the Complaint.

1  115. Defendants deny the allegations in paragraph 115 of the Complaint.

2  **PLAINTIFF BLENDERBOTTLE'S SIXTH CLAIM FOR RELIEF: UNFAIR COMPETITION**
3  **UNDER CALIFORNIA COMMON LAW (CALIFORNIA COMMON LAW)**

4  116. Defendants repeat and re-allege their responses to the allegations of paragraphs 1-115 of the

5  Complaint as if set forth fully herein.

6  117. Defendants deny the allegations in paragraph 117 of the Complaint.

7  118. Defendants deny the allegations in paragraph 118 of the Complaint.

8  119. Defendants deny the allegations in paragraph 119 of the Complaint.

9  120. Defendants deny the allegations in paragraph 120 of the Complaint.

10  121. Defendants deny the allegations in paragraph 121 of the Complaint.

11  **XI. PLAINTIFF BLENDERBOTTLE'S PRAYER FOR RELIEF**

12  122. A. Defendants deny the allegations in paragraph A of the Complaint's PRAYER FOR RELIEF.

13  123. B. Defendants deny the allegations in paragraph B of the Complaint's PRAYER FOR RELIEF.

14  124. C. Defendants deny the allegations in paragraph C of the Complaint's PRAYER FOR RELIEF.

15  125. D. Defendants deny the allegations in paragraph D of the Complaint's PRAYER FOR RELIEF.

16  126. E. Defendants deny the allegations in paragraph E of the Complaint's PRAYER FOR RELIEF.

17  127. F. Defendants deny the allegations in paragraph F of the Complaint's PRAYER FOR RELIEF.

18  128. G. Defendants deny the allegations in paragraph G of the Complaint's PRAYER FOR RELIEF.

19  129. H. Defendants deny the allegations in paragraph H of the Complaint's PRAYER FOR RELIEF.

20  130. I. Defendants deny the allegations in paragraph I of the Complaint's PRAYER FOR RELIEF.

21  131. J. Defendants deny the allegations in paragraph J of the Complaint's PRAYER FOR RELIEF.

132. K. Defendants deny the allegations in paragraph K of the Complaint's PRAYER FOR RELIEF.

133. L. Defendants deny the allegations in paragraph L of the Complaint's PRAYER FOR RELIEF.

134. M. Defendants deny the allegations in paragraph N of the Complaint's PRAYER FOR RELIEF.

135. N. Defendants deny the allegations in paragraph M of the Complaint's PRAYER FOR RELIEF.

## AFFIRMATIVE AND OTHER DEFENSES

136. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of its Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

137. In further response to the Complaint, Hydra Cup asserts the following affirmative and other defenses. Hydra Cup reserves the right to amend this Third Amended Answer and its Affirmative and Other Defenses with additional, supplemental, and or different defenses as Hydra Cup's investigation and discovery in this case may merit, and as permitted by the Federal Rules of Civil Procedure and the Local Rules of this Court.

**AFFIRMATIVE DEFENSE: (NONINFRINGEMENT OF THE ASSERTED PATENTS).**

138. BlenderBottle's patent infringement claims are barred, in whole or in part, because Hydra Cup's Accused Products are not infringing and have never infringed any valid claim of the D235 Patent, the D551 Patent, or the D798 Patent either willfully, directly or indirectly, or either literally or under the doctrine of equivalents; and Hydra Cup has not induced or contributed to the infringement of any valid claim of the Asserted Patents because, *inter alia*, each of the Accused Products is instantly distinguishable as patently dissimilar from each of BlenderBottle's Asserted Patents, as discussed in detail in the paragraphs above.

**AFFIRMATIVE DEFENSE: (INVALIDITY OF THE ASSERTED PATENTS UNDER 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, AND 171).**

139. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon information and belief, the D235 Patent, the D551 Patent, and the D798 Patent are invalid for failure to meet the conditions for patentability specified in 35 U.S.C. §§ 101 *et seq*.

140. BlenderBottle's patent infringement claims are barred, in whole or in part, under 35 U.S.C. §§ 101 and 116 because, upon information and belief, the D235 Patent, the D551 Patent, and the D798 Patent fail to name the actual inventors and the named inventors are not truly the inventors.

141. BlenderBottle's patent infringement claims are barred, in whole or in part, under 35 U.S.C. § 102 because, upon information and belief, each design claimed by the D235 Patent, the D551 Patent, and the D798 Patent is anticipated by prior art.

142. BlenderBottle's patent infringement claims are barred, in whole or in part, under 35 U.S.C. § 103 because, upon information and belief, each design claimed by the D235 Patent, the D551 Patent, and the D798 Patent is obvious over the prior art.

143. BlenderBottle's patent infringement claims fail under 35 U.S.C. § 112 in that the Asserted Patents are ambiguous if they are sufficiently broad to cover the different design used by Hydra Cup as opposed to precise replicas of BlenderBottle's bottle design, lid design, and container design.

144. BlenderBottle's patent infringement claims fail under 35 U.S.C. § 113 in that the drawings in the Asserted Patents do not sufficiently disclose the designs claimed in the Asserted Patents that enable understanding of the subject-matter claimed therein.

145. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon information and belief, the D235 Patent, the D551 Patent, and the D798 Patent are invalid, unenforceable, and void because the claimed designs are primarily dictated by function and therefor lack the requisite ornamentality required by 35 U.S. Code § 171.

**AFFIRMATIVE DEFENSE: (FAILURE TO STATE A CLAIM).**

146. BlenderBottle's Complaint fails to state a claim, in whole or in part, upon which relief can be granted because, *inter alia*, BlenderBottle's Asserted Patents and Asserted Trade Dresses claim standalone components of a complete shaker whereas Hydra Cup's Accused Products are marketed, offered, and sold exclusively in multipacks of complete shakers—bottles, lids, and agitators all together.

**AFFIRMATIVE DEFENSE: (LACK OF STANDING).**

147. BlenderBottle's claims are barred, in whole or in part, because it lacks standing, including but not limited to because, upon information and belief, BlenderBottle does not own or otherwise have the right to enforce the Asserted Patents and Trade Dresses.

**AFFIRMATIVE DEFENSE: (UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT BEFORE THE USPTO).**

148. BlenderBottle's patent infringement claims are barred, in whole or in part, because, upon information and belief, because BlenderBottle's Asserted Patents are unenforceable due to inequitable conduct before the USPTO as further described with particularity below.

149. More specifically, as described in the Counterclaims, the Asserted Patents are unenforceable due to inequitable conduct before the USPTO, including, among other things, BlenderBottle's failure to identify known prior art, failure to disclose known functionality, misrepresentation of material information, and failure to disclose other material information during the prosecution of each Asserted Patent, which was done with knowledge and the failure to disclose was material to patentability. This failure to identify material references extends to each individual associated with the filing and prosecution of the patent applications asserted by BlenderBottle.

**AFFIRMATIVE DEFENSE: (PATENT MISUSE).**

150. BlenderBottle's patent infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, BlenderBottle has misused the

Asserted Patents by attempting to impermissibly broaden the physical and/or temporal scope of the patents with anticompetitive effect. BlenderBottle's patent misuse includes without limitation its assertion of its invalid and/or vastly narrow and limited patent rights against numerous competitors in the beverage container industry for the sole purpose of stifling competition without any good-faith infringement or other legal claims, and by attempting to impermissibly extend the life of its design and utility patents by registering them as trade dresses and asserting those trade dress registrations along with unregistered ones against Defendant and numerous other competitors.

**AFFIRMATIVE DEFENSE: (LIMITATIONS ON DAMAGES 35 U.S.C. § 286).**

151. BlenderBottle's alleged damages for patent infringement are limited to the six (6) years before it filed the Complaint pursuant to 35 U.S.C. § 286.

**AFFIRMATIVE DEFENSE: (NONINFRINGEMENT OF THE ASSERTED TRADE DRESSES).**

152. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because Hydra Cup has not infringed any valid, enforceable trade dress rights owned by BlenderBottle and because Hydra Cup has not infringed any of BlenderBottle's Asserted Trade Dresses, as, inter alia, the 019 Lid Trade Dress only claims a standalone lid design and the 626 Agitator Trade Dress only claim a standalone agitator design whereas Hydra Cup exclusively sells multipacks of complete shaker bottles—bottles, lids, and agitators all sold together.

**AFFIRMATIVE DEFENSE: (INVALIDITY OF THE ASSERTED TRADE DRESSES DUE TO FAILURE TO DEVELOP SECONDARY MEANING).**

153. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, BlenderBottle failed to develop secondary meaning in the Asserted Trade Dresses and because consumers do not

16

1  associate the lid design claimed by the 019 Lid Trade Dress with any single source, as,

2  upon information and belief, many companies have sold virtually identical lids for over a

3  decade, among many other reasons.

4  **AFFIRMATIVE DEFENSE: (INVALIDITY OF THE ASSERTED TRADE DRESSES DUE TO CLAIMING**
5  **PRIMARILY FUNCTIONAL DESIGNS).**

6  154. BlenderBottle's trade dress infringement claims and other related claims are barred, in

7  whole or in part, because, upon information and belief, the trade dresses asserted by

8  BlenderBottle, and each and every design feature thereof, are invalid, unenforceable,

9  and void because they are functional. At a minimum, the scope of the claimed trade

10  dresses should be construed as limited to any ornamental aspects alone and should not

11  extend to any functional elements of the claimed features.

12  **AFFIRMATIVE DEFENSE: (TRADE DRESS ABANDONMENT THROUGH NON-USE).**

13  155. BlenderBottle's trade dress infringement claims and other related claims are barred, in

14  whole or in part, because, upon information and belief, BlenderBottle has abandoned

15  any and all rights in the Asserted Trade dresses by non-use of the Asserted Trade

16  Dresses with the express or implied intent not to resume their use, as, inter alia,

17  BlenderBottle does not even sell a lid without a finger carry loop as claimed by its 019

18  Lid Trade Dress.

19  **AFFIRMATIVE DEFENSE: (TRADE DRESS ABANDONMENT—BECOMING GENERIC OR LOSING**
20  **SIGNIFICANCE).**

21  156. BlenderBottle's trade dress infringement claims and other related claims are barred, in

22  whole or in part, because, upon information and belief, the Asserted Trade Dresses have

23  become generic or otherwise have lost trade dress significance including but not limited

24  due to BlenderBottle's failure to control third-party uses of the Asserted Trade Dresses.

**AFFIRMATIVE DEFENSE: (REMOTE GOOD FAITH USER).**

157. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, under the remote good faith user doctrine.

**AFFIRMATIVE DEFENSE: (SENIOR USER OF TRADE DRESSES).**

158. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part because, upon information and belief, Hydra Cup are the senior users of the Asserted Trade Dresses.

**AFFIRMATIVE DEFENSE: (FAIR USE).**

159. BlenderBottle's patent infringement claims, trade dress infringement claims, and other related claims are barred, in whole or in part because any use of the Asserted Patents or Asserted Trade Dresses, or the design elements therein, by Hydra Cup was permissible fair use.

**AFFIRMATIVE DEFENSE: (TRADE DRESS MISUSE).**

160. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, BlenderBottle has misused the Asserted Trade Dresses by attempting to impermissibly broaden the physical and/or temporal scope of both its asserted trade dresses and patents with anticompetitive effect. BlenderBottle's trade dress misuse includes without limitation its assertion of its invalid and/or vastly overbroad, vague, and/or ambiguous trade dresses against numerous competitors in the beverage container industry for the sole purpose of stifling competition without any good-faith infringement or other legal claims, and by attempting to impermissibly extend the life of its design and utility patents by registering them as trade dresses and asserting those trade dress registrations along with unregistered ones against Hydra Cup and numerous other competitors.

**AFFIRMATIVE DEFENSE: (INEQUITABLE CONDUCT BEFORE THE USPTO).**

161. BlenderBottle's 019 Lid Trade Dress infringement claim is barred and the 019 Lid Trade Dress is unenforceable due to inequitable conduct before the USPTO as further described with particularity below and as set forth in Defendant's Counterclaims that it expressly incorporates by reference herein. Specifically, the registration for the 019 Lid Trade Dress was procured by material, false, and fraudulent declarations and representations to the USPTO, including but not limited to various misrepresentations, including the following: (1) the Lid Trade Dress was first used anywhere and first used in commerce at least as early as 2003, when, on information and belief, the Lid Trade Dress was not used until on or around 2014; and (2) in response to the USPTO's request for a "written statement as to whether the applied-for mark, or any feature(s) thereof, is or has been the subject of a design or utility patents or patent applications, including expired patents and abandoned patent applications" and "copies of the patents and/or patent applications documentation," the Registrant for the Lid Trade Dress only provided "representative samples" and failed to disclose at least seven (7) relevant patents and/or patent applications, including without limitation some related to the functionality of the Lid Trade Dress and/or other requirements for trade dress protection. The Registrant made the above misrepresentations knowing they were false and with the intention to deceive the USPTO, and the USPTO relied on the misrepresentations.

**AFFIRMATIVE DEFENSE: (NO LIKELIHOOD OF CONFUSION).**

162. BlenderBottle's trade dress infringement claims and other related claims are barred, in whole or in part, because, upon information and belief, Hydra Cup's actions have not caused and are not likely to cause confusion as to source, affiliation, connection, or association with BlenderBottle or its products because, inter alia, BlenderBottle's 019 Lid Trade Dress only claims a design for a standalone and its 626 Agitator Trade Dress

1  only claims the design for a standalone agitator whereas the Accused Products are

2  marketed, offered, and sold exclusively in multipacks of complete shakers—bottles, lids,

3  and agitators.

4  **AFFIRMATIVE DEFENSE: (PREEMPTION).**

5  163. BlenderBottle's common law trade dress infringement claims and common law unfair

6  competition claims and other related claims are barred, in whole or in part, because,

7  upon information and belief, BlenderBottle's trade dress claims under its Asserted

8  Trade Dresses are preempted by federal patent law.

9  **AFFIRMATIVE DEFENSE: (UNCLEAN HANDS).**

10 164. BlenderBottle's claims are barred, in whole or in part, because, on information and

11 belief, BlenderBottle has engaged in unconscionable conduct that has an immediate and

12 necessary relation to the matters at issue in the case and is attempting to benefit from

13 that unconscionable conduct.

14 **AFFIRMATIVE DEFENSE: (STATUTE OF LIMITATIONS).**

15 165. BlenderBottle's claims are barred, in whole or in part, by the applicable statute of

16 limitations, including but not limited to 35 U.S.C. § 286, Cal. Civ. Proc. Code § 337, 338,

17 340, and/or 343, and/or Cal. Bus. & Prof. Code § 17208.

18 **AFFIRMATIVE DEFENSE: (ANTITRUST).**

19 166. BlenderBottle's claims are barred, in whole or in part, because, on information and

20 belief, BlenderBottle's Asserted Patents and Asserted Trade Dresses have been or are

21 being used to violate the antitrust laws of the United States, as, upon information and

22 belief, BlenderBottle is improperly using the patent system to develop fake secondary

23 meaning to secure registered trade dresses while excluding all meaningful competition

24 with their patents thereby securing perpetual patents in product configurations.

1 **AFFIRMATIVE DEFENSE: (LACHES).**

2 167. BlenderBottle's claims are barred, in whole or in part, by the doctrine of laches because,

3      on information and belief, BlenderBottle unreasonably delayed in filing this action, as

4      BlenderBottle has been aware of Hydra Cup as a competitor in the shaker bottle market

5      for nearly a decade and has been aware of each Accused Products for most of each

6      Accused Product's existence. Despite being aware of Hydra Cup and the Accused

7      Products, BlenderBottle took no action and waited several years to file a lawsuit.

8      BlenderBottle's delay misled Hydra Cup as to BlenderBottle's assertion of rights. Hydra

9      Cup relied on to its detriment, causing injury and prejudice to Hydra Cup. Similarly,

10      Hydra Cup was misled and relied to its detriment on the fact that BlenderBottle learned

11      of the Accused Products before 2022 yet did not file a lawsuit until December 2022,

12      leading Hydra Cup to continue to offer and sell the Accused Products without

13      BlenderBottle taking effective legal steps to stop Hydra Cup. Furthermore,

14      BlenderBottle did not notify Hydra Cup of the 019 Lid Trade Dress until it filed this

15      Complaint and did not mention the 019 Lid Trade Dress in any of the cease and desist

16      letters that BlenderBottle served on Hydra Cup.[2]

17 **AFFIRMATIVE DEFENSE: (ESTOPPEL).**

18 168. Along similar lines, BlenderBottle's claims are barred, in whole or in part, by the

19      doctrine of estoppel because, on information and belief, BlenderBottle misled Hydra Cup

20      to the detriment of Hydra Cup concerning, among other things, what specific

21      intellectual property rights BlenderBottle was asserting against Hydra Cup as

22      discussed in the preceding paragraphs.

---

[2] For example, none of BlenderBottle's cease and desist letters mentions the 019 Lid Trade Dress. (*See* Ex. 71,, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 January 2021) (listing, under the Section titled "Hydra Cup's Patent Infringement," the following patents that BlenderBottle was accusing Hydra Cup of infringing: U.S. Patent No. 9,492,024, U.S. Patent No. 9,216,843, U.S. Patent No 1,0165,877, U.S. Patent No. D510,235, U.S. Patent No. D697,798, and U.S. Patent No. 6,379,032); *see also* Ex. 72,, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 March 2022) (accusing Hydra Cup of infringing, among others, U.S. Patent No. 10,165,877, U.S. Patent No. 9,492,024, and U.S. Patent No. 9,216,843); Ex. 73, Cease and Desist Letter from BlenderBottle to Hydra Cup (17 August 2022) (accusing Hydra Cup of infringing U.S. Patent No. D696,551)).

**AFFIRMATIVE DEFENSE: (ACQUIESCENCE).**

169. Also along similar lines, BlenderBottle's claims are barred, in whole or in part, by the doctrine of acquiescence because, on information and belief, BlenderBottle has implicitly and/or explicitly acquiesced to the conduct described in the Complaint and has therefore waived any purported claim for relief against Hydra Cup as discussed in the paragraphs above.

**AFFIRMATIVE DEFENSE: (UNJUST ENRICHMENT).**

170. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, BlenderBottle is seeking to recover more than it is entitled to recover under the circumstances of this case (any amount of which Hydra Cup expressly denies), and as such, an award of any recovery by Plaintiff would constitute unjust enrichment.

**AFFIRMATIVE DEFENSE: (PUBLIC POLICY).**

171. BlenderBottle's claims are barred, in whole or in part, because, on information and belief, BlenderBottle's claims and its actions violate public policy for the reasons discussed in the preceding paragraphs, including, among other reasons, if BlenderBottle is allowed to abuse the patent system to develop meaningless secondary meaning on the designs disclosed in its Asserted Trade Dresses while excluding all competition with its Asserted and Equivalent Patents, that means Hydra Cup and every other company will be allowed to use their patents to exclude all competition and then can simply pay for advertising and pay to be mentioned in blog articles and secure declarations under threat of lawsuit to acquire the evidence to establish secondary meaning. If enough companies learn how to use the patent system to hack the trade dress system, a few companies will own all product configurations indefinitely thereby causing great harm to consumers. Put differently, no single entity—not BlenderBottle or Hydra Cup—

1    should be allowed to abuse the patent and trade dress system to secure a monopoly on

2    an entire product category.

3    **AFFIRMATIVE DEFENSE: (PROSECUTION HISTORY ESTOPPEL).**

4    172. BlenderBottle's claims are barred, in whole or in part, because, on information and

5    belief, because, based on statements and admissions made during prosecution of the

6    patent applications, BlenderBottle is estopped from asserting any interpretation of the

7    claims that would cover the Accused Products.

8    **AFFIRMATIVE DEFENSE: (PUBLIC DOMAIN).**

9    173. BlenderBottle's claims are barred, in whole or in part, because, on information and

10   belief, because the designs it claims rights to belong to the public domain. More

11   specifically, BlenderBottle's D235 Patent expired in October 2019. Once the D235

12   Patent expired, BlenderBottle granted all rights to the D235 Patent to the public

13   domain. Thus, as of 06 October 2019, the shaker bottle and lid design claimed by the

14   D235 patent was free to use.

15   **AFFIRMATIVE DEFENSE: (OBVIOUSNESS-TYPE DOUBLE PATENTING).**

16   174. BlenderBottle's claims are barred, in whole or in part, because, on information and

17   belief, the claims of the Asserted Patents are invalid for obviousness-type double

18   patenting over claims of BlenderBottle's other patents, other previously filed patent

19   applications, prior publications, and other prior art.

20   **AFFIRMATIVE DEFENSE: (NO WILLFUL INFRINGEMENT).**

21   175. BlenderBottle's claims alleging willful infringement are barred, in whole or in part,

22   because Hydra Cup has not willfully infringed any of the Asserted Patents or Asserted

23   Trade Dresses as discussed in the paragraphs above.

**AFFIRMATIVE DEFENSE: (NO BASIS FOR ENHANCED DAMAGES).**

176. Any conduct of Hydra Cup was in good faith and/or non-willful and precludes all claims for enhanced damages.

**AFFIRMATIVE DEFENSE: (NO BASIS FOR ATTORNEYS' FEES).**

177. BlenderBottle has failed to allege an adequate and/or reasonable basis upon which to seek attorneys' fees.

**AFFIRMATIVE DEFENSE: (NO IRREPARABLE HARM).**

178. If BlenderBottle suffered any injury, which Hydra Cup does not concede, it could be adequately compensated in an action at law, and accordingly, BlenderBottle is not entitled to equitable relief. Further, BlenderBottle has not suffered any harm, including the type of irreparable harm required to support its claim for injunctive relief.

**COUNTERCLAIMS**

179. Defendants TRRS Magnate LLC d/b/a Hydra Cup and Thomas Raymus (collectively "Hydra Cup" unless otherwise specified), by and through counsel, bring this Third Amended Counterclaim ("Counterclaim") against Plaintiff BlenderBottle Trove Brands, LLC, d/b/a the BlenderBottle Company ("BlenderBottle") and in response to BlenderBottle's Second Amended Complaint (the "Complaint") pursuant to Rule 13 of the Federal Rules of Civil Procedure and seek the following determinations:

a. A declaratory judgment under 28 U.S.C. § 2201 and 2202 that the D047 License Agreement between Tianqi and Hydra Cup is valid and enforceable;

b. A declaratory judgments under 28 U.S.C. § 2201 and 2202, declaring that Tianqi granted Hydra Cup a valid and enforceable implied license to substantial rights in Tianqi's U.S. Patent No. D666,047 and U.S. Patent No. D766,029;

c. A declaratory judgment under 28 U.S.C. § 2201 and 2202 that the "Bottle" design disclosed by U.S. Patent No. D510,235 was granted to the public domain when the patent expired on 04 October 2019.

d. A declaratory judgment under 28 U.S.C. § 2201 and 2202 that any Accused Product that was not offered, used, or sold in the United States before 04 October 2019 did not infringe the expired D235 Patent;

e. Fourteen declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that each Asserted Patent and each Equivalent Patent is invalid as follows: (i) invalid under 35 U.S.C. § 116 for failing to name the actual inventors; invalid under 35 U.S.C. §§ 102 and 103 because the subject matter claimed in said patents is anticipated by and/or obvious over the prior art and is therefore not novel or original; (iii) invalid under 35 U.S.C. §§ 112 and 113 for failing to provide proper specifications and drawings;

f. Counterclaims for nine declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent are each invalid under 35 U.S.C. § 171 because each claimed design is primarily dictated by function and lacks the requisite ornamentality;

g. Counterclaims for nine declaratory judgment actions under 28 U.S.C. § 2201 and 2202 that the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent are each invalid for lack of ornamentality, as each patent claims a design that is primarily dictated by function and therefore lacks the requisite ornamentality;

h. Counterclaims for declaratory judgment under 28 U.S.C. § 2201 and 2202 that the D551 Patent, the D478 Patent, and the 830 Patent are unenforceable due to inequitable conduct on the USPTO;

i. A counterclaim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup's Accused Products have not infringed and do not infringe the Asserted Patents or the Equivalent Patents;

j.   Counterclaims for six declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, the Unregistered Bottle Trade Dress, and the Unregistered Label Trade Dress and U.S. Trademark Registration No. 4,894,363 and U.S. Trademark Registration No. 3,515,591 are generic and not protectable under the Lanham Act, California law, or common law;

k.   Counterclaims for four declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that the designs claimed in BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, the Unregistered Bottle Trade Dress, and the Unregistered Label Trade Dress are primarily functional and therefore not eligible for protection under the Lanham Act;

l.   Counterclaims for six declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591, the Unregistered Bottle Trade Dress, and the Unregistered Label Trade Dress lack distinctiveness and have not developed valid secondary meaning and therefore are not protectable under the Lanham Act;

m.   A counterclaim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that BlenderBottle's U.S. Trademark Registration No. 6,800,019 is invalid due to inequitable conduct on the USPTO;

n.   Counterclaims for six declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that the Accused Products are not likely to be confused with BlenderBottle's U.S. Trademark Registration 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591, the Unregistered Bottle Trade Dress, or the Unregistered Label Trade Dress;

o.   Counterclaims for six declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that Hydra Cup's Accused Products do not infringe BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591, the Unregistered Bottle Trade Dress, or the Unregistered Label Trade Dress;

p.   Counterclaims for four declaratory judgment actions under 28 U.S.C. § 2201 and 2202, declaring that BlenderBottle's U.S. Trademark Registration No. 6,245,626, U.S. Trademark Registration No. 6,800,019, Trade Dress U.S. Trademark Registration No. 4,894,363, U.S. Trademark Registration No. 3,515,591 are unenforceable, invalid, and therefore canceled;

q.   A counterclaim for infringement of Hydra Cup's licensed rights in U.S. Patent No. D666,047 under the Patent Act, 35 U.S.C. § 271, based on BlenderBottle's unauthorized commercial manufacture, use, importation, offer for sale, and sale of its Infringing BlenderBottle Products in the United States;

r.   A counterclaim for declaratory judgment under 28 U.S.C. § 2201 and 2202 that Hydra Cup developed secondary meaning for its OG DualShaker Trade Dress, that the OG DualShaker Trade Dress is not primarily functional, and that the OG DualShaker Trade Dress valid and enforceable;

s.   A counterclaim that BlenderBottle's Infringing Products infringe Hydra Cup's valid and enforceable OG DualShaker Trade Dress under 15 U.S.C. § 1125(a);

t.   Adjudging BlenderBottle to have misused the Asserted Patents, Equivalent Patents, and Asserted Trade Dresses to attempt to obtain improper perpetual patents through trade dress protection;

u.   A counterclaim that BlenderBottle has attempted to monopolize and monopolized the shaker bottle markets in the United States in violation of 15 U.S.C. § 2.

## JURISDICTION AND VENUE

180. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

181. This Court has original subject matter jurisdiction over Hydra Cup's counterclaims relating to patent infringement, trademark and trade dress infringement, false designation of origin, and federal unfair competition under, *inter alia*, 28 U.S.C. §§ 1331 and 1338, as these claims arise under the laws of the United States at 35 U.S.C.§§ 1, *et seq*., the Lanham Act, 15 U.S.C. §§ 1051, *et seq*., the California Business & Professions Code §§ 17200, *et seq*., and common law.

182. Jurisdiction in this Court is also proper pursuant to 28 U.S.C. § 1332, as Hydra Cup and Mr. Raymus both reside in California and BlenderBottle resides in Utah and the amount in controversy exceeds $75,000 exclusive of interests and costs.

183. This Court has supplemental jurisdiction over Hydra Cup's California law unfair competition counterclaims pursuant to 28 U.S.C. § 1367(a) because the state law counterclaims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative fact under Article III of the United States Constitution.

184. Jurisdiction is also proper in this Court pursuant to 28 U.S.C. §§ 2201 and 2202 as it relates to the declaration that the alleged Asserted Patents, Asserted Trade Dresses, Equivalent Patents, and Related Trademarks are invalid, unenforceable, and not infringed by any product offered for sale, sold, made or used by Hydra Cup.

185. This United States District Court for the Eastern District of California has general and specific personal jurisdiction over BlenderBottle because, directly or through intermediaries, BlenderBottle has committed acts within the District giving rise to this action and are present in and transact and conduct business in and with residents of this district and the State of California.

186. Hydra Cup's Counterclaims arise, at least in part, from BlenderBottle's contacts with and activities in this district and the State of California, as explained below in the General Jurisdictional Allegations and Factual Allegations.

187. This Court also has personal jurisdiction over BlenderBottle because BlenderBottle has submitted to the jurisdiction of this Court by filing its Complaint against Hydra Cup in this district and because, *inter alia*, BlenderBottle has been selling and offering for sell the BlenderBottle Infringing Products in this district, and committing, among other things, acts of patent and trade dress infringement in this district against Hydra Cup, including but not limited to, selling Infringing Products to consumers and/or retailers in this district and selling into the stream of commerce knowing such products would be sold in California and this district; enforcing the Asserted Patents, Equivalent Patents, Asserted Trade Dresses, and/or Related Trademarks against multiple entities in California through litigation in this district; advertising and marketing in California; and selling thousands of products to Californians, including products embodying the designs claimed by the Asserted Patents, Equivalent Patents, and/or Asserted Trade Dresses; serving cease and desist letters concerning the Asserted Patents, Equivalent Patents, Asserted Trade Dresses, and/or Related Trademarks against multiple entities in California, including against Hydra Cup.

188. BlenderBottle, directly and through intermediaries, makes, uses, sells, offers for sale, imports, ships, distributes, advertises, promotes, and/or otherwise commercializes such Infringing Products into this district and the State of California. BlenderBottle regularly conducts and solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from goods and services provided to residents of this district and the State of California These acts form a substantial part of the events or omissions giving rise to BlenderBottle's claims.

189. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and 1391(c), and 1400(a) and 1400(b) based on information set forth herein, which is hereby repeated and incorporated by reference. Furthermore, upon information and belief, BlenderBottle has committed acts of infringement, and/or advertise, market, sell, and/or offer to sell its products, including its Infringing Products, in this district. Venue is also proper in this district because BlenderBottle has submitted to

the venue of this Court by filing its Complaint against Hydra Cup in this judicial district, because BlenderBottle is subject to personal jurisdiction in this judicial district, because BlenderBottle has directed its business, licensing, and enforcement activities at this judicial district, and because a substantial part of the events giving rise to the claims and counterclaims occurred in this judicial district.

## PARTIES

190. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

191. Counterclaim Plaintiff TRRS Magnate LLC d/b/a Hydra Cup is a limited liability company organized and existing under the laws of the State of California, with a principal place of business at 1433 Moffat Blvd., Ste. #13, Manteca, California 95336.

192. Counterclaim Plaintiff Thomas Raymus is an individual who resides in Manteca, California. Mr. Raymus is a citizen of California. Mr. Raymus is the current CEO of Hydra Cup.

193. Upon information and belief, Counterclaim Defendant Trove Brands, LLC, doing business as the BlenderBottle Company is a limited liability company organized and existing under the laws of the State of Utah, with its principal place of business located at 250 South 850 East, Lehi, Utah 84043.

## NON-PARTIES

194. Upon information and belief, Zhigang Lin is the owner of Ningbo Aoyida Plastic Co., Ltd. and Ningbo Tianqi Molding Co., Ltd (collectively "Tianqi").[3]

195. Upon information and belief, Tianqi is the owner of all right, title, and interest in and to the D047 Patent and D029 Patent and Tianqi manufactured all of the Accused Products

## THE INTELLECTUAL PROPERTY, ASSERTED PRODUCTS, AND ALLEGEDLY INFRINGING PRODUCTS

---

[3] (*See* Ex. 49, Hydra Cup's Fifth Amended Answers and Responses to BlenderBottle's Interrogatories.

196. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

I.   **HYDRA CUP'S INTELLECTUAL PROPERTY AND ACCUSED PRODUCTS.**

197. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

   **A. Hydra Cup's Intellectual Property.**

198. To protect its proprietary designs, Hydra Cup has obtained numerous patents and common law trade dresses on various designs it created for shaker bottles and lids and other products as well as obtained rights to designs disclosed by third party patents, including U.S. Patent No. D992,348, U.S. Patent No. D1,003,107, and U.S. Patent Application No. 47/631,468.

199. Hydra Cup's "OG DualShaker Trade Dress" refers to the valid and enforceable trade dress rights that Hydra Cup developed in its bottle and lid design practiced by its DualShaker Bottle, which it first started offering in commerce as early as 19 April 2012.[4] The OG DualShaker Trade Dress includes the following design elements that consumers identify with Hydra Cup: a tapered cylindrical body that slightly narrows towards the bottle's base; the base of the bottle is flat; the lid has a prominent domed, concave-shaped body with a distinct lid skirt that extends down from the domed top and covers the threading that connects to the lid to the bottle; on top of the lid's dome body sit pivoting top arms that are connected to brackets on one end and, on the opposing ends of each pivoting top arm, is a circular spout guard that closes into the spout; each opposing drinking spout is located on opposing sides that are slightly off center; and the lid has a finger carry loop connected to the brackets that stick out from the lid opposite the spout and spout guard.

---

[4] *See* Ex. 96, Screenshots of HydraCup's OG DualShaker Trade Dress from 2012 to Present from Internet Archive (2012-2024) (showing Hydra Cup using the DualShaker Trade Dress as early as 2012 and marketing and offering the DualShaker for sell as early as 19 April 2012.)



*Hydra Cup's OG DualShaker Bottle Trade Dress in 2013.*



*Hydra Cup's OG DualShaker Bottle Trade Dress in 2018.*



*Hydra Cup's OG DualShaker Bottle Trade Dress in 2024.*

200. On information and belief, U.S. Patent No. D666,047 (the "D047 Patent") issued on 28 August 2012,

with Zhigang Lin listed as the named inventor.[5] The D047 Patent issued from U.S. Patent Application

---

[5] (Ex. 12, U.S. Patent No. D666,047 (filed 14 Apr. 2011)).

No. 29/389,694, which was filed on 14 April 2011. Upon information and belief, the D047 Patent expires on 28 August 2026.

201. On information and belief, U.S. Patent No. D766,029 (the "D029 Patent") issued on 13 September 2016, with Zhigang Lin listed as the named inventor and Ningbo Tianqi Molding Co Ltd listed as the assignee.[6] The D029 Patent issued from U.S. Patent Application No. 29/533,824, which was filed on 22 July 2015. Upon information and belief, the D029 Patent expires on 13 September 2031.

202. Hydra Cup obtained licensed rights to the shaker bottle and lid designs disclosed by U.S. Patent No. D666,047 and U.S. Patent No. D766,029, which are the designs embodied by the TS1327 OG Mini Shaker, the TS1314 OG Regular Shaker, the TS1352 OG Storage Shaker, and the HC OG Carry Loop Lid, and the lid design on the TS1038 Jumbo Shaker.



*The following Accused Products were Designed Based on the D047 and D029 Patents licensed to Hydra Cup by Tianqi: Hydra Cup Shaker Bottle I, II, IV, V, VI, VII, IX, X, and the Accused HC OG Carry Loop Lid*

---

[6] (Ex. 13, U.S. Patent No. D766,029 (filed 22 July 2015)).

**Patents that the Accused Products were modeled after (non blender bottle)**



| | Patent No: | **047D** | **029D** | **Accused Product** |
|---|---|---|---|---|
| | Date: | 8/28/2012 | 9/13/2016 | |
| Side View | | | | |
| Upper Perspective View | | | | |
| Relation to Blender Bottle Patents | | Cites 235D<br>Cited By 551D<br>Predates other BB lid patents. | Cites BlenderBottle patents<br>235D, 097D, 843, 908 | |

1

2   *The TS1314 OG Regular Shaker was designed based on Tianqi's D047 Patent; the TS1327 OG Mini Shaker, the TS1352*
3   *OG Storage Shaker, and the HC OG Carry Loop Lid were designed based on Tianqi's D029 Patent.*

4   **B. Hydra Cup's Accused Products.**

5   203. Hydra Cup realleges and incorporates by reference its allegations in each and every

6      paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set

7      forth herein.

8   *1. Hydra Cup's Accused Shakers.*

9   204. The "Accused Shakers" refers to Hydra Cup's Shakers, bottles and lids combined, listed in paragraph

10     49 of the Second Amended Complaint that BlenderBottle is accusing of infringing its Asserted

11     Patents, Equivalent Patents, and Asserted Trade Dresses.[7]

---

[7] "Hydra Cup Shaker Bottle I" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle I." (*See* Second Am. Compl., ¶ 49, ECF No. 102.); "Hydra Cup Shaker Bottle II" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle II." (*Id*.); "Hydra Cup Shaker Bottle III" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle III." (*Id*.); "Hydra Cup Shaker Bottle IV" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle IV." (*Id*.); "Hydra Cup Shaker Bottle V" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle V." (*Id*.); "Hydra Cup Shaker Bottle VI" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle VI." (*Id*.); "Hydra Cup Shaker Bottle VII" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle VII." (*Id*.); "Hydra Cup Shaker Bottle VIII" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle VIII."(*Id*.); "Hydra Cup Shaker Bottle IX" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle IX." (*Id*.); "Hydra Cup Shaker Bottle X" refers to the bottle pictured in paragraph 49 of the Second Amended Complaint titled "Hydra Cup Shaker Bottle X." (*Id*.).



1

2    *The Accused Products: Hydra Cup Shaker Bottles I-X.*

3    205. After removing duplicates, the ten Accused Shakers identified in paragraph 49 of the Second

4          Amended Complaint represent the following five distinct Accused Shakers offered by Hydra Cup at

5          issue in this case: (i) the "TS1327 OG Mini Shaker"; (ii) the "TS1314 OG Regular Shaker"; (iii) the

6          "TS1352 OG Storage Shaker"; (iv) the "TS1038 Jumbo Shaker"; and (v) the "GOAT Shaker"

7          (collectively, the "Accused Shakers").[8]



8

9    *Hydra Cup's Accused Shakers Seen in the Accused Products: the GOAT Shaker, the 1352 OG Storage Shaker, the TS1038*
10   *Jumbo Shaker, the TS1327 OG Mini Shaker, and the TS1314 OG Regular Shaker.*

---

1    [8] (*See* Second Am. Compl., ¶ 49, ECF No. 102.). Hydra Cup's Accused Shakers can be matched to the Tianqi catalog as
2    follows: TS1314: Hydra Cup Shaker Bottles 1, 4, 5, and 10; TS1327: Hydra Cup Shaker Bottles 6 and 7; TS1352: Hydra Cup
3    Shaker Bottles 2 and 9; TS1038: Hydra Cup Shaker Bottle 8.

206. The "TS1314 OG Regular Shaker" refers to Accused Hydra Cup Shaker Bottles I, IV, V, and X in the Second Amended Complaint (Bates Number HC0180553), which all embody the same identical shaker bottle and lid design modeled after the design disclosed by Tianqi's D047 Patent.[9]



*Hydra Cup's TS1314 OG Regular Shaker.*

207. The "TS1327 OG Mini Shaker" refers to Accused Hydra Cup Shaker Bottles VI and VII in the Second Amended Complaint (Bates Number HC0180552), which both embody the same identical shaker bottle and lid design modeled after the design disclosed by Tianqi's D029 Patent.[10]




*Hydra Cup's TS1327 OG Mini Shaker.*

---

[9] (*See* Second Am. Compl., ¶ 49, ECF No. 102.).

[10] (*Id.*).

208. The "TS1352 OG Storage Shaker" refers to Accused Hydra Cup Shaker Bottles II and IX in the Second Amended Complaint (Bates Number HC0180554), which both embody the same identical shaker bottle and lid design modeled after the design disclosed by Tianqi's D029 Patent.[11]



*Hydra Cup's TS1352 OG Storage Shaker.*

209. The "TS1038 Jumbo Shaker" refers to Accused Hydra Cup Shaker Bottle XIII in the Second Amended Complaint (Bates Number HC0180555), which embodies the lid design disclosed by Tianqi's D029 Patent.[12]



*Hydra Cup's TS1038 Jumbo Shaker.*

---

[11] (*Id.*).

[12] (*Id.*).

210. The "GOAT Shaker" refers to Accused Hydra Cup Shaker Bottle III in the Second Amended Complaint (Bates Number HC0180556).[13] The GOAT Shaker is the only Accused Product that does not embody the designs disclosed by Tianqi's D029 and D047 Patents.



*Hydra Cup's GOAT Shaker.*

### *2. Hydra Cup's Accused Shaker Lid.*

211. The "HC OG Carry Loop Lid" refers to the Accused Shaker Lid in the Second Amended Complaint (Bates Number HC0180557).[14] The HC OG Carry Loop Lid is the same lid as the lid on the lid on the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, and the TS1038 Jumbo Shaker—each manufactured by Tianqi and designed based on Tianqi's D029 Patent—with the addition of a finger carry loop.



*Hydra Cup's HC OG Carry Loop Lid .*

---

[13] (*Id.*).

[14] (*Id.* at ¶ 50.).

The accused shaker lid has the same lid as the OG shakers above. It only has the addition of a U-shaped carry loop. You can remove the old flip cap and add the new flip cap with the U-shaped loop.



Hydra Cup
Shaker Bottle II

*The HC OG Carry Loop Lid is the same exact lid used on the TS1327 OG Mini Shaker and TS1314 OG Regular Shaker with the addition of a carry-loop.*

### 3. Hydra Cup's Accused Shaker Label.

212. The "OG Shaker Label" refers to the label pictured in paragraph 52 the Second Amended Complaint.[15]




*Hydra Cup's OG Shaker Label.*

### 4. Hydra Cup's Accused Shaker Agitators.

213. The "OG Spherical Agitator" refers to the four spherical wired agitators pictured in paragraph 49 of the Second Amended Complaint, which are the agitators pictured with Hydra Cup's Bottles I-IV. [16]

---

[15] (*Id.* at ¶ 52.).

[16] (*Id.* at ¶ 49.).



1

2    *Hydra Cup's OG Spherical Agitator.*

3    214. The "OG Dumbbell Agitator" refers to the Hydra Cup dumbbell agitators pictured with Hydra Cup

4    Shaker Bottles VI-IX in paragraph 49 of the Second Amended Complaint.[17]



5

6    *Hydra Cup's OG Dumbbell Agitator.*

7    **II. BLENDERBOTTLE'S INTELLECTUAL PROPERTY AND INFRINGING PRODUCTS.**

8    215. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

9    Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

10   216. In its Second Amended Complaint, BlenderBottle alleges that Hydra Cup's Accused Products

11   infringe BlenderBottle's Asserted Patents and Asserted Trade Dresses and, through its actions and

---

1    [17] (*Id.* at ¶ 49).

behavior, Hydra Cup understands BlenderBottle also accuses Hydra Cup of infringing the Equivalent

Patents and the Related Trademarks (collectively, "BlenderBottle's Intellectual Property").

**A. BlenderBottle's Intellectual Property.**

*1. BlenderBottle's Asserted Patents.*

 ![BlenderBottle's "Classic Simple Shaker" Patent Family.](img_101.png)

217. On information and belief, U.S. Patent No. D510,235 (the "D235 Patent") entitled "Bottle" issued on

04 October 2005, with Steven M. Sorensen listed as the named inventor and Runway Way Blue LLC

listed as the assignee.[18] The D235 Patent issued from U.S. Patent Application No. 29/189,695, which

was filed on 09 September 2003. Upon information and belief, the D235 Patent expired on 04

October 2019.

218. On information and belief, U.S. Patent No. D696,551 (the "D551 Patent") entitled "Bottle Lid Having

Integrated Handle" issued on 31 December 2013, with David O. Meyers and Steven M. Sorensen

listed as the named inventors and Runway Blue LLC listed as the assignee.[19] The D551 Patent issued

from U.S. Patent Application No. 29/426,833, which was filed on 07 September 2012. Upon

information and belief, the D551 Patent expires on 31 December 2027.

219. On information and belief, U.S. Patent No. D697,798 (the "D798 Patent") entitled "Container" issued

on 21 January 2014, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the

named inventors and Runway Blue LLC listed as the assignee.[20] The D798 Patent issued from U.S.

Patent Application No. 29/455,395, which was filed on 06 June 2013. Upon information and belief,

the D798 Patent expires on 21 January 2028.

*2. BlenderBottle's Equivalent Patents—The "Classic Simple Shaker" Patent Family.*

---

[18] (Ex. 14, U.S. Patent No. D510,235 (filed 09 Sept. 2003)).

[19] (Ex. 15, U.S. Patent No. D696,551 (filed 07 Sept. 2012)).

[20] (Ex. 16, U.S. Patent No. D697,798 (filed 06 June 2013)).



2    220. Because the designs claimed by the Asserted Patents and the Asserted Trade Dresses are substantially

3    and confusingly similar to numerous other patents owned by BlenderBottle and because

4    BlenderBottle has directly and indirectly accused Hydra Cup of infringing such patents, Hydra Cup

5    understands that BlenderBottle is also accusing Hydra Cup of infringing BlenderBottle's other

6    Equivalent Patents claiming inventions and designs that are substantially and confusingly similar to

7    the "classic simple shaker" bottle, lid, and agitator designs claimed by the Asserted Patents and the

8    Asserted Trade Dresses. Accordingly, upon information and belief, Hydra Cup understands

9    BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent

10   Patents: U.S. Patent Number D820,038 Patent (the "D038 Patent"), U.S. Patent Number D748,478

11   Patent (the "D478 Patent"), U.S. Patent No. D900,540 (the "D540 Patent"), U.S. Patent No. D644,065

12   (the "D065 Patent"), U.S. Patent No. D830,119 (the "D119 Patent"), U.S. Patent No. D897,149 (the

13   "D149 Patent") (collectively the "Equivalent Design Patents") as well as claims disclosed by U.S.

14   Patent No. 9,216,843 (the "843 Patent"), U.S. Patent No. 9,492,024 (the "024 Patent"), U.S. Patent

15   No. 10,165,877 (the "877 Patent"), U.S. Patent No. 8,695,830 (the "830 Patent") and U.S. Patent

16   No. 11,111,060 (the "060 Patent") (collectively the "Equivalent Utility Patents") (collectively all

17   together the "Equivalent Patents").



*The "Classic Simple Shaker" Patent Family Lids.*



*BlenderBottle's Equivalent Design Patents: D235, D551, D478, D038, D540.*

221. On information and belief, U.S. Patent No. D644,065 (the "D065 Patent") issued on 30 August 2011, with Sergio Llerena listed as the named inventor and Runway Blue LLC listed as the assignee.[21] The D065 Patent issued from U.S. Patent Application No. 29/375,884, which was filed on 29 September 2010. Upon information and belief, the D065 Patent expires on 30 August 2025.

222. On information and belief, U.S. Patent No. D748,478 (the "D478 Patent") issued on 02 February 2016, withSteven M. Sorensen and David O. Meyers listed as the named inventors and Runway Blue LLC listed as the assignee.[22] The D478 Patent issued from U.S. Patent Application No. 29/457,096, which was filed on 06 June 2013. Upon information and belief, the D478 Patent expires on 02 February 2030.

223. On information and belief, U.S. Patent No. D820,038 (the "D038 Patent") issued on 12 June 2018, with Steven M. Sorensen and David O. Meyers listed as the named inventors and Runway Blue LLC

---

[21] (Ex. 23, U.S. Patent No. D644,065 (filed 29 Sept. 2010)).

[22] (Ex. 24, U.S. Patent No. D748,478 (filed 06 June 2013)).

listed as the assignee.[23] The D038 Patent issued from U.S. Patent Application No. 29/525,379, which was filed on 29 April 2015. Upon information and belief, the D038 Patent expires on 12 June 2032.

224. On information and belief, U.S. Patent No. D900,540 (the "D540 Patent") issued on 03 November 2020, with Steven M. Sorensen and David O. Meyers listed as the named inventors and Runway Blue LLC listed as the assignee.[24] The D540 Patent issued from U.S. Patent Application No. 29/733,191, which was filed on 30 April 2020. Upon information and belief, the D540 Patent expires on 03 November 2035.

225. On information and belief, U.S. Patent No. D830,119 (the "D119 Patent") issued on 09 October 2018, with Steven M. Sorensen and David O. Meyers listed as the named inventors and Runway Blue LLC listed as the assignee.[25] The D119 Patent issued from U.S. Patent Application No. 29/614,992, which was filed on 24 August 2017. Upon information and belief, the D119 Patent expires on 09 October 2033.

226. On information and belief, U.S. Patent No. D897,149 (the "D149 Patent") issued on 29 September 2020, with Steven M. Sorensen and David O. Meyers listed as the named inventors and Runway Blue LLC listed as the assignee.[26] The D149 Patent issued from U.S. Patent Application No. 29/650,949, which was filed on 11 June 2018. Upon information and belief, the D149 Patent expires on 29 September 2035.

227. On information and belief, U.S. Patent No. 9,492,024 (the "024 Patent") issued on 15 November 2016, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the named inventors and Runway Blue LLC listed as the assignee.[27] The 024 Patent issued from U.S. Patent Application No. 13/633,864, which was filed on 02 October 2012. Upon information and belief, the 024 Patent expires on 02 October 2032.

---

[23] (Ex. 25, U.S. Patent No. D820,038 (filed 29 Apr. 2015)).

[24] (Ex. 26, U.S. Patent No. D900,540 (filed 30 Apr. 2020)).

[25] (Ex. 27, U.S. Patent No. D830,119 (filed 24 Aug. 2017)).

[26] (Ex. 28, U.S. Patent No. D897,149 (filed 11 June 2018)).

[27] (Ex. 33, U.S. Patent No. 9,492,024 (filed 02 October 2012)).

228. On information and belief, U.S. Patent No. 9,216,843 (the "843 Patent") issued on 22 December 2015, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the named inventors and Runway Blue LLC listed as the assignee.[28] The 843 Patent issued from U.S. Patent Application 14/297,433, which was filed on 05 June 2014. Upon information and belief, the 843 Patent expires on 05 June 2034.

229. On information and belief, U.S. Patent No. 10,165,877 (the "877 Patent") issued on 01 January 2019, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the named inventors and Runway Blue LLC listed as the assignee.[29] The 877 Patent issued from U.S. Patent Application No. 15/149,095, which was filed on 07 May 2016. Upon information and belief, the 877 Patent expires on 02 October 2032. The 877 Patent was a continuation of U.S. patent application Ser. No. 13/633,864 which was filed on Oct. 2, 2012, now U.S. Pat. No. 9,492,024, issued Nov. 15, 2016, and is hereby incorporated by reference in its entirety.

230. On information and belief, U.S. Patent No. 8,695,830 (the "830 Patent") issued on 15 April 2014, with Steven M. Sorensen, David O. Meyers, and Kim L. Sorensen listed as the named inventors and Runway Blue LLC listed as the assignee.[30] The 830 Patent issued from U.S. Patent Application No. 13/610,445, which was filed on 11 September 2012. Upon information and belief, the 830 Patent expires on 11 September 2032.

231. On information and belief, U.S. Patent No. 11,111,060 (the "060 Patent") issued on 07 September 2021, with Steven M. Sorensen and David O. Meyers listed as the named inventors and Runway Blue LLC listed as the assignee.[31] The 060 Patent issued from U.S. Patent Application Nos. 15/957,775 and 17/466,851, which were filed on 19 April 2018 and 03 September 2021, respectively. Upon information and belief, the 060 Patent expires on 14 August 2036.

---

[28] (Ex. 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)).

[29] (Ex. 34, U.S. Patent No. 10,165,877 (filed 07 May 2016)).

[30] (Ex. 29, U.S. Patent No. 8,695,830 (filed 11 Sept. 2012)).

[31] (Ex. 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018)).

232. On information and belief, U.S. Patent No. U.S. Patent No. 6,379,032 (the "032 Patent") issued on 30 April 2002, with Steven M. Sorensen listed as the named inventor and Runway Blue LLC listed as the assignee. The 032 Patent issued from U.S. Patent Application No. 09/507,124, which was filed on 18 February 2000. Upon information and belief, the 032 Patent expired on 18 February 2020.

### 3. BlenderBottle's Asserted Trade Dresses.

233. On information and belief, U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress") was registered on the Principal Register of the United States Patent and Trademark Office ("USPTO") on 20 July 2021, from U.S. Trademark Application No. 90,301,455 filed on 05 November 2020, with a first use date of 2003 and a first use in commerce date of 2003 for the following goods in International Class 012: "Lids for bottles, namely, lids with drinking spouts for bottles; Lids for shaker bottles sold empty, namely, lids with drinking spouts for bottles." The Lid Trade Dress is described as "a bottle lid with a recessed domed top from which a conical spout protrudes on one side and a pair of brackets on the opposing side and the brackets host a pivoting arm containing a circular spout closure element. The dotted lines are matter not claimed as part of the mark." The 019 Lid Trade Dress consists of a three-dimensional configuration of a product packaging for a shaker bottle lid identical, without the finger carry loop, to the lid disclosed by BlenderBottle's D478 Patent, with Runway Blue LLC listed as the owner.



*BlenderBottle's 019 "Lid" Trade Dress claims an identical design, without the finger carry loop, to the lid design disclosed by BlenderBottle's D478 "Closure" Patent.*

234. On information and belief, U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress") was registered on the Principal Register of the USPTO on 12 January 2021, with a first use date of 01 January 2004 and a first use in commerce date of 01 January 2004.[32] The Agitator Trade Dress is described as "a three-dimensional configuration of a beverage agitator consisting of a wire that is wound to symmetrically define the shape of a sphere." The registration indicates that the mark consists of a three-dimensional configuration of a product design, with Runway Blue LLC listed as the owner.

235. The "Unregistered Bottle Trade Dress" refers to the shaker bottle and lid design that BlenderBottle is attempting to assert common law trademark rights over in paragraph 18 of the Second Amended Complaint.[33]



*Unregistered Bottle Trade Dress*

236. The "Unregistered Label Trade Dress" refers to the shaker bottle label design that BlenderBottle is attempting to assert common law trademark rights over that is pictured in paragraph 26 of the Second Amended Complaint.[34]

---

[32] (Ex. 18, U.S. Trademark Registration No. 6,245,626).

[33] Compl., at ¶ 18.

[34] Compl., ¶ 26.

 

*BlenderBottle's Alleged Unregistered Label Trade Dress.*

### 4. BlenderBottle's Related Trademarks.

237. On information and belief, U.S. Trademark Registration No. 4,894,363 (the "363 Reg." or "BLENDERBOTTLE Mark") was registered on the Principal Register of the USPTO on 2 February 2016, with a first use date of 05 September 2000 and a first use in commerce date of 05 September 2000.[35] The 363 Reg. is for the term BLENDERBOTTLE. The 363 Reg. has Runway Blue LLC listed as the owner. The 363 Reg. is registered in International Class 021.

238. On information and belief, U.S. Trademark Registration No. 3,515,591 (the "591 Reg." or "BLENDER BALL Mark") was registered on the Principal Register of the USPTO on 14 October 2008, with a first use date of 05 September 2000 and a first use in commerce date of 05 September 2000.[36] The 591 Reg. is for the term BLENDER BALL. The 591 Reg. has Runway Blue LLC listed as the owner. The 591 Reg. is registered in International Class 021.

### B. BlenderBottle's Asserted (and Infringing) Products.

239. The "Asserted Products" refers to BlenderBottle's five Asserted Products listed below: the BlenderBottle Classic V2—BB-0038396, BlenderBottle ProStack, The BlenderBottle Pro, The BlenderBottle Mini, and BlenderBottle Classic V1.

---

[35] (Ex. 21, U.S. Trademark Registration No. 4,894,363).

[36] (Ex. 22, U.S. Trademark Registration No. 3,515,591).



1

2  *BlenderBottle Classic V2 (BB-0038396), BlenderBottle ProStack (BB-0038397), The BlenderBottle Pro (BB-0038398),*
3  *The BlenderBottle Mini (BB-0038399), BlenderBottle Classic V1 (BB-00383100).*

| Product | Original | None | V1 | V2 |
|---|---|---|---|---|
| | | | | ADJUSTABLE CARRY LOOP |
| **Timeframe** (first sale date-estimate) | 2003 | No known sales | OCT 2013 | 2016 |
| **Patent** | Patent 235 | Patent 551 | Patent 478 <br> Lid Trade Dress Obtained from this design | Patents 038D, 540D, 149D, 119D |
| **Visual Differences** | Original Product | • Same as 235 with added hiking loop <br> • No  active known sales with this lid | • Added carry loop with a partial rubber coming up from the loop <br> • Crescent indentation on top of flip cap <br> • Thumb press area rounded <br> • Spout changes from Cylindrical to Conical <br> • Spout cover shortened <br> • Slots in back of bracket for loop to fold back | • Spout guard <br> • thicker flip cap side profile <br> • Much thicker carry loop at two axis points <br> • rubber material wraps around top part of carry loop <br> • Flip cap flattened out at the end area and extended <br> • Flip cap tapered out at brackets and shorter towards spout |
| **% of Sales** | 100% from 2003-2012 | No known sales | 50% from 2016-2024? | 50% from 2015-2024? |
| **Selling Status** | Discontinued | No known sales | Active | Active |

4

5  *Design Evolution of the BlenderBottle Classic.*

6  240. Upon information and belief, the "BlenderBottle Classic V2" refers to the blender bottle identified by

7  Bates Number BB-0038396 and was designed and built based on the "classic simple shaker" the

8  bottles and lids claimed in BlenderBottle's Equivalent Patents, including the D038 Patent and the 060

9  Patent, among others.[37]

---

[37] (Ex. 36, BlenderBottle Classic V2—BB-0038396 (BB-0038396)). Upon information and belief, the BlenderBottle Classic V2-D038 is an identical lid design to the lid design embodied by the BlenderBottle Pro28-D038 (BB-0038398) and the ProStak 22-D038 (BB-0038397).



*BlenderBottle Classic V2 (BB-0038396) (See Ex. 107, Asserted, Accused, and Infringing Products Labeled Functional Elements.).*

241. Upon information and belief, the "BlenderBottle ProStack" refers to the shaker bottle identified by Bates Number BB-0038397 and was designed and built based on the "classic simple shaker" bottle lid inventions claimed in BlenderBottle's Equivalent Patents, including the D038 Patent, the 060 Patent, and the 830 Patent, among others.[38]



*The BlenderBottle ProStack (BB-0038397) (See Ex. 107, Asserted, Accused, and Infringing Products Labeled Functional Elements.).*

242. Upon information and belief, the "The BlenderBottle Pro" refers to the blender bottle identified by Bates Number BB-0038398 and was designed and built based on the "classic simple shaker" bottle

---

[38] (Ex. 37, BlenderBottle ProStack (BB-0038397)). Upon information and belief, the BlenderBottle ProStack is an identical lid to the lid on the BlenderBottle Classic V2 (BB-0038396) and the The BlenderBottle Pro (BB-0038398).

1   and lid inventions claimed in by the Equivalent Patents, including the D038 Patent, the 060 Patent,

2   the 830 Patent, among others.[39]



*The BlenderBottle Pro (BB-0038398) (See Ex. 107, Asserted, Accused, and Infringing Products Labeled Functional Elements.).*

243. Upon information and belief, the "The BlenderBottle Mini" refers to the blender bottle identified by Bates Number BB-0038399 and was designed and built based on the "classic simple shaker" bottles and lids claimed by the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents, specifically including the D235 Patent, 019 Lid Trade Dress, and Unregistered Bottle Trade Dress.[40]

---

[39] (Ex. 38, The BlenderBottle Pro (BB-0038398)). Upon information and belief, the The BlenderBottle Pro is an identical lid to the lid on the BlenderBottle Classic V2—BB-0038396 (BB-0038396) and the ProStak 22oz-D038 (BB-0038397).

[40] (Ex. 39, The BlenderBottle Mini (BB-0038399)).



*BlenderBottle Mini (BB-0038399) (See Ex. 107, Asserted, Accused, and Infringing Products Labeled Functional Elements.).*

244. Upon information and belief, the "BlenderBottle Classic V1" refers to the shaker identified by Bates Number BB-00383100 and was designed and built based on the "classic simple shaker" bottle and lid inventions claimed in BlenderBottle's Asserted Patents, Asserted Trade Dresses, and Equivalent Patents, specifically including the D478 Patent and 019 Lid Trade Dress, among others.[41]



*BlenderBottle Classic V1 (BB-00383100) (See Ex. 107, Asserted, Accused, and Infringing Products Labeled Functional Elements.).*

245. The "Infringing Products" refers to the following four Asserted Products that Hydra Cup is accusing BlenderBottle of infringing: the BlenderBottle Classic V2—BB-0038396, BlenderBottle ProStack, The BlenderBottle Pro, BlenderBottle Classic V1.

## GENERAL JURISDICTIONAL ALLEGATIONS[42]

---

[41] Ex. 40, BlenderBottle Classic V1 (BB-00383100)

246. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

247. This Court has personal jurisdiction over BlenderBottle because BlenderBottle has infringed Hydra Cup's licensed rights the D047 Patent by, *inter alia*, offering, marketing, and selling the Infringing Products in this district, including to Californians.

248. This Court also has personal jurisdiction over BlenderBottle because BlenderBottle has infringed Hydra Cup's OG DualShaker Trade Dress by, *inter alia*, offering, marketing, and selling the Infringing Products in this district, including to Californians.

249. Upon information and belief, BlenderBottle sells thousands of its shaker bottle products in California each year as a result of substantial advertising and marketing targeted towards Californians both online and offline, including on websites such as Amazon, Walmart, and Target.[43]

250. BlenderBottle has a significant and ongoing business presence in California, deriving substantial revenue from California consumers and sells the Infringing Products to Californians using both the internet and third-party brick-and mortar-stores in California, including Target and GNC.[44] BlenderBottle's continuous and systematic commercial activity within California establishes general jurisdiction over BlenderBottle, as it has purposefully availed itself of the privileges and benefits of conducting business in California.

251. BlenderBottle has a substantial history of aggressively enforcing the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents against dozens of individuals and entities throughout the United States, including against Californians.

---

[42] These general jurisdictional allegations are meant to support Hydra Cup's Affirmative Defenses and Counterclaims for, *inter alia*, infringement and declaratory judgment actions against BlenderBottle's Asserted Patents, Asserted Trade Dresses, Equivalent Patents, and Related Trademarks to minimize duplication of information.

[43] (*See, e.g.*, Ex. 95, BlenderBottle Classic V1 on Walmart.com )

[44] (*See, e.g.*, Ex. 99, Google Search Results Showing GNC and Target in Los Angeles, California Selling BlenderBottle's Infringing Products (screenshot taken 24 June 2024))

252. BlenderBottle has filed dozens of similar lawsuits in numerous states against dozens of companies,[45] including in California,[46] over the BlenderBottle Intellectual Property in dispute here, including numerous patents in its same family of "classic simple shaker" bottles and lids as well as over its spherical wired agitator design, including several of the Asserted Patents, the Equivalent Patents, and the Asserted Trade Dresses.

253. ALong similar lines, BlenderBottle sent Hydra Cup numerous cease and desist letters in California, threatening Hydra Cup with litigation and accusing Hydra Cup of infringing the Asserted Patents, Asserted Trade Dresses, and several of the Equivalent Patents that disclose substantially similar designs to the "classic simple shaker" bottle and lid designs disclosed by the Asserted Patents and Asserted Trade Dresses, including U.S. Patent No. 9,216,843, U.S. Patent No. 9,492,024, and U.S. Patent No. 10,165,877, among others.[47]

254. Furthermore, as part of the ongoing disputes in this case, BlenderBottle is demanding Hydra Cup cease and desist from using terms including "blender bottle," "blender ball," "blender" and "bottle" within the same sentence, "blender" and "ball" within the same sentence, and other similar terms and phrases. But such terms and phrases refer to a general category of products and using such terms is essential for entities selling blender bottles and wired spherical blender balls that enable the user to blend supplements, liquids, fruits, and even peanutbutter and bananas.

---

[45] *See, e.g.*, *Trove Brands, LLC v. JH Studios*, Inc., No. 8:19-CV-1809-KKM-AAS, 2021 WL 7501178 (M.D. Fla. July 21, 2021) (alleging infringement of the 032 Patent, the D235 Patent, the 830 Patent, the 065 Patent, and other trademarks.)

[46] *See,* e.g., *Sundesa, LLC v. EHPLABS, LLC*, 2:14-cv-05327, (C.D. Cal. July 11, 2019); (alleging infringement of the 830 Patent); *Sundesa LLC v. Labrada Bodybuilding Nutrition Inc*, No. 8:13-cv-01984, (C.D. Cal. June 12, 2014) (alleging infringement of the 032 and D235 Patent); *Sundesa LLC v. I A Nutrition Inc*, 8:13-cv-01085, (C.D. Cal., Jan 29, 2019); *Sundesa, LLC v. Cool Gear International, LLC*, No. 2:16-cv-01605, (C.D. Cal., March 08, 2016); *Sundesa, LLC v. IQ Formulations, LLC*, No. CV1906467ABMAAX, 2020 WL 3067383, at *1 (C.D. Cal. Feb. 27, 2020) (alleging infringement of the D235 Patent); Sundesa, LLC v. Sunvalley Enterprises LLC, No. 2:15-cv-02254, (C.D. Cal. March 26, 2015); Trove Brands, LLC v. California Innovations Inc., No. 21 C 1132, 2021 WL 5320408, at 5* (N.D. Ill. Nov. 16, 2021); *Sundesa LLC v. Harrison-Daniels Inc*, No. 2:14-cv-08713, (C.D. Cal. July 11, 2019); *Sundesa LLC v. Beachbody LLC*, 8:13-cv-01087, (C.D. Cal. July 19, 2013) (alleging infringement of the D235 Patent); *Sundesa LLC v. Chemi-Source, Inc.*, 8:13-cv-01981, (C.D. Cal. May 1, 2013) (alleging infringement of the D235 Patent).

[47] *See* (Ex. 71,, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 January 2021) (listing, under the Section titled "Hydra Cup's Patent Infringement," the following patents that BlenderBottle was accusing Hydra Cup of infringing: U.S. Patent No. 9,492,024, U.S. Patent No. 9,216,843, U.S. Patent No 1,0165,877, U.S. Patent No. D510,235, U.S. Patent No. D697,798, and U.S. Patent No. 6,379,032); *see also* Ex. 72,, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 March 2022) (accusing Hydra Cup of infringing, among others, U.S. Patent No. 10,165,877, U.S. Patent No. 9,492,024, and U.S. Patent No. 9,216,843); Ex. 73, Cease and Desist Letter from BlenderBottle to Hydra Cup (17 August 2022) (accusing Hydra Cup of infringing U.S. Patent No. D696,551).).

255. BlenderBottle is also demanding Hydra Cup cease as desist from offering, marketing, or selling both spherical and dumbbell wire agitators as part of the disputes in this case and BlenderBottle is accusing the OG Spherical Agitator and OG Dumbbell Agitator of infringement.

256. The threats from its previous cease and desist letters combined with this pattern of enforcement activity gives Hydra Cup further reasonable apprehension that it will face additional infringement suits if it continues its current activities.

257. The fact that BlenderBottle has engaged California counsel to represent it in these patent and trade dress enforcement efforts further underscores the company's purposeful availment of California's legal system and resources.

258. Upon information and belief, BlenderBottle has also consulted and engaged third parties residing in California about the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents, including for this case.

259. Upon information and belief, BlenderBottle markets and advertises the Infringing Products in California with paid and targeted advertising.

260. Upon information and belief, BlenderBottle has conducted business with numerous California businesses concerning BlenderBottle's Infringing Products.

261. Upon information and belief, BlenderBottle also maintains a website through which it targets and sells to consumers throughout the United States, including to Californians. In addition to BlenderBottle's own online website and advertising within this district, BlenderBottle has also made its Infringing Products available within this district and advertised to Californians within the district in stores such as Whole Foods, Walmart, and Target, among others.

262. Hydra Cup's declaratory judgment actions seeking declarations of invalidity and noninfringement of BlenderBottle's Equivalent Patents from the same "classic simple shaker" patent family as the Asserted Patents—the D065 Patent, D478 Patent, D038 Patent, D119 Patent, D149 Patent, D540 Patent, the 024 Patent, the 843 Patent, the 877 Patent, the 060 Patent, and 830 Patent (the "Equivalent

1  Patents")—are proper because there is a true case and controversy between BlenderBottle and Hydra

2  Cup over each Equivalent Patent.

3  263. BlenderBottle has commited numerous "affirmative acts" sufficient to confer jurisdiction over Hydra

4  Cup's declaratory judgment claims against BlenderBottle, including filing this lawsuit over the "class

5  simple shaker" bottle and lid designs claimed by the Asserted Patents and Trade Dresses disclosing

6  virtually identical designs to the "classic simple shaker" bottle and lid designs claimed by the

7  Equivalent Patents.

8  264. More specifically, BlenderBottle filed this lawsuit against Hydra Cup, accusing Hydra Cup of

9  infringing the Asserted Patents and the Asserted Trade Dresses; these patents and trade dresses

10  disclose "classic simple shaker" bottle, lid, and agitator designs that are substantially similar, and

11  even virtually identical in some instances, to the designs claimed by BlenderBottle's Equivalent

12  Patents.

13  265. For example, BlenderBottle itself admits that the D478 Patent discloses a "classic simple shaker"

14  bottle lid design that is identical to the design claimed by BlenderBottle's 019 Lid Trade Dress

15  although the 019 Lid Trade Dress was forced to disclaim protection to the integrated carry loop.[48]

---

1  [48] *See* Ex. 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455, 1-2 (HC0170962-
2  HC0171062) (filed 21 September 2021) (stating "Applicant's distinctive lid . . . has been granted a design patent D748,478.")



*BlenderBottle's "Classic Simple Shaker" Patent Family: The Equivalent Design Patents.*



*BlenderBottle's "Classic Simple Shaker" Patent Family: The Equivalent Utility Patents.*

266. What's more, when Hydra Cup requested products embodying the designs disclosed by the Asserted Patents for analysis, BlenderBottle, mailed Hydra Cup physical blender bottles embodying the designs disclosed in BlenderBottle's Eqivalent Patents–i.e., the D478 Patent, the D038 Patent, the D119 Patent, D149 Patent, the D540 Patent, the 024 Patent, the 843 Patent, the 877 Patent, the 060 Patent, and the 830 Patent—that disclose substantially similar "classic simple shaker" bottle and lid designs to those designs disclosed by the Asserted Patents and Asserted Trade Dresses.

267. Furthermore, Hydra Cup also owns multiple patents for shaker bottle and lid designs that BlenderBottle, upon information and belief, considers infringing BlenderBottle's Asserted Products.

56

Without such a declaration, Hydra Cup faces uncertainty and the potential for ongoing litigation over BlenderBottle's various patents covering the same basic design.

268. Competitive fairness requires that others in the marketplace be able to understand and visualize, not as an abstract idea, what things they can or cannot utilize themselves. Allowing BlenderBottle to assert its rights piecemeal, sometimes using a lid, sometimes using a lid with a finger carry loop, sometimes using a lid with a bottle, and so forth, makes it difficult, if not impossible, for a competitor like Hydra Cup to know what designs it can lawfully use. At this point, BlenderBottle is effectively claiming to own all combinations for "classic simple shaker" shaker bottle and lid products.

269. Along similar lines, Hydra Cup's declaratory judgment action seeking declarations of non-infringement and invalidity of BlenderBottle's BLENDERBOTTLE and BLENDER BALL trademarks are proper because there is a true case and controversy between BlenderBottle and Hydra Cup regarding Hydra Cup's use of these terms.

270. As an inventor, designer, and seller of shaker bottles, Hydra Cup has a legitimate need to use the terms "blender bottle" and "blender ball" to accurately describe the products it sells.[49] These terms are essential to communicate the nature and function of Hydra Cup's products to consumers.

271. Upon information and belief, as part of the dispute in this case, BlenderBottle is demanding that Hydra Cup not use the terms "blender," "bottle," "blender bottle," "blender ball" or any variation of such terms in any of Hydra Cup's marketing and advertising and will continue to demand such until this dispute is settled. But Hydra Cup needs these terms to operate its business. Upon information and belief, if Hydra Cup continues to use search terms, BlenderBottle is likely to file a lawsuit to attempt to enforce its intellectual property rights to stop Hydra Cup from using the disputed terms in its advertising and marketing. In other words, BlenderBottle considers Hydra Cup's use of such terms as

---

[49] *See, e.g.*, Ex. 103, Walmart.com "Blender Bottles" Product Category (screenshot taken 24 June 2024) (screenshot taken on 24 June 2024) (showing the search filter "Product Category" lists the following categories of bottles: "Blender Bottles", "Water Bottles", "Cocktail Shakers", "Thermoses", "Tumblers", among others). *See also* Ex. 97, BlenderBottle Classic Sold on Amazon Under Different Brand Names (screenshot from Internet Archive) (21 February 2012) (showing the terms "blender bottle" and "blender ball" were used on Amazon in 2012 as a "keyword that's strongly related to this product" along with "shaker cup", "protein shaker", and "hand mixer"). *See also* 95, BlenderBottle Classic V1 on Walmart.com (showing common search keywords are "blender bottles", "shaker cup", "blender bottle 28oz", "shaker bottle", "blender cup", "shaker", "blender").

1    trademark infringement and unfair competition. Therefore, an actual case and controversy exists

2    regarding the dispute terms.

272. The English language has a limited number of words that accurately describe a manual mixing

apparatus, such as "mix," "shake," and "blend." These words are commonly understood by the public

to convey the action of combining and agitating substances, which is precisely the purpose of a shaker

bottle. By claiming exclusive rights to the terms "blender bottle" and "blender ball," BlenderBottle is

effectively monopolizing the use of generic and descriptive language in the shaker bottle industry.

273. Trademarks are intended to identify the source of goods and services, not to grant a monopoly over

common words that are necessary to describe a product or its functionality. Allowing BlenderBottle

to assert exclusive rights over "blender bottle" and "blender ball" would hinder Hydra Cup's ability to

fairly compete in the market and accurately inform consumers about the nature of its products.

274. Hydra Cup faces a genuine risk of infringement litigation if it continues to use the terms "blender

bottle" and "blender ball" in connection with its products. This risk is not speculative; as discussed

above, BlenderBottle has a history of aggressively enforcing its alleged intellectual property rights

against competitors in the shaker bottle industry, including Hydra Cup.

275. Public policy considerations also support Hydra Cup's declaratory judgment action. trademark law

should not be used as a tool to stifle competition or prevent companies from accurately describing

their products. Allowing BlenderBottle to monopolize generic and descriptive terms like "blender

bottle" and "blender ball" would undermine the fundamental goals of trademark law and hinder free

and fair competition in the marketplace.

276. By asserting infringement of the Asserted Patents and Asserted Trade Dresses claiming virtually

identical "classic simple shaker" bottle and lid designs and by demanding Hydra Cup cease and desist

from using terms necessary to do business, BlenderBottle is effectively accusing Hydra Cup of

infringing its entire family of substantially similar patents that claim the "classic simple shaker" bottle

and lid design—i.e., the Equivalent Patents.

277. Accordingly, upon information and belief, Hydra Cup understands BlenderBottle is accusing Hydra Cup's Accused Products of infringing BlenderBottle's Equivalent Patents and Related Trademarks.

278. This means, even after Hydra Cup is successful in the lawsuit, without a declaration of rights concerning BlenderBottle's Equivalent Patents and Related Trademarks, BlenderBottle can simply keep suing Hydra Cup over substantially similar designs in its same patent family of "classic simple shaker" bottle and lid designs until Hydra Cup can no longer afford to defend itself.

279. Put differently, without a declaration of rights concerning the Equivalent Patents, this dispute will not end. Handling this dispute in a single case is efficient and economical, and will provide a final resolution of the parties' rights.

280. Accordingly, Hydra Cup's declaratory judgment action seeking declarations of invalidity and noninfringement of BlenderBottle's Equivalent Patents and declarations of noninfringement of the Related Trademarks is proper and justiciable, as there is a real and immediate controversy between the parties arising from Hydra Cup's need to use these functional designs and generic and descriptive terms to accurately describe its products and compete effectively in the shaker bottle market. BlenderBottle's assertion of patent and trademark rights in these designs, inventions, and terms creates a concrete dispute that satisfies the case and controversy requirement for declaratory judgment jurisdiction. Hydra Cup needs clarity and certainty regarding the parties' rights and obligations to ensure that patent and trademark law are not used to monopolize language and stifle legitimate competition.

281. Similarly, there exists, between Hydra Cup and BlenderBottle concerning the Equivalents Patents, a substantial controversy of sufficient immediacy and reality to warrant the issuance of declaratory judgments of invalidity and noninfringement of the Equivalent Patents, which are necessary and appropriate so that Hydra Cup may ascertain its rights regarding the validity of the Equivalent Patents and so that this dispute over the "classic simple shaker" bottle and lid design claimed by the Asserted Patents, the Asserted Trade Dresses, the Equivalent Patents.

1

**FACTUAL ALLEGATIONS**

282. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

I.   **HYDRA CUP'S BEGINNING, EARLY SUCCESS WITH ITS INNOVATIVE DUALSHAKER, RESEARCH AND DEVELOPMENT, AND CONTINUED SUCCESS.**

283. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

**2012 to 2019: Hydra Cup Enjoyed Early Success with its Iconic OG Dual Shaker.**

284. Founded in 2012, Hydra Cup achieved early success and notoriety in the shaker bottle industry with its patented DualShaker bottle and lid, which, due to its highly unusual and distinct dual shaking design, became quickly well known and distinguished"

285. Hydra Cup has continually advertised, marketed, and sold the DualShaker bottle and lid since 2013, selling thousands of units to customer all across the United States resulting in widespread recognition of the design embodied by Hydra Cup's DualShaker bottle and lid in the workout community.

286. Through its distinct design combined with extensive use, promotion, and sales, Hydra Cup's DualShaker Trade Dress has acquired distinctiveness and developed secondary meaning in the minds of consumers as a designation of the source of Hydra Cup's shaker bottles.

287. Hydra Cup has continuously and exclusively used, advertised, marketed, and sold its OG DualShaker Trade Dress, which covers the distinctive shape and configuration of features of its OG DualShaker bottle and lid, for over ten years across the United States since it launched the OG DualShaker product line in 2012. During this time, Hydra Cup has sold its OG Dual Shaker to thousands of customers due to its substantial investment in advertising through bootstrapping campaigns, online marketing, social media campaigns, promotional events, YouTube campaigns, Amazon campaigns,

and other advertising and marketing efforts. Hydra Cup has spent a substantial amount of time and resources on such advertising and promotional efforts highlighting the distinctive OG DualShaker bottle and lid design.

288. As a result of Hydra Cup's long-term use and promotion, its DualShaker bottle has been extremely successful and popular with consumers. Hydra Cup has sold over a large number of units of its DualShaker bottles bearing the DualShaker Trade Dress, accounting for substantial total sales over the years. The DualShaker product is Hydra Cup's flagship and oldest product line. Hydra Cup's DualShaker bottles have also received significant unsolicited media coverage and praise, including numerous review videos on platforms such as YouTube, Instagram, and the TikTok.

289. Consumer surveys confirm that the relevant consuming public has come to strongly associate the DualShaker Trade Dress with Hydra Cup. For example, a recent internet survey found that a plurality of relevant consumers of shaker bottles associate the distinctive shape and design of the DualShaker bottle and lid with a single source, and a plurality of such relevant consumers identify Hydra Cup as that source.

290. Over the years, customers in the exercise community grew to know and love Hydra Cup's iconic DualShaker bottle and lid design due to its innovative dual shaker technology combined with its distinct design.

291. In light of Hydra Cup's long and exclusive use of the DualShaker Trade Dress, its extensive promotion and advertising of the DualShaker design, the tremendous sales and success of DualShaker products bearing the trade dress, widespread attention, and strong evidence of consumer association, there can be no question that the DualShaker Trade Dress has achieved secondary meaning designating Hydra Cup as the source of the DualShaker product.

292. Furthermore, while the DualShaker may contain numerous functional design elements, the overall appearance and configuration of the DualShaker is not functional, but rather serves as a source identifier to consumers, instantly signaling that the DualShaker is a trusted product from Hydra Cup. For example, the tall, tapering bottle body with the extra wide bottle head is one of many highly

distinctive dominant designs consumers instantly recognize as the DualShaker Product from Hydra Cup. And the domed shaped lid, with the first ever dual flip top pivoting arms, brackets, spouts, and spout guards instantly tells consumers that this shaker is mistakenly the famous OG DualShaker from Hydra Cup.

**2019: Research, Development, Trials, and Tribulations—Hydra Cup's Attempt to Develop the GOAT Shaker.**

293. The GOAT Shaker was Hydra Cup's first attempt at designing a single-compartment shaker bottle. Hydra Cup's CEO took the lead on this project, which was originally pitched under the name "Kracken."

294. The design process for the GOAT Shaker began with the bottle shape, which was inspired by the contoured shape of Hydra Cup's patented Dual Shaker bottle (U.S. Patent No. 8,777,044). The Dual Shaker's shape, which is wide at the top and narrower at the bottom, was dictated by the functional need to accommodate two supplements while still fitting in a cup holder. Despite the functional origins of the design, many customers expressed appreciation for the unique and ergonomic shape of the Dual Shaker bottle.

295. Hydra Cup collaborated with industrial designer Ginikanwa Uzegbu to create a unique mixing grid for the GOAT Shaker, and together they explored various creative concepts, including designs inspired by sea creatures and fitness equipment.

296. After developing the initial design concepts, Hydra Cup worked with product designer Jeff Harlan to refine the 3D design of the GOAT Shaker and then sent the files to Tianqi to create the molds for production.[50]

297. Upon receiving the finished product samples, Hydra Cup discovered that the dual mixing grid, while visually appealing, posed significant challenges in terms of cleaning and usability. Realizing that customers prioritize functionality and ease of use over aesthetics, Hydra Cup made the decision to abandon the dual mixing grid design and explore alternative agitator options.

---

[50] (*See* Ex. 47, Deposition Transcript of Jeff Harlan, 22-43 (February 2024)).

298. With the expiration of BlenderBottle's 032 Patent for the spherical wire agitator in February 2020 and with said spherical wire agitator design being granted to the public domain, Hydra Cup saw an opportunity to develop a unique wire whisk agitator for the GOAT Shaker. Despite the availability of inexpensive standard wire whisk agitators from Tianqi, Hydra Cup invested time and resources into exploring various alternative designs, including cage balls, titanium whisks, metal ball inserts, and silicone-coated whisks.

299. Through extensive testing and evaluation, Hydra Cup discovered that these alternative agitator designs posed various issues, such as increased production costs (250-450% more expensive than standard wire whisks), rusting, potential choking hazards, and reduced mixing efficiency. Notably, even a thin layer of silicone coating on the wire whisk resulted in a noticeable decrease in mixing performance.

300. Hydra Cup ultimately selected a black silicone-coated wire whisk agitator for the GOAT Shaker, prioritizing visual differentiation over cost savings. Despite the significantly higher cost compared to standard wire whisks ($0.35/each vs. $0.10/each), Hydra Cup proceeded to order 10,000 units of the silicone-coated whisk to accompany the 10,000 GOAT Shakers in production, with most never sold.

301. The development process of the GOAT Shaker presented Hydra Cup with invaluable experience in product design and manufacturing. The final version of the GOAT Shaker suffered from functional issues, such as leakage and a loose flip cap, and was ultimately inferior in quality compared to the shaker bottles offered in Tianqi's existing product catalog that had proven successes for almost a decade. Recognizing these shortcomings, and in light of Tianqi's proven track record of producing millions of high-quality shaker bottles based on the D047 Patent design, Hydra Cup made the decision to abandon further research and development of the GOAT Shaker. The molds for the GOAT Shaker remain unused at Tianqi's factory since the initial order (PO1108) placed on 16 December 2019.

**2019-2020: Tianqi, the D047 Patent, the D029 Patent, and Hydra Cup's Second Wave of Success with Selling Tianqi's Shakers on Amazon.**

302. Upon information and belief, Tianqi began selling the TS1314 Shaker Bottle, which embodies the design disclosed by the D047 Patent, in the United States in late 2011 or early 2012.[51] By 2013, Tianqi had exported 8 million TS1314 Shaker Bottles worldwide.

303. Upon information and belief, in 2011 Tianqi designed and patented the D047 Patent disclosing the design practiced by the TS1314 OG Regular Shaker and millions of other shaker bottles sold by hundreds of companies over the last decade. Shortly thereafter, Tianqi began selling the TS1314 Tianqi Shaker Bottle and Lid to customers across the globe.[52] For example, in June 2012, the TS1314 Shaker Bottle from Tianqi was being sold on Bodybuilding.com, a major online retailer of fitness supplements and accessories.[53]

304. Upon information and belief, Tianqi began selling its shaker bottles to companies in the United States in 2011; by 2013, thousands of Tianqi's shaker bottles were being sold by dozens of companies in the United States.[54]

305. On 19 March 2019, Chris McCarthy, Hydra Cup's first employee, sent Hydra Cup the Tianqi Product Catalog, where Hydra Cup first discovered Tianqi's TS1314 Shaker Bottle for sale at $0.65 per bottle.[55] Hydra Cup started selling its TS1314 OG Regular Shaker from Tianqi later that year.

---

[51] (*See* Ex. 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014) (showing shaker bottle's embodying the design disclosed by Tianqi's D047 Patent alongside shaker bottles embodying the design disclosed by BlenderBottle's D235 Patent.)).

[52] (*See, e.g.*, Exs. 77-88, Screenshots of Shaker Bottles and Lids from the Aughts (showing early substantially similar shaker bottle and lid designs disclosed before the D551 Patent; see also Ex. 106, BrandMakers Purchase Order for D047 "Arnold.com" Shaker Bottles from Ningbo to MusclePharm (14 October 2013); Ex. 104, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Exhibit 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013)).

[53] (*See* Exhibit 79, Bodybuilding.Com Measurement Shaker Bottle (Screenshot from the Internet Archive) (23 June 2005) (HC0172425-HC0172426); *see also* Ex. 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014)).

[54] *See, e.g.*, Ex.77, Ningbo Body Build Shaker (January 2007) (HC0172423-HC0172423);

[55] ( *See* Ex. 42, Tianqui Product Catalog.).

306. Hydra Cup's Accused Products are based on Tianqi's patented designs, which, except for the expired D235 Patent, predate BlenderBottle's Asserted Patents, Asserted Trade Dresses, and Equivalent Patents.

307. Tiaqni designed, developed, and manufactured the TS1314 OG Regular Shaker based on the "classic simple shaker" bottle and lid design claimed by Tianqi's D047 Patent.

308. Tiaqni created, designed, developed, and manufactured the TS1352 OG Storage Shaker, the TS1327 OG Mini OG Shaker, and the TS1038 Jumbo Shaker based on the "classic simple shaker" bottle and lid designs claimed by Tiaqni's D029 Patent.

309. Aside from putting the Hydra Cup logo on the TS1314 Shaker Bottles it purchased from Tianqi, Hydra Cup did not change the designs of the TS1314 Shaker Bottle at all.[56] In other words, the Accused Products are identical to the TS1314 Shaker Bottles Tianqi sells, which embody the designs disclosed by Tianqi's D047 Patent.

310. Hydra Cup does not own the molds for the lid, bottle, or flip cap of the TS1314 Shaker Bottle or any of the other products in Tianqi's product catalog.

311. Hydra Cup did not have any input in conceiving, creating, designing, developing, or manufacturing the designs embodied in Tianqi's TS1314 Shaker Bottle.

312. Tianqi granted Hydra Cup an implied license to substantial rights in the D047 Patent and the D029 Patent in 2019.

313. Tianqi also explicitly granted Hydra Cup a license to substantial rights in Tianqi's D047 Patent in September 2022 (the "D047 License Agreement"), including the right to enforce such rights against third party infringers.[57] The D047 License Agreement granted Hydra Cup, *inter alia*, "the first right, but not the obligation, to bring an infringement action to enforce the Licensed [D047] Patent, to defend any declaratory judgment action, and take any other legal action necessary to protect the Licensed [D047] Patent."

---

[56] (Ex. 49, Def.'s Answers. to Pl.'s Interrogs., at 140-41.)

[57] (Ex. 48, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022)).

**2020-2021: Hydra Cup Created the HC OG Carry Loop Lid by Adding a Pivoting Finger Carry Loop to the "Classic Simple Shaker" Lid Design Claimed by Tianqi's D029 Patent.**

314. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

315. As of November 2020, Hydra Cup was having success selling the TS1314 OG Regular Shaker on Amazon, but some customers were specifically requesting Hydra Cup to add a "hiking loop" or "carry loop" to the TS1314 OG Regular Shaker to allow users to easily carry the bottle with one finger or secure it to a backpack or gym locker hook.[58]

316. Seeking to build the shaker bottle its customers wanted, Hydra Cup began researching and developing ways to add a carry loop feature to its shaker bottles that were selling well on Amazon. But, as discussed above, the cost of developing new molds for entirely new shaker bottle and lid designs was prohibitively expensive for Hydra Cup, as, upon information and belief, new molds cost tens, even hundreds of thousands of dollars. Consequently, Hydra Cup was limited to its existing molds for the TS1314 Shaker Bottle.[59]

317. Hydra Cup was thus forced to find a solution that allowed integrating a carry loop into its existing lid.[60] Hydra Cup noticed numerous other companies such as Thermos and BlenderBottle were able to integrate a carry loop into brackets that functioned similar to the brackets already existing on Tianqi's designs that Hydra Cup had been selling and opined it could probably develop a carry loop to function with the existing brackets on Tianqi's designs.

318. Responding to its customers demands, Hydra Cup decided to add a finger carry loop to Tianqi's TS1314 OG Regular Shaker lid to provide a convenient way for customers to carry the bottle.[61] Hydra

---

[58] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 141.).

[59] (*See* Ex. 47, Harlan Depo. Tr., 42:9-12 (discussing Hydra Cup being limited to the molds and tools modeled after Tianqi's D047 Patent, stating "in an injection molding tool, if you have a side action that has to move out of the way, that's a slide. You know, every time you add one, it's probably about 5- to $10,000 to the tool.")).

[60] (*See id.*; *see also* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 141.).

[61] (*See* Ex. 48, Emails Between Hydra and Alec of Tianqi Regarding New Mold Quote for OG shaker (November 2020 - January 2021; *see also* Ex. 49, Def.'s Answers to Pl.'s Inerrogs., 142.).

Cup worked with a product designer, Jeff Harlan, to modify the existing TS1314 OG Regular Shaker lid design to incorporate a finger carrying loop.[62]

319. On 5 November 2020, Hydra Cup sent Mr. Harlan instructions on modifying the lid to add an integrated finger carrying loop but was still waiting on the 1314.stp file from Tianqi.[63]

320. As Mr. Harlan explained in his deposition, Hydra Cup was interested in BlenderBottle's Classic shaker bottle because "[i]t just worked really well."[64] Hydra Cup and Mr. Harlan cut-up and reverse engineered one of BlenderBottle's shaker bottle products to figure out how BlenderBottle's shaker bottle functioned so much better than all other shaker bottles—a common practice in the shaker bottle industry.[65] In other words, Hydra Cup was only interested in the superior functionality of BlenderBottle's products.[66]

321. Hydra Cup received the 1314.stp file from Tianqi and sent the 1314.stp file to Mr. Harlan, instructing Mr. Harlan to proceed with the November 5th instructions to modify the 1314.stp file to add the finger carrying loop.[67]

322. On 06 November 2020, Tianqi emailed Hydra Cup the "Tianqi 3D file of the TS1314 Shaker Bottle and 047D patent he owns."[68] This 3D 1314.stp file is owned by Tianqui and "is the exact part file that was used to make the following accused parts[:]" the "Bottle from 1314 is exactly the bottle from accused shaker bottle 1, 4, 5, & 10[;] [the] Lid from 1314 is exactly the lid from accused shaker bottle 1, 2, 4, 5, 6, 7, 9, 10, & accused lid[;] [and the] Flip cap from 1314 is exactly the flip cap from accused shaker bottle 1, 2, 4, 5, 6, 7, 9, & 10."

---

[62] (*Id*. at 142-43; *see generally* Ex. 47, Harlan Depo. Tr., 34-45; 118-25.).

[63] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 143.).

[64] (*See* Ex. 47, Harlan Depo. Tr., at 120:10-14 (explaining Hydra Cup appreciated the BlenderBottle sample bottle because "mostly just how nice it worked and felt. It just worked really well.")).

[65] (*See id.* at 37:10-15 (describing Hydra Cup's interests in BlenderBottle's products: "What he was really looking for was the – the function and feel of the BlenderBottle. You know, that bottle has a really nice click to the top, and, you know, it just feels nice and thick and solid. It doesn't feel like a cheap Chinese cup, which is basically what we were working with."))

[66] (*See id.*; *id.* at 219:7-8 (stating Hydra Cup "wants to look – just have it function as much like the BlenderBottle as possible, and that's when he's talking about having his – his – mold maker creep up on it.")).

[67] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 143.).

[68] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 140.).

323. As Mr. Harlan explained, ultimately, due to the prohibitive expensive costs of developing new molds, Hydra Cup was limited to its existing for the shaker bottles and lid designs modeled after Tianqi's D047 and D029 Patents.[69] Ultimately, the majority of Hydra Cup's work with Mr. Harlan failed to produce any new products.[70]

324. During the development of Hydra Cup's shaker bottle lid with a carrying loop, Hydra Cup provided instructions to Mr. Harlan regarding the necessary modifications to the existing TS1314 Shaker Bottle lid design. In the course of providing these instructions, Hydra Cup used BlenderBottle's product as a reference to quickly convey functional aspects of the design and to prevent errors in the design process. This is a common practice in product development, where designers often use shorthand language such as "copy that like [competitor's product]" or "do it like [competitor's product] for that" to efficiently communicate design requirements.

325. On 10 November 2020, Mr. Harlan sent Hydra Cup a draft of the changes to the 1314.stp file with the changes to add the finger carrying loop as Hydra Cup had previously requested.[71] After reviewing Mr. Harlan's modifications, Hydra Cup sent a feedback video to Mr. Harlan, informing Mr. Harlan he had failed to make an important modification. Mr. Harlan mistakenly "made the hiking loop and flip cap work the same as BlenderBottle putting the hiking loop on the outside of the flip cap . . . which was the opposite of what [Hydra Cup] had requested." Hydra Cup "provided a screenshot with notes providing further clarification of the changes that needed to be made to not infringe."[72] More

---

[69] (*See* Ex. 47, Harlan Depo. Tr., 42:9-12 (explaining how manufacturing and molding restrictions ultimately limited Hydra Cup to the molds and tools modeled after Tianqi's D047 Patent and D029 Patent: "in an injection molding tool, if you have a side action that has to move out of the way, that's a slide . . . every time you add one, it's probably about 5- to $10,000 to the tool."); *see id* at 174-76 (discussing Hydra Cup abandoning designs worked on by Mr. Harland because they could not get the designs to function properly); *see id* at 176:11-13 (noting making changes to Hydra Cup's existing molds and tooling for the TS1314 Shaker Bottle was prohibitively expensive, restricting the changes that could be made, stating that changes that "required slides in the tool . . . were abandoned, I'm sure."); *id*. at 40:1-4: (noting it was not possible for Hydra Cup to copy BlenderBottle due to molding and tooling constraints, stating "*our knuckles ended up opposite what they look like on the BlenderBottle*. And he was always frustrated by that, but *there was nothing we could do about it.*") (emphasis added)).

[70] (*See id*. at 122:1-14 (stating that Hydra Cup and Mr. Harlan were "working on the original design before we abandoned it, so the one that never really got produced."); *see id*. at 187:13-16 (noting the limitations on design presented by molds and tooling: "That would have been the same – same flip – you know, how far back I can flip that cap. We were still fighting that just because of the geometry of the whole lid."); *see id*. at 183:9-10 (explaining the prototypes that Hydra Cup and Mr. Harlan worked on were abandon because they did not work: "I don't know that it ever got off the ground. I think we just kind of started it, and it was one of those things that just faded away.")).

[71] (Ex. 49, Def.'s Answers to Pl.'s Inerrogs., 143.)

[72] (*Id*. at 143-44).

specifically, Hydra Cup instructed Mr. Harlan to make the following updates: "[i]nvert the flip cap and hiking loop" that Mr. Harlan failed to do; to "get rid of the carabiner because this was very complicated and expensive" to develop and manufacture; and, finally, to "reduce the width of the hiking loop to the size of BlenderBottle's as a wide clip from my industrial design sketch was too bulky and added extra costs and complications."[73]

326. As noted by Mr. Harlan , when providing instructions to designers, it is common for clients to use phrasing such as "copy BlenderBottle" or "do it like BlenderBottle" as just a broad, generalized goal to provide clarity. Both Mr. Harlan and Hydra Cup were well aware that Hydra Cup did not intend for its designers to literally copy BlenderBottle's designs. Hydra Cup was simply attempting to generate a general idea of the functionality it was attempting to achieve. This is common practice when designing, developing, and manufacturing functional elements of injection molded products.

327. Despite using BlenderBottle as a reference, Hydra Cup was clear that it did not want Mr. Harlan to literally copy BlenderBottle's design. For example, Hydra Cup specifically instructed Mr. Harlan to invert the placement of the flip cap and carrying loop, which is the opposite of BlenderBottle's design.

328. Hydra Cup's instructions to Mr. Harlan focused on functional aspects of the design, such as the width of the carrying loop, to ensure that the final product would be practical and cost-effective to manufacture. Hydra Cup did not ask Mr. Harlan to copy any ornamental or non-functional elements of BlenderBottle's design.[74]

329. What's more, when Mr. Harlan initially failed to follow Hydra Cup's instructions and mistakenly designed a carrying loop that was similar to BlenderBottle's, Mr. Raymus promptly corrected him and reiterated the importance of creating a design that was different from BlenderBottle's.

330. The size and placement of the carrying loop on Hydra Cup's final product are dictated by functional considerations, such as the need to support the weight of a filled shaker bottle, minimize material

---

[73] (*Id*. at 143.).

[74] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 143-44.).

costs, and ensure that the flip cap can be easily moved out of the way when drinking. These functional elements are not protected by patent or trademark law.

331. In designing its finger carrying loop, Hydra Cup sought to create a design that would be functional and not infringe any existing patents. Hydra Cup specifically designed its finger carrying loop to be different from BlenderBottle's patented design by placing the flip cap on the outside of the loop, rather than on the inside as shown in BlenderBottle's patent.

332. On 11 November 2020, Mr. Harlan "corrected his error above and made the modifications based on [Hydra Cup's] feedback. This time the flip cap was inverted correctly."[75] For the next four days, Hydra Cup and Mr. Harlan continued working together to tweak the details of the updates to TS1314 Shaker Bottle lid design, but "no noticeable changes to the visual were made beyond November 11th."[76] The changes were completed on 25 November 2021. Hydra Cup informed Mr. Harlan that Hydra Cup was sending the final updates to the 1314.stp to Tianqi to develop and manufacture. This was the last contact between Hydra Cup and Mr. Harlan concerning the updates he made to 1314.stp file to integrate a finger carrying loop.

***Hydra Cup Begins Selling the HC OG Carry Loop Lid in January 2021.***

333. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

334. On 25 November 2020, after incorporating the carrying loop designed by Mr. Harlan, Hydra Cup sent the updated 1314.stp files to Tianqi to begin production.[77] That same day, Tianqi informed Hydra Cup that BlenderBottle had patents disclosing a carrying loop, stating "we are learned that BlenderBottle have a patent, please comment." In response, Hydra Cup told Tianqi that its "patent lawyer says it is different enough where there is no infringement" and pointed to differences such as "the way the flip cap and hiking loop are inverted" and that "[t]he flip cap has two pieces and on the BlenderBottle it

---

[75] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 144:21-22.).

[76] (*Id.* at 144:21-22, 24-30.).

[77] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 145.).

1   only has one."[78] On 27 November 2020, Tianqi informed Hydra Cup that it was "open[ing] up a mold

2   for a new flip cap and hiking loop."

3   335. Importantly, there was no discussion of a new lid mold with Tianqi because Hydra Cup planned to

4   use the Accused Products that were designed based on Tianqi's D047 and D029 Patents.[79]

5   336. Tianqi quoted Hydra Cup for the cost of producing "the hiking loop, the Clip Overmold (rubber), the

6   flip cap, and a $460 charge for a lid revision of the interior of the 1314 patented lid."[80] The lid

7   revision did not involve any exterior changes, but rather an internal adjustment to accommodate the

8   hiking loop. A comparison of the modified 1314.stp file to the original confirms that the lids are

9   identical, with the only change being to the flip cap's axis point to allow room for the hiking loop

10   between the brackets.

11   337. Hydra Cup requested one additional change related to the surface finish of the parts. The original

12   TS1314 Shaker Bottle, lid, and flip cap had a glossy, mirror-like finish that was prone to scratches

13   and blemishes.[81] Hydra Cup believed a textured, matte finish would be more scratch-resistant and

14   visually appealing.

15   338. On 13 January 2021, Hydra Cup asked Tianqi if it had a BlenderBottle product on hand and if it could

16   use the same surface texture on the new TS1314 Shaker Bottle hiking loop and flip cap molds.[82] This

17   request was not an instruction to copy any BlenderBottle designs, but rather an attempt to

18   communicate the desired surface finish by visually referencing an existing product, which Hydra Cup

19   believed would be easier than describing the finish in writing given the language barrier between the

20   parties.[83] However, shortly thereafter, Hydra Cup realized that the existing TS1314 bottle and lid had

21   a very shiny finish that would not match a matte flip cap and carry loop.[84] Hydra Cup therefore

---

1   [78] (*Id*. at 145 (referring to opinion from patent attorney Niq Howard)).

2   [79] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 145).

3   [80] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 145).

4   [81] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146).

5   [82] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146).

6   [83] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146).

7   [84] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146).

instructed Tianqi to "not match the BlenderBottle" and instead "match the shinny [sic] lid for both parts." As a result, there is a clear difference between BlenderBottle's products, which have a matte finish, and the accused Hydra Cup products, which have a glossy finish.

339. While Hydra Cup would have preferred a matte finish, the cost of making new molds for that texture was prohibitive, especially since Hydra Cup did not own the TS1314 lid mold and would have had to pay for an entirely new mold to change the lid's texture.[85] Additionally, Hydra Cup later learned that printing logos on a matte finish is more complicated due to the texture's effect on the UV print primer.

340. Tianqi proceeded with manufacturing and sent Hydra Cup the first samples from the new molds on February 12th.[86] Upon receipt, Hydra Cup discovered several functional issues with the parts, including leaks, the flip cap not pulling back fully, and the flip cap not staying in the open position when pulled back, which interfered with the drinking experience.[87]

341. On February 12th, Hydra Cup received samples of the modified TS1314 Shaker Bottle lid with the added carrying loop from Tianqi. Upon testing, Hydra Cup discovered that the samples had functional issues, including leaks, and problems with the flip cap not staying in the open position when pulled back for drinking.[88] To address these issues, Hydra Cup engaged in an extensive iterative process with Tianqi and Jeff Harlan, which involved multiple rounds of sample shipping, testing, design adjustments, mold modifications, and production runs. This process took several months, with the final acceptable samples being produced on 12 July 2021.

342. The process of developing the modified TS1314 Shaker Bottle lid with the carrying loop, from the initial design to the final production-ready version, took approximately 251 days and required an estimated investment of $50,000 by Hydra Cup, including costs for injection molds, industrial design,

---

[85] (Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-147).

[86] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 147).

[87] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 147).

[88] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-150).

3D design services, patent infringement analysis, prototypes, research, sample parts, and patent application.[89]

343. Hydra Cup invested substantial time and resources to develop its own unique design that improved upon the functionality of the existing TS1314 Shaker Bottle, while purposefully avoiding infringement of BlenderBottle's intellectual property.[90]

344. In September 2020, Hydra Cup placed the final purchase order for the modified shakers with the new HC OG Carry Loop Lid, which included 29,040 units across three different SKUs.[91] The addition of the carrying loop increased the cost per unit by only $0.04.[92] This final purchase order was shipped from Tianqi to Hydra Cup in two containers, arriving at the LA port and then Manteca in late October and early November 2021, more than a year after the initial idea for the carrying loop was conceived.

345. As a small company, Hydra Cup does not maintain a large warehouse and instead stores its inventory in the founder's parents' storage shed. From there, Hydra Cup ships the products to Amazon for distribution to customers.

346. Almost all modified TS1314 Shaker Bottles with the carrying loop were sold on Amazon, with only minor exceptions being a one-time order with Walmart and a few orders with Muscle and Strength.[93] Hydra Cup primarily relies on Amazon's platform for its ease of use and operation.

347. Hydra Cup engaged in minimal marketing for the modified TS1314 Shaker Bottles, limited to product photography and Amazon pay-per-click advertising.[94] Despite adding value through the carrying loop and other subsequent improvements, Hydra Cup has maintained the same pricing for its products since their introduction, prioritizing customer value and maintaining a lean operation.

---

[89] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-150)).

[90] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-150).

[91] (*See* Ex. 90, Emails Between Hydra Cup and Tianqi Regarding PO1070-PO1074 (24 Sept. 2020)).

[92] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-150).

[93] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-150).

[94] (*See* Ex. 49, Def.'s Answers to Pl.'s Interrogs., 146-150).

**II.   BLENDERBOTTLE'S AGGRESSIVE LITIGATION TACTICS AIM TO STIFLE COMPETITION AND INNOVATION.**

348. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

349. BlenderBottle enjoyed its monopoly on its functional manual "classic simple shaker" design for fourteen years with its D235 Patent and BlenderBottle Classic shaker bottle. In exchange for that fourteen-year monopoly on a valuable product, BlenderBottle disclosed the design to the public and agreed to give the design to the public domain after the expiration of its fourteen-year monopoly. Put differently, BlenderBottle cannot monopolize the functional manual shaker bottle indefinitely.

350. On 17 August 2022, BlenderBottle sent Hydra Cup a cease-and-desist letter alleging that Hydra Cup's shaker bottles infringed BlenderBottle's D551 Patent and demanding that Hydra Cup stop selling the products within two weeks, threatening legal action if Hydra Cup did not comply. Hydra Cup responded on 30 August 30, 2022, explaining that its products were based on Tianqi's prior patented design and did not infringe.

351. In response, on 30 August 2022, Hydra Cup sent a letter to BlenderBottle refuting the infringement allegations, specifically pointing out that the Accused Products were based on the design of Tianqi's 047 Patent and D029 patent, which predated BlenderBottle's 551 Patent by several years.

352. Hydra CUp had observed the widespread presence of Tianqi's TS1314 Shaker Bottles, based on the 047 Patent, in gyms and on websites across the United States since 2012 when Hydra Cup first entered the shaker bottle market. To confirm these observations, Hydra Cup investigated the history of Tianqi's TS1314 Shaker Bottle sales in the United States and obtained evidence from Tianqi demonstrating the product's significant market presence,[95] Tianqi's TS1314 Shaker Bottle being listed on Bodybuilding.com, Tianqi producing its TS1314 blender bottles for a high-profile partnership between Arnold Schwarzenegger and MusclePharm, and Tianqi's blender bottles being sold by well-known brands such as Infinite Labs, Universal Nutrition, and Twinlab, among others.

---

[95] *See* Exhibit 41, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Ex. 105, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013); *see also* Ex. 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014) (showing shaker bottle's embodying the design disclosed by Tianqi's D047 Patent alongside shaker bottles embodying the design disclosed by BlenderBottle's D235 Patent.)

353. As of 2024, Tianqi's classic TS1314 shaker bottle continues to be a strong seller, selling millions of bottle annually through hundreds of different resellers. Upon information and belief, BlenderBottle has not sued any of these companies, and many continue to advertise and sell the same exact shaker bottles and lids at issue in this case.

354. Because so many other companies were selling the exact same shakers as Hydra Cup, Hydra Cup continued selling the TS1314 OG Regular Shaker with the HC OG Carry Loop Lid, selling 119,496 units across nine purchase orders, primarily in multipacks containing multiple complete blender bottles—lids, bottles, and agitators together—on Amazon.

355. Hydra Cup placed its last purchase order containing the accused HC OG Carry Loop Lid, PO1114, in early August 2022 to cover anticipated Christmas sales, but on 14 December 2022, BlenderBottle filed this lawsuit against Hydra Cup.

356. BlenderBottle's aggressive legal strategy is aimed at stifling competition and preventing other companies from offering better and more affordable shaker bottle products. Even more egregious, BlenderBottle is trying to thwart Hydra Cup's efforts to improve upon the TS1314 design. Thus, not only is BlenderBottle stiffing competition, it is also stifling innovation.

357. Hydra Cup has invested significant time and resources, including the development of over 500 prototypes, to create a new shaker bottle design that incorporates novel, patentable features. While there is no guarantee that BlenderBottle will not also challenge this new design, Hydra Cup remains committed to competing fairly and providing innovative, high-quality products to its customers. Accordingly, Hydra Cup seek declaratory judgments that BlenderBottle's Asserted Patents and Trade Dresses, Equivalent Patents, and Related Trademarks so to establish certainty in the market, so that both companies can avoid future litigation.

358. BlenderBottle's aggressive litigation strategy has harmed not only Hydra Cup but also numerous other companies in the health and fitness industry. By stifling competition and innovation, BlenderBottle has denied consumers access to better and more affordable products, forcing them to

1   pay higher prices for essentially the same shaker bottle design that has been on the market for over

2   twenty years.

**III.   BLENDERBOTTLE'S ASSERTED PATENTS AND EQUIVALENT PATENTS ARE INVALID AND
3
4   UNENFORCEABLE.**

5   359. Hydra Cup realleges and incorporates by reference its allegations in each and every

6   paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set

7   forth herein.

8   **A. BlenderBottle's Asserted Patents and Equivalent Patents are Invalid for Lack of Originality and
9   Lack of Novelty.**

10   360. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

11   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

12   361. The D235 Patent is invalid including because it is anticipated by or obvious over the prior art. The

13   prior art references that render the D235 Patent invalid, whether alone or in combination, include by

14   way of example only and without limitation, the following: U.S. Patent Registration No. 3,820,692

15   (filed 16 April 1973), attached as Exhibit 50; U.S. Patent Registration No. D421,547 (filed 5 May

16   1999), attached as Exhibit 51; and Great Shakers Shaker Bottle (Screenshot from Internet Archive)

17   (disclosed 10 Feb. 2003), attached as Exhibit 52; D482,936 (1999-05-05). Each of these references

18   predates the D235 Patent and discloses a shaker bottle and lid design having the same overall

19   appearance as the claimed design.

20   362. The D551 Patent is invalid including because it is anticipated by or obvious over the prior art. The

21   prior art references that render the D551 Patent invalid, whether alone or in combination, include by

22   way of example only and without limitation, the following: 8,464,895 (filed 27 June 2011); D646,919

23   (filed 23 September 2010); D656,357 (filed 15 August 2011); D644,065 (filed 2010-09-29);

24   D626,838 (filed 2010-04-16); D626,837 (filed 2010-04-16); D626,838 (filed 2010-04-16); D565,353

25   (filed 2007-02-13); US D699,996 (filed 2012-08-28); D688,520 (filed 2012-04-18); D597,365 (filed

26   2008-04-25) 3,820,692; 2,754,866; 2,752,971; 5,088,614; 8,833,586; 2,851,203; 6,510,971;

27   D644,065; D208,935; D233,116; D409,043; D421,547; D425,362; D185,179; D280,606; D218,733;

D666,047; and D686,448 (filed 08 Sept. 2011); D686,872 (filed 2012-08-27); D686,871 (filed 2012-05-21); D610,402 (filed 2008-08-20); D675,059 (filed 2010-11-09); D658,445 (filed 2010-11-09); US D695,069 (filed 2012-02-28); D690,558 (2012-05-22); D718,626 (filed 2012-03-22); US 8,689,989 (filed 2012-02-28); US 8,622,229 (filed 2012-05-12); D608,640 (filed 2008-09-20); JP2008023202A (filed 2006-07-24); 2011/0253733 (filed 2010-04-16); 2010/0224631 (filed 2009-03-02) JP2008023202A (filed 2006-07-24); CN302040499 (filed 2012-04-20); CN301990459 (filed 2011-12-07); KR20130079338A; Smart Shake (2011-05-14); Core 150 Shaker Bottle (2011-10-6); Body Bottle; U.S. Trademark Registration No. 6,800.019 (claims the practiced design was first used in commerce in 2003).

363. Each of these references cited in the preceding paragraph predates the D551 Patent and discloses a shaker bottle lid design having the same overall appearance as the claimed design.



*Prior Art Disclosing the Finger Carry Loop Claimed by the D551 Patent.*



*The Design Disclosed by the D551 Patent was Obvious Over the Prior Art.*

364. The D798 Patent is invalid including because it is anticipated by and/or obvious over the prior art. The prior art references that render the D798 Patent invalid, whether alone or in combination, include by way of example only and without limitation all forging prior art that applies to the D551 Patent and the D235 Patent as well as the following, among others: U.S. Patent No. D646,919 (filed 23

September 2010), attached as Exhibit 61; U.S. Patent No. D656,357 (filed 15 August 2011), attached as Exhibit 62; U.S. Patent No. 9,301,648 (filed 20 February 2014), attached as Exhibit 63; U.S. Patent No. D747,148 (filed 17 April 2014), attached as Exhibit 64.

365. Each of these references cited in the preceding paragraph predates the D798 Patent and discloses a shaker container design that is substantially the same as the patented design.



*Prior Art Disclosing the Design Claimed by the D798 Patent.*

366. The D065 Patent is invalid including because it is anticipated by or obvious over the prior art. The prior art references that render the D065 Patent invalid, whether alone or in combination, include by way of example only and without limitation, the following: U.S. Patent Registration No. 3,820,692 (filed 16 April 1973), attached as Exhibit 50; U.S. Patent Registration No. D421,547 (filed 5 May 1999), attached as Exhibit 51; Great Shakers Shaker Bottle (Screenshot from Internet Archive) (disclosed 10 Feb. 2003), attached as Exhibit 52; D482,936 (1999-05-05); D646,919 (filed 23 September 2010); D626,838 (filed 2010-04-16); D597,365 (filed 2008-04-25); D610,402 (filed 2008-08-20), among others.

367. Each of these references cited in the preceding paragraph predates the D065 Patent listed in the preceding paragraph.

368. BlenderBottle's Equivalent Patents—the D478 Patent, the D038 Patent, the D149 Patent, the D119 Patent, the D540 Patent, the 830 Patent, the 843 Patent, the 877 Patent, the 024 Patent, and the 060 Patent—are each invalid, including because each patent is anticipated by or obvious over the prior art,

including, whether alone or in combination, by way of example only and without limitation, the following: 8,464,895 (filed 27 June 2011); D646,919 (filed 23 September 2010); D656,357 (filed 15 August 2011); D644,065 (filed 2010-09-29); D626,837 (filed 2010-04-16); D626,838 (filed 2010-04-16); D565,353 (filed 2007-02-13); US D699,996 (filed 2012-08-28); D688,520 (filed 2012-04-18); D597,365 (filed 2008-04-25); 3,820,692; 2,754,866; 2,752,971; 5,088,614; 8,833,586; 2,851,203; 6,510,971; D644,065; D208,935; D233,116; D409,043; D421,547; D425,362; D185,179; D280,606; D218,733; D666,047; and D686,448 (filed 08 Sept. 2011); D686,872 (filed 2012-08-27); D686,871 (filed 2012-05-21); D610,402 (filed 2008-08-20); D675,059 (filed 2010-11-09); D658,445 (filed 2010-11-09); US D695,069 (filed 2012-02-28); D690,558 (2012-05-22); D718,626 (filed 2012-03-22); US 8,689,989 (filed 2012-02-28); US 8,622,229 (filed 2012-05-12); D608,640 (filed 2008-09-20); JP2008023202A (filed 2006-07-24); 2011/0253733 (filed 2010-04-16); 2010/0224631 (filed 2009-03-02) JP2008023202A (filed 2006-07-24); CN302040499 (filed 2012-04-20); CN301990459 (filed 2011-12-07); KR20130079338A; Smart Shake (2011-05-14); Core 150 Shaker Bottle (2011-10-6); Body Bottle; U.S. Trademark Registration No. 6,800.019 (claims the practiced design was first used in commerce in 2003), among others.

369. Each of these references cited in the preceding paragraph predates the relevant Equivalent Patents listed in the preceding paragraph.

**B. The "Classic Simple Shaker" Bottles, Lids, and Agitators Claimed by the Asserted Patents, Equivalent Patents, and Asserted Trade Dresses Comprises a Combination of Primarily Functional Prominent Design Elements Configured in a Particular Arrangement that is Primarily Dictated by Function.**

370. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

371. In addition to being invalid as anticipated and obvious, the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents are also invalid for claiming designs primarily dictated by function consisting of primarily functional prominent design elements.

372. Note, the same facts, allegations, and arguments regarding functionality generally apply to all relevant subject matter claimed by each Asserted Patent, Equivalent Patent, and Asserted Trade Dress because the "classic simple shaker" bottles and lids claimed by the Asserted Patents, Equivalent Patents, and Asserted Trade Dresses are all closely related and substantially similar. For example, the D478 Patent claims the same exact lid design claimed by the 019 Lid Trade Dress except the 019 Lid Trade Dress disclaims any rights in the finger carry loop design. And that lid design claimed by the D478 Patent and 019 Lid Trade Dress is virtually identical to the lid claimed by each Asserted Patent, Asserted Trade Dress, and Equivalent Patent.

***1. BlenderBottle's "Classic Simple Shaker" Bottle and Lid Claimed by the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents is Primarily Dictated by Function.***

373. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.



*Prominent Design Elements from the D551 "Lid" Patent that are Common in the Lid Designs Claimed by BlenderBottle's Asserted Patents, Asserted Trade Dresses, Equivalent Patents, and Asserted/Infringing Products. (See Ex. 75, Prominent Design Elements in the Shaker Bottles and Lids.)*



*Prominent Design Elements from the D478 "Lid" Patent and the 019 "Lid" Trade Dress that are Common in the Lid Designs Claimed by BlenderBottle's Asserted Patents, Equivalent Patents, Asserted Trade Dresses, and Asserted/Infringing Products. (See Ex. 75, Prominent Design Elements in the Shaker Bottles and Lids.)*

374. BlenderBottle's "classic simple shaker" bottle and lid design—claimed by the Asserted Patents, Equivalent Patents, the 019 Lid Trade Dress, and the Unregistered Bottle Trade Dress—is dictated by function, with prominent functional design elements specifically configured a particular way to build the best working blender bottle.

375. BlenderBottle's "classic simple shaker" lid design is also primarily functional, as it mirrors the "classic simple shaker" lid design disclosed by BlenderBottle's Equivalent Utility Patents, inheriting the same functional features.

376. The overall design of BlenderBottle's "classic simple shaker" lid design is dictated by the functional requirements of a shaker bottle lid, such as facilitating secure attachment, easy drinking and pouring, efficient mixing, and leak-proof storage and transportation of contents.

377. Furthermore, the shape and configuration of the design practiced by BlenderBottle's "classic simple shaker" lid design is primarily dictated by function and the practical requirements of a shaker bottle lid with each prominent element serving a specific utilitarian purpose that is essential to the lid's overall function and use.

378. The domed body of the lid enhances structural strength, promotes even distribution of forces during shaking, prevents powder accumulation, simplifies manufacturing and cleaning, and improves grip and handling. The concave, domed shape is crucial for optimal mixing efficiency and structural integrity during vigorous shaking. This specific curved shape works in harmony with the spherical agitator to create optimal fluid flow patterns for thorough mixing. Sharp edges or other shapes would be prone to trapping clumps of powder and be more difficult to clean.

379. The domed body of the lid enhances structural strength, promotes even distribution of forces during shaking, prevents powder accumulation, simplifies manufacturing and cleaning, and improves grip and handling. The 019 Lid Trade Dress's domed body lid design, exemplified in BlenderBottle products, is functionally driven, focusing on enhancing mixing efficiency, structural integrity, and ergonomic use. The concave, domed shape improves structural strength, crucial for vigorous shaking

and mixing, as outlined in BlenderBottle's utility patent. This design distributes forces evenly, reducing deformation risk, and aids efficient mixing by preventing powder accumulation. The domed design simplifies manufacturing, conceals imperfections, and contributes to the lid's hygiene and ergonomic handling. It provides a better grip for opening and closing and simplifies cleaning. BlenderBottle's advertising underscores these functional benefits, highlighting the domed body's role in ensuring smooth, thorough mixing and ease of maintenance.

380. The tall shoulder/skirt is critical for forming an airtight seal with the shaker bottle. The height, width, and thickness of the skirt must be precisely engineered to fit securely on the bottle. If the dimensions are off, it may not seal properly, allowing moisture to enter and degrade the bottle over time. The skirt's specific configuration is essential for the lid's leak-proof functionality.

381. The pivoting top arm, spout, and spout guard work together as an integrated system for controlled dispensing and hygienic drinking. Their arrangement is dictated by functional necessity. The spout must be positioned away from the center to allow comfortable drinking without hitting the user's nose. The spout guard covers the spout to maintain cleanliness. The pivoting top arm seals the spout and must be positioned to work in tandem with the spout and spout guard.

382. The pivoting top arm with spout guard cap allows quick, one-handed access to the bottle's contents without fully removing the lid, facilitating easy drinking and pouring while preventing spills and maintaining hygiene. The 019 Lid Trade Dress's pivoting top arm design exemplifies optimal functionality, focusing on practicality rather than aesthetics. The pivoting top arm enhances the bottle's functionality by providing quick and effortless access to its contents. Its design, connected to the brackets' pivot mechanism and spout guard, facilitates one-handed operation. Further integrating with the lid's other features, the pivoting top arm facilitates faster access to the bottle's contents and helps keep the cap secure. The pivoting top arm and spout guard combination acts as a protective barrier for the drinking spout, maintaining hygiene. BlenderBottle's marketing highlights the functional importance of the pivoting top arm, focusing on its ease of use and hygienic advantages.

383. The spout and spout guard work together to control the flow of liquid, enable direct drinking of thick mixtures, prevent spills and splashes, and shield the drinking surface from external contaminants. The spout and spout guard's functionality is integral to the overall design of BlenderBottle's "classic simple shaker" lid design's lid. They work in harmony with other functional elements to facilitate drinking and pouring, ensure the contents are accessible and consumable directly from the lid, and enable precision placement in distributing the bottle's contents. The spout and spout guard designs are functionally optimized, enhancing the lid's usability for consuming liquids efficiently. Their design is meticulously engineered to control liquid flow and maintain hygiene while preventing leaks. The spout guard's circular design provides an effective seal with the spout, ensuring a smooth drinking experience. The spout's design represents the optimal functional approach, tailored for comfortable and easy drinking. BlenderBottle's advertising highlights the spout guard's functionality in keeping the drinking surface germ-free and preventing spills.

384. The brackets and carry loop are also configured in a specific arrangement for optimal functionality. The brackets provide a sturdy attachment point for the carry loop while allowing it to pivot smoothly. The carry loop's position and range of motion are carefully calibrated to bear the bottle's weight when carried, without putting undue stress on the lid or inadvertently opening the pivoting top arm. Changing the configuration of these elements would impair their intended functions.

385. The pivoting bracket design, featuring cylindrical pivots held within concave brackets, enables smooth and stable rotation of the flip-top cap while maintaining structural integrity and minimizing friction and wear. The 019 Lid Trade Dress's bracket design, featuring a cylindrical pivot encased within concave brackets, exemplifies functional optimization. The cylindrical middle of the brackets acts as a pivot for the pivoting top arm, allowing for smooth operation. The cylindrical shape efficiently minimizes friction and wear, enhancing durability and reliability. The concave brackets provide a secure hold for the pivot, maintaining structural integrity and ensuring the pivoting top arm remains firmly attached under stress. The brackets ensure ease of use without adding bulk, contributing to the lid's lightweight and portability. They strike a balance between robustness and flexibility, supporting the bottle's weight while allowing smooth cap movement. The bracket design

is superior to alternatives, such as non-pivoting or rigid designs, which would limit the pivoting top arm's functionality.

386. The circular screw-top base with threading provides a secure, adjustable, leak-proof seal that is critical for attaching the lid to the bottle and preventing spills during vigorous shaking and active use. The 019 Lid Trade Dress's circular screw-top base design is functionally optimal, primarily serving to provide a secure and adjustable seal. The threaded mechanism ensures a tight, leak-proof seal, offering superior durability and reliability. The broad shoulder of the circular screw-top base facilitates a secure fit and aids in the ease of drinking and mixing. The threaded design is user-friendly, allowing for straightforward opening and closing, and provides flexibility in adjusting the tightness of the seal. Given the limited design options available for creating an effective domed lid with such functionality, the circular screw-top base is dictated by practical needs.

387. BlenderBottle's "classic simple shaker" lid design is predominantly functional, aimed at enhancing practical use for drinking, mixing, pouring, storing, and transporting beverages. BlenderBottle's utility patent confirms the lid's functional nature, emphasizing its role in facilitating container handling and content mixing. This lid design significantly improves the overall utility of BlenderBottle's shaker bottles as versatile, portable beverage containers.

388. A key functional aspect of BlenderBottle's "classic simple shaker" lid design is its ability to efficiently mix contents without leakage, a primary selling point for shaker bottles. The lid features a leak-proof seal, achieved through a threaded design and secure flip cap, ensuring contents remain contained even during vigorous shaking. The lid's size and shape cater to comfortable drinking and effective mixing, matching the bottle's internal dimensions. User-friendly features, like grooved sides, facilitate easy handling. The design allows quick sealing and unsealing without fully removing the lid, enabling spill-free mixing and pouring.

389. The tall, cylindrical bottle body shape of the BlenderBottle's "classic simple shaker" bottle design is essential to providing sufficient volume capacity to meet users' needs for preparing and consuming

various beverages and supplements. The elongated design is not ornamental but rather serves the

utilitarian purpose of holding an adequate quantity of liquid.



*Prominent Design Elements from the D235 Patent that are Common in the Asserted Patents, Trade Dresses, and Products. (See Ex. 75, Prominent Design Elements in the Shaker Bottles and Lids.)*

390. The elongated, rocket-shaped grip strips with five pronounced bumps on the Ribbed-Grip-Bottle-Sides serve the utilitarian purpose of enhancing grip traction and stability. The unique shape and protrusions of the grip strips increase the contact surface area between the user's hand and the bottle, ensuring a secure hold during shaking and preventing slippage. The design is driven by functionality, not mere decoration.

391. The individual design elements of BlenderBottle's "classic simple shaker" bottle design, as well as their combined overall configuration, are all primarily functional in nature. Each feature serves a specific utilitarian purpose that is essential to the shaker bottle's intended use and performance.

392. The primacy of functionality in BlenderBottle's "classic simple shaker" bottle design practiced by its Unregistered Bottle Trade Dress precludes its validity and enforceability as a protectable trade dress. The design does not serve to identify and distinguish BlenderBottle's products in the market but merely embodies the functional requirements of a shaker bottle.

393. Each individual element of BlenderBottle's "classic simple shaker" bottle and lid serves a specific utilitarian purpose that is essential to the lid's overall function and use. Put differently, the "classic simple shaker" claimed by the Asserted Patents, Equivalent Patens, and Asserted Trade Dresses is not an arbitrary or ornamental design, but rather a compilation of functional elements that are essential to

the lid's purpose and use as part of a shaker bottle that are arranged in a very specific configuration to provide the optimal blender bottle for users.

394. BlenderBottle's "classic simple shaker" lid and bottle design supports mobile drinking, mixing, storage, and pouring, offering portability for on-the-go use. Its robust, leak-proof construction suits the storage and transportation of liquids. Durability and safety are prioritized in the material and construction choices, ensuring the shaker bottle withstands regular use and dynamic environments. Though the shaker bottle may include some ornamental aspects, its form is primarily dictated by functional requirements. Any ornamental aspects of BlenderBottle's "classic simple shaker" bottle and lid design are subordinate to and inseparable from the design's overall functionality, which is dictated by the practical requirements of a shaker bottle and lid.

395. Given the functionality of the overall design and each individual element, the scope of any rights in the "classic simple shaker" bottle and lid claimed by the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents is extremely narrow and does not extend to the functional features.

396. Allowing BlenderBottle to monopolize the functional design of BlenderBottle's "classic simple shaker" lid design would improperly prevent competitors from using design features that are necessary for the practical use and efficiency of shaker bottle lids.

### *2. BlenderBottle's Spherical Wire Agitator Design is Primarily Functional, Primarily Dictated by Function, and the Best Design Available.*

397. BlenderBottle's 626 Agitator Trade Dress, covering the design of a spherical wire whisk agitator, is primarily functional rather than ornamental.

398. Upon information and belief, BlenderBottle's claimed 626 Agitator Trade Dress is described in the registration as "a three-dimensional configuration of a beverage agitator consisting of a wire that is wound to symmetrically define the shape of a sphere."[96]

---

[96] (Ex. 18, U.S. Trademark Reg. No. 6,245,626).

399. The 032 Patent discloses a "wire-frame agitator apparatus" comprising "an object with a wire-frame shape through which liquids and fine-grained solids may pass."[97] This is the same basic configuration claimed in the 626 Agitator Trade Dress, i.e. "a wire that is wound to symmetrically define the shape of a sphere."

400. BlenderBottle's own expired utility patent, 032 Patent, discloses and claims the same spherical wire agitator as the 626 Agitator Trade Dress.[98] The existence of this utility patent is strong evidence that the design is functional, as utility patents are intended to protect new and useful inventions.



*BlenderBottle's Expired 032 Patent Describes the Functionality of the 626 Trade Dress in Detail.*

401. Additionally, the 032 Patent discloses using the wire-frame agitator with "an interior agitator placed inside a wire-frame object . . . [to] create[] further turbulence and dispersion which more quickly and effectively mixes the solids with the liquid suspension medium."[99] This further demonstrates that the wire-frame configuration serves a functional purpose in allowing an interior object to be used to enhance mixing.

---

[97] (Ex. 31, 032 Patent at Abstract, 2:48-51).

[98] (Ex. 31, U.S. Patent No. 6,379,032 (filed 18 February 2000)).

[99] (Ex. 31, 032 Patent at 2:63-67).

402. BlenderBottle actively enforced the 032 Patent against competitors, demonstrating its belief that the spherical wire agitator design provided a functional competitive advantage. Companies typically enforce utility patents to protect functional designs, not mere ornamental features.

403. The 032 Patent's "Summary and Objects of the Invention" section explicitly states that the agitator's shape is formed by a wire frame to allow the flow of material through and around it.[100] This language directly ties the design to its functional purpose of mixing the contents of the shaker bottle.

404. Every aspect of the design claimed in the 626 Agitator Trade Dress—the spherical shape, the wire-frame construction with spaces between wire elements, and the spiral-wound configuration—is disclosed in the 032 Patent as having functional benefits in terms of allowing flow-through mixing action, creating turbulence to disperse particles, facilitating motion through the container, and enabling elastic deformation to break up aggregations.

405. The wire-frame configuration of the agitator is essential to its function. The 032 Patent explains that "[t]he flow of material, whether liquid or powder, through the object creates turbulent eddy currents within and around the object that break up aggregations of material and disperse particles throughout the suspension medium."[101] The spaces between the wire-frame elements are necessary to allow this flow-through action that creates the turbulent mixing currents.

406. The 032 Patent further discloses that the wire-frame agitator may take many possible shapes, including "cubes, spheres, ellipsoids, pyramids, polyhedrons, cylinders and others."[102] However, a spherical shape is optimal because the "spherical shape shown in FIG. 1 may be constructed of wire-frame elements which represent longitudinal and latitudinal circles or other curves or lines found on the surface of a particular shape."[103] The spherical shape allows the agitator to efficiently mix contents as it moves around the container.

---

[100] (*Id.* at 2:48-58).

[101] (*Id.* at 2:54-58).

[102] (*Id.* at 2:58-60).

[103] (*Id.* at 4:36-39).

407. The 032 Patent also teaches that the wire-frame agitator may be constructed as "a single coiled wire-like element, as shown in FIG. 2, where a single wire element 12 is wound in a spiral pattern to form a spherically shaped object 10."[104] This coiled configuration "works advantageously to allow substantial elastic deformation of the spherical shape . . . [which] creates a crushing action which breaks up aggregations of powder which may stick thereto or become lodged there between."[105] The spiral-wound, elastically deformable sphere is the exact configuration claimed in the 626 Agitator Trade Dress.

408. Upon information and belief, the features claimed in the 626 Agitator Trade Dress are essential to the use or purpose of the agitator and impact its quality by providing superior mixing capabilities. The design is not arbitrary or ornamental but instead is dictated by the functional considerations disclosed in the 032 Patent.

409. BlenderBottle's 626 Agitator Trade Dress is, in essence, an attempt to monopolize the functional wire-frame agitator design of the expired 032 Patent under the guise of trade dress. Allowing such trade dress protection would improperly extend BlenderBottle's patent monopoly and prevent others from practicing the invention claimed in the 032 Patent, which is now in the public domain.

410. In light of the clear functionality of the claimed design, as evidenced by the disclosures of the 032 Patent, the 626 Agitator Trade Dress fails to serve as a valid trademark identifying the source of BlenderBottle's products. The design is not perceived by consumers as an indicator of origin but rather as a purely utilitarian feature of the agitator products.

411. The overall design of the spherical wire agitator is dictated by its function. The wire frame structure is essential for effectively mixing the contents of the shaker bottle, and its design elements are chosen primarily for this functional purpose. Alternative designs mentioned in the 032 Patent, such as non-spherical shapes, offer inferior mixing functionality compared to the claimed spherical design.[106]

---

[104] (*Id*. at 4:42-45).

[105] (*Id*. at 4:48-53).

[106] (*Id*. at 2:58-60, 4:30-39).

412. Upon information and belief, BlenderBottle's own advertising and promotional materials highlight the functionality of the spherical wire agitator design. As early as 2001, BlenderBottle described the agitator as being made of high-grade surgical stainless steel, resistant to rusting, chipping, peeling, or staining, and effective at whipping cream and blending ingredients smoothly. BlenderBottle compared the agitator's functionality to that of a traditional wire whisk used by gourmet cooks, emphasizing its primary functional role.

413. BlenderBottle markets the spherical wire agitator under the name "BlenderBall," which literally describes the product's function as a ball designed for blending. BlenderBottle's trademark registration for BLENDER BALL (the "591 Reg.") identifies the goods as "whisks, namely, agitators for mixing and blending food and drinks," further confirming the functional nature of the design.[107]

414. Among the various designs for spherical wire agitators disclosed in the 032 Patent, BlenderBottle chose to use the design in Figure 2 for its commercial products because it is the cheapest and easiest to manufacture. *See*[108] This further demonstrates that the specific configuration of the 626 Agitator Trade Dress is dictated by functional considerations, not ornamental design.

415. In light of BlenderBottle's own utility patent, enforcement history, promotional materials, and product naming, it is clear that the 626 Agitator Trade Dress is primarily functional. The spherical wire agitator design is essential to the use and purpose of the product, and its features are dictated by the functional requirements of effectively mixing the contents of a shaker bottle.

### 3. The Label Trade Dress is Primarily Functional.

416. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

417. BlenderBottle's Unregistered Label Trade Dress's overall design and its constituent elements are predominantly dictated by functional considerations, working in unison to create a label that

---

[107] (Ex. 22, U.S. Trademark Registration No. 3,515,591.).

[108] (Ex. 31, 032 Patent, Figures).

1   prioritizes clear communication, usability, and practicality over aesthetic or source-identifying

2   purposes.



4   *See Ex. 74, Prominent Design Elements in the Claimed Label Designs.*

5   418. The overall design of BlenderBottle's Unregistered Label Trade Dress is primarily dictated by the

6   functional need to convey essential product information to consumers in a clear, concise, and easily

7   readable manner. The vertical layout, contrasting colors, and straightforward typography are all

8   geared towards effectively communicating the brand identity, product line, and capacity, which are

9   vital for customers to make informed purchasing decisions. The simplicity of the design ensures that

10   the label does not interfere with the product's usability or aesthetics, allowing the bottle to be easily

11   gripped, cleaned, and stored.

12   419. For example, the dimensions and proportions of BlenderBottle's Unregistered Label Trade Dress are

13   primarily dictated by the need to fit precisely on the specific bottle for which it is designed. The

14   label's width and height must be carefully calibrated to match the bottle's circumference and the

15   desired vertical coverage area. This functional requirement restricts the label's design to a specific

16   size and shape, limiting the creative possibilities in order to ensure a secure and seamless fit on the

17   bottle.

18   420. Displaying the brand name "Blender Bottle" prominently at the top of the label serves the function of

19   telling consumers the exact function of the product—a bottle that blends. Furthermore, clearly

20   identifying the product's manufacturer enables consumers to quickly recognize and trust the brand

21   they are purchasing.

421. And the label's placement and alignment is patently functional. The label's placement on the bottle is also governed by functional factors. It must be positioned at a specific height and aligned accurately to avoid interfering with the bottle's grip area, cap, or any other functional components. The label's placement is crucial for maintaining the bottle's usability and ergonomics, as misaligned or poorly placed labels can hinder the user's ability to comfortably hold, open, or drink from the bottle.

422. Functionality also dictates adhesive and material considerations for the Unregistered Label Trade Dress. The label's design must also account for the functional requirements of the adhesive and material used. The chosen adhesive must be strong enough to keep the label securely attached to the bottle throughout its lifecycle, withstanding exposure to moisture, friction, and temperature changes. Similarly, the label material must be durable, moisture-resistant, and compatible with the bottle's surface to ensure long-lasting adherence and legibility. These functional constraints further limit the design options for the Label Trade Dress.

423. The Label Trade Dress's interaction with bottle contours is also primarily functional. The Label Trade Dress must be designed to accommodate the specific contours and curvature of the bottle. This functional necessity dictates that the label's shape and layout must be adapted to fit the bottle's surface without wrinkling, bubbling, or peeling. Designing the label to conform to the bottle's contours may require compromises in terms of layout, graphics, or text placement, as the label must prioritize a smooth and secure fit over purely aesthetic considerations.

424. Including the product line "CLASSIC" on the Unregistered Label Trade Dress helps differentiate this specific model from other offerings by the same brand, guiding customers to select the product that best suits their needs.

425. Presenting the bottle's capacity in both imperial and metric units (28 oz. | 828 ml) is a functional necessity, as it provides critical information about the product's size and volume, helping consumers choose the appropriate bottle for their intended use.

426. The clean, legible typography used throughout the Label Trade Dress is primarily functional, as it ensures that all the information is easily readable by consumers, even at a glance or from a distance.

427. The use of a light blue background and white text is a functional choice that provides high contrast and visibility, making the information on the label easy to discern. The color blue is also often associated with water and hydration, reinforcing the product's intended use.

428. Importantly, by designing the Unregistered Label Trade Dress to fit snugly and seamlessly on the bottle, the overall appearance of the label is primarily dictated by functional requirements rather than distinctive or ornamental choices. The label's dimensions, proportions, placement, alignment, adhesive, material, and interaction with the bottle's contours are all governed by the practical necessity of ensuring a secure, durable, and user-friendly attachment to the bottle.

429. The functional elements of BlenderBottle's Unregistered Label Trade Dress work together synergistically to create an overall design that is primarily driven by practicality and usability. The combination of the brand name, product line, capacity, eco-friendly icon, clear typography, and contrasting color scheme all serve the overarching function of effectively communicating essential product information to consumers while ensuring the bottle remains easy to handle and use.

430. By prioritizing functionality in both the individual design elements and their cohesive arrangement, BlenderBottle's Unregistered Label Trade Dress achieves a streamlined, intuitive, and user-friendly appearance that enhances the product's utility and marketability. The design's emphasis on functionality makes it less likely to be perceived as a distinctive source identifier, as it primarily serves practical purposes rather than acting as a unique, ornamental feature.

**B. BlenderBottle Continually Touts the Superior Functionality of the "Classic Simple Shaker" Bottle and Lid Designs Claimed by the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents.**

431. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.



1

*Prominent Design Elements in the Asserted Patents, Asserted Trade Dresses, and Asserted Products.*

432. For example, BlenderBottle touts the superior functionality of its multi-functional shaker bottle and lid designs on its blog: "The main purpose of a shaker cup is to mix up protein shakes. But they can also be used for any drink from juice to sports drink to iced coffee or just plain water. The BlenderBottle SportMixer shaker is ergonomically designed with an easy-to-hold grip, allowing it to double as an active lifestyle water bottle. We even make a protein shaker bottle with compartments the BlenderBottle ProStak with built-in storage for powders, snacks, and pills. Some people put shaker cups to work in other ways entirely, such as blending dressings, marinades, and pancake batter." [109]

433. And, also on its blog, BlenderBottle explains the important functions of its functional shaker bottle lid design: Functional Lid: "With all this mixing, it's *critical that the lid to your shaker cup stays securely in place*. It's no fun to wind up with protein powder and milk splattered all over your clothes and kitchen, rather then inside your belly! *All BlenderBottle shakers include lids engineered to stay tight, backed by our leak-proof guarantee*. The *lids twist snugly in place, forming a secure seal; with a distinctive snap, the caps click tightly closed and you're ready to shake away*. Our BlenderBottle Classic, BlenderBottle Pro32, and BlenderBottle Classic 45oz shakers even contains a special *spoutGuard, which keeps dirty gym fingers from touching the drinking spout*. Did we mention our

---

[109] (Ex. 54, BlenderBottle Website Blog Article, "What is a Shaker Cup?" (21 Aug. 2017) (emphasis added) (touting functionality as follows: "Did we mention our bottles use our StayOpen flip cap, which conveniently keeps the lid from banging on your nose as you drink?"; "We even make a protein shaker bottle with compartments the BlenderBottle ProStak with built-in storage for powders, snacks, and pills. Some people put shaker cups to work in other ways entirely, such as blending dressings, marinades, and pancake batter."; "All BlenderBottle shakers include lids engineered to stay tight, backed by our leak-proof guarantee."; "The lids twist snugly in place, forming a secure seal; with a distinctive snap, the caps click tightly closed and you're ready to shake away."; and the "spoutGuard . . . keeps dirty gym fingers from touching the drinking spout.")).

bottles use our *StayOpen flip cap*, which conveniently *keeps the lid from banging on your nose as you drink*?"[110]

434. BlenderBottle explains the superior functionality of its materials comprising its shaker bottles and lids: "The bottle material not only makes a difference aesthetically, it can impact the taste and temperature of your shake." BlenderBottle further explains the importance of material selection as follows: "Plastic shaker cups are the most common type but *not all plastics are the same*. It's important to make sure your shaker is BPA and phthalate free, like all BlenderBottle brand shakers. Otherwise, harmful chemicals can leach into your drink. One of the best food-grade plastics is Eastman Tritan, known for its extreme durability and clarity, as well as being stain and odor resistant a highly desirable quality that prevents today's smoothie from tasting like last week's protein shake. Many BlenderBottle plastic shaker cups feature Eastman Tritan as the bottle material."[111]

435. Also on its blog, BlenderBottle explains the functionality of its spherical wire agitator design: "Shaker cups differ from traditional cups or water bottles because they contain a mixing mechanism to blend the ingredients. There are several types of mixing mechanisms: ball or propeller-shaped agitators, built-in screens or strainers, and even self-contained mini motors. All BlenderBottle shaker cups use our patented BlenderBall Wire Whisk the mixing device that revolutionized the handheld mixing industry. *Made from 316 surgical-grade stainless steel, the BlenderBall whisk cuts through even the thickest ingredients (think bananas, nut butters, dense protein powders, honey, syrup, and more), whipping around inside the bottle to reach every last bit of the mix-ins and blend the smoothest possible shake.* Plus, it can stay in the bottle while you drink the BlenderBall whisk will *never rust, chip, or peel, nor will it tumble out* of the drinking spout."[112]

436. According to BlenderBottle, its "classic simple shaker" bottle and lid designs provide the following functionality: (i) "[e]rgonomic flip cap and spout"; (ii) "leak-proof"; (iii) its "adjustable carry loop

---

[110] (*Id.* (emphasis added)).

[111] (*Id.* (emphasis added)). (*See also*, Ex. 47, Harlan Depo. Tr., at 212: 4:9 (noting the utility of material mixtures: "seems like it was polycarbonate and something else, but I don't remember exactly what it was. But that was very popular material when it first came out because it was very clear and – and was BPA-free, and everybody was all on the Tritan train for a while.")).

[112] (Ex. 54, BlenderBottle Website Blog Article, "What is a Shaker Cup?" (21 Aug. 2017)) (emphasis added)).

1    lets you hold more when your hands are full and offers a convenient place to attach keys while at the

2    gym"; (iv) "[w]ide mouth makes it easy to add ingredients and to clean"; (v) "[s]tay open™ flip cap

3    won't close on your nose"; (vi) "[g]ripper Bars™ make it easy to hold"; (vii) "[e]mbossed ounce and

4    milliliter markings"; (viii) "[f]its in most car drink holders"; "dishwasher safe"; (ix) has "20-oz, 28-

5    oz, and 32-oz capacities"; and (x) "screw-on lid and secure flip cap keep your gym bag and car seat

6    dry."[113]

**C. Numerous Utility Patents Describe the Functionality of the "Classic Simple Shaker" Bottle and Lid Claimed by BlenderBottle's Asserted Patents, Equivalent Patents, and Asserted Trade Dresses.**

437.  Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

438.  The functional nature of each element of BlenderBottle's "classic simple shaker" lids and bottles claimed by the Asserted Patents, Asserted Trade Dresses, and Equivalent Patents is confirmed by BlenderBottle's own utility patents, which emphasize the utilitarian advantages of the design features.

439.  Multiple utility patents, including those owned by BlenderBottle, demonstrate that the designs claimed in BlenderBottle's Asserted Patents and Asserted Trade Dresses are primarily dictated by function rather than ornamental design. Each key element of these designs serves a utilitarian purpose.

440.  For two decades, BlenderBottle has consistently touted the functionality of its substantially similar shaker bottle, lid, and agitator designs, highlighting their functional strengths as a multi-functional blending tool, including in multiple utility patents owned by BlenderBottle.[114]

441.  The 830 Patent, owned by BlenderBottle, discloses describes the functional aspects of the spout, pivoting top arm, lid body, posts/brackets, handle/loop, and lid threading present in the Asserted Patents and Trade Dresses: For example, the 830 Patent claims a "lid base having an opening for dispensing contents" and "a flip top for sealing the opening" with the flip top having a "downwardly

---

[113] Ex. 95, BlenderBottle's Classic Shaker Bottle Product Page on Walmart.com

[114] (*See, e.g.*, Ex. 29, U.S. Patent No. 8,695,830 (filed 11 Sept. 2012); Ex. 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018); Ex. 31, U.S. Patent No. 6,379,032 (filed 18 February 2000); Ex. 34, U.S. Patent No. 10,165,877 (filed 07 May 2016); Ex. 33, U.S. Patent No. 9,492,024 (filed 02 October 2012); Ex. 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)).

extending protrusion . . . inserted [into the spout] to seal the opening."[115] This shows the spout functions to dispense contents and the flip top functions to seal the spout. (*See id*.). And While not explicitly claimed, the 830 Patent claims "a lid base" and "a lid that connects to a top of the bottle to seal the bottle", which are functional aspects related to the overall lid structure, including the domed body and skirt/shoulder that allow the lid to connect to and seal the bottle. (*See id*. at Claims 1, 12, 20.). And The "posts" claimed in the 830 Patent are equivalent to the "brackets" in the Asserted Patents and Trade Dresses, functioning to secure the handle and flip top to the lid base. The patent also claims the handle comprising a loop that functions to "support[] [the] weight of the container and allow[] the container to be carried without creating an opening force on the flip top"[116] And, while not explicitly claimed, the 830 Patent claims "a lid that connects to a top of the bottle to seal the bottle," which is the function performed by the lid threading.[117]

442. BlenderBottle's 060 Patent describes numerous functional aspects of the claimed shaker bottle lid design, demonstrating that the design is primarily dictated by function rather than ornamental appearance.[118] The 060 Patent states that the "spout 14" provides "direct access to the container" and is "sized and configured to allow a user to drink and/or pour from the container." The spout is described as being "large enough to allow the contents to easily be poured or dispensed" and "disposed toward a periphery or outer edge of the lid."[119] This shows the spout's size, location, and configuration are driven by the functions of providing access to the container contents for drinking and pouring. (*See id*.).

443. The 060 Patent extensively describes the functional aspects of the "flip-top closure 40", explaining it is "sized and configured to help control fluid flow through the opening or spout 14." In the closed position, the flip-top "cover[s] or close[s]" the spout "to prevent fluid from exiting the container 10."

---

[115] (Ex. 29, U.S. Patent No. 8,695,830, Claims 1, 11-12, 20 (filed 11 Sept. 2012)).

[116] (*Id*. at Claims 14, 20.).

[117] (*Id*. at Claim 20.).

[118] (Ex. 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018)).

[119] (*Id*. at 4:29-35).

In the open position, it "allow[s] fluid flow through the opening or spout 14."[120] The flip-top's two positions serve the functions of preventing and allowing fluid flow. The flip-top also includes a "fitting 80" that is "sized and configured to prevent fluid flow through the spout or opening 14 when the flip-top is in the closed position" by being "at least partially disposed in the spout 14."[121] The fitting's size and configuration perform the function of sealing the spout. (*See id*.).

444. The 060 Patent describes in detail how the flip-top closure and carrying member are pivotally connected to the lid via protrusions on the lid's flanges that engage with receiving portions on the flip-top and carrying member.[122] These pivotal connections, formed by the interaction between the protrusions and receiving portions, serve the function of allowing the flip-top and carrying member to rotate between different positions relative to the lid. (*See id*.).

445. The 060 Patent states that the "carrying member 44" has a "loop-shaped configuration" that "facilitate[s] carrying of the container 10" and "attaching one or more items to the container 10 or lid 12, and/or attaching the container or lid to one or more items."[123] The loop shape performs the function of providing a means to carry the container and attach it to other items. (*See id*.).

446. While not explicitly described as domed, the 060 Patent depicts the lid as having a domed body in the drawings. The specification states the "lid 12 may cover a relatively large opening to allow the container to be easily filled, cleaned, and washed."[124] This shows the lid body's size and shape serve the function of covering a large opening for filling and cleaning.

447. The 060 Patent further emphasizes the functional benefits of the flip-top closure design:

(i)  The "protecting member 90" around the flip-top's fitting "prevent[s] a user from touching or contacting at least a portion of the spout 14 and/or the fitting 80" when opening the flip-top. This allows opening "when a user's hands may be unclean or unwashed, wearing gloves, sweaty or perspiring, and the like" and "facilitate[s] use of the flip-top closure 40 in environments

---

[120] (Ex. 30, 060 Patent at 5:22-32).

[121] (Ex. 30, 060 Patent at 7:50-54).

[122] (Ex. 30, 060 Patent at 5:33-48, 8:30-9:31).

[123] (Ex. 30, 060 Patent at 5:44-48).

[124] (Ex. 30, 060 Patent at 3:66-4:1).

such as exercising, bodybuilding, gardening, construction, repairing, cleaning, wearing gloves, and the like where it may be desirable not to touch the spout 14, the fitting 80, or other surfaces of the flip-top."[125] The protecting member serves the function of preventing contact with the spout and fitting during use.

(ii)   The flip-top closure and lid design enable the "lid 12 [to] be simple to use and operate," "quickly and easily assembled, cleaned, and disassembled," "efficiently manufactured, easily repaired, and/or conveniently replaced."[126] These statements tout the utilitarian benefits of the design.

448. The 060 Patent describes the shaker bottle and lid as being made of functional "durable, long-lasting materials" such as "a relatively rigid material such as plastic . . . e.g., high-density polyethylene ("HDPE") or other materials with similar properties and/or characteristics."[127] Selecting materials based on durability and rigidity shows the design is primarily functional.

449. The detailed description in the 060 Patent of the functional aspects of the spout, flip-top closure, pivotal connections, carrying member, and lid body, as well as the utilitarian benefits and material choices, demonstrates that BlenderBottle's claimed design in the 060 Patent is dictated by function, not ornamental appearance. Each feature is described in terms of its utilitarian purpose and benefits rather than any ornamental value. This further supports Hydra Cup's declaratory judgment counterclaim that the 060 Patent is invalid due to functionality.

450. BlenderBottle's 843 Patent, which BlenderBottle accused Hydra Cup of infringing in cease-and-desist letters, describes numerous functional aspects of the claimed shaker bottle and lid design, which are substantially similar to the shaker bottle and lid designs claimed by the Asserted Patents and Asserted Trade Dresses, demonstrating that the designs claimed by the Asserted Patents and Trade Dresses are primarily dictated by function rather than ornamental appearance.[128]

451. The 843 Patent describes the functionality of the overall designs of a beverage container with lid as follows: "In greater detail, the stackable container system 10 may include a primary or beverage container 14 which may be configured to hold, store and/or transport liquids or fluids such as water,

---

[125] (Ex. 30, 060 Patent at 10:40-59).

[126] (Ex. 30, 060 Patent at 10:60-65).

[127] (Ex. 30, 060 Patent at 10:66-11:13).

[128] (Ex. 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)).

juices, drinks and the like. … The primary container lid 18 may provide a cover or cap to the primary container 14 and the lid is preferably removably connected to the container."[129]

452. The 843 Patent describes the functionality of multiple interchangeable secondary containers and lids as follows: "The smaller containers 16 and the smaller container lids 20 may be configured to allow any of the smaller container lids to be used in connection with any of the smaller containers."[130]

453. The 843 Patent describes the functionality of secondary containers attaching via same mechanism as beverage lid as follows: "The upper portion 50 may include a first connecting mechanism 56, such as a threaded or screw-type connection, which is sized and configured to be attached or coupled to a secondary container lid 20."

454. The 843 Patent describes the functionality of bases of containers interchangeably connecting to secondary lids as follows (Col. 8, lines 29-34): "The bottom or base of the beverage container 14 and the bottom or base of each of the smaller containers 16 may have the same or similar connecting or coupling mechanisms, which may allow the smaller container lids 20 to be connected to the beverage container or the smaller containers as desired."

455. The 843 Patent describes the functionality of secondary containers that are independently sealable as follows: "Advantageously, because each container 12 (such as the beverage container 14 and the smaller containers 16) may include a separate lid (such as the beverage container lid 18 and the smaller container lid 20), each container may be independently sealable."

456. The 843 Patent describes the functionality of secondary lids having bayonet top and threaded bottom as follows (Col. 10, lines 40-49): "An upper attachment portion 78 is preferably disposed about the upper portion 72 of the lid 20 and a lower attachment portion 80 is preferably disposed about the lower portion 76 of the lid. The upper and lower attachment portions 78, 80 may be different structures. For example, the upper attachment portion 78 may be a twist and lock, or bayonet-type structure that allows the upper portion 72 of the lid 20 to be connected to the base 30 of the primary

---

[129] *Id.* at 32-47.).

[130] 843 Patent, Col. 8, lines 27-32).

container 14 and/or the lower portion 54 of the secondary container 16. The lower attachment portion 80 may be a threaded or screw-type structure that allows the lower portion 76 of the lid to be attached to the upper portion of the secondary containers 16."

457. The 843 Patent describes the functionality of an optional tray fitting within the secondary lid as follows: "Preferably, the tray 22 is attached to the lid 20 in a manner that does not interfere with the lid being attached to the container 14, 16. The tray 22, as shown in FIGS. 6A and 6B, may include a body 100 with one or more dividers, such as a central divider 102."

458. The 843 Patent describes the functionality of a beverage lid that is not attachable to secondary containers as follows: "wherein the primary container lid is not configured to be connected to the secondary containers; and wherein the secondary container lids are not configured to be connected to the upper portion of the primary container."

459. The 843 Patent describes the functionality of having the possibility of multiple stacked configurations as follows: "Advantageously, the secondary containers 16 may be connected in any desired order or arrangement, and the secondary containers may offer unlimited expandability. In addition, any of the secondary containers 16 may be attached to a primary container 14."

460. The 843 Patent describes the functionality of the ability to store and mix ingredients as follows: "Significantly, the stackable container system 10 can be used to store liquids and/or ingredients separately until the user desires to consume and/or mix the liquids and ingredients. For example, a user can put ingredients for a protein shake in one or more of the smaller containers 16 and a liquid, such as water or mild, in the larger container 14."

461. The 877 Patent, which BlenderBottle accused Hydra Cup of infringing in cease-and-desist letters, describes numerous functional aspects of the claimed shaker bottle and lid design, which are substantially similar to the shaker bottle and lid designs claimed by the Asserted Patents and Asserted Trade Dresses, demonstrating that the designs claimed by the Asserted Patents and Trade Dresses are primarily dictated by function rather than ornamental appearance.[131]

---

[131] (Ex. 34, U.S. Patent No. 10,165,877 (filed 07 May 2016)).

462. More specifically, the functionality of the 877 Patent includes, *inter alia*, the following: Threaded connector on the upper portion of the beverage container body for connecting the beverage container lid, allowing secure attachment of the lid;[132] annular flange extending downwardly from the lower portion of the beverage container for connecting to the smaller container lids, providing a surface for the bayonet mount connection; a smaller container lid connecting portion on the interior wall of the beverage container's annular flange comprising a male portion of a bayonet mount with an inwardly extending flange and engaging portion enables quick attachment of the smaller container lids to the beverage container; a threaded connecting portion on the outer surface of the upper portion of the smaller containers for connecting to the smaller container lids, allows secure attachment of the lids to the containers; The smaller container lids having a first connecting structure with a threaded portion on the inner surface of a downwardly extending flange for connecting to the smaller containers enables secure attachment; the smaller container lids having a second connecting structure comprising a female portion of a bayonet mount with an upwardly extending portion, outwardly extending flange, and receiving portion for connecting to the beverage container enables quick attachment to the beverage container; the engaging portion of the beverage container's bayonet mount being complementary to the receiving portion of the smaller container lid's bayonet mount enables the bayonet mounting mechanism to function, and the outwardly extending flange of the smaller container lid's bayonet mount abutting the inwardly extending flange of the beverage container's bayonet mount when connected helps secure the connection—just to name a few.

463. The 024 Patent, which BlenderBottle accused Hydra Cup of infringing in cease-and-desist letters, describes numerous functional aspects of the claimed shaker bottle and lid design, which are substantially similar to the shaker bottle and lid designs claimed by the Asserted Patents and Asserted Trade Dresses, demonstrating that the designs claimed by the Asserted Patents and Trade Dresses are primarily dictated by function rather than ornamental appearance.[133]

---

[132] Ex. 34, 877 Patent, claims 1, 11, 21.

[133] (Ex. 33, U.S. Patent No. 9,492,024 (filed 02 October 2012)).

464. The 895 Patent describes functional aspects of the finger carry loop present in the D551 Patent, explaining that the "finger loop 172" is "configured to . . . allow a user to easily carry the assembly" and may "rotate about the hinge pin 180 between a downward extending position . . . to an upward extending position" so "a user may carry the assembly 10 by inserting a finger or other object (e.g., a belt, a strap, or the like) into the loop portion 178 of the finger loop 172."[134]

465. U.S. Patent No. 3,820,692 ("692 Patent") 692 Patent describes how the domed lid body provides optimal functionality: (i) the overall lid shape is "functional to direct fluid flow patterns therein and effect maximum mixing characteristics"; the "closure member side wall 18 is smoothly curved inwardly in its progression toward top wall 19 to generate the dome-like configuration," which combined with the "specially shaped" bottle "produce[s] a fluid flow pattern that directs fluid in the vicinity of the assembly side walls back toward the center thereof…[and] creates a maximum of agitation as the fluid passes over the differently shaped areas of blending element 14"; (iii) the "specially shaped bottom and top walls" of the lid and bottle "create the desired fluid flow pattern therein"[135]

466. The 692 Patent also explains the bottle and lid should be made of "polyethylene or other plastic having similar physical properties" because the "resiliency and local distortability of the material" enables "increased sealing engagement between the closure member top wall opening and seal therefor"[136] This shows the materials are chosen for functional reasons. (*See id.*).

467. Additionally, the 692 Patent describes how the domed lid body "enable[s] increased sealing engagement…for storage, packaging and dispensing purposes" and includes "an opening in the top wall and an associated seal therefor" to provide a "feed mouth and dispensing spout for the vessel when the closure member 12 is in seal-tight engagement therewith"[137]

---

[134] (Ex. 92, U.S. Patent No. 8,464,895.).

[135] (Ex. 94, U.S. Patent No. 3,820,692, Description.).

[136] (*Id.* at Abstract, Description).

[137] (*Id.* at Description.).

468. U.S. Patent No. 8,833,586 (the "586 Patent"), while not owned by BlenderBottle, further demonstrates the functionality of carry loops on bottles, explaining as follows: (1) integrated handles "allow users to carry the container/bottle with as little as one finger, which is easier and more convenient," "minimize heat or cold transfer to the user," "minimize the concerns caused by condensation," and "permit attachment of the container or bottle to other items such as bags, belts, and the like using hooks, ties, carabiners, etc. for convenient, hands-free transportation"; and, (2) despite these functional benefits, "manufacturers have not attached handles to the flip tops for fear that carrying the container/bottle by the handle would create upward pressure on the flip top and cause the flip top to open at an unwanted time."[138]

469. Taken together, these utility patents, among others show that the overall designs and each prominent design element claimed in BlenderBottle's Asserted Patents and Trade Dresses—the spout, pivoting top arm, domed lid body, lid skirt/shoulder, posts/brackets, finger carry loop, lid threading, bottle shape and configuration, the spherical wire agitator, and the bottle's belly label—are primarily dictated by function rather than ornamental design. The utility patents repeatedly extol the utilitarian advantages of these exact design features.

470. This detailed evidence of functionality from the utility patents, including BlenderBottle's own admissions regarding its virtually identical designs for shaker bottles and lids, demonstrates that BlenderBottle's Asserted Patents and Trade Dresses are invalid because the claimed designs are functional and not protectable as designs or trade dress.

471. Furthermore, BlenderBottle's expired 032 Patent describes the functionality of its 626 Agitator Trade Dress.

472. BlenderBottle's expired 032 Patent, entitled "Flow-Through Agitator," discloses a "wire-frame agitator apparatus" for mixing liquids and powders.[139] The 032 Patent discloses an agitator "compris[ing] an object with a wire-frame shape through which liquids and fine-grained solids may

---

[138] (Ex. 93, U.S. Patent No. 8,833,586.).

[139] (Ex. 31, 032 Patent, Title, Abstract).

pass."[140] The wire-frame configuration is described as essential to the agitator's mixing function: "The flow of material, whether liquid or powder, through the object creates turbulent eddy currents within and around the object that break up aggregations of material and disperse particles throughout the suspension medium."[141]

- Figure 1 of the 032 Patent depicts an embodiment of the wire-frame agitator in the shape of a sphere.[142] The patent states that this spherical shape is advantageous because it "may be constructed of wire-frame elements which represent longitudinal and latitudinal circles or other curves or lines found on the surface of [the] particular shape," allowing effective mixing as the agitator moves through the container.[143]

- The 032 Patent further discloses that the wire-frame agitator may be constructed as "a single coiled wire-like element, as shown in FIG. 2, where a single wire element 12 is wound in a spiral pattern to form a spherically shaped object 10."[144] This spiral-wound configuration is described as advantageous because it "allows substantial elastic deformation of the spherical shape . . . [which] creates a crushing action which breaks up aggregations of powder which may stick thereto or become lodged there between."[145]

**D. Alternative Shakers are Functionally Inferior to the "Classic Simple Shaker" Bottle and Lid.**

473. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

---

[140] (Ex. 31, 032 Patent, 2:48-51).

[141] (*Id*. at 2:54-58).

[142] ((*Id*. at Fig. 1, 4:30-35).

[143] (*Id*. at 4:36-39).

[144] ((*Id*. at 4:42-45, Fig. 2).

[145] (*Id*. at 4:48-53).

Blender Bottle has listed 12 different <u>alternative shaker bottles</u> on their lawsuit.
Although, many of these are not shaker bottles.



1

*Inferior "Alternative" Shaker Bottle and Lid Designs Offered by BlenderBottle.*

474. While the marketplace contains a variety of shaker bottle designs, as explained the utility patents discussed above disclosing virtually identical shaker bottles and lids, the designs covered by BlenderBottle's Asserted Patents and Asserted Trade Dresses are far superior in terms of functionality, ease of use, and overall performance. Simply put, the shaker bottle, lid, and agitator designs at issue in this care are the best available design for shaker bottles, lids, and agitators, providing optimal utility, mixing capabilities, storage, ergonomics, and ease of use, among other things.

All "acceptable products" compared to BlenderBottles "simple shakers". These products are not in the "simple shaker" category. We believe there are five core features that define this category. Each of these is fundamentally flawed in two or more of the five key features that define a "simple shaker".



*Not One of BlenderBottle's Alternative Designs Constitutes a "Simple Shaker."*

475. None of the alternative designs cited by BlenderBottle as purportedly available substitutes, such as the Artoid Push Limits Bottle, Rubbermaid Shaker Bottle, Contigo Shaker Bottle, Blue Peak Shaker Bottle, Huel Shaker Bottle, Lava Fitness Shaker Bottle, ShakeSphere Tumbler, WeightWatchers Shaker Bottle, Vortex Shaker Bottle, Aladin Shaker Bottle, Coleman Shaker Bottle, or Constant Contact Shaker Bottle, offer comparable functionality or efficiency to the designs at issue. [*See* Compl. at ¶ 39.]

476. These alternative designs suffer from numerous flaws that significantly impair their utility as mixing and drinking containers, especially for fitness and active lifestyle applications.

477. Many alternative designs, such as the Artoid, Rubbermaid, Contigo, Blue Peak, and Lava bottles, have flat lid designs that restrict mixing space, hinder effective mixing and pouring, and lead to residue buildup. In contrast, BlenderBottle's domed lid shape facilitates superior mixing, smoother liquid flow, and easier cleaning.

478. Several designs, like the Artoid, Lava, and Aladin bottles, have weak or unstable carry loop attachment mechanisms that compromise durability and risk breakage. BlenderBottle's sturdy, pivoting carry loops with secure bracket attachments offer enhanced strength and reliability.

479. The undersized flip cap pins on bottles like the Artoid and Lava are prone to damage under normal use forces. BlenderBottle's larger, more robust pin and bracket system ensures long-lasting performance.

480. Bottles such as the Contigo, Blue Peak, and Coleman feature ergonomic shortcomings like oversized carry loops, low spout heights, or inconvenient cap mechanisms that hinder portability and comfortable use. BlenderBottle's carefully engineered proportions and features optimize ease of handling and drinking.

481. The Huel bottle's detachable cap poses a high risk of loss, while its excessive lid space is inefficient. BlenderBottle's integrated cap and space-optimized design eliminate these issues.

482. Bottles like the WeightWatchers, Vortex, and Constant Contact have crevices or rubber seals that impede thorough cleaning and may trap odors. BlenderBottle's streamlined, smooth interior surfaces and material choices promote better hygiene.

483. Designs like the ShakeSphere and Aladin are unstable due to their tall, narrow shapes and lack of solid base, increasing tip-over risk. BlenderBottle's balanced proportions ensure reliable stability.

484. The Coleman bottle's design and categorization as a children's product limit its functionality and appeal for active adult users. BlenderBottle's design caters to a wide demographic with universal usability.

485. The Constant Contact bottle's coffee mug-like lid and bulky loop sacrifice the professional aesthetic and sleek portability of BlenderBottle's universally appealing design.

486. The functional deficiencies of these alternative designs highlight the thoughtful engineering and user-centric approach that set BlenderBottle's patented and trade dress designs apart. From the efficient mixing enabled by the domed lid to the secure yet user-friendly carry loop and cap mechanisms, BlenderBottle's designs prioritize performance, ergonomics, convenience, and hygiene to deliver a superior product experience.

487. By optimizing functionality without sacrificing aesthetics, BlenderBottle's designs have become the industry standard for shaker bottles. The marked shortcomings of alternative designs only serve to underscore the utilitarian advantages and enhanced usability that BlenderBottle's designs provide.

488. Upon information and belief, many of the alternative designs offered by BlenderBottle were virtually identical to other alternative designs offered by BlenderBottle—i.e., merely duplicates.



*Inferior Alternative Plastic Agitators Offered by BlenderBottle as Equal to a Spherical Wire Agitator.*



*BlenderBottle's Alternative Plastic Agitators are Redundant.*

They are all made of plastic.



*Inferior Alternative Plastic Agitator Cannot Possibly Offer Equal Functionality to the Spherical Wire Agitator Design.*

489. Furthermore, due to the rise in microplastic contamination, consumers are quickly developing an aversion to plastic products, especially plastic products contacting consumables.

**IV.   BLENDERBOTTLE'S INEQUITABLE CONDUCT ON THE USPTO.**

490. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

**A. The D551 Patent, the D478 Patent, and the 830 Patent are Unenforceable Due to Inequitable Conduct on the USPTO.**

491. The D551 Patent, the D478 Patent, and the 830 Patent are invalid and unenforceable due to BlenderBottle's inequitable conduct before the USPTO.

492. Upon information and belief, BlenderBottle withheld material prior art from the USPTO during prosecution of the patents and made arguments about the purported novelty and non-obviousness of the claimed inventions that it knew to be false.

493. Upon information and belief, BlenderBottle failed to disclose several highly material prior art references for "classic simple shaker" bottle and lid designs that were known to BlenderBottle during

prosecution of the D551 Patent, the D478 Patent, and the 830 Patent, including, without limitation, at least one of the following: U.S. Patent No. D421,547 (filed 5 May 1999), attached as Exhibit 51; U.S. Patent No. 8,464,895 (filed 27 June 2011), attached as Exhibit 55; U.S. D688,520 (filed 2012-04-18); D699,996 (filed 2012-08-28); CN301990459 (filed 2011-12-07); US 8,689,989 (filed 2012-02-28); US D686448S1 (filed 2011-09-08); US D608,640S (filed 2008-09-20); and JP2008023202A (filed 2006-07-24).

494. Furthermore, BlenderBottle claims the D478 Patent discloses an identical "classic simple shaker" lid design to the design claimed by the 019 Lid Trade Dress (except the 019 Lid Trade Dress disclaims the finger carry loop); and BlenderBottle claims it has used the 019 Lid Trade Dress in commerce since 2003; therefore, BlenderBottle should have disclosed the 019 Lid Trade Dress and any related references claiming the exact same lid design as the D478 Patent during the prosecution of the D551 Patent, D478 Patent, and 830 Patent since it knew about the substantially similar design before it filed any of the applications for the D551 Patent, the D478 Patent, or the 830 Patent.

495. Along the same lines, upon information and belief, numerous publications disclosed "classic simple shaker" bottle and lids that are substantially similar to the D551 Patent, the D478 Patent, and the 830 Patent and therefore BlenderBottle's patents are anticipated by and obvious over such prior art publications, yet BlenderBottle failed to disclose such publications to the USPTO even though it knew of their existence.[146]

496. Upon information and belief, each of these prior art references shows a "classic simple shaker" bottle and lid that are substantially the same as the Asserted Patents and Equivalent Patents and thus each Asserted and Equivalent Patent is anticipated by and obvious over such prior art references. Upon

---

[146] *See, e.g.*, Ex. 77, Ningbo Body Build Shaker (January 2007) (Internet Archive Screenshot) (HC0172423-HC0172423); Ex. 78, Energy First Shaker Bottle (Internet Archive Screenshot) (HC0172424-HC0172424); Ex. 79, Bodybuilding.Com Measurement Shaker Bottle (Internet Archive Screenshot) (23 June 2005) (HC0172425-HC0172426); Ex. 80, Shakerbottle.com Shaker Bottle (15 June 2012) (Internet Archive Screenshot) (HC0172427-HC0172427); Ex. 81, Spiderbottle Shaker Bottle (January 2012) (Internet Archive Screenshot)(HC0172428-HC0172428); Ex. 82, BlenderBottle ShakerBottle Tumbler (Internet Archive Screenshot) (HC0172429-HC0172429 (24 September 2011); Ex. 83, WinWee Shakerbottle Shaker Cup Shaker (Internet Archive Screenshot) (HC0172430-HC0172430) (17 June 2012); Ex. 84, Shakerbottle.cn (Internet Archive Screenshot) (HC0172431-HC0172431) 01 (October 2009); Ex. 85, SmartShake Carry Loop Caribener Storage Shaker (Internet Archive Screenshot) (HC0172432-HC0172434) (16 August 2010); Ex. 86, Core 150 Shaker Bottle with Compartments (Internet Archive Screenshot) (HC0172435-HC0172435) (26 October 2012); Ex. 87, Body Bottle Patented Spring (Internet Archive Screenshot) (HC0172436-HC0172436); Ex. 88, Cyclone Shaker Bottle (Internet Archive Screenshot) (HC0172437-HC0172437) (31 Janurary 2011); Ex. 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014)).

information and belief, however, BlenderBottle knew such prior art references existed, yet withheld such information from the USPTO, so that the USPTO would grant each patent application. BlenderBottle's deliberate decision to withhold this prior art from the USPTO constitutes inequitable conduct. Had the examiner been aware of these highly relevant designs and prior art references, the D551 Patent, the D478 Patent, and the 830 Patent never would have issued. BlenderBottle's inequitable conduct therefore renders the D551 Patent, the D478 Patent, and the 830 Patent unenforceable.

**B. BlenderBottle's 019 Lid Trade Dress is Unenforceable for Inequitable Conduct on the USPTO.**

497. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

498. During the prosecution of the 455 Application for the 019 Lid Trade Dress, the USPTO issued an Office Action on 01 March 2021, refusing registration under Sections 1, 2, and 45 because the trade dress was a "non-distinctive product design."[147]

499. Upon information and belief, BlenderBottle committed intentional fraud on the USPTO by falsely representing the first use date of its 019 Lid Trade Dress in commerce.

500. BlenderBottle committed fraud on the USPTO in prosecuting its 019 Lid Trade Dress by engaging in a bait-and-switch tactic, whereby it presented arguments pertaining to its Bottle Trade Dress in response to the USPTO's Office Action, rather than addressing the lid design claimed in the 019 Lid Trade Dress application.

501. In its response to the 455 App. Office Action, BlenderBottle mentioned the lid design once in the Preamble, then switched to a combination of the alleged Bottle Trade Dress with the D478 Lid and Carry Loop.

---

[147] (Ex. 58, 455 App. Office Action (01 March 2021)).



Mark:
Applicant: Runway Blue, LLC
Serial No.: 90301455
Our Ref.: BBCOM.052T

### RESPONSE TO OFFICE ACTION

The following amendments and remarks are submitted in response to the Office Action

issued on March 1, 2021 in connection with U.S. Application Serial No. 90301455 (the "Subject



Application") for the design mark                (the "Applicant's Mark").

### I.   INTRODUCTION

Applicant adopted its unique shaker bottle design, shown below, in 2003.

Applicant has since adopted a variety of different color combinations for its bottles and lids,

however, the common thread that consumers look to when purchasing Applicant's shaker bottles

1

*BlenderBottle's Response to the Office Action for the 019 Lid Trade Dress Used Arguments for its Unregistered Bottle Trade Dress Almost Exclusively.*

502. During the prosecution of the 019 Lid Trade Dress, the USPTO issued an Office Action raising

questions about the registrability of the claimed lid design. In response, BlenderBottle submitted

arguments that focused on the combination of the bottle and lid, emphasizing the overall appearance

and alleged distinctiveness of the complete shaker bottle design. These arguments, however, were not

germane to the 019 Lid Trade Dress, which specifically claims only the lid design, not the entire

bottle.

503. For example, in its Response to the 455 App. Office Action due to lack of distinctiveness,

BlenderBottle claimed that due to its "successful marketing and promotion of its unique *shaker bottle*

1    products, [BlenderBottle's] *shaker bottle* has become the best-selling *shaker bottle* product on the

2    market since 2004."[148] These arguments are for a shaker bottle, not a lid.



Due to Applicant's successful marketing and promotion of its unique shaker bottle products, Applicant's shaker bottle has become the best-selling shaker bottle product on the market since 2004. Applicant has secured over a 50% market share in the shaker bottle market.

*BlenderBottle Arguing its Shaker Bottles Acquired Distinctiveness Rather than the 019 Lid Design at Issue in the 455 App. Office Action.*

504. Similarly, BlenderBottle claimed "world-famous athletes and celebrities, including Tom Brady,

Connor McGregor, Kim Kardashian, The Rock (Dwayne Johnson), Justin Bieber, and Jennifer

Aniston, among others, have selected Applicant's distinctive *shaker bottle* as their product of choice."

Again, these arguments are for shaker bottles, not lids.

---

[148] (Ex. 58, BlenderBottle's Response to 455 App. Office Action, 3 (01 Mar. 2021) (emphasis added)).



1

*None of the Shaker Bottles BlenderBottle Submitted as Evidence of a Celebrity Endorsement for its Response to the 455 App. Office Action to Register its 019 Lid Trade Dress Show a Product from BlenderBottle.*

505. BlenderBottle concludes "each of Applicant's products are readily identifiable in the above images because of Applicant's unique ornamental lid design that distinguishes Applicant's products" without providing any evidence these are the products it claims.

506. Again, BlenderBottle provided shaker bottles with a carry loop lid in claiming that it "successfully licensed and co-branded with some of the world's most popular franchises, including Marvel, DC Comics, Harry Potter, and Star Wars."



Applicant also partnered with The Hunger Project (a global non-profit organization whose mission is to end hunger by building self-reliance) to design custom bottles for World Hunger Day. Examples of this partnership are shown below (see The Hunger Project + BlenderBottle):



*BlenderBottle Co-brands and Licenses Shaker Bottles, Not the 019 Lid Trade Dress.*

507. BlenderBottle goes on to provide numerous arguments arguing its *shaker bottle* had acquired distinctiveness, but failed to provide a single argument in support of showing its 019 Lid Trade Dress had acquired distinctiveness: "Applicant's *shaker bottles*, which include Applicant's Mark, are sold online and in some of the most popular online and retail stores"; "Applicant's *classic bottle* that features Applicant's Mark was showcased in Shape Magazine as the "Best Overall" shaker bottle in "The 14 Best Shaker Bottles, According to Customer Reviews;" and "[w]ith more than 43,000 reviewers giving the BlenderBottle Classic Loop Top Shaker Bottle a five-star rating, this is a clear go-to if you're looking for a shaker." None of these arguments show any acquired distinctiveness for the 019 Lid Trade Dress; each of BlenderBottle's arguments here is directed toward its alleged Unregistered Bottle Trade Dress.

508. By shifting the focus from the lid to the bottle and lid combination, BlenderBottle misled the USPTO into considering factors that should not have been relevant to the registrability of the 019 Lid Trade Dress. The arguments presented by BlenderBottle, such as the commercial success, advertising expenditures, and consumer recognition of the bottle and lid combination, were inapplicable to the assessment of the lid design alone.

509. BlenderBottle's bait-and-switch tactic is further evidenced by its concurrent assertion of rights in an Unregistered Bottle Trade Dress that features the exact same lid design claimed in the 019 Lid Trade Dress. This demonstrates that BlenderBottle itself recognizes the lid as part of a larger bottle trade dress and not as a standalone source identifier.

510. If the 019 Lid Trade Dress truly merited registration on its own, BlenderBottle should have been able to present arguments specific to the lid design, without relying on the bottle and lid combination. The fact that BlenderBottle felt compelled to resort to arguments about the overall bottle trade dress strongly suggests that the lid design alone is not distinctive or protectable.

511. BlenderBottle's actions amount to fraud on the USPTO because it knowingly misrepresented the relevant facts and arguments in order to obtain registration of the 019 Lid Trade Dress. By directing the USPTO's attention away from the lid and towards the bottle and lid combination, BlenderBottle deliberately obscured the weakness of its lid trade dress claim and secured registration through deceptive means.

512. The USPTO relies on the accuracy and truthfulness of the representations made by applicants during the trademark prosecution process. BlenderBottle's bait-and-switch tactic undermined the integrity of this process and prevented the USPTO from properly evaluating the registrability of the 019 Lid Trade Dress based on the merits of the lid design itself.

513. BlenderBottle's fraudulent conduct before the USPTO renders the 019 Lid Trade Dress registration invalid and unenforceable. The registration was obtained through misrepresentation and deceptive arguments that were not specific to the claimed lid design. By failing to present arguments relevant to

the lid alone and instead relying on the bottle and lid combination, BlenderBottle committed fraud and violated its duty of candor and good faith in dealing with the USPTO.

514. In its application for U.S. Registration No. 6,800,019 filed on 05 November 2020, BlenderBottle claimed the 019 Lid Trade Dress was first used in commerce in 2003, stating "In sum, given Applicant's use of its mark since 2003 (18 years) as well as its significant unsolicited media attention and public recognition, Applicant's Mark has acquired distinctiveness in the minds of the relevant consumers."[149]

515. Upon information and belief, however, a comparison of the design elements in BlenderBottle's D235 Patent from 2003 and the 019 Lid Trade Dress reveals significant differences when compared in light of the crowded prior art. These discrepancies clearly indicate that the design claimed in the 019 Registration was not in commercial use as early as 2003. The design elements claimed in the 019 Registration closely align with those in BlenderBottle's later D478 Patent, suggesting that the 019 Lid Trade Dress was actually used in commerce around the time of the D478 filing, which is post-2013, and not in 2003 as claimed.



*BlenderBottle Attempting to Claim its 019 Lid Trade Dress Includes a Finger Carry Loop.*

---

[149] (Ex. 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455 (HC0170962-HC0171062) (filed 21 September 2021)).

516. Upon information and belief, despite thorough examination, there is a conspicuous absence of documentary evidence, such as historical sales records or promotional materials, supporting the use of the 019 Lid Trade Dress in the market in 2003. This lack of evidence further undermines BlenderBottle's claim of early usage.

517. BlenderBottle's misrepresentation of the first use date was not a mere oversight but a calculated attempt to deceive the USPTO. Given BlenderBottle's access to accurate records and historical data, it is implausible that such a significant error could have occurred unintentionally.

518. The misrepresented first use date of 2003 potentially influenced the USPTO's decision-making process by suggesting an erroneously extended period of market presence and distinctiveness of the 019 Lid Trade Dress, which could have been a decisive factor in granting the registration.

519. Upon information and belief, BlenderBottle failed to disclose numerous design and utility patents disclosing substantially similar lid designs to the USPTO when the USPTO asked BlenderBottle.

520. Upon information and belief, as early as the mid-aughts, BlenderBottle began offering private labeling for the designs claimed by the Asserted Trade Dresses, and BlenderBottle allowed third parties to sell products embodying the designs claimed by BlenderBottle's Asserted Trade Dresses.[150]

---

[150] *See, e.g.*, Ex. 45, BlenderBottle Private Label Licensing Program (Screenshots from Internet Archive of BlenderBottle's websites over time) (2011-2014).



1

2    *BlenderBottle Private Offering Private Labeling for the '019 Lid Trade Dress.*

3    521. Furthermore, upon information and belief, BlenderBottle failed to disclose known design and utility

4    patents from the USPTO after the USPTO requested "[a] written statement whether the applied-for

5    mark, or any feature(s) thereof, is or has been the subject of a design or utility patents or patent

6    applications, including expired patents and abandoned patent applications."[151]

7    522. BlenderBottle responded to the examiners request for patents disclosing design elements contained in

8    the 019 Lid Trade Dress by citing the following nineteen patents: D510,235; D644,065; D696,551;

9    D748,478; D820,038; D920,739; D906,757; D887,267; D886,528; D886,528; D886,521; D885,825;

10   D884,416; D879,552; D878,853; D867,062, D745827S1, D626838, D862,156.[152]

---

1   [151] (Ex. 58, 455 App. Office Action (issued 01 March 2021); Ex. 59, BlenderBottle's Response to 455 App. Office Action, 10-17
2   (01 Mar. 2021) (emphasis added) (disclosing several other patents that are less similar than its own Equivalent Patents.)

3   [152] (Ex. 58, BlenderBottle's Response to 455 App. Office Action, 10-17 (01 Mar. 2021) (emphasis added)).

Patents Disclosed by BlenderBottle in Response to Office Action for the 019 Lid Trade Dress.



*The Patents BlenderBottle Disclosed to the USPTO in Response to the 455 App. Office Action.*

523. On the other hand, BlenderBottle failed to disclose several of its own patents that are much more similar to and that describe the functionality of the 019 Lid Trade Dress, including D830,119; 8,695,830; D897,149; D900,540, 11,111,060; 8,695,830.[153]

524. Nor did BlenderBottle disclose Tianqi's D047 or D029 Patents—which are also much more similar than the patents BlenderBottle actually disclosed—despite citing Tianqi's Patents as prior art in its own patents, demonstrating it clearly was aware of the Tianqi's D047 and D029 Patents well before it filed its trademark application.[154]

---

[153] *See id.* at 10-17.

[154] *See id.* at 10-17.

525. Upon information and belief, BlenderBottle also failed to disclose known substantially similar designs offered by third parties.[155]

526. Upon information and belief, BlenderBottle also represented the functionality of the prominent design elements comprising the design practiced by its 019 Lid Trade Dress. For example, BlenderBottle misrepresented the known functional advantage of a shaker bottle with a finger carry loop, stating "[f]or those bottles that choose to utilize a [carry] loop, . . . [t]he most common method of doing so is in a fixed, non-movable way. . . . [and] [t]his method *satisfies all the functionality of a carrying loop without the complication and additional cost of having the loop movable*."[156]

527. In light of these points, BlenderBottle knowingly and intentionally committed fraud on the USPTO. The significant discrepancies in design elements, the clear timeline contradiction, the lack of supporting evidence, and BlenderBottle's capability to accurately represent such crucial information, all lead to the inescapable conclusion that BlenderBottle's actions were deliberately deceptive, thereby constituting inequitable conduct.

## V.  BLENDERBOTTLE'S ASSERTED TRADE DRESSES AND RELATED TRADEMARKS ARE INVALID AND UNENFORCEABLE.

528. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

### A. BlenderBottle's Asserted Trade Dresses and Related Trademarks are Generic.

529. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

---

[155] *See, e.g.*, Ex. 104, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Ex. 105, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013).

[156] (*Id*. at 19-20.) (emphasis added).

*1. BlenderBottle's 019 Lid Trade Dress is Generic.*

530. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

531. BlenderBottle's 019 Lid Trade Dress, as employed in the BlenderBottle Classic shaker bottle, represents a fundamental, bare-bones design of a shaker bottle lid. The design encompasses basic elements that are universally adopted in shaker bottle lids, making it a boilerplate or base model design in the industry.

532. Upon information and belief, the design elements of the 019 Lid Trade Dress constitute what can be considered the most optimal and functionally necessary features for a shaker bottle lid. These features include aspects such as a secure closure mechanism, a spout for pouring or drinking, and a means of sealing to prevent leaks. These are not unique or distinctive features but rather utilitarian and essential components for the functionality of any shaker bottle lid.

533. Upon information and belief, the market for shaker bottles showcases a multitude of products that utilize a lid design similar to that of the 019 Lid Trade Dress. This widespread adoption signifies that the design is viewed as a standard, basic model in the industry, rather than a distinctive trade dress that identifies the source of the product.

534. Upon information and belief, the 019 Lid Trade Dress lacks features that would make it distinctly identifiable to consumers as originating from a specific source. Its design is so common and functional that it does not serve to distinguish BlenderBottle's products from those of other manufacturers in the minds of consumers. 253. Other manufacturers in the industry commonly use the design elements of the 019 Lid Trade Dress as a starting point or base model, upon which they add or modify features to create new and different designs. This practice further underscores the generic nature of the 019 Lid Trade Dress, as it is seen as a basic template rather than a proprietary design.

535. Upon information and belief, the 019 Lid Trade Dress is not inherently distinctive, as it consists of a combination of elements that are commonly used in the shaker bottle industry. The circular base,

1    domed top, spout, and closure mechanism are all standard features found in numerous shaker bottle

2    lids, and their combination does not create a unique or distinctive overall design.

3    536. Upon information and belief, BlenderBottle has not provided evidence that the 019 Lid Trade Dress

4    has acquired distinctiveness through secondary meaning. The widespread use of similar lid designs by

5    competitors and the lack of consumer recognition of the 019 Lid Trade Dress as a source identifier

6    indicate that it has not gained the necessary secondary meaning to be protectable.

7    537. Upon information and belief, the generic nature of the 019 Lid Trade Dress is further evidenced by

8    the fact that it has been used by multiple manufacturers in the shaker bottle industry for many years.

9    This long-standing and widespread use by various companies reinforces the notion that the design is a

10   standard, basic configuration that is not exclusively associated with BlenderBottle.

11   538. Given its fundamental, optimal, and widely adopted nature, the 019 Lid Trade Dress for a shaker

12   bottle lid does not qualify for trade dress protection. It represents a generic design that is commonly

13   used in the industry as a basic, functional model, lacking the distinctiveness necessary to be protected

14   as a trade dress.

15   539. The generic nature of the 019 Lid Trade Dress precludes it from serving as a source identifier for

16   BlenderBottle's products. Consumers do not associate this common lid design with a single source

17   but rather view it as a standard feature of shaker bottles available from multiple manufacturers.

18   540. Granting trade dress protection to the generic 019 Lid Trade Dress would unfairly hinder competition

19   in the shaker bottle market. It would allow BlenderBottle to monopolize a basic, functional design

20   that is necessary for other manufacturers to effectively compete and offer their own products.

21   541. In conclusion, BlenderBottle's 019 Lid Trade Dress is a generic design that consists of common,

22   functional elements that are widely used in the shaker bottle industry. It lacks the inherent

23   distinctiveness and secondary meaning required for trade dress protection and does not serve to

24   identify BlenderBottle as the source of the products. Recognizing the 019 Lid Trade Dress as a valid

1    trade dress would be contrary to the principles of fair competition and would unjustly restrict other

2    manufacturers from using essential design features in their shaker bottle lids.

3    *2. BlenderBottle's 626 Agitator Trade Dress is Generic.*

4    542. BlenderBottle's 626 Agitator Trade Dress registration covers the design of a spherical wire agitator

5    used inside shaker bottles to mix ingredients.

6    543. The spherical wire agitator design claimed in the 626 registration is generic because it represents the

7    basic, standard configuration for such agitators that has been widely used in the shaker bottle industry

8    for many years.

9    544. The 626 agitator design is fundamentally a foundational model that provides optimal functionality for

10   mixing shaker bottle contents. The spherical shape and wire construction are engineered to efficiently

11   blend ingredients into a uniform mixture. This optimal functionality indicates the design is a practical,

12   standard solution rather than a distinctive trademark.

13   545. Spherical wire agitators like the 626 design are prevalent in the shaker bottle market, with numerous

14   third-party manufacturers adopting substantially identical designs due to their effectiveness and

15   practicality. This widespread use by multiple companies shows the design has become a generic

16   configuration in the industry.

17   546. Many companies use the basic spherical wire agitator configuration as a starting point for further

18   innovation, adding minor variations or features to create new designs. The 626 design's role as a base

19   model that others build off of further demonstrates its generic nature.

20   547. The 626 agitator design is not inherently distinctive, as its configuration is dictated primarily by

21   functional considerations rather than source identification. The spherical shape and wire construction

22   are selected for their ability to efficiently mix contents, not to indicate origin from BlenderBottle.

23   548. Consumers perceive spherical wire agitators as common functional components used in shaker bottles

24   generally, not as features that identify BlenderBottle as the source. The design lacks distinctiveness

25   and fails to function as a source-identifying trademark in the minds of ordinary consumers.

549. BlenderBottle itself has emphasized the utilitarian benefits of its agitator design in marketing materials, touting how the configuration enhances mixing and blending performance. These functionality-focused statements further support the generic nature of the design.

550. Any alleged exclusive use of the spherical wire agitator design by BlenderBottle has not been substantially exclusive, as many third parties have used identical or virtually identical designs for years without challenge.[157] BlenderBottle has not policed the market to prevent others from using this basic configuration.

551. To the extent the 626 registration was ever valid, any rights in the claimed design have been abandoned due to widespread use by third parties and BlenderBottle's failure to stop such use.

***3. BlenderBottle's Unregistered Bottle Trade Dress is Generic.***

552. BlenderBottle's Unregistered Bottle Trade Dress, which includes features such as a cylindrical bottle body, a wide Bottle-Mouth, a domed body lid, a spout, a spout guard, a pivoting top arm, a tall Lid-Skirt/Lid-Shoulder, Pivoting-Brackets, and a Bottle-Base, is generic and lacks distinctiveness.

553. The design elements of BlenderBottle's Unregistered Bottle Trade Dress are largely dictated by the functional requirements of a shaker bottle, such as effectively mixing beverages, being easy to clean, and providing a secure seal for shaking.[158]

554. The cylindrical bottle body shape is a standard design choice for shaker bottles, as it allows for efficient mixing and easy gripping during shaking. This shape is not unique to BlenderBottle but is commonly used across the industry.

555. The wide bottle mouth is another functional necessity, facilitating easy filling, adding ingredients, and cleaning of the bottle. This feature is not distinctive but is a practical requirement for all shaker bottles.

---

[157] (*See, e.g.*, Ex. 122, Mr. Pen Shaker and Spherical Wire Whisk Agitator (screenshot taken 28 June 2024).

[158] *See, e.g.*, Ex. 97, Screenshots of BlenderBottle Classic Sold on Amazon Under Different Brand Names from 2012 from Internet Archive (21 February 2012) (showing CLICK Protein Shaker Cup with Wire Wisk Ball that shows identical "classic simple shaker" bottle, lid, and agitator designs to BlenderBottle's 019 Lid Trade Dress, the 626 Agitator Trade Dress, and the Unregistered Bottle Trade Dress).

556. The domed body lid design is a common solution to provide additional space for shaking and mixing the contents. It is not a unique or source-identifying feature but a functional element used by many shaker bottle brands.

557. The spout and spout guard are essential for controlled pouring and drinking, while also preventing spills. These features are standard across shaker bottles and are not distinctive to BlenderBottle.

558. The pivoting top arm is a common type of closure used in various bottle designs, chosen for its convenience and ability to seal securely; it is not a unique or source-identifying feature of BlenderBottle's design.

559. The tall lid-skirt/lid-shoulder and pivoting-brackets are functional elements that provide a secure connection between the lid and the bottle body. These features are not ornamental but are necessary for the proper functioning of the shaker bottle.

560. The bottle-base design, whether flat or pill-shaped, is a standard feature that provides stability to the bottle. It is not a distinctive element but a functional requirement for all shaker bottles.

561. The overall combination and configuration of these design elements in BlenderBottle's Unregistered Bottle Trade Dress does not create a unique or distinctive look that sets it apart from other shaker bottles in the market. Instead, it follows a common template used by numerous brands.

562. The generic nature of BlenderBottle's Unregistered Bottle Trade Dress is evidenced by the widespread use of similar designs by hundreds of companies selling millions of shaker bottles in the U.S. over the last decade.

563. Consumers do not associate the generic design of BlenderBottle's Unregistered Bottle Trade Dress with a single source or brand but rather view it as a common utility item available from multiple sources.

564. Given the limited design options for creating a functional shaker bottle, the elements of BlenderBottle's Unregistered Bottle Trade Dress are not only generic but also necessary for competitors to effectively compete in the market.

565. The generic and functional design elements of BlenderBottle's Unregistered Bottle Trade Dress, such as the cylindrical bottle body, domed body lid, spout, pivoting top arm, and Bottle-Base, belong in the public domain and cannot be monopolized by a single company.

***4. BlenderBottle's Unregistered Label Trade Dress is Generic.***

566. BlenderBottle's Unregistered Label Trade Dress, which consists of a wrap-around belt label on a shaker bottle, is generic and lacks distinctiveness.

567. Wrap-around belt labels are a common and standard design feature used in packaging across various industries, particularly in the beverage and supplement sectors.

568. The primary purpose of a wrap-around belt label is functional, providing space for necessary information such as branding, product details, ingredients, and regulatory compliance.

569. The generic design of a wrap-around belt label lacks inherent distinctiveness, as it is a basic and practical solution widely adopted by numerous manufacturers.

570. The cylindrical shape of shaker bottles naturally lends itself to the use of wrap-around labels, as they provide maximum visibility and readability. This design choice is driven by functionality rather than distinctiveness.

571. There are limited options for effectively implementing a label on a cylindrical bottle, further reinforcing the argument that a wrap-around belt label is a functional necessity rather than a unique trade dress.

572. Consumers generally perceive wrap-around belt labels as standard packaging elements and do not associate them with a particular source or brand. This lack of source-identifying significance undermines the label's distinctiveness.

573. Wrap-around belt labels often serve as a base template upon which brands apply their specific logos, colors, or designs. The generic nature of the label itself is evident in its use as a foundational element across multiple brands.

574. The widespread use of wrap-around belt labels in the shaker bottle industry is driven by their practicality and functionality, allowing brands to display necessary information while conforming to the bottle's shape.

575. BlenderBottle's Unregistered Label Trade Dress fails to function as a source identifier, as it is a common and generic design that does not distinguish BlenderBottle's products from those of competitors.

576. The prevalence of wrap-around belt labels on shaker bottles produced by numerous companies further demonstrates the generic nature of BlenderBottle's Unregistered Label Trade Dress.

577. In the context of shaker bottles, where functionality is paramount, a generic wrap-around belt label does not serve as a distinctive or source-identifying feature.

578. Allowing BlenderBottle to monopolize the use of a generic wrap-around belt label would unfairly hinder competition and limit the ability of other companies to effectively market and label their shaker bottle products.

***5. BlenderBottle's U.S. Trademark Registration No. 4,894,363 for the Term "BLENDERBOTTLE" is Generic.***

579. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

580. BlenderBottle owns U.S. Trademark Registration No. 4,894,363 for the term "BLENDERBOTTLE" in International Class 021.

581. The term "blender bottle" has become generic for the category of portable plastic bottles with integrated mixing systems, such as agitators or blender balls, used for blending the contents. The term merely describes the intended function and key characteristics of the bottle products, rather than identifying BlenderBottle as the exclusive source. The term merely describes a category of common products.[159]

---

[159] *See, e.g.*, Ex. 103, Walmart.com "Blender Bottles" Product Category (screenshot taken 24 June 2024) (screenshot taken on 24 June 2024) (showing the search filter "Product Category" lists the following categories of bottles: "Blender Bottles", "Water Bottles", "Cocktail Shakers", "Thermoses", "Tumblers", among others).

582. Consumers, retailers, journalists, and competitors in the portable beverage container industry commonly use "blender bottle" as a generic term to refer to bottles with built-in mixing features, regardless of the manufacturer. This widespread generic use has caused the term to lose any source-identifying significance in relation to BlenderBottle.

583. Numerous third parties in the industry openly sell and market their own bottles with integrated mixers under the name "blender bottle" or close variations. BlenderBottle has failed to take appropriate action to police the market and prevent competitors from using "blender bottle" in a generic manner to describe their products.

584. Online marketplaces, physical retail stores, and review websites frequently categorize or label portable mixing bottles from various brands as "blender bottles." This broad application of the term to products not originating from BlenderBottle shows its primary significance as a generic product descriptor.

585. When searching for portable bottles with mixing capabilities, consumers often use the generic term "blender bottle" without necessarily seeking BlenderBottle's specific products. This consumer usage confirms the term has become a common name for the type of goods, not a brand.

586. Media coverage and product reviews in the fitness and nutrition space routinely discuss "blender bottles" in a generic sense to describe the category of portable mixing bottles generally. Articles comparing different brands' offerings often refer to them collectively as "blender bottles," without suggesting an exclusive association with BlenderBottle.

587. Considering the highly descriptive nature of "blender bottle" in relation to portable mixing bottles, BlenderBottle had the burden of establishing and maintaining exclusive use of the term as a trademark. However, BlenderBottle did not fulfill this obligation, allowing widespread generic use by third parties and the public to continue unchallenged.

588. The extensive generic use and understanding of "blender bottle" in the relevant industry and marketplace overshadows any evidence of BlenderBottle using the term as a purported mark.

1  BlenderBottle's efforts have been inadequate to prevent "blender bottle" from becoming the generic

2  name for the goods.

3  589. Even if the 363 Reg. for "BLENDERBOTTLE" was initially valid, BlenderBottle's trademark rights

4  in the term have been abandoned and lost through the process of genericide, as evidenced by the

5  prevalent generic use by competitors, retailers, media, and the public. The term's primary significance

6  is now a common name for portable bottles with integrated mixing systems, not a brand identifier.

7  ***6. BlenderBottle's U.S. Trademark Registration No. 3,515,591 for the Term "BLENDER BALL" is***
8  ***Generic.***

9  590. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

10  Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

11  591. BlenderBottle owns U.S. Trademark Registration No. 3,515,591 for the term "BLENDER BALL" in

12  International Class 021.

13  592. The term "blender ball" has become generic for the category of spherical wire agitators used to mix

14  the contents of shaker bottles and containers.[160] The term merely describes the intended function and

15  physical characteristics of the agitator products, rather than identifying BlenderBottle as the exclusive

16  source.

17  593. Third parties in the shaker bottle industry, consumers, and the media commonly use "blender ball" as

18  a generic name to refer to spherical wire agitators, regardless of the manufacturer.[161] This widespread

19  generic use has caused the term to lose any source-identifying significance in relation to

20  BlenderBottle.

21  594. Numerous third parties openly sell and advertise spherical wire agitators under the name "blender

22  ball" or close variants thereof. BlenderBottle has not diligently policed the market to prevent

23  competitors from using "blender ball" generically to describe their own agitator products.

---

[160] *See, e.g.*, Ex. 53, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023) ("repeatedly using the term "blender bottle" to refer to an entire category of specific products).

[161] *See, e.g.*, Ex. 97, Screenshots of BlenderBottle Classic Sold on Amazon Under Different Brand Names from 2012 from Internet Archive (21 February 2012) (showing the terms "blender bottle" and "blender ball" were used on Amazon in 2012 as a "keyword that's strongly related to this product" along with "shaker cup", "protein shaker", and "hand mixer", indicating the term is necessary for consumers to describe the category of product they seek.).

595. Retailers, e-commerce platforms, and product review websites often categorize or label spherical wire agitators from various brands as "blender balls." This broad application of the term to products not originating from BlenderBottle demonstrates its primary significance as a generic product descriptor.

596. Consumers seeking to purchase spherical wire agitators commonly search for and refer to such products using the generic term "blender ball," without intending to find BlenderBottle's specific offerings. This consumer usage confirms the term has become a generic name for the type of goods, not a brand.

597. The media and publications reporting on the shaker bottle industry routinely use "blender ball" in a generic manner to describe the category of spherical wire agitators generally. Articles and reviews discussing different brands' agitators often call them "blender balls" without suggesting an exclusive association with BlenderBottle.

598. Given the highly descriptive nature of "blender ball" in relation to spherical wire agitators, BlenderBottle bore the burden of establishing and maintaining exclusive use of the term as a trademark. However, BlenderBottle failed to do so by allowing widespread generic use by the public to continue unchallenged.

599. Any evidence of BlenderBottle using "blender ball" as a purported mark is outweighed by the extensive generic use and understanding of the term in the shaker bottle industry and marketplace. BlenderBottle's efforts have been insufficient to prevent "blender ball" from becoming the generic name for the goods.

600. To the extent the 591 Reg. for "BLENDER BALL" was ever valid, BlenderBottle's trademark rights in the term have been lost due to abandonment and genericide based on prevalent generic use by competitors and the public. The term's primary significance is now a common name for spherical wire agitators, not a brand.

**B. BlenderBottle's Asserted Trade Dresses and Related Trademarks Have Not Developed Secondary Meaning.**

601. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

***1. BlenderBottle's 019 Lid Trade Dress Has Not Acquired Secondary Meaning.***

602. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

603. BlenderBottle's 019 Lid Trade Dress, which covers the design of its shaker bottle lid, is not inherently distinctive and has not acquired secondary meaning in the minds of consumers.

604. Upon information and belief, numerous third parties are selling "classic simple shaker" bottle and lid designs virtually identical to BlenderBottle's Asserted Trade Dresses.[162]



*Body Nutrition's Blender Bottle; RaidAway Shaker; GOMOYO Blender Protein Shaker; Mr. Pen Shaker Bottle and Spherical Wire Whisk Agitator;Velomix Shaker Cup and Wire Whisk Agitator; Gfuel Liquid Luck Shaker; Sage Mode Tall Shaker; and Gatorade Shaker Bottle.*

---

[162] (*See, e.g.*, Ex. 120, Body Nutrition's Blender Bottle Tall and Short With Carry Loop (screenshot taken 28 June 2024); Ex. 121, G Fuel Shaker (screenshot taken 28 June 2024); Ex. 122, Mr. Pen Shaker Bottle Product Page (screenshot taken 28 June 2024); Ex. 123, Gatorade Shaker Bottle for Gym (screenshot taken 28 June 2024); Ex. 124, Velomix Shaker Cup and Wire Whisk Product Page on Amazon (screenshot taken 28 June 2024); Ex. 125, GOMOYO Shaker Bottle, Blender Protein Shaker (screenshot taken 28 June 2024)).

605. Upon information and belief, the design elements of the 019 Lid Trade Dress, such as the domed lid, conical spout, hinged flip cap, and brackets, are commonly used in shaker bottle lids across the industry. This widespread use suggests that the design is functional and generic, rather than distinctive.

606. The prevalence of similar lid designs in the market undermines BlenderBottle's claim of distinctiveness.

607. Upon information and belief, BlenderBottle has not exclusively used the 019 Lid Trade Dress.

608. Upon information and belief, dozens, possibly hundreds, of companies have sold substantially similar versions of the "classic simple shaker" for at least the past ten years and likely much longer. Numerous companies continue to sell shaker bottles with lid designs similar to BlenderBottle's, even after litigation over these designs. BlenderBottle's failure to consistently enforce its alleged trade dress rights against these third parties constitutes tacit acknowledgment of the non-distinctiveness of its lid design.

609. The ongoing sale of similar lid designs by competitors has led to dilution of any distinctiveness that BlenderBottle's design might have once had. The widespread availability of similar products inevitably causes consumer confusion regarding the source of the products, undermining the primary function of a trade dress.

610. Upon information and belief, the standardization of similar lid designs in the industry is largely attributed to the primarily functional and utilitarian aspects that are essential for the products, rather than aesthetic choices meant to identify the source.

611. Upon information and belief, data showing that BlenderBottle's sales or brand recognition have not been significantly impacted by the presence of third-party products with similar lid designs supports the argument that the 019 Lid Trade Dress is not a primary driver of consumer decision-making and, therefore, not a significant source identifier.

612. In light of the descriptive and non-distinctive nature of the design elements, the widespread use of similar designs by third parties, the lack of exclusive use and consistent enforcement by BlenderBottle, the absence of consumer association evidence and intentional copying, and the primarily functional nature of the design, BlenderBottle's 019 Lid Trade Dress has not acquired secondary meaning and is not protectable under the Lanham Act or common law.

### 2. BlenderBottle's 626 Agitator Trade Dress Has Not Acquired Secondary Meaning.

613. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

614. BlenderBottle's 626 Agitator Trade Dress is not inherently distinctive as a matter of law and has not acquired secondary meaning in the minds of consumers as indicating a single source, affiliation, or sponsorship.

615. The spherical wire agitator design is a common and generic design for mixing balls or agitators used in shaker bottles across the industry.[163] Many companies use similar designs, and consumers do not exclusively associate this design with BlenderBottle's products. The design lacks the unique, distinctive qualities necessary to establish secondary meaning.



*Mr. Pen, GOMOYO, and Velomix Selling Wire Agitators Similar to the Wire Agitators at Issue in this Case.*

---

[163] (*See, e.g.*, Ex. 122, Mr. Pen Shaker Bottle Product Page (screenshot taken 28 June 2024) (showing a spherical wire agitator identical to the design claimed by BlenderBottle's 626 Agitator Trade Dress); Ex. 124, Velomix Shaker Cup and Wire Whisk Product Page on Amazon (screenshot taken 28 June 2024); Ex. 125, GOMOYO Shaker Bottle, Blender Protein Shaker (screenshot taken 28 June 2024)).

616. BlenderBottle has not shown that it has exclusively used this agitator design or that it has actively policed and prevented others from using similar designs. Without a history of exclusive use and enforcement efforts, BlenderBottle cannot establish that the design has acquired secondary meaning.

617. BlenderBottle did not develop meaninful secondary meaning in its 626 Agitator Trade Dress, as the design was protected by patents, thereby excluding all competition.

618. BlenderBottle's 626 Agitator Trade Dress does not serve as a source indicator due to the prevalence of third-party agitators coming with shaker bottles exhibiting features claimed by BlenderBottle to indicate source.

### 3. BlenderBottle's Unregistered Bottle Trade Dress Has Not Developed Secondary Meaning.

619. BlenderBottle's Unregistered Bottle Trade Dress, which includes the overall design of its shaker bottle and lid, is descriptive and non-distinctive, and has not acquired secondary meaning in the minds of consumers.

620. The design elements of the Unregistered Bottle Trade Dress, such as the tall cylindrical bottle body, recessed domed lid, conical spout, brackets, and round base, are commonly used in shaker bottles and other beverage containers. These features are dictated by the functional requirements of containing, mixing, and dispensing liquids, rather than serving as unique source identifiers.[164]

621. BlenderBottle's D119 Patent identifies many of the same elements claimed in the Unregistered Bottle Trade Dress, such as the conical spout, bracket or hinge, round lid base, and recessed domed top, as "unregisterable [sic] functional elements of the bottle lid." This further demonstrates the functionality and lack of distinctiveness of the claimed trade dress.

622. Upon information and belief, numerous third-party shaker bottles and beverage containers employ similar combinations of cylindrical bodies, recessed domed lids, conical spouts, and brackets.[165] This

---

[164] *See* Ex. 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455 (HC0170962-HC0171062) (filed 21 September 2021).

[165] Ex. 105, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013); Ex. 48, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022); Ex. 77, Ningbo Body Build Shaker (January 2007) (Screenshot from the Internet Archive) (HC0172423-HC0172423); Ex. 79, Bodybuilding.Com Measurement Shaker Bottle (Screenshot from the Internet Archive) (23 June 2005) (HC0172425-HC0172426).

1  widespread use of comparable designs in the market precludes BlenderBottle from claiming its

2  Unregistered Bottle Trade Dress as a distinctive source identifier.

3  623. The shaker bottle market is crowded with similar designs, making it unlikely that BlenderBottle's

4  product configuration has achieved a level of consumer recognition sufficient to establish secondary

5  meaning.

6  624. To the extent the Unregistered Bottle Trade Dress incorporates any ornamental features,

7  BlenderBottle has failed to articulate or plausibly plead those elements in a manner that would

8  support a claim of inherent or acquired distinctiveness.

9  625. In light of the functionality and commonplace nature of the design elements, the lack of exclusivity

10  and duration of use, the absence of targeted advertising and consumer recognition evidence, and the

11  failure to identify any ornamental features, BlenderBottle's Unregistered Bottle Trade Dress has not

12  attained the level of distinctiveness required for protection under the Lanham Act or common law.

13  ***4. BlenderBottle's Unregistered Label Trade Dress Has Not Acquired Secondary Meaning.***

14  626. BlenderBottle's Unregistered Label Trade Dress, which consists of a wraparound label with a brand

15  name, product name, capacity information, and colored accents, is descriptive and non-distinctive,

16  and has not acquired secondary meaning in the minds of consumers.

17  627. The design elements of BlenderBottle's Unregistered Label Trade Dress are common and widely used

18  in the industry. Numerous third-party shaker bottles and other beverage containers employ similar

19  labels with brand names, product names, capacity information, and colored accents.[166] This

20  widespread use of similar label designs suggests that BlenderBottle's label is not inherently

21  distinctive.

---

1  [166] (*See, e.g.*, Exs. 77-88, Screenshots of Shaker Bottles and Lids from the Late Aughts (showing early substantially similar
2  shaker bottle and lid designs disclosed before the D551 Patent); *see also* Ex. 106, BrandMakers Purchase Order for D047
3  "Arnold.com" Shaker Bottles from Ningbo to MusclePharm (14 October 2013); Ex. 104, Purchase Order and Export Records
4  for Laltec International from Tianqi (14 December 2012); Ex. 105, Invoices and Purchase Orders from Tianqi for D047 Shaker
5  Bottles (15 January 2013)).

628. Upon information and belief, BlenderBottle even offered its alleged Asserted Trade Dress designs to third parties to sell under their own private label.[167]

629. Upon information and belief, BlenderBottle almost never used the Unregistered Label Trade Dress online.[168] In other words, BlenderBottle did not use the Unregistered Label Trade Dress in the vast majority of Asserted Products, or any products, it has sold.

630. The primary purpose of BlenderBottle's label design is to convey basic product information to consumers, such as the brand, product name, and capacity. These elements are descriptive of the product and its characteristics, rather than serving as unique source identifiers.

631. The arrangement of the informational elements on BlenderBottle's label, including the placement of the brand name, product name, and capacity, follows a standard format commonly used in the industry. This conventional layout lacks inherent distinctiveness and does not create a unique commercial impression.

632. The presence of BlenderBottle's brand name on the label does not automatically confer distinctiveness to the overall label design. Consumers are likely to associate the brand name itself with BlenderBottle, rather than viewing the entire label layout as a distinctive source identifier.

633. BlenderBottle has not demonstrated that it has exclusively used the Unregistered Label Trade Dress. The widespread use of similar label designs by third parties in the industry undermines any claim of exclusive use and weakens the argument for secondary meaning.

*5. BlenderBottle's BLENDERBOTTLE Mark Has Not Acquired Secondary Meaning.*

634. BlenderBottle owns the BLENDERBOTTLE Mark for the term "BLENDERBOTTLE" in connection with "[p]lastic bottles sold empty; plastic bottles sold containing an agitator for mixing contents."

---

[167] (Ex. 45, BlenderBottle Private Label Licensing Program (Screenshots from Internet Archive of BlenderBottle's websites over time) (2011-2014)).

[168] Wholefoods.com is, upon information belief, the only online store where the Unregistered Label Trade Dress is used.

635. The BLENDERBOTTLE Mark is descriptive of the type of goods sold under the mark—namely, bottles designed for blending and mixing contents. The BLENDERBOTTLE Mark directly conveys an immediate idea of the key ingredients, qualities, and characteristics of the goods.

636. By combining the generic terms "blender" and "bottle," the BLENDERBOTTLE Mark simply describes a bottle used for blending, which is the intended purpose and function of BlenderBottle's shaker bottles. The Mark does not require imagination, thought, or perception to determine the nature of the goods.

637. The BLENDERBOTTLE Mark has not acquired distinctiveness or secondary meaning in the minds of consumers. Consumers do not perceive BLENDERBOTTLE as a brand that identifies BlenderBottle as the unique source of the goods, but rather as a generic name for the type of product —a bottle designed for blending.

638. Upon information and belief, BlenderBottle's own use of the BLENDERBOTTLE Mark emphasizes its descriptive nature. BlenderBottle's website and marketing materials consistently use the Mark in a descriptive manner to convey the blending functionality of the bottles, rather than as a distinctive brand identifier.

639. Upon information and belief, third parties in the industry frequently use the terms "blender bottle" or variations thereof descriptively to refer to portable mixing bottles generally, regardless of the manufacturer. This common usage underscores the descriptive nature of the BLENDERBOTTLE Mark.[169]

640. Consumers seeking portable bottles for blending and mixing commonly search for and refer to such products using the descriptive terms "blender bottle,"[170] without intending to find BlenderBottle's specific offerings. This consumer understanding demonstrates the Mark's primary significance as describing the type of goods, not identifying BlenderBottle as the source.

---

[169] *See* Ex. 53, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023); Ex. 55, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024).

[170] *See, e.g.*, Ex. 103, Walmart.com "Blender Bottles" Product Category (screenshot taken 24 June 2024) (screenshot taken on 24 June 2024) (showing the search filter "Product Category" lists the following categories of bottles: "Blender Bottles", "Water Bottles", "Cocktail Shakers", "Thermoses", "Tumblers", among others).

641. Media, publications, and retailers often use "blender bottle" descriptively to discuss and categorize portable mixing bottles from various brands. This broad application of the term to products not originating from BlenderBottle confirms its descriptive nature.[171]

642. Upon information and belief, BlenderBottle has not engaged in substantially exclusive use of the BLENDERBOTTLE Mark. Numerous third parties openly sell and market similar products under the descriptive terms "blender bottle" or close variations thereof without challenge from BlenderBottle.

643. BlenderBottle's sales, advertising, and promotional efforts related to the BLENDERBOTTLE Mark are insufficient to establish secondary meaning or transform the descriptive term into a distinctive brand in the minds of consumers. Any alleged commercial success is attributable to the popularity of the blender bottle product category as a whole, not to the mark itself as an indicator of origin.

644. No evidence suggests that consumers view BLENDERBOTTLE as a distinctive brand signifying BlenderBottle as the exclusive source of the goods. The primary significance of the mark in the minds of the consuming public is a generic name for the type of product, not a single-source identifier.

645. To the extent the 363 Reg. for BLENDERBOTTLE was ever valid, any rights in the mark have been lost due to widespread descriptive use by third parties and consumers, which BlenderBottle has failed to police. The mark has become generic for the category of portable blending bottles and no longer functions as a distinctive brand.

**6. BlenderBottle's BLENDER BALL Mark has Not Acquired Secondary Meaning.**

646. BlenderBottle owns the registered BLENDER BALL Mark in connection with "Wire whisk balls for mixing and blending contents of bottles or containers that include integrated mixing systems."

647. The BLENDER BALL Mark is highly descriptive of the goods sold under the mark—specifically, spherical wire agitators used to blend and mix the contents of bottles—immediately conveying the key characteristics and function of the product.

---

[171] *See* Ex. 53, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023); Ex. 55, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024).

648. The BLENDER BALL Mark combines the descriptive terms "blender" and "ball" to directly describe the product as a ball-shaped device used for blending. The mark requires no imagination, thought, or perception to understand the nature of the goods.

649. Upon information and belief, consumers do not perceive BLENDER BALL as a distinctive brand indicating BlenderBottle as the exclusive source, but rather as a generic term for the type of product —a spherical wire blending agitator. The mark has not acquired secondary meaning in the minds of the consuming public.

650. Upon information and belief, BlenderBottle's own use of the BLENDER BALL Mark in its marketing and packaging highlights the descriptive nature of the term. BlenderBottle consistently uses the mark to describe the functionality of the agitator product, rather than as a unique brand identifier.

651. Upon information and belief, numerous third parties in the industry commonly use the terms "blender ball" or close variations descriptively to refer to spherical wire agitators for mixing bottle contents, irrespective of the manufacturer.[172] This widespread industry usage confirms the descriptive nature of the BLENDER BALL Mark.[173]

652. Consumers searching for spherical wire agitators to blend and mix bottle contents frequently use the descriptive terms "blender ball," without necessarily seeking BlenderBottle's specific product. This consumer usage demonstrates the mark's primary significance as describing the type of goods, not identifying BlenderBottle as the source.

653. Upon information and belief, media, publications, and retailers regularly use "blender ball" descriptively when discussing and categorizing spherical wire agitators from various brands. This

---

[172] *See, e.g.*, Ex. 97, BlenderBottle Classic Sold on Amazon Under Different Brand Names (screenshot from Internet Archive) (21 February 2012) (showing the terms "blender bottle" and "blender ball" were used on Amazon in 2012 as a "keyword that's strongly related to this product" along with "shaker cup", "protein shaker", and "hand mixer").

[173] *See, e.g.*, Ex. 97, Screenshots of BlenderBottle Classic Sold on Amazon Under Different Brand Names from 2012 from Internet Archive (21 February 2012) (showing CLICK Protein Shaker Cup with Wire Wisk Ball that shows identical "classic simple shaker" bottle, lid, and agitator designs to BlenderBottle's 019 Lid Trade Dress, the 626 Agitator Trade Dress, and the Unregistered Bottle Trade Dress).

1    broad application of the term to products not originating from BlenderBottle reinforces its descriptive

2    character.

654.   Upon information and belief, BlenderBottle has not exercised substantially exclusive use of the

BLENDER BALL Mark. Many third parties openly market and sell similar agitator products under

the descriptive terms "blender ball" or close variations without opposition from BlenderBottle.

655.   Any sales, advertising, or promotional efforts by BlenderBottle related to the BLENDER BALL Mark

are insufficient to establish secondary meaning or transform the highly descriptive term into a

distinctive brand in the minds of consumers. Any alleged commercial success is due to the popularity

of the spherical wire agitator product itself, not to the mark as a source identifier.

656.   Upon information and belief, there is no evidence indicating that consumers perceive BLENDER

BALL as a distinctive brand signifying BlenderBottle as the exclusive source of the goods. The

primary significance of the mark to the consuming public is as a generic term for the type of product,

not as a single-source indicator.

657.   To the extent the 591 Reg. for BLENDER BALL was ever valid, any rights in the mark have been

lost due to extensive descriptive use by third parties and consumers, which BlenderBottle has failed to

prevent. The mark has become generic for the category of spherical wire agitators used in blending

bottles and no longer functions as a distinctive brand.

**VI.    HYDRA CUP'S ASSERTED PRODUCTS DO NOT INFRINGE BLENDERBOTTLE'S ASSERTED PATENTS, ASSERTED TRADE DRESSES, EQUIVALENT PATENTS, OR RELATED TRADEMARKS.**

658.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

659.   Hydra Cup's Accused Products do not infringe the Asserted Patents, the Equivalent Patents, the

Asserted Trade Dresses, or the Related Trademarks. As shown and discussed below, there are

numerous differences between Hydra Cup's Accused Products and BlenderBottle's Intellectual

Property.

660. Note, the same facts, allegations, and arguments for noninfringement generally apply to all relevant subject matter claimed by each Asserted Patent, Equivalent Patent, and Asserted Trade Dress because the "classic simple shaker" bottles and lids claimed by the Asserted Patents, Equivalent Patents, and Asserted Trade Dresses are all closely related and substantially similar. For example, the D478 Patent claims the same exact lid design claimed by the 019 Lid Trade Dress except the 019 Lid Trade Dress disclaims any rights in the finger carry loop design. And that lid design claimed by the D478 Patent and 019 Lid Trade Dress is virtually identical to the lid claimed by each Asserted Patent, Asserted Trade Dress, and Equivalent Patent.

661. Hydra Cup has never offered or sold standalone lids.

662. Hydra Cup has never even offered or sold complete shakers as a single product. Hydra Cup only offers complete shakers—bottles, lids, and agitators—in multipacks.

**A. Hydra Cup's Accused Products Do Not Infringe BlenderBottle's Intellectual Property.**

663. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

664. BlenderBottle's D235 Patent expired in October 2019, meaning BlenderBottle granted the "Bottle" design claimed by the D235 Patent to the public domain when the D235 Patent expired in October 2019.

665. The TS1314 OG Regular Shaker Bottle was the only Accused Product that Hydra Cup offered or sold before the expiration of the D235 Patent in October 2019. Hydra Cup did not sell the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the HC OG Carry Loop Lid, the GOAT Shaker, or the TS1038 Jumbo Shaker before the D235 Patent expired in October 2019, so it is not possible that these Accused Products infringed the expired D235 Patent.

***1. Hydra Cup's TS1314 OG Regular Shaker Bottle Does Not Infringe BlenderBottle's D235 Patent.***

666. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

667. Detailed differences highlight the distinct ornamental design choices in the TS1314 OG Regular Shaker Bottle compared to the more simplistic and functional design of the D235 Patent. The TS1314 OG Regular Shaker Bottle incorporates unique design elements such as crescent-shaped ornamentation, a flatter dome, an oval closure area, and a shorter, tilted spout, which collectively create a significantly different visual appearance from the D235 lid design.



*BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle.*

668. Hydra Cup's shaker bottle and lid design seen in the Accused Products features a significantly different overall design compared to BlenderBottle's D235 Patent. The TS1314 OG Regular Shaker Bottle incorporates a cohesive design theme with ornamental elements on both the bottle and lid, creating a balanced and visually appealing appearance. In contrast, the design disclosed by BlenderBottle's D235 Patent has a more functional, bare-bones design lacking a unified aesthetic.

These numerous design differences contribute to a distinctly different overall visual impression



between the two products.



*Lids on BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle.*

669. Hydra Cup's Accused Products present a much different overall design impression from the impression of BlenderBottle's D235 Patent: (i) The D235 Patent lacks a cohesive design theme, consisting of a busy-looking bottle with large grips and a bare-bones lid with minimal features. This creates an imbalance in the overall design appearance; (ii) The TS1314 OG Regular Shaker Bottle applies the "rule of three" design principle, featuring crescent shapes in the flip cap, lid, and bottle, thereby creating a greater sense of visual balance and consciously directs the viewer's attention to key elements; (iii) The TS1314 OG Regular Shaker Bottle's design elements, such as the crescent-shaped ornamentation on the lid and flip cap, the recessed crescent-shaped area on the bottle, and the overall rounded shape, work together to create a harmonious and visually appealing design.



1

2   *Lids on BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle.*

3   670. Hydra Cup's Accused Shaker Bottle and lid design have a significantly different overall visual

4   impression compared to the design claimed in BlenderBottle's D235 Patent. The TS1314 OG Regular

5   Shaker Bottle features a cohesive design theme with ornamental elements on both the bottle and lid,

6   creating a balanced and visually appealing appearance. In contrast, the D235 design lacks a unified

7   aesthetic, with a busy bottle design and bare-bones lid.

8   671. The TS1314 OG Regular Shaker Bottle incorporates the "rule of three" design principle, featuring

9   crescent shapes in the flip cap, lid, and bottle. This creates visual balance and directs the viewer's

10   attention to key elements. The D235 lacks any such cohesive design theme.



11

12   *BlenderBottle's D235 Patent and Hydra Cup's TS1314 OG Regular Shaker Bottle*

13   672. The TS1314 OG Regular Shaker Bottle's design elements, including the crescent-shaped

14   ornamentation on the lid and flip cap, the recessed crescent-shaped area on the bottle, and the overall

15   rounded shape, work together harmoniously. The D235 lacks this unified design.

_D235_ _Accused Bottle_

 

1. D235 shows a very detailed bottle design with large grips composed of five protrusions and a distinct pill-like bubble that displays measurement markings. It lacks any rhyme or reason; consisting of a busy looking bottle and a bare bones lid with nothing on the surface. This creates an imbalance in design appearance. Accused bottle applies the rule of three to this angle as you can see the crescent shapes in the flip cap, lid, and bottle.

1. Accused bottle applies the rule of three to this angle as you can see the crescent shapes in the flip cap, lid, and bottle.

*BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*



*BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

673. The TS1314 OG Regular Shaker Bottle's lid has numerous differences compared to the D235 lid: the Accused spout starts further back near the apex of the dome, while the D235 spout starts close to the threading; the Accused spout is much smaller, about half the size of the D235 spout; the Accused spout is tilted towards the flip cap, whereas the D235 spout is straight; the Accused brackets are significantly shorter than the tall D235 brackets; the Accused brackets are flat, starting on the flat part of the dome and the D235 brackets are curved, starting lower on the dome; the Accused lid features an ornamental crescent line from the skirt to the dome whereas he D235 lid is bare; the Accused lid

has a flatter dome compared to the D235's half-spherical dome; The Accused lid has an oval-shaped closure area, while the D235 closure is circular; The Accused flip cap has crescent ornamentation on the surface, unlike the plain D235 flip cap.



*BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

674. The TS1314 OG Regular Shaker Bottle has a markedly different shape from the D235 bottle: the D235 has large grips with five protrusions and a pill-shaped bubble for measurements, while Hydra Cup's TS1314 OG Regular Shaker Bottle is continuously rounded without protrusions or flat areas; the D235 features prominent elevated gripper bars on the sides. The TS1314 OG Regular Shaker Bottle has a recessed crescent area instead; the D235 bottom has straight lines below the gripper bars, while the TS1314 OG Regular Shaker Bottle bottom is completely circular.



*Flip Top Caps on BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

675. The measurement markings also differ between the TS1314 OG Regular Shaker Bottle and D235: the D235 displays measurements in a pill-shaped area, while the TS1314 OG Regular Shaker Bottle has no designated area; the D235 shows both mL and oz with a central line, whereas the TS1314 OG Regular Shaker Bottle rear-view shows only oz; the D235 shows 4 oz increments up to 20 oz and the TS1314 OG Regular Shaker Bottle uses 5 oz increments up to 25 oz.



*BlenderBottle's D235 Patent Compared to Hydra Cup's TS1314 OG Regular Shaker Bottle.*

676. These numerous differences in design elements and overall visual impression between the TS1314 OG Regular Shaker Bottle and the D235 Patent demonstrate the TS1314 OG Regular Shaker Bottle is plainly dissimilar from the claimed design and does not infringe.

677. For the same reasons listed above, Hydra Cup's HC OG Carry Loop Lid, its TS1327 OG Mini Shaker, its TS1352 OG Storage Shaker, its TS1038 Jumbo Shaker, and its GOAT Shaker are also patently dissimilar from BlenderBottle's D235 Patent and therefore do not infringe BlenderBottle's D235 Patent.

***2. Hydra Cup's HC OG Carry Loop Lid Does Not Infringe the D551 Patent or Any Substantially Similar Lid Claimed by the Equivalent Patents.***

678. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

679. Hydra Cup's Accused Shakers comprising bottles and lids together, including the Shaker with the HC OG Carry Loop Lid—are immediately distinguishable and patently dissimilar from the standalone lid design disclosed by BlenderBottle's D551 "Lid" Patent.

680. BlenderBottle's D551 "Lid" Patent discloses a standalone lid—no bottle. On the other hand, each of Hydra Cup's five Accused Shaker products comprises a *bottle and lid*. Even the most astute ordinary observer would immediately distinguish a standalone lid or standalone container from a complete shaker product made up of both bottle and lid.

681. Upon comparing the TS1327 OG Mini Shaker with the HC OG Carry Loop Lid to the design disclosed in the D551 "Lid" Patent, it is immediately apparent that the two designs are patently

dissimilar and would be easily distinguishable to an ordinary observer. The most glaring difference is that the D551 "Lid" Patent claims a standalone lid design, whereas the TS1327 OG Mini Shaker with the HC OG Carry Loop Lid consist of a complete shaker bottle product comprising both a lid and a bottle. This fundamental distinction in the scope and nature of the designs would be instantly recognizable to any ordinary observer. Again, Hydra Cup has never sold standalone lids.

682. Hydra Cup's HC OG Carry Loop Lid has a significantly different overall visual impression compared to the design claimed in BlenderBottle's D551 Patent. Numerous differences in shape, proportions, ornamentation, and functional features contribute to this distinct appearance.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

683. The D551 lid has a plain, bare surface throughout, while the Accused Lid features an ornamental crescent-shaped line extending from the skirt up to the dome and back down; the D551 spout is significantly larger (estimated 400% larger) than the much shorter spout on the Accused Lid. The Accused Lid's spout is also slightly tilted towards the flip cap; the Accused Lid has a spout cover protruding down from the flip cap, which is absent in the D551 design; the D551 carry loop varies in thickness, starting thick, narrowing, and then appearing to thicken again towards the end, with some curvature. The Accused Lid's carry loop maintains a sharp, consistent angle and thickness throughout; the D551 brackets are much taller compared to the significantly shorter brackets on the Accused Lid; the D551 spout starts directly adjacent to the threading, almost at the beginning of the dome. The Accused Lid's spout starts much further back, close to the apex of the domed lid, with the length visually appearing 700% longer; there is significant space between the flip cap and lid on the D551 design, while the Accused Lid has very little space in this area.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

684. The Accused Lid's carry loop features a built-in scooper or measuring tool, a functional element not present in the D551 design.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

685. The Accused Lid has pronounced crescent-shaped ornamentation on both sides, while the D551 has no surface ornamentation; the Accused Lid's carry loop has rubber over-molding, while the D551 implies a single solid surface; the D551 closure area is circular, while the Accused Lid's closure area is oval-shaped; the Accused Lid's flip cap has crescent-shaped surface ornamentation, while the D551 flip cap has no ornamentation.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

686. The D551 has a circular spout (based on dotted lines), while the Accused Lid shows an oval spout.

687. The D551 has a large skirt housing a large threading area, while the Accused Lid has a much smaller threading area; the D551 has a tall back side bracket creating a stopper for the flip cap, while the

Accused Lid's back side bracket barely comes off the surface; in the D551, the flip cap is wedged between the two sides of the carry loop, while in the Accused Lid, the carry loop is wedged between the two sides of the flip cap.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

688. Missing from the D551 Patent is a view showing the front of the lid and a view shown in condition of use, both standard views, suggesting no ornamental content.

689. Additional differences include the spout and cap shapes differ (circle vs. oval); the spouts differ in height by a factor of 2x; the lid "dome" curvatures differ; the surface ornamentation differs, with the Accused Lid incorporating concave, elevated curves.



*BlenderBottle's D551 Patent's Lid Design and Hydra Cup's HC OG Carry Loop Lid.*

690. These numerous differences in design elements and overall visual impression between the Accused Lid and the D551 Patent demonstrate the Accused Lid is plainly dissimilar from the claimed design and does not infringe.





*BlenderBottle's D551 Patent (left) and the HC OG Carry Loop Lid (right).*

691. For the same reasons listed above, Hydra Cup's HC OG Carry Loop Lid, its TS1314 OG Regular Shaker, its TS1327 OG Mini Shaker, its TS1352 OG Storage Shaker, its TS1038 Jumbo Shaker, and its GOAT Shaker are also each patently dissimilar from BlenderBottle's D551 Patent and therefore do not infringe BlenderBottle's D551 Patent.

### 3. Hydra Cup's TS1352 OG Storage Shaker Does Not Infringe the D798 Patent.

692. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

693. BlenderBottle's D798 "Container" Patent discloses a standalone container—no lid. On the other hand, each of Hydra Cup's five Accused Shaker products comprises a *bottle and lid*. Even the most astute ordinary observer would immediately distinguish a standalone container from a complete shaker product made up of both bottle and lid, especially considering Hydra Cup's Accused Products were only sold in multipacks.

694. Hydra Cup's TS1352 OG Storage Shaker—bottle and lid combined—is instantly distinguishable and patently dissimilar from the standalone container design claimed by Hydra Cup's D798 "Container" Patent.

695. There are a wide array of design differences between BlenderBottle's D798 Patent and Hydra Cup's TS1352 OG Storage Shaker. Notably, while both are cylindrical shaker bottles, the overall shapes differ, with the TS1352 OG Storage Shaker having a more rounded, tapered form compared to the straight-sided D798 Patent's disclosed design. The measurement markings, bottle indentations, and surface textures also have clear dissimilarities between the two designs. Taken together, these differences give the bottles distinct overall visual impressions:

696. For example, the overall shape is different between the two designs. The D798 Patent discloses a container design with straight vertical sides, creating a cylindrical shape. The TS1352 OG Storage Shaker has a rounded, oval-like shape that curves inward slightly with a mild taper from top to bottom. The bottom of the container design disclosed by the container design disclosed by the D798 Patent is flat. The TS1352 has more of a rounded base.

697. And the measurement markings are patently dissimilar. The container design disclosed by the D798 Patent shows measurement markings contained in a rounded rectangular area on the side of the bottle whereas the TS1352 OG Storage Shaker has measurement markings directly on the bottle without any containing shape. The container design disclosed by the D798 Patent displays both ml and oz measurements with a vertical line between them. The TS1352 OG Storage Shaker only shows oz measurements. And the measurement increments and values differ between the two bottles.

698. The container design disclosed by the D798 Patent does not disclose a lid.

699. The container design disclosed by the D798 Patent has two oval-shaped, slightly depressed indented areas on the bottle, one on each side. The TS1352 OG Storage Shaker instead has one larger crescent-shaped indented area.

700. And the surface texture of the two bottles is different. The design disclosed by the D798 Patent discloses a container with a completely smooth surface; the surface of the TS1352 OG Storage Shaker bottle, on the other hand, has some light texture and ridges.

701. For the same reasons listed above, Hydra Cup's HC OG Carry Loop Lid, its TS1314 OG Regular Shaker, its TS1327 OG Mini Shaker, its TS1352 OG Storage Shaker, its TS1038 Jumbo Shaker, and its GOAT Shaker are also patently dissimilar from BlenderBottle's D798 Patent and therefore do not infringe BlenderBottle's D798 Patent.

***4. BlenderBottle's Equivalent Design Patents—the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent—are Not Infringed by Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, or GOAT Shaker, as Hydra Cup's Accused Products are patently dissimilar and Thus Instantly Distinguishable from BlenderBottle's Equivalent Design Patents.***

702. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

703. Because BlenderBottle's Equivalent Design Patents are virtually identically to the designs disclosed by BlenderBottle's Asserted Patents and were filed after the Asserted Patents, Hydra Cup's Accused Products do not infringe BlenderBottle's Equivalent Design Patents for the same reasons listed in the paragraphs above concerning noninfringement of the Asserted Patents—i.e., Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker are immediately distinguishable and patently dissimilar from BlenderBottle's Asserted and Equivalent Patents.

704. The overall shape, configuration, and design details differ significantly between the Accused Products and BlenderBottle's "classic simple shaker" bottle and lid design disclosed by the Asserted Patents, Equivalent Patents, 019 Lid Trade Dress, and Unregistered Bottle Trade Dress

***5. Hydra Cup's Accused Products Do Not Infringe BlenderBottle's Equivalent Utility Patents.***

705. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

706. Hydra Cup also does not infringe any of BlenderBottle's five Equivalent Utility Patents—the 830 Patent, the 060 Patent, the 024 Patents, the 843 Patent, and the 877 Patent—disclosing virtually identical shaker bottles and lids to those disclosed by the Asserted Patents, as Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker lack key claim limitations and do not operate in the same manner as BlenderBottle's Equivalent Utility Patents.

707. Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker do not infringe the claims of BlenderBottle's Equivalent Utility Patents, as, *inter alia*, Hydra Cup's Accused Products are substantially different, as, for among other reasons, Hydra Cup's Accused Products do not include multiple containers connected through bayonet mounts, and the handle and pivoting top arm are attached directly to the lid body independently of each other, rather than the pivoting top arm pivoting on the handle and the handle pivoting on posts of a mount as required by the claims of Equivalent Patents, among many other differences.

708. Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker do not infringe any of claims of the 830 Patent, either literally or under the doctrine of equivalents. The key structural elements, relationships and pivotal connections between the handle, flip top and mount that are recited in the claims of the 830 Patent are not present in Hydra Cup's Accused Products. The design embodied in Hydra Cup's Accused Products are substantially different, with the handle and pivoting top arm pivotally attached directly to the lid body independently of each other, rather than the pivoting top arm pivoting on the handle and the handle pivoting on posts of a mount as required by the claims of the 830 Patent.

709. Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker do not infringe the claims of the 060 Patent, either literally or under the doctrine of equivalents. The key elements of the claimed invention, including the specific structural configuration and pivotal relationships between the flip-top

closure, carrying member, flanges, and protrusions, are not present in the Hydra Cup product. Hydra Cup's Accused Products are function differently than the 060 Patent, with the pivoting top arm and finger carry loop connected by having separate and independent pivotal connections to the lid body, rather than sharing a common pivot axis defined by protrusions extending from flanges as required by the claims the 060 Patent. In other words, Hydra Cup's Accused Products pivoting access connects with the brackets whereas the 060 Patent claims that its "pivot axis extends through the first protrusion, the second protrusion, and the end portion of the flip-top closure," among many other differences.

710. Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker do not infringe the claims the 024 Patent or the 877 Patent either literally or under the doctrine of equivalents. The key elements of the claimed invention, including the multiple connecting containers comprising the "stackable container system," are not present in the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, or the GOAT Shaker. Nor are the specific structural configuration and pivotal relationships between the multiple containers connected through bayonet mounts present in the Accused Products.

711. Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, and GOAT Shaker do not infringe the claims of the 877 Patent, either literally or under the doctrine of equivalents. The Accused Products, for example, do not include multiple stackable containers that connect to the base of the bottle. And the key structural elements, relationships and pivotal connections between the handle, flip top and mount that are recited in the claims of the 877 Patent are not present in Hydra Cup's Accused Products, with the finger carry loop and pivoting top arm attached directly to the lid body independently of each other, rather than the pivoting top arm pivoting on the handle and the handle pivoting on posts of a mount as required by the claims of the 877 Patent.

**D. Noninfringement of BlenderBottle's Asserted Trade Dresses.**

712. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

713. The shaker bottle and supplement bottle mixing industry is notably saturated with a wide array of players selling similar products. This dense market landscape leads to an abundance of similar designs and features. Consequently, trade dress claims, like those asserted by BlenderBottle, must be scrutinized within this competitive backdrop. Given the array of common and functional design elements present in the industry, trade dress protection is inherently limited.

*1. BlenderBottle's "Classic Simple Shaker" Lid Design Claimed by the 019 Lid Trade Dress, D478 Patent, and Other Equivalent Patents is Not Infringed by Hydra Cup's HC OG Carry Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker, TS1038 Jumbo Shaker, or GOAT Shaker.*

714. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

715. The Accused Products do not infringe upon BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, or any other Equivalent Patent. Hydra Cup's lid designs exhibit significant differences from BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, and the other Equivalent Patents, as evident from a detailed comparison of the design elements.

716. BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, and the other Equivalent Patents describes a shaker bottle lid with specific design elements, namely a recessed domed top, a conical spout on one side, a pair of brackets on the opposite side, a pivoting arm, and a circular spout closure element. In contrast, the Accused Products exhibit significant design variances in each of these elements, clearly distinguishing them from the asserted trade dress.

717. The spouts of the two lids differ significantly. Hydra Cup's spout is shorter and uniformly wide, contrasting with BlenderBottle's taller, conical spout. BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, and the other Equivalent Patents' conical

1    spout is nearly twice as tall and cone-shaped, while the spout on the Accused Products is shorter and

2    lacks a conical shape, maintaining the same width from bottom to top.

3    

4    *Hydra Cup's Accused Products vs. BlenderBottle's 019 Lid Trade Dress.*

5    718. The spout closure element also differs between the designs. Contrary to the circular spout closure

6    element claimed in BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade

7    Dress, D478 Patent, and the other Equivalent Patents, the Accused Products feature an oval-shaped

8    spout closure element.

9    

10   *BlenderBottle's 019 Lid Trade Dress includes the green pivots for the disclaimed finger carry loop whereas Hydra Cup's*
11   *Accused Products do not include this pivot.*

12   719. The domed body of Hydra Cup's lid is noticeably more bulbous with a steeper slope compared to

13   BlenderBottle's less pronounced dome. Hydra Cup's lid design presents a less voluminous dome with

14   a gradual slope, as opposed to the more pronounced curve in BlenderBottle's design. This difference

in the primary structure of the lids is immediately apparent to an observer, indicating a unique design approach by Hydra Cup.

720. The curved outline of Hydra Cup's flip-top cap is characterized by rounded and soft transitions, contrasting with the sharp and hard transitions in BlenderBottle's trade dress. Hydra Cup's flip-top cap also features slight concave depressions, differing from BlenderBottle's smoother design.

721. The edge-lips of the lids, where the domed bodies end, also differ. Hydra Cup features a narrower, thin edge-lip and prominent concave indentations on the lid's main dome, setting it apart from BlenderBottle's broader, flatter lip and smooth dome. This variance affects the lids' appearance from various angles.

722. Hydra Cup's lid designs incorporate user-friendly features like an integrated handle and a more versatile flip-top cap. These functional aspects further distinguish Hydra Cup's products from BlenderBottle's design, which lacks such enhancements.

723. Given the constraints of functionality in shaker bottle lids, some similarities across different brands are inevitable. However, the comprehensive analysis of the distinct design features demonstrates that Hydra Cup's lid designs do not replicate or closely resemble BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, or any the other Equivalent Patents.

724. The significant differences in the domed top, spout, flip-top cap, spout closure element, brackets, edge-lip, and dome indentations underscore the non-infringement of BlenderBottle's trade dress by Hydra Cup's lid designs.

725. An ordinary observer, familiar with the variety in the shaker bottle market, would not confuse Hydra Cup's lid designs with BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, and the other Equivalent Patents. The variations in design are substantial enough to indicate Hydra Cup's commitment to originality and innovation, setting its products apart in the crowded market.

726. Hydra Cup's evolution and distinct design path demonstrate an independent approach, separate from BlenderBottle's designs. In the context of trade dress, where the overall look and feel of a product are considered, Hydra Cup's lid designs reflect a unique identity, not infringing upon BlenderBottle's 019 Lid Trade Dress, the D478 Patent, or any other Asserted or Equivalent Patent claiming a "classic simple shaker" lid design.

727. Therefore, based on the detailed comparison of design elements and the significant differences between the Accused Products and the BlenderBottle's "classic simple shaker" lid design claimed by the 019 Lid Trade Dress, D478 Patent, and the other Equivalent Patents, it is evident that Hydra Cup's lid designs do not infringe upon BlenderBottle's "classic simple shaker" lid design, claimed by the 019 Lid Trade Dress, D478 Patent, or any other Equivalent Patent.

**E. BlenderBottle's 626 Agitator Trade Dress is Not Infringed by Hydra Cup's OG Spherical Agitator or OG Dumbbell Agitator.**

728. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

729. Hydra Cup's Accused Products, including its agitator designs, do not infringe upon BlenderBottle's 626 Agitator Trade Dress. The agitator designs in the Accused Products exhibit significant differences from the claimed trade dress, as evident from a detailed comparison of the design elements.

730. The 626 Agitator Trade Dress describes a spherical agitator design characterized by a wire wound symmetrically to define the shape of a sphere. In contrast, the Accused Products feature agitator designs that significantly deviate from this symmetrical, spherical configuration.

731. The design elements and overall shape of the agitators in the Accused Products are markedly different, demonstrating a clear departure from the asserted trade dress. For example, some of the Accused Products feature agitators with non-spherical shapes, such as dumbbell or peanut-like configurations, which are visually distinct from the claimed spherical design.

732. The wire configuration and winding pattern in the Accused Products' agitators exhibit structural differences when compared to the 626 Agitator Trade Dress. These differences include variations in

the number of windings, the tightness of the windings, the gauge of the wire, and the overall symmetry of the sphere.

733. For instance, some of the Accused Products' agitators have a more open and loose wire structure, with fewer windings and less symmetry compared to the tightly wound, symmetrical sphere described in the 626 Agitator Trade Dress. These structural variations directly impact the functionality and appearance of the agitator, further distancing the Accused Products from the claimed trade dress.

734. Upon information and belief, the materials and construction methods used for the agitators in the Accused Products may also differ from those specified in the 626 Agitator Trade Dress. These differences can alter the weight, flexibility, and overall performance of the agitator, contributing to its distinctiveness.

735. Upon information and belief, from a visual perspective, the agitators in the Accused Products can be easily distinguished from the design claimed in the 626 Agitator Trade Dress. This distinction is evident to both the ordinary observer and the expert in the field, negating any claims of substantial similarity in appearance.

736. The differences in design, structure, material, construction, and overall visual appearance sufficiently differentiate the Accused Products' agitators from the 626 Agitator Trade Dress. These differences are not minor or trivial variations, but rather substantial and significant departures from the claimed design.

737. Furthermore, upon information and belief, the functionality of the agitator designs in the Accused Products is not tied to the specific configuration claimed in the 626 Agitator Trade Dress. The Accused Products' agitators achieve their mixing and blending functions through alternative designs that do not rely on the symmetrical, spherical wire configuration.

738. Based on the aforementioned points, it is clear that the design of the agitators in the Accused Products does not infringe upon BlenderBottle's 626 Agitator Trade Dress. The differences in design, structure,

1   material, construction, and overall visual appearance, along with the alternative functional

2   approaches, sufficiently differentiate the Accused Products from the claimed trade dress.

3   739. Hydra Cup's agitator designs represent a distinct and non-infringing approach to achieving the

4   desired mixing and blending functionality in its shaker bottles. The Accused Products do not copy or

5   imitate the specific design elements protected by the 626 Agitator Trade Dress, but rather employ

6   innovative and differentiated solutions.

7   **F. BlenderBottle's Unregistered Bottle Trade Dress is Not Infringed by Hydra Cup's HC OG Carry**
8   **Loop Lid, TS1314 OG Regular Shaker, TS1327 OG Mini Shaker, TS1352 OG Storage Shaker,**
9   **TS1038 Jumbo Shaker, or the GOAT Shaker.**

10   740. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

11   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.



12

13   *BlenderBottle's Unregistered Bottle Trade Dress, D235 Patent, and Hydra Cup's Accused Products.*

14   741. Hydra Cup's Accused Products do not infringe BlenderBottle's Unregistered Bottle Trade Dress for

15   the same reasons stated in each of the paragraphs above, considering the Unregistered Bottle Trade

16   Dress is virtually identical to the "classic simple shaker" bottle and lid designs disclosed by

17   BlenderBottle's Asserted Patents and Equivalent Patents.

742. Hydra Cup's Accused Products do not infringe upon BlenderBottle's Unregistered Bottle Trade Dress. A detailed comparison of the design elements reveals significant differences between the Accused Products and the claimed trade dress, which is almost identical to the design disclosed in BlenderBottle's D235 Patent.

743. Upon information and belief, the bottle body of Hydra Cup's shaker bottle is notably shorter than BlenderBottle's design. This distinct height variation can readily differentiate the two bottles in the eyes of consumers, as it creates a visually apparent contrast in the overall proportions of the products.

744. Upon information and belief, the materials used in the construction of the bottle body also differ between the two designs. BlenderBottle employs mixed plastic materials, producing both opaque and transparent areas on its bottle body, whereas Hydra Cup's bottle uniformly employs a slightly transparent material. This difference in material usage creates a distinct appearance that distinguishes the two bottles at first glance.

745. Upon information and belief, the Bottle-Base and bottle body shapes are significant defining features that further differentiate the designs. While Hydra Cup's bottle is a pure cylinder with a circular base, BlenderBottle's bottle employs a stadium-shaped base with a mix of curved and flat surfaces. This stark contrast in the foundational geometry of the bottles ensures that even an ordinary consumer can easily distinguish between the two designs.

746. The diameter of the Bottle-Mouth also varies between Hydra Cup's and BlenderBottle's designs. This difference creates a distinguishable characteristic that not only affects the visual appearance but also impacts the user experience when pouring liquids from the bottle.

747. Hydra Cup's shaker bottle features concave depressions housing its logo on both the Bottle-Front and Bottle-Back. This design element is distinctive and unlike BlenderBottle's design, which only features a logo on the Bottle-Front, while the Bottle-Back contains a single Measurement-Markings-Tool. The prominent inclusion of logo depressions on both sides of Hydra Cup's bottle further ensures differentiation in the minds of consumers.

748. The approach to measurement markings is another point of divergence between the two designs. Hydra Cup employs a dual-measurement tool approach, positioning the markings on its curved sides, with ounces on one side and milliliters on the other. In contrast, BlenderBottle utilizes a single stadium/pill-shaped measuring strip on its flat Bottle-Back. These differences in the placement, shape, and presentation of the measurement tools clearly separate the two bottles, reducing the likelihood of consumer confusion.

749. The gripping features on BlenderBottle's bottle offer another striking contrast to Hydra Cup's design. While Hydra Cup opts for a minimalist, smooth surface without grip additions, BlenderBottle introduces prominent rocket ship-shaped grip strips on the flat Ribbed-Grip-Bottle-Sides, each containing five long, narrow bumps. This distinctive design element not only affects the bottle's visual appearance but also alters its tactile feel, further solidifying the differences between the two products.

750. The cumulative effect of these design differences ensures that the overall look and feel of Hydra Cup's shaker bottle is substantially distinct from BlenderBottle's Unregistered Bottle Trade Dress. The variations in bottle body height, materials, Bottle-Base and bottle body shapes, Bottle-Mouth diameter, logo placement, measurement marking approaches, and gripping features create a clear and unmistakable differentiation between the two designs.

751. Given these substantial design distinctions, it is evident that Hydra Cup's shaker bottle design does not infringe upon BlenderBottle's Unregistered Bottle Trade Dress. The numerous and significant differences in the individual design elements, as well as their combined effect on the overall appearance and user experience, make it highly unlikely that consumers would confuse the source or origin of the Accused Products with BlenderBottle's designs.

752. Hydra Cup's shaker bottle represents an independent and innovative approach to product design, incorporating functional and aesthetic choices that set it apart from BlenderBottle's claimed trade dress. The Accused Products do not copy or imitate the protectable elements of BlenderBottle's

Unregistered Bottle Trade Dress, but rather offer a distinct and non-infringing alternative in the market.

**G. Hydra Cup's OG Shaker Label Does Not Infringe BlenderBottle's Unregistered Label Trade Dress.**

753. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

754. Detailed differences highlight the distinct ornamental design choices in the Hydra Cup Shaker Bottle Label compared to the more simplistic and functional design of BlenderBottle's Unregistered Label Trade Dress.

755. The Hydra Cup Shaker Bottle Label features a significantly different overall design compared to BlenderBottle's Unregistered Label Trade Dress. The Hydra Cup Shaker Bottle Label and BlenderBottle's alleged Unregistered Label Trade Dress create substantially different overall impressions due to distinctions in layout, color scheme, font styles, graphic elements, and emphasis. Moreover, the individual design elements that make up each label, such as the brand name, capacity, icons, and additional text, differ significantly in their specific appearance and presentation. These numerous and notable differences in both the overall design and the constituent elements make it unlikely that consumers would confuse the two labels or perceive them as coming from the same source.

756. The Hydra Cup Shaker Bottle Label is substantially dissimilar from the label design practiced by BlenderBottle's alleged Unregistered Label Trade Dress, including, without limitation, the following:

**Hydra Cup Label**          **BlenderBottle® Label**



*Hydra Cup's OG Shaker Label and BlenderBottle's Unregistered Label Trade Dress.*

757. Hydra Cup's Accused Products, including the labels used on its shaker bottles, do not infringe upon BlenderBottle's Unregistered Label Trade Dress. A detailed comparison of the label designs reveals significant differences that negate any claim of infringement.

758. Upon information and belief, labels on products like shaker bottles are primarily functional, serving the purpose of providing information about the product, brand identity, and usage instructions. This functional aspect limits the scope of protectable trade dress in label designs, as there is a reduced scope for originality due to the practical constraints of the format.

759. Upon information and belief, the use of a central, wrap-around label, often referred to as a "belly band," is a common design choice among many well-established brands in the drinkware industry, such as Yeti, HydroFlask, and Contigo. This widespread use of similar label placement indicates that such a design is more of an industry standard rather than a unique and distinctive feature associated with a single brand.

760. Upon information and belief, the overall design of Hydra Cup's label is markedly different from BlenderBottle's Unregistered Label Trade Dress. Hydra Cup's label features a horizontal layout with the brand name on the left and product details on the right, creating a distinctly different visual arrangement compared to BlenderBottle's vertical layout.

761. Upon information and belief, the color schemes used in the labels also set them apart. BlenderBottle's label uses a solid light blue background, while Hydra Cup's label employs a black background with a striking teal accent color. This stark color contrast creates a completely different tone and mood, distinguishing the two designs. c

762. Upon information and belief, the font styles chosen for the labels contribute to their distinct visual identities. BlenderBottle's label uses a modern, minimalist sans-serif font, whereas Hydra Cup's label features a futuristic, angular font for the brand name and a more traditional serif font for the product details. These contrasting font choices further differentiate the overall aesthetics of the labels.

763. Hydra Cup's label incorporates a prominent graphic element in the form of a stylized water droplet icon, which is absent in BlenderBottle's purely typographic label. This additional visual component adds a layer of distinctiveness to Hydra Cup's design.

764. The emphasis placed on different elements within the labels also varies. BlenderBottle's label gives equal prominence to the brand name and capacity, while Hydra Cup's label clearly prioritizes the "HYDRA CUP" brand name, with product details taking a secondary position. This shift in focus further distinguishes the two designs.

765. Upon information and belief, differences in individual design elements, such as the presentation of the brand name, product line, capacity, and the presence of additional text and icons, further highlight the distinctiveness of Hydra Cup's label. For example, Hydra Cup's label includes the text "4 PACK" and "HydraCup.com," as well as the phrases "LEAK PROOF" and "BPA FREE," none of which appear in BlenderBottle's label.

766. The primary function of trade dress is to indicate the source of a product. The differences in the label designs, upon information and belief, combined with the widespread use of similar designs in the industry, significantly reduce the likelihood of consumer confusion between Hydra Cup's products and BlenderBottle's.

767. For an unregistered trade dress to be protected, it must have acquired secondary meaning, where consumers associate the design with a particular source. Given the common use of similar label designs across various brands, it may be challenging for BlenderBottle to prove that its label design has acquired such secondary meaning.

768. Thus, the functional nature of labels, the prevalence of similar designs in the industry, the distinct differences in Hydra Cup's label design, and the lack of consumer confusion all support the conclusion that Hydra Cup's Accused Products do not infringe upon BlenderBottle's Unregistered Label Trade Dress. The variations in layout, color scheme, font styles, graphic elements, emphasis, and individual design components create a clear and unmistakable differentiation between the two label designs.

**COUNTERCLAIMS**

769. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

**COUNTERCLAIM I: (DECLARATORY JUDGMENT, DECLARING TIANQI GRANTED HYDRA CUP SUBSTANTIAL RIGHTS IN U.S. PATENT NO. D666,047 UNDER THE TERMS OF THE VALID AND ENFORCEABLE D047 LICENSING AGREEMENT)**

770. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

771. An actual controversy exists between Hydra Cup and BlenderBottle as to the validity and enforceability of the D047 License Agreement between Hydra Cup and Tianqi granting Hydra Cup substantial rights to the D047 Patent, because most of the Accused Products were manufactured by Tianqi based on the design claimed by Tianqi's D047 Patent and therefore do not infringe any BlenderBottle's Asserted Patents and Asserted Trade Dresses that also claim "classic simple shaker" bottle and lid designs.

772. Hydra Cup entered into the D047 License Agreement with Tianqi on 27 September 2022. This valid and enforceable contract, supported by mutual consideration, grants Hydra Cup substantial and exclusive rights to the D047 Patent in the United States in exchange for Hydra Cup agreeing to enforce the D047 in the United States against third-party infringers.[174]

773. Accordingly, Hydra Cup seeks a declaratory judgment from this Court, declaring that the D047 License Agreement is valid and enforceable.

**COUNTERCLAIM II: (DECLARATION THAT TIANQI GRANTED HYDRA CUP A VALID AND ENFORCEABLE IMPLIED LICENSE TO THE PATENT RIGHTS IN TIANQI'S U.S. PATENT NOS. D666,047 AND D766,029)**

774. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

---

[174] (Ex. 48, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022)).

775. An actual controversy exists between Hydra Cup and BlenderBottle as to the validity and enforceability of the implied license agreement between Hydra Cup and Tianqi, granting Hydra Cup substantial rights to Tianqi's D047 Patent and D029 Patent, because most of the Accused Products were manufactured by Tianqi based on the design claimed by Tianqi's D047 Patent and D029 Patent and therefore do not infringe BlenderBottle's Asserted Patents or Asserted Trade Dresses that also claim "classic simple shaker" bottle and lid designs.

776. Tianqi is the owner of the D047 and D029 Patents, which claim designs for "classic simple shaker" bottle and lid designs that are embodied by the Accused Products.

777. Tianqi, the owner of the D047 and D029 Patents, granted Hydra Cup an implied license to the these patents in 2019 by selling Hydra Cup the Accused Products embodying designs claimed by said patents without any restrictions, and with knowledge and intent that Hydra Cup would resell those products in the United States and would enforce said patent rights against third party infringers in the United States. Under this implied license, Hydra Cup has the right to make, use, sell, and offer for sale products embodying the designs claimed in the D047 and D029 Patents.

778. Accordingly, Hydra Cup seeks a declaratory judgment from this Court that Tianqi granted Hydra Cup a valid and enforceable implied license to substantial rights in the D047 and D029 Patents.

**COUNTERCLAIM III: (DECLARATORY JUDGMENT THAT THE "BOTTLE" DESIGN CLAIMED BY BLENDERBOTTLE'S U.S. PATENT NO. D510,235 WAS GRANTED TO THE PUBLIC DOMAIN WHEN THE D235 PATENT EXPIRED ON 04 OCTOBER 2019)**

779. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

780. This is a cause of action for declaratory judgment that the "Bottle" design claimed by the D235 Patent was granted to the public domain when the D235 Patent expired on 04 October 2019.

781. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the manufacture, use, sale, offer for sale, or importation into the United States of Hydra Cup's Accused Products infringe the D235 Patent. Specifically, *inter alia*, the parties are

currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D235 Patent. Thus, as a result of the acts described in the preceding paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of noninfringement of the D235 Patent.

782. U.S. Patent No. D510,235 was filed on 09 September 2003, granted on 04 October 2005, expired on 04 October 2019.

783. Courts have continually emphasized that a central tenet underlying the patent system is that matter which falls into the public domain must remain free for all to use.["The right to copy items within the public domain exists in the common law and is inherent in the free enterprise system." *Winning Ways, Inc. v. Holloway Sportswear, Inc.*, 903 F. Supp. 1457, 1460 (D. Kan. 1995) (citation omitted); *International News Serv. v. Associated Press*, 248 U.S. 215, 250 (1918) (Brandeis, J. dissenting) ("The general rule of law is that the noblest of human productions—knowledge, truths ascertained, conceptions and ideas—become, after voluntary communications to others, free as the air to common use."); *In re Morton–Norwich Products, Inc.*, 671 F.2d 1332 (C.C.P.A.1982) (stating "there exists a fundamental right to compete through imitation of a competitor's product, which right can only be temporarily denied by the patent or copyright laws.")).] Withholding previously patented designs from the public domain undermines the foundation and integrity of the patent system.[175]

784. Because the D235 Patent expired on 04 October 2019, the "Bottle" design claimed by the D235 Patent was granted to the public domain after the D235 Patent expired.

785. Accordingly, Hydra Cup is entitled to a declaration that the "Bottle" design disclosed by BlenderBottle's D235 Patent was granted to the public domain when the D235 Patent expired on 04 October 2019 and that said design was free for the public to use and slavishly copy as of 04 October 2019.

---

[175] The Supreme Court has repeatedly endorsed the public's right to copy. *See, e.g., Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 165 (1989); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232–33 (1964); *Compco Corp. v. Day–Brite Lighting, Inc.*, 376 U.S. 234, 238 (1964); *accord Vornado Air Circulation Systems, Inc. v. Duracraft Corp.*, 58 F.3d 1498, 1505 (10th Cir. 1995).

**COUNTERCLAIM IV: (DECLARATORY JUDGMENT THAT IT WAS NOT POSSIBLE TO DEVELOP MEANINGFUL SECONDARY MEANING IN THE "BOTTLE" DESIGN DISCLOSED BY U.S. PATENT NO. D510,235 BEFORE IT EXPIRED AND WAS GRANTED TO THE PUBLIC DOMAIN ON 04 OCTOBER 2019)**

786. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

787. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the "Bottle" design claimed by the D235 Patent was granted to the public domain, and thus free for the public to use and slavishly copy, when the D235 Patent expired on 04 October 2019. Specifically, *inter alia*, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D235 Patent. Thus, as a result of the acts described in the preceding paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of noninfringement of the D235 Patent.

788. Because the D235 Patent expired and was therefore granted to the public domain on 04 October 2019, the public, including BlenderBottle and Hydra Cup, enjoyed equal ownership and rights to the D235 Patent's claimed "Bottle" design. Because the public enjoyed equal rights and ownership to the "Bottle" design claimed by the expired D235 Patent, it was not possible for any individual or entity to have developed any meaning secondary meaning in said design.[176]

789. Hydra Cup is entitled to a declaratory judgment that, as of 04 October 2019 when the D235 Patent expired granted to the public domain, the entire public enjoyed equal rights and ownership to freely use said design with no member of the public having developed any meaninful secondary meaning in the design as of 04 October 2019.

---

[176] The patent system has three primary purposes, including to "promote disclosure of inventions to stimulate further innovation and to permit the public to practice the invention once the patent expires," and, most importantly, "to assure that ideas in the public domain remain there for the free use of the public." *Vornado Air Circulation Systems*, 58 F.3d at 1507 (citing *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)).

**COUNTERCLAIM V: (DECLARATORY JUDGMENT THAT THE FIVE ACCUSED PRODUCTS THAT WERE NOT USED, MARKETED, OFFERED, OR SOLD UNTIL AFTER 04 OCTOBER 2019—THE TS1327 OG MINI SHAKER, THE TS1352 OG STORAGE SHAKER, THE HC OG CARRY LOOP LID, THE GOAT SHAKER, AND THE TS1038 JUMBO SHAKER—DO NOT INFRINGE U.S. PATENT NO. D510,235 THAT EXPIRED ON 04 OCTOBER 2019)**

790. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

791. An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether the manufacture, use, sale, offer for sale, or importation into the United States of Hydra Cup's Accused Products infringe the D235 Patent. Specifically, *inter alia*, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the D235 Patent. Thus, as a result of the acts described in the preceding paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment of noninfringement of the D235 Patent.

792. Five of Hydra Cup's Accused Products—the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the HC OG Carry Loop Lid, the GOAT Shaker, and the TS1038 Jumbo Shaker—were not offered, marketed, or sold in the United States before BlenderBottle's D235 Patent expired on 04 October 2019. Therefore, it is not possible that the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the HC OG Carry Loop Lid, the GOAT Shaker, or the TS1038 Jumbo Shaker infringe BlenderBottle's D235 Patent.

793. Hydra Cup's Accused Products have not infringed and do not currently infringe, either directly or indirectly, the D235 Patent. Hydra Cup's Accused Products do not infringe the D235 Patent, either literally or under the doctrine of equivalents, at least because, among other reasons, the D235 Patent expired before the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the HC OG Carry Loop Lid, the GOAT Shaker, and the TS1038 Jumbo Shaker were offered, marketed, or sold in the United States. This also means that Hydra Cup has not infringed, willfully or otherwise, and is not now infringing the claim of the D235 Patent pursuant to 35 U.S.C. §§ 281 and 289.

794. Hydra Cup is entitled to a declaratory judgment that the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the HC OG Carry Loop Lid, the GOAT Shaker, and the TS1038 Jumbo Shaker do not infringe the D235 Patent because the D235 Patent expired before these Accused Products were offered, marketed, or sold in the United States.

**COUNTERCLAIM VI: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D510,235)**

795. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

796. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D235 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D235 Patent.

797. The D235 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

798. The D235 Patent is invalid under 35 U.S.C. § 102 because the "Bottle" design claimed by the D235 Patent was known or used in the prior art before the filing date of the D235 Patent and therefore is anticipated by the prior art.

799. The D235 Patent is invalid under 35 U.S.C. § 103 because the claimed "Bottle" design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D235 Patent and therefore the design and configuration of design elements claimed by the D235 Patent were obvious over the prior art.

800. The D235 Patent is invalid under 35 U.S.C. § 171 because the claimed "Bottle" design is primarily dictated by function and is not primarily ornamental.

801. The claim of the D235 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly

claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.

802. The D235 Patent is invalid for failing to name the actual inventors of the D235 Patent as required under 35 U.S.C. §§ 101 and 116.

803. Hydra Cup is therefore entitled to a declaratory judgment that the D235 Patent is invalid under 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM VII: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D510,235 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED "BOTTLE" DESIGN)**

804. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

805. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D235 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D235 Patent.

806. The claimed scope of the D235 Patent is far narrower than BlenderBottle has asserted; to the extent that the D235 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining subject matter within the scope of the D235 Patent is too minimal to enforce. More specifically, after screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function, the scope of the D235 Patent's protectable subject matter is virtually eliminated, meaning that it is impossible to infringe the D235 Patent and that the D235 Patent is not enforceable.

807. Hydra Cup is entitled to a definitive claim construction of the claim of the D235 Patent to define the scope of protection in light of the vast amount of substantially similar prior art and in light of the functional design elements claimed by the D235 Patent, including a declaration that (i) the prominent design elements disclosed by prior art belong to the public domain and should be considered

1   *background* elements in any ordinary observer analysis, (ii) that the primarily functional design

2   elements are not protectable by patent law and should be considered *irrelevant* in any ordinary

3   observer analysis, and (iii) that the primarily functional design elements and the elements disclosed

4   by prior art are therefore not included in the scope of the D235 Patent's claim.

5   808. Hydra Cup is entitled to a declaratory judgment, declaring that the D235 Patent is not enforceable

6   after screening for primarily functional design elements and design elements disclosed by prior art

7   that belong to the public domain.

8   **COUNTERCLAIM VIII: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT**
9   **NO. D510,235)**

10   809. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

11   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

12   810. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

13   BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation

14   into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352

15   OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid,

16   infringe, have infringed, or will infringe the D235 Patent either directly or indirectly, and either

17   literally or under the doctrine of equivalents.

18   811. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the

19   D235 Patent either literally or under the doctrine of equivalents and is not liable for such infringement

20   at least because, among other reasons, the Accused Products were modeled after the designs claimed

21   by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus

22   instantly distinguishable from the "Bottle" design disclosed by BlenderBottle's D235 Patent, meaning

23   an ordinary observer would not be deceived into believing the Accused Products are the same as the

24   D235 Patent. Because the "Bottle" design claimed D235 Patent is patently dissimilar and instantly

25   distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's

26   Accused Products will not literally infringe the D235 Patent.

812. Hydra Cup's Accused Products will not infringe the D235 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

813. Hydra Cup's Accused Products also will not infringe the D235 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

814. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D235 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any valid and enforceable claims of the D235 Patent.

**COUNTERCLAIM IX: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D696,551)**

815. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

816. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D551 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D551 Patent.

817. The D551 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

818. The D551 Patent is invalid under 35 U.S.C. § 102 because the "Bottle lid having integrated handle" design claimed by the D551 Patent was known or used in the prior art before the filing date of the D551 Patent and therefore is anticipated by the prior art.

819. The D551 Patent is invalid under 35 U.S.C. § 103 because the claimed "Bottle lid having integrated handle" design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D551 Patent and therefore the design and configuration of design elements claimed by the D551 Patent were obvious over the prior art.

820. The D551 Patent is invalid under 35 U.S.C. § 171 because the claimed "Bottle lid having integrated handle" design is primarily dictated by function and is not primarily ornamental.

821. The claim of the D551 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.

822. The D551 Patent is invalid for failing to name the actual inventors of the D551 Patent as required under 35 U.S.C. §§ 101 and 116.

823. Hydra Cup is therefore entitled to a declaratory judgment that the D551 Patent is invalid under 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM X: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D696,551 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED "BOTTLE LID HAVING INTEGRATED HANDLE" DESIGN)**

824. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

825. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the D551 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D551 Patent.

826. The claimed scope of the D551 Patent is far narrower than BlenderBottle has asserted; to the extent that the D551 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining subject matter within the scope of the D551 Patent is too minimal to enforce. More specifically, after screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function, the scope of the D551 Patent's protectable subject matter is virtually eliminated, meaning that it is impossible to infringe the D551 Patent and that the D551 Patent is not enforceable.

827. Hydra Cup is entitled to a definitive claim construction of the claim of the D551 Patent to define the scope of protection in light of the vast amount of substantially similar prior art and in light of the functional design elements claimed by the D551 Patent, including a declaration that (i) the prominent design elements disclosed by prior art belong to the public domain and should be considered *background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D551 Patent's claim.

828. Hydra Cup is entitled to a declaratory judgment, declaring that the D551 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XI: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D696,551 DUE TO INEQUITABLE CONDUCT BEFORE USPTO)**

829. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

830. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the D551 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D551 Patent.

831. The individuals associated with the filing and prosecution of the D551 Patent breached their duty of candor and good faith by, *inter alia*, withholding material information concerning substantially similar prior art as well as by withholding and misrepresenting material information about the functional elements of the claimed design from the patent examiner with the intent to deceive or mislead the examiner into granting the D551 Patent.

832. BlenderBottle's failure to identify known prior art, known design elements that are primarily functional, and misrepresentation of material information during the prosecution of the D551 Patent was done with knowledge and the failure to disclose was material to patentability. This failure to identify material references extends to each individual associated with the filing and prosecution of the patent applications asserted by BlenderBottle.

833. As a result of BlenderBottle's misconduct involved in prosecuting and procuring the D551 Patent, the D551 Patent is invalid and unenforceable.

834. Hydra Cup is entitled to a judicial declaration that the D551 Patent is unenforceable due to inequitable conduct on the USPTO.

**COUNTERCLAIM XII: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. D696,551)**

835. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

836. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D551 Patent either directly or indirectly, and either literally or under the doctrine of equivalents.

837. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D551 Patent either literally or under the doctrine of equivalents and is not liable for such infringement

at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the "Bottle lid having integrated handle" design claimed by BlenderBottle's D551 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the D551 Patent. Because the D551 Patent is patently dissimilar and instantly distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D551 Patent.

838. Hydra Cup's Accused Products will not infringe the D551 under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

839. Hydra Cup's Accused Products also will not infringe the D551 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

840. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D551 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any valid and enforceable claims of the D551 Patent.

**COUNTERCLAIM XIII: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D697,798)**

841. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

842. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D798 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D798 Patent.

843. The claim of the D798 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

844. The D798 Patent is invalid under 35 U.S.C. § 102 because the design claimed by the D798 Patent was known or used in the prior art before the filing date of the D798 Patent and therefore is anticipated by the prior art.

845. The D798 Patent is invalid under 35 U.S.C. § 103 because the claimed design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D798 Patent and therefore the design and configuration of design elements claimed by the D798 Patent were obvious over the prior art.

846. The D798 Patent is invalid under 35 U.S.C. § 171 because the claimed design is primarily dictated by function and is not primarily ornamental.

847. The claim of the D798 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.

848. The D798 Patent is invalid for failing to name the actual inventors of the D798 Patent as required under 35 U.S.C. §§ 101 and 116.

849. Hydra Cup is therefore entitled to a declaratory judgment that the D798 Patent is invalid under 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM XIV: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D697,798 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

850. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

851. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D798 Patent, based on, *inter alia*, BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the D798 Patent.

852. The claimed scope of the D798 Patent is far narrower than BlenderBottle has asserted; to the extent that the D798 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining subject matter within the scope of the D798 Patent is too minimal to enforce. More specifically, after screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function, the scope of the D798 Patent's protectable subject matter is virtually eliminated, meaning that it is impossible to infringe the D798 Patent and that the D798 Patent is not enforceable.

853. Hydra Cup is entitled to a definitive claim construction of the claim of the D798 Patent to define the scope of protection in light of the vast amount of substantially similar prior art and in light of the functional design elements claimed by the D798 Patent, including a declaration that (i) the prominent design elements disclosed by prior art belong to the public domain and should be considered *background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D798 Patent's claim.

854. Hydra Cup is entitled to a declaratory judgment, declaring that the D798 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XV: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. D697,798)**

855. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

856. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D798 Patent either directly or indirectly, and either literally or under the doctrine of equivalents.

857. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D798 Patent either literally or under the doctrine of equivalents and is not liable for such infringement at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the design claimed by BlenderBottle's D798 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the design claimed by the D798 Patent. Because the D798 Patent is patently dissimilar and instantly distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D798 Patent.

858. Hydra Cup's Accused Products will not infringe the D798 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

859. Hydra Cup's Accused Products also will not infringe the D798 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

860. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D798 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any valid and enforceable claims of the D798 Patent.

**COUNTERCLAIM XVI: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D748,478)**

861. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

862. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D478 Patent because, *inter alia*, the D478 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

863. The D478 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

864. The D478 Patent is invalid under 35 U.S.C. § 102 because the "Closure for a container" design claimed by the D478 Patent was known or used in the prior art before the filing date of the D478 Patent and therefore is anticipated by the prior art.

865. The D478 Patent is invalid under 35 U.S.C. § 103 because the claimed "Closure for a container" design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D478 Patent and therefore the design and configuration of design elements claimed by the D478 Patent were obvious over the prior art.

866. The D478 Patent is invalid under 35 U.S.C. § 171 because the claimed "Closure for a container" design is primarily dictated by function and is not primarily ornamental.

867. The claim of the D478 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.

868. The D478 Patent is invalid for failing to name the actual inventors of the D478 Patent as required under 35 U.S.C. §§ 101 and 116.

869. Hydra Cup is therefore entitled to a declaratory judgment that the D478 Patent is invalid under 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM XVII: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D748,478 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

870. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

871. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the D478 Patent because, *inter alia*, the D478 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

872. The scope of the "Closure for a container" claimed by the D478 Patent is far narrower than BlenderBottle has alleged; to the extent that the D478 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining subject matter within the scope of the D478 Patent is too minimal to enforce. More specifically, after screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function, the scope of the D478 Patent's protectable subject matter is virtually eliminated, meaning that it is impossible to infringe the D478 Patent and that the D478 Patent is not enforceable.

873. Hydra Cup is entitled to a definitive claim construction of the claim of the D478 Patent to define the scope of protection in light of the vast amount of substantially similar prior art and in light of the functional design elements claimed by the D478 Patent, including a declaration that (i) the prominent design elements disclosed by prior art belong to the public domain and should be considered *background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D478 Patent's claim.

874. Hydra Cup is entitled to a declaratory judgment, declaring that the D478 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XVIII: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D748,478 DUE TO INEQUITABLE CONDUCT BEFORE USPTO)**

875. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

876. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity and enforceability of the D478 Patent because, *inter alia*, the D478 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

877. The individuals associated with the filing and prosecution of the D478 Patent breached their duty of candor and good faith by, *inter alia*, withholding material information concerning substantially similar prior art as well as by withholding and misrepresenting material information about the functional elements of the claimed design from the patent examiner with the intent to deceive or mislead the examiner into granting the D478 Patent.

878. BlenderBottle's failure to identify known prior art, known design elements that are primarily functional, and misrepresentation of material information during the prosecution of the D478 Patent

1   was done with knowledge and the failure to disclose was material to patentability. This failure to

2   identify material references extends to each individual associated with the filing and prosecution of

3   the patent applications asserted by BlenderBottle.

4   879. As a result of BlenderBottle's misconduct involved in prosecuting and procuring the D478 Patent, the

5   D478 Patent is invalid and unenforceable.

6   880. Hydra Cup is entitled to a judicial declaration that the D478 Patent is unenforceable due to inequitable

7   conduct on the USPTO.

8   **COUNTERCLAIM XIX: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT**
9   **NO. D748,478)**

10   881. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

11   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

12   882. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

13   BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation

14   into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352

15   OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid,

16   infringe, have infringed, or will infringe the D478 Patent either directly or indirectly, and either

17   literally or under the doctrine of equivalents because, *inter alia*, the D478 Patent is closely related to

18   and in the same "classic simple shaker" patent family as the Asserted Patents.

19   883. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the

20   D478 Patent either literally or under the doctrine of equivalents and is not liable for such infringement

21   at least because, among other reasons, the Accused Products were modeled after the designs claimed

22   by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus

23   instantly distinguishable from the design claimed by BlenderBottle's D478 Patent, meaning an

24   ordinary observer would not be deceived into believing the Accused Products are the same as the

25   design claimed by the D478 Patent. Because the D478 Patent is patently dissimilar and instantly

1    distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's

2    Accused Products will not literally infringe the D478 Patent.

3    884. Hydra Cup's Accused Products will not infringe the D478 Patent under the doctrine of equivalents at

4    least because the dedication-disclosure rule bars the application of the doctrine of equivalents with

5    respect to Hydra Cup's Accused Products.

6    885. Hydra Cup's Accused Products also will not infringe the D478 Patent under the doctrine of

7    equivalents because argument-based prosecution history estoppel and/or amendment-based

8    prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra

9    Cup's Accused Products.

10   886. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement

11   of, or induced the infringement of the D478 Patent either literally or under the doctrine of equivalents,

12   and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker,

13   the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT

14   Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any

15   valid and enforceable claims of the D478 Patent.

16   **COUNTERCLAIM XX: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D820,038)**

17   887. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

18   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

19   888. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

20   BlenderBottle regarding the validity of the D038 Patent because, *inter alia*, the D038 Patent is closely

21   related to and in the same "classic simple shaker" patent family as the Asserted Patents.

22   889. The claim of the D038 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the

23   United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as

24   obviousness-type double patenting.

890. The D038 Patent is invalid under 35 U.S.C. § 102 because the design claimed by the D038 Patent was known or used in the prior art before the filing date of the D038 Patent and therefore is anticipated by the prior art.

891. The D038 Patent is invalid under 35 U.S.C. § 103 because the claimed design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D038 Patent and therefore the design and configuration of design elements claimed by the D038 Patent were obvious over the prior art.

892. The D038 Patent is invalid under 35 U.S.C. § 171 because the claimed design is primarily dictated by function and is not primarily ornamental.

893. The claim of the D038 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.`

894. The D038 Patent is invalid for failing to name the actual inventors of the D038 Patent as required under 35 U.S.C. §§ 101 and 116.

895. Hydra Cup is therefore entitled to a declaratory judgment that the D038 Patent is invalid under 35 U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM XXI: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D820,038 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

896. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

897. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the D038 Patent

because, *inter alia*, the D038 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

898. The claimed scope of the D038 Patent is far narrower than BlenderBottle has asserted; to the extent that the D038 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining subject matter within the scope of the D038 Patent is too minimal to enforce. More specifically, after screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function, the scope of the D038 Patent's protectable subject matter is virtually eliminated, meaning that it is impossible to infringe the D038 Patent and that the D038 Patent is not enforceable.

899. Hydra Cup is entitled to a definitive claim construction of the claim of the D038 Patent to define the scope of protection in light of the vast amount of substantially similar prior art and in light of the functional design elements claimed by the D038 Patent, including a declaration that (i) the prominent design elements disclosed by prior art belong to the public domain and should be considered *background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D038 Patent's claim.

900. Hydra Cup is entitled to a declaratory judgment, declaring that the D038 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XXII: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT No. D820,038)**

901. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

902. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation

into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D038 Patent either directly or indirectly, and either literally or under the doctrine of equivalents because, *inter alia*, the D038 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

903. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D038 Patent either literally or under the doctrine of equivalents and is not liable for such infringement at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the design claimed by BlenderBottle's D038 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the design claimed by the D038 Patent. Because the D038 Patent is patently dissimilar and instantly distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D038 Patent.

904. Hydra Cup's Accused Products will not infringe the D038 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

905. Hydra Cup's Accused Products also will not infringe the D038 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

906. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D038 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT

1   Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any

2   valid and enforceable claims of the D038 Patent.

3   **COUNTERCLAIM XXIII: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT**

4   **NO. D644,065)**

5   907. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

6   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

7   908. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

8   BlenderBottle regarding the validity of the D065 Patent because, *inter alia*, the D065 Patent is closely

9   related to and in the same "classic simple shaker" patent family as the Asserted Patents.

10   909. The claim of the D065 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the

11   United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as

12   obviousness-type double patenting.

13   910. The D065 Patent is invalid under 35 U.S.C. § 102 because the design claimed by the D065 Patent was

14   known or used in the prior art before the filing date of the D065 Patent and therefore is anticipated by

15   the prior art.

16   911. The D065 Patent is invalid under 35 U.S.C. § 103 because the claimed design and the design elements

17   and configuration of those elements comprising said design, were known or used in the prior art

18   before the filing of the D065 Patent and therefore the design and configuration of design elements

19   claimed by the D065 Patent were obvious over the prior art.

20   912. The D065 Patent is invalid under 35 U.S.C. § 171 because the claimed design is primarily dictated by

21   function and is not primarily ornamental.

22   913. The claim of the D065 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as

23   the claimed invention is not described in such full, clear, concise and exact terms as to enable any

24   person skilled in the art to make and use the same, and fails to particularly point out and distinctly

25   claim the subject matter which applicant regards as the invention and, along similar lines, the

1   drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all

2   views of the design are included.

3   914. The D065 Patent is invalid for failing to name the actual inventors of the D065 Patent as required

4   under 35 U.S.C. §§ 101 and 116.

5   915. Hydra Cup is therefore entitled to a declaratory judgment that the D065 Patent is invalid under 35

6   U.S.C. §§ 101 *et seq*., including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

7   **COUNTERCLAIM XXIV: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT**
8   **NO. D644,065 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART**
9   **AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

10   916. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

11   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

12   917. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

13   BlenderBottle regarding the validity, enforceability, and scope of protection of the D065 Patent

14   because, *inter alia*, the D065 Patent is closely related to and in the same "classic simple shaker"

15   patent family as the Asserted Patents.

16   918. The claimed scope of the D065 Patent is far narrower than BlenderBottle has asserted; to the extent

17   that the D065 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining

18   subject matter within the scope of the D065 Patent is too minimal to enforce. More specifically, after

19   screening for the prominent design elements that were disclosed by prior art and design elements that

20   are primarily dictated by function, the scope of the D065 Patent's protectable subject matter is

21   virtually eliminated, meaning that it is impossible to infringe the D065 Patent and that the D065

22   Patent is not enforceable.

23   919. Hydra Cup is entitled to a definitive claim construction of the claim of the D065 Patent to define the

24   scope of protection in light of the vast amount of substantially similar prior art and in light of the

25   functional design elements claimed by the D065 Patent, including a declaration that (i) the prominent

26   design elements disclosed by prior art belong to the public domain and should be considered

*background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D065 Patent's claim.

920. Hydra Cup is entitled to a declaratory judgment, declaring that the D065 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XXV: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. D644,065)**

921. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

922. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D065 Patent either directly or indirectly, and either literally or under the doctrine of equivalents because, *inter alia*, the D065 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

923. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D065 Patent either literally or under the doctrine of equivalents and is not liable for such infringement at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the design claimed by BlenderBottle's D065 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the design claimed by the D065 Patent. Because the D065 Patent is patently dissimilar and instantly

distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D065 Patent.

924. Hydra Cup's Accused Products will not infringe the D065 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

925. Hydra Cup's Accused Products also will not infringe the D065 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

926. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D065 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any valid and enforceable claims of the D065 Patent.

**COUNTERCLAIM XXVI: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D830,119)**

927. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

928. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D119 Patent because, *inter alia*, the D119 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

929. The claim of the D119 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

930. The D119 Patent is invalid under 35 U.S.C. § 102 because the design claimed by the D119 Patent was known or used in the prior art before the filing date of the D119 Patent and therefore is anticipated by the prior art.

931. The D119 Patent is invalid under 35 U.S.C. § 103 because the claimed design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D119 Patent and therefore the design and configuration of design elements claimed by the D119 Patent were obvious over the prior art.

932. The D119 Patent is invalid under 35 U.S.C. § 171 because the claimed design is primarily dictated by function and is not primarily ornamental.

933. The claim of the D119 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.

934. The D119 Patent is invalid for failing to name the actual inventors of the D119 Patent as required under 35 U.S.C. §§ 101 and 116.

935. Hydra Cup is therefore entitled to a declaratory judgment that the D119 Patent is invalid under 35 U.S.C. §§ 101 *et seq*., including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM XXVII: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D830,119 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

936. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

937. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the D119 Patent

because, *inter alia*, the D119 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

938. The claimed scope of the D119 Patent is far narrower than BlenderBottle has asserted; to the extent that the D119 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining subject matter within the scope of the D119 Patent is too minimal to enforce. More specifically, after screening for the prominent design elements that were disclosed by prior art and design elements that are primarily dictated by function, the scope of the D119 Patent's protectable subject matter is virtually eliminated, meaning that it is impossible to infringe the D119 Patent and that the D119 Patent is not enforceable.

939. Hydra Cup is entitled to a definitive claim construction of the claim of the D119 Patent to define the scope of protection in light of the vast amount of substantially similar prior art and in light of the functional design elements claimed by the D119 Patent, including a declaration that (i) the prominent design elements disclosed by prior art belong to the public domain and should be considered *background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D119 Patent's claim.

940. Hydra Cup is entitled to a declaratory judgment, declaring that the D119 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XXVIII: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT No. D830,119)**

941. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

942. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation

into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D119 Patent either directly or indirectly, and either literally or under the doctrine of equivalents because, *inter alia*, the D119 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

943. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D119 Patent either literally or under the doctrine of equivalents and is not liable for such infringement at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the design claimed by BlenderBottle's D119 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the design claimed by the D119 Patent. Because the D119 Patent is patently dissimilar and instantly distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D119 Patent.

944. Hydra Cup's Accused Products will not infringe the D119 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

945. Hydra Cup's Accused Products also will not infringe the D119 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

946. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D119 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT

1  Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any

2  valid and enforceable claims of the D119 Patent.

**COUNTERCLAIM XXIX: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. D897,149)**

947. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

948. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D149 Patent because, *inter alia*, the D149 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

949. The claim of the D149 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

950. The D149 Patent is invalid under 35 U.S.C. § 102 because the design claimed by the D149 Patent was known or used in the prior art before the filing date of the D149 Patent and therefore is anticipated by the prior art.

951. The D149 Patent is invalid under 35 U.S.C. § 103 because the claimed design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D149 Patent and therefore the design and configuration of design elements claimed by the D149 Patent were obvious over the prior art.

952. The D149 Patent is invalid under 35 U.S.C. § 171 because the claimed design is primarily dictated by function and is not primarily ornamental.

953. The claim of the D149 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the

1   drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all

2   views of the design are included.

3   954. The D149 Patent is invalid for failing to name the actual inventors of the D149 Patent as required

4   under 35 U.S.C. §§ 101 and 116.

5   955. Hydra Cup is therefore entitled to a declaratory judgment that the D149 Patent is invalid under 35

6   U.S.C. §§ 101 *et seq.*, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

7   **COUNTERCLAIM XXX: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT**
8   **NO. D897,149 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART**
9   **AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

10   956. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

11   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

12   957. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

13   BlenderBottle regarding the validity, enforceability, and scope of protection of the D149 Patent

14   because, *inter alia*, the D149 Patent is closely related to and in the same "classic simple shaker"

15   patent family as the Asserted Patents.

16   958. The claimed scope of the D149 Patent is far narrower than BlenderBottle has asserted; to the extent

17   that the D149 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining

18   subject matter within the scope of the D149 Patent is too minimal to enforce. More specifically, after

19   screening for the prominent design elements that were disclosed by prior art and design elements that

20   are primarily dictated by function, the scope of the D149 Patent's protectable subject matter is

21   virtually eliminated, meaning that it is impossible to infringe the D149 Patent and that the D149

22   Patent is not enforceable.

23   959. Hydra Cup is entitled to a definitive claim construction of the claim of the D149 Patent to define the

24   scope of protection in light of the vast amount of substantially similar prior art and in light of the

25   functional design elements claimed by the D149 Patent, including a declaration that (i) the prominent

26   design elements disclosed by prior art belong to the public domain and should be considered

*background* elements in any ordinary observer analysis, (ii) that the primarily functional design elements are not protectable by patent law and should be considered *irrelevant* in any ordinary observer analysis, and (iii) that the primarily functional design elements and the elements disclosed by prior art are therefore not included in the scope of the D149 Patent's claim.

960. Hydra Cup is entitled to a declaratory judgment, declaring that the D149 Patent is not enforceable after screening for primarily functional design elements and design elements disclosed by prior art that belong to the public domain.

**COUNTERCLAIM XXXI: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. D897,149)**

961. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

962. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D149 Patent either directly or indirectly, and either literally or under the doctrine of equivalents because, *inter alia*, the D149 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

963. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D149 Patent either literally or under the doctrine of equivalents and is not liable for such infringement at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the design claimed by BlenderBottle's D149 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the design claimed by the D149 Patent. Because the D149 Patent is patently dissimilar and instantly

distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D149 Patent.

964. Hydra Cup's Accused Products will not infringe the D149 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

965. Hydra Cup's Accused Products also will not infringe the D149 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

966. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D149 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any valid and enforceable claims of the D149 Patent.

**COUNTERCLAIM XXXII: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT No. D900,540)**

967. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

968. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the D540 Patent because, *inter alia*, the D540 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

969. The claim of the D540 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and/or 171 as well as obviousness-type double patenting.

970. The D540 Patent is invalid under 35 U.S.C. § 102 because the design claimed by the D540 Patent was known or used in the prior art before the filing date of the D540 Patent and therefore is anticipated by the prior art.

971. The D540 Patent is invalid under 35 U.S.C. § 103 because the claimed design and the design elements and configuration of those elements comprising said design, were known or used in the prior art before the filing of the D540 Patent and therefore the design and configuration of design elements claimed by the D540 Patent were obvious over the prior art.

972. The D540 Patent is invalid under 35 U.S.C. § 171 because the claimed design is primarily dictated by function and is not primarily ornamental.

973. The claim of the D540 Patent is indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention and, along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the design are included.

974. The D540 Patent is invalid for failing to name the actual inventors of the D540 Patent as required under 35 U.S.C. §§ 101 and 116.

975. Hydra Cup is therefore entitled to a declaratory judgment that the D540 Patent is invalid under 35 U.S.C. §§ 101 *et seq*., including 35 U.S.C. §§ 101, 102, 103, 112, 113, 116, and 171.

**COUNTERCLAIM XXXIII: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT NO. D900,540 DUE TO LACKING ANY PROTECTABLE SUBJECT-MATTER IN LIGHT OF THE PRIOR ART AND PRIMARILY FUNCTIONAL DESIGN ELEMENTS COMPRISING THE CLAIMED DESIGN)**

976. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

977. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the D540 Patent

1   because, *inter alia*, the D540 Patent is closely related to and in the same "classic simple shaker"

2   patent family as the Asserted Patents.

3   978. The claimed scope of the D540 Patent is far narrower than BlenderBottle has asserted; to the extent

4   that the D540 Patent is not fully invalidated as discussed in the preceding paragraphs, any remaining

5   subject matter within the scope of the D540 Patent is too minimal to enforce. More specifically, after

6   screening for the prominent design elements that were disclosed by prior art and design elements that

7   are primarily dictated by function, the scope of the D540 Patent's protectable subject matter is

8   virtually eliminated, meaning that it is impossible to infringe the D540 Patent and that the D540

9   Patent is not enforceable.

10   979. Hydra Cup is entitled to a definitive claim construction of the claim of the D540 Patent to define the

11   scope of protection in light of the vast amount of substantially similar prior art and in light of the

12   functional design elements claimed by the D540 Patent, including a declaration that (i) the prominent

13   design elements disclosed by prior art belong to the public domain and should be considered

14   *background* elements in any ordinary observer analysis, (ii) that the primarily functional design

15   elements are not protectable by patent law and should be considered *irrelevant* in any ordinary

16   observer analysis, and (iii) that the primarily functional design elements and the elements disclosed

17   by prior art are therefore not included in the scope of the D540 Patent's claim.

18   980. Hydra Cup is entitled to a declaratory judgment, declaring that the D540 Patent is not enforceable

19   after screening for primarily functional design elements and design elements disclosed by prior art

20   that belong to the public domain.

21   **COUNTERCLAIM XXXIV: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT**
22   **NO. D900,540)**

23   981. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this

24   Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

25   982. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

26   BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation

into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe the D540 Patent either directly or indirectly, and either literally or under the doctrine of equivalents because, *inter alia*, the D540 Patent is closely related to and in the same "classic simple shaker" patent family as the Asserted Patents.

983. Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of the D540 Patent either literally or under the doctrine of equivalents and is not liable for such infringement at least because, among other reasons, the Accused Products were modeled after the designs claimed by Tianqi's D047 and D029 Patents and because such designs are patently dissimilar and thus instantly distinguishable from the design claimed by BlenderBottle's D540 Patent, meaning an ordinary observer would not be deceived into believing the Accused Products are the same as the design claimed by the D540 Patent. Because the D540 Patent is patently dissimilar and instantly distinguishable from the Accused Products, the manufacture, use, sale, or importation of Hydra Cup's Accused Products will not literally infringe the D540 Patent.

984. Hydra Cup's Accused Products will not infringe the D540 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

985. Hydra Cup's Accused Products also will not infringe the D540 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

986. Hydra Cup is entitled to a judicial declaration that it has not infringed, contributed to the infringement of, or induced the infringement of the D540 Patent either literally or under the doctrine of equivalents, and that the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT

Shaker, and the HC OG Carry Loop Lid, have not infringed, do not infringe, and will not infringe any valid and enforceable claims of the D540 Patent.

**COUNTERCLAIM XXXV: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT No. 11,111,060)**

987. Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

988. There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the 060 Patent, based on, *inter alia*, (i) BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents that are closely related to and in the same patent family, the "classic simple shaker" bottle and lid, as the 060 Patent; (ii) BlenderBottle mailing Hydra Cup physical products practicing the claims of the 060 Patent; and (iii) BlenderBottle filing dozens of lawsuits, including against Californians, asserting both design and utility patents in the same "classic simple shaker" patent family as the Asserted and Equivalent Patents.

989. Each and every claim of the 060 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and/or 116, as well as for obviousness-type double patenting.

990. The alleged invention of the 060 Patent was known or used by others in this country or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the 060 Patent.

991. The alleged invention of the 060 Patent was patented or described in a printed publication in this or a foreign country more than one year prior to the date of the application for the 060 Patent in the United States.

992. The 060 Patent describes and claims an alleged invention, the making of which did not involve the inventive faculty but only the obvious judgment, knowledge, and mechanical skill possessed by persons having ordinary skill in the art to which the alleged invention pertains.

993. The alleged invention of the 060 Patent does no more than combine familiar elements according to known methods to yield predictable results. Any alleged improvement over the prior art set forth in the 060 Patent is no more than the predictable use of prior art elements according to their established functions. A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the 060 Patent and would have had a reasonable expectation of success in doing so.

994. The subject matter claimed in the 060 Patent fails to comply with 35 U.S.C. §§ 102 and/or 103 in that the differences between the subject matter claimed in the 060 Patent and the prior art are such that the subject matter as a whole was either fully anticipated by the prior art or would have been obvious at the time the alleged invention was made to a person having knowledge or such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

995. The 060 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes of the United States to enable any person skilled in the art to practice the full scope of the invention purported to be covered thereby.

996. The 060 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes of the United States to demonstrate to a person skilled in the art that the alleged inventors were in possession of the full scope of the subject matter of the claims contained therein.

997. The claims of the 060 Patent are indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention; along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed as, *inter alia*, not all necessary views of the invention are included.

998. The 060 Patent is invalid for failing to name the actual inventors of the 060 Patent as required under 35 U.S.C. §§ 101 and 116.

999. Hydra Cup is entitled to a judicial declaration that all claims of the 060 Patent are invalid.

**COUNTERCLAIM XXXVI: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 11,111,060)**

1000.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1001.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe any valid and enforceable claim of the 060 Patent either directly or indirectly, and either literally or under the doctrine of equivalents.

1002.   Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the 060 Patent either literally or under the doctrine of equivalents and is not liable for such infringement.

1003.   Because the claims of the 060 Patent differ from the Accused Products as described in the preceding paragraphs, the manufacture, use, sale, or importation of Hydra Cup's Accused Products do not literally infringe the 060 Patent.

1004.   Hydra Cup's Accused Products do not infringe the 060 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1005.   Hydra Cup's Accused Products do not infringe the 060 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history

1  estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused

2  Products.

3  1006.   Hydra Cup is entitled to a judicial declaration that (i) it has not infringed, contributed to the

4  infringement of, or induced the infringement of the 060 Patent either literally or under the doctrine of

5  equivalents, and that (ii) the manufacture, use, sale, offer for sale, or importation of the TS1314 OG

6  Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo

7  Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid do not infringe any valid and enforceable

8  claims of the 060 Patent.

9  **COUNTERCLAIM XXXVII: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT**
10 **NO. 10,165,877)**

11 1007.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of

12 this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

13 1008.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

14 BlenderBottle regarding the validity of the 877 Patent, based on, *inter alia*, (i) BlenderBottle filing the

15 Complaint against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents that are closely

16 related to and in the same patent family, the "classic simple shaker" bottle and lid, as the 877 Patent;

17 (ii) BlenderBottle mailing Hydra Cup physical products practicing the claims of the 877 Patent; and

18 (iii) BlenderBottle filing dozens of lawsuits, including against Californians, asserting both design and

19 utility patents in the same "classic simple shaker" patent family as the Asserted and Equivalent

20 Patents.

21 1009.   Each and every claim of the 877 Patent is invalid for failure to satisfy one or more provisions of

22 Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112,

23 and/or 116, as well as for obviousness-type double patenting.

24 1010.   The alleged invention of the 877 Patent was known or used by others in this country or patented or

25 described in a printed publication in this or a foreign country, before the invention thereof by the

26 applicant for the 877 Patent.

1011.   The alleged invention of the 877 Patent was patented or described in a printed publication in this or a foreign country more than one year prior to the date of the application for the 877 Patent in the United States.

1012.   The 877 Patent describes and claims an alleged invention, the making of which did not involve the inventive faculty but only the obvious judgment, knowledge, and mechanical skill possessed by persons having ordinary skill in the art to which the alleged invention pertains.

1013.   The alleged invention of the 877 Patent does no more than combine familiar elements according to known methods to yield predictable results. Any alleged improvement over the prior art set forth in the 877 Patent is no more than the predictable use of prior art elements according to their established functions. A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the 877 Patent and would have had a reasonable expectation of success in doing so.

1014.   The subject matter claimed in the 877 Patent fails to comply with 35 U.S.C. §§ 102 and/or 103 in that the differences between the subject matter claimed in the 877 Patent and the prior art are such that the subject matter as a whole was either fully anticipated by the prior art or would have been obvious at the time the alleged invention was made to a person having knowledge or such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

1015.   The 877 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes of the United States to enable any person skilled in the art to practice the full scope of the invention purported to be covered thereby.

1016.   The 877 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes of the United States to demonstrate to a person skilled in the art that the alleged inventors were in possession of the full scope of the subject matter of the claims contained therein.

1017.   The claims of the 877 Patent are indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113, as the claimed invention is not described in such full, clear, concise and exact terms as to enable any person skilled in the art to make and use the same, and fails to particularly point out and distinctly claim the subject matter which applicant regards as the invention; along similar lines, the drawings do not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all necessary views of the invention are included.

1018.   The 877 Patent is invalid for failing to name the actual inventors of the 877 Patent as required under 35 U.S.C. §§ 101 and 116.

1019.   Hydra Cup is entitled to a judicial declaration that all claims of the 877 Patent are invalid.

**COUNTERCLAIM XXXVIII: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 10,165,877)**

1020.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1021.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe any valid and enforceable claim of the 877 Patent either directly or indirectly, and either literally or under the doctrine of equivalents.

1022.   Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the 877 Patent either literally or under the doctrine of equivalents and is not liable for such infringement.

1023.   Because the claims of the 877 Patent differ from the Accused Products as described in the preceding paragraphs, the manufacture, use, sale, or importation of Hydra Cup's Accused Products do not literally infringe the 877 Patent.

1024.   Hydra Cup's Accused Products do not infringe the 877 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1025.   Hydra Cup's Accused Products do not infringe the 877 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1026.   Hydra Cup is entitled to a judicial declaration that (i) it has not infringed, contributed to the infringement of, or induced the infringement of the 877 Patent either literally or under the doctrine of equivalents, and that (ii) the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid do not infringe any valid and enforceable claims of the 877 Patent.

**COUNTERCLAIM XXIX: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 9,216,843)**

1027.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1028.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the 843 Patent, based on, *inter alia*, (i) BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents that are closely related to and in the same patent family, the "classic simple shaker" bottle and lid, as the 843 Patent; (ii) BlenderBottle mailing Hydra Cup physical products practicing the claims of the 843 Patent; and (iii) BlenderBottle filing dozens of lawsuits, including against Californians, asserting both design and utility patents in the same "classic simple shaker" patent family as the Asserted and Equivalent Patents.

1029.   Each and every claim of the 843 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and/or 116, as well as for obviousness-type double patenting.

1030.   The alleged invention of the 843 Patent was known or used by others in this country or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the 843 Patent.

1031.   The alleged invention of the 843 Patent was patented or described in a printed publication in this or a foreign country more than one year prior to the date of the application for the 843 Patent in the United States.

1032.   The 843 Patent describes and claims an alleged invention, the making of which did not involve the inventive faculty but only the obvious judgment, knowledge, and mechanical skill possessed by persons having ordinary skill in the art to which the alleged invention pertains.

1033.   The alleged invention of the 843 Patent does no more than combine familiar elements according to known methods to yield predictable results. Any alleged improvement over the prior art set forth in the 843 Patent is no more than the predictable use of prior art elements according to their established functions. A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the 843 Patent and would have had a reasonable expectation of success in doing so.

1034.   The subject matter claimed in the 843 Patent fails to comply with 35 U.S.C. §§ 102 and/or 103 in that the differences between the subject matter claimed in the 843 Patent and the prior art are such that the subject matter as a whole was either fully anticipated by the prior art or would have been obvious at the time the alleged invention was made to a person having knowledge or such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

1035.   The 843 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes

1  of the United States to enable any person skilled in the art to practice the full scope of the invention

2  purported to be covered thereby.

3  1036.   The 843 Patent does not contain a written description of the invention, and of the manner and

4  process of making and using it, in such full, clear, concise, and exact terms as required by the statutes

5  of the United States to demonstrate to a person skilled in the art that the alleged inventors were in

6  possession of the full scope of the subject matter of the claims contained therein.

7  1037.   The claims of the 843 Patent are indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113,

8  as the claimed invention is not described in such full, clear, concise and exact terms as to enable any

9  person skilled in the art to make and use the same, and fails to particularly point out and distinctly

10  claim the subject matter which applicant regards as the invention; along similar lines, the drawings do

11  not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all necessary views

12  of the invention are included.

13  1038.   The 843 Patent is invalid for failing to name the actual inventors of the 843 Patent as required

14  under 35 U.S.C. §§ 101 and 116.

15  1039.   Hydra Cup is entitled to a judicial declaration that all claims of the 843 Patent are invalid.

16  **COUNTERCLAIM XL: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT**
17  **NO. 9,216,843)**

18  1040.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of

19  this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

20  1041.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

21  BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation

22  into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352

23  OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid,

24  infringe, have infringed, or will infringe any valid and enforceable claim of the 843 Patent either

25  directly or indirectly, and either literally or under the doctrine of equivalents.

1042.   Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the 843 Patent either literally or under the doctrine of equivalents and is not liable for such infringement.

1043.   Because the claims of the 843 Patent differ from the Accused Products as described in the preceding paragraphs, the manufacture, use, sale, or importation of Hydra Cup's Accused Products do not literally infringe the 843 Patent.

1044.   Hydra Cup's Accused Products do not infringe the 843 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1045.   Hydra Cup's Accused Products do not infringe the 843 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1046.   Hydra Cup is entitled to a judicial declaration that (i) it has not infringed, contributed to the infringement of, or induced the infringement of the 843 Patent either literally or under the doctrine of equivalents, and that (ii) the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid do not infringe any valid and enforceable claims of the 843 Patent.

**COUNTERCLAIM XLI: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT NO. 8,695,830)**

1047.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1048.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the 830 Patent, based on, *inter alia*, (i) BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents that are closely

related to and in the same patent family, the "classic simple shaker" bottle and lid, as the 830 Patent;
(ii) BlenderBottle mailing Hydra Cup physical products practicing the claims of the 830 Patent; and
(iii) BlenderBottle filing dozens of lawsuits, including against Californians, asserting both design and
utility patents in the same "classic simple shaker" patent family as the Asserted and Equivalent
Patents, including the 830 Patent.

1049.   Each and every claim of the 830 Patent is invalid for failure to satisfy one or more provisions of
Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112,
and/or 116, as well as for obviousness-type double patenting.

1050.   The alleged invention of the 830 Patent was known or used by others in this country or patented or
described in a printed publication in this or a foreign country, before the invention thereof by the
applicant for the 830 Patent.

1051.   The alleged invention of the 830 Patent was patented or described in a printed publication in this or
a foreign country more than one year prior to the date of the application for the 830 Patent in the
United States.

1052.   The 830 Patent describes and claims an alleged invention, the making of which did not involve the
inventive faculty but only the obvious judgment, knowledge, and mechanical skill possessed by
persons having ordinary skill in the art to which the alleged invention pertains.

1053.   The alleged invention of the 830 Patent does no more than combine familiar elements according to
known methods to yield predictable results. Any alleged improvement over the prior art set forth in
the 830 Patent is no more than the predictable use of prior art elements according to their established
functions. A person of ordinary skill in the art would have been motivated to combine the teachings of
the prior art to achieve the alleged invention of the 830 Patent and would have had a reasonable
expectation of success in doing so.

1054.   The subject matter claimed in the 830 Patent fails to comply with 35 U.S.C. §§ 102 and/or 103 in
that the differences between the subject matter claimed in the 830 Patent and the prior art are such

1    that the subject matter as a whole was either fully anticipated by the prior art or would have been

2    obvious at the time the alleged invention was made to a person having knowledge or such prior art

3    and having ordinary skill in the art to which the claimed subject matter pertains.

4    1055.   The 830 Patent does not contain a written description of the invention, and of the manner and

5    process of making and using it, in such full, clear, concise, and exact terms as required by the statutes

6    of the United States to enable any person skilled in the art to practice the full scope of the invention

7    purported to be covered thereby.

8    1056.   The 830 Patent does not contain a written description of the invention, and of the manner and

9    process of making and using it, in such full, clear, concise, and exact terms as required by the statutes

10   of the United States to demonstrate to a person skilled in the art that the alleged inventors were in

11   possession of the full scope of the subject matter of the claims contained therein.

12   1057.   The claims of the 830 Patent are indefinite and therefore invalid under 35 U.S.C. §§ 112 and 113,

13   as the claimed invention is not described in such full, clear, concise and exact terms as to enable any

14   person skilled in the art to make and use the same, and fails to particularly point out and distinctly

15   claim the subject matter which applicant regards as the invention; along similar lines, the drawings do

16   not sufficiently enable understanding the subject matter claimed, as, *inter alia*, not all views of the

17   design are included.

18   1058.   The 830 Patent is invalid for failing to name the actual inventors of the 830 Patent as required

19   under 35 U.S.C. §§ 101 and 116.

20   1059.   Hydra Cup is entitled to a judicial declaration that all claims of the 830 Patent are invalid.

21   **COUNTERCLAIM XLII: (DECLARATORY JUDGMENT OF UNENFORCEABILITY OF U.S. PATENT
22   NO. 8,695,830 DUE TO INEQUITABLE CONDUCT BEFORE USPTO)**

23   1060.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of

24   this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1061.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity, enforceability, and scope of protection of the 830 Patent, based on, *inter alia*, based on, *inter alia*, (i) BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents that are closely related to and in the same patent family, the "classic simple shaker" bottle and lid, as the 830 Patent; (ii) BlenderBottle mailing Hydra Cup physical products practicing the claims of the 830 Patent; and (iii) BlenderBottle filing dozens of lawsuits, including against Californians, asserting both design and utility patents in the same "classic simple shaker" patent family as the Asserted and Equivalent Patents, including the 830 Patent.

1062.   The individuals associated with the filing and prosecution of the 830 Patent breached their duty of candor and good faith by, *inter alia*, withholding material information concerning substantially similar prior art as well as by withholding and misrepresenting material information about the functional elements of the claimed design from the patent examiner with the intent to deceive or mislead the examiner into granting the 830 Patent.

1063.   BlenderBottle's failure to identify known prior art and misrepresentation of material information during the prosecution of the 830 Patent was done with knowledge and the failure to disclose was material to patentability. This failure to identify material references extends to each individual associated with the filing and prosecution of the patent applications asserted by BlenderBottle.

1064.   As a result of BlenderBottle's misconduct involved in prosecuting and procuring the 830 Patent, the 830 Patent is invalid and unenforceable.

1065.   Hydra Cup is entitled to a judicial declaration that the 830 Patent is unenforceable due to inequitable conduct on the USPTO.

**COUNTERCLAIM XLIII: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 8,695,830)**

1066.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1067.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe any valid and enforceable claim of the 830 Patent either directly or indirectly, and either literally or under the doctrine of equivalents.

1068.   Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the 830 Patent either literally or under the doctrine of equivalents and is not liable for such infringement.

1069.   Because the claims of the 830 Patent differ from the Accused Products as described in the preceding paragraphs, the manufacture, use, sale, or importation of Hydra Cup's Accused Products do not literally infringe the 830 Patent.

1070.   Hydra Cup's Accused Products do not infringe the 830 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1071.   Hydra Cup's Accused Products do not infringe the 830 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1072.   Hydra Cup is entitled to a judicial declaration that (i) it has not infringed, contributed to the infringement of, or induced the infringement of the 830 Patent either literally or under the doctrine of equivalents, and that (ii) the manufacture, use, sale, offer for sale, or importation of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid do not infringe any valid and enforceable claims of the 830 Patent.

COUNTERCLAIM XLIV: (DECLARATORY JUDGMENT OF INVALIDITY OF U.S. PATENT No. 9,492,024)

1073.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1074.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity of the 024 Patent, based on, *inter alia*, (i) BlenderBottle filing the Complaint against Hydra Cup, accusing Hydra Cup of infringing the Asserted Patents that are closely related to and in the same patent family, the "classic simple shaker" bottle and lid, as the 024 Patent; (ii) BlenderBottle mailing Hydra Cup physical products practicing the claims of the 024 Patent; and (iii) BlenderBottle filing dozens of lawsuits, including against Californians, asserting both design and utility patents in the same "classic simple shaker" patent family as the Asserted and Equivalent Patents.

1075.   Each and every claim of the 024 Patent is invalid for failure to satisfy one or more provisions of Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, and/or 116, as well as for obviousness-type double patenting.

1076.   The alleged invention of the 024 Patent was known or used by others in this country or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for the 024 Patent.

1077.   The alleged invention of the 024 Patent was patented or described in a printed publication in this or a foreign country more than one year prior to the date of the application for the 024 Patent in the United States.

1078.   The 024 Patent describes and claims an alleged invention, the making of which did not involve the inventive faculty but only the obvious judgment, knowledge, and mechanical skill possessed by persons having ordinary skill in the art to which the alleged invention pertains.

1079.   The alleged invention of the 024 Patent does no more than combine familiar elements according to known methods to yield predictable results. Any alleged improvement over the prior art set forth in

the 024 Patent is no more than the predictable use of prior art elements according to their established functions. A person of ordinary skill in the art would have been motivated to combine the teachings of the prior art to achieve the alleged invention of the 024 Patent and would have had a reasonable expectation of success in doing so.

1080.   The subject matter claimed in the 024 Patent fails to comply with 35 U.S.C. §§ 102 and/or 103 in that the differences between the subject matter claimed in the 024 Patent and the prior art are such that the subject matter as a whole was either fully anticipated by the prior art or would have been obvious at the time the alleged invention was made to a person having knowledge or such prior art and having ordinary skill in the art to which the claimed subject matter pertains.

1081.   The 024 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes of the United States to enable any person skilled in the art to practice the full scope of the invention purported to be covered thereby.

1082.   The 024 Patent does not contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as required by the statutes of the United States to demonstrate to a person skilled in the art that the alleged inventors were in possession of the full scope of the subject matter of the claims contained therein.

1083.   The claims of the 024 Patent are invalid and void because they do not inform those skilled in the art about the scope of the invention with reasonable certainty and the claims do not particularly point out and distinctly claim the subject matter of the claimed invention, as required by 35 U.S.C. § 112.

1084.   The 024 Patent is invalid for failing to name the actual inventors of the 024 Patent as required under 35 U.S.C. §§ 101 and 116.

1085.   Hydra Cup is entitled to a judicial declaration that all claims of the 024 Patent are invalid.

**COUNTERCLAIM XLV: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. PATENT NO. 9,492,024)**

1086.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1087.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding whether Hydra Cup's manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, or the HC OG Carry Loop Lid, infringe, have infringed, or will infringe any valid and enforceable claim of the 024 Patent either directly or indirectly, and either literally or under the doctrine of equivalents.

1088.   Hydra Cup has not infringed, contributed to the infringement of, or induced the infringement of any valid and enforceable claim of the 024 Patent either literally or under the doctrine of equivalents and is not liable for such infringement.

1089.   Because the claims of the 024 Patent differ from the Accused Products as described in the preceding paragraphs, the manufacture, use, sale, or importation of Hydra Cup's Accused Products do not literally infringe the 024 Patent.

1090.   Hydra Cup's Accused Products do not infringe the 024 Patent under the doctrine of equivalents at least because the dedication-disclosure rule bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1091.   Hydra Cup's Accused Products do not infringe the 024 Patent under the doctrine of equivalents because argument-based prosecution history estoppel and/or amendment-based prosecution history estoppel bars the application of the doctrine of equivalents with respect to Hydra Cup's Accused Products.

1092.   Hydra Cup is entitled to a judicial declaration that (i) it has not infringed, contributed to the infringement of, or induced the infringement of the 024 Patent either literally or under the doctrine of equivalents, and that (ii) the manufacture, use, sale, offer for sale, or importation of the TS1314 OG

Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid do not infringe any valid and enforceable claims of the 024 Patent.

**COUNTERCLAIM XLVI: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 6,800,019 IS GENERIC)**

1093.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1094.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether Hydra Cup's Accused Products infringe BlenderBottle's 019 Lid Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the 019 Lid Trade Dress. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

1095.   BlenderBottle's claimed 019 Lid Trade Dress is a generic design for the "classic simple shaker" bottle lid that is common on many shaker bottles and other beverage containers.[177]

1096.   The basic elements of BlenderBottle's lid design—a domed lid body, a tall shoulder, a circular spout and spout guard, a pivoting top arm attached by a hinge to brackets, and a protruding lip opposite the hinge for the user's thumb to easily open the pivoting top arm, among others—are all generic features that are ubiquitous across the shaker bottle and lid market. These elements are dictated by the function of the lid—e.g., sealing the container and allowing the user to open and close the spout—rather than serving as unique source identifiers.

---

[177] *See, e.g.*, Ex. 97, Screenshots of BlenderBottle Classic Sold on Amazon Under Different Brand Names from 2012 from Internet Archive (21 February 2012) (showing BlenderBottle's 019 Lid Trade Dress and its Unregistered Bottle Trade Dress sold under the brand name "Young Living"; also showing CLICK Protein Shaker Cup with Wire Wisk Ball that shows identical "classic simple shaker" bottle, lid, and agitator designs to BlenderBottle's 019 Lid Trade Dress, the 626 Agitator Trade Dress, and the Unregistered Bottle Trade Dress).

1097.   Numerous third-party shaker bottle lids, as well as lids for water bottles, coffee mugs, and other beverage containers, employ the same generic combination of domed lid body, pivoting top arm attached to brackets, spout and spout guard all supported by a domed lid body.[178]

1098.   This widespread use of the same basic design elements precludes BlenderBottle from claiming those common features as its own proprietary trade dress.

1099.   In the utility patent context, BlenderBottle's own patents and patent applications demonstrate that BlenderBottle has continually sought to protect the functional aspects of its shaker bottle lid design since 2003. For example, the 830 Patent claims a "cover [that] includes a cap and a pivoting handle that pivots along an axis distinct from the cap."[179] Figures 7-8 of the 830 patent show a lid with the same generic configuration of spout, flip cap, hinge, and thumb post that BlenderBottle now claims as trade dress. (*See id.*).

1100.   On the design patent side, BlenderBottle's D551, D478, D038, D065, D540, D119, and D149 Patents all depict substantially and confusingly similar lid designs with the same basic configuration as the alleged trade dress.[180] If these features were unique source identifiers, there would be no need to seek design patent protection for those designs. The fact that BlenderBottle pursued design patents demonstrates that it considered the designs to be ornamental and not inherently distinctive. Having enjoyed years of design and utility patent protection for its lid designs, BlenderBottle cannot now claim those same designs as trade dress.

1101.   According to BlenderBottle, the 019 Lid Trade Dress has allegedly been in use since 2003.[181] But the evidence shows that lids with the same generic features were widely used by third parties before

---

[178] (*See, e.g.*, Exs. 77-88, Screenshots of Shaker Bottles and Lids from the Aughts (showing early substantially similar shaker bottle and lid designs disclosed before the D551 Patent); *see also* Ex. 106, BrandMakers Purchase Order for D047 "Arnold.com" Shaker Bottles from Ningbo to MusclePharm (14 October 2013); Ex. 104, Purchase Order and Export Records for Laltec International from Tianqi (14 December 2012); Exhibit 42, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15 January 2013)).

[179] (Ex. 29, U.S. Patent No. 8,695,830, Abstract (filed 11 Sept. 2012)).

[180] (*See* Ex. 15, U.S. Patent No. D696,551 (filed 07 Sept. 2012); Exhibit 24, U.S. Patent No. D748,478 (filed 06 June 2013); Ex. 25, U.S. Patent No. D820,038 (filed 29 Apr. 2015); Ex. 26, U.S. Patent No. D900,540 (filed 30 Apr. 2020)).

[181] (Ex. 17, U.S. Registration No. 6,800,019 (alleging the 019 Lid Trade Dress was first used in commerce "at least as early as 00/00/2003")).

that date. BlenderBottle was not the first to adopt this generic design and cannot monopolize it as proprietary trade dress.

1102.   Furthermore, while BlenderBottle claimed the 019 Lid Trade Dress has been in use since 2003, it also stated that the 019 Lid Trade Dress practices the exact same lid design disclosed by the D478 Patent, which was filed on 06 June 2013, except the D478 Patent discloses a finger carry loop whereas the 019 Lid Trade Dress disclaims any rights to a finger carry loop.

1103.   BlenderBottle's 019 Lid Trade Dress claims a generic "classic simple shaker" bottle lid design that consists of common functional features used across the industry. Such generic designs cannot be trade dress, as a matter of law, regardless of sales, advertising, or other alleged secondary meaning. BlenderBottle has failed to identify any distinctive, non-functional features that warrant trade dress protection. Instead, it is attempting to protect the overall generic, functional design of a domed-lid body with a pivoting top arm with a spout and spout guard connected to brackets. Accepting BlenderBottle's position would improperly allow it to monopolize the basic design of all "classic simple shaker" bottles and lids, preventing competitors from using these common functional features.

1104.   Hydra Cup is entitled to a declaration that the 019 Lid Trade Dress is generic and not protectable under the Lanham Act or California unfair competition laws.

**COUNTERCLAIM XLVII: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 6,800,019 IS PRIMARILY FUNCTIONAL)**

1105.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1106.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether Hydra Cup's Accused Products infringe BlenderBottle's 019 Lid Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the 019 Lid Trade Dress. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment concerning whether the 019 Lid Trade Dress is primarily functional.

1107.   BlenderBottle's 019 Lid Trade Dress is primarily functional and therefore is not protectable as trade dress, as the overall configuration of the 019 Lid Trade Dress is dictated by the functional requirements of a shaker bottle lid, such as the following: facilitating secure attachment with the bottle; easy drinking and pouring; efficient mixing; and leak-proof storage and transportation of contents.

1108.   The overall shape and configuration of "classic simple shaker" lid design claimed by the 019 Lid Trade Dress is primarily functional, with each prominent design element serving a practical purpose and arranged in a specific way to create a cohesive, utilitarian design. The domed body, tall shoulder/skirt, pivoting top arm, spout, spout guard, brackets, and carry loop are all dictated by the functional requirements of an effective, ergonomic, and hygienic shaker bottle lid. Altering any of these elements or their configuration would compromise the lid's overall functionality and performance, as each prominent, functional design element of the 019 Lid Trade Dress—the domed body, circular screw-top base, pivoting brackets, flip-top cap, spout and spout guard—serves a specific utilitarian purpose that is essential to the lid's overall function and use.

1109.   The functional nature of the 019 Lid Trade Dress's overall design and each individual element is confirmed by BlenderBottle's own utility patents, which describe in detail the utilitarian advantages of these features.

1110.   BlenderBottle's advertising also touts the functional benefits of the 019 lid design, focusing on secure sealing, easy access, spill prevention, hygienic drinking, and durability. BlenderBottle has consistently touted the functionality of its shaker bottle and lid design to the public, highlighting the functional strengths of its multi-functional blending tool.

1111.   Alternative lid designs that deviate from the 019 Lid Trade Dress, such as flat lids, snap-on caps, non-pivoting brackets, or differently shaped spouts, would not provide the same level of functionality and would impair the lid's performance and usability.

1112.   Due to third parties needing these functional shaker bottle lid designs, hundreds of companies sell shaker bottle lids virtually identical to the lid design in BlenderBottle's 019 Lid Trade Dress, meaning

BlenderBottle's 019 Lid Trade Dress does not serve as a source indicator due to the prevalence of third-party shaker bottles exhibiting features claimed by BlenderBottle to indicate source.

1113.   BlenderBottle's own utility patents demonstrate that BlenderBottle has continually sought to protect the functional aspects of its shaker bottle lid design. BlenderBottle's utility patent filings for a virtually identical bottle and lid is strong evidence that the claimed lid design is primarily functional rather than ornamental.

1114.   Upon information and belief, since at least 2011, dozens of third parties have sold tens of millions of the exact same shaker bottle and lid designs that BlenderBottle is accusing of infringement here.

1115.   Accordingly, because BlenderBottle's 019 Lid Trade Dress is primarily functional, it is not protectable, and should be cancelled pursuant to 15 U.S.C. § 1119.

1116.   Accordingly, there is an actual controversy between the parties as to the functionality and validity of BlenderBottle's 019 Lid Trade Dress. Hydra Cup is therefore entitled to a declaration that the shaker bottle lid design practiced by BlenderBottle's 019 Lid Trade Dress is primarily functional. Hydra Cup seeks a declaration from this Court that the 019 registration is invalid because it is primarily functional.

**COUNTERCLAIM XLVIII: (Declaratory Judgment that U.S. Trademark Registration No. 6,800,019 is Invalid Due to Inequitable Conduct on the USPTO)**

1117.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1118.   This is a cause of action for declaratory judgment that BlenderBottle acquired its 019 Lid Trade Dress through inequitable conduct on the USPTO.

1119.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether BlenderBottle committed fraud on the USPTO in obtaining its registration for the 019 Lid Trade Dress. BlenderBottle has alleged that Hydra Cup infringes the 019 Lid Trade Dress.

Hydra Cup denies those allegations and contends that the 019 Lid Trade Dress registration is invalid and unenforceable due to BlenderBottle's inequitable conduct.

1120.   BlenderBottle's bait-and-switch tactic—i.e., presenting arguments and evidence for its unregistered Bottle Trade when arguing it achieved secondary meaning in its 019 Lid Trade Dress—in prosecuting the 019 Lid Trade Dress constitutes fraud on the USPTO. More specifically, by presenting arguments pertaining to its alleged Unregistered Bottle Trade Dress, and even other lids (e.g., the D551 Patent's disclosed lid design with an integrated carry loop), and not the claimed lid design itself, BlenderBottle misled the USPTO and obtained registration through deceptive means. The fact that BlenderBottle also asserts rights in an Unregistered Bottle Trade Dress featuring the same lid further demonstrates the impropriety of its actions. Consequently, the 019 Lid Trade Dress registration is invalid and unenforceable due to BlenderBottle's fraudulent conduct before the USPTO.

1121.   Upon information and belief, BlenderBottle's failure to identify known utility and design patents disclosing substantially similar shaker bottle lid designs during the prosecution of the 019 Lid Trade Dress was done with knowledge and the failure to disclose was material to patentability. This failure to identify material references extends to each individual associated with the filing and prosecution of the trademark application for the 019 Lid Trade Dress.

1122.   Each individual associated with the filing and prosecution of a trade dress application has a duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the office all information known to that individual to be material to trademarkability as defined in this section. The duty to disclose information exists with respect to each pending application until the application is cancelled or withdrawn from consideration, or the application becomes abandoned.

1123.   The individuals associated with the filing and prosecution of the 019 Lid Trade Dress breached their duty of candor and good faith by withholding material information concerning substantially similar prior art as well as by withholding material information about the functional elements of the claimed design from the trademark examiner with the intent to deceive or mislead the examiner into granting federal trademark registration for the 019 Lid Trade Dress.

1124.   Upon information and belief, BlenderBottle's failure to disclose known utility patents and design patents, known functionality, and other known information material to the examiner's decision to grant registration to the 019 Lid Trade Dress during the prosecution of the 019 Lid Trade Dress was done with knowledge and the failure to disclose was material to registration of the 019 Lid Trade Dress. This failure to identify material references extends to each individual associated with the filing and prosecution of the trade dress application asserted by BlenderBottle.

1125.   As a result of BlenderBottle's misconduct involved in prosecuting and procuring the 019 Lid Trade Dress, the 019 Lid Trade Dress is invalid and unenforceable. Accordingly, the 019 Lid Trade Dress asserted by BlenderBottle is not enforceable and should be declared unenforceable.

1126.   Furthermore, in its application for U.S. Registration No. 6,800,019, BlenderBottle falsely claimed that the 019 Lid Trade Dress was first used in commerce in 2003.

1127.   A comparison of the design elements in BlenderBottle's D235 Patent from 2003 and the 019 Lid Trade Dress reveals significant differences, clearly indicating that the design claimed in the 019 Registration was not in commercial use as early as 2003.

1128.   The design elements claimed in the 019 Registration closely align with those in BlenderBottle's later D478 Patent, suggesting that the 019 Lid Trade Dress was actually used in commerce around the time of the D478 filing, which is post-2013, and not in 2003 as claimed.

1129.   There is a conspicuous absence of documentary evidence supporting BlenderBottle's claim of the 019 Lid Trade Dress being used in the market in 2003.

1130.   BlenderBottle's misrepresentation of the first use date was a calculated attempt to deceive the USPTO. Given BlenderBottle's access to accurate records and historical data, it is implausible that such a significant error could have occurred unintentionally.

1131.   The inequitable conduct, improper failures to disclose, and misrepresented facts, among other things, each potentially influenced the USPTO's decision-making process by suggesting an

1    erroneously extended period of market presence and distinctiveness of the 019 Lid Trade Dress,

2    which could have been a decisive factor in granting the registration.

3    1132.   Further investigations reveal inconsistencies in BlenderBottle's public statements and other filings

4    regarding the first use date, supporting the contention of intentional deception.

5    1133.   BlenderBottle knowingly and intentionally committed fraud on the USPTO. The significant

6    discrepancies in design elements, the clear timeline contradiction, the lack of supporting evidence,

7    and BlenderBottle's capability to accurately represent such crucial information, all lead to the

8    inescapable conclusion that BlenderBottle's actions were deliberately deceptive.

9    1134.   BlenderBottle's inequitable conduct renders the 019 Lid Trade Dress registration invalid and

10    unenforceable.

11    1135.   Accordingly, there is an actual and justiciable controversy between the parties as to whether

12    BlenderBottle committed fraud on the USPTO in obtaining the 019 Lid Trade Dress registration.

13    Hydra Cup seeks a declaration from this Court that the 019 Lid Trade Dress registration is invalid and

14    unenforceable due to BlenderBottle's inequitable conduct.

15    **COUNTERCLAIM XLIX: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION**
16    **NO. 6,800,019) HAS NOT ACQUIRED SECONDARY MEANING)**

17    1136.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of

18    this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

19    1137.   This is a cause of action for declaratory judgment that BlenderBottle's 019 Lid Trade Dress is not

20    valid or protectable because it is descriptive, non-distinctive, and has not acquired secondary

21    meaning.

22    1138.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

23    concerning whether BlenderBottle's 019 Lid Trade Dress is descriptive, lacks distinctiveness, and has

24    not acquired secondary meaning, and is thus not protectable as a trademark. BlenderBottle has alleged

that Hydra Cup infringes the 019 Lid Trade Dress. Hydra Cup denies those allegations and contends that the 019 Lid Trade Dress is invalid.

1139.   The 019 Lid Trade Dress design is not inherently distinctive. For a trade dress to be protectable, it must have acquired secondary meaning, signifying that consumers primarily associate the design with BlenderBottle as the source of the products. BlenderBottle has failed to provide conclusive evidence to support this claim.

1140.   The design elements of the 019 Lid Trade Dress, such as the domed lid, conical spout, hinged flip cap, and brackets, are commonly used in shaker bottle lids across the industry, suggesting that the design is functional and generic, rather than distinctive.

1141.   The widespread use of similar lid designs in the market renders the 019 Lid Trade Dress incapable of acquiring secondary meaning, as consumers perceive it as a basic feature of shaker bottles, not as a brand identifier.

1142.   BlenderBottle has not exclusively used the 019 Lid Trade Dress, as numerous companies continue to sell shaker bottles with similar lid designs, even after litigation over these designs. BlenderBottle's failure to consistently enforce its alleged trade dress rights against these third parties constitutes tacit acknowledgment of the non-distinctiveness of its lid design.

1143.   The ongoing sale of similar lid designs by competitors has diluted any distinctiveness that BlenderBottle's design might have once had, causing consumer confusion regarding the source of the products and undermining the primary function of a trade dress.

1144.   The lack of evidence of intentional copying of the 019 Lid Trade Dress by competitors further weakens BlenderBottle's claim for secondary meaning, as competitors would be more likely to copy a design that is truly distinctive and associated with BlenderBottle.

1145.   The standardization of similar lid designs in the industry is largely attributed to the primarily functional and utilitarian aspects that are essential for the products, rather than aesthetic choices meant to identify the source. This further argues against the distinctiveness of BlenderBottle's design.

1146.   Data showing that BlenderBottle's sales or brand recognition have not been significantly impacted by the presence of third-party products with similar lid designs supports the argument that the 019 Lid Trade Dress is not a primary driver of consumer decision-making and, therefore, not a significant source identifier.

1147.   Given the descriptive and non-distinctive nature of the design elements, the widespread use of similar designs by third parties, the lack of exclusive use and consistent enforcement by BlenderBottle, the absence of consumer association evidence and intentional copying, and the primarily functional nature of the design, BlenderBottle's 019 Lid Trade Dress has not acquired secondary meaning and is not protectable under the Lanham Act or common law.

1148.   Accordingly, there is an actual and justiciable controversy between the parties as to the descriptiveness, lack of distinctiveness, and absence of secondary meaning of BlenderBottle's 019 Lid Trade Dress. Hydra Cup seeks a declaration from this Court that the 019 Lid Trade Dress is not entitled to trademark protection.

1149.   BlenderBottle's 019 Lid Trade Dress is not inherently distinctive as a matter of law and has not acquired secondary meaning in the minds of consumers as indicating a single source, affiliation, or sponsorship.

1150.   BlenderBottle's 019 Lid Trade Dress does not serve as a source indicator due to the prevalence of third-party shaker bottles exhibiting features claimed by BlenderBottle to indicate source.

**COUNTERCLAIM L: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 6,800,019 IS CANCELLED)**

1151.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1152.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's U.S. Trademark Registration No. 6,800,019 in that Hydra Cup is prevented from using generic, primarily functional designs that are necessary for competitors to fairly compete in the market and that belong to the public.

1153.  By reason of the foregoing paragraphs, the 019 Lid Trade Dress should be cancelled pursuant to Lanham Act § 37, 15 U.S.C. §§ 1064(3) and 1119.

**COUNTERCLAIM LI: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. TRADEMARK REGISTRATION NO. 6,800,019)**

1154.  Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1155.  This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's 019 Lid Trade Dress.

1156.  A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1157.  Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 32(1) (15 U.S.C. § 1114(1)); (b) constitute unfair competition or a false designation of origin in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (c) constitute unfair competition or trademark infringement under state statutory or common law; (d) constitute dilution in violation of 15 U.S.C. § 1125(c); (e) constitute dilution in violation of state statutory or common law; or (f) otherwise violate state or federal statutory or common law.

1158.  Considering, among other things, the crowded shaker bottle and lid market and millions of similar shaker bottles and lids sold on Amazon each year by hundreds of different companies, there is no likelihood of confusion between the Accused Products and the shaker bottle lid design practiced by BlenderBottle's 019 Lid Trade Dress.

1159.  Hydra Cup's Accused Products were designed and modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent. Tens of millions of these exact same shaker bottle and lid designs have been manufactured by Tianqi and sold to hundreds of companies that sell these exact same shaker bottle and lid designs in the United States.

1160.   The 019 Lid Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The 019 Lid Trade Dress is not widely recognized by the general consuming public as a designation of the source of BlenderBottle's goods.

1161.   Hydra Cup began using its shaker bottle lid designs, which are based on designs licensed from third party Tianqi, before BlenderBottle's 019 Lid Trade Dress allegedly became famous. As such, Hydra Cup's use is not actionable under 15 U.S.C. § 1125(c)(1). Millions of these same exact shaker bottle and lid designs have been sold throughout the United States for over a decade.

1162.   Hydra Cup's use of its shaker bottle lid designs also does not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup lids have numerous and significant differences in shape, configuration, orientation, surface ornamentation, and overall appearance compared to the registered 019 design. The products are being sold in similar marketing channels to similar consumers, which actually tends to negate any dilution by blurring.

1163.   Hydra Cup always displays its own distinct brand name and logo on its products and packaging, further distinguishing them from BlenderBottle's goods and dispelling any likelihood of dilution by blurring or tarnishment.

1164.   Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or infringement of BlenderBottle's trade dress rights.

1165.   Hydra Cup's prominent marking of its shaker bottles and lids with its own well-known trademarks precludes any likelihood of confusion as to the source or other affiliation of Hydra Cup's shaker bottles and lids.

1166.   Dozens of consumer reviews clearly show there is no likelihood of confusion between the Accused Products and BlenderBottle's 019 Lid Trade Dress.

1167.   Even if BlenderBottle does have some valid trade dress interest in its 019 Lid Trade Dress, Hydra Cup's Accused Products do not infringe BlenderBottle's purported trade dress rights.

1168.   Furthermore, Hydra Cup's Accused Products do not infringe BlenderBottle's 019 Lid Trade Dress because Hydra Cup's product designs and trade dress are distinct from BlenderBottle's 019 Lid Trade Dress, and are not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1169.   To the extent that any similarities exist between the Accused Products and BlenderBottle's products, those similarities are based on functionality and common design elements that belong to the public domain and that are used by third parties such that there is no source identification arising therefrom.

1170.   Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe BlenderBottle's 019 Lid Trade Dress and the Accused Products are not likely to be confused with BlenderBottle's 019 Lid Trade Dress.

1171.   Accordingly, this Court should declare that the Accused Products do not infringe BlenderBottle's rights in its 019 Lid Trade Dress.

**COUNTERCLAIM LII: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 6,245,626 IS GENERIC)**

1172.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1173.   This is a declaratory judgment action under the Trademark Laws of the United States, 15 U.S.C. § 1051 et seq. (the "Trademark Act"), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act) seeking a declaratory judgment that BlenderBottle's 626 Agitator Trade Dress is generic.

1174.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether Hydra Cup's Accused Products infringe BlenderBottle's 626 Agitator Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the 626 Agitator Trade Dress. Thus, as a result of the acts described in the

1   foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the

2   issuance of a declaratory judgment.

3   1175.   The 626 Agitator Trade Dress is a generic design that is a common functional tool in many shaker

4   bottles and other beverage containers.

5   1176.   The basic elements of BlenderBottle's wired spherical agitator are all generic features that are

6   ubiquitous across the shaker bottle market. These elements are dictated by the function of the agitator

7   rather than serving as unique source identifiers.

8   1177.   Numerous third-party shaker bottle companies employ the same generic spherical wire agitator.

9   1178.   This widespread use of the same basic design elements precludes BlenderBottle from claiming

10   those common features as its own proprietary trade dress.

11   1179.   Hydra Cup is entitled to a declaration that the 626 Agitator Trade Dress is generic and therefore not

12   protectable under the Lanham Act or California unfair competition law.

13   **COUNTERCLAIM LIII: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION**
14   **NO. 6,245,626 IS PRIMARILY FUNCTIONAL)**

15   1180.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of

16   this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

17   1181.   This is a cause of action for declaratory judgment that BlenderBottle's 626 Agitator Trade Dress is

18   not valid or protectable due to its primarily functional design covering a spherical wired agitator that

19   goes in shaker bottles to mix liquids with supplements.

20   1182.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle

21   concerning whether BlenderBottle's 626 Agitator Trade Dress is functional and thus not protectable

22   as a trademark. BlenderBottle has alleged that Hydra Cup infringes the 626 Agitator Trade Dress.

23   Hydra Cup denies those allegations and contends that the 626 Agitator Trade Dress is invalid because

24   it is primarily functional.

1183.  The 626 Agitator Trade Dress covers the design of a spherical wire whisk agitator used for mixing the contents of a shaker bottle. The overall design is dictated by the functional requirements of effectively agitating and blending the contents of the bottle.

1184.  BlenderBottle's own expired utility patent, the 032 Patent, discloses and claims the same spherical wire agitator design as the 626 Agitator Trade Dress. The existence of this utility patent is strong evidence that the design is functional, as utility patents are granted for inventions that are new, useful, and non-obvious.

1185.  BlenderBottle actively enforced the 032 Patent against competitors, demonstrating its belief that the spherical wire agitator design provided a functional competitive advantage, not merely an ornamental feature.

1186.  BlenderBottle's advertising and promotional materials consistently highlight the functional benefits of the spherical wire agitator, such as its ability to effectively mix and blend ingredients, its durability and resistance to wear, and its similarity to traditional wire whisks used for culinary purposes.

1187.  BlenderBottle markets the spherical wire agitator under the functionally descriptive name "BlenderBall," which literally conveys the product's purpose as a ball designed for blending. BlenderBottle's trademark registration for BLENDER BALL identifies the goods as "agitators for mixing and blending," further confirming the functional nature of the design.

1188.  Among the various configurations of spherical wire agitators disclosed in the 032 Patent, BlenderBottle chose the design claimed in the 626 Agitator Trade Dress because it is the cheapest and easiest to manufacture, not for any distinctive ornamental features.

1189.  The spherical wire agitator design is essential to the use and purpose of the product, and its features are dictated by the functional requirements of effectively mixing and blending the contents of a shaker bottle. Alternative designs, such as non-spherical shapes, are less effective at agitating and mixing.

1190.   In summary, all aspects of BlenderBottle's claimed 626 Agitator Trade Dress—i.e., the spherical shape, wire-frame construction, and spiral-wound configuration—are disclosed in the 032 Patent as having utilitarian advantages. The trade dress is essential to the use or purpose of the article and affects its cost or quality. It is not an arbitrary, incidental, or ornamental design.

1191.   The functional features of the 626 Agitator Trade Dress cannot be monopolized under the guise of trade dress protection after BlenderBottle's utility patent has expired. Doing so would improperly extend the patent monopoly and deprive the public of the right to practice the invention claimed in the 032 Patent.

1192.   Because BlenderBottle's 626 Agitator Trade Dress is primarily functional, it is not protectable and should be cancelled pursuant to 15 U.S.C. § 1119.

1193.   Hydra Cup is therefore entitled to a declaration that the spherical wired agitator design practiced by BlenderBottle's 626 Agitator Trade Dress is primarily functional.

1194.   Thus, there is an actual controversy between the parties as to the functionality and validity of BlenderBottle's 626 Agitator Trade Dress. Hydra Cup seeks a declaration from this Court that the 626 registration is invalid because it is functional and fails to serve as a trademark to identify and distinguish BlenderBottle's goods.

**COUNTERCLAIM LIV: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 6,245,626) IS INVALID DUE TO INEQUITABLE CONDUCT ON THE USPTO)**

1195.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1196.   As a result of BlenderBottle's misconduct involved in procuring the 626 Agitator Trade Dress, the 626 Agitator Trade Dress asserted by BlenderBottle is invalid and unenforceable.

1197.   BlenderBottle's failure to identify known utility and design patents disclosing substantially similar agitator designs during the prosecution of the 626 Agitator Trade Dress was done with knowledge and the failure to disclose was material to patentability. This failure to identify material references extends

to each individual associated with the filing and prosecution of the trademark application for the 626 Agitator Trade Dress.

1198.   Each individual associated with the filing and prosecution of a trade dress application has a duty of candor and good faith in dealing with the USPTO, which includes a duty to disclose to the office all information known to that individual to be material to trademarkability as defined in this section. The duty to disclose information exists with respect to each pending application until the application is cancelled or withdrawn from consideration, or the application becomes abandoned.

1199.   The individuals associated with the filing and prosecution of the 626 Agitator Trade Dress breached their duty of candor and good faith by withholding material information concerning substantially similar prior art as well as by withholding material information about the functional elements of the claimed design from the trademark examiner with the intent to deceive or mislead the examiner into granting federal trademark registration for the 626 Agitator Trade Dress.

1200.   BlenderBottle's failure to disclose known utility patents and design patents, known functionality, and other known information material to the examiner's decision to grant registration to the 626 Agitator Trade Dress during the prosecution of the 626 Agitator Trade Dress was done with knowledge and the failure to disclose was material to registration of the 626 Agitator Trade Dress. This failure to identify material references extends to each individual associated with the filing and prosecution of the trade dress application asserted by BlenderBottle.

1201.   As a result of BlenderBottle's misconduct involved in prosecuting and procuring the 626 Agitator Trade Dress, the 626 Agitator Trade Dress is invalid and unenforceable. Accordingly, the 626 Agitator Trade Dress asserted by BlenderBottle is not enforceable and should be declared unenforceable.

1202.   Hydra Cup is therefore entitled to a judicial declaration that BlenderBottle's 626 Agitator Trade Dress is unenforceable.

1203.   Accordingly, the 626 Agitator Trade Dress asserted by BlenderBottle is invalid and should be declared unenforceable.

**COUNTERCLAIM LV: (DECLARATION THAT BLENDERBOTTLE'S 626 AGITATOR TRADE DRESS (U.S. TRADEMARK REGISTRATION NO. 6,245,626) IS CANCELLED.**

1204.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1205.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's U.S. Trademark Registration No. 6,245,626 in that Hydra Cup is prevented from using primarily functional designs that belong to the public domain.

1206.   By reason of the foregoing, U.S. Trademark Registration No. 6,245,626 should be cancelled pursuant to Lanham Act § 37, 15 U.S.C. §§ 1064(3) and 1119.

**COUNTERCLAIM LVI: (DECLARATORY JUDGMENT OF NONINFRINGEMENT OF U.S. TRADEMARK REGISTRATION NO. 6,245,626)**

1207.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1208.   This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's 626 Agitator Trade Dress.

1209.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1210.   Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 32(1) (15 U.S.C. § 1114(1)); (b) constitute unfair competition or a false designation of origin in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (c) constitute unfair competition or trademark infringement under state statutory or common law; (d)

243

1  constitute dilution in violation of 15 U.S.C. § 1125(c); (e) constitute dilution in violation of state

2  statutory or common law; or (f) otherwise violate state or federal statutory or common law.

1211.  Considering, among other things, the crowded market and millions of similar shaker bottle agitators sold on Amazon each year by hundreds of different companies, there is no likelihood of confusion between the Accused Products and the spherical wired agitator design practiced by BlenderBottle's 626 Agitator Trade Dress.

1212.  Millions of these same spherical wired agitators have been sold in the United States for over a decade.

1213.  The 626 Agitator Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The 626 Agitator Trade Dress is not widely recognized by the general consuming public as a designation of the source of BlenderBottle's goods.

1214.  Hydra Cup's use of its agitator designs also does not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup agitators have numerous and significant differences in shape, configuration, orientation, surface ornamentation, and overall appearance compared to the registered 019 design. The products are being sold in similar marketing channels to similar consumers, which actually tends to negate any dilution by blurring.

1215.  Hydra Cup always displays its own distinct brand name and logo on its products and packaging, further distinguishing them from BlenderBottle's goods and dispelling any likelihood of dilution by blurring or tarnishment.

1216.  Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or infringement of BlenderBottle's trade dress rights.

1217.   Hydra Cup's prominent marking of its shaker bottles and lids with its own well-known trademarks and brand name precludes any likelihood of confusion as to the source or other affiliation of Hydra Cup's shaker bottles and lids.

1218.   Dozens of consumer reviews clearly show there is no likelihood of confusion between the Accused Products and BlenderBottle's 626 Agitator Trade Dress.

1219.   Even if BlenderBottle does have some valid trade dress interest in its 626 Agitator Trade Dress, Hydra Cup's Accused Products do not infringe BlenderBottle's purported trade dress rights.

1220.   Furthermore, Hydra Cup's Accused Products do not infringe BlenderBottle's 626 Agitator Trade Dress because Hydra Cup's product designs and trade dress are distinct from BlenderBottle's 626 Agitator Trade Dress, and are not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1221.   To the extent that any similarities exist between the Accused Products and BlenderBottle's products, those similarities are based on functionality and common design elements that belong to the public domain and that are used by third parties such that there is no source identification arising therefrom.

1222.   Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe BlenderBottle's 626 Agitator Trade Dress and the Accused Products are not likely to be confused with BlenderBottle's 626 Agitator Trade Dress.

1223.   Accordingly, this Court should declare that the Accused Products do not infringe BlenderBottle's rights in its 626 Agitator Trade Dress.

**COUNTERCLAIM LVII: (DECLARATION THAT THE UNREGISTERED BOTTLE TRADE DRESS IS GENERIC)**

1224.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1225.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether Hydra Cup's Accused Products infringe BlenderBottle's Unregistered Bottle Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the Unregistered Bottle Trade Dress. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

1226.   BlenderBottle's claimed Unregistered Bottle Trade Dress is a generic shaker bottle design that is common in the industry, used by many different companies, and sold under a wide array of different brand names. The basic elements—a tall cylindrical bottle body, a recessed domed top, a pivoting top arm attached to brackets on one end with a spout guard that closes into the lid's spout on the other end —are ubiquitous features dictated by the function of securely containing, mixing, and dispensing liquids and powders, rather than serving as unique source identifiers.

1227.   Numerous third-party shaker bottles employ the same generic combination of a tall cylindrical body, recessed top, hinged lid, spout, and closure. This widespread use of the same basic design elements precludes BlenderBottle from claiming those common features as its own proprietary trade dress.

1228.   BlenderBottle's own utility patents, such as the 830 Patent, demonstrate that BlenderBottle has continually sought to protect the functional aspects of its claimed shaker bottle design. The utility patents extensively describe the utilitarian benefits of features like the recessed lid, drinking spout, and secure closure. This is strong evidence that the design is functional rather than ornamental.

1229.   The individual elements and overall configuration of the Unregistered Bottle Trade Dress are all dictated by the functional requirements of a shaker bottle - to efficiently contain, mix, and dispense liquids and powders. The design does not include any arbitrary embellishments that are conceptually separable from the bottle's function.

1230.   In sum, BlenderBottle's Unregistered Bottle Trade Dress is a generic design that consists of common functional features used across the shaker bottle industry. Such generic designs cannot be

trade dress, as a matter of law, regardless of sales, advertising, or other alleged secondary meaning. BlenderBottle has failed to identify any distinctive, non-functional features that warrant trade dress protection. Accepting BlenderBottle's position would improperly allow it to monopolize the basic design of shaker bottles, preventing competitors from using these essential functional features. The Court should therefore rule that BlenderBottle's claimed Unregistered Bottle Trade Dress is generic and unprotectable.

1231.  Hydra Cup is entitled to a declaration that the Unregistered Bottle Trade Dress is generic and therefore not protectable under federal trademark law.

**COUNTERCLAIM LVIII: (DECLARATION THAT THE UNREGISTERED BOTTLE TRADE DRESS IS PRIMARILY FUNCTIONAL)**

1232.  Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1233.  This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Bottle Trade Dress is not valid or protectable due to its primarily functional design covering a shaker bottle.

1234.  A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle alleged that it has valid and protectable trade dress rights in its Unregistered Bottle Trade Dress and that the Accused Products infringe BlenderBottle's purported trade dress rights.

1235.  BlenderBottle's Unregistered Bottle Trade Dress is primarily functional and therefore is not protectable as trade dress.

1236.  BlenderBottle has consistently promoted the functionality of its claimed shaker bottle design to the public, emphasizing the utilitarian advantages of features like the tall cylindrical body for mixing, the recessed top for securing the lid, the spout for controlled pouring, and the pivoting closure for sealing.

1237.   BlenderBottle's utility patents, such as the 830 Patent, describe in detail the functional benefits of the claimed shaker bottle design features. These utility patent filings are strong evidence that the design is primarily functional rather than ornamental.

1238.   The shape and features of the Unregistered Bottle Trade Dress are all dictated by the functional requirements of effectively containing, mixing, and dispensing liquids and powders. The tall cylindrical body allows for vigorous shaking and mixing, the recessed top accommodates the lid and forms a leak-resistant seal, the spout enables precise pouring, and the hinged cap securely closes the bottle. These features provide specific utilitarian advantages essential to the function of a shaker bottle.

1239.   Numerous companies in the industry sell shaker bottles with the same functional features claimed by BlenderBottle, confirming that the design is principally driven by function, not source identification. Dozens of third parties have sold millions of substantially identical shaker bottles for many years.

1240.   Accordingly, because BlenderBottle's Unregistered Bottle Trade Dress is primarily functional, it is not protectable as trade dress under the Lanham Act.

1241.   Hydra Cup is therefore entitled to a declaration that the shaker bottle design claimed by BlenderBottle's Unregistered Bottle Trade Dress is primarily functional and invalid as trade dress.

**COUNTERCLAIM LIX: (DECLARATION THAT THE UNREGISTERED BOTTLE TRADE DRESS HAS NOT ACQUIRED SECONDARY MEANING)**

1242.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1243.   This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Bottle Trade Dress is not valid or protectable because it is not distinctive and has not acquired secondary meaning.

1244.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether BlenderBottle's Unregistered Bottle Trade Dress is descriptive, lacks

distinctiveness, and has not acquired secondary meaning, and is thus not protectable as a trademark. BlenderBottle has alleged that Hydra Cup infringes the Unregistered Bottle Trade Dress. Hydra Cup denies those allegations and contends that the Unregistered Bottle Trade Dress is invalid.

1245.   The design elements of BlenderBottle's Unregistered Bottle Trade Dress, including the tall cylindrical bottle body, recessed domed lid, conical spout, brackets, and round base, are commonly used in shaker bottles and other beverage containers. These features are dictated by the functional requirements of containing, mixing, and dispensing liquids, rather than serving as unique source identifiers.

1246.   The USPTO has rejected BlenderBottle's application to register the Bottle Trade Dress, finding that the design elements are functional and that there are few alternative designs available for the goods described in the application.

1247.   Numerous third-party shaker bottles and beverage containers employ similar combinations of design elements, precluding BlenderBottle from claiming its Unregistered Bottle Trade Dress as a distinctive source identifier.

1248.   BlenderBottle has not demonstrated substantial, exclusive, and continuous use of the Unregistered Bottle Trade Dress for a sufficient period of time to establish secondary meaning. The crowded market of similar designs makes it unlikely that consumers associate the trade dress specifically with BlenderBottle.

1249.   BlenderBottle has not provided evidence of significant advertising expenditures or promotional efforts aimed at educating consumers to recognize the Unregistered Bottle Trade Dress as an indicator of BlenderBottle as the source of the products. Mere sales and general advertising are insufficient to prove secondary meaning.

1250.   There is no evidence of actual consumer confusion or intentional copying of the Unregistered Bottle Trade Dress by competitors, suggesting that the design has not acquired distinctiveness in the market.

1251.   To the extent the Unregistered Bottle Trade Dress incorporates any ornamental features, BlenderBottle has failed to plausibly plead those elements in a manner that would support a claim of inherent or acquired distinctiveness.

1252.   Given the functionality, commonplace nature, lack of exclusivity and duration of use, absence of targeted advertising and consumer recognition evidence, and failure to identify ornamental features, BlenderBottle's Unregistered Bottle Trade Dress has not acquired secondary meaning and is not protectable under the Lanham Act or common law.

1253.   Accordingly, there is an actual and justiciable controversy between the parties as to the descriptiveness, lack of distinctiveness, and absence of secondary meaning of BlenderBottle's Unregistered Bottle Trade Dress. Hydra Cup seeks a declaration from this Court that the Unregistered Bottle Trade Dress is not entitled to trademark protection.

**COUNTERCLAIM LVIII: (DECLARATION OF NONINFRINGEMENT OF THE UNREGISTERED BOTTLE TRADE DRESS)**

1254.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1255.   This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's Unregistered Bottle Trade Dress.

1256.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1257.   Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (b) constitute unfair competition or trademark infringement under state statutory or common law; (c) constitute dilution in violation of 15 U.S.C. § 1125(c) or state law; or (d) otherwise violate state or federal law.

1258.   Considering, among other things, the crowded shaker bottle market and millions of similar shaker bottles sold each year by numerous companies, there is no likelihood of confusion between the Accused Products and the shaker bottle design claimed by BlenderBottle's Unregistered Bottle Trade Dress.

1259.   Hydra Cup's Accused Products were designed and modeled after designs disclosed by Tianqi's D047 Patent and D029 Patent. Tens of millions of these exact same shaker bottle designs have been manufactured by Tianqi and sold to hundreds of companies that sell these same designs in the United States.

1260.   The Unregistered Bottle Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The design is not widely recognized by the general public as a designation of the source of BlenderBottle's goods.

1261.   Hydra Cup began using its shaker bottle designs, which are based on designs licensed from third party Tianqi, before BlenderBottle's Unregistered Bottle Trade Dress allegedly became famous. As such, Hydra Cup's use is not actionable under 15 U.S.C. § 1125(c)(1). Millions of these same shaker bottle designs have been sold throughout the United States for over a decade.

1262.   Hydra Cup's use of its shaker bottle designs does not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup bottles have numerous differences in shape, configuration, proportions, textures, and overall appearance compared to BlenderBottle's design. The products are being sold in similar channels to similar consumers, which negates any dilution by blurring.

1263.   Hydra Cup always displays its own distinct brand name and logo on its products and packaging, further distinguishing them from BlenderBottle's goods and dispelling any likelihood of dilution or confusion.

1264.   Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute infringement of BlenderBottle's alleged trade dress rights.

1265.   Hydra Cup's prominent marking of its shaker bottles with its own well-known trademarks precludes any likelihood of confusion as to the source or affiliation of Hydra Cup's products.

1266.   Consumer reviews confirm there is no actual confusion between the Accused Products and BlenderBottle's Unregistered Bottle Trade Dress.

1267.   Even if BlenderBottle could establish some valid trade dress rights in its Unregistered Bottle Trade Dress, Hydra Cup's Accused Products do not infringe those rights.

1268.   Hydra Cup's Accused Products do not infringe BlenderBottle's Unregistered Bottle Trade Dress because Hydra Cup's product designs and trade dress are distinct and not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1269.   To the extent any similarities exist between the Accused Products and BlenderBottle's design, those similarities are based on functionality and common elements in the public domain, used by third parties, such that there is no source identification.

1270.   Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe BlenderBottle's Unregistered Bottle Trade Dress and that the Accused Products are not likely to be confused and do not infringe the Unregistered Bottle Trade Dress.

**COUNTERCLAIM LIX: (DECLARATION THE UNREGISTERED LABEL TRADE DRESS IS GENERIC)**

1271.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1272.   This is a declaratory judgment action under the Trademark Laws of the United States, 15 U.S.C. § 1051 et seq. (the "Trademark Act"), and 28 U.S.C. §§ 2201 and 2202 (the Declaratory Judgment Act) seeking a declaratory judgment that BlenderBottle's Unregistered Label Trade Dress is generic.

1273.   An actual, present, and justiciable controversy exists between Hydra Cup and BlenderBottle concerning whether Hydra Cup's Accused Products infringe BlenderBottle's Unregistered Label Trade Dress. Furthermore, the parties are currently in litigation regarding, in part, BlenderBottle's belief that Hydra Cup infringed the Unregistered Label Trade Dress. Thus, as a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy to warrant the issuance of a declaratory judgment.

1274.   BlenderBottle's claimed Unregistered Label Trade Dress is a generic label design commonly used in the industry. The basic elements - a wraparound label with a brand name, product name, capacity information, and colored accents - are ubiquitous features dictated by the need to convey basic product information, rather than serving as unique source identifiers.

1275.   Numerous third-party shaker bottle labels employ the same generic combination of a wraparound label, brand name, product name, capacity, and accent colors. This widespread use of the same basic label elements precludes BlenderBottle from claiming those common features as its own proprietary trade dress.

1276.   The individual elements and overall configuration of the Unregistered Label Trade Dress are all dictated by the functional requirements of clearly displaying essential product information to consumers. The design does not include any arbitrary embellishments that are conceptually separable from the label's informational function.

1277.   In sum, BlenderBottle's Unregistered Label Trade Dress is a generic design that consists of common informational features used across the industry. Such generic designs cannot be trade dress, as a matter of law, regardless of sales, advertising, or other alleged secondary meaning. BlenderBottle has failed to identify any distinctive, non-functional features that warrant trade dress protection. Accepting BlenderBottle's position would improperly allow it to monopolize the basic design of shaker bottle labels, preventing competitors from using these essential informational features. The Court should therefore rule that BlenderBottle's claimed Unregistered Label Trade Dress is generic and unprotectable.

1278.   Hydra Cup is entitled to a declaration that the Unregistered Label Trade Dress is generic and therefore not protectable under federal trademark law.

**COUNTERCLAIM LX: (DECLARATION THAT THE UNREGISTERED LABEL TRADE DRESS IS PRIMARILY FUNCTIONAL)**

1279.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1280.   This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Label Trade Dress is not valid or protectable due to its primarily functional design.

1281.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle alleged that it has valid and protectable trade dress rights in its Unregistered Label Trade Dress and that the Accused Products infringe BlenderBottle's purported trade dress rights.

1282.   BlenderBottle's Unregistered Label Trade Dress is primarily functional and therefore is not protectable as trade dress.

1283.   The individual elements and overall configuration of the Unregistered Label Trade Dress are all dictated by the functional need to clearly convey essential product information to consumers, such as the brand, product name, and capacity. The layout, colors, and text are selected to optimize legibility, not to serve as unique source identifiers.

1284.   The wraparound label design allows the product information to be displayed prominently and permits consumers to easily view it from multiple angles. This is a functional requirement for any informational label on a cylindrical bottle.

1285.   The Unregistered Label Trade Dress simply assembles common informational elements (brand name, product name, capacity) in a standard label configuration (wraparound design, colored accents). This basic combination is driven by the functional purpose of providing product details in a clear manner, not by any source-identifying role.

1286.   Numerous companies in the industry use functionally equivalent labels with the same key informational elements in a similar configuration, confirming that the design is principally dictated by function, not source identification.

1287.   Accordingly, because BlenderBottle's Unregistered Label Trade Dress is primarily functional, it is not protectable as trade dress under the Lanham Act.

1288.   Hydra Cup is therefore entitled to a declaration that the shaker bottle label design claimed by BlenderBottle's Unregistered Label Trade Dress is primarily functional and invalid as trade dress.

**COUNTERCLAIM LXI: (DECLARATION THAT THE UNREGISTERED LABEL TRADE DRESS HAS NOT ACQUIRED SECONDARY MEANING)**

1289.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1290.   This is a cause of action for declaratory judgment that BlenderBottle's Unregistered Label Trade Dress is not valid or protectable due to lack of acquired distinctiveness and that the Unregistered Label Trade Dress has not acquired secondary meaning.

1291.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that the Accused Products infringe BlenderBottle's purported trade dress rights.

1292.   BlenderBottle's Unregistered Label Trade Dress is not inherently distinctive as a matter of law and has not acquired secondary meaning in the minds of consumers as indicating a single source, affiliation, or sponsorship.

1293.   BlenderBottle's Unregistered Label Trade Dress does not serve as a source indicator due to the prevalence of third-party shaker bottles exhibiting labels with the same basic elements claimed by BlenderBottle. Numerous competitors use labels with a brand name, product name, capacity, and accent colors in a similar configuration.

1294.  Because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's manufacture, distribution, and sale of its Accused Products cannot constitute unfair competition or infringement of BlenderBottle's alleged trade dress rights.

1295.  Hydra Cup's prominent use of its own distinct brand name, logo, and label design precludes any likelihood of confusion as to the source or other affiliation of Hydra Cup's products.

1296.  Accordingly, BlenderBottle's Unregistered Label Trade Dress is invalid and unenforceable.

**COUNTERCLAIM LXII: (DECLARATION OF NONINFRINGEMENT OF THE UNREGISTERED LABEL TRADE DRESS)**

1297.  Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1298.  This is a cause of action for declaratory judgment that the Accused Products do not infringe BlenderBottle's Unregistered Label Trade Dress.

1299.  A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trade dress and that Hydra Cup's Accused Products infringe BlenderBottle's purported trade dress rights.

1300.  Hydra Cup's use of the Accused Products does not and will not, (a) cause confusion or mistake or deceive the public in violation of Lanham Act § 43(a) (15 U.S.C. § 1125(a)); (b) constitute unfair competition or trademark infringement under state statutory or common law; (c) constitute dilution in violation of 15 U.S.C. § 1125(c) or state law; or (d) otherwise violate state or federal law.

1301.  Considering the crowded shaker bottle market and the common use of labels displaying brand names, product names, and capacity information in similar configurations, there is no likelihood of confusion between the Accused Products and the label design claimed by BlenderBottle's Unregistered Label Trade Dress.

1302.   Hydra Cup's labels use a different layout, color scheme, graphical elements, and text compared to BlenderBottle's label design. Hydra Cup prominently features its own distinct "HYDRA CUP" brand name in a unique font and style.

1303.   The Unregistered Label Trade Dress is not famous and has not achieved the requisite level of recognition among the general consuming public to be eligible for dilution protection under 15 U.S.C. § 1125(c). The design is not widely recognized by the general public as a designation of the source of BlenderBottle's goods.

1304.   Hydra Cup's label designs do not dilute, blur, or tarnish the distinctiveness of BlenderBottle's alleged trade dress. The accused Hydra Cup labels have numerous differences in layout, colors, text, and overall appearance compared to BlenderBottle's design.

1305.   Hydra Cup always displays its own distinct brand name and logo on its labels, further distinguishing them from BlenderBottle's labels and dispelling any likelihood of dilution or confusion.

1306.   Furthermore, as discussed above, because BlenderBottle does not have a valid and protectable trade dress, Hydra Cup's use of its own label designs on the Accused Products cannot constitute infringement of BlenderBottle's alleged trade dress rights.

1307.   Consumer reviews confirm there is no actual confusion between the Accused Products and BlenderBottle's Unregistered Label Trade Dress.

1308.   Even if BlenderBottle could establish some valid trade dress rights in its Unregistered Label Trade Dress, Hydra Cup's Accused Products do not infringe those rights.

1309.   Hydra Cup's labels do not infringe BlenderBottle's Unregistered Label Trade Dress because Hydra Cup's label designs are distinct and not likely to cause consumer confusion as to source, sponsorship, or affiliation.

1310.   To the extent any similarities exist between Hydra Cup's labels and BlenderBottle's label design, those similarities are based on common informational elements used across the industry, such that there is no source identification.

1311.   Hydra Cup is entitled to a declaratory judgment that it has not infringed and does not infringe BlenderBottle's Unregistered Label Trade Dress and Hydra Cup's labels are not likely to be confused with BlenderBottle's alleged trade dress.

1312.   Accordingly, this Court should declare that Hydra Cup's Accused Products do not infringe BlenderBottle's rights in its Unregistered Label Trade Dress.

**COUNTERCLAIM LXIII: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 3,515,591 FOR THE TERM "BLENDER BALL" IS GENERIC, NOT PROTECTABLE UNDER THE LANHAM ACT, AND THEREFORE CANCELED)**

1313.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1314.   BlenderBottle owns U.S. Trademark Registration No. 3,515,591 for the term BLENDER BALL in International Class 021 for "Whisks, namely, agitators for mixing and blending food and drinks."

1315.   This is a cause of action for declaratory judgment that U.S. Trademark Registration No. 3,515,591 for the term BLENDER BALL is generic.

1316.   A justiciable case or actual controversy has arisen and exists between Hydra Cup and BlenderBottle because in the Complaint filed in the present action, BlenderBottle has alleged that it has a valid and protectable trademark and that Hydra Cup infringes BlenderBottle's purported trademark rights.[182]

1317.   The term "blender ball" is generic for agitators used for mixing and blending food and drinks. It combines the generic terms "blender," referring to a device that mixes or blends substances, and "ball," referring to the spherical shape of the agitator. The term "blender ball" as a whole is no more

---

[182] (*See* Second Am. Compl., ¶ 46.).

than the sum of its generic parts and is widely used by consumers and the trade to refer to the genus of spherical mixing agitators.

1318.   Numerous third parties use the term "blender ball" generically to describe their own spherical mixing agitators for blending food and drinks.[183] Examples include the "Blender Bomb Blender Ball" by 1st Phorm, the "Blender Ball" by Gaspari Nutrition, the "Blender Ball" by SmartShake, the "Vortex Blender Ball" by Trimr, and many others. This widespread generic use by competitors confirms that "blender ball" is a generic term.

1319.   BlenderBottle's own generic use of "blender ball" is further evidence that the term is generic. BlenderBottle uses "blender ball" generically throughout its website, product packaging, and marketing materials to describe the genus of mixing agitators, not as a unique source identifier. For example, BlenderBottle's website states: "The surgical-grade stainless steel BlenderBall® is designed to remain in the cup while you drink, even if you're drinking plain water. It's designed to never rust, chip, or peel."

1320.   BlenderBottle has also used "blender ball" generically in its utility and design patent filings. For example, BlenderBottle's expired U.S. Patent No. 6,379,032 is titled "Blender Ball" and generically describes a "wire whisk mixing apparatus having hemispherical mixing cavities for use in a container intended to hold liquid."

1321.   Under the Lanham Act, if a registered mark becomes the generic name for the goods or services for which it is registered, the registration is subject to cancellation. 15 U.S.C. § 1064(3). A mark is generic if it refers to the class or category of goods or services on or in connection with which it is used.

1322.   Based on the overwhelming evidence that "blender ball" is a generic term for spherical mixing agitators used to blend food and drinks, the 591 Registration is invalid and should be cancelled on the ground of genericness. Hydra Cup is being damaged by the continued registration of this generic

---

[183] *See, e.g.*, Ex. 97, Screenshots of BlenderBottle Classic Sold on Amazon Under Different Brand Names from 2012 from Internet Archive (21 February 2012) (showing the term "blender bottle" and "blender ball" were used on Amazon in 2012 as a "keyword that's strongly related to this product" along with "shaker cup", "protein shaker", and "hand mixer", indicating the term is necessary for consumers to describe the category of product they seek.).

1    term, which BlenderBottle has asserted against Hydra Cup in this litigation to allege infringement and

2    exclude Hydra Cup from using the common generic name for its agitator products.

3    1323.   Hydra Cup has standing to petition to cancel the 591 Registration based on its demonstrated

4    interest in using the term "blender ball" to describe its own products, as well as its reasonable belief

5    that it will be damaged by the continued registration of this generic term.

6    1324.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's

7    BLENDERBOTTLE Mark in that Hydra Cup is prevented from using highly descriptive terms that

8    belong to the public domain.

9    1325.   Hydra Cup is entitled to a declaration that U.S. Trademark Registration No. 3,515,591 for the term

10    BLENDERBOTTLE is generic and therefore not protectable.

11    1326.   Accordingly, Hydra Cup respectfully requests that the Court declare the term "blender ball" to

12    describe a spherical mixing agitator is generic and that the Court enter an order cancelling U.S.

13    Trademark Registration No. 3515591 as generic.

14    1327.   BlenderBottle's U.S. Trademark Registration No. 3,515,591 for the term BLENDER BALL should

15    be cancelled pursuant to 15 U.S.C. §§ 1064(3) and 1119 as the alleged trademark is generic and

16    therefore cannot possibly identify any single source.

17    **COUNTERCLAIM LXIV: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION**
18    **NO. 4,894,363 FOR THE TERM "BLENDERBOTTLE" IS GENERIC, NOT PROTECTABLE UNDER THE**
19    **LANHAM ACT, AND THEREFORE CANCELED)**

20    1328.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of

21    this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

22    1329.   BlenderBottle owns U.S. Trademark Registration No. 4,894,363 for the term BlenderBottle. in

23    International Class 021 for the following goods: "Containers for household or kitchen use, namely,

24    bottles with internal agitators for mixing ingredients; Mixing cups, namely, shaker cups, sold empty;

25    Containers for household or kitchen use, namely, bottles with non-electric internal agitators for

26    mixing ingredients, for beverages, liquid foods, and/or powdered foods, sold empty; Containers for

1   household or kitchen use, namely, interlocking plastic or glass containers with optional carrying

2   handle, sold empty; Containers for household or kitchen use, namely, plastic, glass and stainless steel

3   containers for use with beverages, liquid foods, dry and/or powdered foods, sold empty; Containers

4   for household or kitchen use; Household containers for foods; Plastic storage containers for

5   household or domestic use; Containers for personal household use for food, medications, vitamins

6   and supplements, water and/or beverages, sold empty; Whisks, namely, agitators for mixing and

7   blending food and drinks; Insulated water bottle holders in the nature of thermal insulated wrap for

8   containers to keep the contents cold [ ; Water bottle belts for running, hiking, biking; Plastic water

9   bottle holders and attached carabiner clip sold as a unit ]".

10   1330.   This is a cause of action for declaratory judgment that the U.S. Trademark Registration

11   No. 4,894,363 for the term BLENDERBOTTLE is generic for shaker bottles.

12   1331.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and

13   BlenderBottle regarding the terms "blender bottle" and "blender ball" because in the Complaint filed

14   in the present action, BlenderBottle alleged that it has a valid and protectable trade dress rights in the

15   Asserted Trade Dresses, which claims rights in its "classic simple shaker" bottle and lid design—aka

16   the "BlenderBottle"—that is at the center of every dispute in this case. Furthermore, upon information

17   and belief, as part of the disputes in this case, BlenderBottle is demanding that Hydra Cup completely

18   cease and desist from using the terms "blenderbottle," "blender ball," and other related terms; but

19   these terms are absolutely essential to compete in the shaker bottle market because they describe and

20   directly identify the category of products that both parties sell—i.e., the "classic simple shaker"

21   bottle, lid, and agitator. Put differently, without the terms "blenderbottle," "blender ball," and related

22   terms, competitors cannot fairly compete in the market. Accordingly, Hydra Cup understands

23   BlenderBottle intends to file a lawsuit over Hydra Cup's use of the terms "blenderbottle," "blender

24   ball," and related terms.

25   1332.   BlenderBottle's registered trademark for the term BLENDERBOTTLE is generic and therefore not

26   entitled to trademark protection.

1333.   The consuming public uses the term "BLENDERBOTTLE" to refer to the genus or class of which a particular product is a member.[184] The term "BLENDERBOTTLE" is not protectable as trademarks because it does not identify the source of a product, but rather the product itself.

1334.   The term "blender bottle" is a generic name for the class of products that BlenderBottle sells—namely, bottles with built-in mixing mechanisms for blending beverages. The term "blender" describes the function of the product—blending or mixing—while the term "bottle" describes the type of product (a container for holding liquids). Putting these two generic terms together to form the compound term "blender bottle" does not create a protectable trademark. Rather, "blender bottle" remains a generic term that consumers understand to refer to the class of products, not a single brand.

1335.   Numerous third-parties in the industry use the term "blender bottle" generically to describe their products.[185] A simple Google search for "blender bottle" returns dozens of results for various brands of shake mixer bottles, not just BlenderBottle's products. This widespread generic use of the term by competitors and consumers shows that "blender bottle" is a generic product name, not a brand-specific trademark.

1336.   Upon information and belief, hundreds of customer reviews on Amazon, YouTub, Instagram, Ebay, and other popular online websites show consumers generally use the verbs "blender bottle" and "shaker bottle" interchangeably as a verb to describe the functionality of a manual blending apparatus. And the Internet Archive shows such generic use of the term has been consistent over time.

1337.   For example, Google Trends data shows largely interchangeable and coextensive use of "blender bottle" and "shaker bottle" over an 18-year period is strong evidence that consumers perceive "blender bottle" as a generic term for the class of shake mixer bottles, rather than as a distinctive brand. This data confirms that "blender bottle" is not functioning as a source identifier deserving of trademark protection, thereby further showing that BlenderBottle's BLENDER BOTTLE mark is

---

[184] *See, e.g.*, Ex. 53, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023) ("repeatedly using the term"blender bottle" to refer to an entire category of specific products).

[185] *See, e.g.*, Ex. 97, Screenshots of BlenderBottle Classic Sold on Amazon Under Different Brand Names from 2012 from Internet Archive (21 February 2012) (showing the terms "blender bottle" and "blender ball" were used on Amazon in 2012 as a "keyword that's strongly related to this product" along with "shaker cup", "protein shaker", and "hand mixer", indicating the term is necessary for consumers to describe the category of product they seek.).

generic and should be canceled. The attached Google Trends graph compares the relative search interest over time for the terms "blender bottle" and "shaker bottle" from January 2004 to the present day. This data provides compelling evidence that the term "blender bottle" is generic and not protectable as a trademark. First, the graph shows that "blender bottle" and "shaker bottle" have had very similar levels of search interest over the past 18 years. In many periods, the search interest for the two terms is nearly identical, with the lines overlapping or closely tracking each other. This parallel interest strongly suggests that consumers see "blender bottle" and "shaker bottle" as interchangeable, generic terms for the same category of products, rather than viewing "blender bottle" as a brand-specific trademark. Second, the overall volume of searches for "blender bottle" and "shaker bottle" is roughly equivalent over the full time period. Neither term consistently outpaces the other, indicating that both are commonly used by the public to refer to the same type of goods. If "blender bottle" was functioning as a distinctive source identifier, one would expect to see it garner significantly more search interest than the generic "shaker bottle" term, but that is not the case here. Third, the graph shows that interest in both "blender bottle" and "shaker bottle" has grown substantially since 2004 and particularly in the last 5-10 years. This rising interest tracks the increasing popularity of these products in the marketplace. Notably, both terms have seen similar growth trajectories, suggesting the public sees them as interrelated and referring to the same trending product category. Fourth, there does not appear to be any significant divergence between the search interest for "blender bottle" and "shaker bottle" following BlenderBottle's claimed first use of the BLENDER BOTTLE mark in January 2004. If the term "blender bottle" had acquired secondary meaning as a trademark, one would expect the search volume for that term to decouple from the generic "shaker bottle" term and grow independently as the brand gained popularity. The absence of any such trend indicates consumers continue to see "blender bottle" primarily as a generic product name, not a brand.[186]

1338.   Upon information and belief, a majority of consumers understand "blender bottle" to be a generic term. Upon information and belief, when asked "What is a BLENDERBOTTLE?", most consumers give a generic descriptions like "a water bottle with something inside to help mix the contents" or "a

---

[186] *See* Ex. 55, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024).

drink container that has an insert for blending or mixing what you put in it." Upon information and belief, only a small percentage of relevant consumers mentioned BlenderBottle as a brand. Upon information and belief, there is strong evidence that most consumers primarily understand "blender bottle" to mean the class of products, not BlenderBottle's brand.

1339.   BlenderBottle cannot escape the genericness of its mark by capitalizing the "B" in BLENDERBOTTLE or deleting the space between the words. These minor stylizations do not change the generic nature of the term. Consumers who see the term BLENDERBOTTLE still immediately understand it to refer to the class of blender bottles, even if they also recognize BlenderBottle as one brand within that class.

1340.   The fact that the USPTO registered the BLENDERBOTTLE mark on the Principal Register is not dispositive. Those proceedings did not involve the same evidentiary record presented here. The presumption of validity is rebuttable by the greater weight of evidence in this case showing genericness.

1341.   The genericness of BLENDERBOTTLE is further demonstrated by BlenderBottle's lack of enforcement against the many competitors using "blender bottle" to describe their products. If the term was a valid trademark, BlenderBottle would be expected to police the market and prevent competitors from using the term. Its failure to do so shows that even BlenderBottle recognizes "blender bottle" is a generic term.

1342.   The evidence overwhelmingly shows that consumers primarily understand BLENDERBOTTLE to be a generic term for the class of shake mixer bottles, not a trademark identifying the source of BlenderBottle's products. Accordingly, the Court should cancel BlenderBottle's trademark registration and rule that BLENDERBOTTLE is unprotectable as a matter of law.

1343.   Hydra Cup is likely to be damaged by the continued registration of BlenderBottle's U.S. Trademark Registration No. 4,894,363 in that Hydra Cup is prevented from using highly descriptive terms that belong to the public domain.

1344.   Hydra Cup is entitled to a declaration that U.S. Trademark Registration No. 4,894,363 for the term BLENDERBOTTLE is generic and therefore not protectable.

1345.   Accordingly, BlenderBottle's U.S. Trademark Registration No. 4,894,363 for the term BLENDERBOTTLE should be cancelled pursuant to 15 U.S.C. §§ 1064(3) and 1119 as the alleged trademark is generic and therefore cannot possibly identify any single source.

**COUNTERCLAIM LXV: (Declaratory Judgment that U.S. Trademark Registration No. 4,894,363 (The BLENDERBOTTLE Mark) has Not Developed Secondary Meaning)**

1346.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1347.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the terms "blender bottle" and "blender ball" because in the Complaint filed in the present action, BlenderBottle alleged that it has a valid and protectable trade dress rights in the Asserted Trade Dresses, which claims rights in its "classic simple shaker" bottle and lid design—aka the "BlenderBottle"—that is at the center of every dispute in this case. Furthermore, upon information and belief, as part of the disputes in this case, BlenderBottle is demanding that Hydra Cup completely cease and desist from using the terms "blenderbottle," "blender ball," and other related terms; but these terms are absolutely essential to compete in the shaker bottle market because they describe and directly identify the category of products that both parties sell—i.e., the "classic simple shaker" bottle, lid, and agitator. Put differently, without the terms "blenderbottle," "blender ball," and related terms, competitors cannot fairly compete in the market.[187] Accordingly, Hydra Cup understands BlenderBottle intends to file a lawsuit over Hydra Cup's use of the terms "blenderbottle," "blender ball," and related terms.

1348.   BlenderBottle is the owner of U.S. Trademark Registration No. 4,894,363 for the mark BLENDERBOTTLE for "Plastic bottles sold empty; plastic bottles sold containing an agitator for mixing contents" (the "'363 Registration").

---

[187] (*See* Second Am. Compl., ¶ 46.).

1349.   The BLENDERBOTTLE Mark is highly descriptive of BlenderBottle's goods, as it directly conveys the nature and key characteristics of the goods - namely, bottles designed for blending and mixing contents.

1350.   Due to the descriptive nature of the BLENDERBOTTLE mark, it is not inherently distinctive and can only be protected upon a showing of acquired distinctiveness or secondary meaning.

1351.   The BLENDERBOTTLE mark has not acquired distinctiveness or secondary meaning in the minds of the consuming public. Consumers perceive the mark as a generic term describing the type of product - a bottle used for blending - rather than as a distinctive brand signifying BlenderBottle as the exclusive source of the goods.

1352.   BlenderBottle's own use of the BLENDERBOTTLE mark, as well as widespread use by third parties and consumers, demonstrates the mark's primary significance as a descriptive term for the goods, not as a source identifier.

1353.   BlenderBottle's sales, advertising, and promotional efforts related to the BLENDERBOTTLE mark are insufficient to establish secondary meaning or transform the descriptive term into a distinctive brand in the minds of consumers.

1354.   Accordingly, there is an actual and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity and enforceability of the '363 Registration.

1355.   Pursuant to 28 U.S.C. §§ 2201-2202, Hydra Cup seeks a declaration from this Court that the BLENDERBOTTLE mark has not acquired distinctiveness and that the '363 Registration is invalid and unenforceable.

**COUNTERCLAIM LXVI: (DECLARATORY JUDGMENT THAT U.S. TRADEMARK REGISTRATION NO. 3,515,591 (THE BLENDER BALL MARK) HAS NOT ACQUIRED DISTINCTIVENESS)**

1356.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1357.   There is an actual, substantial, continuing, and justiciable controversy between Hydra Cup and BlenderBottle regarding the terms "blender bottle" and "blender ball" because in the Complaint filed in the present action, BlenderBottle alleged that it has a valid and protectable trade dress rights in the Asserted Trade Dresses, which claims rights in its "classic simple shaker" bottle and lid design—aka the "BlenderBottle"—that is at the center of every dispute in this case. Furthermore, upon information and belief, as part of the disputes in this case, BlenderBottle is demanding that Hydra Cup completely cease and desist from using the terms "blenderbottle," "blender ball," and other related terms; but these terms are absolutely essential to compete in the shaker bottle market because they describe and directly identify the category of products that both parties sell—i.e., the "classic simple shaker" bottle, lid, and agitator. Put differently, without the terms "blenderbottle," "blender ball," and related terms, competitors cannot fairly compete in the market.[188] Accordingly, Hydra Cup understands BlenderBottle intends to file a lawsuit over Hydra Cup's use of the terms "blenderbottle," "blender ball," and related terms.

1358.   BlenderBottle is the owner of U.S. Trademark Registration No. 3,515,591 for the mark BLENDER BALL for "Wire whisk balls for mixing and blending contents of bottles or containers that include integrated mixing systems" (the "'591 Registration").

1359.   The BLENDER BALL mark is highly descriptive of BlenderBottle's goods, as it directly conveys the key characteristics and function of the goods - specifically, spherical wire agitators used to blend and mix the contents of bottles.

1360.   Due to the descriptive nature of the BLENDER BALL mark, it is not inherently distinctive and can only be protected upon a showing of acquired distinctiveness or secondary meaning.

1361.   The BLENDER BALL mark has not acquired distinctiveness or secondary meaning in the minds of the consuming public. Consumers perceive the mark as a generic term describing the type of product - a spherical wire blending agitator - rather than as a distinctive brand signifying BlenderBottle as the exclusive source of the goods.

---

[188] (*See* Second Am. Compl., ¶ 46.).

1362.   BlenderBottle's own use of the BLENDER BALL mark, as well as widespread use by third parties and consumers, demonstrates the mark's primary significance as a descriptive term for the goods, not as a source identifier.

1363.   BlenderBottle's sales, advertising, and promotional efforts related to the BLENDER BALL mark are insufficient to establish secondary meaning or transform the highly descriptive term into a distinctive brand in the minds of consumers.

1364.   Accordingly, there is an actual and justiciable controversy between Hydra Cup and BlenderBottle regarding the validity and enforceability of the '591 Registration.

1365.   Pursuant to 28 U.S.C. §§ 2201-2202, Hydra Cup seeks a declaration from this Court that the BLENDER BALL mark has not acquired distinctiveness and that the '591 Registration is invalid and unenforceable.

**COUNTERCLAIM LXVII: (DECLARATORY JUDGMENT THAT THE USE OF THE TERMS "BLENDERBOTTLE" AND "BLENDER BALL" CONSTITUTES PERMISSIBLE FAIR USE)**

1366.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1367.   An actual controversy exists between Hydra Cup and BlenderBottle as to whether use of the terms "BLENDERBOTTLE" to describe a shaker bottle that allows manually blending liquids "BLENDER BALL" to describe a wire whisk mixing ball constitutes trademark infringement.

1368.   The public, including Hydra Cup, needs the term "BLENDERBOTTLE" to accurately describe the functionality of shaker bottles, which allow users to manually blend protein shakes, smoothies, and other drinks by shaking the bottle. The term communicates and describes to consumers the utilitarian purpose and characteristics of shaker bottle products.

1369.   Similarly, the public, including Hydra Cup, needs "BLENDER BALL" to truthfully describe the wire whisk mixing apparatus included in its shaker bottles to blend the contents. The term literally describes what the device is and does—a ball-shaped implement that helps blend liquids.

1370.   Hydra Cup does not use the terms "BLENDERBOTTLE" or "BLENDER BALL" as trademarks to indicate the source of its products. Hydra Cup prominently displays its own distinctive "HYDRA CUP" trademark on its shaker bottles to designate their origin. Any use of "BLENDERBOTTLE" or "BLENDER BALL" is strictly for the terms' common descriptive meanings, not as source identifiers.

1371.   Hydra Cup's use of "BLENDERBOTTLE" and "BLENDER BALL" is also fair and in good faith. Hydra Cup does not use the terms in a deceptive or misleading manner. Its placement and use of the terms alongside its own branding minimizes any risk that consumers will understand them as trademarks.

1372.   Under 15 U.S.C. § 1115(b)(4), Hydra Cup is permitted to use the terms "BLENDERBOTTLE" and "BLENDER BALL" fairly and in good faith to describe the characteristics and functionality of its products. Hydra Cup is not prevented from using these terms in their ordinary descriptive sense.

1373.   BlenderBottle's linguistic monopoly on the terms "BLENDERBOTTLE" and "BLENDER BALL" is robbing the public of words necessary to the English language. Hydra Cup therefore contends that any use of the terms constitutes descriptive fair.

1374.   Accordingly, Hydra Cup seeks a declaratory judgment that the descriptive use of "BLENDERBOTTLE" to accurately depict a shaker bottle that blends liquids manually, and "BLENDER BALL" to truthfully describe a mixing ball that blends the bottle's contents, is permissible fair use and does not infringe U.S. Trademark Registration No. 3,515,591 or U.S. Trademark Registration No. 4,894,363 that are owned by BlenderBottle.

**COUNTERCLAIM LXVIII: PATENT INFRINGEMENT OF U.S. PATENT NO. D666,047.**

1375.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1376.   Tianqi conveyed all substantial rights in the D047 Patent to Hydra Cup in September 2022 under the terms of the D047 Patent License Agreement.[189] The D047 License Agreement granted Hydra Cup exclusive and substantial rights in the D047 Patent, including "the first right, but not the obligation, to

---

[189] (Ex. 48, License Agreement Between Tianqi and Hydra Cup for U.S. Patent No. D666,047 (27 September 2022)).

1    bring an infringement action to enforce the Licensed [D047] Patent, to defend any declaratory

2    judgment action, and take any other legal action necessary to protect the Licensed [D047] Patent."[190]

3    1377.   BlenderBottle has been and is infringing Hydra Cup's rights in the D047 Patent by making, using,

4         selling, or offering for sale in the United States, or importing into the United States, including within

5         this judicial district, shaker bottles and lids that embody the design claimed in the D047 Patent,

6         including BlenderBottle's Infringing Products, in violation of 35 U.S.C. § 271(a).

7    1378.   BlenderBottle has knowingly, intentionally, and willfully infringed the D047 Patent by making,

8         using, selling, offering for sale, and/or importing products, including BlenderBottle's Infringing

9         Products, that have designs that infringe the D047 Patent.

10   1379.   The side-by-side visual comparison of the D047 Patent and BlenderBottle's Infringing Products

11        shown below establishes that, in the eye of the ordinary observer, giving such attention as a purchaser

12        usually gives, the design of BlenderBottle's Infringing Products are substantially the same as the

13        claimed design of the D047 Patent, because the resemblance is such as to deceive such an observer

14        inducing him to purchase one supposing it to be the other. BlenderBottle's Infringing Products

15        slavishly copy the D047 Patent's overall shape and configuration as well as its prominent design

16        elements comprising its shape and configuration, including the domed lid body design, its spout and

17        spout guard design, the brackets, and the pivoting top arm as well as the tall cylindrical shape of the

18        bottle body and the measurement markings, just to name a few. As a result, BlenderBottle has

19        infringed the D047 Patent.

---

1    [190] *See id*. at Provision 5.



Hydra Cup's Licensed D047 Patent vs. BlenderBottle's Infringing Products

*BlenderBottle's Infringing Products: BlenderBottle Classic V2—BB-0038396 (BB-0038396), BlenderBottle ProStack (BB-0038397), The BlenderBottle Pro (BB-0038398), BlenderBottle Classic V1 (BB-00383100)*

1380.   As seen above, when comparing the representative figure from the D047 Patent with BlenderBottle's Infringing Products, BlenderBottle's Infringing Products are clearly "substantially similar" to the shaker bottle and lid design claimed by the D047 Patent.

1381.   Upon information and belief, BlenderBottle has been and is inducing infringement of the D047 Patent by actively and knowingly inducing others to make, use, sell, offer for sale, or import BlenderBottle's Infringing Products that embody or use the design claimed in the D047 Patent, in violation of 35 U.S.C. § 271(b).

1382.   Upon information and belief, BlenderBottle has been and is contributing to the infringement of the D047 Patent by selling or offering to sell BlenderBottle's Infringing Products, knowing them to be especially made or especially adapted for practicing the invention of the D047 Patent and not a staple article or commodity of commerce suitable for substantial non-infringing use, in violation of 35 U.S.C. § 271(c).

1383.   BlenderBottle has knowledge that its activities concerning its Infringing Products infringe the claim of the D047 Patent. On information and belief, BlenderBottle will continue to encourage, aid, or otherwise cause third parties to import, sell, offer for sale, and use the Infringing Products, and BlenderBottle has and will continue to encourage those acts with the specific intent to infringe one or more claims of the D047 Patent. Further, BlenderBottle provides information and technical support to its customers, including product manuals, brochures, videos, demonstrations, and website materials, encouraging and instructing its customers and use BlenderBottle's Infringing Products. Alternatively, BlenderBottle knows and/or will know that there is a high probability that the importation, sale, offer for sale, and use of the Infringing Products constitutes direct infringement of the D047 Patent but took deliberate actions to avoid learning of these facts.

1384.   On information and belief, BlenderBottle has made no attempt to design around the claims of the D047 Patent.

1385.   On information and belief, BlenderBottle did not have a reasonable basis for believing that the claims of the D047 Patent were invalid.

1386.   On information and belief, BlenderBottle's Accused Products are available to businesses and individuals throughout the United States and in the State of California, including in this district.

1387.   BlenderBottle's acts of infringement of the D047 Patent have caused and will continue to cause Hydra Cup damages for which Hydra Cup is entitled to compensation pursuant to 35 U.S.C. § 284.

1388.   BlenderBottle's acts of infringement of the D047 Patent have caused and will continue to cause Hydra Cup immediate and irreparable harm unless such infringing activities are enjoined by this Court pursuant to 35 U.S.C. § 283. Hydra Cup has no adequate remedy at law.

1389.   This case is exceptional and, therefore, Hydra Cup is entitled to an award of attorneys' fees pursuant to 35 U.S.C. § 285.

**COUNTERCLAIM LXX: (TRADE DRESS INFRINGEMENT UNDER 15 U.S.C. § 1125(A))**

1390.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1391.   Hydra Cup is the owner of unregistered trade dress rights in the overall appearance and design of its OG DualShaker product identified by the distinctive OG DualShaker Trade Dress.

1392.   Hydra Cup has been using its OG Dual Shaker Trade Dress in commerce continuously since April 2012.[191] The OG DualShaker Trade Dress is inherently distinctive and nonfunctional. Hydra Cup has extensively and continuously promoted and used the OG DualShaker Trade Dress in the United States in connection with its dual protein shaker bottle products. Through this extensive and continuous use, the OG DualShaker Trade Dress has become a well-known indicator of the origin and quality of Hydra Cup's DualShaker products and has acquired substantial secondary meaning in the marketplace.

1393.   Hydra Cup has expended a substantial investment to create unique and distinctive shaker bottle and lid designs which utilize the OG DualShaker Trade Dress, and has expended substantial time and resources for advertising and promoting the sales of Hydra Cup's DualShaker products.

1394.   By reason of the foregoing, Hydra Cup has become known for the high quality, high style and the distinctiveness of Hydra Cup's DualShaker.[192] By offering dual shaking capabilities, the DualShaker stands out in the fitness and exercise world as one of the most distinct designs available, with consumers instantly recognizing the DualShaker as originating from Hydra Cup. As such, Hydra Cup's DualShaker has taken on a distinctive meaning and association with Hydra Cup in the minds of consumers, and has acquired a strong source indicating quality, selling power and commercial

---

[191] *See* Ex. 96, Screenshots of HydraCup's OG DualShaker Trade Dress from 2012 to Present from Internet Archive (2012-2024) (showing Hydra Cup using the DualShaker Trade Dress as early as 2012, advertising and marketing the OG DualShaker, offering dealer programs, offering affiliate programs, offering international distribution, and offering the OG DualShaker for sale as early as 19 April 2012.)

[192] *See, e.g., id.* (showing Hydra Cup offering YouTube videos on the DualShaker in 2016.); *see also* Ex. 11, Hydra Cup's DualShaker Product Page on Amazon (showing customer reviews about the DualShaker's distinctive design: "I love this shaker bottle. It has made my gym routine simple. I have all I need in 1 bottle."; "I use it for pre-workout on one side and protein shake on the other. Makes it nice to not have to mix things at the gym."; "No mess, works perfectly, easy to carry around, holds a lot, and easy to clean. Perfect for someone on the go. This is my new favorite bottle.").

impression, all of which comprise the trade dress of Hydra Cup, thereby representing valuable goodwill owned exclusively by Hydra Cup.

1395.   Consumers identify the OG DualShaker Trade Dress as having a common source in Hydra Cup, and the OG DualShaker Trade Dress has acquired a secondary meaning identifying Hydra Cup as the source of the OG DualShaker product. BlenderBottle has used without authorization and has intentionally imitated the OG DualShaker Trade Dress and has infringed Hydra Cup's exclusive rights in its OG DualShaker Trade Dress in violation of 15 U.S.C. § 1125(a).

1396.   The trade dress embodied in Hydra Cup's OG DualShaker is non-functional because competitors have numerous alternative designs, including, inter alia, the VOLTRX Premium Electric Protein, the Promixx Pursuit Shaker Bottle, and the SHAKESPHERE Tumbler: Protein Shaker Bottle and Smoothie Cup, just to name a few. Due to its distinct design and sticking out from all other shaker bottles, Hydra Cup's OG DualShaker Trade Dress developed secondary meaning quickly and serves to indicate Hydra Cup as the source of the OG DualShaker.

1397.   BlenderBottle's use of Hydra Cup's OG DualShaker Trade Dress without Hydra Cup's consent constitutes trade dress infringement in violation of 15 U.S.C. § 1125(a).

1398.   Hydra Cup is informed and believe and based thereon allege that BlenderBottle's unlawful and unauthorized appropriation and use of the OG DualShaker Trade Dress in connection with BlenderBottle's Infringing Products was undertaken purposefully, willfully and deliberately with the intention to cause confusion, mistake and deception; to deceive and mislead the public as to the identity of the company purporting to be the source of BlenderBottle's Infringing Products; to derive benefit from and trade upon the reputation and goodwill of Hydra Cup and to injure Hydra Cup. BlenderBottle's actions are likely to cause confusion or to mislead or deceive the public, since BlenderBottle is not in fact authorized to use Hydra Cup's trade dress and is not affiliated in any way with Hydra Cup.

1399.   Hydra Cup is informed and believes and based thereon alleges that the use by BlenderBottle of the trade dress embodied in Hydra Cup's DualShaker with respect to the marketing of BlenderBottle's

1    Infringing Products is likely to deceive purchasers thus causing them to purchase BlenderBottle's

2    Infringing Products being offered for sale by BlenderBottle believing it to be Hydra Cup's

3    DualShaker, thereby resulting in a loss of sales to Hydra Cup.



5   *BlenderBottle's Infringing Products: BlenderBottle Classic V2—BB-0038396 (BB-0038396), BlenderBottle ProStack*
6   *(BB-0038397), The BlenderBottle Pro (BB-0038398), BlenderBottle Classic V1 (BB-00383100)*

7   1400.   BlenderBottle's Infringing Products embody the key distinctive elements of the OG DualShaker

8         Trade Dress, including, *inter alia*, the cylindrical bottle design, the domed lid design, the spout and

9         spoutguard, the brackets with the pivoting arm, and the finger carry loop.

10  1401.   Hydra Cup has no control over the quality of BlenderBottle's Infringing Products sold by

11        BlenderBottle, and because of the confusion as to the source engendered by BlenderBottle, Hydra

12        Cup's valuable good will in respect to its aforesaid trade dress is at the mercy of BlenderBottle.

13  1402.   As a direct result of BlenderBottle's actions, Hydra Cup has been injured and there is a substantial

14        likelihood that Hydra Cup will suffer further, immediate and irreparable injury to its name, business

15        reputation and goodwill and that Hydra Cup will be deprived of the value of its name and trade dress

16        as commercial assets, for which damages alone will be inadequate.

1403.   If BlenderBottle and its officers, agents, servants and employees and others acting in concert with them, are not enjoined and restrained from selling and offering for sale BlenderBottle's Infringing Products which imitates Hydra Cup's OG DualShaker Trade Dress, Hydra Cup will suffer immediate and irreparable harm.

1404.   BlenderBottle has acted intentionally, willfully, maliciously and with conscious indifference to the consequences, which actions and intentions constitute aggravating circumstances authorizing the award of damages, attorneys' fees and the costs of this action.

1405.   BlenderBottle's trade dress infringement will continue unless enjoined by this court. Hydra Cup is therefore entitled to injunctive relief and damages pursuant to the provisions of 15 U.S.C. § 1116(a) and 15 U.S.C. § 1117.

**COUNTERCLAIM LXXI: (FALSE DESIGNATION OF ORIGIN, PASSING OFF, AND FEDERAL UNFAIR COMPETITION UNDER, AND DILUTION 15 U.S.C. § 1125(A)).**

1406.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1407.   This is a claim for unfair competition and false designation of origin arising under 15 U.S.C. § 1125(a) against BlenderBottle.

1408.   BlenderBottle's Infringing Products use a shaker bottle and lid trade dress confusingly similar to the OG DualShaker Trade Dress and they embody the key distinctive elements of the OG DualShaker Trade Dress, including the cylindrical bottle design, the domed lid design, the spout, the spoutguard, the brackets with the pivoting arm, and more.

1409.   BlenderBottle's use of trade dress confusingly similar to the OG DualShaker Trade Dress is likely to cause confusion, mistake, and deception among the relevant consuming public as to the source or origin of BlenderBottle's Infringing Products and has caused and is likely to continue to cause the public to believe, contrary to fact, that BlenderBottle's Infringing Products are sold, authorized, sponsored, or approved by Hydra Cup, or that BlenderBottle is affiliated, connected, or associated with Hydra Cup.

1410.   Hydra Cup has no control over BlenderBottle's Infringing Products manufactured and sold by BlenderBottle, and any failure, default, or neglect by BlenderBottle in providing such goods will reflect adversely on Hydra Cup as the believed source of origin thereof, thus hampering efforts by Hydra Cup to continue to protect the outstanding reputation of Hydra Cup's DualShaker.

1411.   BlenderBottle's use of the OG DualShaker Trade Dress without Hydra Cup's consent constitutes false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such entity with another entity, or as to the origin, sponsorship, or approval of its goods or commercial activities by another entity in violation of 15 U.S.C. § 1125(a).

1412.   As a result of the foregoing activities, Hydra Cup has suffered substantial damages and BlenderBottle has acquired substantial profits, at Hydra Cup's expense.

1413.   Upon information and belief, BlenderBottle's use of confusingly similar trade dress has been intentional and willful, making this an exceptional case within the meaning of 15 U.S.C. § 1117.

1414.   BlenderBottle's actions have caused and are continuing to cause Hydra Cup irreparable harm. Hydra Cup has no adequate remedy at law and is entitled to an injunction under 15 U.S.C. § 1116 restraining BlenderBottle, its agents, employees, representatives and all persons acting in concert with it from engaging in further acts of infringement.

1415.   Hydra Cup is further entitled to recover its actual damages, BlenderBottle's profits, enhanced damages and costs pursuant to 15 U.S.C. § 1117(a), and prejudgment interest on all monetary awards.

**COUNTERCLAIM LXXII: (MONOPOLIZATION UNDER 15 U.S.C. § 2).**

1416.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1417.   BlenderBottle has attempted to monopolize and monopolized the market for the "classic simple shaker" in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

1418.   The acts complained of violate the Sherman Act § 2, 15 U.S.C. § 2 in that BlenderBottle alone and in combination with their exclusive distributors, are monopolizing or attempting to monopolize trade in "classic simple shakers."

1419.   BlenderBottle has attempted to monopolize the relevant markets in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

1420.   BlenderBottle's activities are anticompetitive and predatory and were individually undertaken with the specific intent to inhibit competition, control prices and create and maintain BlenderBottle's monopoly in the "classic simple shaker" bottle, lid, and agitator market.

1421.   There is a dangerous probability that BlenderBottle will succeed in its attempt to monopolize or maintain its monopolies in the "classic simple shaker" market.

1422.   On information and belief, BlenderBottle willfully engaged in the actions, as alleged above, which constitute violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and specifically intended to monopolize the relevant markets.

1423.   In addition, BlenderBottle has monopolized the relevant markets in the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

1424.   Upon information and belief, BlenderBottle's aforesaid monopolization has consisted of BlenderBottle obtaining a monopoly in the market for "classic simple shaker" bottles and lids with spherical wire mixing mechanisms, with a market share of, upon information and belief, approximately 70% or more, and engaging in the above alleged predatory and/or anticompetitive conduct to maintain its monopoly power, including by asserting fraudulently procured and invalid patents and trade dress rights against competitors like Hydra Cup.

1425.   The relevant market is "classic simple shaker" bottles and lids with mixing mechanisms, such as wire whisk balls or blender bottles with integrated agitators, in the United States. These products are not reasonably interchangeable with other products, such as regular water bottles or beverage

containers without mixing mechanisms, because they serve the distinct purpose of allowing consumers to mix protein shakes, smoothies, and other beverages on-the-go.

1426.   BlenderBottle's actions, as alleged above, have unlawfully injured competition in and adversely affected interstate commerce and business activities in interstate commerce.

1427.   BlenderBottle's actions, as alleged above, have injured competition in the relevant market by excluding competitors, inhibiting innovation, and allowing BlenderBottle to charge higher, unreasonable prices for its products.

1428.   There are significant barriers to entry in the relevant market, including the need for specialized manufacturing capabilities, brand recognition, and a broad retail and distribution network. BlenderBottle has also erected additional barriers through its pattern of asserting fraudulently obtained and invalid intellectual property rights against new entrants, with the purpose and effect of deterring competition.

1429.   BlenderBottle's conduct is not justified by any legitimate business or pro-competitive purpose. Any purported pro-competitive benefits of its actions are outweighed by their anticompetitive effects.

1430.   As a direct and proximate result of BlenderBottle's monopolization of the relevant market, Hydra Cup has been injured in its business and property, including by losing sales and profits due to BlenderBottle's exclusionary conduct and by incurring costs to defend against BlenderBottle's sham litigation. As a result, Hydra Cup has suffered damages in an amount to be established at trial in excess of $100,000 exclusive of costs and interest.

1431.   Hydra Cup is entitled to an award of damages, including an amount up to three times the amount found as actual damages, attorneys' fees and costs, under 15 U.S.C. § 15.

1432.   Moreover, BlenderBottle's monopolization is ongoing and, unless enjoined, will continue to cause irreparable harm to Hydra Cup and to competition in the relevant market unless BlenderBottle, their officers, agents, servants, employees, attorneys, and those persons acting in concert with Hydra Cup are permanently enjoined from continuing such actions.

**COUNTERCLAIM LXXIII: (PATENT AND TRADE DRESS MISUSE).**

1433.   Hydra Cup realleges and incorporates by reference its allegations in each and every paragraph of this Third Amended Answer, Defenses, and Counterclaims as if fully set forth herein.

1434.   BlenderBottle has engaged in a pattern of patent misuse by attempting to improperly extend its monopoly over the "classic simple shaker" bottle and lid design beyond the lawful scope and term of its patent rights.

1435.   BlenderBottle previously sought and obtained design and utility patent protection for the "classic simple shaker" bottle and lid design, including the D235 Patent, the D551 Patent, the D798 Patent, the 024 Patent, the 830 Patent, the 843 Patent, and the 877 Patent, among many others. These patents granted BlenderBottle exclusive rights to the patented designs for a limited term in exchange for public disclosure of the invention.

1436.   Upon expiration of the patents, the "classic simple shaker" bottle and lid design rightfully entered the public domain, free for all to use and practice. The public has a fundamental right to copy and use designs that are no longer patent-protected.

1437.   However, BlenderBottle has attempted to circumvent this public policy and improperly monopolize the "classic simple shaker" bottle and lid design indefinitely by filing for registered trade dress protection on the same designs that were the subject of its expired patents, including the 019 Lid Trade Dress and the 626 Agitator Trade Dress.

1438.   By claiming trade dress rights in designs that were previously protected by patents, BlenderBottle is attempting to extend its exclusive rights beyond the lawful patent term and prevent others, including Hydra Cup, from using designs that have rightfully entered the public domain. This conduct undermines the bargain of the patent system, which grants temporary exclusivity in exchange for public disclosure and dedication to the public upon expiration.

1439.   BlenderBottle's trade dress registrations are nothing more than an attempt to gain a perpetual monopoly on formerly patented designs and to exclude all competition in the market for "classic

1  simple shaker" bottles and lids. This is an abuse of the patent and trade dress system and constitutes

2  patent

1440.   As a direct and proximate result of BlenderBottle's patent misuse, competition has been harmed, and Hydra Cup has suffered damages in an amount to be determined at trial. BlenderBottle's misconduct has also harmed the public interest by depriving the public of the right to use and benefit from designs that are no longer patent-protected.

1441.   BlenderBottle's patent misuse renders its patents and trade dress registrations unenforceable, and Hydra Cup is entitled to a declaration of unenforceability and an injunction preventing BlenderBottle from enforcing these intellectual property rights against Hydra Cup and others.

## OTHER COUNTERCLAIMS

1442.   Hydra Cup reserves its right to assert and rely upon such other applicable counterclaims as may be available or apparent during discovery and investigation. Such counterclaims may include the application of additional, yet to be discovered, prior art that would invalidate BlenderBottle's Asserted Patents or Equivalent Patents pursuant to the Patent Laws of the United States. Other counterclaims may include invalidation of BlenderBottle's Asserted Patents, Equivalent Patents, Asserted Trade Dresses, or Related Trademarks for inequitable conduct if evidence of supporting such a claim arises during discovery or evidence indicating that this case is exception under 35 § U.S.C. 285.

## PRAYER FOR RELIEF

Wherefore, Defendants Hydra Cup and Mr. Raymus respectfully requests this Court enter judgment against Plaintiff BlenderBottle and issue an order:

a.   Dismissing BlenderBottle's Complaint with prejudice and denying each request for relief made by BlenderBottle's therein;

b.  Declaring the D047 License Agreement granting Hydra Cup substantial rights in U.S. Patent No. D666,047 between Tianqi and Hydra Cup is valid and enforceable;

c.  Declaring the implied license granting Hydra Cup substantial rights in U.S. Patent No. D766,029 and U.S. Patent No. D666,047 between Tianqi and Hydra Cup is valid and enforceable;

d.  Declaring the D235 Patent expired on 04 October 2019 and that the "Bottle" design disclosed therein was granted to the public domain on 04 October 2019;

e.  Declaring BlenderBottle has not developed secondary meaning in the bottle design claimed by the expired D235 Patent since it expired on 04 October 2019 and that the "Bottle" design disclosed therein is available and free for the public to copy and use;

f.  Declaring that the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid do not infringe the D235 Patent because the D235 Patent expired before such products were offered or sold.

g.  Declaring that each claim of the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, the D540 Patent, the 830 Patent, the 060 Patent, 024 Patent, 843 Patent, and the 877 Patent is invalid for lack of novelty and lack of originality, as such claim are anticipated by and obvious over the prior art;

h.  Declaring that each claim of the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent is invalid for lack of ornamentality, as each patent claims a design that is primarily dictated by function and therefore lacks the requisite ornamentality;

i.  Declaring that the D551 Patent, the D478 Patent, and the 830 Patent are unenforceable due to inequitable conduct on the USPTO;

j.  Declaring that the D235 Patent, the D551 Patent, the D798 Patent, the D065 Patent, the D478 Patent, the D038 Patent, the D119 Patent, the D149 Patent, and the D540 Patent are each unenforceable due to lack of protectable scope after screening each patent for primarily functional design elements and prominent design elements disclosed by prior art that belong to the public domain;

k.  Declaring that Hydra Cup has not directly or indirectly infringed, induced infringement of, or contributed to the infringement of any valid and enforceable claim, if any, of the Asserted Patents or Equivalent Patents;

l.  Declaring that the manufacture, use, offer to sell, sale, and/or importation into the United States of the TS1314 OG Regular Shaker, the TS1327 OG Mini Shaker, the TS1352 OG Storage Shaker, the TS1038 Jumbo Shaker, the GOAT Shaker, and the HC OG Carry Loop Lid, has not and does not directly or indirectly infringe any valid and enforceable claim, if any, of the Asserted Patents or Equivalent Patents;

m.  Declaring that the Asserted Trade Dresses and Related Trademarks are generic and therefore not protectable under the Lanham Act;

n.  Declaring that the designs claimed by the 019 Lid Trade Dress, the 626 Agitator Trade Dress, the Unregistered Label Trade Dress, and the Unregistered Bottle Trade Dress are primarily functional and are therefore invalid and not protectable under the Lanham Act;

o.  Declaring the Asserted Trade Dresses and Related Trademarks have not developed secondary meaning and are therefore invalid and not protectable under the Lanham Act;

p.  Declaring the 019 Lid Trade Dress is unenforceable due to inequitable conduct on the USPTO;

q.  Ordering the following Asserted Trade Dresses and Related Trademarks to be canceled: U.S. Trademark Registration No. 6,800,019 (the "019 Lid Trade Dress", U.S. Trademark Registration No. 6,245,626 (the "626 Agitator Trade Dress"), U.S. Trademark Registration No. 4,894,363 (the "BLENDERBOTTLE Mark"), and U.S. Trademark Registration No. 3,515,591 (the "BLENDER BOTTLE Mark");

r.  Declaring the Unregistered Bottle Trade Dress and Unregistered Label Trade Dress are invalid and unenforceable;

s.  Declaring Hydra Cup has not infringed and does not infringe the 019 Lid Trade Dress, the 626 Agitator Trade Dress, the Unregistered Bottle Trade Dress, the Unregistered Label Trade Dress, the "BLENDERBOTTLE Mark, or the BLENDER BALL Mark;

t.  Declaring Hydra Cup's OG DualShaker Trade Dress has developed secondary meaning, is not primarily functional, and is therefore valid and enforceable;

u.  Adjudging BlenderBottle to have infringed Hydra Cup's OG DualShaker Trade Dress under 15 U.S.C. § 1125;

v.  Adjudging BlenderBottle to have infringed Hydra Cup's licensed rights in U.S. Patent No. D666,047 under 35 U.S.C. § 271;

w.  Ordering that BlenderBottle account for all gains, profits, and advantages derived through BlenderBottle's infringement of the D047 Patent in violation of 35 U.S.C. § 271, and that BlenderBottle pay to Hydra Cup all damages suffered by Hydra Cup from such infringement and all profits from such infringement pursuant to 35 U.S.C. §§ 284 and 289;

x.  Awarding damages adequate to compensate Hydra Cup for BlenderBottle's infringement of the D047 Patent, but in no event less than a reasonable royalty, together with prejudgment interest and costs;

y.  A judgment that BlenderBottle's infringement of the D047 Patent has been willful and an award of enhanced damages under 35 U.S.C. § 284;

z.  A permanent injunction enjoining BlenderBottle and its officers, directors, agents, servants, employees, affiliates, divisions, branches, subsidiaries, parents and all others acting in active concert or participation with it, from infringing the D047 Patent and the OG DualShaker Trade Dress;

aa.  Adjudging BlenderBottle to have misused the Asserted Patents, Equivalent Patents, and Asserted Trade Dresses to attempt to obtain improper perpetual patents through trade dress protection;

bb.  Adjudging BlenderBottle has attempted to monopolize and monopolized the shaker bottle markets in the United States in violation of 15 U.S.C. § 2.

cc.  Declaring this case is an exceptional case in favor of Hydra Cup under 35 U.S.C. § 285 and 15 U.S.C. § 1117(a) and an award of Hydra Cup's reasonable attorney fees;

dd.  Awarding Hydra Cup costs under Fed. R. Civ. P. 54(d);

ee.  Declaring Hydra Cup the prevailing party and awarding costs and attorney fees to Hydra Cup;

ff.   Treble damages;

gg.   Pre-judgement interests and post-judgement interests on all damages, costs, and fees;

hh.   Awarding Hydra Cup such other and further relief as the Court deems just and equitable.

**JURY DEMAND:** Defendants Hydra Cup and Mr. Raymus hereby demand a trial by jury on all issues so triable.

**Dated**: 01 July 2024

Respectfully submitted,

By: /s/Meghan Pratschler/
Meghan Pratschler
CA Bar No.: 324970
Meghan the Attorney, LLP
95 3rd St. 2nd Floor
San Francisco, CA 94103-3103
meghan@meghantheattorney.com
(415) 335-9226

-and-

By: /s/Casey Scott McKay/
Casey Scott McKay
TN Bar No.: 034028
MC Law, PLLC
1441 U St. NW, Suite 102
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

*Attorneys for Defendants TRRS Magnate, LLC dba Hydra Cup and Thomas Raymus, an Individual.*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was filed using this Court's CM/ECF

notification service, which sent notification of such filing to all pro se parties and counsel of

record on 01 July 2024.

KNOBBE MARTENS OLSON & BEAR
Sean Murray (SBN 213,655)
sean.murray@knobbe.com Ali S. Razai (SBN 246,922)
ali.razai@knobbe.com
Jacob R. Rosenbaum (SBN 313,190)
jacob.rosenbaum@knobbe.com
Christian D. Boettcher (SBN 342,950)
christian.boettcher@knobbe.com

KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614
Phone: (949) 760-0404
Facsimile: (949) 760-9502

By: /s/Meghan Pratschler/
Meghan Pratschler
CA Bar No.: 324970
Meghan the Attorney, LLP
95 3rd St. 2nd Floor
San Francisco, CA 94103-3103
meghan@meghantheattorney.com
(415) 335-9226

-and-

By: /s/Casey Scott McKay/
Casey Scott McKay
TN Bar No.: 034028
MC Law, PLLC
1441 U St. NW, Suite 102
Washington, DC, D.C. 20009
202.743.1972
casey@mclaw.io

*Attorneys for Defendants TRRS Magnate, LLC dba Hydra Cup and Thomas Raymus, an Individual.*

**EXHIBITS**

Exhibit 1, Declaration of Attorney Casey Scott McKay

Exhibit 2, Deposition Transcript of Thomas Raymus (13 Dec. 2023)

Exhibit 3, Hydra Cup's TS1327 Mini OG Shaker Bottle (Picture) (HC0180552)

Exhibit 4, Hydra Cup's TS1314 Regular OG Shaker Bottle (Picture) (HC0180553)

Exhibit 5, Hydra Cup's TS1352 Storage Shaker Bottle (Picture) (HC0180554)

Exhibit 6, Hydra Cup's Jumbo Shaker Bottle (Picture) (HC0180555)

Exhibit 7, Hydra Cup's GOAT Shaker Bottle (Picture)

Exhibit 8, Hydra Cup's Accused Lid (Picture) (HC0180557)

Exhibit 9, Hydra Cup's Accused Shaker Bottle Label (Picture)

Exhibit 10, Hydra Cup's Accused Spherical Agitator and Accused Dumbbell Agitator (Picture)

Exhibit 11, Hydra Cup's DualShaker Product Page on Amazon

Exhibit 12, U.S. Patent No. D666,047 (filed 14 Apr. 2011)

Exhibit 13, U.S. Patent No. D766,029 (filed 22 July 2015)

Exhibit 14, U.S. Patent No. D510,235 (filed 09 Sept. 2003)

Exhibit 15, U.S. Patent No. D696,551 (filed 07 Sept. 2012)

Exhibit 16, U.S. Patent No. D697,798 (filed 06 June 2013)

Exhibit 17, U.S. Registration No. 6,800,019 (the "019 Lid Trade Dress")

Exhibit 18, U.S. Registration No. 6,245,626 (the "626 Agitator Trade Dress")

Exhibit 19, (CONFIDENTIAL) BlenderBottle's Unregistered Label Trade Dress (Picture)

Exhibit 20, (CONFIDENTIAL) BlenderBottle's Unregistered Bottle Trade Dress from "Bottle Trade Dress Design Elements" from BlenderBottle's Cease and Desist Letter to California Innovations.

Exhibit 21, U.S. Trademark Registration No. 4,894,363

Exhibit 22, U.S. Trademark Registration No. 3,515,591

Exhibit 23, U.S. Patent No. D644,065 (filed 29 Sept. 2010)

Exhibit 24, U.S. Patent No. D748,478 (filed 06 June 2013)

1      Exhibit 25, U.S. Patent No. D820,038 (filed 29 Apr. 2015)

2      Exhibit 26, U.S. Patent No. D900,540 (filed 30 Apr. 2020)

3      Exhibit 27, U.S. Patent No. D830,119 (filed 24 Aug. 2017)

4      Exhibit 28, U.S. Patent No. D897,149 (filed 11 June 2018).

5      Exhibit 29, U.S. Patent No. 8,695,830 (filed 11 Sept. 2012)

6      Exhibit 30, U.S. Patent No. 11,111,060 (filed 19 Apr. 2018)

7      Exhibit 31, U.S. Patent No. 6,379,032 (filed 18 February 2000)

8      Exhibit 32, U.S. Patent No. 9,216,843 (filed 05 June 2014)

9      Exhibit 33, U.S. Patent No. 9,492,024 (filed 02 October 2012)

10      Exhibit 34, U.S. Patent No. 10,165,877 (filed 07 May 2016)

11      Exhibit 35, BlenderBottle's Asserted and Infringing Products: the BlenderBottle
12  Classic V2—BB-0038396 (BB-0038396), BlenderBottle ProStack (BB-0038397), The
13  BlenderBottle Pro (BB-0038398), The BlenderBottle Mini (BB-0038399), BlenderBottle
14  Classic V1 (BB-00383100).

15      Exhibit 36, BlenderBottle Classic V2 (BB-0038396)

16      Exhibit 37, BlenderBottle ProStack (BB-0038397)

17      Exhibit 38, The BlenderBottle Pro (BB-0038398)

18      Exhibit 39, The BlenderBottle Mini (BB-0038399)

19      Exhibit 40, BlenderBottle Classic V1 (BB-00383100)

20      Exhibit 41, Email Between Hydra Cup, Tianqi, and Chris McCarthy Regarding
21  Tianqi's Product Catalog (March 2019)

22      Exhibit 42, Tianqi Product Catalog (March 2019)

23      Exhibit 43, Emails Between Hydra and Alec of Tianqi Regarding New Mold Quote for
24  OG shaker (25 November 2020 - January 2021)

25      Exhibit 44, Tianqi's STP File for the TS1314 Shaker Based on Tianqi's D047 Patent

26      Exhibit 45, BlenderBottle Private Label Licensing Program (Screenshots from
27  Internet Archive of BlenderBottle's websites over time) (2011-2014)

28      Exhibit 46, Emails Between Hydra Cup and Tianqi Regarding the D047 Patent (09
29  September 2022)

30      Exhibit 47, Transcript of Deposition of Jeff Harlan (February 2024).

31      Exhibit 48, License Agreement Between Tianqi and Hydra Cup for U.S. Patent
32  No. D666,047 (27 September 2022)

Exhibit 49, (CONFIDENTIAL) Hydra Cup's Fifth Amended Answers and Responses to BlenderBottle's Interrogatories (served Feb. 2024)

Exhibit 50, U.S. Patent Registration No. 3,820,692 (filed 16 April 1973)

Exhibit 51, U.S. Patent Registration No. D421,547 (filed 5 May 1999)

Exhibit 52, Great Shakers Shaker Bottle (Screenshot from Internet Archive) (10 Feb. 2003)

Exhibit 53, Lauren Levy Marshall, Rick Stella, "The 5 best blender bottles we tested in 2023 for easy protein shakes" (BB16684) (17 January 2023)

Exhibit 54, BlenderBottle Website Blog Article, "What is a Shaker Cup?" (21 Aug. 2017), *available at* https://www.blenderbottle.com/blogs/health/what-is-a-shaker-cup-anyway/).

Exhibit 55, Google Trends Data Comparing Blender Bottle to Shaker Bottle (21 April 2024)

Exhibit 56, D235 Patent Compared to Hydra Cup's Accused Products

Exhibit 57, D551 Patent Compared to Hydra Cup's Accused Products

Exhibit 58, Office Action U.S. Trademark Application Serial No. 90301455 (issued 01 March 2021)

Exhibit 59, BlenderBottle's Response to Office Action for U.S. Application Serial No. 90301455 (HC0170962-HC0171062) (filed 21 September 2021).

Exhibit 60, Specimens 1-5 from U.S. Application Serial No. 90301455

Exhibit 61, U.S. Patent No. D646,919 (filed 23 September 2010)

Exhibit 62, U.S. Patent No. D656,357 (filed 15 August 2011)

Exhibit 63, U.S. Patent No. 9,301,648 (filed 20 February 2014)

Exhibit 64, U.S. Patent No. D747,148 (filed 17 April 2014)

Exhibit 65, Body Nutrition's Blender Bottle Tall and Short With Carry Loop (screenshot taken 28 June 2024)

Exhibit 66, G Fuel Shaker (screenshot taken 28 June 2024)

Exhibit 67, Gatorade Shaker Bottle for Gym (screenshot taken 28 June 2024)

Exhibit 68, Velomix Shaker Cup and Wire Whisk Product Page on Amazon (screenshot taken 28 June 2024)

Exhibit 69, GOMOYO Blender Protein Shaker (screenshot taken 28 June 2024)

Exhibit 70 , Mr. Pen Shaker Bottle Product Page (screenshot taken 28 June 2024)

Exhibit 71, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 January 2021)

Exhibit 72, Cease and Desist Letter from BlenderBottle to Hydra Cup (21 March 2022)

Exhibit 73, Cease and Desist Letter from BlenderBottle to Hydra Cup (17 August 2022)

Exhibit 74, Prominent Design Elements in the Claimed Label Designs

Exhibit 75, Prominent Design Elements in the Shaker Bottles and Lids

Exhibit 76, Kathleen Tesori Affidavit (March 2024)

Exhibit 77, Ningbo Body Build Shaker (January 2007) (Internet Archive Screenshot) (HC0172423-HC0172423)

Exhibit 78, Energy First Shaker Bottle (Internet Archive Screenshot) (HC0172424-HC0172424)

Exhibit 79, Bodybuilding.Com Measurement Shaker Bottle (Internet Archive Screenshot) (23 June 2005) (HC0172425-HC0172426)

Exhibit 80, Shakerbottle.com Shaker Bottle (15 June 2012) (Internet Archive Screenshot) (HC0172427-HC0172427)

Exhibit 81, Spiderbottle Shaker Bottle (January 2012) (Internet Archive Screenshot) (HC0172428-HC0172428).

Exhibit 82, BlenderBottle ShakerBottle Tumbler (Internet Archive Screenshot) (HC0172429-HC0172429 (24 September 2011)

Exhibit 83, WinWee Shakerbottle Shaker Cup Shaker (Internet Archive Screenshot) (HC0172430-HC0172430) (17 June 2012)

Exhibit 84, Shakerbottle.cn (Internet Archive Screenshot) (HC0172431-HC0172431) 01 (October 2009)

Exhibit 85, SmartShake Carry Loop Caribener Storage Shaker (Internet Archive Screenshot) (HC0172432-HC0172434) (16 August 2010)

Exhibit 86, Core 150 Shaker Bottle with Compartments (Internet Archive Screenshot) (HC0172435-HC0172435) (26 October 2012)

Exhibit 87, Body Bottle Patented Spring (Internet Archive Screenshot) (HC0172436-HC0172436).

Exhibit 88, Cyclone Shaker Bottle (Internet Archive Screenshot) (HC0172437-HC0172437) (31 Janurary 2011)

Exhibit 89, Bodybuilding.com Shaker Bottle Products (Screenshot from Internet Archive) (14 March 2014).

Exhibit 90, Emails Between Hydra Cup and Tianqi Regarding PO1070-PO1074 (24 September 2020)

1      Exhibit 91, BlenderBottle Prostack Announced (27 September 2013)

2      Exhibit 92, U.S. Patent No. 8,646,895

3      Exhibit 93, U.S. Patent No. 8,833,586.

4      Exhibit 94, U.S. Patent No. 3,820,692

5      Exhibit 95, BlenderBottle Classic V1 on Walmart.com

6      Exhibit 96, Screenshots of HydraCup's OG DualShaker Trade Dress from 2012 to
7  Present from Internet Archive (2012-2024)

8      Exhibit 97, BlenderBottle Classic Sold on Amazon Under Different Brand Names
9  (screenshot from Internet Archive) (21 February 2012)

10     Exhibit 98, Smart Shaker with Carabiner Carry Loop on Amazon (2012)

11     Exhibit 99, Google Search Results Showing GNC and Target in Los Angeles,
12 California Selling BlenderBottle's Infringing Products (screenshot taken 24 June 2024)

13     Exhibit 100, BlenderBottle Classic Discontinued on Amazon (2024)

14     Exhibit 101, BlenderBottle Classic V1 on Amazon (2024)

15     Exhibit 102, Amazon Product Page of Hydra Cup Multi-Pack Shakers (10 June 2024)

16     Exhibit 103, Walmart.com "Blender Bottles" Product Category (screenshot taken 24
17 June 2024)

18     Exhibit 104, Purchase Order and Export Records for Laltec International from Tianqi
19 (14 December 2012)

20     Exhibit 105, Invoices and Purchase Orders from Tianqi for D047 Shaker Bottles (15
21 January 2013)

22     Exhibit 106, BrandMakers Purchase Order for D047 Patent "Arnold.com" Shaker
23 Bottles from Ningbo Tianqi to MusclePharm (14 October 2013)

24     Exhibit 107, Asserted, Accused, and Infringing Products Labeled Functional Elements
25 (created June 2024)